# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**                )
                                             )
**vs.**                                       )
                                             )
**JOEL IVERSON GILBERT,**                     )          Civil Action Number
**STEVEN GEORGE MCKINNEY,**                   )          **2:17-cr-00419-AKK-TMP**
**DAVID LYNN ROBERSON,**                      )
                                             )
      Defendants.                         )

## MEMORANDUM OPINION AND ORDER

The court has for consideration the Defendants' joint motion to dismiss the indictment. Doc. 55. The Defendants maintain that the alleged conduct—that they bribed a state legislator to take actions opposing the EPA's proposal to expand a Superfund site and add it to the National Priorities List—does not constitute honest services fraud or federal program bribery, and that the indictment violates the First Amendment and the rule of lenity. Doc. 55. For the reasons stated below, the motion is due to be denied.

## I. LEGAL STANDARD

An indictment or information "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7. It "must contain the elements of the offense intended to be charged, and sufficiently apprise the defendant of what he must be prepared to meet." *United*

*States v. Bobo*, 344 F.3d 1076, 1083 (11th Cir. 2003) (internal quotations omitted).

Defendants may move to dismiss an indictment when the facts alleged "fail[] to state an offense" as a matter of law. Fed. R. Crim. P. 12(b)(3(B)(v). "In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes." *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (emphasis in original). Courts must view the allegations "in the light most favorable to the government" and may not dismiss an indictment "on a determination of facts that should have been developed at trial." *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987).

## II.    FACTUAL BACKGROUND

In September 2013, the EPA notified five companies[1] that it was investigating their role in pollution around the 35th Avenue Superfund Site. Doc. 1. A year later, the EPA granted a petition from an environmental advocacy group, GASP, to assess whether to expand the Site into surrounding areas. *Id.* The EPA also proposed adding the Site to the National Priorities List ("NPL"),[2] potentially subjecting the companies to millions of dollars in cleanup costs. *Id.* In response to

---

[1] *See* United States Environmental Protection Agency, *General Notice Letters Sent to PRPs*, available at https://www.epa.gov/north-birmingham-project/general-notice-letters-sent-prps (last visited May 3, 2018).

[2] Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), the EPA is required to maintain a list of the hazardous waste sites most in need of cleanup, the National Priorities List. *See* 42 U.S.C. § 9605. Only sites listed on the NPL are eligible for Superfund-financed remedial action. *See* 40 C.F.R. § 300.425.

these proposals, the Governor of Alabama designated the Alabama Department of Environmental Management ("ADEM") as the state's representative on issues concerning the Site. *Id.* ADEM is a state agency charged with implementing and administering environmental programs, and it acts under the umbrella of the Alabama Environmental Management Commission ("AEMC"), which selects ADEM's director and develops the state's environmental policies.[3] *Id.* During the EPA's public comment period in January 2015, ADEM opposed adding the Site to the NPL and voiced its intent to request a formal review under the EPA's issue resolution process if the EPA did not withdraw its proposal. *Id.*

The indictment alleges that a conspiracy began in 2014, when David Roberson, who was the Vice President of Government and Regulatory Affairs of one of the five companies under investigation, along with Joel Gilbert and Steven McKinney, partners at a local law firm and chief legal counsel for Roberson's employer on environmental matters, purportedly hatched a plan to avoid or reduce the company's potential exposure to EPA assessed cleanup costs. *Id.* Allegedly, the Defendants enlisted the help of then-Alabama state representative Oliver Robinson, who agreed to harness his influence and take specific actions opposing the EPA's proposal, in return for monthly payments of $7,000 to his charitable organization, the Oliver Robinson Foundation. *Id.* To conceal the source and

_____

[3] *See* Alabama Department of Environmental Management, *ADEM Overview*, available at http://www.adem.state.al.us/inside/overview.cnt (last visited May 3, 2018).

3

purpose of the money, the Defendants purportedly funneled many of the payments to the Foundation through a shell corporation they created, Alliance for Jobs and the Economy ("AJE"), which also received contributions from other entities involved in the EPA investigation. *Id.* In total, the Defendants allegedly facilitated $360,000 in payments to Robinson's Foundation.

Part of the alleged agreement entailed an ongoing communications campaign, whereby Robinson and his Foundation "communicated . . . opposition to [the] EPA's actions to the residents of north Birmingham as directed by [the Defendants] through an organization formed for that purpose called Get Smart Tarrant." *Id.* Allegedly, the Defendants also instructed Robinson to meet with EPA officials and GASP, secretly record the meetings, and propound the Defendants' talking points. *Id.* The Defendants also allegedly directed Robinson to deliver a letter—ghostwritten by the Defendants and printed on Robinson's official Alabama House of Representatives letterhead—to the chair of AEMC requesting permission to appear before the agency to air his concerns with the EPA's proposal. *Id.* In private, however, Robinson expressed reservations to the Defendants about appearing before AEMC. *Id.* These reservations purportedly led the Defendants and Robinson to negotiate a formal written agreement between Robinson's Foundation and McKinney and Gilbert's law firm. *Id.* Allegedly, a few days after the Defendants directed the law firm to promptly issue a $14,000

check to his Foundation, Robinson and the Defendants executed a final written agreement, which contained a provision requiring confidentiality. *Id.* The next day, Roberson's employer paid the law firm $14,000, purportedly to reimburse the law firm for the money it had paid to Robinson's Foundation. *Id.*

