<u>TESTIMONY</u>

of

STEVEN MCKINNEY

Before the

G R A N D   J U R Y

Impaneled February, 2017

and Convened in

THE NORTHERN DISTRICT OF ALABAMA

Robert S. Vance Federal Building
1800 Fifth Avenue, North
Birmingham, Alabama

Testimony May 24, 2017

- - - - - - - - - - - - - - - - - - - - - - - - - -

Examination Conducted by:

GEORGE A. MARTIN
ROBIN MARK
Assistant United States Attorneys
1801 4th Avenue North
Birmingham, Alabama

Re:   2016R00620

2:17-cr-00419-AKK-TMP

6/25/18 Jury Trial

GOVT EXHIBIT NO. 262

1    P R O C E E D I N G S

2    May 24, 2017                          1:04 p.m.

3    Whereupon,

4                    STEVEN MCKINNEY,

5    a witness of lawful age, having sworn to tell the

6    truth, the whole truth, and nothing but the truth,

7    was examined and testified as follows:

8    EXAMINATION BY MR. MARTIN:

9    Q.          Good afternoon.

10   A.          Hi.

11   Q.          Would you state and spell your last name

12   for the Grand Jury, please?

13   A.          My last name is McKinney.  (Spelling)

14   M-C-K-I-N-N-E-Y.

15   Q.          And your first name?

16   A.          Steve or Steven.  (Spelling)

17   S-T-E-V-E-N.

18   Q.          Mr. McKinney, before we get started I

19   want to give you some warnings and some rights that

20   witnesses here in the Grand Jury have.

21          First, you've been placed under oath

22   now, and should you give materially false testimony

23   to the Grand Jury, you would be prosecuted for

24   federal offenses such as perjury of obstruction of

25   justice.

1    Do you understand?

2   A.        I do.

3   Q.        You also have the right to refuse to

4   answer any question that you think might

5   incriminate yourself.

6           If you do answer questions, anything you

7   say could be used in a subsequent legal proceeding,

8   and I believe you're represented by counsel today.

9           If at anytime during the questioning you

10  need to consult with counsel, let us know because

11  you have the right to do that, and we'll give you a

12  fair opportunity.

13          Do you understand those --

14  A.        I do.

15  Q.        Could you give us your address, please?

16  Your home address.

17  A.        I live at 333 Turnberry Road in

18  Birmingham.  That's kind of south of town.

19  Q.        And can you give us your work and home

20  phone number and cellphone number too, please?

21  A.        Okay.  My work phone number is area code

22  205-226-3496.  My home phone number is area code

23  205-991-9310, and my cellphone is area code 205-

24  790-4871.

25  Q.        Do you have a separate cellphone for

1   work and personal or do you use the same one?

2   A.          I use the same one.

3   Q.          How about email addresses?  What email

4   addresses do you use?

5   A.          It's smckinney.  (Spelling)

6   S-M-C-K-I-N-N-E-Y @balch (spelling) B-A-L-C-H .com.

7   Q.          Do you have a personal email?

8   A.          I do not.

9   Q.          What's your job, Mr. McKinney?

10  A.          I'm an attorney.

11  Q.          And where do you work?

12  A.          Balch & Bingham.  It's a law firm here

13  in town.

14  Q.          How long have you worked there?

15  A.          It will be 30 -- started in '79.  So it

16  will be 38 years next week.

17  Q.          Have you had other legal jobs or have

18  you worked at Balch your entire career?

19  A.          I've worked at Balch Bingham the whole

20  time.

21  Q.          Where did you go to law school?

22  A.          The University of Illinois, which is in

23  Champaign-Urbana, Illinois.

24  Q.          And how about undergrad?

25  A.          I went to the University of Mississippi.

1    Q.         And what was your undergraduate degree

2    in?

3    A.         Uh

4    Q.         Has it been that long?

5    A.         Yeah.  My major, my degree was a

6    bachelor of arts in liberal arts, and my major was

7    in political science and economics as a double

8    major, and I have a minor in English.

9    Q.         What is the focus of your practice at

10   Balch & Bingham?

11   A.         I'm an environmental lawyer.

12   ██  ████████████████████████████

13   ███████████  █████████████████████

14   ██     ████████

15   Q.         And do you have some sort of supervisory

16   role ████████████████

17   A.         Yes, in the sense that I am the head of

18   the environmental section ███████████████

19   ██████████

20   ██     ████████████████████

21   █████████

22   ██     ████████████████  █████████████

23   ██████████████████████████  ████

24   ████████████████████████████████

25   ███████████████████████████

I assist ███████ the partners and
all the lawyers in my group. ███████████

███████████████████████████████

████████████

They may come to me for advice or
assistance.  Something of a mentor, you might say,
to them.

I may help them really with anything
that they are doing to serve a client or to improve
themselves as a lawyer.  They would ask me to be
involved and help them in some way.

For example, if a lawyer in my group
believes that going to a particular seminar, you
know, would be good for them to help them be a
better lawyer, they would come to me and we would
talk about that, and I would have input into, you
know, whether they should go to that seminar or
not, but it's that kind of thing.

Q.          How big is the environmental group at

Balch?

A.          We have more than 20 lawyers in the

environmental group, and I'm trying to remember the

exact number.  I can't remember exactly, but we've

got 22, 23, maybe 24 lawyers in that group.

          They are in Atlanta, Washington, D.C.,

Birmingham, Gulfport, Mississippi, and I should

know the exact number, but I don't have it on the

tip of my tongue.

Q.

Q.        Are you familiar with the Environmental
Protection Agency's, EPA's actions in North
Birmingham in the last few years?

A.        I am.

Q.        Can you sort of generally describe the
history of EPA's actions in North Birmingham for
the Grand Jury, please?

A.        Sure.  Let me think a bit because it
might be a long story.

          Generally several years ago, perhaps
five, maybe six years ago, maybe even a little
longer, US EPA had a project going on in North
Birmingham that was being handled with the US EPA
and there was cooperation from a local company
under a federal law called RCRA.

          It stands for Resource Conservation
Recovery Act, and that federal law is a law that
governs and directs parties, whoever they are, how

1  they should handle hazardous waste that they

2  generate or somehow come to possess, and that

3  project was going on under RCRA in North Birmingham

4  with regard to a particular company and their

5  property.

6  Q.          The particular company was Walter Coke?

7  Is that who you're referring to?

8  A.          I believe so, Mr. Martin.  That

9  company's name has changed a couple of times.

10  They've been combined with other companies, but I

11  believe what people refer to as the Walter Coke

12  property, yes.

13          And US EPA was involved in that on that

14  basis, and then they decided to change the focus of

15  their involvement with regard to that property to

16  approach that situation under another federal

17  statute.

18          It also deals with hazardous waste, but

19  it deals with it in a different way, and that

20  statute is called CERCLA.  That's (spelling)

21  C-E-R-C-L-A.  It's nickname is Superfund.

22          That statute is much broader than the

23  previous one I mentioned, RCRA, and it deals with

24  contaminated land in a different way.

25          It gives EPA, US EPA a more power

1   authority.  Broader power and authority to do

2   things, and when they changed their focus and

3   starting using the Superfund statute, one of the

4   things that they are allowed to do under Superfund

5   is to deal with parties that they believe are

6   somehow responsible for the contamination being on

7   the land.

8          That notion of being responsible is very

9   broadly stated.  It is a broadly stated statute,

10  and it gives US EPA broad powers.

11         In this case when they began handling

12  the matter as a Superfund matter, they broadened

13  their activity off of the property in question into

14  you might say adjoining property in the

15  neighborhoods near or around that property, and

16  they began treating that whole area as a Superfund

17  site.

18         There is a lot of process that goes on

19  in getting to that point, but they began treating

20  it like a Superfund site.

21         One of the things that happens at a

22  Superfund site is US EPA has money they can use to

23  do things to deal with the contamination they

24  found, but the statute also authorizes US EPA to

25  try to hold other people responsible for the costs

of cleaning up that property.

You know, it can be a very expensive proposition to be involved in one of these sites to do what EPA wants to do to address the contamination.

So it's a very serious matter for someone to -- some entity, person, business, company, university, city, you know, county, any government, United States, can be a party under Superfund.

It's a very serious matter to be held responsible for doing -- for paying for what US EPA believes ought to be done.

So it leads to a lot of serious consideration when someone thinks they might be responsible, or is told that someone else thinks they might be responsible.

