| From: | Gilbert, Joel </O=BALCH/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=JGILBERT> |
|---|---|
| Sent: | Wednesday, July 13, 2016 3:31 PM |
| To: | 'Messier, Steve (NSBHM)' <Steve.Messier@nucor.com> |
| Cc: | 'Roberson, David' <DRoberson@drummondco.com> |
| Subject: | Materials Related to EPA Activities (Privileged & Confidential) |
| Attach: | Jefferson County Resolution.pdf; Governor Letters re GASP.pdf; Citizens of TARRANT.pdf; Get Smart Facts (May 2016).pdf; 2014.08.28 - Mayor Bell Ltr to EPA re concern over GASP petition and NPL listing.pdf; 2016.02.29 - Tarrant mayor final ltr to EPA with technical comments on South Tarrant sampling.pdf; Get Smart ltr to homeowners.pdf; 2015.10.15 - Get Smart ltr to Lanier Brown re concern over EPA actions in Tarrant.pdf; Mayor Tuck Letter to Tarrant Citizens.pdf; Congress member letter to EPA re concern over process for listing 35th Ave site.pdf; 2014.10.23 - AL AG letter to EPA re disapproval of proposed NPL listing.pdf; Shelby Sessions Palmer Letter to EPA.pdf |

Privileged & Confidential

Steve –

Attached are a few examples of information AJE has helped to disseminate to the neighborhoods as well as communications, reports etc. that we have developed for others use. This is just a little of what AJE has done over the course of the last couple of years and we have many more examples; however, I thought this would give you adequate insight to the work AJE has done. As discussed, please keep this email confidential and not allowed to be provided to anyone outside of Nucor. Once you have had a chance to review, let me know if you want to discuss or need further examples/information. Thanks.
Joel



Joel I. Gilbert, Partner, Balch & Bingham LLP
1901 Sixth Avenue North • Suite 1500 • Birmingham, AL 35203-4642
t: (205) 226-8737   f:(205) 488-5824   e: jgilbert@balch.com
www.balch.com

**CONFIDENTIAL**                                                           **Balch-ORF-PRIV-003878**

2:17–CR–00419–AKK–TMP
06/25/18 Jury Trial

DEFENDANT EXHIBIT 1222

Balch-ORF-PRIV-003878
**DX 1222 - 001**

employee of the governing body of the County or any other public official or public employee, in any manner whatsoever, to secure or obtain this Agreement and further certify that, except as expressively set out in the scope of work or services of this Agreement, no promise or commitment of any nature whatsoever of anything of value whatsoever has been made or communicated to any such governing body member or employee or official as inducement or consideration for this Agreement.

19.     HOLD HARMLESS AND INDEMNIFICATION: Contracting party agrees to indemnify, hold harmless and defend Jefferson County, Alabama, its elected officers and employees (hereinafter referred to in this paragraph collectively as "County"), from and against any and all loss expense or damage, including court cost and attorney's fees, for liability claimed by a third party against or imposed upon County because of bodily injury, death or tangible property damage, real or personal, negligent acts, errors or omissions, including engineering and/or professional error, fault, mistake or negligence of Integrator, its employees, agents, representatives, or subcontractors, their employees, agents or representatives in connections with or incident to the performance of this agreement. Company obligation under this Section shall not extend to any liability caused by the sole negligence of the County, or its employees.

20.     LIMITATION OF LIABILITY

Except for Contractor's indemnity obligation for third party claims for personal injury, death, property damage, or infringement, County hereby agrees that Contractor total liability to County for any and all liabilities, claims or damages arising out of or relating to this Agreement, howsoever caused and regardless of the legal theory asserted, including breach of contract or warranty, tort, strict liability, statutory liability or otherwise, shall not, in the aggregate, exceed fees paid to Contractor during the previous 12-month period. Except for Contractor's indemnity obligation for third party claims for personal injury, death, property damage, or infringement, in no event shall either Contractor or County be liable to the other for any punitive, exemplary, special, indirect, incidental or consequential damages (including, but not limited to, lost profits, lost business opportunities, loss of use or equipment down time, and loss of or corruption to data) arising out of or relating to this Agreement, regardless of the legal theory under which such damages are sought, and even if the parties have been advised of the possibility of such damages or loss and notwithstanding any failure of essential purpose of any limited remedy.

21.     VIOLATION: Any violation of this certification shall constitute a breach and default of this Agreement which shall be cause for termination. Upon such termination Contractor shall immediately refund to the County all amounts paid by the County pursuant to this Agreement.

IN WITNESS WHEREOF, the Parties have hereunto set their hands and seals or caused these presents to be executed by their duly authorized representative.

Jefferson County Commission

W.D. CARRINGTON, PRESIDENT

Vendor

_____, Authorized Signature

Motion was made by Commissioner Stephens seconded by Commissioner Brown that the above resolution be adopted. Voting "Aye" Stephens, Brown, Bowman and Carrington.

---

Oct-9-2014-902

A RESOLUTION TO SUPPORT THE CITY OF TARRANT, ALABAMA, AND

ITS RESOLUTION IN OPPOSITION TO THE JULY 1, 2014

PETITION OF G.A.S.P. TO THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

TO INVESTIGATE AND DECLARE RESIDENTIAL AREAS IN THE CITY OF TARRANT TO BE A SUPERFUND SITE

BE IT RESOLVED AND ORDERED by the County Commission ("Commission") of Jefferson County (the "County") in the State of Alabama as follows:

WHEREAS, the Commission is aware of the petition, dated July 1, 2014 (the "Petition"), submitted by the organization known as G.A.S.P. to the U.S. Environmental Protection Agency ("EPA"); and

WHEREAS, the Commission understands that the Petition seeks certain actions by EPA to declare certain residential areas within the City of Tarrant, Alabama, to be a Superfund site under the federal Comprehensive Environmental Response, Compensation, and Liability Act; and

WHEREAS, the Commission further understands that the City Council of Tarrant has found the allegations in the Petition to be unfounded and that the actions requested of EPA in the Petition would subject the City, its residents, and its businesses to substantial economic hardships, including decreased property values, closing of businesses, significant job loss, diversion of City revenues and expenditure of funds, and generally depressed economic development; and

26

WHEREAS, the County Department of Health, EPA, and the U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, have each conducted recent studies related to health risks in the North Birmingham area, each concluding that no unacceptable risks or health impacts are present; and

WHEREAS, the County Department of Health specifically concluded in its August 6, 2014 report that populations in the Collegeville, Fairmont, and Harriman Park areas of North Birmingham have the same or lower statistical chances of death due to cancer or pulmonary disease than do populations across the rest of the County; and

WHEREAS, the Commission has been advised that the allegations in the Petition are unfounded and agrees that the actions requested of EPA in the Petition would cause substantial economic hardships to the City of Tarrant, its residents, and its businesses; and

WHEREAS, the Commission finds that such negative economic impact to the City of Tarrant would also negatively impact the economic well-being of the County; and

WHEREAS, the Commission further finds that the Petition and the actions of EPA requested therein would also directly subject the County, its residents, and its businesses to these same economic hardships; and

WHEREAS, the City of Tarrant has requested assistance from state and local leaders and representatives in opposing the G.A.S.P. Petition, including the Honorable Governor of the State of Alabama Robert Bentley, the Alabama Department of Environmental Management, the Honorable United States Senators Richard Shelby and Jeff Sessions, the Honorable United States Representative Spencer Bachus of the 6th District of Alabama, and the Honorable United States Representative Terri Sewell of the 7th District of Alabama; and

WHEREAS, the City of Tarrant has further called upon the City of Birmingham, and the Honorable Mayor William A. Bell, to oppose the G.A.S.P. Petition in order to promote a prosperous economic future for the Greater Birmingham Area; and

WHEREAS, the Commission agrees with the City of Tarrant that assistance from these federal, state and local leaders is warranted and necessary to prevent the substantial economic hardships to the City of Tarrant, the Greater Birmingham Area, and Jefferson County that would result from the actions requested of EPA in the Petition; and

WHEREAS, the Jefferson County Commission hereby agrees that the actions of EPA requested therein present an unacceptable risk of negative economic impacts to the County, its residents, its local businesses, and the municipalities within and adjacent to County borders; and

WHEREAS, that because of the negative economic impacts that would result from the Petition, if granted, the Commission hereby supports and joins with the City of Tarrant in its opposition to the G.A.S.P. Petition and the actions of EPA requested therein, and asks EPA to deny said petition.

BE IT FURTHER RESOLVED that the Commission hereby requests the support of the heretofore mentioned leaders and representatives of the State of Alabama and the City of Birmingham in opposing the G.A.S.P. Petition.

NOW, THEREFORE, the Jefferson County Commission hereby adopts and approves this resolution, on the 9th day of October, 2014.

Motion was made by Commissioner Stephens seconded by Commissioner Brown that the above resolution be adopted. Voting "Aye" Stephens, Brown, Bowman and Carrington.

---

Oct-9-2014-903

WHEREAS, Act 705 , October 2,1986 of the Alabama State Legislature determines the personnel of the Jefferson County Planning and Zoning Commission; and

WHEREAS, the Act establishes three designated positions on the Commission, which are: 1) An employee of the county designated by the County Commission; 2) The County Engineer; and, 3) An employee of the Board of Health appointed by said Board; and

WHEREAS, the Commission wishes to appoint an appropriate employee for the County's designated county employee position.

NOW THEREFORE BE IT RESOLVED BY THE JEFFERSON COUNTY COMMISSION, that the County employee appointed to be a designated member of the Jefferson County Planning and Zoning Commission shall be the person holding or acting in the position of Deputy County Manager for Infrastructure.

Motion was made by Commissioner Stephens seconded by Commissioner Brown that the above resolution be adopted. Voting "Aye" Stephens, Brown, Bowman and Carrington.

---

Oct-9-2014-904

BE IT RESOLVED BY THE JEFFERSON COUNTY COMMISSION that the Commission does hereby ratify the action taken by

CONFIDENTIAL

Balch-ORF-PRIV-003880

Balch-ORF-PRIV-003880
DX 1222 - 003

OFFICE OF THE GOVERNOR

ROBERT BENTLEY
GOVERNOR

STATE CAPITOL
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-3282



# STATE OF ALABAMA

August 25, 2014

The Honorable William A. Bell, Sr.
Mayor
City of Birmingham
710 20th Street North
Birmingham, Alabama 35203

Re: EPA Superfund Activities in Birmingham, Alabama

Dear Mayor Bell:

I wanted to notify you that my office is becoming increasingly concerned about activities being advanced by EPA and others in Birmingham. Specifically, in addition to EPA's potential listing of the 35th Avenue Site in Birmingham on the National Priorities List (NPL), my office has recently become aware of a petition filed by GASP, an Alabama non-profit corporation, requesting that EPA perform a preliminary assessment of the City of Tarrant and the Inglenook community in Birmingham (hereinafter collectively the "Tarrant/Inglenook area") under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. Taken together, the combined effect of the 35th Avenue Site being listed on the NPL and the apparent attempt by GASP to have the Tarrant/Inglenook area designated as a Superfund site under CERCLA would undoubtedly have a drastic, negative impact on the economic redevelopment and revitalization efforts currently underway in the cities of Birmingham and Tarrant.

My May 30, 2014, correspondence to Ms. Heather McTeer Toney, U.S. EPA Region 4 Administrator (attached), designated ADEM as the State of Alabama's representative in issues concerning the potential listing of the 35th Avenue Site on the NPL. In addition, due to my growing concern, I have recently instructed ADEM to become fully engaged in both the proposed NPL listing of the 35th Avenue Site as well as GASP's petition to ensure that the State's and the cities of Birmingham and Tarrant interests are fully protected and that whatever may result from these initiatives are supported in both law and fact.

I am contacting you to let you know of my instruction to ADEM to become more fully engaged in both of these matters and offer any assistance that the State and ADEM may provide to you, as Mayor of Birmingham, in these matters. My desire is to ensure that all parties, in particularly the City, understand the grave potential implications of these initiatives should they move forward.