Allegedly, after multiple days of preparation with the Defendants, Robinson appeared before AEMC and ADEM on February 20, 2015. *Id.* During his presentation, Robinson purportedly stated that calls from his constituents caused him, "as the vice chairman of the Jefferson County House delegation, to do some research on the Superfund designations and the NPL listings" and that he had "yet to see any information that shows . . . that this area should be designated as a Superfund site, not to mention being put on the NPL listing." *Id.* He also expressed concerns that the residents in and around the Site would not want "to live in a dump," with the attendant decline in property values, and warned of "decades of litigation" the proposal would create because "there have been no reports that these [five companies] are culpable in any way." *Id.* Robinson accordingly requested that AEMC try to convince the EPA to narrow the list of potentially responsible parties. *Id.* Robinson followed up two weeks later when he wrote a second letter on his official letterhead—again ghostwritten by the Defendants—requesting information about the Site from the ADEM Director and

AEMC members.  *Id.*  Robinson forwarded the ADEM Director's response to the Defendants.  *Id.*

Finally, the Government alleges that in May 2015 the Defendants drafted a joint resolution urging "the Attorney General and ADEM to combat the EPA's overreach."  *Id.*  Robinson, then a member of the Alabama House of Representatives' Rules Committee, allegedly voted in committee to advance the joint resolution to the floor.  The resolution was ultimately adopted by the House and the Senate, and signed by the Governor.  *Id.*

During the course of his advocacy against the EPA proposal, Robinson never disclosed the nature of his relationship with the Defendants.  *Id.*  Robinson was subsequently indicted and has pleaded guilty in this court to conspiracy, bribery, honest services wire fraud, three counts of wire fraud, and tax evasion.  *See United States v. Robinson*, 2:17-cr-00267-AKK-TMP.  Thereafter, the Government charged Roberson, Gilbert, and McKinney with (1) conspiracy in violation of 18 U.S.C. § 371 (Count One); (2) bribery in violation of 18 U.S.C §§ 666(a)(2) and 2 (Count Two); (3) honest services fraud in violation of 18 U.S.C. §§ 1343, 1346, and 2 (Counts Three–Five); and (4) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Six).  *See*  doc. 1.  The Defendants now move to dismiss the indictment.  Doc. 55.

## III.  ANALYSIS

Federal prosecutors enjoy a wide array of statutory options when filing bribery charges, including abstract crimes, such as honest services fraud, which prohibits "depriv[ing] another of the intangible right of honest services."  18 U.S.C §§ 1343, 1346.  Unlike the traditional understanding of fraud, "in which the victim's loss of money or property supplie[s] the defendant's gain, . . . the honest-services theory target[s] corruption [where] the betrayed party suffer[s] no deprivation of money or property; instead, a third party, who ha[s] not been deceived, provide[s] the enrichment."  *Skilling v. United States*, 561 U.S. 358, 400 (2010).  To address vagueness concerns arising from such broad language, the Supreme Court has narrowed the scope of Section 1343 and other similar anticorruption laws over the years.  In *United States v. Sun-Diamond Growers of California*, the Court interpreted the federal gratuities statute, 18 U.S.C. § 201(c), to require a "link" between the thing of value conferred and the official act.  526 U.S. 398, 406-14 (1999) (noting the "peculiar results" of a broader reading of § 201(c), such as criminalizing "token gifts to the President based on his official position and not linked to any identifiable act—such as the replica jerseys given by championship sports teams each year during ceremonial White House visits").  Subsequently, the Court limited Section 1343 to reach only "bribe-and-kickback" schemes.  *Skilling*, 561 U.S. at 408–10 (rejecting the argument that "undisclosed

self-dealing by a public official or private employee" constitutes honest services fraud under §§ 1343, 1346).

Significant here, the Court further circumscribed the reach of bribery law in *McDonnell v. United States*, where it clarified the meaning of an "official act" for purposes of honest services fraud or Hobbs Act extortion. 136 S. Ct. 2355 (2016). There, Virginia Governor Robert McDonnell and his wife accepted roughly $175,000 in gifts from an individual promoting a nutritional supplement. *Id.* at 2361-65. In exchange, McDonnell arranged meetings with various state officials, hosted events at the Governor's mansion promoting the product, and encouraged state university officials to study the product's nutritional benefits. *Id.* The parties agreed at trial that the Government had to show that, in return for the gifts, McDonnell performed, or agreed to perform, "official acts," as defined by a different bribery statute, Section 201(a)(3):

> [T]he term "official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

18 U.S.C. § 201. The district court instructed the jury accordingly, and further defined "official acts" to include "actions that have been clearly established by settled practice as part of a public official's position, even if the action was not taken pursuant to responsibilities explicitly assigned by law," and "acts that a

public official customarily performs," such as those "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end." 136 S. Ct. at 2373. The jury convicted McDonnell of honest services fraud and extortion, and the Fourth Circuit affirmed. *Id.* at 2366-67.