Because this statute is so broad, you can have someone -- let's just say someone is responsible.  Maybe it's their property even.  That person can turn around and say, "Well, I believe that there is several other parties who are also responsible, and I want to bring them into this activity."

There may be someone outside of that

1   process and maybe US EPA would say we believe that

2   other people are responsible and bring them into

3   the situation.

4           So that's typical of a Superfund

5   situation, and that's what happened in North

6   Birmingham.

7           US EPA began to ask themselves is anyone

8   else responsible for this, and there were several.

9   Over time there were several parties that US EPA

10  approached and said, "We think you might be

11  responsible for this."

12          That led to engagement with them.

13  Conversations with them and various people.  Really

14  all the people they spoke to that way denied

15  responsibility and said, "We're not responsible for

16  this."

17          US EPA continued their activity.  The

18  activity they thought was appropriate for

19  addressing the situation and continued spending

20  money.

21          In various episodes approached those

22  parties they thought that they could hold

23  responsible for the situation and said, "Don't you

24  think you're responsible," and although I wasn't

25  involved in all of the parties, the parties I

1  represented, we consistently told the US EPA we are

2  not responsible for this.  We had nothing to do

3  with it, and if you have a view otherwise, please

4  tell us, you know, why and show us the reasons.

5  Tell us the reasons.  Show us the evidence that you

6  have that would say we are somehow responsible for

7  this.

8           So we engaged in that kind of

9  discussion.  US EPA continued their work.  They

10  continue it even today doing what they think they

11  need to do out there to address contaminated land,

12  and that was the North Birmingham site.

13  Q.           We've heard it referred to in a couple

14  of different ways.  Were you referring to the 35th

15  Avenue Superfund site, or were you referring to

16  both that site plus the Tarrant Inglenook area?

17  A.           I've been referring just now to just the

18  North Birmingham site.  The 35th Avenue site.

19           Another chapter in that story is that

20  there were -- it was an environmental group that

21  was involved in the North Birmingham site.

22           You know, this is a very public process.

23  People are allowed to participate and express their

24  views and things.

25           This environmental group --

1    Q.          What was the name of the group?

2    A.          The name of the group is (spelling)

3    G-A-S-P.  I suppose they call themselves GASP.  It

4    stands for -- GASP stands for something else.  I'm

5    not sure exactly what it is, but GASP would be the

6    name of the letters and what they spell.

7              The environmental group was very

8    adverse.  You haven't asked me, but I'll say my

9    client in this matter was ABC Coke.  A coke

10   manufacturer over in the Tarrant area.

11   Q.          Which is a division of Drummond?

12   A.          It is.  It is a subsidiary or division.

13   I'm not sure which the appropriate nomenclature

14   would be of Drummond Company.

15             This environmental group was very

16   adverse to ABC Coke, and they kind of made it very

17   obvious by the things they put on their website and

18   the stuff that they published, and they were very

19   adverse to the coke plant.

20             You know, at least in terms of public

21   activity they filed a petition with US EPA that in

22   summary said we think that you should take this

23   view that you have about North Birmingham and the

24   activity that you are engaging in in North

25   Birmingham, we think you should take this and just

1    expand it to include the City of Tarrant and some

2    neighborhoods of Birmingham.  A very large area.

3              They petitioned EPA to do that, and

4    that's allowed under the statute that I told you

5    about; the Superfund statute.

6              So there was a petition filed and US EPA

7    had an obligation to respond to the petition.  So

8    they went about their business of preparing a

9    response to the petition which involves taking

10   public comments and such.

11             So my client, ABC Coke is located in

12   that area, and in light of GASP's previous position

13   opposed to ABC Coke it was pretty apparent, and you

14   didn't have to guess, they were saying it pretty

15   plainly, that this petition was really about trying

16   to involve, to pull in ABC Coke into this North

17   Birmingham situation.

18             One of the things that, you know, was

19   always something that we would say to US EPA is,

20   you know, our plant that you're talking about is a

21   long distance from where you are.  It's almost two

22   miles away from where this is going on.

23             How is it that you think we had

24   something to do with the contamination that you're

25   focused on?

1          So this was kind of a response to that

2     in the sense well, we'll just expand the site to

3     include the neighborhood that you're in.

4          So that petition was being processed,

5     and US EPA was responding to it.  There is several

6     steps in that.

7          The first step was to do kind of a

8     review of the situation just based on paper.  You

9     know, what's available in the records that would

10    tell us anything about this site.

11         They came back after doing that, and

12    they said well we're going to go to the next step,

13    which is a little more involved.

14         It's beyond the paper.  It actually goes

15    out in this step -- one actually goes out onto the

16    property in question and begins to examine it and

17    test for things and do a physical examination of

18    the area to enhance the review you've just done

19    based on records and things.

20         So US EPA did that, and at the end of

21    that they reached a decision that they would not go

22    any farther with that petition.  It would not

23    expand the Superfund site or create a new Superfund

24    site in that City of Tarrant area and the related

25    neighborhoods of Birmingham.

1    That's pretty much where we are today.

2    It's a very summary form, but that's pretty much

3    where we are today.

4    Q.        What's the timing of this action?  Did

5    it begin roughly in 2014?

6    A.        I'm a little fuzzy on exactly when

7    things happened.  This has been going on for a

8    number of years.

9            The petition that I told you about, you

10   know, I can't be sure.  You know, this is 2017.

11   It's been going two or three years, but I don't

12   remember a date specifically.

13   Q.        Maybe we'll look at some documents in a

14   bit that will refresh your recollection of the

15   date.

16           First I want to ask you as part of this,

17   and I didn't hear this in your explanation, was

18   there some effort by EPA to put the North

19   Birmingham site on the National Priorities List?

20   A.        There was.

21   Q.        Can you briefly explain that?

22   A.        Under the Superfund statute there is a

23   program, I'll call it, whereby US EPA is both

24   authorized and somewhat expected to identify,

25   evaluate and list the most serious contaminated

1  areas that are Superfund sites.

2         You know, they get involved, and they

3  make a decision.  Should we declare this to be a

4  Superfund site, and they had done that in North

5  Birmingham.

6         Then this process is kind of after that,

7  and it's a process that says we're going to have a

8  list in the United States.  We're going to have a

9  list of the most serious Superfund sites that are

10 out there.

11         It's called the National Priorities List

12 or the NPL, and it dates back to the beginning of

13 Superfund, and a little bit of history.

14         When Superfund was adopted, it was a

15 very bold and broad and very strong statute, and it

16 was adopted in an environment where we had some

17 really, really big contaminated land problems.

18         And so Congress acted with a broad

19 sweeping statute that authorized EPA to get out

20 there and deal with these things.

21         And that was in 1980.  So we're 37 years

22 from that, and this NPL process was a part of that

23 because there were many different places that might

24 qualify as a Superfund site, and EPA would be

25 authorized to do things about that site.

1    Other parties would be authorized to do

2    things about it and to engage with other people to

3    get things done, but it might not be the highest

4    priority that the US EPA would have, and

5    particularly with regard to spending money from the

6    Superfund.

7          The nickname Superfund comes from the

8    reality that this statute also imposed a tax on a

9    barrel of oil to collect money to create a special

10   fund so that EPA would have money to do what they

11   needed to do when they found a site they wanted to

12   do something with, but there is not enough money.

13          So issues of priorities arose and the

14   NPL was a way of saying well US EPA you should

15   create a list of the most -- the highest priority

16   sites.

17          That was mid-1980.  Come forward through

18   time and you know, we have done a lot of cleanup.

19   The sites that are being handled today are somewhat

20   different than the sites that were being handled

21   back then, but the process is still there.  The NPL

22   process is still there.

23          In this case the US EPA issued a

24   proposal, and EPA being an agency, a lot of times

25   they act through what we call a notice and comment

1   rule making process, and that's them saying we

2   think we should do this, but we're going to receive

3   comments from the public about this, and then we'll

4   decide after we consider those comments.

5           And so the NPL process is one of those

6   processes.  So they issued a proposal to list the

7   North Birmingham or the 35th Avenue Superfund site

8   on the National Priorities List.

9           The public had the opportunity to file

10  comments, and then US EPA considered those

11  comments, and they have not decided.

12          I don't know -- I'm trying to think.  I

13  believe they have simply not decided.  I don't

14  believe they've said we're not going to do it.  I

15  believe they simply haven't decided the issue,

16  which is common, you know.  That happens.

17  Q.          So what difference does it make if a

18  Superfund site is on the National Priorities List?

19  And primarily focus on in terms of money spent by

20  the federal and state governments and the potential

21  effect on responsible parties.