Sincerely,

Robert Bentley
Governor

Attachment

c:     Lance R. LeFleur, Director, Alabama Department of Environmental Management

**CONFIDENTIAL**

**Balch-ORF-PRIV-003881**

Balch-ORF-PRIV-003881

OFFICE OF THE GOVERNOR

ROBERT BENTLEY
GOVERNOR



STATE CAPITOL
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-3282

## STATE OF ALABAMA

May 30, 2014

Heather McTeer Toney
Regional Administrator
U.S. Environmental Protection Agency, Region 4
Atlanta Federal Center
61 Forsyth Street, SW
Atlanta, GA 30303-3104

Dear Ms. Toney:

By letter of April 2, 2014, your office contacted the Alabama Department of Environmental Management ("ADEM") concerning potential listing of the 35th Avenue Site located in Northern Birmingham, Alabama, on the National Priorities List and solicited the State's position on the proposed listing. EPA's letter asked for a response from the Governor or a delegated representative. ADEM has worked closely with EPA in the evaluation of the Site throughout the assessment process. Accordingly, I am delegating authority to ADEM to provide comments to EPA on behalf of the State concerning the proposed listing. The Department will be providing a response to you regarding this matter in the near future.

Sincerely,

Robert J Bentley

Robert Bentley
Governor

cc:     Lance R. LeFleur, Director, Alabama Department of Environmental Management
        Franklin E. Hall, Director, Superfund Division
        Phillip Davis, Director, Land Management Division

**CONFIDENTIAL**

**Balch-ORF-PRIV-003882**

OFFICE OF THE GOVERNOR

ROBERT BENTLEY
GOVERNOR

STATE CAPITOL
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-3282



# STATE OF ALABAMA

August 25, 2014

Mr. Lance LeFleur
Director
Alabama Department of Environmental Management
1400 Coliseum Drive
Montgomery, Alabama 36110

Re: EPA Superfund Activities in Birmingham, Alabama

Dear Director LeFleur:

My May 30, 2014, correspondence to Ms. Heather McTeer Toney, U.S. EPA Region 4 Administrator, designated ADEM as the State of Alabama's representative on issues concerning the potential listing of the 35th Avenue Site in Birmingham on the National Priorities List (NPL), I wanted to notify you that my office is becoming increasingly concerned about activities being advanced by EPA and others in Birmingham. Specifically, in addition to EPA's potential listing of the 35th Avenue Site on the NPL, my office has become aware of a petition filed by GASP, an Alabama non-profit corporation, requesting that EPA perform a preliminary assessment of the City of Tarrant and the Inglenook community in Birmingham (hereinafter collectively the "Tarrant/Inglenook area") under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq.

Taken together, the combined effect of the 35th Avenue Site being listed on the NPL and the apparent attempt by GASP to have the Tarrant/Inglenook area designated as a Superfund site under CERCLA would undoubtedly have a drastic negative impact on the economic redevelopment and revitalization efforts currently underway in the cities of Birmingham and Tarrant. As such, I am requesting that your department become fully engaged in both of these matters to ensure that the State's and these cities' interests are fully protected and that whatever may result from these initiatives are supported in both law and fact.

Furthermore, to ensure that my office fully understands the present status of EPA's proposal to list the 35th Avenue Site on the NPL and the potential impacts of the GASP petition, I am requesting you and any relevant agency staff participate in a meeting to fully brief my office on these matters. Due to the urgency of these matters, I would appreciate you notifying my office as to when you would be available to meet as soon as possible.

Sincerely,

Robert Bentley
Governor

c:    Phillip Davis, Director, Land Management Division

**CONFIDENTIAL**

**Balch-ORF-PRIV-003883**

Balch-ORF-PRIV-003883

OFFICE OF THE GOVERNOR

ROBERT BENTLEY
GOVERNOR



STATE CAPITOL
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-3282

## STATE OF ALABAMA

August 25, 2014

The Honorable Loxcil Tuck
Mayor
City of Tarrant
1604 Pinson Valley Parkway
Birmingham, Alabama 35217

Re: EPA Superfund Activities in Birmingham, Alabama

Dear Mayor Tuck:

I wanted to notify you that my office is becoming increasingly concerned about activities being advanced by EPA and others in Birmingham. In addition to EPA's potential listing of the 35th Avenue Site in Birmingham on the National Priorities List (NPL), my office has recently become aware of a petition filed by GASP, an Alabama non-profit corporation, requesting that EPA perform a preliminary assessment of the City of Tarrant and the Inglenook community in Birmingham (hereinafter collectively the "Tarrant/Inglenook area") under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. Taken together, the combined effect of the 35th Avenue Site being listed on the NPL and the apparent attempt by GASP to have the Tarrant/Inglenook area designated as a Superfund site under CERCLA would undoubtedly have a drastic, negative impact on the economic redevelopment and revitalization efforts currently underway in the cities of Birmingham and Tarrant.

My May 30, 2014, correspondence to Ms. Heather McTeer Toney, U.S. EPA Region 4 Administrator (attached), designated ADEM as the State of Alabama's representative in issues concerning the potential listing of the 35th Avenue Site on the NPL. In addition, due to my growing concerns, I have recently instructed ADEM to become fully engaged in both the proposed NPL listing of the 35th Avenue Site as well as GASP's petition to ensure that the State's and the cities of Birmingham and Tarrant interests are fully protected and that whatever may result from these initiatives are supported in both law and fact.

I am contacting you to let you know of my instruction to ADEM to become more fully engaged in both of these matters and offer any assistance that the State and ADEM may provide to you, as Mayor of Tarrant, in these matters. My desire in doing so is to ensure that all parties, in particular the City, understand the grave potential implications of these initiatives should they move forward.

Sincerely,

Robert Bentley
Governor

Attachment

**CONFIDENTIAL**

**Balch-ORF-PRIV-003884**

OFFICE OF THE GOVERNOR

ROBERT BENTLEY
GOVERNOR



STATE CAPITOL
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-3282

STATE OF ALABAMA

May 30, 2014

Heather McTeer Toney
Regional Administrator
U.S. Environmental Protection Agency, Region 4
Atlanta Federal Center
61 Forsyth Street, SW
Atlanta, GA 30303-3104

Dear Ms. Toney:

By letter of April 2, 2014, your office contacted the Alabama Department of Environmental Management ("ADEM") concerning potential listing of the 35th Avenue Site located in Northern Birmingham, Alabama, on the National Priorities List and solicited the State's position on the proposed listing. EPA's letter asked for a response from the Governor or a delegated representative. ADEM has worked closely with EPA in the evaluation of the Site throughout the assessment process. Accordingly, I am delegating authority to ADEM to provide comments to EPA on behalf of the State concerning the proposed listing. The Department will be providing a response to you regarding this matter in the near future.

Sincerely,

Robert J Bentley

Robert Bentley
Governor

cc:     Lance R. LeFleur, Director, Alabama Department of Environmental Management
        Franklin E. Hall, Director, Superfund Division
        Phillip Davis, Director, Land Management Division

**CONFIDENTIAL**

**Balch-ORF-PRIV-003885**

CONFIDENTIAL

Balch-ORF-PRIV-003886

# GET SMART TARRANT

## Our Mission:

    We are here to provide the citizens of Tarrant information that will help them make the best decision when the Environmental Protection Agency (EPA) tries to designate the area as a Superfund Site or put Tarrant on the National Priorities List (NPL) by sampling the soil and as a result possibly labeling your property as a toxic dump.

    We want to inform, educate and give the citizens full disclosure of all of the facts based on the EPA coming into your city.

### IF YOU LET THE EPA DESIGNATE TARRANT AS A SUPERFUND SITE OR LIST TARRANT ON THE NPL LIST:

- No money will be given to any resident to purchase a new home or for personal use
- Your property value will decrease
- You property value will be worthless for at least the next 30 years
- You will not be able to sell your property
- The EPA will not give you any money
- Local businesses will be hurt
- Local school's attendance will decrease
- People will be leaving the city and no one will be moving in
- Your property value will decrease but you will still have to pay your current property tax
- If placed on the NPL list your property will be considered a toxic dump

Balch-ORF-PRIV-003886

CONFIDENTIAL

Balch-ORF-PRIV-003887

**EVEN IF THERE IS NO CONTAMINATION OF YOUR PROPERTY BUT THE AREA IS DESIGNATED AS A SUPERFUND SITE OR PUT ON THE NPL LIST, THEN EVERYONE IN THE CITY OF TARRANT PROPERTY VALUE WILL PLUMMET.**

**Even though rumors and lies are being told that the City of Tarrant is polluted and filled with toxins, the Jefferson County Department of Health stated that the air quality for the area is GOOD. Please refer to JCDH.ORG for further information on the air quality in this area.**

**\*If you have any concerns, please contact GET SMART Tarrant at: GetSmartTarrant@GMAIL.COM**

Balch-ORF-PRIV-003887

CONFIDENTIAL

## Here are the FACTS:

As you may know, the Environmental Protection Agency (EPA) is in the Tarrant area testing soil. You might have heard different information about what could happen in Tarrant if the EPA considers the area a Superfund Site. However, Get Smart would like to give you the FACTS.

- **No money will be given to any resident to purchase a new home or for personal use**
- **Your property value will decrease**
- **You will not be able to sell your property**
- **The EPA will not give you any money**
- **Local businesses will be hurt**
- **Local school's attendance will decrease**
- **If you do NOT own the property, you can NOT sign the release to allow the EPA to test the property**
- **Your property value will decrease but you will still have to pay your current property tax**
- **If placed on the NPL list your property will be considered a toxic dump**
- **EVEN IF THERE IS NO CONTAMINATION OF YOUR PROPERTY BUT THE AREA IS DESIGNATED AS A SUPERFUND SITE OR PUT ON THE NPL LIST, THEN EVERYONE IN THE CITY OF TARRANT PROPERTY VALUE WILL PLUMMET**

**If you have any questions or concerns, please contact Get Smart at 205-541-9297 or GetSmartTarrant@gmail.com**




OFFICE OF THE MAYOR
CITY OF BIRMINGHAM

WILLIAM A. BELL, SR.
MAYOR

August 28, 2014

Hon. Heather McTeer Toney, Regional Administrator
U.S. Environmental Protection Agency – Region 4
61 Forsyth Street, S.W.
Mail Code: 9T25
Atlanta, GA 30303-8960

Dear Administrator Toney:

It has come to my attention that EPA Region 4 is considering a petition filed by GASP, an Alabama non-profit corporation, requesting that Region 4 perform a Preliminary Assessment of the Inglenook neighborhood in the City of Birmingham and residential areas in the City of Tarrant under the "Superfund" law. I also understand that Region 4 is presently considering whether to propose the 35th Avenue Superfund Site for listing on the National Priorities List ("NPL").

Given the potential impacts of these actions on the City of Birmingham, the Birmingham-Shuttlesworth International Airport, and our city's citizens, neighborhoods, and businesses, I am very interested in and concerned about Region 4's considerations and ultimate decisions. I would very much appreciate an opportunity to meet and discuss these matters with you before Region 4 makes any decisions that could have such significant impacts on Birmingham.