The Supreme Court reversed, finding that the district court's definition of "official act" was too broad. The Court created a two-pronged definition of "official act" under Section 201. First, the Government must identify a specific "question, matter, cause, suit, proceeding or controversy" that involves a "formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 2372-74. The identified question or matter must also be "specific and focused," and either currently "pending" or potentially "brought before a public official." *Id.* (internal quotations omitted). Second, the Government must prove that the public official either made a decision or took an action "on" that concrete "question, matter, cause, suit, proceeding or controversy," or agreed to do so. *Id.* Such decisions or actions "may include using his official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.* Ultimately, although the Court found McDonnell's conduct "distasteful," it held that "setting up a meeting, calling another public official, or

hosting an event does not, standing alone, qualify as an 'official act.'" *Id.* at 2368-75.

Relying heavily on *McDonnell*, the Defendants assert that the indictment: (1) fails to state an offense for honest services fraud under Section 1343; (2) fails to state an offense for federal program bribery under Section 666; and (3) violates the First Amendment and the rule of lenity. Doc. 55. The court addresses these contentions below, viewing the allegations in the light most favorable to the Government. *See Torkington*, 812 F.2d at 1354.

## A. The indictment sufficiently alleges honest services fraud.

The Defendants argue that the indictment fails to allege honest services fraud[4] because none of Robinson's purported actions meet *McDonnell*'s "official act" definition. Doc. 55 at 15-33. The Defendants do not dispute that the EPA's proposals to expand the Superfund Site to surrounding areas and add it to the NPL, and ADEM and AEMC's involvement in that process, were all pending "questions" or "matters" involving the "formal exercise of governmental power," as required by *McDonnell*'s first prong. *See* doc. 55 at 20-33. The Defendants' focus is thus on the second prong of *McDonnell*: whether the Defendants paid Robinson to make a decision or take any action "on" these pending matters. *See*

---

[4] The statute prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1343, 1346.

*McDonnell*, 136 S. Ct. at 2372-74.  For the reasons below, the court finds that, even assuming that an "official act" is required,[5] the indictment sufficiently alleges several such acts that satisfy *McDonnell*'s second prong.

### 1. Official Act #1: meeting with EPA officials

Robinson's meeting with EPA officials qualifies as an official act.  Doc. 1 at 17-27.  As the Defendants see it, merely "speaking with officials, or expressing support for a particular view are not official acts" because "Robinson was not engaging in any 'formal exercise of governmental power.'"  Doc. 55 at 21.  This contention conflates the two prongs of *McDonnell*.  The alleged "formal exercise of governmental power" involves the EPA's pending decisions regarding the Site rather than actions taken by Robinson.  *See McDonnell*, 136 S. Ct. at 2372-74.  Moreover, the indictment alleges conduct that exceeds the Defendants' framing of simply "speaking with officials" or "expressing support."  *See id.*  Allegedly, the Defendants paid Robinson to meet with the EPA and echo their talking points opposing the proposal.  Doc. 1 at 17-27.  And a Superfund-financed remedial action cannot proceed unless the state provides "assurances" beforehand, including agreeing to pay ten percent of the cleanup costs.  *See* 42 U.S.C. §§ 9604, 9605; *see*

---

[5] The Government argues that *McDonnell* did not "categorically require proof of an official act" to prove honest services fraud, and that the term "became part of the case after the parties agreed to use it in the jury instructions."  Doc. 83 at 23; *see McDonnell*, 136 S. Ct. at 2375 ("For purposes of this case, the parties defined honest services fraud and Hobbs Act extortion with reference to § 201.").

*also* 40 C.F.R. § 300.510 ("A Fund-financed remedial action undertaken pursuant to CERCLA section 104(a) *cannot proceed unless a state provides its applicable required assurances* . . . prior to the initiation of remedial action.") (emphasis added). Therefore, unlike an op-ed in a newspaper or a press release, Robinson's actions were purportedly designed to put the EPA on notice that, as a state legislator, he would oppose granting such assurances. *See* 42 U.S.C. §§ 9604, 9605; 40 C.F.R. § 300.510. Such conduct goes far beyond "[s]imply expressing support." *See McDonnell*, 136 S. Ct. at 2371-72. Consequently, the indictment sufficiently alleges that the Defendants intended that Robinson's advice would "form the basis" for the EPA's "formal exercise of governmental power." *See id.* at 2372-74.

The Defendants' assertion that Robinson was not using his "official position" when he met with the EPA because "anyone can advocate a position on behalf of a political ally at a meeting," doc. 55 at 24, is also unavailing. Governmental agencies are not in the practice of granting "anyone" a private forum. Doing so would prove impracticable. Indeed, one of the central purposes of CERCLA's public participation provision is to allow constituents to submit comments in a structured, unified forum. *See* 42 U.S.C. § 9617(a)(2) (providing for "a reasonable opportunity for submission of written and oral comments and an opportunity for a public meeting at or near the facility at issue regarding the

proposed plan"). In this regard, Robinson likely received a private meeting *precisely because of* his official position as a state representative from Jefferson County. *See United States v. Biaggi*, 853 F.2d 89, 99 (2d Cir. 1988) ("[B]oth of the deputy mayors . . . testified at trial that it was not unusual for a congressman to intercede for a constituent on city matters; Biaggi easily gained their attention precisely because he was a congressman."). The court therefore rejects the Defendants' assertion that "a private citizen could have done the same thing," doc. 55 at 24, and the secondary contention that Robinson's actions could not constitute an official act because "[t]he EPA is a *federal* agency, while Robinson was a *state* official," *id.* at 25. As the Second Circuit put it when rejecting a similar contention, "we see no basis for ruling that a congressman's official acts—especially those 'demonstrating Congressional interest'—may not include efforts that are directed toward local rather than federal officials." *See Biaggi*, 853 F.2d at 99.