22  A.          Usually US EPA will propose a site for

23  listing because doing so gives them access to more

24  of the Superfund -- the available Superfund money.

25          That money is in short supply.  So

1  people have to make decisions on how they're going

2  to allocate it.

3          So usually listing the site will give US

4  EPA access to more of the Superfund money from a

5  prospective of a private party.

6  Q.          Talk about the state.  What is the

7  potential effect on the State of Alabama if the

8  35th Avenue site is listed on the NPL?

9  A.          Well, first of all the state is a party

10 like anybody else, and they're authorized to

11 participate in this notice and comment process and

12 file their comments to see what they think, and

13 they make a statement of what they think.

14         In terms of the state, Mr. Martin, I'm a

15 little fuzzy on this.  So, you know, bear with me.

16         When a site gets listed, there are by

17 practice and habit opportunities for the state

18 where the site is located to participate in some

19 form of management of the site.

20         I'm a little fuzzy on exactly how, you

21 know, that works in the sense of relating to money.

22 I have heard that that process of the state being

23 involved in a listed site involves the state

24 putting up some matching funds.  Some state funds

25 that the federal government matches, but I don't

1  know that myself.

2  Q.          I read in the statute CERCLA that you

3  mentioned where the state could be responsible for

4  as much as 10% of the cleanup.

5          Is that what you're referring to?

6  A.          I have heard that, Mr. Martin, but I

7  don't know that myself.

8          I've never represented the state in a

9  Superfund matter, and I've not had the opportunity

10  for that issue to be something I needed to study.

11  Q.          And you were going to tell us about the

12  potential effect on private parties of a listing on

13  the NPL.

14  A.          Well in my judgment it doesn't affect

15  private parties in terms of, you know, how you

16  decide whether someone is responsible or not.

17          It doesn't change the way the law

18  applies to the private parties.  It would, however,

19  you know, mean that if US EPA is seeing this

20  particular site as one the nation's top priorities,

21  it would mean that there would be more activity to

22  address the site or manage the site or whatever.

23          If you were a party who was responsible,

24  and remember -- sorry, I shouldn't say remember.  I

25  haven't told you this, but oftentimes the question

1  of who is responsible as a private party is known

2  early.

3         I mean, you know, the issue of well who

4  are the responsible parties for the site oftentimes

5  is determined.

6         I've been involved in sites where at the

7  earliest states the private parties would agree

8  that they are responsible for the site.

9         So they get together.  The law makes

10  them responsible in a way we call joint and

11  several.  It's like you're all in this together,

12  and the whole issue of how you divided up the

13  responsibility is going to be your business.

14         The statute compels these people then to

15  get together and kind of try to kind of work

16  together and try to work with US EPA to get this

17  addressed or handled, and then, you know, kind of

18  work out amongst them the financial responsibility

19         So oftentimes that's the case, and it's

20  not the case here, but oftentimes it is.  So in

21  that NPL process those parties who are also invited

22  to participate like anyone else and provide written

23  comments, those parties would do so knowing that,

24  hey, we're going to be doing this.  So let's get

25  involved and provide our view of what this site is

1    like and what needs to be done, et cetera.

2              So, I don't know if that answers your

3    question.

4    Q.          Well, just to go back to something you

5    mentioned earlier.  You said that, and we'll talk

6    specifically about the 35th Avenue site, that is

7    that's a Superfund site and is listed on the NPL,

8    and if Tarrant and Inglenook had been also

9    designated a Superfund site, I think you used the

10   phrase, that could be an expensive proposition for

11   the parties who are responsible for the pollution.

12             Is that correct?

13   A.          Yes.

14   Q.          That's what you meant?

15   A.          It would be an expensive proposition for

16   US EPA, and for anyone who is responsible for the

17   site.

18   Q.          Just to make it about this case, your

19   client was ABC Coke.  If ABC Coke was held

20   responsible for the pollution in those areas that

21   the EPA was looking at, it was going to cost them a

22   lot of money potentially, right?

23   A.          If it were held responsible, yeah.  US

24   EPA has already spent a lot of money in North

25   Birmingham.

1    So if any party who was ultimately held
2  responsible, it would be an expensive proposition.
3  A.        Because EPA could require a potentially
4  responsible party to pay for the cost of the
5  cleanup, correct?
6  A.        If they were determined to be
7  responsible, yeah, and you know, it's not uncommon
8  for US EPA to have a view that someone is
9  potentially responsible address them to that point
10  and say we think -- and for that party to say we
11  think you're wrong and there to be a dispute over
12  that.
13  Q.        And if there is a dispute that EPA or
14  the parties cannot work out, does that end up in
15  court?
16  A.        It does.
17  ██   ██████████████████████████████
18  ████████████████████████████████████████
19  ███████████████████████████████████
20  ████████████████████████████████████████
21    Would you agree with that?  That at
22  least it's an uphill climb to avoid liability if it
23  ends up in court.
24  A.      ███████████████████████████████
25  ██████ but I don't think -- you know, if it ends up

1    in court I don't think the deck is stacked against

2    anybody.

3              I mean, the court is the court, and you

4    have the opportunity to defend yourself.

5              What may be the problem -- it's an

6    intricate kind of problem in Superfund that makes

7    it challenging if you want to dispute US EPA, and

8    many people do.

9              I've been involved in disputing those

10   things.  If you want to dispute US EPA's position

11   that you're potentially responsible, it can be

12   challenging because remember, this statute was

13   written at a day in time.

14             Some of you I can tell are maybe as old

15   as I am, and the news was filled with stories of a

16   place called Love Canal, and it was on the news

17   every night.  It was a terrible situation.

18             Those were the motive forces when

19   Congress said we got to do something, and they

20   wrote this statute to be very, very strong in favor

21   of US EPA to give US EPA lots of authority to get

22   things done.

23             Because many times, you know, these

24   sites involve contamination that occurred over a

25   long period of time.  Maybe the parties have

changed.  The parties have gone or some of the business.

US EPA said that person is responsible, but they're gone.  We're never going to get them to help pay.

They wrote this statute to be as broad as I described it because of that situation.  So there have been lots of court cases about how that's supposed to work and whether it's fair or not and such.

But I think what he may be talking about, Mr. Martin, is the fact that the statute is itself -- it gives EPA lots of authority, and if you want to dispute them about anything, and it's not just the idea of who is responsible, but it might be what's the nature of this site.

What's the problem at this site?  How should that problem be addressed?  When should it be addressed?

All of those things.  If you're a responsible party for the site, you know, you're interested in those things because those things have cost implications, or they have, you know, implications for public health, and you're involved.  If you're involved, you want to make

1    sure it's done right.

2              So you have views about that, but the

3    statute gives EPA really strong authority that

4    you're going to do it their way.

5              So if you're going to dispute those

6    things, any of those things, it's a process that's

7    extensive and it's expensive because you're going

8    to be engaged for a long time, and it's a very

9    detailed process and things like that.

10   ██████████████████████████

11   ████████████

12   Q.        So as a lawyer for a potential

13   responsible party on the 35th Avenue site, was it

14   important -- was it your strategy, part of your

15   strategy to try and head this off?

16             The designation on the NPL or expanding

17   the Superfund site to include Tarrant and

18   surrounding areas, was it an important part of your

19   strategy to try and nip this in the bud, so to

20   speak, to not get to the point where you are in

21   court disputing EPA?

22   A.        Well, first we had made it very clear to

23   US EPA on behalf of our client, ABC Coke, that they

24   were not responsible for this site.

25             We had engaged with them several

1   different ways and several times at their

2   invitation, and these were meetings, you know.

3            They would invite you to have a meeting

4   and kind of like, you know, this is not a fun

5   meeting but it's a meeting.

6            They would state their case.  So we

7   think you might be a potential responsible party

8   here, and we would respond.

9            So we had made it very clear that we did

10  not believe ABC Coke was responsible in any way,

11  and that was the first thing.

12           The second thing is recognizing, you

13  know, what I was just talking about about how EPA

14  has a lot of authority to do things the way they

15  want to do them.

16           It is not uncommon at all, and it is

17  what happened here, that if you think that somehow

18  some day you might get held responsible for this,

19  then it is in your best interest to make sure that

20  whatever is done is done the best it can be done as

21  far as you're concerned.

22           So participating in what EPA was

23  proposing to do makes a lot of sense if you can

24  point out to them that well, you know, you're

25  thinking about doing this particular activity here;

1  but we're aware of other places where you did this

2  differently and these were less expensive.  Why

3  don't you consider this?