Sincerely,

William A. Bell, Sr.
Mayor

Cc:  Governor Robert Bentley, State of Alabama
     Representative Terri Sewell, U. S. Congress, 7th District of Alabama
     Representative Spencer Bachus, U. S. Congress, 6th District of Alabama
     Lance R. LeFleur, Director, Alabama Department of Environmental Management
     Gaynell Hendricks, Chairperson - Birmingham Airport Authority Board
     Al Denson, President/CEO - Birmingham Airport Authority

710 NORTH 20TH STREET  BIRMINGHAM, ALABAMA 35203  (205) 254-2277  FAX (205) 254-2926

**CONFIDENTIAL**

**Balch-ORF-PRIV-003889**

Balch-ORF-PRIV-003889
**DX 1222 - 012**

**BENJAMIN S. GOLDMAN**
**CITY ATTORNEY**

**LOXCIL B. TUCK**
**MAYOR**

**LILLIAN A. KEITH**
**CITY CLERK**

# CITY OF TARRANT

**1604 Pinson Valley Parkway**
**P. O. Box 170220**
**Tarrant, Alabama 35217-0220**
**205/849-2800**
**Fax 205/849-2805**

**COUNCIL MEMBERS**
**CATHERINE ANDERSON**
**JOHN T. "TOMMY" BRYANT**

**COUNCIL MEMBERS**
**DEBORAH M. MATTHEWS**
**BETTY S. MIDDLEBROOKS**

**LAURA HORTON**
**MAYOR PRO TEM**

February 29, 2016


VIA U.S. MAIL & E-MAIL (Delli-Gatti.Dionne@epa.gov)
Dionne Delli-Gatti, Government Relations Specialist
U.S. Environmental Protection Agency – Region4
Sam Nunn Federal Center
61 Forsyth Street, S.W.
Atlanta, GA 30303-8960

Dear Dionne:

Please allow this letter to, again, affirm the City of Tarrant's (the City) concerns regarding the United States Environmental Protection Agency's (EPA) CERCLA Site Inspection (SI) of the South Tarrant Neighborhood Site, which encompasses a large portion of the City. As we expressed to you in our meeting on January 21, 2016 and my letter of January 26, 2016, the City takes this matter and the health risks to our citizens very seriously. If any defined health risks to our citizens truly exist, then the City wants to know about it, properly understand the potential impacts, and prepare a plan of action for dealing with those risks. However, a potential NPL listing would have an enormous impact on the current and future viability of the City and the quality-of-life for our citizens. Therefore, we also want to ensure that sound science and quality analytical data is the basis for any conclusions reached by EPA. That being said, the recent actions by EPA in this regard have not allayed the City's concerns that quality analytical data will be obtained in order to support a reliable site recommendation. In fact, based on our observations, it appears that EPA's actions have only one objective – to meet a pre-determined result.

Per our January 21 meeting and documented in my letter of January 26, 2016, the City initially requested that, at a minimum, EPA revise the proposed sampling plan to incorporate the following prior to carrying it out:

**CONFIDENTIAL**

**Balch-ORF-PRIV-003890**

1. Establish a grid for sampling for the SI initial investigation that covers the entire area encompassed by the GASP petition - not just focus on the three present and former industrial sites in close proximity to the Phase I area. This was of particular concern given EPA appeared to exclude properties in the Phase I area that included commercial properties. Establishing a grid for sampling would have provided a more representative picture of the area of concern as presented by the GASP petition.

2. Perform a separate background analysis (study) that more accurately reflects conditions that exist in the City, including issues such as increased commercial density, which is significantly different from either the 35th Avenue Superfund or the Robinwood neighborhood site. Conversely, at the very least, if EPA is intent on using the Robinwood study to establish background for Tarrant, it is critical for fairness that EPA include all samples from the Robinwood data set and not exclude some samples as it did for the 35th Avenue Superfund Site HRS work.

3. The SI sampling strategy should be carried out via composite sampling, not grab samples, in order to ensure a more comprehensive and accurate assessment as well as to ensure that it is consistent with the sampling strategy of the Robinwood Study.

However, before beginning with sampling, EPA failed to acknowledge the above concerns and proceeded with sample collections on February 2nd through the 4th, 2016. To ensure our concerns are not continued to be dismissed by EPA and are adequately documented, attached is a detailed technical memorandum outlining the above and other concerns identified by our consultant.

Moreover, during EPA's February sampling event, the City's consultant was present to observe all sampling conducted by EPA within the City of which the City was notified in advance. Observations made on behalf of the City only served to raise additional concerns that EPA failed to follow sound scientific protocols and quality analytical data was not collected. Some of these observations include:

1. The SI Sampling Plan indicated that 23 "random" locations had been selected using a model to ensure that the "random" sampling was statistically valid, plus the two original PA petitioners, for a total of 25 samples. The 23 randomly selected locations were to statistically support the data collected as being representative of the entire Phase I area. However, when sampling was initiated on February 2nd, 2016, EPA had received approvals to sample only approximately half of the predetermined locations. Sampling proceeded with EPA personnel seeking additional approvals for predetermined and/or alternate locations. In total, only 23 locations were sampled (which included the two original petitioners). This indicates that only 21 "random" samples were collected instead of 23. In addition, several samples were located in "alternative" locations and not in the locations selected by the EPA model. These issues raise serious questions regarding the statistical representativeness of the collected data. Furthermore, according to recent conversations with ADEM, it is very questionable whether 25 samples, much less 23, are adequate for this type analysis.

2

**Balch-ORF-PRIV-003891**

Balch-ORF-PRIV-003891
**DX 1222 - 014**

2. At several of the sampling locations, coal and/or slag fragments were observed in the sample collected. These samples were still packaged for analysis. EPA's inclusion of these samples for analysis raises the question of comparativeness to the Robinwood background study as sampling locations which contained coal and/or slag fragments in the Robinwood study were excluded from analysis.

3. Similarly, several sampling locations were located adjacent to or in areas where vehicles are routinely parked. These samples were also packaged for analysis. EPA's inclusion of these samples for analysis again raises the question of comparativeness to the Robinwood background study as sampling locations which were adjacent to or in areas where vehicles routinely parked or stored in the Robinwood study were excluded from analysis.

4. On at least one occasion, EPA's sampling team broke the chain-of-custody by leaving a sample unattended.

5. At the end of sampling on February 4th, a single point grab sample was collected from the Robinwood neighborhood. The intended purpose of this sample was not identified and the collection of additional samples in the Robinwood neighborhood was not indicated in the SI Sampling Plan. If this single point is to be used for background for comparison with the South Tarrant Neighborhood Site samples then the City would have serious concerns as this sample was collected with the prior knowledge of contaminant levels in the area and not as a random sample in the Robinwood neighborhood. Not only will this biased sample not serve as an appropriate background comparison but statistically one sample does not show a representative background with appropriate similarity to the 23 South Tarrant Neighborhood samples collected.

6. This week, the EPA informed us that, following the conclusion of the sample in Robinwood on Feb 4th and after all observers had left, the EPA collected a sample across the street from Tarrant Elementary School (ST-17 location). Of course, because the City had requested and the EPA had agreed to allow the City to have an observer present for all sampling, this is extremely concerning.

I have just received a letter from Mr. Franklin Hill, dated February 22, 2016, in which he states he is responding to the issues raised in our January 21 meeting and my letter of January 26, 2016, referenced above. While I certainly appreciate Mr. Hill providing a response, after reading Mr. Hill's letter, I do not believe it substantively addresses any of our concerns. Furthermore, with regard to Mr. Hill's statement that the City has "requested a separate background analysis be conducted for the South Tarrant Neighborhood investigation, and that the background samples to be collected in the same way the other samples are being collected", I want to clarify to ensure that there is no misunderstanding. First, for the numerous reasons set out in the attached report, the City believes that the Robinwood Study should not be used in establishing a reference point to evaluate whether or not a release of a hazardous substance has occurred in the South Tarrant Neighborhood Site. Secondly, it is the City's position that the sampling performed in both the relevant background study and in the South Tarrant Neighborhood Site should be composite samples, not grab samples. The City believes that a composite sample approach of the background area and the South Tarrant Neighborhood Site will provide a much truer and accurate assessment of both. Moreover, EPA's use of grab samples is particularly troubling

3

**Balch-ORF-PRIV-003892**

Balch-ORF-PRIV-003892
**DX 1222 - 015**

given what was observed and documented during EPA's sampling of Phase I of the South Tarrant Neighborhood Site.

I would request that no information be released to anyone, except the City, before there are final results from site inspections that can be compared to an appropriate background study. It would be reckless for there to be incomplete data made available to the public until there is a completion of all of the areas to be sampled in Tarrant (i.e., not *ad hoc* on a phase-by-phase basis, should the EPA continue to move forward).

In the attached report, on Page 6, Mr. Hardy notes that we have not been provided the EPA's Work Place, Health & Safety Plan, Investigation-Derived Waste Plan, and Site Reconnaissance. If the EPA has completed these plans for the South Tarrant Neighborhood Site, please provide copies of the same to the City.

In closing, I want to again express the City's growing concerns regarding the SI sampling activities being conducted by EPA. It is paramount that EPA obtains quality data to make a reliable, scientifically-based assessment of the South Tarrant Neighborhood Site. However, based on our observations, it appears EPA's objectives lie elsewhere. I sincerely hope that this is indeed not the case for the City and our citizens' sake. I welcome discussing any of the above concerns with you in more detail. Furthermore, I look forward to receiving any analysis of the samples taken thus far and appreciate your offer to provide the draft background investigation once it has been developed.

Sincerely,

*Loxcil B Tuck*

Loxcil B. Tuck, Mayor
City of Tarrant, Alabama


Attachment

Cc:     Governor Robert Bentley, State of Alabama
        Senator Richard Shelby
        Senator Jeff Sessions
        Representative Gary Palmer, U.S. Congress, 6th District of Alabama
        Representative Terri Sewell, U.S. Congress, 7th District of Alabama
        Luther Strange, Attorney General, State of Alabama
        Heather McTeer Toney, Regional Administrator
        Lance R. LeFleur, Director, Alabama Department of Environmental Management
        Franklin Hill, Region 4, U.S. EPA
        Jennifer Wendel, Region 4, U.S. EPA
        Benjamin S. Goldman, City Attorney, City of Tarrant, Alabama
        Gerald Hardy, Strada Professional Services, LLC

4

**CONFIDENTIAL**

February 23, 2016

This technical memorandum provides a summary of our technical analyses and evaluation of the United States Environmental Protection Agency's (EPA) November 3, 2015 Sampling and Analysis Plan/Quality Assurance Project Plan (SAP/QAPP) for the South Tarrant Neighborhood Site. Specifically, this memorandum provides our evaluation of EPA's apparent objectives in undertaking this investigation, as well as our concerns related to both technical implementation and potential long-term risks for the City of Tarrant.

<u>Background Information</u>

On July 1, 2014, EPA received a petition under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)[1] from GASP – a non-profit, non-governmental organization located in Birmingham, Alabama – and two individuals purported to reside in Tarrant (hereinafter, the "GASP petition"). The GASP petition presented their request that EPA conduct a Preliminary Assessment (PA) to assess potential releases of hazardous substances from nearby facilities, specifically ABC Coke, and the impact of those releases on the neighborhoods identified in the petition.

Thereafter, EPA accepted the petition and completed a PA for what was then named the Pinson Valley Neighborhood Site. In preparing the PA, EPA primarily relied on existing, historical information from the Alabama Department of Environmental Management (ADEM), the Jefferson County Department of Health and other sources, such as the City of Tarrant. According to EPA, it also relied on existing information gathered as a part of its efforts on the nearby 35th Avenue Superfund Site in developing the PA. EPA's PA Report, dated June 29, 2015, reached a determination that further assessment under CERCLA was necessary and a Site Inspection (SI) should be performed.[2] Pursuant to the PA, EPA engaged Oneida Total Integrated Enterprises (OTIE) to prepare a SAP/QAPP which was finalized on November 3, 2015.[3]

<u>Technical Concerns Related to EPA's SI Based on the SAP/QAPP</u>

EPA Is Not Proposing to Conduct the Proper Inquiry.

The Resource Conservation and Recovery Act (RCRA)[4] is the public law that creates the federal framework for the proper management of hazardous and non-hazardous solid waste. A RCRA Facility Investigation (RFI)[5] is used to determine the nature and extent of hazardous waste and hazardous constituent releases from a regulated facility. Conversely, a CERCLA SI[6] is meant to determine whether releases have occurred in a designated or defined area and, if so, to gather sufficient information to identify where those releases originated. This information may then be used to calculate a CERCLA Hazard Ranking System ("HRS") score for the area.