### 2. Official Act #2: AEMC and ADEM meeting and communications

The indictment also sufficiently alleges that Robinson's appearance before and communications with AEMC and ADEM constituted official acts. Robinson purportedly wrote to AEMC on his official state legislature letterhead requesting permission to appear at the agency's meeting, and, once there, spoke in his capacity as "the vice chairman of the Jefferson County House delegation." Doc. 1

at 20, 24. This conduct supports a contention that Robinson "us[ed] his official position" to "advise another official." *McDonnell*, 136 S. Ct. at 2372. Moreover, the indictment sufficiently alleges that the Defendants directed Robinson to engage in this conduct. They apparently instructed Robinson to communicate with these agencies, dictated the precise contents of Robinson's communications, and held several conference calls to rehearse Robinson's talking points. Doc. 1 at 18-24. These allegations, viewed in the light most favorable to the Government, show that the Defendants intended that Robinson "advise" the agencies, "intending that such advice [would] form the basis for an 'official act' by" the agencies—i.e., formally opposing the EPA's proposals and narrowing the list of responsible parties. *See McDonnell*, 136 S. Ct. at 2370-74 (commenting that even "a decision or action on a qualifying step, such as narrowing down the list of potential research topics . . . would qualify as an 'official act'").

The court is not persuaded by the contention that Robinson's appearance before AEMC and ADEM was not an official act because Robinson "had no control over what these agencies would do with respect to the Superfund plan," and did not "threaten to hold an oversight hearing or withhold agency funding unless the state agencies did what he wanted." Doc. 55 at 21-22. Actual control

over the ultimate decision is not necessary.[6]  Rather, *McDonnell* requires only that the bribee use his official position to either "exert pressure" on or "provide advice" to a second official.[7]  *See McDonnell*, 136 S. Ct. at 2372.  Robinson's alleged conduct before AEMC and ADEM satisfies this requirement.  Contrary to the Defendants' contention, *see* doc. 93 at 19, Robinson's conduct is different from the conduct in *United States v. Jefferson*, 289 F. Supp. 3d 717, No. 1:07-cr-209, 2017 WL 4423258, at *16 (E.D. Va. 2017), where the court found that writing a letter on official letterhead, standing alone, is insufficient to satisfy the exertion of "pressure" requirement.  The indictment here alleges far more than a single letter or phone call expressing support for an action.  Moreover, the reliance on *Jefferson* ignores that "exert[ing] pressure on another official to perform an 'official act'" is only one of at least two ways that a public official can act "on" a "matter" under *McDonnell*.  As the Court explained, decisions or actions on a pending matter

---

[6] *See United States v. Menendez*, 291 F.Supp.3d 606, No. 15-155, 2018 WL 526746, at *5-8 (D.N.J. 2018) (holding that a rational jury could conclude that a senator's calls to federal agency officials to obtain favorable consideration of visa applications, and encourage a change to Medicare's billing policies were "official acts" under *McDonnell*, even though individuals senators have no formal control over these agencies); *United States v. Fattah*, 223 F. Supp. 3d 336, 362 (E.D. Pa. 2016) (house representative's hand-delivery of a letter to the President recommending the alleged briber for an ambassadorship was an official act, even though "as a Congressman he had no role in the naming of ambassadors"); *United States v. Lee*, No. 1:15-CR-445, 2016 WL 7336529, at *3 (N.D. Ohio Dec. 19, 2016) (holding that "exerting pressure" does not require any "authority or leverage over the other official").

[7] The Defendants also challenge causation, arguing that ADEM had "already informed the EPA of the State's conclusive opposition to" the proposal several months before the AEMC meeting, and that the Defendants "could not possibly have paid Robinson to influence a 'request' to the EPA that the State had *already made*."  Doc. 55 at 25.  But this argument goes to the merits of the Government's case, not the sufficiency of the indictment.