4           So participating to make sure that what

5  they end up deciding to do is the best course of

6  action and right and based on the facts, that's

7  what we do.

8           I say we in the sense of that's what

9  most parties do.  You know, done it many times, and

10  that's what was going on with ABC Coke.

11  Q.          So part of your strategy was to meet

12  with EPA and try and convince them of your point of

13  view, correct?

14  A.          Correct.

15  Q.          Generally speaking, what were the other

16  parts of your strategy in addressing these issues

17  that you were facing?

18  A.          Well, with regard to the 35th Avenue

19  site, which as I mentioned, is at some distance

20  from the ABC Coke plant.

21           We essentially engaged with EPA to talk

22  about their suggestion that we might be a

23  potentially responsible party, and to say that

24  we're not.

25           Then I think maybe the fair thing to do

1   would be to say that just after that just to

2   monitor that site.  Keep up with what they were

3   doing, and be informed about how they were going

4   about business and how they were making decisions.

5   How they were evaluating the situation.  We tried

6   to keep up with the current status of the site.

7           I think then when they proposed to list

8   it on the National Priorities List, based on what

9   we understood about the site, and based on what we

10  understand about the process for evaluating sites

11  for NPL purposes, we decided that they were

12  exaggerating the condition of the site as it

13  relates to the NPL ranking process.

14          It's a process that is -- I mean, it's

15  actually a ranking.  It's like you score the site.

16  So many points for this and so many points for

17  that.

18          So they were engaged in evaluating the

19  site and this kind of a scoring sense, and we

20  believe that they had not looked at it in the right

21  sense; that they had made mistakes in the way they

22  evaluated and scored the site.

23          So we participated to make that point of

24  view clear.

25  Q.          And as part of your strategy did you

1   have contact with state and federal elected

2   officials to try and convince them to support your

3   view of the issues?

4   A.          Yes.

5   Q.          And did you have contact with the

6   Alabama Department of Environmental Management to

7   discuss the issues?

8   A.          I'm trying to remember.  Let me say.  I

9   did not have any contact.  That's why I'm

10  hesitating because I'm trying to remember, you

11  know, what contact may have been had.  I did not

12  have any contact.

13  Q.          And that's one of the primary focuses of

14  your testimony today is your involvement -- your

15  personal involvement in the carrying out of this

16  strategy and representing ABC Coke.

17          How would you describe that to the Grand

18  Jury?  Your involvement?

19  A.          My personal involvement?

20  Q.          Yes.

21  A.          Let me think about that.  The best way

22  to describe that.

23          Well, first as a mentor.  If you will as

24  the section head, I would help any lawyer.  ■

25

There were some situations, some parts
of this representation, and I'm going to try to
answer in the sense of representing ABC Coke in
this matter.

There were some parts of this
representation where I was directly involved, and
I'll give you an example.

In this process that US EPA goes through
in evaluating possible responsible parties, they
have the right under the statute to ask people to
provide information, and it's a legal obligation.

So they use that authority in Superfund,
and they may have some ideas.  Maybe they see some

1  contamination.

2          They say this looks like it might have

3  come from, you know, Joe's Body Shop or whatever,

4  and they have the authority under the statute to

5  send that party a letter saying we need information

6  from you, and please supply the following.  Answer

7  the following questions and supply the following

8  documents.

9          Well, they did that in this case, and

10  they sent such requests for information to ABC

11  Coke, and I was directly involved in helping that

12  client answer those questions.  The questions from

13  US EPA to ABC Coke.

14          I say directly involved.  Like I helped

15  advise the client.  Helped gather information.

16  Prepare the responses.  Send the material in.  So I

17  was directly involved in that.

18          There were times -- I remember times

19  when, you know, the client wanted to talk about how

20  things are going.  What are we doing?  What are we

21  going to do next?

22          I would participate in those

23  conversations with like on a conference call or

24  maybe even in person.  So there were some times

25  like that.

1    Q.

2

3

4    Q.          Who were your primary client contacts?

5    A.          A man named Blake Andrews is a lawyer

6    who works directly for Drummond.  Referred to often

7    as an in-house lawyer.

8              Blake -- I don't know his proper title,

9    but he was the Drummond lawyer responsible for

10   environmental matters.  So he was the principal

11   contact.

12             There were times particularly when

13   information was needed to respond maybe to one of

14   these letters I told you about that I would deal

15   with the plant manager at the plant or other

16   personnel at the plant.

17   Q.

18

19

20

21

22

23

24

25

1  Q. ██████████████████████

2  ████████████████

3     ██████████████████████

4  ██████████████████████████████

5  ███████████████████

6  ██     ████

7  ██     ████████     ████████████

8  ██████████████████████████████

9  ██     █████████████████████████

10 █████████████     ████████   ██████

11 ████████████████   ████████████

12 █████████████████████████

13 ████████████████████

14    ██████████████████████

15 ███████████   ████████████████

16 ██████████████████████████████

17 ██████████████████   ████████

18 ████████████

19    ██████████████████████

20 ████████████

21 ██    ████████████████

22 A.   ████████████████

23 ██    ████████████████████████

24 ████████████████

25 ██    ████   ██████████   ██████

A.

Q.          ████ would it be part of the smart thing
to do to communicate to ADEM officials what your
position of the matter was?

A.          Sure.

            (Whereupon, the above-referred

            document was marked Grand Jury

            Exhibit 2 for identification.)

Q.          Let me show you what has been marked as
Grand Jury 2 McKinney and ask you again to review
that and let me know when you're finished.

A.          Okay.

Q.          Start at the bottom and sort of go up
and describe for the Grand Jury what that first
email in that string is.

A.          Okay.  This paper is a paper copy of an

1    email string, and the first email in the string is

2    an email from Lance LeFleur, and Lance is the

3    Director of the Alabama Department of Environmental

4    Management.  He's the top person there.

5            It is dated September 16, 2014.  It is

6    addressed to one, two, three people at US EPA and

7    the three people that are addressed is Gina

8    McCarthy, Heather McTeer, and Gwen Fleming.  Those

9    three people are officials at US EPA.

10           Gina McCarthy was the administrator.

11   The top official at US EPA for the whole nation.

12           Heather McTeer-Toney was the -- I

13   believe at this time -- I'm not sure, but I believe

14   at this time Heather McTeer-Toney was the

15   administrator for Region IV of the country, which

16   involves Alabama, Georgia and a number of other --

17   I think it's eight states.  She was the regional

18   administrator of EPA over that area.

19           Then Gwen Keyes Fleming had been the

20   regional administrator of Region IV, and she had

21   gone to Washington, D.C. to be the Chief of Staff

22   for Gina McCarthy, the US EPA administrator.

23           Those are the three addresses.  The

24   subject is the 35th Avenue Birmingham NPL Listing.

25   Q.           Just generally, and you don't have to

1    read it, is it true that that email is notifying

2    ADEM.  Mr. LeFleur is notifying EPA that the State

3    of Alabama objects to the 35th Avenue site being

4    listed on the NPL?

5    A.          It does.

6    Q.          And what is the date and time of that

7    email?

8    A.          It's September 16, 2014.  At 12:43 p.m.

9    Q.          Move up to the next email in that string

10   and tell us what that is.

11   A.          The next email in that string is from

12   Lance LeFleur.  It is to the same people.  Well,

13   both of them have a carbon copy to Governor

14   Bentley.

15              I'm not sure.  It's doesn't make -- it's

16   like the same header.  It's to Gina McCarthy,

17   Heather McTeer, Gwen Keyes Fleming.  It's the same

18   subject.  It's 12:46.  I'm not sure what that is.

19   It looks like the same header on the same email.

20   Q.          But it says CC: Governor Bentley?

21   A.          Correct, as does the first one.

22   Q.          And what is the date and time of the

23   second email?

24   A.          It's September 16, 2014 at 12:46 p.m.

25   Q.          And how does that time compare to the

1 time of the first one?

2 A.          Three minutes later.  So it looks

3 like -- well, I'm sorry.

4 Q.          Okay.  Then the top email in that

5 stream, tell me about that.

6 A.          Well, it's not the top one.  The next

7 one up.

8 Q.          Describe the next one up.

9 A.          So the next one up is from Lance

10 LeFleur. ████████████████████████████

11 ██████████████████████████████████

12 ████████████████████████████████████

13 ██████████████  ████████████████████

14           It looks like this is forwarding this

15 email string.

16 Q.          What is the time on that particular

17 email?