---

[1] 42 U.S.C. §9601 et seq. (1980)
[2] *See* June 29, 2015 Pinson Valley Neighborhood Site Preliminary Assessment, USEPA ID Number ALN000404036
[3] Of note, in the November 3, 2015 OTIE SAP/QAP, the site name was changed from the "Pinson Valley Neighborhood Site" to the "South Tarrant Neighborhood Site."
[4] 42 U.S.C. §6901 et seq. (1976)
[5] EPA 530/SW-89-031
[6] EPA/540-R-92-021

CONFIDENTIAL

Upon review of the OTIE SAP/QAPP, it appears that EPA does not intend to carry out a CERCLA SI but instead intends to perform an investigation more representative of a RCRA RFI. Specifically, the OTIE SAP/QAPP indicates EPA has pre-determined that releases have occurred and is focused on trying to relate specific industries to those alleged releases. The only presently operating industry EPA has identified as a possible source of these alleged releases is the ABC Coke facility. The other potential sources identified in EPA's PA are National Cast Iron & Pipe and Vulcan Rivet & Bolt, neither of which are in operation any longer. In accordance with EPA's Hazard Ranking System Guidance Document[7], an SI is based on the findings of a Preliminary Assessment (PA). In EPA's PA Report for the South Tarrant Neighborhood Site, EPA attempts to connect ABC Coke to the 35th Avenue Superfund Site in North Birmingham by stating that there is ". . . evidence attributing at least a portion of that [referring to the 35th Avenue Superfund Site] contamination to releases from the ABC Coke facility . . ." However, EPA failed to provide any evidence to substantiate this statement. Based on EPA's above statement, it is apparent that EPA will attempt to directly tie the South Tarrant Neighborhood Site and those industries back to the 35th Avenue Superfund Site. However, the South Tarrant Neighborhood Site is not an extension of the current 35th Avenue Superfund Site and the consequences of including this Site on the National Priority List (NPL) would almost certainly be detrimental to the City of Tarrant's economy and residential community.

In the GASP petition, GASP's sole allegation with regard to any "release" is that windblown deposition of various constituents has impacted the South Tarrant Neighborhood Site. The South Tarrant Neighborhood Site is 1.9 miles from the Birmingham-Shuttlesworth International Airport; however, the SAP/QAPP fails to mention the potential for contribution from the airport operations. Additionally, the GASP petition identified a study area encompassing 1,365 acres with no other potential sources within or adjacent to this area identified except for ABC Coke. Although there are no facilities listed in the EPA Toxic Release Inventory (TRI) database that show arsenic, lead, or polycyclic aromatic hydrocarbons (PAHs) located within the identified South Tarrant Neighborhood Site, in addition to the three named facilities in the PA and the airport, there are 11 other TRI listed facilities surrounding and located within 1.5 miles of the South Tarrant Neighborhood Site. Furthermore, according to the SAP/QAPP, sampling is to be conducted in phases with phase 1 covering only a small subset (approximately 118 acres) of the Site and within 1/4 mile of ABC Coke and the City of Tarrant Municipal Complex, *i.e.*, the former location of the National Cast Iron & Pipe facility. Based on this focused sampling area and the exclusion of the airport and the 11 other facilities, it is clear that EPA has no interest in determining the actual sources of contamination, should any be found. Rather, EPA appears to be attempting to link these pre-determined facilities to any as-yet-to-be-identified contamination.

With regard to the actual sampling by EPA, according to the OTIE SAP/QAPP, only 25 locations are to be sampled in Phase 1, of which 23 have been randomly selected and an additional 2 samples will be collected from the named GASP petitioners' properties within the South Tarrant Neighborhood Site. The placement of the random samples was pre-determined using the Visual Sample Plan, version 7.4 (VSP7.4) program to ensure statistical validity to the randomness of the selected sample locations. According to recent conversations with ADEM, ADEM representatives commented that this number of samples is not adequate for this type of analysis. ADEM representatives referenced "Sampling for Defensible Environmental Decisions", by Chuck Ramsey with EnviroStat Inc. as the source of this concern.

Furthermore, each of these samples will be collected through a single grab sample approach. Conversely, the sampling for the 35th Avenue Site investigation was comprised of a total of 3,160 samples including

---

[7] OSWER 9345.1-07

CONFIDENTIAL

Balch-ORF-PRIV-003895

2,976 composite and 184 grab samples. Moreover, the grab samples were collected from specific targeted areas such as children's play areas or drainage areas and were related to the RFI of Walter Coke's North Birmingham facility. EPA's use of grab sampling and how such samples were utilized by EPA in the 35th Avenue Site investigation is further confirmation that EPA's investigation is more similar to an RFI than a CERCLA SI. Therefore, EPA's proposed investigation is being carried out inappropriately and should be revised to more accurately reflect a true CERCLA SI of the South Tarrant Neighborhood Site.

EPA's Use of the Robinwood Study as Background Should be Reassessed.

In 2010, EPA collected samples from the Robinwood neighborhood for the purpose of establishing background values for Walter Coke's RFI. Thereafter, when EPA began sampling for the 35th Avenue Superfund Site, it continued to use the Robinwood sample results to establish background (hereinafter, the Robinwood Study). However, in so doing, EPA excluded one sample result which had been taken in a commercial area and yielded the highest concentrations of arsenic and BaP. The remaining Robinwood samples used to establish background were taken from primarily residential areas where, according to EPA, soil composition was said to be very similar to that of the 35th Avenue Site. This provided EPA with its rationale for the use of the Robinwood sampling results as the background comparison for the sampling of the 35th Avenue Superfund Site. However, in using the Robinwood Study as background for the SAP/QAPP for the South Tarrant Neighborhood Site there does not appear to have been a comparison of the Robinwood neighborhood to the South Tarrant Neighborhood Site to ensure that land use or site soils of these two areas are consistent and would provide an adequate comparison.

To this point, as noted in the SAP/QAPP, the South Tarrant Neighborhood Site has undergone significant commercialization over the years and, due to this extensive industrialization, potential background locations near the site were likely influenced by other commercial activities and industries. Despite this observation, the SAP/QAPP subsequently concludes that "due to the close proximity and other similarities, the 2010 Robinwood background study will be used as the background comparison" for this investigation. However, besides close proximity, EPA has not provided any substantive information concerning any similarities to justify the use of the Robinwood Study to establish background for the South Tarrant Neighborhood Site. Given the noted and other possible differences in South Tarrant Neighborhood Site and the Robinwood Study area, it is imperative that an appropriate new background be established that reflects the true representative conditions of the South Tarrant Neighborhood Site. At a very minimum, to ensure that the Robinwood sampling data is an appropriate measure to establish background, the Robinwood neighborhood needs to be compared to the South Tarrant Neighborhood Site to determine if they are indeed similar. Should the comparison determine that these sites are dissimilar in nature, a new more representative background study should be performed to ensure that the appropriate background levels are identified.

In addition, there are also significant concerns related to how EPA used the Robinwood background data set for comparison with the 35th Avenue Superfund Site sampling results. As discussed in more detail below, these issues likely biased EPA's background to lower levels than what the true background may be, which in turn likely inflated the appearance of higher levels of contamination within the 35th Avenue Superfund Site and will most assuredly have the same result if used as a comparison for the South Tarrant Neighborhood Site.

As referenced in the HRS document for the North Birmingham Site, the Robinwood Study was soil sampling of the Robinwood neighborhood conducted for the purpose of documenting background in relation to the RFI of the Walter Coke Facility in North Birmingham. This background sampling was

CONFIDENTIAL

originally performed as a part of Walter Coke's RCRA Corrective Action. Conversely, the purpose of establishing a background for use in a CERCLA HRS Scoring is to confirm the anthropogenic contamination that is common throughout an area and provide the data used to identify the level of background contamination that is not attributable to a specific facility or facilities alleged to be the source of the "released" contamination.

Based on this, the use of the Robinwood Study, developed for the Walter Coke RCRA Corrective Action, is flawed and biased for use in establishing background concentrations for comparison in the South Tarrant Neighborhood Site investigation for a number of reasons. First, and of considerable concern, is EPA's failure to collect samples at designated sampling points within the Robinwood Study area. The first such instance is EPA's failure to collect a sample at the WC-08 property identified in the Robinwood Study simply because there were coal fragments in the soil in a coal storage area. The proper procedure would have been for EPA to have collected a sample from areas outside the coal storage area or sieved to remove large material. However, this sample was not collected at all, so it is unknown what the applicable constituent of concern (COC) concentrations were or the impacts those concentrations would have had on establishing background. In addition, the fifth aliquot of sample WC16 of the Robinwood Study was not collected on the basis of abandoned cars being nearby. Abandoned cars are not uncommon and are not industrial activities. This aliquot should have been collected and included in the background data evaluation or, at a minimum, a four-aliquot sample should have been analyzed. If the Robinwood Study area was truly background, all the samples should have been collected and included in determining background concentrations. By EPA failing to collect these samples (and include their respective results in the background evaluation), the Robinwood data set has been biased to artificially lower the background concentration and as a result, in the case of the 35th Avenue Superfund Site, falsely identified numerous properties as needing to be cleaned up. EPA's use of the Robinwood Study to establish background for the South Tarrant Site will have the same affect.

Relatedly, the most significant bias of the Robinwood Study occurred when EPA arbitrarily excluded the Robinwood Grocery sampling result (Sample ID WC03-SF) in determining background concentrations. This sample yielded the highest concentrations of arsenic and BaP in the Robinwood Study. EPA's exclusion of this sampling result in establishing the background for the 35th Avenue Superfund Site resulted in numerous 35th Avenue Superfund Site properties having levels of arsenic and BaP above the determined Robinwood Study established background and caused many yards within that site to be excavated that likely did not require remediation. EPA's exclusion of this sampling result in the Robinwood Study will almost assuredly result in artificially inflated levels of these same constituents for the South Tarrant Site and could require numerous yards to be excavated based on false lower background levels.

In addition to the above issues, page 17 of the SAP/QAPP for the South Tarrant Site states that "[T]he Level of Comparison is defined as 3x the highest background concentration of a *residential* property in the 2010 Robinwood Background Study." (Emphasis added). However, according to EPA's own Directive Establishing Background Levels[8], "*In all evaluations, release and background samples must be similar for comparison* [emphasis added]. *Factors which determine sample similarity include location, type, depth, medium, sampling method, preservation, handling, timing, and weather conditions during sampling.* EPA has not provided sufficient analyses of the similarity between the Robinwood Study area and the South Tarrant Neighborhood Site. For example, the Robinwood sampling was conducted in September, 2010 and the initial South Tarrant Neighborhood Site sampling was conducted in February, 2016. This is not similar timing. Nor is there any indication as to whether there were similar weather conditions during the

---

[8] OSWER 9285.7-19FS

CONFIDENTIAL

Balch-ORF-PRIV-003897

Balch-ORF-PRIV-003897
DX 1222 - 020

two sampling events.[9] Additionally, EPA has not provided any analysis for establishing that the soils in the Robinwood Study area are indeed similar to those of the South Tarrant Neighborhood Site SAP/QAPP, in particular the areas to be targeted in the Phase 1 and 2 sampling events.

Furthermore, in the South Tarrant Neighborhood Site, EPA is proposing to sample both residential and public properties. Therefore, it is appropriate for EPA to include the results of WC03-SF as a part of the background determination given the makeup of the South Tarrant Neighborhood Site is more similar to Robinwood with this sample included. Importantly, sample WC03-SF results were 670 ug/kg for BaP and 36 mg/kg for arsenic. If the WC03-SF sample results are included in determining background, it would result in a value of 3X background being 2.01 mg/kg instead of the 1.59 mg/kg for BaP and 108 mg/kg as opposed to the 18.6 mg/kg for arsenic in the SAP/QAPP. Lead would remain the same at 840 mg/kg since the highest value was found to be 280 mg/kg in another sample[10]. At the very minimum, again, EPA should include the analytical results for WC03-SF in the dataset for establishing background given the inclusion of this data set more accurately reflects the mixed use of the South Tarrant Neighborhood Site. However, given the noted differences in timing and weather and EPA's failure to provide any assessment as to whether the Robinwood and South Tarrant Neighborhood Site soils are similar, the more appropriate and prudent course of action would be for EPA to undertake another study to establish background to ensure that it is representative of the South Tarrant Neighborhood Site.