"*may include* using [one's] official position to exert pressure on another official to perform an 'official act,' *or* to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *McDonnell*, 136 S. Ct. at 2372 (emphasis added). The term "may include" indicates that the stated examples comprise a non-exhaustive list, while the word "or" places the two clauses in the disjunctive. *See id.* In other words, "advis[ing] another official," without exerting any pressure, could qualify as an official act under § 201. *See id.* Accordingly, even if Robinson exerted no pressure on the agencies, the indictment sufficiently alleges that the Defendants intended for Robinson to "advise" the agencies and that "such advice [would] form the basis for" the agencies to oppose the EPA's proposal.[8]

### 3. Official Act #3: voting to advance a resolution

The third official act outlined in the indictment is Robinson's alleged vote in a committee meeting on a resolution that the Defendants purportedly drafted and

---

[8] *McDonnell* gives little guidance as to what qualifies as "advice," but cited *United States v. Birdsall*, 233 U.S. 223, 234 (1914), which found "official action" on the part of subordinates "where their superiors would necessarily rely largely upon the reports and advice of subordinates . . . who were more directly acquainted with the facts and circumstances of particular cases." *McDonnell*, 136 S. Ct. at 2370-71 (internal quotations omitted). The Defendants argue that this restricts the meaning to the limited set of circumstances where "a superior is relying on the counsel of an aide *whose official role is to provide it*." Doc. 55 at 22-23. The court declines to adopt such a narrow interpretation. *See Lee*, 2016 WL 7336529, at *3 (holding that "providing advice" is not limited "to public officials who have an advisory role in relation to the other official"). Also, the indictment sufficiently alleges advice, as the EPA and ADEM would "necessarily rely largely upon" reports from local officials like Robinson, "who were more directly acquainted with the existing conditions" on the ground near the Site. *See Birdsall*, 233 U.S. at 234.

paid Robinson to advance. *See* doc. 1. Contrary to the Defendants' claim that a vote on a "ceremonial," "non-binding resolution" cannot qualify as an official act, *see* docs. 55 at 25-26; 93 at 22-23, *McDonnell* specifically contemplated that "a proposition . . . to be voted on in a meeting, such as a question before [a legislative body]" would qualify. *See McDonnell*, 136 S. Ct. at 2368. Indeed, even purely "symbolic" resolutions are official acts. *See United States v. Silver*, 864 F.3d 102, 121 (2d Cir. 2017), *cert. denied,* 138 S. Ct. 738, 199 L. Ed. 2d 605 (2018) ("The resolution honoring [the alleged briber] was a clear formal exercise of government power on a specific matter: it was brought to the floor [by the defendant] and subsequently passed by the Assembly."). That Robinson "did not vote or does not remember voting on the joint resolution," *see* doc. 55 at 26, is immaterial because "[a] payor defendant completes the crime[] of honest-services [fraud] as soon as he gives or offers payment in exchange for an official act, *even if the payee does nothing*." *See United States v. Suhl*, 885 F.3d 1106, 1113 (8th Cir. 2018) (emphasis added) (noting that *McDonnell* does not require that "bribe payors and payees have a meeting of the minds about an official act").

Finally, the Defendants' claim that Robinson's vote had "no more legal force than the opinion of a private citizen," doc. 55 at 25-26, is also unavailing. Commencing a Superfund-financed remedial action requires certain assurances from the state. *See* 42 U.S.C. §§ 9604, 9605; 40 C.F.R. § 300.510. The resolution

and Robinson's vote to advance it were formal exercises of state power sending a clear message to the EPA that the state would not provide the requisite "assurances" necessary for the Site's addition to the NPL.[9] *See id.*

In sum, the indictment sufficiently alleges that the Defendants committed honest services fraud under § 1343. Among other things, it alleges that the Defendants paid Robinson to take official acts beyond merely "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)." *See McDonnell*, 136 S. Ct. at 2372-74. Based on these allegations, which the court must view in the light most favorable to the Government, *see Torkington*, 812 F.2d at 1354, a jury could reasonably conclude that Robinson performed "official acts." Therefore, the motion to dismiss the Section 1343 charges is due to be denied.

## B. The indictment sufficiently alleges federal program bribery.

Congress passed Section 666, in part, to "protect the integrity of the vast sums of money distributed through Federal programs" because the then-existing bribery laws "had proven inadequate" to stop "local and state improbity." *Sabri v.*

---

[9] The court also disagrees that the indictment must allege an explicit *quid pro quo*—i.e., that the "Defendants paid Robinson *in exchange for* his vote." Doc. 55 at 26. As the Government correctly explains, *McDonnell* did not disturb the well-accepted "retainer" theory of bribery, whereby a briber pays a public official to "do certain things connected with his office *as specific opportunities arise.*" Doc. 83 at 30 (quoting *United States v. Repak*, 852 F.3d 230, 251 (3d Cir. 2017)). The indictment sufficiently alleges an ongoing agreement to perform favorable acts as opportunities arise. *See* doc. 1 at 22.

*United States*, 541 U.S. 600, 605-06 (2004).  In relevant part, the federal program

bribery statute targets anyone who:

> corruptly gives, offers, or agrees to give anything of value to any
> person, with intent to influence or reward an agent of an organization
> or of a State, local or Indian tribal government, or any agency thereof,
> in connection with any business, transaction, or series of transactions
> of such organization, government, or agency involving anything of
> value of $5,000 or more.

18 U.S.C. § 666(a)(2).  Notably, Section 666 "sweeps more broadly than" Section

201, as there is no *quid pro quo* or "official act" requirement.  *United States v.

McNair*, 605 F.3d 1152, 1191 (11th Cir. 2010) ("Section 666 does not say 'official

act' but says 'any business, transaction, or series of transactions,' [and] does not

say 'in return for' or 'because of' but says 'in connection with.'").