18 A.          The time is 12:49 p.m.

19 Q.          How does that compare to the previous

20 two?

21 A.          It's six minutes after the very first

22 one and three minutes after the second one.

23 Q.          So my question is why do you think that

24 Mr. LeFleur would forward an email to you and

25 others three minutes after he forwarded it to the

1    governor, and three minutes before that he had

2    forwarded it to ADEM?

3                So it went to EPA.  Three minutes later

4    it went to the governor and three minutes later it

5    went to you.

6                Can you explain that to us?

7    A.          Sure.  Lance -- of course first of all,

8    Lance and I have worked together for a very long

9    time.  I actually was his lawyer in the BP oil

10   spill problem.  So we have a personal relationship.

11               Because of that Lance would have been

12   aware and is aware that our firm represents

13   Drummond and ABC Coke.

14               So I can't read his mind or anything,

15   but it makes sense to me that when he did something

16   like this that affected a client that he knows our

17   firm represents, and he sees me as the leader of

18   the environmental section at our firm, it would

19   make sense to him that he would say well, okay, I'm

20   doing -- saying something about a Balch Bingham

21   client in the environmental world, I'm going to go

22   ahead and let Steve know what I've done.

23               This is a public email.  I mean, you

24   know, sending something to US EPA is not

25   confidential.

1          So it makes sense to me that he would

2     have notified me of that.

3     Q.          And had Balch & Bingham through you or

4     Mr. Gilbert or someone else communicated to Mr.

5     LeFleur that this was an important issue to Balch

6     and its clients?

7     A.          I'm trying to remember whether I had any

8     conversations with Lance about it, and I can't

9     actually remember, or I don't remember having any

10    conversations with him about it personally.  Me and

11    him.

1. ▬ ▬▬▬▬▬▬▬▬▬▬▬▬
2. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬
3. ▬▬▬▬▬▬▬▬▬▬▬▬
4. ▬▬▬▬▬▬▬▬▬▬▬▬▬
5. ▬▬▬
6. ▬▬▬▬▬▬▬▬▬▬▬
7. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬
8. ▬
9. ▬ ▬▬▬▬▬ ▬▬▬▬▬
10. ▬▬▬
11. Q. ▬▬▬
12. ▬ ▬▬▬ ▬▬▬▬▬▬
13. ▬▬▬▬▬▬▬▬ ▬▬
14. ▬▬▬▬
15. ▬ ▬▬▬▬▬▬
16. ▬▬▬▬
17. ▬ ▬▬▬▬▬▬▬▬▬
18. ▬▬▬▬▬▬▬▬▬▬▬▬
19. ▬▬▬▬▬▬▬▬▬▬▬▬▬
20. ▬▬▬▬▬▬
21. ▬ ▬▬▬▬▬▬▬
22. ▬▬▬▬▬▬▬▬▬▬
23. ▬▬▬▬▬
24. ▬ ▬▬ ▬▬▬▬▬▬
25. ▬▬▬▬▬▬▬▬ ▬▬

Q.        You mentioned that you were friends with Mr. LeFleur because you've done business in the past, and you've known him a long time, correct?

A.        That's right.

Q.        So it makes sense to me, and I'm not putting words in your mouth, but it just seems to make sense that if you have a client that you're representing on a very important issue that could cost them lots of money, that you might call on your friend to discuss that because he's head of ADEM and has some input into these issues.

So it makes sense that you would have talked to him, even though you don't remember maybe specific conversations.

A.        Oh, absolutely.

Q.        Do you agree that you would have most likely talked with him about the issues in North Birmingham?

A.        Yes.  I mean and, of course, seeing a document that would refresh my recollection certainly, but I would have done that with any director of ADEM.

I mean, you know, it's kind of what we do is work with government officials.  You know, I

1  met with EPA.  I met with the regional Superfund

2  director trying to address these issues.

3            We do that trying to work out problems.

4  Trying to learn information.  Trying to, you know,

5  build consensus about how to deal with something.

6  We do that all the time.

7  Q.          Because if in this particular situation

8  if ADEM took the same position that Balch and

9  Drummond were taking in regards to North

10  Birmingham, that would help your cause in some way?

11  A.          Well, Mr. Martin, it's deeper than that.

12  I mean, these are complicated matters, and so we're

13  always talking to other people trying to -- you

14  know, if they've got a point of view, I want to

15  know what it is.  I want to understand it.

16            They may know something that will help

17  me make a better decision.  You know, when you're

18  dealing with government agencies, and there are

19  people involved, many times they have a very deep

20  knowledge of a situation.

21            So talking with people about a problem

22  is a key way to serve your client by getting

23  information, communicating information trying to

24  work through problems.

25            So, you know, we do that as a part of

1    what we do representing clients.

2    Q.        The last part of your answer touches on

3    my next question, and that is in all of these

4    conversations you had with Mr. LeFleur or US EPA,

5    you're representing your client?

6    A.        Not always.  I mean, there are

7    situations where, you know, we're having

8    conversations about a problem that really doesn't

9    have a client involved.

10   Q.        Let's keep it to the North Birmingham

11   issue just to save some time here.

12             In your conversations with ADEM and EPA

13   regarding North Birmingham you were representing

14   ABC Coke, and I imagine you billed them for the

15   time you spent engaged in those conversations,

16   correct?

17   A.        Yes.

18   Q.        In conversations you may have had ███

19   ███████████████████████████with ADEM are you

20   aware of whether or not discussions were had about

21   Balch's strategy in addressing the issues in North

22   Birmingham?

23   A.        I don't know what you mean by strategy.

24   Q.        Balch had a strategy for how to best

25   represent ABC Coke in relation to these issues

1    created by the EPA in North Birmingham, correct?

2    A.          Yes.

3    Q.          In discussions that Balch may have had

4    with ADEM do you know whether or not that strategy

5    was discussed with ADEM officials?

6    A.          I do not.  I do not know whether it was

7    discussed with them, but when you speak of

8    strategy, it sounds to me like something that we

9    wouldn't have discussed with someone else because

10   strategy is a very detailed -- you know, it's a

11   very involved kind of -- you know, it's not

12   necessarily something that you would have

13   discussed.  People wouldn't have the time for you

14   to discuss your strategy with them.

15          If you're engaged in a conversation with

16   somebody about a matter, you would talk to them

17   about the concerns that you have that they might

18   know something about.

19          They wouldn't be necessarily interested

20   in you describing to them all the things that

21   you're going to do to represent your client in a

22   particular matter.

23   Q.          Did Balch engage in a joint strategy or

24   to talk about a joint strategy with ADEM to address

25   these issues?

1   A.          Well, I don't know in the sense that I

2   don't remember having any conversations like that

3   on my own.

4           I do know that when we were preparing

5   our comments on the proposal to list the site on

6   the NPL, those comments are very extensive.  I

7   don't know how many pages they were, but they might

8   be 40 or 50 pages long.

9           And they would have sections of the

10  comments that are focused on legal issues.  There

11  may be sections of the comments focused on

12  technical issues, and sections of the comments

13  based on, you know, on what we call record issues.

14  The facts, so to speak.

15          And there is a lot of work that goes

16  into that.  You know, really digging into those

17  issues.

18          And it's not uncommon at all when you're

19  involved in one of these things that you would

20  share drafts of those comments with other people

21  because you want them to see what you're saying.

22          If you're saying something that's not

23  right, you want them to say hey, wait a minute.

24  You're forgetting so and so or whatever, or why do

25  you say that, and that's not right.

1          But you're also sharing information with

2     them.  They may be very interested in seeing what

3     your legal analysis is of a particular issue or a

4     technical analysis.

5          I mean, an example here is in the NPL

6     listing proposal in order to score the site, in

7     order to evaluate the site and give it a score or a

8     ranking.  You have to evaluate it against

9     something.

10          You know, all property has different

11    chemical constituencies, you know.  Most of us

12    don't --certainly we hear the word arsenic and we

13    think that's not a good thing.  Arsenic is a

14    poison, isn't it.

15          Well, you know, you could go out in the

16    middle of nowhere in Alabama, and you could sample

17    the soil and find some arsenic.  We call that

18    background.  In other words, it naturally occurs,

19    and it's harmless.  It's there.  If you measure it,

20    it's there.

21          So then in this NPL listing there was a

22    questionable what are you comparing this site

23    against.

24    Q.          Mr. McKinney, I don't mean to cut you

25    off, but in the interest of time I want to sort of

1  focus here.  So if you could, sort of get to your

2  point a little more succinctly, okay?