Furthermore, the sampling method for the South Tarrant Neighborhood Site should be the same as the background area sampling method. EPA is using a grab sample approach for the South Tarrant Neighborhood Site sampling as opposed to a composite sampling approach that was used in the Robinwood Study. Given all the above, if EPA continues to proceed with its current SAP/QAPP, it would be doing so contrary to and in direct conflict with its own directive in establishing background levels.

## The Proposed South Tarrant Neighborhood Sampling Plan is Inadequate.

As noted above, the SAP/QAPP states: "Due to extensive industrialization in the area of the Site, potential background locations near the Site area were likely influenced by other industries, other coke, or other foundry operations." Given this statement, it is imperative that if any contamination is identified in a sampling event, the proper sources are determined including the "other industries, other coke, or other foundry operations." In doing so, the focus of this SAP/QAPP would not be directed at the identified industries solely, but would instead be used to determine the true source of any identified contamination.

In EPA's SAP/QAPP, the ABC Coke facility, National Cast Iron & Pipe Company facility, and Vulcan Rivet & Bolt Company facility are all identified as possible source areas for releases to the South Tarrant Neighborhood Site. However, the sampling strategy presented does not describe the rationale for identifying these facilities as possible source areas or show the migration pathways of "potential releases" from these facilities other than "randomly selected" sample locations based on proximity to the facilities. EPA should provide the rationale for identifying these facilities as the source of any alleged releases and

---

[9] Beyond the obvious differences in weather that you would expect during September as opposed to February in any given year, during EPA's Phase I sampling of the South Tarrant Site, a significant rainfall event occurred. Based on these two facts alone, it is highly unlikely that the weather conditions during the 2010 sampling of the Robinwood area and the recent 2016 sampling of the Phase I area of the South Tarrant Site were similar in nature.

[10] *See* Sampling Investigation Report, Walter Energy, Inc. (*a.k.a.* Walter Coke and Sloss Industries) Birmingham, Alabama, Conducted September 22-24, 2010 Final Report Revision 2 Issued April 05, 2011, SESD Project Identification Number: 10-0656.

**CONFIDENTIAL**

**Balch-ORF-PRIV-003898**

describe how the sample locations selected allow EPA to attribute any contamination found to these sources. The three selected constituents of concern – PAHs, Lead, and Arsenic – can be attributed to numerous sources beyond these three facilities. Therefore, it is imperative that EPA establish how they will attribute such ubiquitous compounds to the alleged source facilities. The three points below illustrate the lack of justified attribution:

1. No connection to overland flow paths are shown to allow for migration to the sample locations selected;
2. No wind rose data or modeling of fugitive emissions or windblown dust has been shown with a correlation to the selected sample locations in comparison to the identified source areas; and
3. Other source areas such as roadways, the Birmingham-Shuttlesworth International Airport, rail lines, other TRI facilities, and other commercial activities have not been evaluated as possible sources for potential release of the three identified constituents of concern.

Additionally, in accordance with EPA's *Guidance for Performing Site Inspections Under CERCLA*[11], in addition to a SAP/QAPP EPA should prepare a Work Plan, a Health & Safety Plan (HASP) and an Investigation-Derived Waste (IDW) Plan before conducting a site investigation. Specifically, per EPA's guidance, these plans are developed to address site-specific considerations identified during data review, help refine the objectives of the investigations and ensure that SI activities proceed efficiently, safely, and on a nationally consistent basis.

Collectively, these plans document procedures to be used, resources needed, and the rationale behind the anticipated tasks to ensure that all planning and review steps have been completed prior to starting field activities. For example, the work plan specifies administrative and logistical requirements. The purpose of the work plan is to efficiently schedule resources such as personnel, equipment, and laboratory services. Preparing the work plan requires a thorough understanding of the site, its surroundings, and the nature of possible contamination and hazards. Clear and concise work plans are prerequisites for obtaining quality analytical data and making reliable site recommendations. The sampling, health and safety, and IDW plans may be sections within the site-specific work plan, or separate documents.

Furthermore, a Site Reconnaissance is to be performed as part of the Work Plan, in part, to validate the planned sample locations but to also:

a. Locate **_all_** [emphasis added] sources;
b. Determine the physical state of wastes deposited at the source;
c. Identify each source type;
d. Examine each source for evidence of hazardous substance migration;
e. Evaluate the degree of source containment;
f. Identify overland flow paths;
g. Determine the distances from sources to onsite and nearby targets; and
h. Refine the site sketch depicting important features (e.g., source locations, nearby targets)

If EPA has completed these plans for the South Tarrant Neighborhood Site, a copy of those plans (particularly the Work Plan and Site Reconnaissance) should be provided to the City of Tarrant to gain a complete understanding of the rationale for the sample locations planned and fully understand what EPA

---

[11] EPA/540-R-92-021

CONFIDENTIAL

Balch-ORF-PRIV-003899

Balch-ORF-PRIV-003899
**DX 1222 - 022**

is planning to do. Conversely, if these materials have not been developed, analysis of the South Tarrant Neighborhood Site should not proceed until they have been completed.

Again, EPA's proposed sampling method of the South Tarrant Neighborhood Site, *i.e.*, one grab sample at the identified sampling locations, is in violation of its own directive. Specifically, as referenced above, according to EPA's own Directive Establishing Background Levels[12], *"In all evaluations, release and background samples **must be** similar for comparison* [emphasis added]. *Factors which determine sample similarity include location, type, depth, medium, sampling method, preservation, handling, timing, and weather conditions during sampling."* In determining background levels in the Robinwood Study, EPA undertook a comprehensive, composite sampling approach. Irrespective of the numerous issues raised above concerning the use of the Robinwood Study to establish background for the South Tarrant Neighborhood Site, EPA's proposed sampling methodology of using a single grab sample is inconsistent and conflicts with how EPA developed its background study and should be revised to include a comprehensive, composite sampling methodology to ensure any sample results of the South Tarrant Neighborhood Site are unbiased and consistent with the methodology used in the Robinwood Study.

Additionally, EPA states that it is intending to use the mean value of the samples for each of the constituents of concern collected and analyzed in the Phase I area of the South Tarrant Neighborhood Site and compare the mean value to the Levels of Comparison (LOC) thresholds to decide whether to sample in Phase II and then use the Phase II mean values compared to the LOC in evaluating Phase II results. This comparison is inappropriate if the data results contain outlier values that may skew the data and in turn the mean value. In this case, the median value may be the more appropriate method of identifying the central tendency of the data. Therefore, EPA should look at the distribution of the data to determine the most appropriate measure of analyzing the central tendency before prescribing the proper value.

Section A.7.2.7 on page 18 of the SAP/QAPP describes how EPA prepared a statistically-based SAP. Since the sample locations were selected in order to support the statistically-based SAP, any deviation from these locations would bring conclusions based on alternate sample locations in question. By using VSP7.4 to pre-determine sample locations, EPA has established 23 "randomly-selected" sample locations. If EPA did not obtain access from all of the property owners for those properties, the "randomness" is suspect for establishing whether constituent of concern levels over 3X background levels are statistically significant. Not only will this bring the Phase 1 samples into question, but it will also draw doubt on an EPA decision to continue Phase 2 sampling.

Furthermore, in delineating boundaries for both the Phase 1 and Phase 2 sampling, EPA appears to have intentionally excluded commercial and mixed-use properties in the area along the northern and western boundaries. One can only assume that EPA's intentional exclusion of these areas was done in an effort to support EPA's assertion that the South Tarrant Neighborhood Site is similar enough to the Robinwood Study area for it to be used for comparison and allow EPA to use lower threshold values as a comparison. In so doing, this would allow EPA to argue that a greater portion of the South Tarrant Neighborhood Site is residential in an attempt to induce a greater sense of urgency and concern for health and human life and to further try to link it back to the 35th Avenue Superfund Site. It must be asked why EPA would accept the GASP Petition with a boundary closer to alleged source facilities but conveniently excluded those properties from the SAP/QAPP for any reason other than to bias the results of the study. Figure 1 below

---

[12] OSWER 9285.7-19FS

CONFIDENTIAL

Balch-ORF-PRIV-003900

Balch-ORF-PRIV-003900

presents the area between the Site boundary and the sampling boundaries and can be seen in greater detail as Attachment 1.[13]



**MAP CONTENTS**

| | | |
|---|---|---|
| Jeff. Co. Parcels | Phase1 Area 05OCT15 | ○ Phase1 Sample Site |
| Alleged Source Property | Phase 2 Area 26OCT15 | |
| EPA Biased Exclusion Area | South Tarrant Neighborhood Site Boundary | |

*Figure 1 : South Tarrant Neighborhood Boundary and Phase 1 & 2 Sampling Boundaries*

Also of concern is that there is no mention of other analyses such as core sampling, borings, or small excavations given that as stated in section A.7.2.1 of EPA's SAP/QAPP the EPA "conceptual model describes that contamination may have been wind-deposited or *used as fill* [emphasis added], into neighborhood yards." If the potential for previous placement of fill materials on the properties to be investigated exists then some additional analysis should be performed to determine if there was fill material placed previously that could impact sampling results. This analysis, in addition to characterizing the material, will also aid in identifying its source, which is one of the main objectives of an SI. Moreover, the characterization of the soil can also be used to determine the similarity of the soils in the South Tarrant Neighborhood Site and the Robinwood Study area, which EPA has thus far failed to do.

---

[13] As provided in Figure 1, it appears that the at least one Phase 1 sampling location is located outside of the designated Phase 1 area. If this is indeed the case, the results of this sample should either be excluded from EPA's Phase 1 assessment or EPA should provide an analysis of how this effects the statistically-based approach.

CONFIDENTIAL

Balch-ORF-PRIV-003901

In conclusion, EPA's intent to carry out the current sampling plan for the South Tarrant Neighborhood Site and use the Robinwood Study to establish background as a comparison is severely flawed and disingenuous at best. Specifically, the sampling plan is not a true SI but appears to be a focused effort to attribute as-of-yet defined contamination to the identified facilities. To support this attempt, EPA deceptively tries to compare the South Tarrant Neighborhood Site, a mixed use area, to the manipulated findings of the Robinwood Study. In summary, it is apparent that EPA is intentionally ignoring its own directives and attempting to bias the outcome of the South Tarrant Neighborhood Site investigation to justify a pre-determined outcome of contaminated properties.

CONFIDENTIAL

Balch-ORF-PRIV-003902

Balch-ORF-PRIV-003902

DX 1222 - 025

Labels on map:
- Former Na[...]
- ABC Coke
- South Tarrant Neighborhood Site Boundary
- Former Napthalene Products Co.
- Former Vulcan Rivet & Bolt
- ST1-19ALT
- ST1-18
- ST1-16
- ST1-14ALT
- ST1-11
- ST1-10ALT
- ST1-03
- ST1-25
- ST1-08

CITY: Birmingham DIV/GROUP: SE>C PIC: Trey Glenn PM: Scott Phillips TM: D.Burton Project (SEC0135-01)

**MAP CONTENTS**

| | |
|---|---|
| Jeff. Co. Parcels | Phase1 Area 05OCT15 |
| Alleged Source Property | Phase 2 Area 26OCT15 |
| EPA Biased Exclusion Area | South Tarrant Neighborhood Site Boundary |

○ Phase[...]

GRAPHIC SCALE

0    1,000

CONFIDENTIAL



Dear homeowner,

We are contacting you because you have been identified as a property owner in the City of Tarrant and we wanted to make you aware of various activities that the federal government and local activist organizations are pursuing that will be detrimental to your property's value, the City of Tarrant and potentially make you financially liable to the federal government and others. Specifically, GASP, a local non-profit organization, and the United States Environmental Protection Agency (EPA) are seeking to declare your property and the City of Tarrant a hazardous waste site; however, their actions are baseless and are with no regard to you and your property but are being advanced solely on their vendetta against business and manufacturing jobs in the United States.