The Defendants contend that the indictment fails to state a federal program

bribery offense.  While acknowledging that Section 666 "uses different words"

than the statutes at issue in *McDonnell*, the Defendants nevertheless insist that this

court should apply the "official act" requirement to Section 666 under "the same

constitutional principles" expressed in *McDonnell.  See* docs. 55 at 28; 93 at 12-13.

The court declines to do so where, as here, the Eleventh Circuit has squarely

declined to graft Section 201's "official act" requirement onto Section 666 in

*McNair*, and *McNair* remains good law.  *United States v. Jackson*, 688 F. App'x

685, 695 (11th Cir. 2017), *cert. denied,* 138 S. Ct. 648, 199 L. Ed. 2d 530 (2018)

(rejecting a request to reconsider *McNair* in light of *McDonnell*).  In any event, as

explained above, even if Section 666 required official acts, the indictment in this case alleges several.[10]  *See* Part III.A *supra*.

Next, the Defendants maintain that the indictment fails to state federal program bribery because it lacks any allegation that Robinson was acting as an "agent" of the state of Alabama.  Docs. 55 at 28-33; 93 at 21.  Specifically, the Defendants argue that Robinson's meetings with officials from the EPA, AEMC, and ADEM fall outside the Section 666 required "legislative authority conferred by his office."  Doc. 55 at 29-30.  Additionally, the Defendants contend that the "business" at issue in this case concerned matters pending before the EPA and state executive agencies, and was thus not "in connection with" any business before the state legislature.  Docs. 55 at 28-33; 93 at 21.  Neither the text of Section 666 nor the case law supports such a narrow reading.

The statute defines "agent" as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative."  18 U.S.C. § 666(d)(1).  Whether an official is an "agent" of a

_____

[10] The Defendants also insist that "federal program bribery cannot be sensibly construed more broadly than honest services bribery [because] federal bribery laws would apply more strictly to *state* officials than to *federal* ones."  *See* doc. 55.  But this statement ignores the history of federal program bribery, which was written with "expansive, unqualified language" and "designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds."  *Salinas v. United States*, 522 U.S. 52, 56-58 (1997).  "The recognition of that ambitious objective, in turn, has led the [Supreme] Court repeatedly to reject statutory constructions aimed at narrowing § 666's scope, in favor of a broad reading."  *United States v. Keen*, 676 F.3d 981, 990 (11th Cir. 2012).

particular governmental entity under Section 666 is a question of fact for the jury and turns on whether the official is "authorize[d] to act on behalf of [the entity]." *United States v. Langston*, 590 F.3d 1226, 1233-34 (11th Cir. 2009). The Eleventh Circuit has found that a member of a county board of commissioners acted as an agent of the county when he urged the Sheriff's Office to add the alleged briber's towing company to the county's towing rotation list, in part, because the member "had a vote on the allocation of funds to the Sheriff's Office." *See United States v. White*, 561 F. App'x 850, 856 (11th Cir. 2014). *But see Langston*, 590 F.3d at 1233-34 (finding that the executive director of a state college was not an agent of the state because his relevant employment documents came from the College, and the money he controlled belonged to the College, not the state, and vacating some of the convictions "[b]ecause the Government chose to charge [him] as an agent of the state, instead of as an agent of the . . . College").

Under the facts alleged here, a reasonable jury could conclude that Robinson was acting as an agent of the state. *See id.* Robinson is a "representative" of a "government" under the most sensible reading of the text, *see* 18 U.S.C. § 666(d)(1), and "[n]othing in the text of [Section 666] prohibits the Government from charging a defendant as an agent of the state" as a whole, *see Langston*, 590 F.3d at 1233. Indeed, multiple circuits have affirmed findings that political officials were agents of their respective states or territories as a whole. *See United*

*States v. Fernandez*, 722 F.3d 1, 9 (1st Cir. 2013) (holding that Senators of the Commonwealth of Puerto Rico are "part of the limited category of government officials who represent the 'State' as a whole [under Section 666], unlike employees of localities or of agencies at every level of government."); *United States v. Willis*, 844 F.3d 155, 167 (3d Cir. 2016), *cert. denied,* 137 S. Ct. 2173, 198 L. Ed. 2d 242 (2017) (executive director of the legislature of the Virgin Islands was an "agent" of the territory for purposes of Section 666); *United States v. Pretty*, 98 F.3d 1213, 1219 (10th Cir. 1996) ("Because [the Deputy State Treasurer] was in charge of investing [Oklahoma's] state's funds, not merely the Treasurer's funds, we find that she was indeed an agent of the state."). Similarly, here, Robinson "had a vote on the allocation of funds" to the agencies he met with on behalf of the Defendants. *See White*, 561 F. App'x at 856. As such, a jury could reasonably conclude that he was "authorize[d] to act on behalf of" the state when meeting with the agencies. *See Langston*, 590 F.3d at 1233-34. Indeed, consistent with the opposition he voiced to these agencies, Robinson allegedly voted to advance a resolution opposing the proposed EPA action. It defies common sense to argue that this vote fell outside the scope of his role as an agent of the state because the resolution "did not make any law" and thus did not "qualify as true legislative 'business.'" *See* doc. 55 at 33. To the contrary, Robinson's vote involved the use of "official authority conferred upon [him] by

[his] legislative branch position[].” *See United States v. Sunia*, 643 F. Supp. 2d 51, 67 (D.D.C. 2009) (internal quotations omitted). The court thus disagrees with the Defendants that these actions were “no different in principle than . . . writ[ing] a newspaper article expressing the same point.” *See* doc. 55 at 29-30.