3  A.          Okay.  Well, what I was trying to say is

4  that there are technical issues.  Background was

5  one of them, you know, and EPA had a view of what

6  was the background against which you would compare

7  the site to say whether it's badly contaminated or

8  not.

9            We thought their view was completely

10  erroneous and we had a basis for that.  We had

11  studied that subject.

12            So our comments had a lot in there about

13  what the appropriate background would be, and

14  that's the kind of information you'd share with

15  anybody willing to listen.

16  Q.          We've heard testimony that as part of

17  its strategy to address these issues, that Balch &

18  Bingham had a consulting contract with the Oliver

19  Robinson Foundation.

20            Are you aware of that?

21  A.          I am.

22  Q.          Do you know whether that part of the

23  strategy, the relationship with the Oliver Robinson

24  Foundation, was discussed with ADEM?

25  A.          I did not discuss it.  I do not know

1    whether anyone else discussed it.

2    Q.          Do you know Oliver Robinson?

3    A.          I know he was a great basketball player.

4    I watched him when he played basketball, but I do

5    not know him.  I've never -- to my knowledge, I've

6    never met him, and I have not talked to him about

7    this situation.

8          If I met him, it would have been court

9    side at a UAB basketball game 30 years ago.

10   Q.          This Grand Jury has heard testimony

11   about that contract, and what we want to know today

12   is your role or knowledge of that contract.

13         So can you first just generally describe

14   what you know about the contract and when you

15   obtained knowledge of it?

16   A.          Sure.  I learned about the decision to

17   hire the Oliver Robinson Foundation after that

18   decision had been reached, and I'm trying to think

19   about the contract whether there is any difference.

20         I don't know if a contract existed at

21   that time when I first learned about it -- about

22   the decision to hire them, or whether the contract

23   came later; ███████████████████████████████████████

24   ███████████████████████████████████████████████████

25   ███████████████████████████████████████████████████

1  ██████████████████████████████████

2  ████████████████████████████████████████

3  ████████████████████████████████

4  Q.          So after the fact, fair to say?

5  A.          After the decision to hire them, yes.

6  Q.          Can you give us a time frame?

7  A.          Well, I can't in the sense that I don't

8  remember, but I would say go to the date of the

9  contract and probably back up some from that; but I

10  don't remember when the time frame was.

11  Q.          So I take it from your answer, that you

12  did not participate in any meetings or negotiations

13  leading up to the contract?

14  A.          That's correct.  To the best of my

15  recollection I agreed with the idea that we needed

16  a contractor to help with grassroots education,

17  communication.

18          I agreed with that idea that we needed a

19  contractor, but I wasn't involved in considering

20  various contractors and who would pick, and I was

21  not involved in the choice of Oliver Robinson

22  Foundation.

23  Q.          ████████████████████████████

24  ████████████████████████████

25  ████████████████████████████████

1 ████████████████████████    ████████████████████

2 ██████

3    Q.          Did you review the contract prior to its

4 execution?

5    A.          You know, Mr. Martin, I may have.  I may

6 have. ████████████████████████████████████

7 ██████████████████████    █████████████████████

8 ████████████████████████████████████████

9 ███

10   Q.      ████████████████████████████

11 ███    ████████████████    ████████████████████

12 ████████████████████████████████████████

13 ████████████████████████████████████████

14 ████████████████████████████████████████

15 ████████████████████

16       ███████████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ████████████████████████████████████████████

20 ████████████████████████

21   Q.      ██████████████████████████████████████

22 ████████████████████████████████████

23 ███        █████

24   Q.          Did you provide any edits to the

25 contract that you recall?

A.        If I looked it over, there is a good chance I suggested some change somewhere.  It's just kind of my nature, but I do not remember having suggested any changes; but it's quite possible.

Q.

Q.        If I show you the final version of the contract, do you think you'd be able to look at that and remember what edits you may have suggested or what questions you may have had about it?

A.        If I read the contract that something might come off the page to me that I said oh, yeah, I remember suggesting that.  So I'll be happy to look at it, but I don't remember.

Q.        I'm going to hand you what has been previously marked as Grand Jury Exhibit 3

1  and just ask you to look over that.

2  A.      Okay.

3  Q.      So was that the contract that you

4  mentioned that you reviewed prior to its execution?

5  A.      I think I remember reviewing it.

6  Reading it over now it doesn't help me remember

7  that I did or not, ████████████████████

8  ███████████████████████████████

9  Q.      ████████████████████████████

10  ██        ████████████

11  Q.      And having read the contract, does any

12  edits that you may have suggested jump out to you?

13  A.      No.  It has a lot of material in it

14  about ethics and about, you know, that none of this

15  is intended to be a contribution to anybody, and

16  nobody is allowed to pass anything along.

17          That's information that had I reviewed

18  this, I would have looked for it, you know, if I

19  knew, you know; but I don't have the expertise to

20  supply that.

21  Q.      Why would you have looked for that sort

22  of language in that contract?

23  A.      Well because Oliver Robinson was a

24  member of the legislature.

25  Q.      When a member of the legislature is

1  hired as a consultant by a law firm, it raises some

2  ethical issues, doesn't it?

3  A.        We want to be sure that it's done right

4  because the law allows you to do it, but you have

5  to do it right.

6  Q.

1    ████████████████████████████████

2    ██████████████████████████████

3    ███████████████    ████████████████████████

4    ████████

5    Q.        What sort of due diligence did you do or

6    are you aware of was done before Oliver Robinson

7    Foundation was hired to do this work?

8            You know, by due diligence I mean on

9    Oliver Robinson's ability to do the work.

10   A.        I'm not aware of any evaluation of that

11   before -- I'm sorry.  I see what you mean.

12            I'm not aware of anything.  You mean

13   like when someone first thought well why don't we

14   hire, you know, this contractor.

15            Are you saying between then and the time

16   you hired them or something?

17   Q.        Well, you were about to spend your

18   client's money on Oliver Robinson Foundation to do

19   this work -- communications work, and you know, I

20   would think that the law firm would be interested

21   in knowing whether Oliver Robinson could actually

22   do the work he was being hired to do.

23   A.        Oh, that.  I do not know of any kind of

24   evaluation.  I don't know how they got to the

25   decision.  I do not know how they got to the

1    decision of Oliver Robinson is the right guy for

2    the job.  I don't know that.

3    Q.          Okay, fair enough.

4               Are you aware that shortly before that

5    contract was signed or shortly after that contract

6    was signed, I'm sorry, that Oliver Robinson

7    appeared and made comments before the Alabama

8    Environmental Management Commission?

9    A.          I know that he did that.  I don't know

10   when it was exactly just looking at the date here,

11   but I know that he did that.

12   Q.          Were you aware of it at the time it was

13   happening?

14   A.          No.

Q.

1    A.

Q.          Were you aware of letters that were ████████████████████████ put on Oliver Robinson's letterhead, signed by Oliver Robinson and sent to Lanier Brown and Lance LeFleur?

A.          I am aware of them now, but at the time I was not aware of them.

Q.          When did you become aware of them?

A.          To be honest, I think it was when you started asking about them.

Q.          Okay, fair enough.

Were you aware that Oliver Robinson prior to appearing before the Commission met with two members of the Commission?

A.          At the time I was not.  I have learned that since.

Q.          And when did you learn that?

A.          Same answer.  When you started asking about it.

Q.          After we issued subpoenas and started asking questions?

A.          Yeah, and in the course of reviewing, you know, documents and stuff to be responsive to the subpoena.

Q.          ████████████████████████████

1 ██████████████████████████

2 ███████████████████████

3 ████████████████████████

4 █ ████████████████████

5 ██████████████████████████

6 ████ ████████████████████

7 ████████████

8 Q. ████████████████████████

9 ████████████████

10 █ █████ ██████████

11 █ ███████████

12 █ ████████████████

13 ██████████████████████████

14 █████████████████████████

15 Q. ████████████████████

16 ███████ █████████████

17 █ ███████████

18 █ █████████

19 █ ████████████████

20 █████████████████████████

21 ██████████████████████

22 ███████████████████████

23 ███████████████████

24 █████████████████ ██████████

25 ██████ ██████████ ███████

Q.          Let me show them to you so there is no

misunderstanding of what we're talking about.

A.          Okay.

Q.          I'm showing you what's been previously

marked as Grand Jury Exhibit 4 ███████ and Grand

Jury Exhibit 5 ███████.