If you have not yet been contacted by the EPA or GASP about the EPA requesting permission to access your property for testing and for you to sign a "release" to allow them to do so, you will be very soon. You should be fully informed before signing anything from EPA or others that would give away your property rights. Given the huge implications and impacts EPA's activities will have on the City of Tarrant and its citizen's respective properties, "Get Smart Tarrant" has been formed to provide Tarrant citizens and property owners with information to help them make the best decision when EPA contacts you. Our mission is to inform, educate and give you full disclosure of the facts based on EPA coming to Tarrant. If you have any concerns or would like to discuss any materials you may receive from EPA, you can contact Get Smart Tarrant at GetSmartTarrant@gmail.com or (205) 541-9297. We look forward to working with you and other property owners and residents in Tarrant in understanding what is happening in our community and the best way to protect our property rights.

Sincerely,


Amanda Robinson

Executive Director
Get Smart Tarrant


**CONFIDENTIAL**                                          **Balch-ORF-PRIV-003904**



**http://www** Get Smart

A. Brooke Robinson, Esquire
Executive Director

October 15, 2015

Commissioner Lanier Brown
Huie, Fernambucq & Stewart, LLP
2801 Highway 280 South, Suite 200
Birmingham, Alabama 35223-2484

Dear Commissioner Brown,

We are contacting you to express our concern about various activities the United States
Environmental Protection Agency (EPA) and local activist organizations are pursuing that will
be detrimental to the City of Tarrant, the residents' property values and potentially make them
financially liable to the federal government and others. Specifically, GASP, a local non-profit
organization and the EPA are seeking to declare the City of Tarrant and its residents' property a
hazardous waste site; however, their actions are baseless and are with no regard to the City or its
residents but are being advanced solely in their apparent vendetta against business and
manufacturing jobs in the United States. Given the huge implications and impacts EPA's
activities will have on the City of Tarrant and its citizens respective properties, "Get Smart
Tarrant" has been formed to be an advocate for Tarrant citizens and property owners as well as
to keep them informed so they can make the best decision when contacted by EPA and others.
Our mission is simply to inform, educate and give full disclosure of the facts to the citizens of
Tarrant, something that has not occurred thus far.

With that in mind, Get Smart Tarrant wanted to contact you directly, given you are a resident of
the City of Birmingham and Chair of the Alabama Environmental Commission,
and ask for your help in this matter. We are very concerned about ADEM's failure and apparent
lack of desire to become involved in EPA's and others' egregious actions that will only destroy
Tarrant's property values and do nothing to help the residents of Tarrant. This is particularly
troubling given what appears to be direct requests from the City of Tarrant, Governor Bentley's
assurances to the City of Tarrant that ADEM will be involved and the joint resolution recently
adopted by the State Legislature, specifically calling on ADEM to combat EPA's apparent abuse
of its regulatory authority (which we have attached to this letter). We need the State of Alabama

Post Office Box 4954
Montgomery, Alabama 36103-4954

to intervene in this process to ensure EPA does not overstep its authority and complies with its
own regulations and are thoroughly perplexed as to why, after repeated instructions by the
Governor and the State Legislature, as well as requested by the City of Tarrant, ADEM is
nowhere be found.

We certainly appreciate your help in this matter and would welcome the opportunity to meet
with you to discuss our concerns as they relate to EPA's activities in Tarrant and our thoughts as
to how ADEM could be an advocate for the City and its residents.

Sincerely,

A. Brooke Robinson

Attachments (5)

CONFIDENTIAL

**BENJAMIN GOLDMAN**
**CITY ATTORNEY**

**LOXCIL B. TUCK**
**MAYOR**

**LYNN KEITH**
**CITY CLERK**

# CITY OF TARRANT

**COUNCIL MEMBERS**
**CATHERINE ANDERSON**
**JOHN T. "TOMMY" BRYANT**

1604 Pinson Valley Parkway
P.O. Box 170220
Tarrant, Alabama 35217-0220
Office 205/849-2800
Fax 205/849-2805

**COUNCIL MEMBERS**
**DEBORAH M. MATTHEWS**
**BETTY S. MIDDLEBROOKS**

**LAURA HORTON**
**MAYOR PRO TEM**

Dear Citizens of Tarrant:

Over the past decade, no organization has accomplished more to help improve the quality of life of Tarrant residents and businesses than your City government and employees. No individual or entity cares more for the health and well-being of our citizens than the men and women who serve our City. From the Greenway trail initiative to the flood mitigation project, from the Vulcan Rivet & Bolt clean up to the historic downtown renovations, the City's efforts and accomplishments have earned awards and recognition throughout the state. We are committed to making Tarrant a cleaner, healthier, better place to live, to work, to play and to build a lasting future.

While we are very proud of our accomplishments, we fully recognize that there is always more work to be done – and, we support all sincere efforts designed to improve the quality of life for the citizens of Tarrant. However, we must respectfully disagree with the tactics currently being employed that are needlessly causing concern among our City's residents about their health and safety, their property values, their homes and the futures of their families. As you may be aware, recently, the EPA decided to further investigate a portion of our community in response to a petition that the EPA received from members of an interest group, a group targeting our local ABC Coke facility. Even though the Jefferson County Board of Health has certified our City's air quality as "good", and even though all businesses operating within the City of Tarrant have been deemed by the Health Department to be in full compliance with all existing environmental rules and regulations, this promotes an agenda that, in our view, is unnecessary and unjustified.

We all want a better life for our citizens and our community, and your City government and its employees are committed to continuing our efforts to keep our environment clean and healthy. In fact, there are several new initiatives in various stages of development that will provide additional environmental improvement for our City. We welcome the support and involvement of all entities who want to responsibly help us reach our goals for a better Tarrant. But, we respectfully disagree with those who feel more reckless and potentially economically damaging efforts are required – and we hope that in the best interests of our citizens that they will reconsider their actions. If you should have any questions regarding this EPA issue, please contact Jennifer L. Wendel, Remedial Project Manager with the EPA, at (404) 562-8799.

Yours for a better Tarrant – Gateway to Progress!

*Loxcil B Tuck*

Loxcil B. Tuck, Mayor

**CONFIDENTIAL**

# Congress of the United States
## House of Representatives
### Washington, DC 20515



October 30, 2014

Mrs. Heather McTeer Toney
Regional Administrator - Region 4
United States Environmental Protection Agency
Sam Nunn Atlanta Federal Center
61 Forsyth Street Southwest
Atlanta, GA 30303-8931

Dear Administrator Toney,

We write to express our concern regarding the U.S. Environmental Protection Agency's (EPA) recent activities in Birmingham, Alabama. Specifically, last month EPA announced plans to list Birmingham's "35th Avenue" Superfund Site on the National Priorities List (NPL). While we appreciate EPA's efforts to protect Alabamians from the effects of hazardous substances in the environment, we are concerned that EPA's proposed listing is unsupported by reliable evidence and that it may undermine economic development in the area.

It is our understanding that EPA failed to follow its own protocol for issuing this proposed listing. The July 25, 1997 memorandum from Timothy Fields, Jr., Acting Assistant Administrator for the Office of Solid Waste and Emergency Response, to EPA's regional administrators titled "Coordinating with the States on National Priorities List Decisions—Issue Resolution Process" establishes the procedure for EPA to follow in listing a site on the NPL over state objections. According to that memorandum, when a state disagrees with a proposed NPL listing, the EPA regional office "should work closely with the State to try to resolve the issue before raising it to EPA Headquarters." If such talks are unsuccessful "the Regional Superfund Division Director should inform the Director of the State, Tribal and Site Identification Center (ST/SI) of the Office of Emergency and Remedial Response (OERR) and/or the appropriate ST/SI Regional Coordinator." OERR would then brief the Assistant Administrator for Solid Waste and Emergency Response, at which time "[t]he State should have the opportunity to present its position in writing."

Further, we understand that EPA was advised that the State of Alabama did not concur in EPA's proposed listing of the 35th Avenue Superfund Site, but proceeded to issue Proposed Rule No. 61 without any further communication with the state. EPA's disregard of the collaborative process with the state is concerning, given the gravity of such a listing on the area and its residents.

In light of our concerns, we write to join in the State of Alabama's and the Alabama Department of Environmental Management's recent requests for a 60 day extension to file comments to this proposed listing. We strongly believe that our

PRINTED ON RECYCLED PAPER

**CONFIDENTIAL**

**Balch-ORF-PRIV-003908**

constituents should be afforded ample time to review EPA's proposed rulemaking and to provide meaningful comments, particularly in light of the opposition and concerns raised by the State of Alabama and the Alabama Department of Environmental Management.

Thank you for your consideration of our views and concerns.

Robert Aderholt
Member of Congress

Spencer Bachus
Member of Congress

Mo Brooks
Member of Congress

Bradley Byrne
Member of Congress

Martha Roby
Member of Congress

Mike Rogers
Member of Congress

**CONFIDENTIAL**



**LUTHER STRANGE**
ATTORNEY GENERAL

**STATE OF ALABAMA**
**OFFICE OF THE ATTORNEY GENERAL**

501 WASHINGTON AVENUE
P.O. BOX 300152
MONTGOMERY, AL 36130-0152
(334) 242-7300
WWW.AGO.ALABAMA.GOV

October 23, 2014

VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED
VIA E-MAIL (MCTEERTONEY.HEATHER@EPA.GOV)

Ms. Heather McTeer Toney
Regional Administrator--Region 4
United States Environmental Protection Agency
Sam Nunn Atlanta Federal Center
61 Forsyth Street, SW
Atlanta, Georgia 30303

  **Re: Non-compliance with July 25, 1997 Fields Memorandum Regarding 35th Avenue**
    **Site Proposed NPL Listing**

Dear Administrator Toney:

  I am writing on behalf of the State of Alabama regarding EPA's proposed listing of the "35th Avenue" Superfund Site[1] on the National Priorities List ("NPL").[2] For the reasons outlined below, EPA's proposed listing is both premature based on EPA's own policies and procedures, and is futile based on the statutory and regulatory mandates regarding EPA's use of superfund money for fund-financed remedial action. Accordingly, the State requests that EPA revise Proposed Rule No. 61 to remove the 35th Avenue Superfund Site from the list of proposed additions to the General Superfund section of the NPL.

  As you are aware, your office contacted the Alabama Department of Environmental Management ("ADEM") on April 2, 2014, regarding the State's position on potentially listing the 35th Avenue Superfund Site on the NPL. On June 11, 2014, ADEM advised your office that it did not concur in EPA's proposed listing and specifically advised your office that the State of Alabama would not provide any funding "to cover the State's share of cleanup costs."[3] On September 16, 2014, ADEM sent your office a follow-up email making it abundantly clear that "[t]he State **DOES NOT CONCUR** in the proposed listing for numerous reasons."[4] Undeterred by the State's unambiguous

---

[1] Docket ID No. EPA-HQ-SFUND-2014-0623.

[2] *See* National Priorities List, Proposed Rule No. 61, 79 Fed. Reg. 56538 (Sept. 22, 2014).

[3] A copy of ADEM's June 11, 2014 letter is attached for your reference.

[4] A copy of ADEM's September 16, 2014 email is attached for your reference.

**CONFIDENTIAL**             **Balch-ORF-PRIV-003910**

statement that it did not concur with EPA's proposed listing, and despite its unqualified refusal to allocate any State funds to assist in clean-up of the 35th Avenue Superfund Site, EPA nevertheless decided to move forward with its proposed NPL listing without any further involvement from the State.