The Defendants’ contention that the alleged payments Robinson received were “in connection with” only “business” or “transactions” of ADEM and AEMC, as opposed to the state legislature, docs. 55 at 28-33; 93 at 21, is also unavailing. Again, federal law requires state cooperation to begin a remedial action with Superfund money, *see* 42 U.S.C §§ 9604, 9605; 40 C.F.R. § 300.510, and the indictment alleges that “[p]lacement on the [NPL]” would have required that the state “agree[] to fund ten percent of the [clean up] costs.” Doc. 1 at 5. Generally, state funding issues are the domain of the legislature, *see generally* Ala. Const. Art IV, and, as such, the Defendants are incorrect that “the Alabama legislature had [no] formal role to play in the state’s response to the Superfund plan,” *see* doc. 55 at 31.

Finally, the Defendants’ reliance on *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009), is misplaced. *Whitfield* involved a pair of Mississippi state court judges charged with accepting bribes from litigants. *Id.* at 345-46. The Government argued at trial that the defendants were agents of Mississippi’s judicial administrative office (“AOC”), an entity that received over $10,000 in

federal funds. *Id.* The court accepted that premise, but only insofar as the judges "performed [nonjudicial] functions that involved AOC funds," such as hiring "chambers staff that were paid at the expense of the AOC." *Id.* However, because the alleged bribes involved official judicial business, the court found that they were not "in connection with" the "business" of the AOC." *Id.* ("If [the litigant] had bribed [the judges] in exchange for their appointment of a friend or family member as a law clerk or secretary, then section 666 might have been implicated.").

Unlike *Whitfield*, the indictment here alleges that the relevant entity is the state of Alabama as a whole, rather than a particular state agency. Doc. 1 at 28 (alleging that that the Defendants bribed "an agent of the State of Alabama, a state government that received in excess of $10,000.00 under a Federal program . . . in connection with any business, transaction, and series of transactions of the State of Alabama involving anything of value of $5,000.00"). Moreover, unlike the Fifth Circuit, the Eleventh Circuit does not require that an official have some control over an entity's funds for a finding of agency. *United States v. Keen*, 676 F.3d 981, 989–90 (11th Cir. 2012) ("Nowhere does the statutory text either mention or imply an additional qualifying requirement that the person be authorized to act *specifically with respect to the entity's funds.*") (emphasis in original) (rejecting the rule in *United States v. Phillips*, 219 F.3d 404, 411 (5th Cir. 2000)).

Consequently, a jury may find that Robinson acted as an agent of Alabama, even if he had no control over the state's general funds. *See id.*

In short, because the "business" here generally implicates Alabama's treasury, and Robinson was a state representative, a jury could reasonably conclude that Robinson accepted money from the Defendants as an "agent" of the state "in connection with" state "business." Whether the evidence at trial can sustain such a finding remains to be seen. At this juncture, however, viewing the allegations in the light most favorable to the Government, the motion to dismiss the Section 666 charges is due to be denied. *See Torkington*, 812 F.2d at 1354.

## C. The indictment does not violate the First Amendment or the rule of lenity.

The Defendants maintain that the indictment is an unconstitutional suppression of speech. To support this contention, the Defendants rely first on *McCormick v. United States*, which required prosecutors to prove an explicit *quid pro quo* for Hobbs Act convictions involving campaign contributions. 500 U.S. 257, 271 (1991). The Defendants argue that they engaged in protected political speech when they hired an elected official to advocate on their behalf for a political cause. Docs. 55 at 34-35; 93 at 23-26. As such, under the guise of protecting against the chilling of political speech, they argue for a "heightened standard" requiring the indictment to allege an "explicit" *quid pro quo*. Docs. 55 at 34; 93 at

24-25. This argument is a non-starter with respect to federal program bribery charges, as the Eleventh Circuit has repeatedly rebuffed invitations to revisit its precedent and require a *quid pro quo* to sustain a Section 666 conviction. *See McNair*, 605 F.3d 1152, 1192; *Jackson*, 688 F. App'x at 695; *United States v. White*, 663 F.3d 1207, 1214 n.6 (11th Cir. 2011).