A.          Okay.

Q.          Just so we're clear, the record is clear

and everybody understands, are those the two

letters that you and I have been talking about ███████

████████████████████████████████████ and

Oliver Robinson signed?  Is that your

understanding?

A.          Well let me explain because I'm -- when I say recently, what I mean is is that I didn't handle these letters when they were prepared or mailed or anything like that.

I learned of them in the process of gathering information in response to your request, and so that's what I mean by recently.

Q.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

25. A.

1 ████████████████████████████████████████████

2 ████████████████████████████

3 ██   █████████████████████████████████████

4 █████████████████████████████████████

5 ██      ████████   ████████████████   ████████

6 ███████████████████████████████

7 Q.        To change gears a little bit, we've

8 talked about your knowledge of the contract that

9 Balch had with Oliver Robinson Foundation.

10        What was your personal involvement with

11 Oliver Robinson's execution of that contract on

12 behalf of Balch?

13 A.        I had no direct personal involvement.

14 ████████████████████████████████   ██

15 ███████████████████████████████████

16 ███████████████████████████████████

17 ██████████

18         █████████████████████████████████

19 ██████████████████   █████████████████████

20 ████████   ████████████   ██████████████████

21 ██████████████████   █████████████████

22 ██      █████████████████████████████

23 ██████████████████████████████████

24        ███████████████   ████████████████████

25 ███████████████████████████████████

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6    Q.          Earlier you talked about the benefits to

7    the client of heading off this action by the EPA

8    early in the process.  Just a couple more

9    questions.

10           What is the benefit to Balch & Bingham

11    in successfully representing its client in relation

12    to this matter with EPA?

13    A.          Well we earn legal fees working on a

14    client's legal matter and providing them with legal

15    advice.

16    Q.          Let me ask some questions.  I said I had

17    two, but I have more.

18           Do you have any idea of the amount of

19    legal fees that Balch has earned from Drummond, ABC

20    Coke on this matter over the years?

21    A.          I do not.  I don't.  I mean, it would be

22    a significant amount.  I don't know the amount.

23    Q.          What do you typically charge per hour?

24    A.          My billing rate is $490 an hour, and

25    that's only because I refused to let the firm raise

1    it higher.  Clients would pay more.

2    Q.            █████████████████████████████████

3    ███    ████████████    ████████████████

4    ███████████    ████████████████████████

5    Q.            Any idea of how many hours have been

6    expended by Balch attorneys and other personnel on

7    the matter of the years?

8    A.            I don't.  It would be quite a number of

9    hours.

10   Q.            You mentioned the legal fees that the

11   firm earns.  How else does Balch benefit from

12   successful litigation against EPA in this matter?

13   A.            Well, you know, we represent many

14   different clients.  Many different clients in

15   Alabama and really around the country.

16            We were invited to represent Drummond

17   ABC Coke because of our environmental expertise.

18   They have good lawyers that do all kinds of things

19   for them.  They didn't have anyone who was capable

20   of helping them with complicated environment stuff.

21            So, you know, when you do a good job for

22   a client, and you help them deal with a complicated

23   problem in a way that they're satisfied, you know,

24   you hope that that leads to other clients

25   recognizing your skill and hiring you to do that

1   for them.

2   Q.          So a reputational effect of being

3   successful?

4   A.          Sure.

5   Q.          Plus not only might you earn business

6   from other clients, you might get more from

7   Drummond?

8   A.          Sure.  Oh, yeah, we're always -- we want

9   to be their lawyer whenever they need a lawyer.

10  Q.          Any other ways the firm benefits?

11  A.          Well --

12  Q.          Are those the main ones?

13  A.          Yeah.  The only thing I would mention is

14  and this is relevant in this case.  EPA's theory

15  that they were employing to say that ABC Coke was

16  potentially responsible was a theory that was new.

17  It had not been used.  It was used in one other

18  situation in the country, and that theory had the

19  potential to effect lots of different parties in

20  many other sites.

21          So I mention it because there would be

22  other lawyers from around the country who would be

23  kind of touching base with me to say what's going

24  on with that case and how is that theory going

25  because it was a matter of concern among lawyers

1    around the country.

2    Q.            So defeating that issue would have

3    benefitted the firm.  Again, I guess that's sort of

4    related to its reputation and business generating.

5    A.            I don't mean this to sound hokey, but I

6    thought the theory was rubbish, and I thought it

7    had the potential to actually turn the Superfund

8    law kind of on its head.

9              So I actually was concerned about the

10   theory from a practitioner's perspective and from

11   the perspective of somebody who thinks Superfund

12   had its place, has its place today, and will have

13   its place in the future if it's not abused, and I

14   felt like it was being abused.

15             So I had kind of a concern from -- you

16   know, I mean, I've been doing this a long time.

17   I'm going to be retired in a while.

18             I sometimes think of from a legal

19   perspective the over-arching legal good, and I

20   thought this was a bad plan.

21   Q.    ███████████████████████████████████████

22   ███████████████████████████████

23        ███████████████████████████████████████

24   ███████████████████████████████████████████

25   ████████████████████████████

1 A. ▬▬▬▬▬▬▬▬▬

2 ▬▬▬▬▬▬▬ ▬▬▬▬▬▬

3 ▬▬▬▬▬▬▬▬▬▬

4 ▬▬▬▬▬▬▬▬ ▬▬

5 ▬▬▬▬▬▬▬▬

6 ▬▬▬▬

7 ▬▬▬▬▬▬▬▬

8 ▬▬▬ ▬▬▬▬▬▬

9 ▬▬▬▬▬▬▬▬▬▬▬

10 ▬▬▬▬▬▬▬▬▬▬

11 ▬▬▬▬▬▬▬▬▬

12 ▬▬▬▬▬▬▬▬▬▬

13 ▬▬▬▬

14 ▬ ▬▬▬▬▬ ▬▬▬

15 ▬▬▬▬▬▬▬▬▬

16 ▬▬▬▬▬▬▬▬▬

17 ▬▬▬▬▬▬▬▬▬▬

18 ▬▬▬▬▬▬▬▬▬▬

19 ▬ ▬▬

20 ▬ ▬▬▬▬▬▬▬

21 ▬▬▬▬▬▬▬▬▬

22 A. ▬▬

23 ▬ ▬▬▬▬▬▬▬▬

24 ▬▬▬▬▬▬

25 ▬▬▬▬▬▬▬▬

MR. MARTIN: Do the Grand Jurors have any questions?

A JUROR: I have one question, and I may have misunderstood.

Did you say earlier that you didn't know that your firm had hired Oliver Robinson until after the fact?

A.        That's a good question, but if I said that, I didn't mean it.

What I meant was that I didn't know that the decision to hire him had been made. I wasn't involved in that decision, and I learned of it after it had been made.

I don't know in relationship to the contract, the date of the contract, which I would say is the day that that foundation got hired.

I'm certain that I learned of it before that contract was signed because I believe I remember looking at the contract as it was being prepared.

THE JUROR: That's why I was asking,

1   because I was thinking if you looked at the

2   contract then, you would have known.

3   A.          Right, yeah, but I didn't -- I guess

4   what I was trying to say is I didn't -- he had been

5   hired when I learned of it.  I first learned of it

6   after he had -- I'm sorry.  Let me say it again.

7               The decision to hire him had been made

8   is what I meant.

9   Q.          You mentioned in response to her

10  question that you consider the date of the contract

11  the time, the date that Oliver Robinson Foundation

12  was hired.

13  A.          Uh-huh (Affirmative).

14  Q.          I got to follow up because there is two

15  dates in this contract, if you noticed.

16  A.          Okay.

17  Q.          There is the date that it was signed,

18  which was February 16, 2015.

19  A.          Right.

20  Q.          But it says it has an effective date of

21  December 1, 2014.

22  A.          That's a good point.

23  Q.          So which date are you referring to?

24  A.          Well, a contract for services often, you

25  know, refers to you started work on this previous

1    date, and that's what that is.

2              So what date was I referring to?  I

3    don't know.  If we're trying to place the

4    conversation where I learned about the decision to

5    hire Oliver Robinson in between those two dates,

6    I'm not sure.

7              December 1, I don't remember if that's

8    like when they started work on December 1, or is

9    that was -- I don't remember why that date is

10   there.

11             But since I've muddied the water so well

12   let me say it again.  When I learned that Oliver

13   Robinson had been chosen, I had not previously

14   known that he, you know, was involved or being

15   considered.

16             So learned that he had been chosen, and

17   then later they showed me the draft contract and

18   asked me to look it over, I'm pretty sure, and then

19   the draft contract got finalized and executed.

20   Q.        So that would have been sometime between

21   roughly December 1, 2014 and February 16, 2015 when

22   you learned that he had been hired or chosen?

23   A.        You know, that makes sense but, you

24   know, I don't know what the December 1 date is.

25   A lot of times in contracts, you know, you will

1    recite the day when someone was perhaps even chosen

2    as the beginning date of the contract, and then

3    there is the day they started working, and then

4    there's the date of the contract.

5              I don't know what December 1 is.  I

6    don't know why that is recited.  So I can't say.

7    Q.              So I guess it's fair to conclude, and

8    you tell me, Oliver Robinson apparently was already

9    doing work at the time that you learned that he had

10   been chosen?

11   A.              I don't know that that's true.

12   Q.              Well, I'm just going by the language of

13   your contract where it says the effective date of

14   December 1.

15   A.              Yeah, it could be, but I don't know that

16   it's true.  I just don't remember whether he had

17   actually begun working when I first learned about

18   him being chosen.  Just don't know that.

19   Q.              Well if Balch paid Oliver Robinson back

20   to include December 1, you would think he had been

21   working.

22   A.              I would expect that.  I would expect

23   that, yes.

24              MR. MARTIN:  Any other questions?

25              A JUROR:  I do.  The two letters that

1  you reviewed that were from Oliver Robinson ███

2  ██████████████████████████ they were to the AEC,

3  is that correct?  Those two letters that you said

4  you questioned him about, and that Mr. Martin

5  showed you those two letters?

6  A.        Right.  Well, I'm looking at them.

7          THE JUROR:  Oh, you still have them

8  there?

9  A.        Yes.

10         THE JUROR:  Do one or both or neither

11 say in the first sentence or references himself as

12 a representative, a state representative?

13 A.        Okay.  Well, the letters are on his

14 letterhead.

15         THE JUROR:  Right.

16 A.        The February 6 letter addressed to

17 Lanier Brown, the second paragraph begins with

18 (Reading) "As a State Legislator and representative

19 of a district adjacent to North Birmingham".

20         So there is a reference there.

21         THE JUROR:  Both letters?

22 A.        That's the first letter, and then the

23 March 4 letter addressed to Lance LeFleur, again

24 it's on his letterhead.

25         I see no reference to him being a

1  legislator in the text of the letter.

2           THE JUROR:  One other question.  The

3  letterhead, is it the letterhead for him as a state

4  legislator or his Partner for Progress or as

5  Robinson & Robinson?  What's the letterhead say?

6  A.           It is the letterhead of his state

7  legislature job.  It's Representative Oliver

8  Robinson, Jr. letterhead.

1

2          THE JUROR:  Or say that he was a state

3   legislator in the letter.  That would come from Mr.

4   Robinson himself?

5   A.          Could have, yeah.

6

7   Q.          What significance does it have to you

8   that it's on letterhead?  On the House of

9   Representatives letterhead?

10  A.          Well, I mean, to me it doesn't have any

11  significance in the sense of, you know, there being

12  anything wrong with it, you know,

13

14  Q.

15

16

17

18          So I don't see any red flags from that.

19  The significance into the addresses, the people

20  that receive it.  You know, they know Oliver

21  Robinson, and they know him to be a state

22  representative.

23          So I don't know if it would have been

24  any different if he had written it on his personal

25  letterhead.  You know, they would have still known

1   they're talking to Oliver Robinson.

2          So as it relates to how those people

3   perceive or concern, I can't say that they would

4   have said -- that they would have a different

5   perception if he had put it on some other

6   letterhead.

7   Q.         That wasn't the question I was really

8   asking was what they thought about it or anything,

9   and I'm sure they knew he was a state legislator

10  because it was written in the letter, if nothing

11  else.

12  A.         Oh, they know.

13  Q.         You know, I guess my question was just

14  when you see a person writing a letter on Alabama

15  House of Representatives letterhead, does that

16  indicate to you that they're a member of the House

17  of Representatives and speaking as such?

18  A.         Well, sure, and the point I guess I'm

19  making is that they do that -- they carry that with

20  them 24-7 wherever they are.

21         That's why the ethics laws kind of say

22  what they're allowed to do and not allowed to do

23  because they can't avoid being -- once they're

24  elected, they are, and it doesn't matter whether

25  they use a letterhead or not.  It doesn't matter

1    whether they wear a suit or not.  They're still a

2    representative.  So they have to abide by the

3    ethics laws.

4    Q.          I wholeheartedly agree with that.

5               MR. MARTIN:  Any other questions?

6               A JUROR:  For Lance, how long have you

7    known him?

8    A.          I first met Lance LeFleur when he became

9    Director.  I had met his wife who worked in state

10   government also before I met Lance.  So I knew of

11   him.

12              He became Director in the Bob Riley

13   administration.  Probably pretty early in the Bob

14   Riley administration.

15              So he's been Director for maybe 10

16   years.  No, -- I don't know.  Eight years?  Quite a

17   while.

18              MR. MARTIN:  Any other questions?

19              A JUROR:  I had a question.

20              Mr. Robinson was hired as a consultant

21   ▉▉▉▉▉▉▉▉.  Oliver Robinson, was he the contract

22   -- was as a consultant through you-all?

23   A.          Well, the work that we hired the Oliver

24   Robinson Foundation to do was work in the nature of

25   consulting.  That's what consultants do.

1    It was to provide us with help
2  communicating and educating.  Providing information
3  to, collecting information from folks in the
4  Tarrant area.

5  ████████████████████████
6  ██████████████    █████████████
7  █████████████████████████
8  ███████████████████████████
9  ████████████████████████
10 █████████████████████████
11 ████████████

12    The work that was to be done is work
13 that in you need to have some local knowledge.  You
14 need to know who to talk to.  Who to find out
15 things from.

16    So when you need help of this type you
17 go looking for someone in that area, you know, and
18 there usually are people who are in the business of
19 helping people communicate well.  So you're looking
20 for that kind of person.

21    I don't know how we got to the Oliver
22 Robinson Foundation, but the people who did the
23 work were people who had experience in that kind of
24 stuff in that area.

25    THE JUROR:  And leading up to that if he

1  had the experience in that -- I know you said as a

2  stated practice that sometimes they ask the lawyers

3  to draft the letter for him.

4  A.          Uh-huh (Affirmative).

5          THE JUROR:  But in this instance with

6  him not being the consultant would they not have

7  their other outside people draft the letter?

8  A.          No.  There is a blend between kind of

9  like how things get done, and now I'm speaking kind

10  of generically.

11          We hire a lot of different consultants

12  to help us provide legal advice.  We may hire

13  technical consultants.  We may hire people, you

14  know, who have experience and we want advice from

15  them.

16          So in all those situations some of those

17  people are really good at writing stuff, and I

18  immediately tell them well you're writing this.

19  I'll review it to see if I got any issues or

20  questions about it, but you're right.

21          In other situations somebody may be

22  really good at, you know, let's just say chemistry.

23  Dealing with chemical problems, but they can't

24  write a letter to their mom.  I mean, they're not

25  any good at writing.

1          So in that situation, say, all right,

2     Dr. Jones, you're the greatest chemist in the

3     world, but we'll write things, and you read it and

4     see if we have captured the truth.

5          So it's a blend, ███████████████████

6     ████████████████████████████████████████

7     ████████████████████████████████████████

8     ████████████████████████████████████████

9     ████████████████████████████████████████

10    ████████████████████████████████████████

11    ████████████        So it would kind of go both ways.

12          MR. MARTIN:  Any other questions?

13          (No response)

14          MR. MARTIN:  Thank you.  You're excused.

15          (Whereupon, the witness exited the Grand

16    Jury Room at approximately 3:25 p.m.)

17

18                    END OF PROCEEDINGS

19

20

21

22

23

24

25

CERTIFICATE

I, Margaret Johnson, a Certified Court Reporter for the State of Alabama, having sworn to keep secret the testimony given before the Grand Jury, hereby certify that I am the Court Reporter who made the stenomask notes of the foregoing proceedings at the time and place stated in the Caption herein; that I later reduced my stenomask notes into typewriting; and that the foregoing pages contain a full, true, and correct transcript of the testimony given before the Grand Jury on that occasion.

I further certify that I am in no way related to nor employed by any of the Grand Jurors, the witness, or the United States Attorneys conducting the examination of the witness; and that I have no interest in the outcome of this matter.


Margaret Johnson

Alabama Certified Court Reporter #488