As noted above, EPA's proposed rule listing the 35th Avenue Superfund Site on the NPL is premature. EPA failed to follow its own internal procedures, which it says "will be employed in cases where a Regional Office . . . recommends proposing or placing a site on the [NPL], but the State . . . opposes listing the site." That process is clearly laid out in the July 25, 1997 memorandum—titled "Coordinating with the States on National Priorities List Decisions—Issue Resolution Process"—from Timothy Fields, Jr., Acting Assistant Administrator for the Office of Solid Waste and Emergency Response, to EPA's regional administrators.[5] According to that memorandum, in situations where a State does not agree that listing a site on the NPL is appropriate, the relevant EPA regional office "should work closely with the State to try to resolve the issue before raising it to EPA Headquarters." In doing so, "[t]he Region should take into account past, ongoing and planned response actions by the State. If the Region determines that the issue cannot be resolved at the Regional level, the Regional Superfund Division Director should inform the Director of the State, Tribal and Site Identification Center (ST/SI) of the Office of Emergency and Remedial Response (OERR) and/or the appropriate ST/SI Regional Coordinator." OERR would then brief the Assistant Administrator for Solid Waste and Emergency Response. And EPA's own memorandum regarding this "Issue Resolution Process" makes very clear that if the matter is escalated to the Assistant Administrator for Solid Waste and Emergency Response, "[t]he State should have the opportunity to present its position in writing."

EPA failed to follow this procedure and Alabama has not been afforded an opportunity to present its position in writing. Instead, after being informed that the State of Alabama did not concur with the proposed NPL listing and that no State funds would be allocated to assist in any clean-up effort at the 35th Avenue Superfund Site, EPA moved forward with its proposed NPL listing without any further involvement from the State of Alabama. Such a blatant disregard of EPA's own policies and procedures is textbook arbitrary and capricious decision-making. *See, e.g., Reuters Ltd. v. F.C.C.,* 781 F.2d 946, 950 (D.C. Cir. 1986) ("[I]t is elementary that an agency must adhere to its own rules and regulations. *Ad hoc* departures from those rules, even to achieve laudable aims, cannot be sanctioned . . . .."). Because the decision to propose the listing has not been elevated for review and because the State was not given the "opportunity to present its position in writing," as the Fields memo mandates, EPA's proposed rule listing the 35th Avenue Superfund Site as an addition to the General Superfund section of the NPL is premature.

Moreover, EPA's decision to move forward with its proposed NPL listing is perplexing, still, given the State's clear statement that it will not allocate **any** funds to assist in any clean-up effort at the 35th Avenue Superfund Site. The very purpose of listing a site on the NPL is to make the site eligible for superfund monies. Indeed, as the regulations make clear, "[o]nly those releases included on the NPL shall be considered eligible for Fund-financed remedial action." 40 C.F.R. § 300.425(b)(1). But

---

[5] A copy of the July 25, 1997 Fields memo is attached for your reference.

CONFIDENTIAL

even if a site is listed on the NPL, "[a] Fund-financed remedial action undertaken pursuant to CERCLA section 104(a) **cannot proceed** unless a state provides its applicable required assurances," 40 C.F.R. § 300.510(a) (emphasis added), including that "the State will pay or assure payment of . . . 10 per centum of the costs of the remedial action, including all future maintenance . . . ." 42 U.S.C. §9604(c)(3).

The State of Alabama has been unmistakably clear that no State money will be expended to assist in any clean-up effort at the 35th Avenue Superfund Site. Although your October 1, 2014 email to ADEM Director Lance LeFleur indicates that EPA believes it has "flexibilities in how the state cost share is paid,"[6] I see no statutory or regulatory basis for such flexibility. In fact, the regulations are quite clear that, in the absence of the State's agreement to shoulder 10% of the cost of EPA's remedial action, "[a] Fund-financed remedial action . . . cannot proceed." 40 C.F.R. § 300.510(a). Because Alabama will not provide any State funds to assist in any clean-up effort at the 35th Avenue Superfund Site, I must question why EPA would propose the site for listing at great expense to all concerned parties when listing the site will be futile and have no practical effect.

I would very much appreciate an explanation of EPA's position as it relates to these issues, which are so critical to the relationship between the State of Alabama and the federal government on environmental matters. For the reasons stated above, the State of Alabama also requests that EPA revise Proposed Rule No. 61 to remove the 35th Avenue Superfund Site from the list of proposed additions to the General Superfund section of the NPL. Should EPA persist in moving forward with listing the 35th Avenue Superfund Site in contravention of its own policies and procedures, the State of Alabama is prepared to file comments in opposition to this proposed rule.

Respectfully,

Luther Strange

Luther Strange
Attorney General


Attachments

cc:    Governor Robert Bentley
       Administrator Gina McCarthy
       Ms. Gwendolyn Keyes Fleming
       Mr. Lance R. LeFleur
       Mayor William A. Bell, Sr.

---

[6] A copy of your October 1, 2014 email is attached for your reference.

CONFIDENTIAL



ROBERT J. BENTLEY
GOVERNOR

Alabama Department of Environmental Management
adem.alabama.gov

1400 Coliseum Blvd. 36110-2400 ■ Post Office Box 301463
Montgomery, Alabama 36130-1463
(334) 271-7700 ■ FAX (334) 271-7950
June 11, 2014

Ms. Heather McTeer Toney
Regional Administrator, US EPA Region 4
61 Forsyth Street, SW
Atlanta, Georgia 30303-3104

RE: Proposed NPL Listing
    35th Avenue Site, Birmingham (Jefferson County), AL

Dear Ms. Toney:

      As indicated in the attached letter, the Alabama Department of Environmental Management (ADEM) has been designated by Governor Robert Bentley to represent the State of Alabama in issues concerning the potential listing of the 35th Avenue Site (Site) in Birmingham on the National Priorities List (NPL). ADEM does not object to EPA's proposal to list the Site on the NPL provided EPA is able to reach an agreement with the potentially responsibilities parties (PRPs) to provide adequate funding for the cleanup efforts. However, should EPA be unable to reach an agreement or prevail in an enforcement action to compel a responsible party for the funding of the remediation, thus resulting in the Agency proceeding with a "fund-lead" cleanup under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), ADEM's support for such a listing would be contingent on having funding available to cover the State's share of the cleanup costs. Currently, no such funding source exists.

      As the listing process progresses, please feel free to coordinate with Mr. Chip Crockett of the ADEM Land Division at 334-270-5627 or via e-mail at vhc@adem.state.al.us.

Sincerely,

Lance R. LeFleur
Director

LRL/VHC/ghe

Attachment



**Birmingham Branch**
110 Vulcan Road
Birmingham, AL 35209-4702
(205) 942-6168
(205) 941-1603 (FAX)

**Decatur Branch**
2715 Sandlin Road, S. W.
Decatur, AL 35603-1333
(256) 353-1713
(256) 340-9359 (FAX)

**Mobile Branch**
2204 Perimeter Road
Mobile, AL 36615-1131
(251) 450-3400
(251) 479-2593 (FAX)

**Mobile-Coastal**
3664 Dauphin Street, Suite B
Mobile, AL 36608
(251) 304-1176
(251) 304-1189 (FAX)

CONFIDENTIAL

Balch-ORF-PRIV-003913

OFFICE OF THE GOVERNOR

ROBERT BENTLEY
GOVERNOR



STATE OF ALABAMA

May 30, 2014

STATE CAPITOL
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-3282

Heather McTeer Toney
Regional Administrator
U.S. Environmental Protection Agency, Region 4
Atlanta Federal Center
61 Forsyth Street, SW
Atlanta, GA 30303-3104

Dear Ms. Toney:

By letter of April 2, 2014, your office contacted the Alabama Department of Environmental Management ("ADEM") concerning potential listing of the 35th Avenue Site located in Northern Birmingham, Alabama, on the National Priorities List and solicited the State's position on the proposed listing. EPA's letter asked for a response from the Governor or a delegated representative. ADEM has worked closely with EPA in the evaluation of the Site throughout the assessment process. Accordingly, I am delegating authority to ADEM to provide comments to EPA on behalf of the State concerning the proposed listing. The Department will be providing a response to you regarding this matter in the near future.

Sincerely,

Robert Bentley
Governor

cc:     Lance R. LeFleur, Director, Alabama Department of Environmental Management
        Franklin E. Hall, Director, Superfund Division
        Phillip Davis, Director, Land Management Division

CONFIDENTIAL

Balch-ORF-PRIV-003914

**From:** LeFleur, Lance R
**Sent:** Tuesday, September 16, 2014 12:43 PM
**To:** 'McCarthy.Gina@EPA.gov'; 'McTeertoney.heather@Epa.gov'; Gwendolyn KeyesFleming
(KeyesFleming.Gwendolyn@epamail.epa.gov)
**Subject:** 35th Avenue Birmingham NPL listing

Administrator McCarthy

It came to the attention of the Alabama Department of Environmental Management (ADEM) this morning that EPA will announce today at 1:00 p.m. CDT, and it will be published in the Federal Register on Thursday, September 18, 2014, that EPA is proposing a listing on the National Priorities List for the 35th Avenue, Birmingham, Alabama site. EPA did not consult with or notify ADEM of this intended action until just hours before announcing it to the public. This is a most egregious breach of protocol in the long established working arrangement between ADEM and EPA.

In a letter dated April 2, 2014 EPA requested the State of Alabama concur in a listing on the NPL. In my June 11, 2014 response directed to Regional Administrator McTeer-Toney, EPA was informed the State **DID NOT CONCUR** in the proposed listing. The State **DOES NOT CONCUR** in the proposed listing for numerous reasons including:

1. ADEM has not been provided the Hazard Ranking System documentation that was requested by the Department, so there is no scientific basis on which the Department can make a determination on whether to concur in a listing.
2. The air and land studies performed by the U. S. Agency for Toxic Substances and Disease Registry (ATSDR) within the Centers for Disease Control determined there is no public health hazard at the 35th Avenue site and therefore the studies do not support listing on the NPL.
3. A recently completed study by the Jefferson County Department of Health determined there is no increased incidence of cancers in the 35th Avenue area and therefore it does not support listing on NPL.
4. ADEM is aware of no scientific or epidemiological data related to contamination at the 35th Avenue site that is consistent with listing on NPL due to a significant threat to public health.
5. EPA has not prevailed in any enforcement action against any Responsible Party and no Potentially Responsible Party has volunteered to cleanup such contamination as may exist on the site, therefore, there is no clear path to removing any contamination.

In the strongest terms possible I wish to voice my disappointment in this action by EPA.

Lance R. LeFleur

Director

Cc: Governor Robert Bentley

CONFIDENTIAL



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

JUL 25 1997

OFFICE OF
SOLID WASTE AND EMERGENCY
RESPONSE

<u>MEMORANDUM</u>

SUBJECT: Coordinating with the States on National
Priorities List Decisions -- Issue Resolution
Process

FROM: Timothy Fields, Jr., Acting Assistant Administrator
Office of Solid Waste and Emergency Response

TO: Regional Administrators
Regions I - X

<u>PURPOSE</u>

The purpose of this memorandum is to describe the process
that will be employed in cases where a Regional Office of the
U.S. Environmental Protection Agency (EPA) recommends proposing
or placing a site on the National Priorities List (NPL), but the
State or Tribe (hereafter referred to as "State") opposes listing
the site.

<u>BACKGROUND</u>

The Department of Veterans Affairs and Housing and Urban
Development, and Independent Agencies Appropriations Act, Fiscal
Year 1996, included a requirement that EPA must receive a
written request from the Governor of the State in order for the
Agency to propose to place a site on the NPL, or to place a site
on the NPL. However, the Department of Veterans Affairs and

CONFIDENTIAL

Balch-ORF-PRIV-003916

Housing and Urban Development, and Independent Agencies
Appropriations Act, Fiscal Year 1997, Public Law 104-204, did not
contain such a requirement. On November 14, 1996, the Office of
Solid Waste and Emergency Response (OSWER) issued a memorandum
entitled, "Coordinating with the States on National Priorities
List Decisions". According to that memorandum, an EPA Regional
Office requests the position of the State on a site that the
Region is considering for NPL listing. The Regional
Administrator directs a written inquiry to the governor, with a
copy to the State commissioner. For some sites, a State may not
agree that EPA should proceed with NPL listing. The purpose of
this memorandum is to outline the process that will be employed
when the State does not agree that a site should be listed, but
the Region believes it has sufficient reasons to proceed with the
NPL listing process.

## IMPLEMENTATION

EPA Regional Offices have been seeking the position of the
States on sites that the Region is considering for NPL listing.
In some cases, the State may not agree that EPA should pursue NPL
listing, but the Region believes it has sufficient reasons to
proceed.

In these cases, the Region should work closely with the
State to try to resolve the issue before raising it to EPA
Headquarters. The Region should take into account past, ongoing
and planned response actions by the State.

If the Region determines that the issue cannot be resolved
at the Regional level, the Regional Superfund Division Director
should inform the Director of the State, Tribal and Site
Identification Center (ST/SI) of the Office of Emergency and
Remedial Response (OERR) and/or the appropriate ST/SI Regional
Coordinator. OERR should then brief the Assistant Administrator
(AA) for Solid Waste and Emergency Response. The State should
have the opportunity to present its position in writing. The
OSWER AA will then decide whether to pursue NPL listing. A case
could arise where the Region notifies the State in writing of its
desire to proceed with listing a site and provides an appropriate
deadline for a response, but the State does not respond. In such
a case, EPA may proceed with the NPL listing process.

CONFIDENTIAL

Balch-ORF-PRIV-003917

**CONCLUSION**

The EPA Regional Offices have been working closely with the States to ensure that sites are evaluated and that response actions, if warranted, are taken as quickly as possible. EPA will continue to work with the States to assess sites and to prepare and submit HRS packages for those sites that are the highest priority for listing on the NPL. The Agency also will coordinate with the ATSDR and the Natural Resource Trustees in gathering information for the process.

If you or your staff have any questions, you may contact me at (202) 260-4610, or Dave Evans, Director of the ST/SI Center, at (703) 603-8885.


cc: Steve Herman, OECA
    Steve Luftig, OERR
    Lisa Friedman, OGC
    Jim Woolford, FFRRO
    All OERR Center Directors
    Site Assessment Contacts, Regions I-X
    Superfund Regional Division Directors
    Regional Counsels, Regions I-X

CONFIDENTIAL

| | |
|---|---|
| **From:** | LeFleur, Lance R |
| **Sent:** | Wednesday, October 01, 2014 4:27 PM |
| **To:** | 'McTeerToney, Heather' |
| **Subject:** | RE: 35th Ave. NPL Listing |

Heather
Thank you for your follow up on our conversation earlier today. I want to make it clear that EPA misconstrued our letter of June 11, 2014. As I previously stated, a careful reading of the letter will confirm ADEM did not and does not conditionally, or otherwise, concur in the proposed listing of the 35th Avenue site on the NPL.
Lance

**From:** McTeerToney, Heather [mailto:McTeerToney.Heather@epa.gov]
**Sent:** Wednesday, October 01, 2014 11:45 AM
**To:** LeFleur, Lance R
**Subject:** FW: 35th Ave. NPL Listing

Please see below. The previous email was incorrect.

All the best,
Heather

**From:** McTeerToney, Heather
**Sent:** Wednesday, October 01, 2014 12:43 PM
**To:** 'LLfleur@ADEM.state.AL.US'
**Cc:** Stanislaus, Mathy; Heard, Anne; Jenkins, Brandi; Feldt, Lisa; HicksWhite, Javoyne; KeyesFleming, Gwendolyn; Hill, Franklin; Chaffins, Randall
**Subject:** 35th Ave. NPL Listing

Dear Lance,

It was a pleasure speaking with you today. On behalf of Administrator McCarthy, I am responding to your September 16, 2014, email regarding EPA's action to propose the 35th Avenue Site to the National Priorities List (NPL). EPA highly values the relationships we maintain with our state partners and recognizes that without these partnerships, success in the work we accomplish to protect human health and the environment is impossible. To that point, I want to clarify that our actions on the 35th Avenue Site are to protect and improve the quality of life for Alabama residents. Moving forward, I would like to reaffirm that we must improve the quantity and quality of our communications to ensure that our words and actions are well coordinated.

In this specific case, EPA strongly believes the 35th Avenue Site warrants inclusion on the NPL based on a large quantity of environmental data sampled and analyzed by EPA contractors which shows widespread contamination of residential yards with hazardous substances. We have conducted a rigorous evaluation of the risks to human health posed by this contamination and have determined that cleanup is warranted for several hundred residential properties. These decisions are consistent with decisions EPA has made on other sites in Region 4 and throughout the nation. EPA is committed to our Enforcement First principle where Potentially Responsible Parties (PRPs) conduct clean-ups. Listing the site on the NPL puts us in the best possible position to achieve a PRP-led investigation and cleanup of the site.

1

CONFIDENTIAL

Balch-ORF-PRIV-003919

On June 11, 2014, I received a response from you to Region 4's request for concurrence to list the Site on the NPL. EPA understood your letter to mean that ADEM concurred on the listing, but conditioned that concurrence with the understanding that the State does not have funds available to pay the 10% cost share required for "fund-lead" remedial actions under Superfund. Region 4 has received similar "conditional concurrence" from other states in Region 4 and has always proceeded with the listing. Your conditional concurrence also references the Agency's ability to identify PRPs which the Region is proceeding on a dual track to accomplish. I certainly understand your funding concerns and you have my commitment that EPA will work closely with the State as we engage PRPs to take full responsibility for the cleanup via an enforceable agreement. Should our enforcement efforts fail and we find it necessary to request a 10% cost share from the state, we will use our flexibilities in how the state cost share is paid to the maximum extent possible.

Our efforts in this community have been discussed with members of the community, the State, congressional representatives, the Mayor and other local government representatives. We are currently responding to a community in need which has suffered disproportionately as the result of a legacy of industrial releases of hazardous constituents that have been documented as a result of our sampling in the Fairmont, Collegeville and Harriman Park communities. We strongly believe our top priority should continue to be bringing as many resources to bear as we can to improve this situation. Adding the site to the NPL sends a strong signal to the community AND to the PRPs that EPA and ADEM are willing to take the necessary steps to address the needs of the community.

I look forward to continuing to work with ADEM to improve our communications and in this effort to protect these communities.

**Heather McTeer Toney**
U.S. Environmental Protection Agency
Regional Administrator, Region 4
Sam Nunn Federal Bldg.
61 Forsyth Street NW
Atlanta, GA 30303
404-562-8348
Mcteertoney.heather@epa.gov

CONFIDENTIAL

Balch-ORF-PRIV-003920

Balch-ORF-PRIV-003920

DX 1222 - 043

# Congress of the United States

## Washington, DC 20510

February 26, 2016

The Honorable Gina McCarthy
Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, DC 20460

Ms. Heather McTeer Toney
Regional Administrator, Region 4
Environmental Protection Agency
Atlanta Federal Center
61 Forsyth Avenue, SW
Atlanta, GA 30303

Dear Madam Administrator and Ms. Toney:

We write to express serious concern regarding the Environmental Protection Agency's (EPA) administration of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), otherwise known as Superfund. In particular, EPA's designation of "potentially responsible parties" (PRPs) through an "air deposition" theory of liability appears to rest on questionable legal authority and may set a troubling precedent for all facilities in the United States which generate air emissions subject to the Clean Air Act and other relevant statutes.

As you are aware, on September 22, 2014, EPA proposed placing the 35th Avenue site in North Birmingham on the National Priorities List. According to the EPA Hazard Ranking System record that accompanied the proposal, "[a]ir is the primary source of deposition within the 35th Avenue site . . . from smokestacks and windblown particles from process fines and other stockpiled material." In conjunction with this air deposition theory, the agency has designated several facilities as PRPs and has informed the facilities that they may be forced to undertake cleanup actions or incur financial liability for costs associated with any cleanup of the site.

We are mindful of EPA's repeated attempts to increase the scope of federal regulatory authority, and we fear the application of the air deposition theory to supposed "arrangers" under CERCLA represents a significant expansion of the agency's Superfund enforcement powers. Arranger liability attaches to any person who disposes of hazardous substances,[1] with "disposal" defined as the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste *into or on any land or water* so that such solid waste or hazardous waste or any

---

[1] 42 U.S.C. § 9607(a)(3).

**CONFIDENTIAL**

**Balch-ORF-PRIV-003921**

Balch-ORF-PRIV-003921

**DX 1222 - 044**

constituent thereof may enter the environment or be *emitted into the air* or discharge into any waters."[2]

A plain reading of this definition demonstrates that, to the extent air emissions may be a factor in determining arranger liability, such emissions must result directly from the discharge of solid or hazardous waste directly into or onto any land or water. In other words, industrial air emissions from lawful sources are to be regulated under the Clean Air Act, not CERCLA. However, EPA seems intent on pressing the air deposition theory in North Birmingham, while having also endorsed the theory in an amicus curiae brief filed recently in the Ninth Circuit Court of Appeals. EPA's legal positions raise serious questions regarding the agency's understanding of its statutory authority.

Similar reservations are expressed in the enclosed resolution, adopted jointly by the Alabama House of Representatives and Alabama Senate and approved by the Governor of Alabama on June 9, 2015. The resolution describes the 35th Avenue site proposal and provides that EPA is "attempting to impose a novel and overbroad 'air deposition' theory of Superfund liability which would allow EPA to pursue industrial facilities for contamination at non-contiguous properties on the basis of air emissions which are subject to the federal Clean Air Act and authorized by a valid air operating permit." The resolution notes further that EPA's "broad air deposition theory would allow EPA to order businesses to clean up hazardous contamination within an indefinite area before proving that the business was actually responsible." Thus, we are especially concerned with the due process implications associated with this charge.

The resolution also suggests that EPA is pursuing the air deposition theory "as an illicit means for funding policy initiatives which are outside its regulatory authority." Indeed, the 35th Avenue site proposal appears to be part of an "environmental justice" initiative for EPA to become a *de facto* redevelopment authority in Birmingham.[3] Tellingly, the proposal follows a 2011 planning document in which EPA announced its intent to "go beyond traditional injunctive relief to stop illegal pollution . . . and, where appropriate and agreed to by defendants, to include Supplemental Environmental Projects . . . that provide benefits to communities," as well as to "leverage benefits resulting from enforcement activities."[4]

Finally, the resolution describes prior objections to the 35th Avenue site proposal from the Alabama Attorney General and Alabama Department of Environmental Management (ADEM). For example, ADEM repeatedly informed EPA that it did not concur with the proposed listing, as the Attorney General explained in a letter provided

---

[2] *Id.* § 6903(3) (emphasis added).

[3] *See* Environmental Protection Agency, Region 4 Superfund, Annual Report, FY 2014 at 5.

[4] Environmental Protection Agency, *Plan EJ 2014: Advancing Environmental Justice Through Compliance and Enforcement* (Sept. 2011).

Balch-ORF-PRIV-003922

to EPA on January 20, 2015. Under the 1997 "Fields Memorandum," ADEM's decision to withhold concurrence required EPA to work closely with the State of Alabama prior to formally proposing a site for the National Priorities List. Yet the Attorney General's comment letter indicates that EPA neglected to follow the procedure outlined in the Fields Memorandum, suggesting agency disregard for state coordination and input during the site proposal process.

EPA's air deposition theory and corresponding proposal to place the 35th Avenue site on the National Priorities List raise important legal and scientific questions and present substantial risk for businesses that may have little to no responsibility for site contamination. For these reasons, the state Legislature, Governor, and Attorney General for Alabama have each requested EPA to reconsider its position.

We believe these requests are justified, and we urge EPA to give them careful attention. Furthermore, so that we may confirm the agency's appropriate understanding of CERCLA and related legal authorities, we request your staff to schedule a meeting with our offices at the earliest opportunity to discuss the concerns raised above and in the enclosed resolution.

Yours very truly,

Jeff Sessions
United States Senator

Richard Shelby
United States Senator

Gary Palmer
United States Representative

cc:  Sen. James M. Inhofe, Chairman, Committee on Environment and Public Works
Sen. Thad Cochran, Chairman, Committee on Appropriations
Sen. M. Michael Rounds, Chairman, Subcommittee on Superfund, Waste Management, and Regulatory Oversight, Committee on Environment and Public Works
Sen. Lisa Murkowski, Chairman, Subcommittee on the Interior, Environment, and Related Agencies, Committee on Appropriations

**CONFIDENTIAL**