Moreover, the indictment sufficiently alleges an explicit *quid pro quo* for purposes of the Section 1343 charges. To prove honest services fraud, the Government will have to show that the Defendants paid Robinson "in exchange for" performing official acts. *See* §§ 1343, 201; *McDonnell*, 136 S. Ct. at 2372-74. A *quid pro quo* arrangement is necessarily implied by this standard, and nothing requires the Government to use these magic words in the indictment. *See Suhl*, 885 F.3d at 1114 ("[T]he phrase 'in exchange for' is not in the [jury] instructions as given. But [the defendant] offers no support for the assertion that this specific phrase must be included when the instructions otherwise convey the *quid pro quo* required in a case against a payor defendant."). To be sure, "[w]hile unusual official action may be evidence of an explicit *quid pro quo* in some instances, more than strong advocacy is required." *See Menendez*, 2018 WL 526746 at *15. But as previously outlined, *see* Part III.A *supra*, Robinson's alleged actions went beyond "strong advocacy." Accordingly, because the indictment alleges payments "in exchange for" the performance of official acts, *see* doc. 1, it sufficiently alleges

a Section 1343 violation. *See Evans v. United States*, 504 U.S. 255, 268 (1992)

("[T]he Government need only show that a public official has obtained a payment

to which he was not entitled, knowing that the payment was made in return for

official acts.").

Second, citing the rule of lenity, the Defendants argue that "it is far from

clear whether [Robinson's] alleged actions qualify as unlawful 'official acts' or

[acts] 'in connection with' state legislative business." Doc. 55 at 36. The rule of

lenity is a longstanding principle that "ambiguity concerning the ambit of criminal

statutes should be resolved in favor of lenity." *Rewis v. United States,* 401 U.S.

808, 812 (1971). The rule "ensures fair warning" as to the line between innocent

and criminal conduct. *United States v. Svete*, 556 F.3d 1157, 1169 (11th Cir.

2009). The rule is extremely narrow, however, and "[t]he simple existence of

some statutory ambiguity . . . is not sufficient" to justify its application.

*Muscarello v. United States*, 524 U.S. 125, 138 (1998). Rather, courts apply the

rule "only if, after seizing everything from which aid can be derived, [the court]

can make no more than a guess as to what Congress intended." *Id.* (internal

quotations omitted). In this case, the court sees very little, if any, ambiguity in the

charged statutes and has no need to wager a "guess" as to Congress's intent. *See*

*id.* Consequently, because the Defendants fail to direct the court to any "grievous

ambiguity" in either Section 1343 or Section 666, the rule of lenity is inapplicable. *See McNair*, 605 F.3d at 1192.

The Defendants' related federalism arguments are similarly unavailing. Certainly, as sovereign governments, states maintain the power to create standards for "the character of those who exercise government authority," which includes "the prerogative to regulate the permissible scope of interactions between state officials and their constituents." *McDonnell*, 136 S. Ct. at 2373 (internal citations omitted). And the Alabama legislature, as in most states, is comprised of "part-time legislators" who generally also earn a living from private work. *See* doc. 55 at 27. For this reason, Alabama law allows legislators to represent private interests, for a fee, in certain official proceedings, provided that they disclose the representation in advance. Ala. Code § 36-25-10. Citing this law, the Defendants assert that the indictment threatens Alabama's power to "set[] standards of good government for local and state officials" and deprives state officials of clear notice of the line between "paid advocacy" and "true bribery." Doc. 55 at 27, 34.

This argument rings hollow here where the Defendants allegedly (1) created a shell corporation; (2) solicited money for the corporation from other allegedly responsible parties; (3) made donations from the corporation to Robinson's Foundation, not to his campaign; and (4) memorialized an agreement with Robinson, which they prohibited him from disclosing. Doc. 1. Given that the

Defendants admit that Alabama state law "arguably required Robinson to disclose the business relationship between his Foundation and Defendants," doc. 55 at 28, assuming the scheme transpired as the Government describes it, these sophisticated individuals entered into an agreement that required Robinson to violate state ethics law. Such alleged conduct bears no resemblance to an ordinary campaign contribution or typical issue advocacy, and the Defendants cannot credibly claim that they lacked fair notice of the law. *See McNair*, 605 F.3d 1197 ("[T]he extent to which the parties went to conceal their bribes is powerful evidence of their corrupt intent."). Because the Defendants cite no authority to support their claim that they lacked fair notice that their purported actions might be unlawful,[11] or that the indictment infringes on Alabama's state sovereignty, the court finds no merit to their rule of lenity arguments.

Courts must tread lightly when reviewing indictments that implicate political speech. Otherwise, an overzealous executive branch could "cast a pall of potential prosecution" over innocuous behavior by characterizing "nearly anything a public official accepts—from a campaign contribution to lunch—[as] a *quid*," and "nearly anything a public official does—from arranging a meeting to inviting a guest to an event—[as] a *quo*." *McDonnell*, 136 S. Ct. at 2372. But there is no indication here

---

[11] The Defendants cite *United States v. Jimenez*, 705 F.3d 1305, 1308 (11th Cir. 2013), where the court found § 666(a)(1)(A) to be ambiguous. By contrast, the provision at issue in this case is § 666(a)(2).

that the Government targeted the Defendants because of their speech. Instead, it is their alleged *conduct* that comprises the bulk of the indictment. *See Menendez*, 2018 WL 526746 at *10 ("[T]he charges in this case concern bribery, not political speech."). Likewise, the court finds no signs of an overaggressive prosecution trying to snare ingenuous individuals who merely seek to amplify their political opinions. As a result, the court declines to dismiss the indictment on any of the constitutional grounds raised.

## CONCLUSION AND ORDER

Consistent with this opinion, the motion to dismiss, doc. 55, is **DENIED.**

DONE the **4th** day of May, 2018.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE