FILED
2018 Sep-24 AM 11:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

1
2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

3   THE UNITED STATES OF AMERICA,   | CASE NO. 2:17-cr-00419-AKK

4              Plaintiff,           | Abdul K. Kallon
                                    | United States District Judge
5   v.                             |
                                    |
6   JOEL IVERSON GILBERT,           |
    STEVEN GEORGE McKINNEY, and     |
7   DAVID LYNN ROBERSON,            |
                                    | July 10, 2018
8              Defendants.          | Birmingham, Alabama

9

10              **JURY TRIAL - VOL. 11 of 19**

11

12      Proceedings recorded by mechanical stenography, transcript
                    produced by computer.

13

14

15

16

17

18

19

20

21

22

23              **SABRINA LEWIS, CCR, RDR, CRR**
                Federal Official Court Reporter
24                1729 Fifth Avenue North
                Birmingham, Alabama 35203
25                  (205) 278-2065
                sabrina_lewis@alnd.uscourts.gov

```
 1   FOR THE GOVERNMENT:        Robin Beardsley Mark
                                George A. Martin, Jr.
 2                              John B. Ward
                                Assistant United States Attorneys
 3                              United States Attorney's Office
                                Northern District of Alabama
 4                              1801 Fourth Avenue North
                                Birmingham, Alabama 35203
 5                              205-244-2001
                                robin.mark@usdoj.gov
 6                              george.martin@usdoj.gov
                                john.b.ward@usdoj.gov
 7

 8   FOR THE DEFENDANT          Jeffrey P. Doss
     JOEL IVERSON GILBERT:      Brandon Keith Essig
 9                              Jackson R. Sharman III
                                Lightfoot Franklin & White LLC
10                              400 20th Street North
                                Birmingham, Alabama 35203
11                              205-581-0700
                                jdoss@lightfootlaw.com
12                              bessig@lightfootlaw.com
                                jsharman@lfwlaw.com
13
     FOR THE DEFENDANT          Craig A. Gillen
14   STEVEN GEORGE McKINNEY:    Gillen Withers & Lake LLC
                                400 Galleria Parkway
15                              Suite 1920
                                Atlanta, Georgia 30339
16                              404-842-9700
                                cgillen@gwllawfirm.com
17
                                Lawanda N. Hodges
18                              The Law Firm of Lawanda Hodges LLC
                                1100 Peachtree Street NE
19                              Suite 200
                                Atlanta, Georgia 30309
20                              404-474-0772
                                lhodges@lhodgeslaw.com
21
                                Stewart Davidson McKnight III
22                              Baxley Dillard McKnight James
                                 & McElroy
23                              2700 Highway 280
                                Suite 110 East
24                              Birmingham, Alabama 35223
                                205-271-1100
25                              dmcknight@baxleydillard.com
```

```
 1    FOR THE DEFENDANT          Henry W. Asbill
      DAVID LYNN ROBERSON:       Buckley Sandler LLP
 2                               1250 24th Street NW
                                 Suite 700
 3                               Washington, DC 20037
                                 202-349-8007
 4                               hasbill@buckleysandler.com

 5                               Brett M. Bloomston
                                 The Bloomston Firm
 6                               2151 Highland Avenue
                                 Suite 310
 7                               Birmingham, Alabama 35205
                                 205-212-9700
 8                               brett@thebloomstonfirm.com

 9                               David Bouchard
                                 Jones Day
10                               1420 Peachtree Street NE
                                 Suite 800
11                               Atlanta, Georgia 30309
                                 404-581-8386
12                               dbouchard@jonesday.com

13                               Barbara Mack Harding
                                 Jones Day
14                               51 Louisiana Avenue NW
                                 Washington, DC 20001
15                               202-879-3939
                                 bharding@jonesday.com
16

17

18

19

20

21

22

23

24

25
```

1                              **EXAMINATION**

                                                      **PAGE**
2   **LANIER BROWN**
       CROSS-EXAMINATION BY MR. SHARMAN (resumed)      2800
3      CROSS-EXAMINATION BY MR. GILLEN                  2806
       CROSS-EXAMINATION BY MR. BLOOMSTON               2807
4      REDIRECT EXAMINATION BY MR. MARTIN               2811
       RECROSS-EXAMINATION BY MR. SHARMAN               2816
5      RECROSS-EXAMINATION BY MR. BLOOMSTON             2817
    **MICHAEL TALMADGE SIMPSON**
6      DIRECT EXAMINATION BY MR. WARD                   2818
       CROSS-EXAMINATION BY MR. ESSIG                   2842
7      CROSS-EXAMINATION BY MR. McKNIGHT                2864
       CROSS-EXAMINATION BY MR. BOUCHARD                2866
8      REDIRECT EXAMINATION BY MR. WARD                 2879
       RECROSS-EXAMINATION BY MR. BOUCHARD              2881
9   **VALERIA "ANNE" HEARD**
       DIRECT EXAMINATION BY MR. WARD                   2883
10     CROSS-EXAMINATION BY MR. ESSIG                   2891
       CROSS-EXAMINATION BY MS. HODGES                  2909
11     CROSS-EXAMINATION BY MR. ASBILL                  2917
    **WILLIE "SCOTT" PHILLIPS**
12     DIRECT EXAMINATION BY MS. MARK                   2928
       CROSS-EXAMINATION BY MR. ESSIG                   2971
13     CROSS-EXAMINATION BY MR. GILLEN                  3007
       CROSS-EXAMINATION BY MR. BLOOMSTON               3030
14     REDIRECT EXAMINATION BY MS. MARK                 3038
       RECROSS-EXAMINATION BY MR. ESSIG                 3044
15     RECROSS-EXAMINATION BY MR. GILLEN                3046
       RECROSS EXAMINATION BY MR. BLOOMSTON             3046
16     FURTHER REDIRECT EXAMINATION BY MS. MARK         3047
    **JEFF PITTS**
17     DIRECT EXAMINATION BY MR. WARD                   3048
       CROSS-EXAMINATION BY MR. SHARMAN                 3064
18     CROSS-EXAMINATION BY MR. McKNIGHT                3068
    **CATRENA NORRIS CARTER**
19     DIRECT EXAMINATION MR. WARD                      3070
       CROSS-EXAMINATION BY MR. ESSIG                   3081
20     CROSS-EXAMINATION BY MR. BLOOMSTON               3091
    **PATRICK RUNGE**
21     DIRECT EXAMINATION BY MR. WARD                   3094
       CROSS-EXAMINATION BY MR. DOSS                    3106
22     CROSS-EXAMINATION BY McKNIGHT                    3117

23

24

25

1                       **GOVERNMENT'S EXHIBITS**

2   **NO.**    **DESCRIPTION**                      **REFERENCED ADMITTED**
3   10      12/10/14 email from Gilbert to      2944
            McKinney, Andrews, Roberson,
4           Bradley, and Phillips notifying
            them of upcoming EPA meeting
5   19      Audio of Robinson's meeting with   2901
            EPA
6   32      12/22/14 email from Roberson to     2807
            Gilbert discussing getting the
7           AEMC chair to respond to GASP
            presentation
8   62      2/16/15 email from Phillips to     3039
            Gilbert regarding Rep. Robinson
9           and Brown meeting
    68      2/20/15 agenda for AEMC meeting     2825
10  69      2/20/15 minutes for AEMC meeting    2811
            with transcript, agenda,
11          requests, and resolution
    70      2/23/15 email from Gilbert to      2836    2837
12          Simpson forwarding Rep. Robinson
            AEMC video link
13  71      2/20/15 email from Simpson to      2831    2831
            Gilbert reporting on
14          Rep. Robinson AEMC appearance
    72      Balch and Bingham's               2838    2839
15          *Environmental Update* concerning
            AEMC 2/20/15 meeting
16  73      2/20/15 email from Gilbert to      2835    2835
            McKinney forwarding Summary of
17          Rep. Robinson AEMC appearance
    74      2/23/15 email from Simpson to      2837    2838
18          Gilbert regarding Rep. Robinson
            at AEMC meeting
19  75      2/23/15 email from Gilbert to      3043
            McKinney and Roberson attaching
20          Toney letter to LeFleur
    91      Senate Joint Resolution 97         3105
21  127     SEC Statements for Balch &         2936
            Bingham for ABC Coke project
22  129     Balch time sheets                  2949
    142     10/10/13 email from Glenn to       2931
23          Gilbert and Roberson with
            attached Superfund Site Proposal
24  145     10/31/13 email from Phillips to     3007
            Glenn and Vaughan with attached
25          draft SEC and Balch agreement

GOVERNMENT'S EXHIBITS

| NO. | DESCRIPTION | REFERENCED | ADMITTED |
|---|---|---|---|
| 146 | 11/22/13 Agreement between Balch & Bingham and Southeast Engineering & Consulting LLC | 2934 | |
| 147 | 1/7/14 email from Catrena to Glenn regarding EPA public meeting | 3073 | |
| 148 | 6/27/14 email from McKinney to Glenn and others with attached 6/11/14 letter from LeFleur to Toney | 3018 | |
| 149 | 9/16/14 email from Glenn to Phillips discussing communication with McKinney | 2938 | |
| 153 | 2/12/15 email from Phillips to Gilbert discussing North Birmingham community activity | 2951 | |
| 154 | 2/20/15 email from Gilbert to Phillips and Glenn regarding meeting on Stakeholder Strategy PowerPoint | 2956 | |
| 156 | 3/6/15 email from Glenn to Andrews, Jones, Gilbert, and Phillips discussing ongoing work | 2965 | |
| 161 | 2/19/15 email from Phillips to Gilbert and Roberson regarding Stakeholder Strategy PowerPoint | 2958 | |
| 189 | 1/15/15 email from Gilbert to Tambling and Atcheson with attached AG draft comments | 3110 | |
| 208 | 9/9/15 email from Gilbert to Roberson with attached Get Smart Narrative | 3058 | |
| 212 | Homeowner Letter from Get Smart | 3061 | 3062 |
| 264 | 7/23/15 email from Gilbert to Brown with attached SJR 97 | 2802 | |
| 266 | 2/4/15 Drummond/ABC Coke Staff Meeting notes | 2876 | |

**DEFENDANT'S EXHIBITS**

| NO. | DESCRIPTION | REFERENCED | ADMITTED |
|-----|-------------|------------|----------|
| 551 | Balch billing statements 35th Avenue Superfund | 3111 | |
| 1019 | 1.27.15 email Lanier Brown to LeFleur re: ATSDR shows no human risk | 2800 | |
| 1161 | 1.10.14 email Glenn to David Moore re: SEC action items | 2981 | |

*BROWN - Cross by Sharman*

```
 1   (The following proceedings were had in open court in the
 2   presence and hearing of the jury.)
 3       THE COURT:  Good morning, everyone.  Be seated, please.
 4       When we left yesterday, Mr. Sharman was cross-examining
 5   Mr. Brown.  Let's pick up from where we left off, please.
 6       Your witness, Mr. Sharman.
 7       MR. SHARMAN:  Thank you, Your Honor.
 8                          LANIER BROWN,
 9   previously sworn, was examined and testified further as
10   follows:
11   CROSS-EXAMINATION BY MR. SHARMAN (resumed):
12   Q.  Good morning, Mr. Brown.
13   A.  Good morning.
14   Q.  Yesterday you and Mr. Martin went over some
15   correspondence that you had with Director Lance LeFleur,
16   the director of ADEM.  And I'd like to follow up on that,
17   if I may.
18       MR. SHARMAN:  May I approach, Your Honor?
19       THE COURT:  You may.
20   (Defendant's Exhibit 1019 was referenced.)
21       MR. SHARMAN:  I want to show to the government and to
22   Chairman Brown what's been marked as Defendant's Exhibit
23   1019.
24   Q.  Chairman Brown, if you would, take a look at that,
25   please, sir, and let me know when you've had a chance to do
```

1    that.

2    **A.**  Yes.

3    **Q.**  Do you recognize 1019 as being email correspondence

4    between you and Director LeFleur?

5    **A.**  Yes.

6        MR. SHARMAN:  Mr. Gilbert moves in evidence Defendant's

7    Exhibit 1019, please.

8        THE COURT:  Any objections?

9        MR. MARTIN:  Judge, I do object.  Relevance.

10       THE COURT:  Okay.  Mr. Sharman, may I see a copy?  And

11   if you can, move on to a different topic for now, please.

12       MR. SHARMAN:  All that is running together.

13       THE COURT:  Okay.  Thanks.

14       Mr. Brown has already testified about his thoughts on

15   this topic.  The exhibit itself, I'll sustain the

16   objection.  You are free to ask him again about his

17   opinions, similar to what you did yesterday.

18       MR. SHARMAN:  Thank you, Your Honor.

19   **Q.**  Did you conclude, Chairman Brown, based on your review

20   of certain studies, that there was no human health risk

21   sufficient to justify an NPL listing?

22   **A.**  That was what I read in the studies.

23   **Q.**  I beg your pardon?

24   **A.**  That's what I read in the studies.

25   **Q.**  Okay.  And is that what you concluded?  Did you believe

1    that?

2    **A.**  Yes, I accepted the studies.

3    **Q.**  And did you believe that in the absence of appropriate

4    evidence to support an NPL listing, that such a listing

5    would be adverse to the State of Alabama generally and the

6    citizens of the affected areas?  Did you believe that?

7         MR. MARTIN:  Objection.  Relevance.

8         THE COURT:  I'll sustain.

9    **Q.**  (BY MR. SHARMAN:)  Did you believe that would just be

10   wrong?

11        MR. MARTIN:  Objection.  Relevance.

12        THE COURT:  I'll sustain.

13   (Government's Exhibit 264 was referenced.)

14   **Q.**  (BY MR. SHARMAN:)  All right.  Yesterday, Chairman

15   Brown, you and Mr. Martin discussed, I believe,

16   Government's Exhibit 264, which is in evidence.

17        MR. SHARMAN:  Sam, could you pull up 264, please, and

18   highlight the top just to remind us?

19   **Q.**  And this was an email from Mr. Gilbert to you copying

20   Mr. Glenn and blind copying Scott Phillips, right?

21   **A.**  Yes.

22   **Q.**  Okay.  And this is an email in which Mr. Gilbert

23   attached a copy of a joint resolution that had passed the

24   Alabama legislature.  Do you remember that?

25   **A.**  I do.

*BROWN - Cross by Sharman*

1   Q.  And you didn't find anything wrong or inappropriate or

2   unusual about Mr. Gilbert sending you a copy of the

3   resolution, right?

4   A.  I think I asked for it.

5   Q.  You believe you asked for it?

6   A.  I saw him somewhere and just asked him what was going

7   on.  And he mentioned, I believe, that the Senate and the

8   House -- legislature had passed this.  And I was not aware

9   that it passed.  I think I asked for a copy.

10      MR. SHARMAN:  You can take that down, Sam.  Thank you.

11  Q.  You also answered a few questions, I believe, about

12  public officials and whether public officials had

13  previously appeared before the commission.  Do you remember

14  some of those questions?

15  A.  Yes.

16  Q.  Okay.  And, in fact, this year, Mayor McCarty of

17  Wilsonville, Alabama, actually appeared before the

18  commission; isn't that right?

19  A.  Yes.

20  Q.  Mr. Martin showed you an email that been sent to you by

21  Trey Glenn conveying some talking points from industry.

22  You remember that discussion with Mr. Martin?

23  A.  I do remember it.

24  Q.  And there was nothing wrong or inappropriate or unlawful

25  about you getting talking points from industry, right?

1   A.   No.

2   Q.   I beg your pardon?

3   A.   No.

4   Q.   And, in fact, you find such communications useful in

5   your job as chairman, right?

6   A.   I've -- yes.  Not just from industry.

7   Q.   From anybody who wants to send you information, you find

8   it useful, right?

9   A.   Any stakeholder, citizen, regulating community,

10   environmental community.

11   Q.   All right.  And then Mr. Martin showed you a variety of

12   documents, letters, drafts of letters, emails that he said

13   were drafted by Joel Gilbert.  Do you remember some of

14   those discussions with Mr. Martin?

15   A.   Yes.

16   Q.   All right.  I won't walk us through all of those, but

17   with regard to any letter, proposal, set of talking points,

18   or other information, it doesn't matter to you whether Joel

19   Gilbert drafted something or edited something or

20   contributed something, but rather what matters to you is

21   what is the communication and who is sending it to you,

22   right?

23   A.   What matters most is what is the communication and what

24   is it based on, is it fact-based.

25   Q.   And you have found, haven't you, that everything Joel

1    Gilbert has sent to you or shared with you has turned out

2    to be fact-based or evidence-based, right?

3    **A.**   Yes.

4    *Q.*   Mr. Martin asked you about a meeting or get-together

5    prior to the February 2015 commission appearance that -- or

6    during which you met Oliver Robinson.   Do you remember some

7    of those questions and answers?

8    **A.**   Yes.

9    *Q.*   In that meeting or in that discussion with Oliver

10   Robinson, Mr. Robinson wasn't putting any pressure on you

11   to do anything or not do anything, right?

12   **A.**   We did not have any substantive conversation --

13   *Q.*   And because you didn't have any substantive --

14   **A.**   -- about the NPL listing and the Superfund site.

15   *Q.*   And because you didn't have any substantive conversation

16   about the NPL listing, he wasn't putting any pressure on

17   you to do anything or not do anything, right?

18   **A.**   He didn't ask me to do anything.

19   *Q.*   And I think the main thing you recall is he mentioned

20   your father, right?

21   **A.**   I -- yes.

22   *Q.*   Okay.   And you remember that because your father was a

23   well-respected state court judge, right?

24   **A.**   Do I have to -- yes.

25       MR. SHARMAN:   Court's indulgence, Your Honor.

1    (Pause.)

2        MR. SHARMAN:  Mr. Brown, I have no further questions at

3    this time.  Thank you very much.

4        THE COURT:  Mr. Gillen?

5        MR. GILLEN:  Thank you, Your Honor.

6    CROSS-EXAMINATION BY MR. GILLEN:

7    Q.  Good morning, Mr. Brown.  How are you?

8    A.  I'm well.  How are you?

9    Q.  I'm well.  Thank you.  My name is Craig Gillen, and I'm

10   one of the attorneys representing Steve McKinney.

11       On direct examination, I believe you indicated that you

12   had met Mr. McKinney at a restaurant; is that correct?

13   A.  Yes.

14   Q.  Just as sort of a quick introduction in the restaurant

15   while both of you happened to be dining there?

16   A.  We were seated at adjacent tables, and he leaned over

17   and spoke and, I would say, reintroduced himself.  But I

18   didn't recognize him when I walked in the restaurant --

19   Q.  Okay.

20   A.  -- and sat down.

21   Q.  But to be clear, you have never had any discussions or

22   communications with Mr. McKinney about the 35th Avenue

23   Superfund Site or the NPL listing or any of the matters

24   about which you have testified here in court, have you?

25   A.  No.

*BROWN - Cross by Bloomston*

1          MR. GILLEN:  That's all I have.  Thank you.

2          THE COURT:  Thank you, Mr. Gillen.

3          Mr. Bloomston?

4          MR. BLOOMSTON:  Yes.  Good morning.  May it please the

5     Court.

6          Mr. Brown, Brett Bloomston.  I represent David

7     Roberson.

8     (Government's Exhibit 32 was referenced.)

9          MR. BLOOMSTON:  Sam, could you pull up Government's

10    Exhibit 32, please?  This is in evidence.  And if you could

11    highlight the top email from David Roberson to Joel

12    Gilbert?

13    CROSS-EXAMINATION BY MR. BLOOMSTON:

14    Q.  Mr. Brown, yesterday you were asked about this email.

15    This email is not to you or from you, is it?

16    A.  No.

17    Q.  But you were asked some questions about it, and I just

18    would like to follow up quickly.

19          That first sentence where Mr. Roberson is asking Joel

20    Gilbert if there's a chance that they could get you to

21    respond, you being the EMC chair, to Ms. Propst's or GASP's

22    presentation, there's a question mark at the end of that

23    sentence, is there not?

24    A.  There is.

25    Q.  Does it appear that Mr. Roberson is asking Joel Gilbert,

*BROWN - Cross by Bloomston*

1   Drummond's attorney, if there is a possible way to get you

2   to speak?

3   **A.**   Yes.

4   **Q.**   Okay.  And then he goes on to say what his opinion is.

5   And I believe he says the "C" word is his opinion of what

6   they are putting out, "they" being GASP.

7       In that last sentence, "just my personal opinion" -- do

8   you see that?

9   **A.**   Yes.

10  **Q.**   Does it appear that Mr. Roberson is again asking

11  Drummond's lawyer if this course of action is a correct

12  course of action?  Does that appear to you the same way?

13  **A.**   That's what it says.

14  **Q.**   Okay.  And Mr. Martin asked you, no one, David Roberson,

15  Joel Gilbert, asked you to respond to GASP at that next

16  meeting, did they?

17  **A.**   No.

18  **Q.**   So does it appear to you that Mr. Gilbert gave the

19  advice or that that course of action never took place?

20  **A.**   Nobody ever talked to me and asked me to do what is

21  suggested here.

22  **Q.**   Okay.  Okay.  And, Mr. Brown, you have discussed with us

23  that ADEM, the agency, and AEMC frequently get

24  correspondence from both sides of controversial issues,

25  correct?

*BROWN - Cross by Bloomston*

1    A.   Yes.

2    Q.   And in this particular matter dealing with the 35th

3    Avenue Superfund Site, you were provided information from

4    Balch, correct?

5    A.   Yes.

6    Q.   And you were provided information from consultants that

7    were working for the law firm, correct?

8    A.   Yes.

9    Q.   And you were provided information from Get Smart, that

10   agency, correct?

11   A.   Yes.

12   Q.   Okay.  And on the flip side of the coin, you were

13   provided information from the environmental group GASP,

14   correct?

15   A.   Yes.

16   Q.   And do you remember yesterday that Mr. Martin asked you

17   if you were familiar whether Get Smart was affiliated with

18   the Oliver Robinson Foundation and you just didn't know?

19   A.   Correct.

20   Q.   Did Mr. Martin or did anyone ever ask you if you were

21   aware that GASP is funded from out-of-state anti-coal

22   interests?

23        MR. MARTIN:   Objection.  Relevance.

24        THE COURT:   Sustained.

25   Q.   (BY MR. BLOOMSTON:)  All the information that was

```
1    provided to you, sir, was it -- I believe you've testified
2    was based on science, correct?
3    A.   Information from whom?
4    Q.   I'm sorry.  Information that helped form the agency's
5    opinion on the Superfund site.
6    A.   The agency's, ADEM's opinion, as I understand it, was
7    based on the scientific studies --
8    Q.   Okay.
9    A.   -- from ADEM that must be considered legally by EPA for
10   designation of a Superfund site or adding a site to the
11   NPL.
12   Q.   Okay.  And as the agency chair, you've discussed this
13   with your fellow folks that are on the commission with you
14   before any decisions are made, correct?
15   A.   Well, that decision -- the position was taken by ADEM.
16   It really only came to the commission when ADEM took a
17   position.  And then GASP came to ask that the commission
18   influence ADEM to reverse course.
19   Q.   So, again, the commission really did not have a decision
20   to make.  It supported Mr. LeFleur and ADEM's branch on
21   what they formed their opinion on, correct?
22   A.   Right.  I had discussions with Director LeFleur --
23   Q.   Okay.
24   A.   -- about, you know, what was going on, why ADEM was
25   taking the position that it was taking.  He provided me
```

1   with the Jefferson County Department of Health study.  He

2   provided me with the ATSDR study.  And I reviewed those and

3   was comfortable that the position ADEM had taken was

4   correct.

5   Q.  And you were satisfied that this was all based in fact,

6   correct?

7   A.  That it was based on the scientific studies.

8   Q.  And it wasn't going to adversely affect the communities

9   that we're dealing with?

10  A.  Based on what I read in the scientific studies.

11  Q.  Yes, sir.  And you never discussed the North Birmingham

12  Superfund site or the NPL listing with David Roberson, did

13  you?

14  A.  Not to my recollection.

15      MR. BLOOMSTON:  Thank you, sir.

16      THE COURT:  Any redirect?

17      MR. MARTIN:  Yes, Your Honor, briefly.

18      THE COURT:  You may.

19  (Government's Exhibit 69 was referenced.)

20      MR. MARTIN:  Would you put up Number 69, please?

21  REDIRECT EXAMINATION BY MR. MARTIN:

22  Q.  Good morning, Mr. Brown.

23  A.  Good morning.

24  Q.  We've called up on the screen Government's Exhibit

25  Number 69.  And would you confirm that these are the

BROWN - Redirect by Martin

1   minutes of the February 20, 2015 meeting when Oliver

2   Robinson spoke?

3   A.   Yes.

4   Q.   Okay.  And I want to ask you a few questions.

5   Mr. Sharman asked you a few questions about them, and I

6   have a few more.  Could you go to page 12 of this exhibit,

7   please?  And on the upper left-hand part of that, please.

8        And you remember during cross by Mr. Sharman we listened

9   to a one-minute clip of your introduction of the public

10  comment period?

11  A.   Yes.

12  Q.   Okay.  And I just want to confirm that you said these

13  words:  "Moving on to the public comment period, we have a

14  request from State Representative Oliver L. Robinson, Jr.

15  on behalf of concerned citizens working and residing in

16  North Birmingham."  You said those words, right?

17  A.   Yes.

18  Q.   Okay.  And were you interested to listen because a state

19  legislator from North Birmingham was coming to the

20  commission to speak on behalf of concerned citizens?

21  A.   I would -- I'm interested when anybody comes to speak.

22  Q.   Well, would you agree that the environmental issues in

23  North Birmingham were serious ones?

24  A.   Absolutely.  They're all serious.

25  Q.   And the position of the citizens who live and work in

1   the area matter?

2   **A.**   Absolutely.

3   **Q.**   Okay.   And the position of a state legislator who

4   represents people in that area matter?

5   **A.**   Yes.

6   **Q.**   Okay.   And no other legislator had come to speak at the

7   commission prior to Oliver Robinson, as far as you

8   remember?

9       MR. SHARMAN:   Objection.   Asked and answered a few

10  times.

11      THE COURT:   It's redirect.   I'll allow it.

12  **A.**   Not during my tenure.

13  **Q.**   (BY MR. MARTIN:)   Okay.   This statement that you made

14  about Oliver Robinson appearing on behalf of concerned

15  citizens, did you take that language from the letter that

16  Oliver Robinson sent to you requesting permission to speak?

17  **A.**   Our executive assistant, Debi, did.

18  **Q.**   When you were reading -- you would agree that language

19  came from the letter that he sent to you?

20  **A.**   Yes.

21  **Q.**   Okay.   I can show you the letter if you want to see it.

22  **A.**   Debi prepares the agenda and she also prepares a more

23  detailed outline for me to -- you know, basically

24  CliffsNotes for the meeting.   And so she would take the

25  language from the letter and include it so that when I

BROWN - Redirect by Martin

1    introduced it, I didn't have to go find the letter.

2    Q.  But you would agree that that language that she wrote

3    for you to say came from Oliver Robinson's letter?

4    A.  It is a quote from his letter.

5    Q.  Were you assuming that the information that Oliver

6    Robinson's letter contained was truthful?

7    A.  Yes.  But the only information I recall that was in

8    there is who -- when he said he wanted to come speak.

9    Q.  And who he was going to speak on behalf of?

10   A.  I didn't think about it.  I just accepted that that's

11   what it said and that's why he was there.

12   Q.  And you accepted that when he sent that letter to you,

13   those words were true?

14   A.  Yes.

15   Q.  Okay.  Because you like to make decisions based on

16   facts, as you said?

17   A.  Try to.

18   Q.  Okay.

19       MR. MARTIN:  Could we go to page -- on that same page,

20   go down to the -- back up.  On the bottom right-hand part

21   of that, please.

22   Q.  Tell me if I'm reading this right, what Oliver Robinson

23   said during one part of his statement.  "And one company,

24   Walter Coke, in the area has accepted responsibility for

25   the part they have contaminated.  But the thing that gets

1    me and what is in the process of hurting the residents in

2    that area is that the EPA has included five other

3    corporations in on this process, but there has been no

4    reports stating that these individuals are culpable in any

5    way.  And where that hurts the residents is the fact that

6    we will have decades of litigation that will occur because

7    of these five individual companies being added to Walter

8    Coke."  Did Oliver Robinson state that to the commission?

9    A.  Yes.

10   Q.  Okay.

11       MR. MARTIN:  If we could go to the next page, 13,

12   please.  And the lower left-hand part, please.

13   Q.  Did Oliver Robinson tell you and the other

14   commissioners, "I'm hoping that this body, along with ADEM,

15   can come, if there are current reports or current ways, to

16   let us know through testing or whatever that can be done to

17   find out who is culpable in this situation"?  Do you see

18   where he said that?

19   A.  Yes.

20   Q.  Okay.

21       MR. MARTIN:  If we could go to -- back out of that and

22   go to the upper right-hand part, please.

23   Q.  And did he say in conclusion, "And just in closing,

24   again, Mr. Chairman and members, my request here today is

25   if ADEM has the ability or if there are any reports out

*BROWN - Recross by Sharman*

```
 1   there that they can share that will help us to narrow down
 2   who's responsible, then that would be very helpful for
 3   residents in my area"?  Did he say that?
 4   A.  Yes.
 5   Q.  Okay.
 6        MR. MARTIN:  That's all I have.  Thank you.
 7        THE COURT:  Mr. Sharman?
 8        MR. SHARMAN:  Very briefly, Your Honor.
 9   RECROSS-EXAMINATION BY MR. SHARMAN:
10   Q.  Chairman Brown, you have not found anything that Oliver
11   Robinson said to the Alabama Environmental Management
12   Commission in that appearance to be untrue, right?
13   A.  I'm not aware of anything.
14   Q.  I'm sorry?
15   A.  I'm not aware of anything he said that was untrue.
16   Q.  And Oliver Robinson didn't ask the commission to make a
17   decision about anything, right?
18   A.  He did not.
19   Q.  And part of that was because the commission had no
20   decision to actually make, right?
21   A.  No.
22   Q.  And if Oliver Robinson testified that everything in his
23   letter to the commission was true, you wouldn't have a
24   reason today to doubt that, right?
25        MR. MARTIN:  Objection.
```

*BROWN - Recross by Bloomston*

1      THE COURT:  Sustained.

2      MR. SHARMAN:  No questions, Your Honor.  Thank you.

3      THE COURT:  Mr. Gillen?

4      MR. GILLEN:  No questions, Your Honor.

5      THE COURT:  Thank you.  Mr. Bloomston?

6      MR. BLOOMSTON:  Your Honor, just one follow-up

7  question.

8  RECROSS-EXAMINATION BY MR. BLOOMSTON:

9  Q.  Mr. Brown, Mr. Martin asked you did the stakeholders or

10  did the stakeholders in Tarrant and Inglenook, did they

11  matter to you.  You remember that question he just asked

12  you?

13  **A.**  Yes.

14  Q.  Did anything come to your attention while chairman of

15  the AEMC board that gave you any reason to believe that

16  Drummond or Balch took any action to harm that community in

17  their advocacy?

18      MR. MARTIN:  Objection.  Relevance.

19      MR. BLOOMSTON:  He just asked -- he just asked that

20  question.

21      THE COURT:  You may answer, Mr. Brown.

22  **A.**  I'm not aware of anything.

23      MR. BLOOMSTON:  Okay.  Thank you, sir.

24      THE COURT:  Anything else of Mr. Brown?

25      MR. MARTIN:  No, Your Honor.  May he be excused?

SIMPSON - Direct by Ward

1     THE COURT:  Any objections from any of the defendants?

2     MR. SHARMAN:  No.

3     MR. BLOOMSTON:  No, sir.

4     MR. GILLEN:  No, Your Honor.

5     THE COURT:  Mr. Brown, have a good day, sir.

6     THE WITNESS:  Thank you.

7   (Witness excused.)

8     THE COURT:  Who is the government's next witness?

9     MR. WARD:  Your Honor, the government calls Talmadge

10   Simpson.

11   (Witness sworn.)

12     THE COURTROOM DEPUTY:  Please state and spell your

13   first and last name for the record.

14     THE WITNESS:  My full name is Michael Talmadge Simpson.

15   Michael, M-i-c-h-a-e-l, Talmadge, T-a-l-m-a-d-g-e, Simpson,

16   S-i-m-p-s-o-n.  But I go by Tal, T-a-l.

17     THE COURTROOM DEPUTY:  And what city and state do you

18   reside in?

19     THE WITNESS:  Birmingham, Alabama.

20     THE COURTROOM DEPUTY:  Thank you.

21     THE COURT:  Mr. Ward, you may begin.

22     MR. WARD:  Thank you, Your Honor.

23                 MICHAEL TALMADGE SIMPSON,

24   duly sworn, was examined and testified as follows:

25   DIRECT EXAMINATION BY MR. WARD:

SIMPSON - Direct by Ward

Q.  Good morning, Mr. Simpson.

A.  Good morning.

Q.  Where do you work?

A.  At BL Harbert International.

Q.  What's your position there?

A.  Associate compliance officer.

Q.  How long have you been there?

A.  Year and a half.

Q.  What did you do before that?

A.  I was an attorney at Balch & Bingham.

Q.  How long were you at Balch & Bingham?

A.  Full-time as an attorney from August 2011 till January 2017.

Q.  Do you have a law degree?

A.  I do.

Q.  What was your position at Balch?

A.  I was a staff attorney and then senior staff attorney in the environmental and natural resources practice group.

Q.  Okay.  All right.  Can you tell us what a staff attorney does at Balch?

A.  I mean, pretty much the same thing an associate does.

Q.  Do you know Joel Gilbert?

A.  I do.

Q.  Did you do you any work for him during your time at Balch?

*SIMPSON - Direct by Ward*

1    A.  I did.

2    Q.  Okay.  Do you know Steve McKinney?

3    A.  I do.

4    Q.  Did you do work for him during your time at Balch?

5    A.  I did.

6    Q.  Let's focus on the 2014-2015 time frame.  During that

7    time frame, did you do work on any matters for the Drummond

8    Coal Company?

9    A.  Yes.

10   Q.  Okay.  When did you begin doing work for Drummond?

11   A.  It was probably late summer, early fall 2014.

12   Q.  Okay.  Was Drummond an existing client of Balch at the

13   time, to your knowledge?

14   A.  No.

15   Q.  Okay.

16   A.  I was there -- they -- I was already working there for a

17   couple of years before they became a client.

18   Q.  You were working at Balch for a couple of years when

19   Drummond became a client.  Do you know how Balch came to

20   hire -- Drummond came to hire Balch?

21   A.  Yeah.  They had some problems, and we were qualified to

22   help them, and they hired us.

23   Q.  Okay.  And when you say "they had some problems," you

24   mean Drummond had --

25   A.  Drummond, yes.

SIMPSON - Direct by Ward

1    Q.   Were those environmental issues?

2    A.   They had some environmental issues, and we had a good

3    track record of environmental law.  So two Birmingham-based

4    companies, we were positioned well to help them, so they

5    hired us.

6    Q.   And the issues that you referred to, were those issues

7    regarding the 35th Avenue Superfund Site?

8    A.   Yes.

9    Q.   Do you know who at Balch was involved in making the

10   pitch to Drummond for this work?

11   A.   Not exactly because I wasn't there.

12   Q.   Okay.  Was Mr. Gilbert one of the lawyers who was

13   involved in working for Drummond on these matters?

14   A.   Yes.

15   Q.   Okay.  What about Mr. McKinney?

16   A.   Yes.

17   Q.   Okay.  Did you work on a matter at Balch called the 35th

18   Avenue Superfund Site?

19   A.   I did.

20   Q.   Okay.  Can you tell us what that matter concerned?

21   A.   That was EPA was looking at a site in North Birmingham

22   considering adding that site to what's called the National

23   Priorities List, which is a list of property around the

24   country that EPA deems necessary to clean up.  And they

25   were looking at the site in North Birmingham that they

*SIMPSON - Direct by Ward*

1    called 35th Avenue.

2    Q.  Okay.  And did you work on a matter for Drummond related

3    to a GASP petition?

4    A.  I did.

5    Q.  Okay.  And was that related to whether to expand the

6    Superfund site into the Tarrant area?

7    A.  Yeah.  More or less, yes.

8    Q.  Okay.  During 2014 and '15, how much of your time was

9    devoted to these two Drummond matters?

10   A.  I couldn't tell you exactly, but a good bit.

11   Q.  Okay.  And what partners did you work for on these

12   matters?

13   A.  I worked with Joel Gilbert, some with Steve McKinney.  I

14   worked with an attorney in the Atlanta office, Rich Glaze.

15   I worked a little bit with some other -- there were several

16   other attorneys.

17   Q.  Okay.

18   A.  I don't know if you want me to go into that.

19   Q.  Well, what kind of work did you do on these matters?

20   Generally, what type --

21   A.  A wide variety of things.

22   Q.  Okay.

23   A.  I would say a lot of my time was devoted to managing

24   public records requests both at the state level and federal

25   level through a law called the FOIA, Freedom of Information

*SIMPSON - Direct by Ward*

```
 1    Act.  That's where government agencies are required to
 2    provide copies of public records.
 3        And we, as part of kind of our due diligence process for
 4    the client, we filed a lot of these requests to get
 5    documents related to EPA's matters and the process of
 6    requesting them, gathering them, reviewing them, finding
 7    things that were important, managing them, organizing them,
 8    all that.  I did a lot of that work but, of course, many
 9    other things.
10    Q.  Okay.  Where did you get your work from?  Was it
11    assigned to you by other attorneys at the firm?
12    A.  Yes.
13    Q.  Okay.  And that included Mr. Gilbert and Mr. McKinney?
14    A.  It did.
15    Q.  Do you recall Balch holding internal staff meetings
16    regarding the work on Drummond matters?
17    A.  Yes.
18    Q.  Okay.  Were those periodic meetings?
19    A.  Yes.  Early on they were -- we had a few kind of set,
20    more regular meetings.
21    Q.  Did you attend any of those meetings?
22    A.  I did.
23    Q.  Okay.  How many would you say you attended?
24    A.  Four, five maybe.
25    Q.  How many other people would come to attend these
```

SIMPSON - Direct by Ward

1    meetings?

2    **A.**   Eight or ten maybe.

3    Q.   Okay.  Did somebody generally lead the meetings?

4    **A.**   It was very collaborative.  We all kind of took turns

5    talking about, you know, the piece that we were working on.

6    I'd say generally they were led by the more senior

7    partners.

8    Q.   Okay.  Would Joel Gilbert and Steve McKinney typically

9    attend these meetings?

10   **A.**   Yes.

11   Q.   Okay.  I want to ask you about the AEMC.  Are you

12   familiar with the AEMC?

13   **A.**   I am.

14   Q.   Okay.  During your time at Balch, did you ever attend

15   any AEMC meetings?

16   **A.**   A few.

17   Q.   Okay.  Was it common for Balch to send an attorney to

18   those meetings?

19   **A.**   Every one.

20   Q.   Okay.  Why is that?

21   **A.**   Well, if we were going to be one of the leading, if not

22   the leading environmental practice groups in the State of

23   Alabama, we just felt like it was important to cover those

24   meetings.  So we would send somebody down to every one.

25   Q.   Would Balch bill clients for the time that this attorney

1    spent at those meetings?

2    **A.**   No.

3    Q.   Okay.  In your time at Balch, how many meetings would

4    you say you attended?

5    **A.**   Probably four, five maybe.

6    Q.   Do you recall covering an AEMC meeting in 2015 where

7    Oliver Robinson made a presentation?

8    **A.**   Yes.

9    Q.   Okay.  And why did you cover that meeting in particular?

10   **A.**   It was my turn.

11   Q.   Okay.  So there was a rotation of associates and staff

12   attorneys to cover these meetings?

13   **A.**   Correct.

14   (Government's Exhibit 68 was referenced.)

15       MR. WARD:  Can we have Government's Exhibit 68?

16   Q.   This is a document in evidence.  Mr. Simpson, do you

17   recognize this as the agenda for the AEMC meeting we have

18   just been discussing?

19   **A.**   Yes.

20   Q.   The date is February 20, 2015.  Do you see at the bottom

21   of the page -- I think if we zoom out, you can see that the

22   agenda, it says that the agenda will be available on the

23   website.

24   **A.**   Yep.

25   Q.   Do you recall pulling this agenda before traveling to

*SIMPSON - Direct by Ward*

1  the meeting?

2  **A.**  Yes.

3  Q.  And then if we go to page 2, at the bottom of the page

4  there's a reference to a public comment period and a

5  reference to requests from the public to address the

6  commission.  Do you see that?

7  **A.**  I do.

8  Q.  And there's a Request 1 listed there on that page.  And

9  then if we go to the next page, the top of the page,

10  there's a Request 2.  Who is the Request 2 from?  Can you

11  read that for us?

12  **A.**  "State Representative Oliver L. Robinson, Jr."

13  Q.  Okay.  Go on.

14  **A.**  "On behalf of the concerned citizens working and

15  residing in North Birmingham."

16  Q.  Okay.  Do you recall seeing this information before you

17  went down to the meeting?

18  **A.**  I'm sure I did, but I don't remember specifically.

19  Q.  Do you recall knowing before you went down to the

20  meeting that Oliver Robinson would be making a

21  presentation?

22  **A.**  Yes.

23  Q.  Okay.  At the time, did you know who Oliver Robinson

24  was?

25  **A.**  Not really.  No.

*SIMPSON - Direct by Ward*

Q.   Okay.  Had you ever met him?

A.   No.

Q.   Did you know that he was a state legislator?

A.   Well, yes.  It's titled "State Representative."

Q.   From the document itself, you knew that he was a

state --

A.   Yes.

Q.   -- legislator.  Did you know at the time of any

connection between Oliver Robinson or a foundation he

controlled and Balch?

A.   No.

Q.   And you mentioned earlier that you attended staff

meetings to discuss your work on these matters when you

worked for Joel Gilbert and Steve McKinney.  Did you ever

hear from them about a connection between Oliver Robinson

or his foundation --

A.   No.

Q.   -- and Balch?  Did you ever hear Oliver Robinson's name

at all in connection with your work on Drummond matters at

Balch?

A.   I don't believe so.

Q.   Did you have any reason before going down to attend this

meeting to believe that Joel Gilbert had asked Oliver

Robinson to go make this presentation?

A.   No.

1   Q.  Did you have any reason to believe that Joel Gilbert had

2   strategized with Steve McKinney and others about the

3   comments Oliver Robinson would make?

4   A.  No.

5   Q.  So the meeting was on February 20, 2015.  Where was the

6   meeting located?  Where did it take place?

7   A.  In the ADEM, Alabama Department of Environmental

8   Management, complex in Montgomery.

9   Q.  Okay.  And were you working in the Birmingham office of

10  Balch at the time?

11  A.  Yes.

12  Q.  Okay.  So did you drive down that morning to --

13  A.  Yes.

14  Q.  -- to the meeting?

15  A.  Yes.

16  Q.  Did you go into the office at Balch first?

17  A.  Probably.

18  Q.  Before you went down to Montgomery for the meeting, did

19  you talk to Joel Gilbert about this meeting?

20  A.  Yes.

21  Q.  Okay.  Do you recall when that was?

22  A.  It was -- I don't recall exactly.  It would have been no

23  later than the day before -- I mean no earlier than the day

24  before, no later than the morning of.

25  Q.  And what do you recall about that conversation?

*SIMPSON - Direct by Ward*

1  A.  I don't recall the specific words that were said, but he

2  basically just said, "Will you let me know?  Someone's

3  going to be talking about 35th Avenue North Birmingham

4  stuff.  Will you just let me know what they say?"

5  Something to that effect.

6  Q.  Did he say that the person who would be making those

7  comments was somebody he had asked to go make those

8  comments?

9  A.  No.

10  Q.  Do you know if he mentioned Oliver Robinson's name

11  specifically?

12  A.  I don't recall.

13  Q.  So the morning of February 20, you went into the office,

14  and then did you drive down to Montgomery for the meeting?

15  A.  Yes.

16  Q.  Okay.  Did you attend the meeting?

17  A.  Yes.

18  Q.  Did you hear Oliver Robinson speak?

19  A.  I did.  Yes.

20  Q.  Did Oliver Robinson give any reason at that meeting to

21  believe that he was actually working or his foundation was

22  working for Balch and Drummond?

23  A.  No.

24  Q.  Did he give any reason to think that he was there as a

25  paid consultant?

SIMPSON - Direct by Ward

1    A.   No.

2    Q.   After that meeting, what did you do next?

3    A.   I schmoozed for a few minutes and then drove to Balch's

4    Montgomery office, and then I found an open computer, typed

5    up my notes.

6    Q.   Okay.  So why would you go straight from the commission

7    meeting to Balch's office in Montgomery to type up your

8    notes?

9    A.   Because it was important that we get the newsletter that

10   we always produced from these meetings out that afternoon

11   because we sent it to clients and colleagues.  And we just

12   wanted to get it out the day of to show that, you know,

13   we're -- it's a priority and we're covering whatever is

14   going on in Montgomery.

15   Q.   Okay.  So you mentioned a newsletter.

16   A.   Yes.

17   Q.   Would Balch prepare and send out to clients a newsletter

18   after each AEMC meeting?

19   A.   Yes.

20   Q.   Summarizing what happened at the meeting?

21   A.   Yes.

22   Q.   So was it ordinary practice for associates covering the

23   meeting to go directly to Balch's Montgomery office, type

24   up their notes, and then get them to the appropriate people

25   to put into a newsletter format?

*SIMPSON - Direct by Ward*

1    **A.**  Yes.

2    **Q.**  Do you recall Joel Gilbert reaching out to you to ask

3    how the meeting went?

4    **A.**  Yes.

5        MR. WARD:  Your Honor, may I approach the witness?

6        THE COURT:  You may.

7    (Government's Exhibit 71 was referenced.)

8    **Q.**  (BY MR. WARD:)  Mr. Simpson, I have handed you a stack

9    of exhibits.  The one on top has been marked for

10   identification as Government's Exhibit 71.  Would you take

11   a look at that and tell me if you recognize it?

12   **A.**  I do.

13       MR. WARD:  Your Honor, the government offers 71.

14       MR. ESSIG:  No objection.

15       MR. BOUCHARD:  No objection, Your Honor.

16       MR. McKNIGHT:  No objection, Your Honor.

17       THE COURT:  Thanks, everyone.  71 is received and may

18   be published.

19   (Government's Exhibit 71 was admitted into evidence.)

20       MR. WARD:  Thank you, Your Honor.

21   **Q.**  Let's look at the bottom of the page, the

22   earliest-in-time email.  Mr. Simpson, do you see this email

23   dated February 20, 2015 from Joel Gilbert to you?

24   **A.**  Yes.

25   **Q.**  And what's the time on that?

SIMPSON - Direct by Ward

1    **A.**  1:22 p.m.

2    **Q.**  Okay.  So how long after the meeting concluded was this

3    email sent?

4    **A.**  Roughly an hour, hour and a half.

5    **Q.**  Okay.  And what's the subject?

6    **A.**  "How Did Meeting Go?"

7    **Q.**  And then if we look at the top of the page to see your

8    response, 14 minutes later you responded.  And can you read

9    for us the first two lines?

10   **A.**  Of my response?

11   **Q.**  Of your response, yes.

12   **A.**  "It was good.  Typing up my notes now for the

13   *Environmental Update*, but here's my summary of the North

14   Birmingham portion."

15   **Q.**  So the *Environmental Update*, is that the reference to

16   the newsletter that you were just talking about?

17   **A.**  Yes.

18   **Q.**  Okay.  But in the meantime, you went ahead and sent him

19   a summary of the North Birmingham portion?

20   **A.**  Yes.

21   **Q.**  Was that because you knew he was interested in that in

22   particular?

23   **A.**  Yes.

24   **Q.**  Was it because of the conversation you had had with him

25   leading up to the meeting?

1    A.  Well, that and the fact that I'd been working with him

2    on this for six months at the time.

3    Q.  Okay.  You knew he would have been interested, in any

4    event?

5    A.  Yes.

6    Q.  And then the next sentence, what does the next sentence

7    say?

8    A.  "Representative Robinson gave a really good

9    presentation."

10   Q.  Okay.  And then you said after that "He touched on the

11   main concerns that his constituency has with EPA's actions

12   in North Birmingham (mentioned specifically both

13   35th Avenue NPL listing and the GASP petition in Tarrant)."

14   Do you see that?

15   A.  Yes.

16   Q.  Okay.  Now, at the time, did you know that

17   Representative Robinson was actually communicating with

18   Joel Gilbert and had been asked by Joel Gilbert to go down

19   and make this presentation?

20   A.  No.

21   Q.  Did you know that Representative Robinson had picked up

22   a $14,000 check from Joel Gilbert four days before this

23   meeting?

24   A.  No.

25   Q.  Okay.  Did Joel Gilbert tell you that in response to

1   this?

2   A.  No.

3   Q.  If we go down to the third bullet point from the bottom

4   that begins "Rep. Robinson" --

5   A.  Yes.

6   Q.  -- can you read that?

7   A.  "Representative Robinson asked for AEMC/ADEM's help in

8   determining who is actually responsible for the

9   contamination and to 'narrow down' the list of responsible

10  parties.  If these other companies are not found to be

11  responsible, they should be taken off the list" -- I

12  misspelled "off."  That's a tough word -- "taken off the

13  list of responsible parties and 'removed from the

14  process.'"

15  Q.  Okay.  And I see language in quotation marks.  Was that

16  language that you thought was taken directly from

17  Representative Robinson's comments?

18  A.  Yes.

19  Q.  Okay.  And was it significant to you that Representative

20  Robinson asked for ADEM/AEMC's help in narrowing down the

21  list of responsible parties?

22  A.  Was it significant to me?

23  Q.  Yeah.

24  A.  Yes.

25  Q.  Okay.  Why was it significant?

*SIMPSON - Direct by Ward*

1    A.  Because it could potentially have an effect on what our

2    client's involvement with that matter was.

3    Q.  Okay.  And that's because -- was Drummond a potentially

4    responsible party at this point?

5    A.  Yes.

6    Q.  And Representative Robinson was asking for their help,

7    ADEM's and AEMC's help in narrowing down the list of

8    responsible parties?

9    A.  That's what he said.

10   (Government's Exhibit 73 was referenced.)

11   Q.  Okay.  If you can take a look at the next document

12   before you which has been marked as Government's

13   Exhibit 73?

14       MR. WARD:  Your Honor, the government offers

15   Government's Exhibit 73.

16       THE COURT:  Any objections?

17       MR. ESSIG:  Just a moment, Your Honor.

18       MR. BOUCHARD:  No objection, Your Honor.

19       MR. McKNIGHT:  No objection.

20       MR. ESSIG:  No objection.

21       THE COURT:  Thanks, everyone.  73 is received and may

22   be published.

23   (Government's Exhibit 73 was admitted into evidence.)

24       MR. WARD:  Thank you, Your Honor.

25   Q.  Let's look at just sort of the top half of the page.  So

1   the bottom email on the page, Mr. Simpson, do you recognize

2   that as the email we just looked at, your email response to

3   Joel Gilbert summarizing --

4   A.   Yes.

5   Q.   -- Oliver Robinson's comments?   Okay.   And then do you

6   see an email at the top that you're not copied on from Joel

7   Gilbert to Steve McKinney dated the same day at 5:17 p.m.?

8   A.   Yes.

9   Q.   And what did Mr. Gilbert tell Mr. McKinney?

10  A.   "Summary of AEMC meeting from Tal.   Also have the

11  video."

12  Q.   Did you understand that a video had been made of this

13  meeting?

14  A.   They record every meeting.

15  Q.   Who does?

16  A.   Alabama Department of Environmental Management.

17  Q.   Okay.

18  A.   Or the AEMC.   I don't know.   Somebody does.

19  Q.   Do you know whether Joel Gilbert had separately paid to

20  have this meeting recorded?

21  A.   No.

22  (Government's Exhibit 70 was referenced.)

23  Q.   Okay.   Let me ask you to look at the next exhibit before

24  you, which is Exhibit 70, marked for identification as

25  Exhibit 70.   Do you see that?

SIMPSON - Direct by Ward

1    A.   I do.

2         MR. WARD:  Government offers Exhibit 70.

3         MR. ESSIG:  No objection.

4         MR. BOUCHARD:  No objection.

5         MR. McKNIGHT:  No objection, Your Honor.

6         THE COURT:  Thanks, everyone.  70 is received and may

7    be published.

8    (Government's Exhibit 70 was admitted into evidence.)

9    Q.   (BY MR. WARD:)  Okay.  Mr. Simpson, what is the date on

10   this email at the top?

11   A.   February 23, 2015.

12   Q.   Okay.  So that's the Monday after the commission meeting

13   we have been discussing?

14   A.   Yes.

15   Q.   And Mr. Gilbert emailed you asking you to "download

16   video to extranet.  Link and password is below"?

17   A.   Yeah.

18   Q.   And then below is a link to video of Representative

19   Robinson speaking at the meeting?

20   A.   Yes.

21   Q.   Okay.  Did you do that?  Did you download the video to

22   the Balch extranet?

23   A.   I don't remember, but I'm sure I did.

24   (Government's Exhibit 74 was referenced.)

25   Q.   Okay.  If you'll look at the next document before you,

*SIMPSON - Direct by Ward*

```
 1    which has been marked as 74, do you recognize that email?
 2    A.  Yes.
 3        MR. WARD:  Government offers Government's Exhibit 74.
 4        MR. BOUCHARD:  No objection.
 5        MR. ESSIG:  No objection.
 6        MR. McKNIGHT:  No objection, Your Honor.
 7        THE COURT:  Thanks, everyone.  74 is received and may
 8    be published.
 9    (Government's Exhibit 74 was admitted into evidence.)
10    Q.  (BY MR. WARD:)  All right.  Mr. Simpson, this is another
11    email the same day.  And is this an email reflecting that
12    you added the materials to the extranet site from the
13    commission meeting?
14    A.  Yes.
15    Q.  Okay.  And that includes a video of Representative
16    Robinson presenting to AEMC?
17    A.  Yes.
18    (Government's Exhibit 72 was referenced.)
19    Q.  Can you look at what's before you as Government's
20    Exhibit 72?
21        MR. WARD:  The government offers Government's
22    Exhibit 72.
23        MR. ESSIG:  No objection.
24        MR. McKNIGHT:  No objection.
25        MR. BOUCHARD:  No objection, Your Honor.
```

SIMPSON - Direct by Ward

1      THE COURT:  Thank you, all.  72 is received and may be

2  published.

3  (Government's Exhibit 72 was admitted into evidence.)

4  Q.  (BY MR. WARD:)  Mr. Simpson, take a look at this

5  document and tell me what it is.

6  A.  It appears to be a very fine written *Environmental*

7  *Update*, February 2015.

8  Q.  Is this the newsletter that you referred to, a copy of

9  the newsletter that was prepared regarding the February 20,

10  2015 meeting?

11  A.  Yes.

12  Q.  Okay.  Did you have a hand in drafting this?

13  A.  I did.

14  Q.  Who did Balch send this newsletter out to?

15  A.  I couldn't tell you exactly, but generally clients,

16  colleagues, probably others around the firm.

17  Q.  Let's go to page 2, the bottom part of the page under

18  the heading "Public Comments."  Mr. Simpson, do you

19  recognize these as your words?

20  A.  Yes.

21  Q.  Okay.  Let's look at the top bullet point regarding

22  Representative Robinson.  Can you read the first sentence

23  there?

24  A.  Well, under "Public Comments," it says "The commission

25  unanimously approved two requests for public comments, and

SIMPSON - Direct by Ward

1    presentations from two commenters were heard."

2    Q.   And then the next sentence?

3    A.   "First, Alabama Representative Oliver Robinson, 58th

4    District, spoke on matters related to EPA's proposed

5    listing on the National Priorities List (NPL) of the

6    35th Avenue site in North Birmingham under Superfund as

7    well as EPA's decision to grant a request for preliminary

8    assessment to determine whether the area should be

9    considered for NPL listing."

10   Q.   Thank you.  So you refer to the speaker as Alabama

11   Representative Oliver Robinson.

12   A.   Yes.

13   Q.   Did you understand Representative Robinson to be at that

14   commission meeting in that capacity?

15   A.   Generally, yes.

16   Q.   Okay.  Your next sentence states "Representative

17   Robinson represents the areas in North Birmingham that are

18   directly involved in these matters."

19   A.   Yes.

20   Q.   Does this say anything about Oliver Robinson serving as

21   a consultant to Balch or Drummond?

22   A.   No.

23   Q.   Did you know that at the time?

24   A.   No.

25   Q.   Did anybody tell you that?

*SIMPSON - Direct by Ward*

1    **A.**   I don't believe so.

2    **Q.**   Did you, Mr. Simpson, continue working on Drummond

3    matters throughout 2015 and into 2016?

4    **A.**   Yes.

5    **Q.**   Okay.  At some point later in 2015, did you learn of an

6    organization called Get Smart Tarrant?

7    **A.**   Yes.

8    **Q.**   What did you understand that to be?

9    **A.**   A public outreach organization and effort to speak to

10   the public about all the different -- you know, the EPA

11   matter in North Birmingham and all the issues surrounding

12   it.

13   **Q.**   Did you know who was involved?

14   **A.**   Generally, yes.

15   **Q.**   Who did you know to be involved?

16   **A.**   Well, I knew they were coordinating with our effort.

17   **Q.**   With Balch?

18   **A.**   Yes.

19   **Q.**   Did you know of any connection between it and Oliver

20   Robinson or the Oliver Robinson Foundation?

21   **A.**   I don't think I did.  I don't recall knowing that, no.

22   **Q.**   Okay.  Do you recall ever learning -- during 2014, '15,

23   '16, do you recall ever learning that Balch signed a

24   contract in February 2015 with a foundation that Oliver

25   Robinson controlled?

1    A.   No.

2    Q.   When did you first learn about that contract?

3    A.   When the -- when al.com blasted it out there for the

4    world to see.

5        MR. WARD:  No further questions, Your Honor.

6        THE COURT:  Cross-exam?

7        MR. ESSIG:  Yes, Your Honor.  Just a moment.

8    CROSS-EXAMINATION BY MR. ESSIG:

9    Q.   Good morning, Mr. Simpson.  How are you?

10   A.   Doing well.

11   Q.   My name is Brandon Essig, and I'm one of the attorneys

12   that represents Joel Gilbert in this case.  I've got just a

13   few follow-up questions for you.

14   A.   Sure.

15   Q.   Now, Mr. Simpson, you left Balch & Bingham, if I

16   understand correctly from your notes, in 2017; is that

17   right?

18   A.   It was about a week or two into 2017, right.

19   Q.   All right.  So you spent about six or seven years at

20   Balch; is that right?

21   A.   In total, I spent -- because I did a summer clerkship

22   and then through law school I worked part-time, so in total

23   more like eight years.

24   Q.   Okay.

25   A.   Full-time about six years.

1    Q.  And through that time, did you spend most of your time

2    working in the environmental section?

3    A.  Yes.

4    Q.  And I suppose then in the entire time you worked in the

5    environmental section that Joel Gilbert was someone who

6    worked there as well?

7    A.  Yes.

8    Q.  So you got to know Joel Gilbert fairly well in your time

9    there?

10   A.  Yes.

11   Q.  And is he someone you worked under quite a bit?

12   A.  Yes.

13   Q.  Now, Mr. Simpson, what I want to talk about is getting a

14   little bit of a sense of how the environmental section at

15   Balch is set up.  I mean, Balch is a very large law firm;

16   would that be fair to say?

17   A.  Yes.

18   Q.  And the environmental section itself is one of the

19   larger sections at the firm; is that right?

20   A.  Yes.

21   Q.  And would it be fair to say that Balch & Bingham, one of

22   the core areas where it holds itself out as having a lot of

23   expertise is in the environmental area?  Is that right?

24   A.  Yes.

25   Q.  And is it important to the firm or did you gather it is

SIMPSON - Cross by Essig

1   important to the firm that they had some of their most

2   experienced and knowledgeable attorneys working in that

3   section and in that area?

4   A.   That's fair to say.

5   Q.   And would it be fair to say that in that section

6   probably, as is the case with the firm at large, there

7   there's a certain hierarchy that exists within the firm?

8   Is that right?

9   A.   Yes.

10   Q.   I mean, there's a senior partner that leads any

11   particular practice area or section; is that right?

12   A.   Yes.

13   Q.   And the environmental section had a senior partner that

14   led that section; is that right?

15   A.   We did.

16   Q.   And when you were there, was that Steve McKinney?

17   A.   Yes.

18   Q.   And if I recall correctly, too, there was another more

19   senior partner at Balch & Bingham that worked in the

20   Atlanta office in the environmental section named David

21   Moore; is that right?

22   A.   Yes.

23   Q.   And early in the days of the Drummond work, the primary

24   sort of senior partners working on that or the most senior

25   parties working on that matter were David Moore and Steve

*SIMPSON - Cross by Essig*

1    McKinney; would that be fair to say?

2    **A.**   I would say so, yes.

3    **Q.**   And as that work evolved, as the Drummond work evolved

4    in North Birmingham, over time Joel Gilbert's role as one

5    of the more senior people became more pronounced; is that

6    right?

7    **A.**   Yes.

8    **Q.**   And would it be fair to say, Mr. Simpson, that during

9    the time that y'all worked on the Drummond matters, that

10   there were over a dozen attorneys at Balch that worked on

11   that?

12   **A.**   Yes.   Probably.

13   **Q.**   And there was -- you've been asked today about the 35th

14   Avenue Superfund Site; is that correct?

15   **A.**   Yes.

16   **Q.**   And you have been asked about the GASP petition as well;

17   is that right?

18   **A.**   Yes.

19   **Q.**   Okay.   But there was also some Title V air permit

20   litigation that the same group of people were working on

21   for Drummond; is that right?

22   **A.**   Yes.

23   **Q.**   And there's a NESHAP compliance matter that y'all were

24   working on as well?

25   **A.**   Yes.

1   Q.  And did you do some work on all those matters?

2   A.  Yes.

3   Q.  And were you generally aware of those four matters that

4   y'all were working on for Drummond?

5   A.  Generally, yes.

6   Q.  Again, as time went by and as it progressed and as

7   Mr. Gilbert became more active in the litigation, would it

8   be fair to say that Mr. Gilbert was the partner that was

9   reviewing most of the work that the associates were doing?

10  A.  That was my understanding.

11  Q.  So in your case, for the work that you did, if you did

12  some research, created a memo, wrote up some talking points

13  kind of like what we've seen here today, Mr. Gilbert would

14  be the person you would submit those matters to for him to

15  review?

16  A.  Generally, but I would just make sure that he was in the

17  loop on everything.

18  Q.  Okay.

19  A.  I mean, sometimes I did work more directly for someone

20  else, but, yes, I'd say Joel was -- anything I did, I

21  wanted to, you know, make sure he was up to date on, yes.

22  Q.  Okay.  And did you perceive that Mr. Gilbert occupied a

23  similar position for the other associates that were working

24  on this matter?

25  A.  Yes.

1   Q.  He was sort of the primary person managing the

2   day-to-day work of all of the associates; is that right?

3   **A.**  Yes.

4   Q.  And of the dozen or so lawyers at Balch that were

5   working on this, the partners -- again, as I understand,

6   David Moore at some time left the firm; is that right?

7   **A.**  Yes.

8   Q.  But when we get into 2014, 2015, the period of time

9   we're talking about here today, the partners on the matter

10  were Steve McKinney, Joel Gilbert, and Mary Samuels; is

11  that right?

12  **A.**  Sounds about right.

13  Q.  And below that would be the associates whose work they

14  were managing?

15  **A.**  Yes.

16  Q.  In your involvement in a project like this that has this

17  many different aspects to it and this many number of

18  attorneys, is there anything unusual at all about you not

19  being aware of certain things that are going on?

20  **A.**  No.

21  Q.  And is there anything unusual at all about maybe you

22  working on an aspect of the matter, but you don't know

23  exactly what the partners are doing or what their next

24  steps are going to be?

25  **A.**  No, it's pretty normal.

1    Q.  Now, the work that you did, Mr. Simpson, I think you

2    said one of the main things you did is you worked with

3    public records requests to the EPA and to the state; is

4    that right?

5    A.  Yes.

6    Q.  And which one of those entities did you spend the most

7    time on working public document requests?

8    A.  The EPA.

9    Q.  Okay.  And why was most of your time spent working on

10   the EPA FOIA requests?

11   A.  There were a lot of documents involved, and it was -- it

12   was a more complex than normal FOIA request, FOIA matter.

13   Q.  Okay.  And why is that?

14   A.  Because there were such a voluminous number of

15   documents, for one.  And, two, there were so many other

16   interested people, that they received so many requests.

17   And, I mean, I can't speak for them, but they handled it

18   differently than any other records request that I have been

19   a part of.

20   Q.  EPA did?

21   A.  EPA did, yes.

22   Q.  And were they withholding a lot of documents that were

23   being requested pursuant --

24       MR. WARD:  Objection to relevance.

25       THE COURT:  Sustained.

1      MR. ESSIG:  Judge, they talked about it on direct

2   examination.

3      THE COURT:  I think you've countered it already.

4      MR. ESSIG:  Okay.

5   Q.  Mr. Tal -- Mr. Simpson, excuse me.  I apologize.

6   A.  That's all right.

7   Q.  What I want to do is I want to go through and I just

8   want to ask you about some of the things you did, some of

9   the tasks that you did on this matter.  Just tell me if I'm

10  correct or not.

11  A.  Okay.

12  Q.  You did some research for Mr. Gilbert on ABC Coke's

13  compliance history; is that right?

14  A.  Yes.

15  Q.  You helped him draft a resolution for the City of

16  Tarrant; is that correct?

17  A.  Yes.

18  Q.  You helped him draft a resolution for the Jefferson

19  County Commission; is that right?

20  A.  Yes.

21  Q.  And we've already talked about you coordinated FOIA

22  responses to the EPA or with the EPA; is that right?

23  A.  Yes.

24  Q.  You reviewed and analyzed EPA's hazard ranking score

25  documentation; is that correct?

1   A.   That's right.

2   Q.   And, again, hazard ranking score, I think the jury has

3   heard the acronym HRS?

4   A.   Yes.

5   Q.   And that's a document where the EPA goes out, does

6   tests, gets back scientific results, and there's sort of an

7   objective data point that you consider?

8   A.   Supposed to be, yes.

9   Q.   And then also as a part of that, you worked with the

10  consultants at SE+C on those EPA pollution reports; is that

11  right?

12  A.   Yes.

13  Q.   As part of your FOIA work in reviewing FOIA requests

14  from the EPA, you reviewed some EPA communications with the

15  law firm of Hare Wynn; is that right?

16  A.   Yes.

17  Q.   Hare Wynn is a plaintiff's firm?

18  A.   Yes.

19       MR. WARD:  Objection.  Relevance.

20       THE COURT:  Sustained.

21  Q.   (BY MR. ESSIG:)  One of the other things you did,

22  Mr. Simpson, is you reviewed from the FOIA requests some

23  EPA communications with plaintiffs' firms and residents out

24  there in the community; is that right?

25  A.   Yes.

1    Q.  And you reviewed EPA's communications with both

2    residents and plaintiffs' firms; is that right?

3    A.  Yes.

4    Q.  You reviewed and summarized EPA waivers that they

5    obtained to sample people's soil?

6    A.  Yes.

7    Q.  Is that correct?

8        MR. WARD:  Objection.  Relevance.

9    A.  Yes.

10       THE COURT:  I think you've covered what he did as a

11   lawyer, so just wrap this up quickly, please.

12   Q.  (BY MR. ESSIG:)  And, Mr. Simpson, in the time that you

13   were there, Mr. Ward had asked you about Get Smart.  And

14   that was a group that you became aware of at some point in

15   time; is that correct?

16   A.  Yes.

17   Q.  And one of the things -- as a matter of fact, at some

18   point in time, you prepared -- let me ask you this question

19   first:  You reviewed some surveys from the Tarrant

20   community that had been compiled by Get Smart; is that

21   correct?

22   A.  Yes.

23   Q.  And based on your review of those surveys, one of your

24   tasks was to draft affidavits or comments for those members

25   of those communities to sign?

*SIMPSON - Cross by Essig*

1    **A.**   Correct.

2    *Q.*   Is that right?

3    **A.**   Yes.

4    *Q.*   Now, Mr. Simpson, I want to go and talk about your

5    attendance at the AEMC meeting.  And just so we're clear,

6    when you go to the AEMC meeting, that is a public meeting;

7    is that right?

8    **A.**   Yes.

9    *Q.*   And that is a meeting, I think as you stated, that

10   someone from Balch & Bingham attends every single month.

11   **A.**   Correct.  Or every meeting.  I don't know if they're

12   held every month.

13   *Q.*   Right, right.  I'm sorry.  I think it's every other

14   month is when they meet.

15   **A.**   Every meeting, yes.

16   *Q.*   And Balch & Bingham is not the only party that attends

17   those meetings; would that be fair to say?

18   **A.**   Yes.

19   *Q.*   I mean, there are others that are typically in

20   attendance at those meetings; is that right?

21   **A.**   It's usually a pretty full room.

22   *Q.*   And usually in addition to Balch & Bingham, who

23   represents a lot of industrial clients, very common for

24   people from environmental groups to be there as well; is

25   that right?

1    A.   Yes.

2    Q.   As a matter of fact, there was an individual from an

3    environmental group that spoke the same day that

4    Representative Robinson spoke; is that right?

5    A.   Correct.

6         MR. ESSIG:   Sam, could you pull up Government's

7    Exhibit 68, please?   If you'd go to page 2, Sam.   And if

8    you would actually just highlight the top portion.

9    Q.   All right.   And, Mr. Simpson, what we're looking at here

10   is this is the actual sort of agenda.   This is the business

11   that the AEMC conducted on this particular meeting; is that

12   right?

13   A.   Yes.

14   Q.   And so the first thing they did is they considered

15   minutes from the previous meeting; is that right?

16   A.   Yes.

17   Q.   They got a report from the ADEM director.   That's

18   Mr. LeFleur?

19   A.   Yes.

20   Q.   The way that would have worked is he would have stood up

21   at the podium and spoken to the commission?

22   A.   Yes.

23   Q.   Report from the commission chair?

24   A.   Yes.

25   Q.   And report from the rulemaking committee.   Is that

SIMPSON - Cross by Essig

1    right?

2    **A.**  Yep.

3    Q.   And if we look here there on arrow number 5, the one

4    matter, that one sort of regulatory matter that the

5    commission was considering was this consideration of

6    adoption of proposed amendments to ADEM's administrative

7    code; is that right?

8    **A.**  Yes.

9    Q.   And if you'll go down and read the sentence where it

10   begins with "this proposed rulemaking."

11   **A.**  "This proposed rulemaking would incorporate revisions

12   made by EPA in its federal hazardous waste regulations to

13   address the management of solvent-contaminated wipes as

14   well as other routine updates and rules maintenance."

15   Q.   So this was the only regulatory or rulemaking issue

16   before the AEMC on the day that Oliver Robinson spoke; is

17   that right?

18   **A.**  Yes.

19   Q.   And then I think the next one, number 6, is there was an

20   appeal issue by Marshall Durbin companies; is that right?

21   **A.**  Yes.

22   Q.   And again, that was the only appeal matter that the AEMC

23   was considering on that particular day; is that correct?

24   **A.**  Yes.

25        MR. ESSIG:  Just a moment, Your Honor.

SIMPSON - Cross by Essig

1      Sam, if you'd bring up Government's Exhibit 72, please.

2  And Sam, if you'll go to the second page.  And if you'll

3  highlight the public comments section or enlarge that,

4  please.

5  Q.  Again, Mr. Simpson, as you testified on direct

6  examination, this is what is a very well-written summary of

7  what occurred at the AEMC --

8  A.  Thank you.

9  Q.  -- that you went to; is that correct?

10  A.  Yes.

11  Q.  And in the public comment period, you summarize the two

12  speeches by the individuals that spoke that day.

13  A.  Yes.

14  Q.  And one of those we've already discovered is Oliver

15  Robinson; is that correct?

16  A.  Yes.

17  Q.  And then after that is Mr. Mitch Reid, who is the

18  program director of the Alabama Rivers Alliance.

19  A.  Yes.

20  Q.  Is that correct?

21  A.  Yes.

22  Q.  Are you familiar with the Alabama Rivers Alliance?

23  A.  I am.

24  Q.  What type of organization is that?

25  A.  Environmental organization.  Environmental advocacy.

SIMPSON - Cross by Essig

1   Q.   Okay.  And if you'll read the last sentence there

2   beginning with "Mr. Reid."  There we go.

3   A.   "Mr. Reid further urged the commission and department to

4   be prepared to act on incorporating the new EPA rules and

5   the state regulations and offered to assist the department

6   in developing its policy in this area."

7   Q.   Okay.  So specifically, Mr. Reid asked ADEM to take a

8   position on those regulations; is that correct?

9   A.   Yes.

10  Q.   And offered to actually assist them with making those

11  regulations; is that right?

12  A.   Yes.

13  Q.   And just so we're clear for the jury, the regulations

14  that he was talking about were coal ash regulations?

15  A.   Correct.

16  Q.   And you would know, Mr. Simpson, from your experience

17  working in the environmental section at Balch that coal ash

18  regulations are regulations that would apply to industry in

19  coal companies; is that right?

20  A.   Yes.

21       MR. ESSIG:  All right.  Sam, if you could bring up

22  Government's Exhibit 71, please.

23  Q.   Now, Mr. Simpson --

24       MR. ESSIG:  Sam, if you could highlight sort of the top

25  through about the first three bullet points.

*SIMPSON - Cross by Essig*

```
1    Q.  Now, Mr. Simpson, you reported back on Oliver Robinson's

2    speech before the commission that day to Mr. Gilbert; is

3    that right?

4    A.  Yes.

5    Q.  All right.  And if we can go to the first sentence there

6    of the first bullet point beginning with "he has

7    researched."

8        MR. ESSIG:  Can you highlight that for us, please?

9    Q.  If you'll read that for us, Mr. Simpson.

10   A.  "He has researched the relevant issues thoroughly once

11   he started receiving a lot of comments of concern from his

12   constituents, the residents in that area."

13   Q.  Now, Mr. Simpson, you were asked a number of questions

14   by Mr. Ward about things you may or may not have known at

15   this time.  At this point in time, did you know that Oliver

16   Robinson's foundation had entered into a contract with

17   Balch & Bingham to do community engagement in North

18   Birmingham and Tarrant?

19   A.  No.

20   Q.  And did you know at this particular time that as of

21   January of 2015, that Mr. Robinson and his organization had

22   been provided with 93 letters from the community regarding

23   their concerns in North Birmingham?  Were you aware of that

24   fact?

25   A.  No.
```

1   Q.  And were you aware of the fact prior to this that

2   Mr. Robinson had represented in December of 2014 to

3   Mr. Gilbert that his organization was going to be doing

4   mail-outs?

5   A.  No.

6   Q.  Were you aware that he had represented they were going

7   to be doing robocalls in the community?

8   A.  No.

9   Q.  Now, if you'll read the next sentence for us too,

10  please.

11  A.  "He has met with EPA, and he has met with GASP."

12  Q.  So that day at the AEMC appearance, you heard him tell

13  the members of the AEMC that he had actually met with EPA

14  and GASP on this particular matter?

15  A.  Yes.

16  Q.  Is that right?  Now, Mr. Simpson, at this point in time

17  you stated that you had worked on this matter at Balch &

18  Bingham under Joel Gilbert's supervision for about six

19  months; is that right?

20  A.  Give or take.  That's probably about right, yeah.

21  Q.  And at this point in time you had done quite a bit of

22  research on the 35th Avenue matter; would that be fair to

23  say?

24  A.  Yes.

25  Q.  And you had had quite a bit of involvement in the issue

SIMPSON - Cross by Essig

1    of whether or not this site would be added to the NPL;

2    would that be fair to say?

3    A.  Yes.

4    Q.  Based on the research you had done -- let me ask you:

5    Did that research include just reviewing Balch and Drummond

6    documents, or did it also include reviewing information

7    from the EPA?

8    A.  It included reading information from the EPA as well.

9    Q.  And information from ADEM and other state agencies?

10   A.  Yes.

11   Q.  And was Mr. Robinson's comments at the AEMC and your

12   summary of them consistent with what you had learned in

13   your six months of work on this matter?

14       MR. WARD:  Objection.  Relevance.

15   A.  Yes.

16       THE COURT:  How much longer do you have with this

17   witness?

18       MR. ESSIG:  I've got a little bit, Your Honor, but not

19   that much, probably -- I would estimate 10 to 15 minutes.

20       THE COURT:  Okay.  Ladies and gentlemen of the jury,

21   let me interrupt Mr. Essig here, please, and give you your

22   morning break.  Please do not talk about this case at all

23   during the break.  And if you leave the jury room, in the

24   unlikely event anyone approaches you about this case,

25   please let me know.  We are in recess until 10:33, so

SIMPSON - Cross by Essig

```
 1    roughly 15 minutes from now.  Thank you.
 2    (The following proceedings were had in open court
 3    outside of the presence and hearing of the jury.)
 4        THE COURT:  You are free to get off the witness stand.
 5    You cannot talk to anyone during the break about your
 6    testimony.  Thank you.  15 minutes, everyone.  Thanks.
 7    (Recess.)
 8    (The following proceedings were had in open court in the
 9    presence and hearing of the jury.)
10        THE COURT:  Mr. Essig, you may continue with your
11    examination.
12        MR. ESSIG:  Thank you, Your Honor.
13    Q.  Mr. Simpson, I want to go back and talk a little bit
14    about Government's Exhibit 72.  We won't pull it up on the
15    screen, but that is the Environmental Update done at Balch.
16        This is not a document that was created solely for the
17    February 2015 AEMC appearance; is that right?  I mean this
18    document in general.  Y'all do one of these -- the firm
19    does these periodically --
20    A.  Yes.
21    Q.  -- is that right?  So, I mean, it's not like you only
22    created this because of the Oliver Robinson appearance in
23    2015.
24    A.  Correct.  We do one after every meeting.
25    Q.  And this gets sent out to clients; is that right?
```

*SIMPSON - Cross by Essig*

1   **A.**   Yes.

2   **Q.**   And does get it sent and posted on your -- on Balch's

3   website?

4   **A.**   Yes.

5   **Q.**   So it's there; it's public information; anybody that

6   wants to come to your website and look at it could look at

7   it?

8   **A.**   Yes.

9   **Q.**   As a matter of fact, the time that the associates at

10  Balch & Bingham spend going to the bimonthly AEMC meetings

11  and creating the *Environmental Update*, that's time that's

12  not billed to a client; is that right?

13  **A.**   Correct.   It's billed to the firm.

14  **Q.**   So it's basically a free service for anyone who might be

15  interested in it?

16  **A.**   Yes.

17  **Q.**   Mr. Simpson, what I do want to talk about and show

18  you --

19      MR. ESSIG:   Sam, if you can pull up Government's

20  Exhibit 74.

21  **Q.**   And, Mr. Simpson, again, you were asked about this on

22  direct examination, an email from you to Joel Gilbert; is

23  that right?

24  **A.**   Yes.

25  **Q.**   And this references information that you were adding to

*SIMPSON - Cross by Essig*

1    the extranet site.

2    **A.**  Yes.

3    **Q.**  Can you tell us what the extranet site is?

4    **A.**  Basically, a web repository of documents that had the

5    ability to let clients also log in from out of the

6    network --

7    **Q.**  Okay.

8    **A.**  -- if we needed to share documents with client.  It was

9    also just kind of an organizational tool for us if we had a

10   lot of documents to deal with in a matter, a place where we

11   could organize them.

12   **Q.**  All right.  I think here in the second paragraph it says

13   "I placed these materials in a new subfolder under the

14   general link from the ABC site, then click on media"; is

15   that right?

16   **A.**  Yes.

17   **Q.**  And media, we're not referring to news coverage.  We're

18   referring to files, digital files of the video and audio

19   for these particular things; is that right?

20   **A.**  Yes.

21   **Q.**  And the extranet site -- and, again, that's a site that

22   any of the dozens of attorneys working on this matter would

23   have access to; is that right?

24   **A.**  Yes.

25   **Q.**  And if you're working on this matter and you're given

*SIMPSON - Cross by Essig*

```
 1   access to the extranet site, you can go and look at
 2   anything you want to on that extranet site; is that
 3   correct?
 4   A.  Yes.
 5   Q.  And this would also be -- you said it's shared with
 6   clients.  This would be something, a file or a filing
 7   system that ABC Coke and Drummond would have been given
 8   access to as well; is that right?
 9   A.  Most likely, yes.
10   Q.  So if it's placed on the extranet site, it's placed in
11   plain sight, so to speak; is that right?
12   A.  Yes.
13   Q.  Now, Mr. Simpson, we've mentioned before that you worked
14   at Balch & Bingham for eight-plus years; is that right?
15   A.  Yes.
16   Q.  And you stated in that time you worked with Joel Gilbert
17   and for Joel Gilbert quite a bit; is that right?
18   A.  Yes.
19   Q.  And in that time, you developed an appreciation of Joel
20   as a person?
21   A.  Yes.
22   Q.  And you trusted Joel?
23   A.  Yes.
24   Q.  And you found Joel to be a truthful and law-abiding
25   person?
```

*SIMPSON - Cross by McKnight*

1    **A.**   Yes.

2         MR. ESSIG:   Thank you.   No further questions.

3         THE COURT:   Who's next?

4         Mr. McKnight.

5    CROSS-EXAMINATION BY MR. McKNIGHT:

6    **Q.**   Mr. Simpson, I'm David McKnight.   I represent Steve

7    McKinney in this matter.   Now, the environmental section

8    where you worked at Balch had 20-something lawyers in it,

9    correct?

10   **A.**   Yes.

11   **Q.**   And approximately half of those were partners, correct?

12   **A.**   Yes.

13   **Q.**   All right.   And you did work for most all those folks,

14   right?

15   **A.**   Yes.

16   **Q.**   And those attorneys all had their own individual clients

17   in addition, correct?

18   **A.**   Yes.

19   **Q.**   I mean, Drummond wasn't the only client the

20   environmental section had, correct?

21   **A.**   Far from it.

22   **Q.**   Okay.   Y'all had tens -- hundred or so additional

23   clients, correct?

24   **A.**   Lots, yes.

25   **Q.**   Lots of clients?

1   A.   Yes.

2   Q.   And work is being done for all those clients, and all

3   those clients have separate matters too.   Well, not all of

4   them, but some of them have separate matters.   Like the

5   Drummond Company we've seen had four or five different

6   matters y'all were working on, right?

7   A.   Yes.

8   Q.   So you've got hundreds -- a hundred or so clients with

9   multiple matters for all those.   You have offices across

10  the southeast in addition too, correct?

11  A.   Yes.

12  Q.   Okay.   And offices in Atlanta with environmental folks?

13  A.   Yes.

14  Q.   Montgomery?

15  A.   Yes.

16  Q.   Jackson?

17  A.   Yes.

18  Q.   Gulfport?

19  A.   Yes.

20  Q.   Okay.   And so as section head, Mr. McKinney visits all

21  those offices, correct?

22  A.   He did.

23  Q.   Okay.   As a matter of fact, he visited you one time when

24  he was over in Atlanta when you were thinking about law

25  school, correct?

SIMPSON - Cross by Bouchard

1    A.   He did.

2    Q.   And he advised you, regretfully or not, to enter the

3    profession of law, correct?

4    A.   Yes.

5    Q.   Okay.  And you trusted his advice and you valued it,

6    correct?

7    A.   I did.

8        MR. McKNIGHT:  That's all I have, Your Honor.

9        THE COURT:  Thank you, Mr. McKnight.

10       Mr. Bouchard?

11       MR. BOUCHARD:  Yes, Your Honor.

12   CROSS-EXAMINATION BY MR. BOUCHARD:

13   Q.   Good morning, Mr. Simpson.  My name is David Bouchard,

14   and I'm an attorney for David Roberson.

15   A.   Good morning.

16   Q.   I think you said previously that Balch & Bingham has a

17   great reputation as one of the top law firms in the state

18   of Alabama; is that right?

19   A.   Yes.

20   Q.   And specifically the environmental law section, the

21   section that you worked in, was considered to be a premiere

22   environmental law section in the whole state of Alabama?

23   A.   Yes.

24   Q.   That was true at the time that Drummond hired Balch &

25   Bingham; isn't that right?

*SIMPSON - Cross by Bouchard*

1  A.  Yes.  It was true at the time that I decided to take

2  that job offer, yes.

3  Q.  And my colleague I think walked you through very well

4  the many different aspects of your work for Drummond.

5  A.  Yes.

6  Q.  Is it fair to say that you did a lot of different work

7  for Drummond?

8  A.  I did.

9  Q.  Would you agree with me or would you have any reason to

10  dispute that you worked around 700 hours for Drummond?

11  A.  I believe that.

12  Q.  Your work ranged the gamut in terms of the different

13  subject matters and topics that it addressed, right?

14  A.  Yes.

15  Q.  And I think it's clear, but just to underline this

16  point, you were not the only attorney at Balch & Bingham

17  working on Drummond matters, right?

18  A.  Correct.

19  Q.  There were many attorneys?

20  A.  Yes.

21  Q.  And many of those attorneys were also working hundreds

22  of hours for Drummond; is that right?

23  A.  Yes.

24  Q.  In all the 700 hours that you worked for Drummond,

25  Mr. Simpson, you never once met my client, David Roberson;

SIMPSON - Cross by Bouchard

1    is that right?

2    **A.**   Correct, I did not.

3    Q.   You never once talked to him on the phone?

4    **A.**   No.

5    Q.   Never once exchanged emails with him; is that right?

6    **A.**   No.  Yes, that's right.  No, I did not.

7    Q.   So if I'm understanding this, then, the matter that

8    Balch or the matters that Balch & Bingham were representing

9    Drummond -- was representing Drummond on were complicated

10   and they were multifaceted and they were numerous; is that

11   fair?

12   **A.**   Yes.

13   Q.   I want to talk to you briefly about an attorney's duties

14   to their client.  You took the bar exam and you're barred

15   in the state of Alabama, right?

16   **A.**   Yes, and Georgia.

17   Q.   And in Georgia.  And you've practiced, as you've said,

18   for almost eight years; is that right?

19   **A.**   2011 is when I became a member of the Georgia bar, so

20   seven, seven years now.  Yeah.

21   Q.   Without getting into the details of boring the jury with

22   an attorney's duties to their client, you generally agree

23   with me that an attorney owes duties to their client,

24   right?

25   **A.**   Yes.

SIMPSON - Cross by Bouchard

1    Q.   And one of those duties is to advise the client

2    accurately of the law, fair?

3    A.   Yes.

4    Q.   And to ensure that if the client is ever going off the

5    road and engaging in conduct that's improper in the mind of

6    the attorney, that the attorney notify the client they

7    think there's a problem?

8    A.   Yes.

9    Q.   You said in your direct examination, I believe, that you

10   were a staff attorney at Balch & Bingham, right?

11   A.   Yes.

12   Q.   But you agree with me that even as a staff attorney,

13   even if, you know, there are senior partners above you and

14   partners above you, as a staff attorney, you still

15   personally owe a duty to your client; is that fair?

16   A.   Yes.

17   Q.   In other words --

18   A.   As a member of the bar, whether or not you're --

19   whatever your title is, as a member of the bar, you are.

20   Q.   And so you individually, Mr. Simpson, if you had ever

21   observed any conduct as an attorney that you thought was

22   improper, impermissible, or unlawful for some reason, you

23   had a duty, did you not, to notify either one of your

24   supervising attorneys or the bar association itself of what

25   you had seen; is that fair?

1    A.  Yes.

2    Q.  And is it true that you never did that because you never

3    felt the need to do that?

4    A.  Yes, that's true.

5    Q.  So to put that in different words, you never saw any

6    conduct occur in Balch's representation of Drummond that

7    you thought was improper, impermissible, or unlawful for

8    any reason?

9    A.  That's correct.

10   Q.  I want to ask you some additional questions about the

11   AEMC meeting on February 20, 2015 --

12   A.  Okay.

13   Q.  -- where Oliver Robinson spoke.  You don't have any

14   special insight into why Oliver Robinson was there that

15   day, right?

16   A.  I do not, no.

17   Q.  You don't have any direct, firsthand knowledge from any

18   conversations you ever had with Oliver Robinson about why

19   he was there, right?

20   A.  I've never had a conversation with Oliver Robinson.

21   Q.  So you don't know what was in his heart or in his mind

22   when he was talking that day?

23   A.  No.

24   Q.  Mr. Ward asked you some questions about things that you

25   knew or didn't know about Oliver Robinson and the contract

*SIMPSON - Cross by Bouchard*

1  between his foundation and Balch & Bingham for community

2  outreach.  Do you recall that?

3  **A.**  Yes.

4  **Q.**  And I want to ask you some questions along those lines.

5  **A.**  Okay.

6  **Q.**  You weren't aware, were you, that Oliver Robinson and

7  John Powe had an agreement to try to become millionaires

8  through pursuing a role of administrators of a Superfund

9  settlement?

10  **A.**  No.

11  **Q.**  You were not aware of that?

12  **A.**  Not aware.

13  **Q.**  And you were not aware that they had this goal of

14  becoming millionaires as of the AEMC meeting in

15  February 2015?

16  **A.**  Not aware.

17  **Q.**  When you heard Oliver Robinson's presentation, you

18  didn't have any indication or you didn't have any reason to

19  believe that he didn't personally believe what he was

20  saying?

21  **A.**  No.

22  **Q.**  You never heard anybody at Balch & Bingham say Oliver

23  Robinson's only saying what we asked him to say or

24  something like that?

25  **A.**  No.

*SIMPSON - Cross by Bouchard*

1   Q.  In fact, if I heard you correctly in direct examination,

2   you actually said that Joel Gilbert asked you to let him

3   know what Oliver Robinson said.

4   **A.**  Yes.

5   Q.  In other words, he was asking you?

6   **A.**  Yes.

7   Q.  The substance of Oliver Robinson's comments,

8   Mr. Simpson, you would agree with me that the substance of

9   his comments was consistent with the position that had been

10  taken by numerous politicians across the state of Alabama?

11  **A.**  I'd agree with that.

12  Q.  Including senators, congresspeople, the attorney

13  general, the governor; is that right?

14  **A.**  Yes.

15  Q.  And the substance of Oliver Robinson's comments was also

16  consistent with Director Lance LeFleur's previously

17  announced position on behalf of ADEM?

18  **A.**  Yes.

19  Q.  You knew, did you not, that prior to 2/2015 when Oliver

20  Robinson spoke to the AEMC that Director LeFleur had taken

21  a firm position on behalf of ADEM that ADEM did not concur

22  in the proposed NPL listing?

23  **A.**  I recall that letter that he wrote, yeah.

24  Q.  And as of February 20, 2015, it was your understanding

25  that ADEM was not concurring and had not deviated from

*SIMPSON - Cross by Bouchard*

1    that; is that right?

2    **A.**  That's correct.

3    **Q.**  To be clear, Oliver Robinson never said "ABC Coke" or

4    "Drummond" in his presentation, did he?

5    **A.**  No, he never did.

6        MR. BOUCHARD:  Sam, if you could please pull up

7    Government's Exhibit 71.  And Sam, if you can please

8    highlight the third-from-the-bottom bullet point that

9    starts "Rep. Robinson asked."

10   **Q.**  Mr. Ward asked you some questions about part of this

11   bullet point.  I want to ask you questions about the other

12   part.

13   **A.**  Okay.

14   **Q.**  It says "Rep. Robinson asked for AEMC/ADEM's help in

15   determining who is actually responsible for the

16   contamination," right?

17   **A.**  Yes.

18   **Q.**  If I'm understanding what you said there, he did not

19   say, "Find that ABC Coke or Drummond are not responsible"?

20   **A.**  He did not say that.

21   **Q.**  So is it fair to say that what he said was please

22   determine who is responsible?

23   **A.**  Yes.

24       MR. BOUCHARD:  And if you go to the second sentence,

25   Sam, and highlight as I read, please.

SIMPSON - Cross by Bouchard

1  Q.  "If these other companies are not found to be
2  responsible, they should be taken off the list of
3  responsible parties."  Did I read that correctly?
4  A.  Yes.
5  Q.  So if we flip that sentence and read it in a positive,
6  if these other companies are found to be responsible, they
7  should remain on the list of responsible parties; is that
8  fair?
9       MR. WARD:  Objection.  Mischaracterizes --
10      THE COURT:  Sustained.
11  A.  It's logical to me.
12      THE COURT:  Sustained.
13  Q.  (BY MR. BOUCHARD:)  Was it your understanding that
14  that's what he meant --
15      MR. WARD:  Objection.
16  Q.  (BY MR. BOUCHARD:)  -- either they're responsible or not
17  and they should stay on the list or they shouldn't?
18      MR. WARD:  Objection.  Speaks for itself.
19      MR. BOUCHARD:  Your Honor, he asked questions about the
20  document.
21      THE COURT:  You can answer that question.
22  A.  Generally, yes.
23  Q.  (BY MR. BOUCHARD:)  Is there any part of what I just
24  said that you don't think is true?
25  A.  No.

SIMPSON - Cross by Bouchard

1   Q.  I want to ask you in closing, Mr. Simpson, just a few

2   questions about community outreach.  You said that you were

3   not aware that the Oliver Robinson Foundation was engaging

4   in community outreach on behalf of Balch & Bingham; is that

5   right?

6   A.  Yes.

7   Q.  But you also said in response to some questions from

8   Mr. Essig that there's a hierarchy in a law firm and that

9   you didn't know everything at all times that everybody in

10  the law firm was working on.

11  A.  Correct.

12  Q.  And there's nothing suspicious or unlawful or anything

13  else about that, right?

14  A.  Correct.

15  Q.  It's just the reality of working on a big team?

16  A.  Correct.

17  Q.  You would agree with me, though, that you believed that

18  community outreach was important and necessary given

19  plaintiffs' law firms and GASP, the environmental advocacy

20  group, were doing their own community outreach work?

21  A.  Yes, I thought it was a good strategy.

22  Q.  And you believed that Get Smart, which you were familiar

23  with, was actually helping to level the playing field by

24  telling the other side of the story that GASP and

25  plaintiffs' attorneys weren't telling?

SIMPSON - Cross by Bouchard

1   A.  Yes.

2   (Government's Exhibit 266 was referenced.)

3       MR. BOUCHARD:  Sam, if you could please pull up

4   Government Exhibit 266.

5   Q.  While Sam's pulling that up, you were asked a question

6   by Mr. Ward in his direct examination of you.  He said,

7   "Did you know that Oliver Robinson picked up a check for

8   $14,000 four days before he spoke to the AEMC?"  Do you

9   remember that?

10  A.  I do.

11  Q.  What's the date on the top of Government's Exhibit 266?

12  A.  It is February 4, 2015.

13  Q.  And do you recall that you testified in your direct

14  examination in response to questions from Mr. Ward that you

15  attended staff meetings?

16  A.  Yes.

17  Q.  Does this appear to be notes from one of those staff

18  meetings that you would have attended?

19  A.  Yes.

20  Q.  And who took these notes at these staff meetings, do you

21  recall?

22  A.  I don't.  It would have been somebody in our

23  environmental section, maybe Amy Benschoter.  I just don't

24  remember specifically.

25  Q.  Is it fair to say that these notes would have been taken

SIMPSON - Cross by Bouchard

1   at or near the time of the actual meeting?

2   **A.**   Yes.

3   Q.   And fair to say that if something's recorded in the

4   notes, it probably was actually said in the meeting or

5   discussed in the meeting?

6   **A.**   Whoever was taking the notes had an incentive to get it

7   accurate, yes.

8        MR. BOUCHARD:   Sam, I'd like to first look at Roman

9   Numeral I(A)(1).

10       Sam's going to highlight that for us.

11  Q.   Do you see there where it says "Comments submitted by

12  others, including ADEM, AG, governor's office, Manufacture

13  Alabama, and BCA"?

14  **A.**   Yes.

15       MR. BOUCHARD:   And, Sam, if you could go down to (2),

16  please, right underneath that.

17  Q.   Do you see where it says "Successfully worked with

18  neighborhood residents, and approximately 100 neighborhood

19  residents also submitted comments in opposition to the

20  listing"?   Is that right?

21  **A.**   Yes.

22  Q.   "Worked" is past tense, right?

23  **A.**   Yes.

24  Q.   So you understood as of February 4, 2015 that

25  neighborhood residents, approximately 100 of them, had

SIMPSON - Cross by Bouchard

1   already submitted comments in opposition to the proposed

2   NPL listing?

3   A.  Yes.

4       MR. BOUCHARD:  And if you can go down to page 2, please

5   Sam, Roman numeral V, right under where it says "community

6   neighborhood outreach/business group."

7   Q.  It says "Community effort currently underway," doesn't

8   it?

9   A.  Yes.

10  Q.  And it says "Encouraged neighborhood residents to file

11  comments opposing NPL listing," right?

12  A.  Yes.

13      MR. BOUCHARD:  And if you go down -- this is the last

14  point I'm going to make with this document -- Sam, to

15  letter D.

16  Q.  Doesn't it say, Mr. Simpson, "Helped encourage

17  neighborhood residents to file comments opposing NPL

18  listing"?

19  A.  Yes, it does.

20  Q.  So this document is describing work that has occurred as

21  of February 4, 2015?

22  A.  Correct.

23  Q.  And you have no knowledge of whether the $14,000 check

24  that Oliver Robinson picked up on February 16, 2015 was to

25  compensate the foundation for this work?

1    **A.**   No, I have no idea.

2         MR. BOUCHARD:   Thank you.   Nothing further at this

3    time.

4         THE COURT:   Redirect?

5         MR. WARD:   Yes, Your Honor, briefly.

6    REDIRECT EXAMINATION BY MR. WARD:

7    **Q.**   Mr. Simpson, you recall Mr. Bouchard asking you on

8    cross-examination about the many attorneys at Balch who

9    worked on Drummond matters?

10   **A.**   Yes.

11   **Q.**   How many Balch attorneys went to that AEMC meeting in

12   February of 2015?

13   **A.**   Probably just me.

14   **Q.**   I think you already said this, but were you aware at

15   that time that Oliver Robinson or his foundation was

16   working for Balch and Drummond?

17   **A.**   No.

18        MR. WARD:   Could we look at Government's Exhibit 74?

19   **Q.**   Mr. Essig asked you questions about the extranet.

20   **A.**   Yes.

21   **Q.**   Which I understand was available to personnel at Balch

22   and others with an invitation?

23   **A.**   Yes.

24   **Q.**   The materials that you uploaded here, did any of those

25   materials say that Oliver Robinson's foundation had just

1    been hired by Balch?

2    **A.**  No.

3    **Q.**  Did any of those materials that you uploaded refer to

4    Oliver Robinson's picking up a check from Balch?

5    **A.**  No.

6        MR. WARD:  Could we look at Government's Exhibit 72?

7    **Q.**  This is the *Environmental Update* we looked at.  If we

8    could look at page 2 and in particular the bottom piece of

9    the page, Mr. Essig asked you questions about the bottom

10   bullet point and what the Alabama River Alliance -- Rivers

11   Alliance asked the commission to do.

12       Can you look at the last sentence of the first bullet

13   point?  Do you see where it says that "Congressmen

14   requested the commission's and the department's assistance

15   in determining the correct potentially responsible parties

16   and in resolving the matter as expeditiously as possible"?

17   Do you see that?

18   **A.**  Yes.

19       MR. WARD:  Thank you, Ms. Borden.

20   **Q.**  Mr. Bouchard asked you questions about knowing that ADEM

21   Director Lance LeFleur had taken a firm position in

22   opposition to the NPL listing?

23   **A.**  Yes.

24   **Q.**  That was before the February 2015 commission meeting?

25   **A.**  Yes.

SIMPSON - Recross by Bouchard

1    Q.   Okay.   But Representative Robinson still went to that

2    meeting, and did he make comments about the NPL listing?

3    A.   Yes.

4    Q.   Okay.   And did he make comments encouraging ADEM and the

5    commission to do something with respect to that listing?

6    A.   Yes.

7         MR. WARD:   No further questions.

8         THE COURT:   As to those limited topics, Mr. Essig,

9    anything further?

10        MR. ESSIG:   Nothing further, Your Honor.

11        THE COURT:   Thank you.

12        Mr. McKnight?

13        MR. McKNIGHT:   No, sir, Your Honor.

14        THE COURT:   Thank you.

15        Mr. Bouchard?

16        MR. BOUCHARD:   Briefly, Your Honor.

17        THE COURT:   You may.

18   RECROSS-EXAMINATION BY MR. BOUCHARD:

19   Q.   Mr. Simpson, I just want to ask you a few questions

20   about Government's 72, which Mr. Ward just inquired about.

21        THE COURT:   Solely as to the line relating to a

22   congressman, that bullet point.

23        MR. BOUCHARD:   Fair enough, Your Honor.

24   Q.   That newsletter was not private or confidential, was it?

25   A.   No.

*SIMPSON - Recross by Bouchard*

1    Q.  It was publicly available?

2    A.  It was on our website.

3    Q.  Do you have any idea of how many Balch attorneys

4    reviewed it?

5    A.  No.  I mean, multiple.  I was aware that at least a few

6    reviewed it, but once it was on the website, I'm sure lots

7    of others.

8    Q.  If it was on the website, theoretically any Balch

9    attorney could have reviewed it?

10   A.  Yes.

11       MR. BOUCHARD:  Thank you.  Nothing further.

12       THE COURT:  Is Mr. Simpson released?

13       MR. WARD:  Yes, Your Honor.

14       THE COURT:  Any objections from the defendants?

15       MR. ESSIG:  No, Your Honor.

16       MR. BOUCHARD:  No, Your Honor.

17       MR. McKNIGHT:  No, sir.

18       THE COURT:  Thank you, all.

19       Mr. Simpson, have a good day, sir.

20       THE WITNESS:  Thank you.  You too.

21   (Witness excused.)

22       THE COURT:  Who is the government's next witness?

23       MR. WARD:  The government calls Anne Heard.

24       THE COURT:  Ms. Heard, good morning.

25       MS. HEARD:  Good morning.

1    (Witness sworn.)

2        THE COURTROOM DEPUTY:  Please state and spell your

3    first and last name for the record.

4        THE WITNESS:  My first name is Valeria, V-a-l-e-r-i-a.

5    My last name is Heard, H-e-a-r-d.

6        THE COURTROOM DEPUTY:  What city and state do you

7    reside in?

8        THE WITNESS:  I reside in Fayetteville,

9    F-a-y-e-t-t-e-v-i-l-l-e, Georgia.

10       THE COURT:  Mr. Ward, you may begin.

11       MR. WARD:  Thank you, Your Honor.

12                        VALERIA "ANNE" HEARD,

13   duly sworn, was examined and testified as follows:

14   DIRECT EXAMINATION BY MR. WARD:

15   Q.  Good morning, Ms. Heard.

16   A.  Good morning.

17   Q.  Where do you work?

18   A.  Right now I work for the Atlanta Metropolitan State

19   College.  I'm an executive in residence there.  I am

20   employed by EPA, but my current work site is Atlanta

21   Metropolitan State College.  That's in Atlanta.

22   Q.  Okay.  And how long have you had that particular

23   position?

24   A.  So I'm rolling into two months now, so I'm really a --

25   really well versed.

HEARD - Direct by Ward

Q.  How long have you been at EPA?

A.  So I have been at EPA for 38 years.  I started in 1979.

Q.  And what did you do before that?  Give us your educational background.

A.  So I'm an attorney.  I went to undergraduate at Duke University.  I went to Emory Law School.  I was in a family practice for about two years before I started working at EPA, and I've been at EPA ever since.

Q.  I want to focus on the 2014-'15 time frame at EPA. During that time frame, what position did you have at EPA?

A.  During '14-'15, I was deputy regional administrator for EPA Region 4, which is the southeastern region of USEPA.

Q.  And is that based in Atlanta, Georgia?

A.  That is.

Q.  And who was the administrator at that point?

A.  In 2014, it was -- Lisa Jackson was 2009, and then Gina McCarthy came after her.  I'm sorry.  I was just --

Q.  And that's the administrator for the entire EPA?

A.  Right.

Q.  For Region 4, was Heather McTeer Toney the Region 4 administrator during the '14-'15 period?

A.  Yes.  Heather was the regional administrator; that is correct.

Q.  The regional administrator.  Okay.  So did you report to her?

A.  I did.  I served as Heather's deputy for the entire time
that she was there.

Q.  Okay.  And what were your job duties as the deputy
regional administrator?

A.  So what I did was help Heather manage the region.  So
EPA, of course, administers several laws.  We protect air,
water, waste, and my job was to help with the substantive
administration of those laws, to help with managing
personnel, to help with relationships that we would
establish in order to administer those laws.  So whatever
it took to help run the region is what the deputy regional
administrator's jobs encompassed.

Q.  Are you familiar with the 35th Avenue Superfund Site --

A.  I am.

Q.  -- here in Birmingham, Alabama?

A.  I am very familiar with that site.

Q.  Okay.  In your role as the deputy regional
administrator, did you do any work or have any involvement
in that site?

A.  I did.  So the 35th Avenue site was one of Gina
McCarthy's Making a Visible Difference sites.  So it means
that it was one of the sites that EPA focused on in
particular.

Q.  In connection with your involvement in the site, did you
attend any meetings in Birmingham?

1    **A.**   I attended a number of meetings in Birmingham.   I mean,

2    one of the ways that we addressed the 35th Avenue site was

3    to try to build coalitions with the community, with the

4    city, with other federal agencies to try to do more than

5    just what EPA could do under its authority.   And that

6    required us to meet with a lot of constituents.   So I was

7    here a number of times.

8    *Q.*   I want to direct your attention to December 2014.

9    During that period, did you attend a meeting in Birmingham

10   with Oliver Robinson?

11   **A.**   I did.

12   *Q.*   Okay.   How did that meeting come about?

13   **A.**   I can't remember exactly whether we were here for

14   another purpose and we met with Oliver Robinson as a part

15   of that, as an extension of that meeting.   I believe we'd

16   come down to meet with the mayor or a number of other

17   officials and the Robinson meeting was a meeting that was

18   set up just as part of our outreach efforts.

19   *Q.*   Had you met Mr. Robinson at that point?

20   **A.**   I had not.

21   *Q.*   Did you know he was a state legislator?

22   **A.**   I did.   As a part of coming to the meeting and the

23   background that we were given to prepare for that meeting,

24   I knew that he was a state legislator.

25   *Q.*   Where was the meeting held?

1    **A.**   It was held in the hotel where we were staying.  Don't

2    ask me the name, but --

3    **Q.**   Somewhere in Birmingham?

4    **A.**   Somewhere in Birmingham, yes.

5    **Q.**   Okay.  Do you know who set the meeting up?

6    **A.**   Probably -- so to answer your question, no, I don't

7    exactly know, but I would imagine it would be one of the

8    special assistants working for Heather.  That is how our

9    meetings usually got set up.  It would either be the

10   special assistant or someone from our Office of

11   Congressional Affairs.  Like Allison Wise would set up --

12   probably it was Allison, thinking out loud, because she was

13   in charge of our congressional liaison work.

14   **Q.**   You said that you came to learn that Oliver Robinson was

15   a state legislator as part of the background for the

16   meeting.  Was Oliver Robinson invited to that meeting

17   because he was a state legislator?

18   **A.**   That meeting was with Oliver Robinson -- yes.  The

19   meeting was with him individually.  So the purpose of the

20   meeting was to answer his questions, to give him

21   information, and to make outreach with him individually.

22   He was not or I don't recall him being at any of the other

23   meetings that we attended.  That was a meeting with Oliver

24   Robinson.

25   **Q.**   Do you recall who else attended the meeting?

1    **A.**  Cynthia Peurifoy, Brandi Jenkins.  Cynthia works in our

2    environmental justice office, and she did a lot of work

3    with the community.  So she was generally, you know, in the

4    forefront of any kind of outreach efforts we made.  Brandi

5    Jenkins was Heather McTeer Toney's special assistant.  Shea

6    Jones-Johnson was there.  She was my special assistant.

7    And I was there.

8    **Q.**  In what capacity did you understand Oliver Robinson to

9    be attending that meeting?

10   **A.**  As in his legislative capacity.  Just as a state

11   legislator representing his constituents trying to get

12   information about what EPA was doing in Birmingham or what

13   our role was with the constituents that he represented.

14   **Q.**  During the meeting, did he make reference to his

15   constituents?

16   **A.**  He did.

17   **Q.**  To the constituents he represents?

18   **A.**  He did.  He did.  He talked about -- well, he asked

19   questions on behalf of his constituents, who he said had

20   expressed concerns about the Superfund action that was

21   being undertaken at 35th Avenue and proposed for the

22   Tarrant neighborhood.

23   **Q.**  You said that you were there to answer his questions.

24   Did you perceive that Oliver Robinson had a particular

25   message or angle with his questions?

**A.**  He expressed a lot of concern about the Superfund
process, about the impact of having a site placed on the
NPL, on the property values of his constituents' homes.  He
expressed concerns.  He had a lot of questions about how
the Superfund process worked in terms of timing, was it a
long process and in the meantime, what would happen to the
constituents' property values.  So he definitely had
concerns or seemed skeptical about the EPA action.

**Q.**  You said you understood him to be there as a legislator.
Did that matter to you?

**A.**  Absolutely.

**Q.**  Why did that matter to you?

**A.**  It mattered to me because the -- first of all, he was a
public servant.  He's there on behalf of his constituents.
So my expectation would be that anything that he said or
his concerns or questions would represent the concerns or
questions of his constituents.  So my goal in that meeting
was to try to assure him that the Superfund process had
great flexibility and that ultimately what you end up with
is a clean site.

     And so, yes, I guess the answer to the question is
definitely the fact that he was a state legislator meant a
lot as far as his potential impact on his constituents, his
influence in the whole project, which as a member of the
EPA team I fervently believed in.

Q.  Hearing skepticism about the proposed NPL listing from a
state legislator who represented constituents in that area,
would that carry weight with you as an EPA official?

**A.**  It would carry weight, absolutely.  It would at least
give me pause to consider why.  Was I missing something?
What was the legislator's perspective?  Because the
legislator is elected by people.  He is or she is close
to -- much closer to the constituency than I would be from
Atlanta.  So what a state legislator or a mayor or a public
official believes or has concerns about would impact my
evaluation of a matter.

Q.  If Oliver Robinson had told you that he was actually
working on behalf of a potentially responsible party, would
that have changed the calculus for you?

**A.**  Absolutely.

Q.  How?

**A.**  Because it would make clear that his direction was more
in saving the responsible party's funds or money or
protecting them than protecting the constituents that he
represented.  It would be exactly opposite of what my
expectation would be from a state legislator.

Q.  Did Oliver Robinson ask you during that meeting for
permission to record the meeting?

**A.**  He did not.

Q.  Did he tell you he was recording the meeting?

1    **A.**  He did not.  I was completely surprised to find that

2    out.  No.

3    **Q.**  When did you first find out that he had recorded the

4    meeting?

5    **A.**  I think I heard that it was -- there were some newspaper

6    articles early on that might have mentioned it, but the

7    first time was when I heard the recording, when you played

8    it for me or when I heard -- heard it, actually heard it.

9    **Q.**  Did Oliver Robinson tell you during that meeting that he

10    was negotiating a contract on behalf of his foundation with

11    Balch and Drummond?

12    **A.**  He did not.  He did not.

13    **Q.**  Did he tell you that in the weeks or months after the

14    fact?

15    **A.**  Absolutely not.

16    **Q.**  Did he ever tell you that?

17    **A.**  No.

18    **Q.**  Did anybody from Balch or Drummond ever tell you that?

19    **A.**  No.

20    **Q.**  And what year did you first learn about that?

21    **A.**  2016, 2017.

22        MR. WARD:  That's all the questions I have, Your Honor.

23        THE COURT:  Cross-exam?

24        MR. ESSIG:  Yes, Your Honor.  Thank you.

25    CROSS-EXAMINATION BY MR. ESSIG:

*HEARD - Cross by Essig*

Q.   Good morning, Ms. Heard.

A.   Good morning.

Q.   My name is Brandon Essig, and I'm one of the attorneys who represents Mr. Joel Gilbert in this case.  I don't think -- you never met Mr. Gilbert in your work on the 35th Avenue site; is that right?

A.   Not that I recall.

Q.   And, Ms. Heard, just want to be clear.  Your role with EPA during sort of a key time frame here, 2014, 2015, is that you were the number two to Ms. Heather McTeer Toney; is that right?

A.   Right.

Q.   So I guess your responsibility and your duties would have covered sort of a variety of issues that would have come to Ms. Toney; is that right?

A.   That's right.  So the deputy regional administrator is the career -- highest-ranking career person in the region. And Heather as a regional administrator is -- or was a political appointee.  So, generally, what deputy regional administrators do is provide the continuity or the institutional knowledge of the programs.  We kind of anchor the agency.

Q.   Yes, ma'am.  And I guess if I understand correctly, what it sounds like is your role is probably to sort of help be one of the people on the ground helping Ms. Toney carry out

1  what sort of her priorities were or the administration's

2  priorities were; is that correct?

3  **A.**  That's correct.

4  **Q.**  And you said that was a political appointee position.

5  Is that a position appointed by the president of the United

6  States?  Is that right?

7  **A.**  Correct.

8  **Q.**  And I don't know.  Correct me.  Is that an appointed

9  position that requires confirmation by the U.S. Senate?

10  **A.**  It does not.

11  **Q.**  It doesn't?  It's one that happens without them?

12  **A.**  Correct.

13  **Q.**  Now, you mentioned that one of the reasons that you and

14  the EPA were involved in 35th Avenue and Tarrant is that

15  this area had been designated as a Making a Visible

16  Difference site; is that right?

17  **A.**  Yes, sir.

18  **Q.**  How many of those were there around the country at that

19  time?

20  **A.**  50.

21  **Q.**  Was there one in each state?

22  **A.**  There was at least one.  One, two, three.

23  **Q.**  Okay.

24  **A.**  You mean in each state?

25  **Q.**  Yes, ma'am.

1   **A.**  No.  Not necessarily each state in the country, no.

2   *Q.*  You said 50, and that's why I was trying to think if

3   maybe there was one per state.  But that wasn't the case?

4   **A.**  No, no, no.

5   *Q.*  What was the purpose of the Making a Visible Difference

6   program?

7   **A.**  So the thought was when the federal government or EPA

8   shows up at a site because there are hazardous wastes in

9   someone's back yard, usually there are other problems that

10  are in that neighborhood or the federal government is the

11  face of the government.  EPA, when EPA comes to your house,

12  it's not just EPA.  You see the federal government.

13      So the thought was when we come, not to just have a

14  narrow focus but to see if there are other agencies that

15  could be involved in a particular area to help address some

16  of the other problems like urban blight or educational

17  deficiencies or food deserts or -- it would be to marshal

18  the resources to try to address more than just the EPA

19  issue.

20  *Q.*  Okay.  And you mentioned, Ms. Heard, I think on direct

21  examination questions from Mr. Ward that one of the things

22  y'all were doing there was building a coalition in the

23  North Birmingham community; is that right?

24  **A.**  Yes.

25  *Q.*  And is the name of that coalition, if I recall

```
 1  correctly, the North Birmingham Community Coalition?  Is
 2  that right?
 3  A.  It was -- it had various names, but that was at least
 4  one of them, yes.
 5  Q.  I think I've seen the acronym NBCC; is that correct?
 6  A.  Yes.
 7  Q.  You mentioned that there were other federal agencies
 8  that got involved in that effort; is that right?
 9  A.  Right.
10  Q.  And was the Department of Justice one of the agencies
11  that was involved in that?
12      MR. WARD:  Objection.  Relevance.
13      THE COURT:  Sustained.
14  Q.  (BY MR. ESSIG:)  Now, as part of this effort -- and
15  again, I think you've already mentioned this, is that the
16  Making a Visible Difference program was there to, in
17  addition to potentially addressing any sort of scientific
18  pollution that existed, also to sort of create a community
19  revitalization program; is that right?
20  A.  It was -- yes.  That would be one benefit of focusing
21  federal resources or one potential benefit of focusing
22  federal resources or state resources or city resources in a
23  particular blighted area or area impacted by a Superfund
24  site.
25  Q.  Okay.  And Ms. Heard, I understand you told us you've
```

*HEARD - Cross by Essig*

1   got a law degree and training as an attorney.

2   **A.**   I do.

3   **Q.**   And have you spent some time actually working in a legal

4   role at EPA?

5   **A.**   I have.

6   **Q.**   And you're aware, you have some knowledge of CERCLA.   I

7   know it's a very complicated statute, but CERCLA and the

8   Superfund, you have some knowledge of that?

9   **A.**   I do.

10  **Q.**   And RCRA I think is one of the other statutes that was

11  at issue here; is that right?

12  **A.**   That is correct.

13  **Q.**   And just so I'm clear, is that the Making a Visible

14  Difference program, that was an administrative priority

15  that's not actually set out in CERCLA or RCRA; is that

16  right?

17  **A.**   That is absolutely correct.

18  **Q.**   Okay.   Those statutes deal with whether there's

19  pollution on the ground and who might be liable for it?

20  **A.**   That is correct.

21  **Q.**   Now, I want to talk about your meeting with Oliver

22  Robinson.   And as I understand correctly, your meeting with

23  Oliver Robinson, that was a part of this Making a Visible

24  Difference effort, right?   That's what that resulted from?

25  **A.**   Yes.

*HEARD - Cross by Essig*

1   Q.   Okay.  So that meeting with him -- and again, I think

2   you stated on direct examination that was a part of a

3   series of meetings that were taking place with important

4   public officials in the Birmingham area?

5   A.   Correct.

6   Q.   As a part of that, you met with Mayor William Bell of

7   Birmingham?

8   A.   We did.

9   Q.   And you met with, I think you told Mr. Ward, Mr. William

10  Parker, who was a city councilman responsible for the area?

11  A.   Yes.

12  Q.   And did y'all also meet with Congresswoman Terri Sewell?

13  Is that right?

14  A.   We did.

15  Q.   Congressman Spencer Bachus, was he involved?

16  A.   I don't remember Congressman Bachus.

17  Q.   Was Ms. Sewell the only congressperson that you remember

18  meeting with?

19  A.   Yes.

20  Q.   And when you went and you met with Mr. Robinson, you

21  stated that y'all got some background on him.

22  A.   Not necessarily on -- yes.  We did get background.

23  Absolutely.

24  Q.   Describe for us what that is.  What is the background?

25  A.   Basic information about who he is, name, who he

1   represents.  Not any historical background.  Just basic

2   information.

3   Q.  Okay.

4   **A.**  So in this particular instance, what I basically knew is

5   that he was a state legislator.

6   Q.  Okay.  And do y'all -- as part of that process, do y'all

7   try to research and figure out if a public official you're

8   meeting with might have a sort of a particular political

9   point of view or perhaps some sort of bias in their past

10  regarding a Superfund cleanup issue?

11  **A.**  No.  That -- I would have to say not really.  That

12  information might come up as a result of any kind of

13  research that you do on an individual, you might find that

14  out.  But is that the purpose?  Not so much.  The purpose

15  is just to be familiar with who you're meeting with so that

16  you can be prepared for the kinds of questions they might

17  ask or just so that you can best represent the agency in

18  your contact with this person.

19  Q.  Okay.  For example, I mean, you're aware, Ms. Heard,

20  that when you get involved in these matters, these

21  environmental matters, that they often create sort of

22  hot-button political issues.  Would that be fair to say?

23  **A.**  That would be very fair.

24  Q.  You have to get sort of the EPA environmental groups on

25  one side and you have sort of the industry and corporate

1    group on the other.  Does this frequently work out that

2    way?

3    A.  It does --

4    Q.  And --

5    A.  -- work out that way.

6    Q.  I'm sorry.  I didn't mean to interrupt you.  I

7    apologize.

8        And so when you come into these meetings with these

9    public officials, is it beneficial for you to know if they

10   are a public official that has a lot of contacts and

11   relationships with the business community?

12   A.  Not really.  I mean, I assume if it's a public official,

13   that they are representing their constituents --

14   Q.  Okay.

15   A.  -- and that the nature of that job, of course, involves

16   interactions with business communities and other

17   stakeholder groups.  But --

18   Q.  Yes, ma'am.

19   A.  -- it's not important for me to know what -- I don't

20   know what else to say.

21   Q.  Yes, ma'am.  I understand.  And would you agree with me,

22   though, that a corporation, if it's in a representative's

23   district, can be that representative's constituent?  You

24   would agree with that, wouldn't you?

25   A.  Yes.

*HEARD - Cross by Essig*

1   Q.  And you used the term "stakeholders."  That's a term

2   that EPA uses to refer to sort of any business, any

3   individual, any resident, any public official that might

4   hold a stake in a particular action taken by EPA; is that

5   right?

6   **A.**  A community person, any resident in addition, yes.

7   Q.  And a stakeholder would be a business or industry that

8   EPA is seeking to regulate.  Would that be correct?

9   **A.**  So I would say a stakeholder is someone who has an

10   interest in the outcome of whatever the EPA action is.  And

11   that would encompass a variety of entities.

12   Q.  Okay.  Would that include business and industry?

13   **A.**  It would definitely include business and industry.

14   Q.  In the research that y'all had done on Oliver Robinson,

15   the background information that you had gotten on Oliver

16   Robinson, had you learned that he had a lot of connections

17   to the business community in Alabama prior to your meeting

18   with him?

19   **A.**  I had not.

20   Q.  And during your meeting with Mr. Robinson, you said he

21   had a lot of questions for you about the Superfund process;

22   is that right?

23   **A.**  That is correct.

24   Q.  And was one of the processes that you described to him

25   or your group collectively described to him, would that

*HEARD - Cross by Essig*

1    have been how liability works under the Superfund?

2    **A.**   Yes.

3    **Q.**   And would you have explained to him how the NPL plays a

4    role in any liability that a company or an industry may

5    have?

6    **A.**   Yes.

7        MR. ESSIG:   Your Honor, I'd like to play portions of

8    the recording for Ms. Heard.

9        THE COURT:   Sure.

10       MR. ESSIG:   Sam, if you'll play --

11       And Your Honor, I apologize.   I don't recall the

12   exhibit number for this exhibit.   19.

13       Sam, could you play Clip Number 2 from 19?

14   (Government's Exhibit 19 was referenced.)

15   (Audio evidence played in open court.)

16       MR. ESSIG:   Pause right there.

17   **Q.**   Ms. Heard, was that your voice we heard there?

18   **A.**   That is my voice.

19   **Q.**   And I think I heard the phrase "our convening power"?

20   **A.**   Correct.

21   **Q.**   Explain to us what that is, please.

22   **A.**   So when we go to a site or an area, we have lines of

23   authority.   So for a Superfund site, we have the Superfund

24   cleanup authority.   But there might be other issues in that

25   neighborhood, so poor housing, dilapidated housing, or, you

1    know, there might be lack of medical care.

2        So even though those are not in our direct line of

3    authority, we can convene, we can bring other agencies,

4    other entities to the table.  So that's what I mean by

5    convening.  We can say to HUD or to FEMA or to the Corps of

6    Engineers, "We are here.  This is a problem that we are

7    addressing, but we see that there are other problems.  Is

8    there something that you can address?"

9    Q.  Okay.  And so convening power means EPA can get other

10   federal agencies and say, "We see issues other than

11   specific acute environmental issues that you guys can help

12   us address"?  Would that be fair to say?

13   **A.**  Correct.

14       MR. ESSIG:  Sam, continue playing, please.

15   (Audio evidence played in open court.)

16       MR. ESSIG:  And Sam, could you play Clip 3, please?

17   (Audio evidence played in open court.)

18   Q.  And, Ms. Heard, just for clarification, that's

19   Representative Oliver Robinson speaking right there; is

20   that right?

21   **A.**  That is correct.

22       MR. ESSIG:  Please continue.

23   (Audio evidence played in open court.)

24   Q.  Ms. Heard, was that you talking again there?

25   **A.**  Yes.

*HEARD - Cross by Essig*

Q.  And there was a discussion about having a Superfund in
an area and the EPA being there, that it gives you some
leverage.  What did you mean by that?

**A**.  Well, the more people you have trying to solve a
problem, the easier it is, let's say, for the PRPs who are
principally the potentially responsible parties who are
principally responsible for cleanup.  So we've seen cases
where there is a community revitalization effort going on
and other entities will take part in the either cleanup
effort or a site assessment effort or take part of the
whole effort to revitalize a site or to clean up a site.

Q.  And so by leverage, did you mean that the EPA's presence
there working on a Superfund site allows you to use an
entity's potential liability to also do some community
revitalization?

**A**.  I don't think I was thinking that when I said that.  I
thought more in a broader context.  But if you ask -- are
you asking me whether EPA's presence at a site gives us
leverage with the PRPs?  I'd have to say absolutely because
there's legal liability.

   The PRPs or the potentially responsible parties put the
pollution there.  And so that's the line of -- between the
site and the party and EPA.  If they were not responsible
for the pollution, we wouldn't have any direct way to get
them to clean up a site.

*HEARD - Cross by Essig*

Q.  But to be fair, Ms. Heard, a potentially responsible

party is a party potentially responsible for the pollution;

is that right?

A.  That is correct.

Q.  Okay.  And then they can actually oppose their status as

a PRP and they can be successful in that and ultimately not

be responsible for the pollution; is that right?

A.  That is correct.

     MR. ESSIG:  Sam, if you will play clip number 6,

please?

(Audio evidence played in open court.)

Q.  Ms. Heard, who is that speaking there?

A.  Cynthia Peurifoy.

Q.  And I heard her say to Mr. Robinson that there was

something she thought he could help y'all with.

A.  She did say "help us with."

Q.  Okay.

     MR. ESSIG:  And we'll continue playing.

(Audio evidence played in open court.)

Q.  And that's Ms. Peurifoy, if I hear correctly, Ms. Heard,

asking Representative Robinson if he can help y'all with

getting some of the companies to the table.  Would that be

fair to say?

A.  I don't know if she said -- could you replay it for me?

Q.  Yes, ma'am, sure can.

HEARD - Cross by Essig

1    (Audio evidence played in open court.)

2    Q.  Ms. Heard, do you agree with that?

3    A.  Restate what I'm agreeing with.

4    Q.  You don't have to if you don't.  But is what we heard

5    Ms. Peurifoy asking Mr. Robinson if he can help y'all with

6    the companies that you want to negotiate with?

7    A.  Yes.  I would say that's what she's saying, yes.

8    Q.  Thank you.

9    (Audio evidence played in open court.)

10   Q.  And, Ms. Heard, there was a statement there again, I

11   think by you, that the NPL is a powerful motivator for

12   companies?

13   A.  Right.

14   Q.  What did you mean by that?

15   A.  Well, with -- the NPL gives EPA access to funds to do

16   remedial work which, by and large, is the most expensive

17   work at most Superfund sites.  So the potential that a

18   party will have that kind -- will have to be responsible

19   for EPA costs at a site tends to get more attention, more

20   concentrated effort to resolve the issue than if you had no

21   ties with a site.

22   Q.  In other words, the NPL can end up costing a company a

23   lot more money than something that's not on the NPL?

24   A.  Not technically.  No, not exactly that way.  The NPL is

25   a list of sites.  It's EPA's decision, once you become an

1    NPL site, to spend money at that site.  You can be an NPL

2    site and EPA not fund that.  I mean, there are a number of

3    factors that go into EPA spending money at an NPL site,

4    like getting the state's agreement.  But once EPA

5    prioritizes that site or puts it on the NPL, then EPA can

6    access Superfund monies to clean up that site.

7    Q.  Okay.  And I think we heard in that clip there was a

8    mention of y'all were hoping to not have to go through the

9    process of litigation with --

10   A.  Absolutely.

11   Q.  Is that right?

12   A.  Yes.

13   Q.  And it was after that that there was the statement that

14   the NPL is a powerful motivator; is that right?

15   A.  It is.  It is.

16   Q.  And the reason it's a powerful motivator and y'all were

17   talking about it being a powerful motivator is it something

18   that could end up costing the company a lot of money?

19   A.  The NPL is one key to EPA accessing cleanup funds for a

20   site.  That is correct.

21   Q.  Okay.  And that was a message that you wanted

22   Mr. Robinson to take back to the companies that you were

23   hoping he would talk to on your behalf?

24   A.  I was only answering his question or just kind of

25   responding to his question.  I was not asking him to go

 1   back and do anything.

 2   Q.  Okay.  Ms. Heard, and we heard there, too, Mr. Robinson

 3   in that meeting with y'all.  I think you mentioned before

 4   in your interview with the FBI, he's a very personable,

 5   likable individual?

 6   A.  Very.

 7   Q.  And we heard a lot of laughter there in the conversation

 8   that you had with him?

 9   A.  Yes.

10   Q.  And I think you described that meeting previously as a

11   pleasant, upbeat experience; is that right?

12   A.  I might have.

13   Q.  And Mr. Robinson, he never made any threats in that

14   meeting with y'all, did he?

15   A.  No.  I didn't feel threatened.

16   Q.  Okay.  He never put any pressure on you at all, did he?

17   A.  No.

18   Q.  And he never said, "What I'd really like the EPA to do

19   is not have Drummond or ABC Coke as a PRP"?  He didn't say

20   that, did he?

21   A.  He just asked a lot of questions mainly during that

22   meeting.

23   Q.  Good, smart questions?  Is that right?

24   A.  He asked a lot of questions about the Superfund process.

25   I thought that they kind of demonstrated his bias towards

 1    the business side or the -- of the House.  I don't know if

 2    I would characterize them as you say.

 3    Q.  Yes, ma'am.  So you're saying that during that meeting

 4    with Mr. Robinson, you identified from him what you

 5    perceived to be as a bias towards business and industry?

 6    **A.**  Absolutely.

 7    Q.  And you said that that gave you pause; is that right?

 8    **A.**  It didn't give -- well, yes, it did give me pause.  I

 9    was surprised.  I expected him to be more concerned about

10    what the impact would be on the health of people or the

11    health of his constituents.

12    Q.  Okay.  And during your meeting with Mr. Robinson, he

13    didn't ask you to not list the 35th Avenue site on the NPL,

14    did he?

15    **A.**  He did not ask that.

16    Q.  And the EPA, in terms of what you saw, didn't change

17    anything that it was doing in North Birmingham as a result

18    of this meeting, did it?

19    **A.**  Not to my knowledge.

20    Q.  As a matter of fact, the site was listed on the NPL?

21    **A.**  It was.

22    Q.  Okay.  And it's still listed as proposed -- or proposed

23    for the NPL; is that right?

24    **A.**  35th Avenue is an NPL -- oh no, it's proposed.

25    Q.  Okay.  And it remains a proposed site; is that right?

1    **A.**   It remains proposed.

2          MR. ESSIG:   Just a moment.

3          No further questions, Your Honor.

4    **A.**   No, it's listed.   I'd have to check.

5    **Q.**   Okay.

6    **A.**   I don't remember if it actually got listed or whether

7    it's proposed.   So I'd have to check.

8    **Q.**   But bottom line is Oliver Robinson, that meeting with

9    him didn't change anything that y'all did; is that right?

10   **A.**   No.

11         MR. ESSIG:   Okay.   Thank you.

12         THE COURT:   Who's next?

13         MS. HODGES:   I am, Your Honor.

14         THE COURT:   Okay, Ms. Hodges.

15         THE WITNESS:   Can I get some water?

16         THE COURT:   Do we have any water for her?

17         THE WITNESS:   Thank you.

18   CROSS-EXAMINATION BY MS. HODGES:

19   **Q.**   Do you want to drink some before I start asking

20   questions?

21   **A.**   You can ask.   I can't answer yet, though.

22   (Pause.)

23   **A.**   All right.

24   **Q.**   My name is Lawanda Hodges, and I represent Steve

25   McKinney.   And I just have some really quick questions for

*HEARD - Cross by Hodges*

1   you.

2       You indicated on direct examination that you are

3   familiar with the 35th Avenue site, right?

4   A.  Yes.

5   Q.  In fact, you said that you're very familiar because that

6   was during your tenure, I believe, at Regional 4 at the

7   time?

8   A.  Correct.  Region 4.

9   Q.  Region 4.  And so you also remember that while you all

10  were handling the 35th Avenue site, there was also a GASP

11  petition pending, right?

12  A.  A GASP petition pending?  Yes, there was a GASP petition

13  pending.

14  Q.  Yes.  And there is a difference between the 35th Avenue

15  site and this GASP petition that was pending, right?

16  A.  Correct.

17  Q.  Right.  So to be clear, the GASP petition was simply

18  asking that the City of Tarrant be declared either a

19  Superfund site or that the 35th Avenue site be extended to

20  Tarrant as a Superfund; is that clear?

21  A.  I'm clear.  Yes.

22  Q.  Okay.  Is that a fair representation of what it was?

23  A.  I think that's fair.

24  Q.  And without getting into all the details of the

25  petition, it's fair to say that ultimately EPA decides on

1    its own whether or not it's going to actually declare a

2    Superfund site, whether some advocacy groups ask for it or

3    not.  Is that fair?

4    **A.**  It is fair to say that EPA makes the ultimate decision

5    about listing a site.

6    Q.  That's right.  Because EPA wants to make sure it gets it

7    right and do its own due diligence, wouldn't you say?

8    **A.**  I would say that EPA is going to consider the scientific

9    evidence.  They're going to consider the comments that they

10   get during a listing process.  They're going to consider

11   the kind of objective facts about the case before they make

12   a decision.  They're going to consider as much information

13   as they have to make the best decision that they can.

14   Q.  Thank you.  So is that a yes to my question?  EPA, you

15   as an agent for EPA, is going to do its own due diligence

16   to make sure you get it right before you declare something

17   a Superfund site?

18   **A.**  I would say yes, we do diligently review our -- the

19   information about a site.  Yes, I would say that.

20   Q.  Right.  And so EPA actually went into Tarrant, and you

21   did the test.  You did a preliminary assessment; isn't that

22   right?

23   **A.**  We did.  I think it was actually conducted by the State

24   of Alabama for EPA.

25   Q.  Okay.  So on behalf of EPA, a preliminary assessment was

*HEARD - Cross by Hodges*

1    done, wasn't it?

2    **A.**   Yes.

3    **Q.**   Okay.  And that's when you actually look at the data,

4    but you also went to the site to actually test the soil;

5    isn't that right?

6    **A.**   That didn't happen until later.  The preliminary

7    assessment, as I recall, with Tarrant showed that further

8    investigation was needed.

9    **Q.**   Okay.  And I appreciate that, but to answer my question,

10   EPA or the state agency on behalf of EPA did do some type

11   of analysis to make the determination?

12   **A.**   That is correct.

13   **Q.**   Yes, ma'am.  And ultimately, this agency on behalf of

14   EPA denied the GASP petition, didn't they?

15   **A.**   Well, EPA denied -- was it EPA that denied the GASP

16   petition?  I would think so.  I'm not sure -- I haven't

17   looked at that GASP petition.  It would have to be EPA.

18   **Q.**   Okay.  So I'll just ask it like this:  The City of

19   Tarrant was not declared a Superfund site, right?

20   **A.**   That is correct.

21   **Q.**   Right.  And ABC Coke is located in the City of Tarrant,

22   isn't it?

23   **A.**   That's correct.

24   **Q.**   Yes.  And so now in regards to 35th Avenue that you are

25   very well versed in, there was discussion about the NPL

1  listing, whether or not the 35th Avenue should be placed on

2  the NPL?

3  **A.**  Yes, there was definitely discussion.  So my hesitation

4  is, you know, the way that the agency works when you

5  propose something for the NPL, it just encompasses so many

6  people.  So there might be conversations at the regional

7  level, but ultimately that's a decision that's going to be

8  made at the headquarters level.  So I'm just not sure what

9  I'm saying "right" to.

10  **Q.**  Okay.  Well, I'll simplify it.  The NPL stands for the

11  National Priorities List, right?

12  **A.**  Correct.

13  **Q.**  And that simply means that the -- how should I put this?

14  The National Priorities List is a list of some contaminated

15  sites in the nation that deserve to be on the list and get

16  treated.  Would that be a fair representation?

17  **A.**  That is correct.

18  **Q.**  And that's why it's called priorities, because these are

19  the ones that the nation or the EPA on behalf of the

20  federal government decided deserve to be treated first and

21  foremost?

22  **A.**  That's correct.

23  **Q.**  And in order to get on that list, it has to go through a

24  ranking system because, you know, ultimately you have to

25  decide which sites deserve to be treated first and

1   foremost.  So that's why they are ranked accordingly.

2   Would that be a fair representation?

3   A.  Kind of sort of, but not really.  So the way that the

4   ranking works, it's like a numeric, there are criteria and

5   factors that you look at to rank a site.  And so you're

6   going to come out with a number.  I forget the range of the

7   number.  And Lord knows I am not the best person to talk

8   about ranking Superfund sites.

9       But you get a number, and so you get on the list.  But

10  getting on the list doesn't mean that that ranking or that

11  there's a particular order.  Because the information that

12  you use in the listing process is very preliminary.  It's

13  usually just the information that already exists.  There's

14  not a lot of remedial investigation.  There's not a lot of

15  study at that point.

16      So the information, you know -- so the fact that you

17  are on the list and your number might be higher than

18  another site on the list doesn't mean that you rank higher

19  because of your number.  Does that make sense?

20  Q.  It does make sense, and I appreciate that.  But to kind

21  of simplify it, the point is that every site, be it

22  35th Avenue here in Birmingham or it could be another site

23  in another location, every contaminated site does not make

24  its way to the NPL list, right?

25  A.  That is absolutely correct.

HEARD - Cross by Hodges

1   Q.  And so to be clear, that NPL list is not just designated

2   for Alabama.  It actually means that it is one of the most

3   hazardous sites in the nation, right?

4   **A.**  Correct.

5   Q.  And you indicated that you all consider a lot of

6   different things, science and comments from others; isn't

7   that right?

8   **A.**  That is correct.

9   Q.  And that's actually why you all ask for a public

10  comments period.  You allow for a public comments period --

11  **A.**  That's correct.

12  Q.  -- for people to give their comments, right?

13  **A.**  That is correct.

14  Q.  And it's not just people.  Anybody that has a vested

15  interest or might be impacted by this listing, they could

16  give their comments?

17  **A.**  Absolutely.

18  Q.  And there's nothing illegal or unethical about giving

19  your comment, is there?

20  **A.**  No.

21  Q.  Actually, you all encourage it?

22  **A.**  We do.

23  Q.  Again, because EPA wants to make sure it does what they

24  deem is right and they get everybody's input, right?

25  **A.**  We do.

Q.  You also were asked about the meeting with Oliver

Robinson.

**A.**  Yes.

Q.  So I'm going to talk a little bit about that.  You

indicated on direct you're not sure who actually scheduled

the meeting, but is it fair to say that EPA or you all as

agents for EPA invited Mr. Robinson to the meeting?

**A.**  I don't know whether we invited Mr. Robinson or we

responded to Mr. Robinson's request.  I don't know.

Q.  Well, let's flesh that out a little bit.  Wouldn't you

agree that there's no other way for him to know that you

all were coming from Atlanta to Birmingham, right?

**A.**  So what happens frequently is representatives call our

office of our congressional liaison and they talk about --

and they might -- a representative might have a question or

might want EPA to address a particular issue.  And then

that person, Allison Wise, they would work with the

congressional office and with Heather or with our staff to

try to set that up.

     And it might turn out that being -- you know, they might

have just taken advantage of the representative and us

being in Birmingham at the same time.  So I honestly -- I

just don't know.  I don't know whether he asked for it or

how it came to be.  I just don't know.

Q.  Okay.  And earlier in direct examination, I believe you

*HEARD - Cross by Asbill*

1    indicated that you think Ms. Toney's assistant might have

2    scheduled or planned the meeting.  Are you saying that that

3    didn't happen?

4    **A.**  I'm saying that I don't know how the meeting got

5    scheduled.  As I talked it out, most likely, because it was

6    with a state legislator, it probably came from our Office

7    of Congressional Affairs.  They do more relating with state

8    and local officials.  But I honestly don't know how that

9    particular meeting came to be.

10   **Q.**  Okay.  I appreciate that.  And so during the meeting,

11   although you might have not explicitly asked Mr. Robinson

12   to convey information, you individually might not have

13   asked him to do those things, you would agree that someone,

14   one of your colleagues, asked him to help in a certain way?

15   **A.**  I would definitely agree that Cynthia asked or said we

16   could use your help with that.  Yes, I heard that on the

17   recording.

18       MS. HODGES:  Thank you.  I have no further questions.

19       THE WITNESS:  Okay.

20       THE COURT:  Thank you, Ms. Hodges.

21       Mr. Asbill?

22   CROSS-EXAMINATION BY MR. ASBILL:

23   **Q.**  Good morning, Ms. Heard.  How are you?

24   **A.**  I'm fine.  And how are you?

25   **Q.**  My name is Hank Asbill.  Excuse me for not introducing

*HEARD - Cross by Asbill*

1   myself first.  Have you got enough water?

2   **A.**  I have.

3   Q.  Thank you.  You were just asked if you knew whether

4   Oliver Robinson invited himself or whether you all invited

5   him.  And I understand that you're not exactly sure about

6   that, correct?

7   **A.**  That is correct.

8   Q.  Who would be sure about that within the EPA?

9   **A.**  The person who scheduled it.  I mean, I'm sure you could

10  trace that down through contacting our congressional office

11  in Region 4.  Allison Wise, that's -- I would imagine if

12  she scheduled it, she has some kind of record of it.

13  Q.  Would any of the other folks who attended that meeting

14  know the answer to that question?

15  **A.**  They might.  They might.

16  Q.  Who else attended?

17  **A.**  Brandi Jenkins, Heather McTeer Toney's special

18  assistant; Cynthia Peurifoy; Shea Jones-Johnson, who's my

19  special assistant.

20  Q.  Okay.  And with respect to what was said or what

21  occurred at the meeting, you have listened to the tape

22  recording of the meeting, correct?

23  **A.**  I have.

24  Q.  And is there anything about that tape recording that you

25  think is incomplete or inaccurate?

*HEARD - Cross by Asbill*

1    **A.**  Well, the portion that I listened to kind of started in

2    the middle or -- and ended abruptly.  So I would have to

3    say it might -- I didn't hear a complete recording of that

4    entire meeting.

5    **Q.**  Okay.  With respect to what you did hear, that

6    accurately reflected what happened, to your knowledge?

7    **A.**  To my knowledge, yes.

8    **Q.**  Okay.  And essentially, it would be accurate for me to

9    say that Oliver Robinson was basically asking questions?

10    **A.**  Yes, sir.

11    **Q.**  Okay.  And you are an attorney and you have dealt with

12    these kinds of matters as an attorney for EPA; is that

13    correct?

14    **A.**  I have.

15    **Q.**  Have you ever dealt with Balch & Bingham in connection

16    with any environmental or Superfund matters?

17    **A.**  Other than this 35th Avenue site or -- I don't recall.

18    I really don't know.  I mean, I handle a lot of matters for

19    the region, so I can't say that they weren't tangentially

20    involved in something.  I don't know.

21    **Q.**  Did you know whether or not Balch & Bingham had a very

22    widely respected environmental section at the law firm?

23    **A.**  I knew that they had an environmental section, yes, that

24    was very well thought of, yes.

25    **Q.**  Okay.  And do you think that the folks at Balch &

*HEARD - Cross by Asbill*

1  Bingham in the environmental section themselves would not

2  know the answers to the questions that Oliver Robinson

3  asked you all?

4  **A.**  I have no idea.

5       MR. WARD:  Objection.  Foundation.

6       THE COURT:  Sustained.

7  Q.  (BY MR. ASBILL:)  Do you have any reason to believe that

8  any competent environmental lawyer would not already know,

9  from your experience of 38 years, would already know the

10  answers to the questions that Oliver Robinson asked you?

11       MR. WARD:  Objection.  Speculative.

12       THE COURT:  You can answer that, ma'am.

13  **A.**  Would you repeat the question?

14       THE COURT:  Let me speed things up.  Do you believe his

15  questions exhibited knowledge in the subject area or were

16  they basic, rudimentary-type questions?

17       THE WITNESS:  Yes.

18  Q.  (BY MR. ASBILL:)  Now, with respect to this meeting --

19  and when you were down here, by the way, you also -- and

20  some questions have been asked about GASP.  Did you meet

21  with any representatives of GASP, or did your group meet

22  with them?

23  **A.**  So I am certain that GASP, members of GASP were at some

24  meetings that we went to in North Birmingham.  I know I

25  have met some.  But, you know, this particular meeting, I

1  don't recall meeting anyone from GASP.

2  Q.  Okay.  With respect to GASP, did you do any research on

3  that organization?

4  A.  I did not.

5  Q.  Do you know whether anybody else from your group or EPA

6  did?

7  A.  I am certain that there are people in Region 4 who are

8  familiar with GASP, the organization.  I'm certain there

9  are people knowledgeable.  I'm certain there are probably

10  people in our Air Division that have worked with or been in

11  contact with GASP over the years on a number of matters.

12  Q.  So do you believe that folks at the EPA knew what GASP's

13  interests were, all its members were?

14      MR. WARD:  Objection.  Foundation.

15      THE COURT:  You may answer that question, ma'am, if you

16  know.

17  A.  Would you repeat the question?

18  Q.  (BY MR. ASBILL:)  Yeah.  Do you know or do you have any

19  reason to know whether or not GASP, when you met with them,

20  whether when you folks met with GASP, did you understand or

21  have any reason to know exactly what their motivations were

22  and who was behind GASP?

23  A.  No.  I would not -- I did not know or have that kind of

24  in-depth knowledge of GASP.  I did not.

25  Q.  Well, you said that when you met with Oliver Robinson,

*HEARD - Cross by Asbill*

```
 1    you didn't know that Oliver Robinson, that his foundation
 2    had a contract with a potentially responsible party,
 3    correct?
 4    A.   That is correct.
 5    Q.   And that's something that you say you would have liked
 6    to have known, right?
 7    A.   Yes.
 8    Q.   Because that would put whatever was said among you all
 9    to -- put it in better context, correct?
10    A.   That's correct.  That's fair.
11    Q.   All right.  And that would be true with any other person
12    that you met or any other interested party, right?
13    A.   Yes.
14    Q.   Did you ever know that Oliver Robinson owned or had
15    property near the 35th Avenue site?
16    A.   I did not.
17    Q.   All right.  Oliver Robinson, I take it, never said
18    anything to you about having another agenda with a man
19    named John Powe?
20    A.   He did not.
21    Q.   Did y'all ever meet with John Powe?  Do you know who he
22    is?
23    A.   I -- the name is familiar.  Does -- but I don't recall
24    John Powe.  Can you -- what did -- who is he?
25         THE COURT:  That's all right.
```

1   Q.  (BY MR. ASBILL:)  You don't have any recollection of who

2   he is or whether or not Ms. Toney met with Mr. Powe?

3   A.  I'm not sure -- no, not accurately enough to answer.

4   I -- not enough to know for sure.

5   Q.  I'm not asking you to speculate.  That's fine.  Whatever

6   you know, you know.  And whatever you don't know, that's

7   fine.  You said that Oliver Robinson in some of these

8   questions that he was asking seemed to have some sort of

9   pro-business bias?

10  A.  Yes.

11  Q.  And that --

12  A.  Well --

13  Q.  I'm sorry.  Go ahead.

14  A.  Go ahead.  No, you go ahead.

15  Q.  Am I wrong in what you said?

16  A.  No, you are not wrong in what I said.

17  Q.  Does it surprise you that somebody that you're meeting

18  with might be interested in the economic impact or whatever

19  EPA might be doing?

20  A.  Not at all.

21  Q.  And would I be fair in suggesting that there's got to be

22  a balance between health and economics in all these sort of

23  situations?

24  A.  Yes.

25  Q.  All right.  And if there's a minimal health risk, for

*HEARD - Cross by Asbill*

1  example, and a maximum negative impact in terms of

2  economics, that might sway a decision one way or another

3  and vice versa?

4  **A.**  Yes.

5  **Q.**  Now, the --

6  **A.**  Except in this instance with Oliver Robinson, I think I

7  would have expected more balanced questions.  In other

8  words, it didn't surprise me that he would be concerned

9  about any particular thing or business.  I think if he'd

10  asked questions that were, you know, more health-related or

11  demonstrated concern for the residents, that -- just it

12  would have been more balanced, as you said, in my view.

13  **Q.**  Well, what if he already knew about the health issues

14  and he wanted to find out about the economic ones?

15  **A.**  It would have still -- I'm just saying that what it

16  appeared to me, it would have -- my impression from that

17  conversation was imbalanced because of the one direction of

18  the question.

19  **Q.**  You talked about this Making a Visible Difference

20  program, correct?

21  **A.**  I did.

22  **Q.**  And that originated in Washington with Gina McCarthy?

23  **A.**  That is correct.

24  **Q.**  Who was the head of the EPA?

25  **A.**  That is correct.

*HEARD - Cross by Asbill*

1   Q.  All right.  And would you agree with me that in these

2   kinds of situations -- and I'm talking about Superfund or

3   NPL issues -- that there is a collision of law, politics,

4   health, business, lots of interests, lots of

5   constituencies, and lots of agendas, correct?

6   **A.**  Yes.

7   Q.  All right.  And I know that Mr. Essig asked you

8   something, and I believe that you misspoke and he asked you

9   about it.  But you talked initially about the PRPs,

10  potentially responsible people -- or parties, excuse me,

11  being the ones who put the pollution there, correct?

12  That's what you said initially.

13  **A.**  Correct.

14  Q.  All right.  And then he asked you, well, wait a minute,

15  potentially means maybe they did, maybe they didn't --

16  **A.**  Correct.

17  Q.  -- right?  So does the EPA start from a proposition that

18  with respect to potentially responsible parties, that they

19  are guilty until they're proved innocent?

20  **A.**  Absolutely not.  So we have a whole cadre of

21  investigators who look into the ties of the individuals

22  with the chemicals that we find at the site or the

23  activities of a particular company with the contamination.

24  So we don't -- what we do is try to make sure that there is

25  a strong link between a potentially responsible party and

1   the site.  And the reason that we use the phrase
2   "potentially responsible party" is because that hasn't been
3   adjudicated.  That matter, liability, hasn't been
4   adjudicated.
5       At the point that we are talking to the parties, the
6   parties are also in a great position to know what their
7   liability or responsibility is for contamination at a site.
8   But at that point, we are not in court.  We really do try
9   to work things out without having to litigate.
10  Q.  And sometimes people who are potentially responsible
11  parties agree they are, in fact, responsible parties and
12  they settle with you, right?
13  A.  Yes.
14  Q.  And sometimes they don't agree that they are responsible
15  parties and they don't settle, correct?
16  A.  That is correct.
17      MR. ASBILL:  I have no further questions.
18      THE COURT:  Any redirect for Ms. Heard?
19      MR. WARD:  No, Your Honor.  May the witness be excused?
20      THE COURT:  Any objections from anyone?
21      MR. ESSIG:  No, Your Honor.
22      MS. HODGES:  No, Your Honor.
23      THE COURT:  Any objections from Mr. Roberson?
24      MR. ASBILL:  No, sir.
25      THE COURT:  Okay.

1          Ms. Heard, thank you for being here.  Safe travels back

2     to Atlanta, ma'am.

3          THE WITNESS:  Thank you.

4          THE COURT:  Thank you.  You're free to go.

5     (Witness excused.)

6          THE COURT:  Members of the jury, it's seven minutes

7     after noon.  Let's stop here for lunch.  Let me stress to

8     you again not to discuss this case among yourselves either

9     in the jury room or anywhere else.  And if you do take your

10    lunch outside of the courthouse, in the event anyone

11    approaches you about this case, please let me know.

12         We are in recess until 1:25.  Enjoy your lunch.  And

13    again, please do not talk about the case during the lunch

14    break.  Thanks, everyone.

15    (The following proceedings were had in open court

16    outside of the presence and hearing of the jury.)

17         THE COURT:  Thanks, everyone.  Please give them a

18    minute or two before you leave the courtroom, please.

19    (Lunch recess.)

20         THE COURT:  Good afternoon, everyone.  Remain seated,

21    please.  Let's wait for Ms. Humphrey, and then we'll bring

22    the jurors in.

23    (The following proceedings were had in open court in the

24    presence and hearing of the jury.)

25         THE COURT:  Good afternoon, everyone.  Be seated,

 1  please.

 2      Who is the government's next witness?

 3      MS. MARK:  The government calls Scott Phillips.

 4      THE COURT:  Mr. Phillips, good afternoon.

 5      MR. PHILLIPS:  Good afternoon.

 6  (Witness sworn.)

 7      THE COURTROOM DEPUTY:  Please state and spell your

 8  first and last name for the record.

 9      THE WITNESS:  My first name is Willie, W-i-l-l-i-e, and

10  last name is Phillips, P-h-i-l-l-i-p-s.

11      THE COURTROOM DEPUTY:  What city and state do you

12  reside in?

13      THE WITNESS:  Verbena, Alabama.

14      THE COURT:  You may begin, Ms. Mark.

15                      WILLIE "SCOTT" PHILLIPS,

16  duly sworn, was examined and testified as follows:

17  DIRECT EXAMINATION BY MS. MARK:

18  Q.  Good afternoon, Mr. Phillips.

19  A.  Good afternoon.

20  Q.  Can you tell us what you do for a living?

21  A.  I'm an environmental consultant.

22  Q.  All right.  And where are you currently employed?

23  A.  At Strada Professional Services.

24  Q.  Can you give us just a brief summary of your education

25  and background?

1   **A.**  I graduated from Mississippi State University in 1984

2   with a degree in construction engineering technology.

3   **Q.**  Prior to working for Strada, did you work for a company

4   called SEC?

5   **A.**  Yes, I did.

6   **Q.**  Southeast Engineering & Consulting?

7   **A.**  Yes, I was a consultant to them.

8   **Q.**  All right.  Can you tell us, what is SEC?

9   **A.**  It's just a small consulting firm.

10  **Q.**  I've heard it referred to as SE+C, and I've also

11  referred to it as SEC.  How would you refer to it?

12  **A.**  Southeast Engineering & Consulting.

13  **Q.**  Okay.  Perfect.  Thank you for helping me with that.

14  **A.**  Uh-huh.

15  **Q.**  You said you were a consultant for SEC?

16  **A.**  That's correct.

17  **Q.**  I want to talk to you and focus your attention on the

18  period of time between 2014 and 2016.  During that period

19  of time, were you a consultant for SEC?

20  **A.**  I was.

21  **Q.**  Okay.  And did you also hold a role with the Alabama

22  Environmental Management Commission?

23  **A.**  I did.

24  **Q.**  And what was that role?

25  **A.**  I was vice chair.

*PHILLIPS - Direct by Mark*

1   Q.  You were a member of the commission?

2   **A.**  Correct.

3   Q.  All right.  What were your duties as a member of the

4   commission?

5   **A.**  Promulgate rules and regulations, hire and fire the

6   director, and hear any hearings or appeals.

7   Q.  Can you describe for us what the relationship is between

8   ADEM and the environmental commission?

9   **A.**  ADEM is the body that implements rules and regulations

10  in the state.  The commission provides oversight.

11  Q.  How long did you serve as a commissioner?

12  **A.**  Roughly 15 years.

13  Q.  And are you still a commissioner?

14  **A.**  I am not.

15  Q.  And when did you retire from your position as a

16  commissioner?

17  **A.**  April 2017.

18  Q.  Are you familiar with the 35th Avenue Superfund Site in

19  Birmingham?

20  **A.**  I am.

21  Q.  All right.  In September of 2013, do you recall that the

22  EPA identified, I believe it was, five potentially

23  responsible parties?

24  **A.**  I recall that.

25  Q.  All right.  Did you have some experience working with

*PHILLIPS - Direct by Mark*

1    Superfunds?

2    **A.**  I did.

3    **Q.**  Can you describe for us a little bit your experience

4    working with Superfund sites?

5    **A.**  I've worked on Superfund sites since the mid '80s doing

6    investigations, feasibility studies, cleanups, designs

7    across the southeast.

8    **Q.**  Okay.  Did SEC pursue work with any of the PRPs that had

9    been identified in the 35th Avenue site?

10   **A.**  Yes.

11   **Q.**  And do you recall in around October of 2013 that SEC

12   submitted a proposal to Balch & Bingham and Drummond?

13   **A.**  Yes, roughly around then.

14   (Government's Exhibit 142 was referenced.)

15       MS. MARK:  Can we pull up Government's Exhibit 142,

16   which is already in evidence?

17   **Q.**  Mr. Phillips, I'm showing you Government's Exhibit 142.

18   This is an email from Trey Glenn to Joel Gilbert and David

19   Roberson in October of 2013.

20       Do you recognize that this is an email sending the

21   proposal on behalf of SEC to Joel Gilbert and David

22   Roberson?

23   **A.**  Yes, sending a draft scope proposal.

24   **Q.**  Okay.

25       MS. MARK:  Can we go to the second page of this

1    document, please?

2    Q.  And, Mr. Phillips, does this appear to be the draft

3    proposal that was attached to the email we just looked at?

4    A.  Yes, it does.

5    Q.  Okay.  Looking there in the first paragraph, it

6    references that the proposal is focused on "providing

7    technical support and community involvement and public

8    outreach activities."  Do you see where I'm referring to

9    that?

10   A.  Yes, I do.

11   Q.  All right.  Tell us, what type of technical support was

12   SEC offering to provide?

13   A.  Review of documents, review of whatever EPA may have

14   already had for the site.

15   Q.  Okay.  And with respect to community involvement, what

16   does that refer to?

17   A.  Just understanding what's going on in the community,

18   what impact a potential cleanup or investigation may have

19   on that community.

20   Q.  Can you describe for the jury what work SEC would be

21   doing to implement this community involvement?

22   A.  Well, originally getting information, gathering

23   information that was going on in the community, what the

24   cleanup was anticipated to be, what the removal action

25   which is referenced in here would be, and what impact that

1  would have on the community.

2  Q.  Okay.  There is also a reference there to public

3  outreach activities.  What type of services would SEC be

4  providing for public outreach activities?

5  A.  Providing input on taking those technical documents and

6  putting them in a form that could be communicated,

7  education, communications, documents, things like that for

8  the public.

9  Q.  And when you say "the public," do you mean residents and

10  people living in the community?

11  A.  Yes, and others, I mean, other stakeholders.

12      MS. MARK:  Thank you.

13  Q.  Mr. Phillips, do you recall that SEC submitted a résumé

14  and history of their experience to Drummond and Balch to

15  try and get this work?

16  A.  Yes.

17  Q.  Okay.  And what experience did you personally have that

18  was part of that proposal?

19  A.  I mean, the experience on the Superfund sites that I

20  mentioned earlier and investigations on contaminated sites.

21  Q.  Did you have particular experience in the areas of

22  community outreach?

23  A.  I did.

24  Q.  Can you tell us about that?

25  A.  Each Superfund site typically has a community around

PHILLIPS - Direct by Mark

1    them or in close proximity.  And so once again,

2    understanding the impact of any investigation or cleanup on

3    the surrounding community has always been a part of doing

4    the technical work, taking that technical information and

5    sharing it with the community and understanding the impact

6    of the cleanup on that community.

7    Q.  How was SEC qualified to do the community outreach work?

8    A.  In the sense of we had people on staff that had done

9    that on different sites.

10   Q.  Do you recall if SEC was hired by Drummond and Balch to

11   work with them on the Superfund site?

12   A.  Yes.

13   Q.  And was there a contract that was executed?

14   A.  Yes.

15   Q.  All right.

16   (Government's Exhibit 146 was referenced.)

17       MS. MARK:  And we'll just take a quick look at the

18   contract, at Government's Exhibit 146.

19   Q.  And, Mr. Phillips, is this a copy of the contract

20   between Balch & Bingham and Southeast Engineering &

21   Consulting for the work we've just been discussing?

22   A.  It appears to be, yes.

23   Q.  This is the first page of the contract?

24   A.  Yes, yes.

25   Q.  All right.  And what was the date that this contract was

PHILLIPS - Direct by Mark

1    executed?

2    A.   According to the first paragraph, effective on

3    November 22, 2013.

4    Q.   Okay.  And looking at the first paragraph under

5    "recitals," it references "Consultant possesses experience

6    in matters related to environmental and regulatory and

7    political matters in Alabama."  Do you see that?

8    A.   Yes.

9    Q.   Can you explain for us what experience SEC had in

10   environmental, regulatory, and political matters?

11   A.   Just the work that we've done historically on

12   environmental projects, permitting, regulations,

13   negotiations, things like that.

14   Q.   And was there a particular client that you were doing

15   this work for for Balch?

16   A.   Yes.

17   Q.   And who was that?

18   A.   Drummond.

19   Q.   Was SEC paid for the work they did on this contract?

20   A.   As far as I know, yes.

21   Q.   Did you get paid?

22   A.   I did.

23   Q.   Okay.  How did SEC get paid pursuant to the Balch

24   contract?

25   A.   In accordance with this agreement.

*PHILLIPS - Direct by Mark*

1    Q.  Do you know who paid the -- who paid the services?

2    **A.**  Oh.  Drummond.

3    Q.  Thank you.  In addition to your experience, did SEC hire

4    any consultants to work with them on community outreach?

5    **A.**  Yes, ma'am.

6    Q.  And do you recall when you first hired a consultant to

7    work on community outreach?

8    **A.**  I don't recall the exact date.

9    Q.  Would you agree that it was from the beginning in around

10   January of 2014 when SEC started doing work on this

11   contract that you had a community outreach specialist?

12       MR. GILLEN:  Objection.  Leading.

13       THE COURT:  Please rephrase.

14       MS. MARK:  I can.

15   (Government's Exhibit 127 was referenced.)

16       MS. MARK:  Can we pull up Government's Exhibit 127 and

17   turn to page 2, please?

18   Q.  Mr. Phillips, do you recognize this as an SEC invoice

19   for the work performed that's to Balch?

20   **A.**  Yes, it does appear to be.

21   Q.  And what is the time period for this particular invoice,

22   particularly the period of the labor?

23   **A.**  January 2014.

24   Q.  Okay.  And looking at this particular bill, do you see

25   on the bottom on January 2014 a Specialist III?

PHILLIPS - Direct by Mark

1   A.   I do.

2   Q.   Can you read for us the description of the work done by

3   the Specialist III?

4   A.   "Prepare for, participate in, and report on community

5   and grassroots meetings."

6   Q.   So did SEC have a specialist working on community

7   outreach in January of 2014?

8   A.   Yes.

9   Q.   Who was doing that work?

10   A.   Catrena Norris Carter.

11   Q.   And how long did Catrena continue to do community

12   outreach work?

13   A.   Quite a while, but I don't know that I remember the

14   exact dates.

15   Q.   Okay.  We may look at some things to help with that.

16   A.   Okay.

17   Q.   Can you describe for us the type of work that Catrena

18   Carter was doing?  Different from this description here,

19   can you tell us what that really means?  What types of

20   things was she doing?

21   A.   Gathering information in the community, talking to

22   people in the community, attending meetings, public

23   meetings, permit meetings, really gathering information

24   about what was going on and bringing it back.

25   Q.   Why did SEC hire Catrena Carter?

1    A.   That's who we had gotten a recommendation from.

2    Q.   Okay.  And did she have any particular experience in

3    doing community outreach?

4    A.   Yes, I believe she did.

5    Q.   Was she someone who had connections in the community and

6    could meet with and go to these community meetings?

7    A.   Yes, ma'am.  As far as I know, yes.

8    Q.   Who did Catrena report to at SEC about the work she was

9    doing on community outreach?

10   A.   Mainly Trey Glenn, but also me.

11   Q.   Looking at this, did SEC bill for the time that Catrena

12   Carter did in community outreach?

13   A.   Yes, ma'am.

14   Q.   Did SEC continue to do work for Balch on this particular

15   contract through 2014 and 2015?

16   A.   Yes, ma'am, I believe so.

17       MS. MARK:   Thank you.

18   (Government's Exhibit 149 was referenced.)

19       MS. MARK:   I want to turn your attention to

20   Government's Exhibit 149.  And if we can pull up

21   Exhibit 149, we're going to go to the third page, please.

22   Q.   Mr. Phillips, I'm showing you Government's Exhibit 149,

23   and we're going to start from the bottom of this email and

24   read up so that we're going forward in time.  This bottom

25   email is an email from Lance LeFleur.  Do you know who

1   Lance LeFleur is?

2   A.  I do.

3   Q.  And what position did he have at that time?

4   A.  Director of ADEM.

5   Q.  All right.  And the date of this email is September 16

6   of 2014.  And it is to Gina McCarthy.  Do you know who Gina

7   McCarthy is?

8   A.  Yes, ma'am.

9   Q.  And who is that?

10  A.  I don't know what her title was at the time, but she was

11  the Region 4 administrator.

12  Q.  Okay.  At EPA?

13  A.  Yes.

14  Q.  And there is also --

15  A.  Yes, ma'am.

16  Q.  Excuse me.  There's also a reference to Heather McTeer

17  Toney.  Was she also with EPA?

18  A.  Yes, ma'am.

19  Q.  This particular email references Lance LeFleur is

20  telling EPA that he does not concur in the NPL listing.  Do

21  you remember that the director made that position known to

22  EPA?

23  A.  I do.

24  Q.  And do you agree that was in around September of 2014?

25  A.  Yes, ma'am, based on what I'm looking at.

*PHILLIPS - Direct by Mark*

1   Q.   Okay.

2         MS. MARK:   If we can back out of that.

3   Q.   And we're going to kind of travel up through this email.

4   Does it appear that Lance LeFleur forwarded this email

5   to -- it says it's a cc to Governor Bentley?

6   A.   Yes, ma'am, it does.

7         MS. MARK:   If we can go to page 2.

8   Q.   There at the bottom of page 2 where it says "beginning

9   forward message," Director LeFleur appears to have

10  forwarded this message to Steve McKinney, David Roberson,

11  and Trey Glenn.   Do you see that?

12  A.   Yes, ma'am, I do.

13  Q.   Did you work with Steve McKinney on the Balch matter?

14  A.   Yes, ma'am.

15  Q.   How often would you interact with Steve McKinney?

16  A.   It varied over the course of the project, but anywhere

17  from weekly to every other week or so.

18  Q.   Did you know him to be one of the attorneys at Balch who

19  was working on this 35th Avenue matter for Drummond?

20  A.   Yes, ma'am.

21  Q.   What other attorneys at Balch did you understand were

22  working on this matter?

23  A.   Joel Gilbert and one other that I can't place her name

24  at the moment.

25  Q.   Okay.   What about David Roberson, did you know David

1    Roberson?

2    **A.**   Yes, ma'am.

3    **Q.**   And how did you know David Roberson?

4    **A.**   I'd known David for quite a while.

5    **Q.**   How do you know David?

6    **A.**   I mean, in this context?

7    **Q.**   Yes, sir.

8    **A.**   In this context, he was working for Drummond.

9        MS. MARK:   We can travel up this email a little bit

10   further to the -- we can go to the bottom of page 1,

11   please.

12   **Q.**   Mr. Phillips, do you see there on September 16 there

13   appears to be an email from you at 2:03 p.m.?

14   **A.**   Yes, ma'am.

15   **Q.**   Do you recognize that as your email address, the

16   sphillips@sec.llc?

17   **A.**   Yes, ma'am, I do.

18   **Q.**   And looking at this, is this an email that you sent to

19   Trey Glenn?

20   **A.**   It was.

21   **Q.**   And it says "Trey, I'm thinking about sending an email

22   to Steve."   And below is a draft of an email to Steve; is

23   that correct?

24   **A.**   Yes, ma'am.

25   **Q.**   Who is Steve in this email?

1   **A.**   Steve McKinney.

2   **Q.**   I want to take a look at -- if we can back out, I want

3   to see if we can take a look at your mail.

4       MS. MARK:   Kind of scroll up just a little bit.

5   Perfect.

6   **Q.**   Mr. Phillips, can you see there on the screen what is

7   the content of the email, the draft email that you were

8   considering sending to Steve McKinney?

9   **A.**   Yes, ma'am, I can.

10  **Q.**   Okay.  Do you remember this particular issue that you

11  were attempting -- or considering sending an email to Steve

12  McKinney?

13  **A.**   Yes, ma'am, I do.

14  **Q.**   Okay.  In this particular draft email, you say down

15  there in the middle of the page, it says "As you know, the

16  comments from PRPs will not carry the same weight as those

17  from others."  Do you see where I'm referring to?

18  **A.**   Yes, ma'am.

19  **Q.**   And it goes on to say "Comments from others like the

20  mayor, the governor, city business leaders, congressional

21  delegation, et cetera, are possible commenters that could

22  make a difference."  Do you see that?

23  **A.**   Yes, ma'am.

24  **Q.**   Can you explain for us what you mean by those particular

25  commenters would make a difference?

PHILLIPS - Direct by Mark

**A.**  I believe that this was in reference to the National
Priorities listing that was published in the *Federal*
*Register*.  And what I meant by that was this was a Super --
EPA was proposing this to be put on the NPL.  And so from
the standpoint of a PRP making comments, it's based on
their perspective.  And from the others, they're kind of
outside of that, third party, independent commenters.

Q.  Did you consider third party commenters to be important
to EPA in that process?

**A.**  I believe that those comments are important to be heard,
yes.

Q.  There at the bottom it says "However, in my experience,
unless there is significant technical arguments or
alternative methods of cleanup for the commenters to refer
to, it will be difficult for any real pressure to have EPA
change the listing."  Do you see where I'm referring to?

**A.**  I do.  Yes, ma'am.

Q.  Were there discussions about putting pressure on EPA to
not list this site on the NPL?

**A.**  There was, yes, ma'am.

Q.  And in what context were those conversations?

**A.**  In the context of the technical arguments about why it
shouldn't be listed.

Q.  And who was a party to those conversations?

**A.**  I was.

*PHILLIPS - Direct by Mark*

1    Q.   And who else?

2    A.   Balch & Bingham and Drummond in the conversations that

3    we had had.

4    Q.   Can you be a little more specific?  Do you recall who at

5    Balch you were working with on issues related to responding

6    to the NPL listing?

7    A.   Steve McKinney, Joel Gilbert, and Mary Samuels.  That's

8    the name I had forgotten.

9    Q.   Mr. Phillips, I want to draw your attention now to

10   December of 2014.  Do you recall in December of 2014

11   receiving an email about Oliver Robinson meeting with EPA

12   officials?

13   A.   Not off the top of my head, no, ma'am.

14   (Government's Exhibit 10 was referenced.)

15       MS. MARK:  Can we pull up Government's Exhibit 10?

16   Q.   Mr. Phillips, looking at Government's Exhibit 10, this

17   is an email from Joel Gilbert, and it's dated December 10,

18   2014.  And are you one of the recipients of this email?

19   A.   I am, yes, ma'am.

20   Q.   Okay.  And the subject is "EPA meeting on Friday"?

21   A.   Yes, ma'am.

22   Q.   There in the second line of the email it says -- let's

23   see.  Excuse me.  Third line.  "Representative Robinson has

24   agreed to meet with them on Friday."  Does this refer to

25   Oliver Robinson going to meet with EPA officials?

PHILLIPS - Direct by Mark

1  A.  Yes, ma'am, it appears to from this.

2  Q.  Do you recall in your work on this matter that there was

3  discussion of having elected officials meet with EPA?

4  A.  I don't know that I remember meeting -- the discussion

5  about meeting but most certainly commenting.

6  Q.  There was a strategy to engage elected officials to

7  comment on the NPL?

8  A.  Yes.

9  Q.  Was that something that was discussed with Balch and

10  with Drummond?

11  A.  Yes, ma'am.

12  Q.  Was there an effort to try and persuade officials to

13  comment on the NPL listing?

14  A.  Not -- I don't -- I'm not aware of that.  I was very

15  focused on the technical arguments that we were making

16  comments on.

17  Q.  What, if anything, did you know about any relationship

18  between Oliver Robinson and Balch or Drummond and

19  particularly in December of 2014?

20  A.  None other than he was a legislator.

21  Q.  Did you know that Balch was considering or negotiating

22  with Oliver Robinson to hire him to do community outreach?

23  A.  No.

24      MR. ESSIG:  Objection.  Relevance.

25      THE COURT:  Overruled.

1  Q.  (BY MS. MARK:)  Mr. Phillips, did you know that there

2  was any --

3      THE COURT:  He's already answered it, though.

4      MS. MARK:  Okay.  Thank you.

5  Q.  At this particular point in December of 2014, was SEC

6  still continuing to do community outreach?

7  A.  I don't recall at that point.

8      MS. MARK:  Can we pull up Government's Exhibit 127 at

9  page 38?

10  Q.  Mr. Phillips, looking at another invoice from SEC

11  Consulting, do you recognize this as an invoice that covers

12  the period of December 2014?

13  A.  Yes, ma'am, I do.

14  Q.  And there at the bottom, do you see was SEC continuing

15  to do some community outreach work?

16  A.  Yes, ma'am.

17  Q.  And can you read for us what type of work was ongoing?

18  A.  "Community outreach support, debriefs, and

19  coordination."

20  Q.  And who would have been doing that community outreach?

21  A.  Catrena Norris Carter.

22  Q.  And would that have included where it says "Community

23  outreach support, debriefs, coordination," would that be

24  what you described earlier, meeting with people in the

25  community?

PHILLIPS - Direct by Mark

1    A.   Yes, ma'am.

2    Q.   Going to neighborhood association meetings?

3    A.   Yes, ma'am.

4    Q.   Thank you.  How often during the December 2014 time

5    frame, how often would you interact with Joel Gilbert and

6    Steve McKinney about this work that you were doing?

7    A.   Off and on but usually weekly.

8    Q.   At that particular time, were y'all preparing to file

9    comments to the NPL listing?

10   A.   Yes, ma'am, technical comments.

11   Q.   Would you consider that a particularly active period of

12   time?

13   A.   Yes, ma'am.

14   Q.   Did you ever receive any update about Oliver Robinson's

15   meeting with EPA?

16   A.   Not that I recall, no.

17   Q.   Do you know if that meeting was recorded?

18   A.   No, ma'am.

19   Q.   Were you ever provided with a summary of the EPA meeting

20   with Oliver Robinson?

21   A.   Not that I recall, no, ma'am.

22   Q.   I want to ask you some more questions about Oliver

23   Robinson.  Did you know Oliver Robinson?

24   A.   Yes, ma'am.

25   Q.   How did you know him?

PHILLIPS - Direct by Mark

**A.**  I had met him a few years earlier at a conference down

on the coast.

Q.  And did you know him to be a state legislator?

**A.**  Yes, ma'am, I did.

Q.  Did you ever have occasion to meet Oliver Robinson at

the Balch & Bingham office?

**A.**  Yes, ma'am, I did.

Q.  Can you describe that for us?

**A.**  I met him twice at the Balch & Bingham office.  Once

when I was coming to a meeting, he was ending a meeting.

And I was asked at that meeting if I would introduce him to

Lanier Brown because he was wanting to make public comment

at the commission meeting.

    And then the second time was a meeting after that to

talk about possible people in the neighborhood who might be

able to help on community engagement.

Q.  We're going take those meetings separately.  You said --

was the first one where you met him coming in or out of the

Balch office?

**A.**  I was coming in, yes, ma'am.

Q.  You were coming in and Oliver Robinson was leaving?

**A.**  They were finishing up a meeting, yes.

Q.  Who is "they"?

**A.**  Mr. Robinson, Mr. Gilbert, and Mr. Roberson.

Q.  What did you understand Oliver Robinson was meeting with

 1   them about?

 2   **A.**  I did not know.

 3   Q.  Was that meeting in February of 2015?

 4   **A.**  That sounds about the time frame, yes, ma'am.

 5   (Government's Exhibit 129 was referenced.)

 6       MS. MARK:  Can we pull up Government's Exhibit 129 at

 7   326?  And can we highlight the second entry at the top?

 8   Q.  Mr. Phillips, I'm showing you this is an invoice from

 9   the Balch & Bingham law firm to Drummond on the 35th Avenue

10   matter.  It references there a time entry for Joel Gilbert

11   on February 11, 2015.  And do you see there where it says

12   "Prepare for and attend meeting with Oliver Robinson, Trey

13   Glenn, Scott Phillips, and David Roberson regarding AEMC

14   meeting and North Birmingham"?  Do you see where I'm

15   referring to?

16   **A.**  Yes, ma'am.

17   Q.  Do you recall if this was the date that you met Oliver

18   Robinson at the Balch & Bingham office?

19   **A.**  I'm not quite sure because it's not my invoice.  It's

20   around the right time frame.

21   Q.  Did you have any conversation with Oliver Robinson?

22   **A.**  At that meeting?

23   Q.  At that time, yes, sir.

24   **A.**  Just a cordial, "Good to see you."

25   Q.  Just shake hands in passing?

A.   Shake hands.  And then when I was asked to -- he'd like

to meet the commission chair because he was going to do

public comments, and I said I would put that together.

Q.   Who asked you to introduce him to the commission chair?

A.   It was either Joel Gilbert or David Roberson.  I think

it was Joel Gilbert, but I'm not sure.

Q.   And why did they want you to introduce him to the

commission chair?

A.   My understanding was that he had not made a

presentation.  He didn't know the chair and would just like

to meet him before he stood before him.

Q.   And to be clear, the commission chair, is that Lanier

Brown?

A.   Yes, ma'am.

Q.   What were you doing at Balch that day?

A.   A technical meeting, I'm sure, relative to the comments

that we were working on.

Q.   When did you first learn that Oliver Robinson was

planning to speak at the environmental commission?

A.   I think the first time I saw it was I had an email from

Lanier Brown.

Q.   Can you tell us what you mean by that?

A.   I think Lanier Brown had sent an email in February,

before this meeting, stating that Oliver Robinson had

requested to make public comment before the commission.

1   Q.  Did you meet with Oliver Robinson to help prepare him

2   for the AEMC meeting?

3   **A.**  No, ma'am.

4   Q.  Did you agree to introduce him to Lanier Brown?

5   **A.**  Yes, ma'am, I did.

6   Q.  Can you tell us about that?

7   **A.**  I arranged to meet with them at a restaurant and -- late

8   one afternoon and introduced the two of them together.

9   Mr. Robinson told him that he wanted to do a public comment

10   period.  And they sat and talked about that and people they

11   knew and who they didn't know, and that was about it.

12   Q.  And was that prior to Oliver's appearance before the

13   commission?

14   **A.**  Yes, ma'am.

15   Q.  And do you know who paid for drinks?

16   **A.**  I did.

17   Q.  Where did that meeting take place?

18   **A.**  I don't remember off the top of my head.  Something

19   George, I believe.

20   Q.  Would it be Daniel George Restaurant?

21   **A.**  Yes, ma'am.

22   Q.  A restaurant here in Birmingham?

23   **A.**  Yes, ma'am.

24   (Government's Exhibit 153 was referenced.)

25       MS. MARK:  Can we pull up Government's Exhibit 153?

 1   Q.  Mr. Phillips, we just talked about a moment ago a
 2   meeting, the billing entry that I showed you for
 3   February 11.  Do you recall that?
 4   A.  Yes, ma'am.
 5   Q.  Okay.  This is an email the next day, February 12.  Do
 6   you see that?
 7   A.  Yes, ma'am.
 8   Q.  All right.  I want to start with the bottom email.  It
 9   is an email from Joel Gilbert, and it's addressed to you,
10   Scott Phillips, correct?
11   A.  Yes, ma'am.
12   Q.  With a copy to David Roberson and Trey Glenn?
13   A.  Yes, ma'am.
14   Q.  Looking at the email, it references "Scott, one thing
15   that Trey mentioned in passing I thought we might discuss
16   yesterday."  Is that in reference to the meeting that y'all
17   had on February 11?
18   A.  It must have been, yes, ma'am.
19   Q.  And it references "Catrena's efforts and also the report
20   Catrena, David, and I discussed a couple of months ago."
21   Do you see where I'm referring to?
22   A.  Yes, ma'am.  But you left "you."  So it was me, David,
23   and Catrena.
24   Q.  And Joel?
25   A.  And Joel, yes, ma'am.

PHILLIPS - Direct by Mark

1   Q.   What report are you referring to there?

2   A.   I'm not sure I recall.   I think it was just about kind

3   of overall community strategy.

4   Q.   What were Catrena's efforts at that time?

5   A.   Once again, collecting information, participating in

6   those meetings and bringing that information back.

7   Q.   And it says "Let's try to revisit this issue soon so

8   that we can begin developing an action plan involving her

9   and coordinating with Oliver."   Do you see where I'm

10  referring to?

11  A.   Yes, ma'am.

12  Q.   What did you understand Catrena was to coordinate with

13  Oliver?

14  A.   I think that's what prompted the meeting that we had

15  following this.

16  Q.   The second meeting?

17  A.   The second meeting.

18  Q.   But what involvement did Oliver have with community

19  activities in North Birmingham?

20  A.   At the time, none that I knew of other than a

21  legislator.

22  Q.   It says "I need to sit down with Oliver soon as well and

23  get some feedback from him now that he's been involved a

24  few months."   What involvement did you know of Oliver

25  having at that time?

1   A.   His interest as a legislator for the area.

2   Q.   Did you know of any contract or consulting agreement

3   between Oliver Robinson or his foundation and Balch &

4   Bingham?

5   A.   No, ma'am.

6   Q.   Did you know of any relationship between Oliver and his

7   foundation and Drummond?

8   A.   No, ma'am.

9   Q.   Did you know that Oliver Robinson was a community

10   outreach consultant for Balch and Drummond?

11   A.   No.

12   Q.   Was SEC actively preparing and doing community outreach

13   work?

14   A.   Yes, ma'am, at that time.

15   Q.   And if we can look at the top email here, you respond

16   saying "Sounds goods.  I'll pull some things together."

17   A.   Yes, ma'am.

18   Q.   What types of things did you -- were you going to pull

19   together on the community activities?

20   A.   Probably the most recent things that we were hearing

21   back from Catrena.

22   Q.   I want to ask you about the commission meeting.  Did you

23   attend the February 2015 commission meeting, the Alabama

24   Environmental Management Commission?

25   A.   Yes, ma'am.

1    Q.  Were you present when Oliver Robinson spoke?

2    A.  Yes, ma'am.

3    Q.  As a commissioner, did you also review his letter

4    requesting to speak?

5    A.  Yes, ma'am.

6    Q.  And do you recall that letter to have been on his House

7    of Representatives letterhead?

8    A.  Yes, ma'am.

9    Q.  In what capacity did you understand Oliver Robinson was

10   appearing at the commission?

11   A.  As a legislator.

12   Q.  Did you understand that he was there speaking on behalf

13   of concerned citizens?

14   A.  Yes, ma'am.

15   Q.  Do you recall if during his comments he referenced those

16   citizens that he was there on behalf of?

17   A.  Yes, ma'am, as best I recall.

18   Q.  Did you know at that time on February 20 at the

19   commission meeting, did you know that Oliver had negotiated

20   and was in a consulting contract with Balch and Drummond?

21   A.  No, ma'am.

22   Q.  That his foundation had a contract with Balch?

23   A.  No, ma'am.

24   Q.  Were you aware of any community outreach work that

25   Oliver Robinson had been doing on the 35th Avenue site for

1    Balch?

2    **A.**  No, ma'am.

3    Q.  Did you know that Oliver Robinson was paid $14,000 four

4    days before that appearance at the commission from Balch?

5    **A.**  No, ma'am.

6    Q.  I want to talk to you about the community strategy that

7    you were working on developing, the one we talked about

8    just a minute ago.

9    (Government's Exhibit 154 was referenced.)

10       MS. MARK:  Let's first pull up Government's

11   Exhibit 154.

12   Q.  Mr. Phillips, I'll give you a second to take a look at

13   this email.  And tell me, does this appear to be attempting

14   to set up a meeting between you, Joel Gilbert, David

15   Roberson, and Trey Glenn about that community stakeholder

16   strategy?

17   **A.**  Yes, ma'am.

18   Q.  Looking at this bottom email, it's on February 19, 2015,

19   and it's from you; is that correct?

20   **A.**  Yes, ma'am.

21   Q.  Would you agree with me that that's the day before

22   Oliver appeared at the commission?

23   **A.**  Yes, ma'am.

24   Q.  And in this email, are you telling Joel Gilbert and

25   David Roberson that you are attaching a document about

1   community and stakeholder strategy?  Is that what the first

2   line there says?

3   A.  Yes, ma'am.

4   Q.  Okay.  Was this a document that had been part of

5   conversations that you'd had with Joel Gilbert and David

6   Roberson about the community strategy?

7   A.  Yes.  And others over the entire time that we had worked

8   on the project, yes.

9   Q.  But did you assemble that document based on

10  conversations that were had with Joel Gilbert, David

11  Roberson, Trey Glenn, and your work on the 35th Avenue --

12  this project?

13  A.  Yes, ma'am.

14  Q.  It references there, it even says "I will be in

15  Montgomery tomorrow for the commission but could meet on

16  Monday."  So you were proposing meeting the week after the

17  commission; is that fair?

18  A.  Yes, ma'am.

19  Q.  If we back out of this, does it appear, looking at the

20  top of this email, that y'all agreed to meet on Wednesday

21  the following week?

22  A.  It appears, yes, ma'am.  I can't see what my response

23  was, but based on this, yes.

24  Q.  That y'all were preparing to have a meeting?

25  A.  Yes.

PHILLIPS - Direct by Mark

1   Q.  Do you recall having a meeting at Balch & Bingham just a

2   few days after the commission meeting where you discussed

3   this PowerPoint, this community strategy stakeholder

4   strategy?

5   A.  Yes, ma'am.

6       MS. MARK:  Can we pull up Government's Exhibit 129 at

7   329?  If we can look at the February 25 entry right there.

8   Q.  Mr. Phillips, I'm showing you another billing entry from

9   Balch.  This is for Joel Gilbert on February 25.  And it

10  references "Prepare for and attend meeting with SE+C and

11  Mr. David Roberson regarding community outreach strategy."

12  Does that appear to be the meeting that we are talking

13  about where you presented this community strategy?

14  A.  Yes, ma'am.

15  Q.  So can we agree that that was five days after the

16  commission meeting?

17  A.  Yes, ma'am.

18  (Government's Exhibit 161 was referenced.)

19      MS. MARK:  Can we go to Government's Exhibit 161?

20  Q.  Mr. Phillips, looking at this, does this appear to be

21  the email where you forwarded to Joel Gilbert, David

22  Roberson, and with a copy to Trey Glenn, a copy of the

23  community stakeholder strategy PowerPoint?

24  A.  Yes, ma'am, a draft, yes.

25  Q.  Draft.  All right.  I want to walk through this

1    PowerPoint.  If we can go to the first -- to the next page,

2    page 2.  Mr. Phillips, do you recognize this as a

3    PowerPoint presentation that you prepared to present at

4    Balch?

5    A.  Yes, ma'am, to go through.

6    Q.  Say that again.  I'm sorry.

7    A.  To go through at the meeting, yes, ma'am.

8    Q.  And did you incorporate points into this presentation

9    that were based on meetings that you'd had with Joel

10   Gilbert and David Roberson about the community strategy?

11   A.  Not with the community strategy.  I mean, it was other

12   meetings that I put in here for a community strategy.

13   Q.  Who was present for -- when you presented this

14   PowerPoint?

15   A.  As I recall, Joel Gilbert, David Roberson, me, and I

16   believe Trey may have been there.

17       MS. MARK:  Can we go to the next page where it

18   references "purpose"?

19   Q.  Is this the purpose of the community strategy?

20   A.  Yes, ma'am.

21   Q.  So the purpose, there's three purposes:  To prevent the

22   35th Avenue site from being added to NPL; is that right?

23   A.  Yes, ma'am.

24   Q.  All right.  To prevent the preliminary assessment

25   created by GASP petition from being successful in expanding

1    the site?

2    A.   Yes, ma'am.

3    Q.   And to separate the issues from remediation from

4    community revitalization?

5    A.   Yes, ma'am.

6    Q.   Were those purposes that were discussed with Joel

7    Gilbert and David Roberson?

8    A.   Yes, ma'am.

9        MS. MARK:  If we can go to -- let's look at the next

10   page very quickly.

11   Q.   Mr. Phillips, can you describe for us and tell us what

12   this particular page represents?

13   A.   This is just a representation of all the stakeholders

14   involved with the 35th Avenue Superfund Site.

15       MS. MARK:  If we can go to the next page, please.

16   Q.   The title of this page is "Messaging Themes."  Can you

17   tell us what you mean by "messaging"?

18   A.   Just the messages you want to get out.

19   Q.   To who?

20   A.   Community, the public, EPA.

21   Q.   And are these the messages that, based on the meetings

22   you had with Drummond and with Balch, that this was the

23   message that they wanted to get out into the community?

24   A.   These were drafts of what we were going to talk about,

25   yes.

PHILLIPS - Direct by Mark

1    Q.  The day you presented this PowerPoint on February 25,

2    did y'all discuss these messaging themes?

3    A.  We just went through the list, but we talked about each

4    bullet.

5        MS. MARK:  Can we go to the next page?

6    Q.  Mr. Phillips, the next page references "Current

7    Resources."  Can you read for us what the current resources

8    were for community strategy?

9    A.  "Drummond team, ABC Coke team, Balch & Bingham team,

10   Steve Bradley, and SE+C team."

11   Q.  Who is Steve Bradley?

12   A.  A public relations consultant.

13   Q.  And to your knowledge, was Steve Bradley doing public

14   relations or consulting on the 35th Avenue matter?

15   A.  As far as I knew, yes, ma'am.

16   Q.  Was there any discussion in the meeting on

17   February 25 when you were talking about the current

18   resources of adding Oliver Robinson to the team?

19   A.  Not that I recall, no, ma'am.

20   Q.  Did anybody speak up and say that Oliver Robinson is a

21   consultant doing community outreach?

22   A.  No, ma'am.

23   Q.  Did you understand these to be the only resources

24   available to Balch and to Drummond to work on community

25   strategy?

1    **A.**   It was the only ones that we had been working with to

2    that point.

3    **Q.**   Mr. Phillips, this was five days after Mr. Robinson had

4    given his comments at the commission.  Was there any

5    discussion of Oliver Robinson at the meeting on

6    February 25?

7    **A.**   Not that I recall, no, ma'am.

8    **Q.**   Were there any discussions about having a state

9    legislator who had made a public statement to the

10   commission that was favorable to the position of Balch and

11   Drummond?

12   **A.**   Not that I recall, no, ma'am.

13      MS. MARK:  Let's go to the next page.

14   **Q.**   This references "Audience Groups."  And I notice there's

15   a number of different groups that are listed here, and some

16   of them are elected officials or legislative delegations.

17   In looking at the audience groups for the message, was

18   there any discussion of Oliver Robinson?

19   **A.**   I don't recall specifically, but there was a local

20   legislative delegation identified on here, and it may have

21   come up in that discussion.

22   **Q.**   Do you recall specifically any discussion of Oliver

23   Robinson being involved with community outreach?

24   **A.**   No, ma'am.

25      MS. MARK:  Can we go to the next page, please?

1   Q.   Mr. Phillips, this page is titled "Individual Audience

2   Strategies."  Do you see where I'm referring to?

3   **A.**   Yes, ma'am.

4   Q.   There is a reference there at the top to "Core

5   Community."  What does Core Community mean?

6   **A.**   The community itself where the Superfund site was.

7   Q.   Where the residents lived?

8   **A.**   Of the 35th Avenue Superfund Site.

9   Q.   The first bullet under "Core Community" says "Hijack

10  NBCC."  Did I read that correctly?

11  **A.**   Yes, ma'am.

12  Q.   Was that based on meetings that you'd had with Joel

13  Gilbert and David Roberson and the messages that they

14  wanted to get out in the community?

15  **A.**   That was based on Walter Coke having worked with that

16  group in the past and an idea of working with them moving

17  forward.

18  Q.   I'm sorry.  Working with them?

19  **A.**   Yes, ma'am.

20  Q.   Did I read that correctly when it says "Hijack NBCC"?

21  **A.**   Yes, ma'am.

22  Q.   And you interpret that as working with them?

23  **A.**   Yes, ma'am.

24  Q.   Was that something that was discussed in the meetings,

25  to hijack NBCC?

1   **A.**  Not that I recall specifically, no, ma'am.

2   **Q.**  So those words that you put in this PowerPoint, "hijack

3   NBCC" is supposed to be "work with NBCC"?

4   **A.**  Yes, ma'am.

5   **Q.**  And NBCC, you understand, is North Birmingham Community

6   Coalition?

7   **A.**  Yes, ma'am.

8   **Q.**  Did you understand that coalition to be a coalition that

9   was formed by EPA?

10   **A.**  No, ma'am, not at that time.

11   **Q.**  There's also reference to supporters there in the

12   middle.  It says "Engage Support."  Can you tell me what

13   that means?

14   **A.**  That's just -- yes, ma'am.  To identify those

15   stakeholders that supported those purposes and align them

16   with those messages.

17   **Q.**  Was that discussed at the meeting on February 25?

18   **A.**  In general, in no more detail than what's on the slide,

19   but yes.

20   **Q.**  There was a discussion of engaging those individuals who

21   were supportive of Balch and Drummond's position?

22   **A.**  In general, yes.

23   **Q.**  In opposing the NPL?

24   **A.**  Yes, ma'am.

25   **Q.**  So five days after the commission, was there any

PHILLIPS - Direct by Mark

1    discussion of engaging Oliver Robinson to support this

2    community strategy?

3    **A.**  Not that I recall, no, ma'am.

4    **Q.**  Did anyone in that meeting speak up and say that Oliver

5    Robinson is a consultant on community outreach working on

6    the team?

7    **A.**  No, ma'am.

8    **Q.**  Were you aware of any role that Oliver Robinson would be

9    playing in community outreach?

10   **A.**  Only as a legislator for the area.

11   **Q.**  At the end of this PowerPoint presentation at this

12   meeting, February 25, what was the plan going forward with

13   the community strategy?

14   **A.**  I don't think there was a real decision on how to move

15   forward other than to have that next meeting that we had.

16       MS. MARK:  Thank you.

17   (Government's Exhibit 156 was referenced.)

18       MS. MARK:  Can we pull up Government's Exhibit 156?

19   **Q.**  Mr. Phillips, looking at Government's Exhibit 156, this

20   is an email from Trey Glenn on March 6, 2015.  Do you see

21   where I'm referring to?

22   **A.**  Yes, ma'am.

23   **Q.**  Okay.

24       MS. MARK:  And if we can back out of this a second, show

25   him the body.  Can we capture from "NPL" through "Tarrant"?

1   Q.  And does this appear to you to be a summary of ongoing

2   activities by SE+C and reporting that to Joel Gilbert and

3   others about the work y'all were doing?

4   A.  It appears it with this, but I didn't see what was

5   before that.  Could we go back?

6   Q.  Yes, we can.  There at the top, it says "Looking forward

7   to talking to you soon.  The following are the main

8   categories of ongoing items that we are working on."

9   A.  Yes, ma'am.  Thank you.

10  Q.  I want to talk about the one that says "Community and

11  Stakeholder Engagement."  Do you see that one there kind of

12  in the middle of the page?

13  A.  Yes, ma'am.

14  Q.  It says "Community positioning, listening, coordinating

15  with the legal team regarding messaging."  Do you see that?

16  A.  Yes, ma'am.

17  Q.  And there's references to ADEM, active conversations

18  with ADEM and EMC.  Do you recall what active conversations

19  were ongoing with ADEM and the commission?

20  A.  I just knew that Joel and David, I believe, were meeting

21  with ADEM.

22  Q.  All right.  And you yourself were a member of the

23  commission?

24  A.  Yes, ma'am.

25  Q.  Were they also meeting with you in your role as a

1  commissioner on this issue?

2  A.  Not -- no, ma'am.  I was on the team here.

3  Q.  Okay.  So you did not meet with Joel Gilbert and David

4  Roberson as a commissioner?

5  A.  I may have met with them as a commissioner with

6  Commissioner Brown.

7  Q.  Looking at the community, the first line in there, what

8  was the messaging and coordinating that was going on at

9  this particular time?  This was March 6, 2015, so maybe a

10  week or so after the meeting on February 25.

11  A.  I think still just gathering information and listening

12  what was going on and seeing what direction we were going

13  to take.

14  Q.  Who was doing the listening and coordinating in the

15  community?

16  A.  I still think it was at that point Catrena Norris

17  Carter.

18  Q.  Why was Oliver Robinson not listed as being involved in

19  the community or stakeholder engagement?

20  A.  I can't answer that.  He wasn't involved with us.

21  Q.  You mentioned earlier that there was a second meeting at

22  Balch --

23  A.  Yes, ma'am.

24  Q.  -- where you met Oliver Robinson.  Let's talk about that

25  meeting.

PHILLIPS - Direct by Mark

1    MS. MARK:  Can we pull up Government's Exhibit 129 at

2    338?  And we're looking at April 20, the bottom entry.

3    Q.  Mr. Phillips, this is another Balch billing record for

4    April 20, 2015, and it's Joel Gilbert.  And it references

5    "Prepare for and attend meeting with Oliver Robinson, SE+C,

6    Mr. David Roberson regarding North Birmingham community

7    outreach and new issues with ADEM."  Do you see where I am?

8    A.  Yes, ma'am.

9    Q.  Do you recall having a meeting at Balch with Oliver

10   Robinson on April 20?

11   A.  Yes, ma'am.

12   Q.  Okay.  Can you tell us about that meeting?  Who was

13   present?

14   A.  I believe it was me and Catrena, may have been Trey

15   Glenn, Joel Gilbert, Oliver Robinson, and David Roberson, I

16   believe.

17   Q.  What do you recall about that meeting?

18   A.  That meeting was really a discussion about if the

19   strategy was to move forward with outreach, who would be a

20   good person in the neighborhood.

21   Q.  Was there discussion about community outreach in

22   Tarrant?

23   A.  Yes, ma'am.

24   Q.  Why was Oliver Robinson at that meeting?

25   A.  My understanding was to provide some insight into who

1    might be a good person to engage in the community.

2    Q.  Was Oliver Robinson the person who would be engaged in

3    the community?

4    A.  That's not my understanding, no, ma'am.

5    Q.  Did you know at that time that Oliver Robinson was a

6    consultant on community outreach for Balch?

7    A.  No, ma'am.

8    Q.  Was there any discussion that Oliver Robinson was a paid

9    consultant?

10   A.  No, ma'am.

11   Q.  What did you understand Oliver -- why Oliver was there?

12   A.  I mean, once again, he was a legislator for that area,

13   and he knew the community.

14   Q.  Did you believe he was there in his capacity as a

15   legislator?

16   A.  Yes, ma'am.

17   Q.  At some point did SE+C's involvement in community

18   outreach begin to slow down?

19   A.  Yes, ma'am.

20   Q.  Prior to that, did you provide Joel Gilbert and David

21   Roberson with your suggestions about what they should do in

22   the community?

23   A.  In the meeting that we spoke about earlier, yes.

24   Q.  The messaging?

25   A.  Yes, ma'am.

PHILLIPS - Direct by Mark

Q.  Did you also provide them with any suggestions about
specifically how to deliver that message, whether it be
door-to-door or website?  Did you provide them with your
thoughts on how to get that message out?

A.  I may have.  I just don't recall specifically.

Q.  Do you know why the community outreach slowed down for
SE+C?

A.  No, ma'am, not off -- not truly, no.

Q.  Did SE+C continue to do technical work?

A.  Yes, ma'am.

Q.  Even after the community outreach seemed to diminish?

A.  Yes, ma'am.

Q.  Would you agree that that was moving into the fall of
2015 that SE+C's role doing community outreach may have
slowed?

A.  Yes, ma'am.

Q.  Did you continue to meet with Joel Gilbert, Steve
McKinney and David Roberson to discuss the work that you
were doing on their behalf?

A.  Yes, ma'am.

Q.  How often would you meet with them carrying forward into
the fall of 2015?  How often would you meet with them?

A.  I don't recall, but it was, you know, sporadic as things
came up, you know, once a month, twice a month.

Q.  At any point did you learn that the Oliver Robinson

PHILLIPS - Cross by Essig

1   Foundation had been hired to do community outreach?

2   **A.**  You mean after the indictments?  Yes, ma'am.

3   Q.  Well, I'm more talking about in 2015.

4   **A.**  No, ma'am.

5   Q.  When you were working with them and doing the technical

6   work for SE+C, did you at any time learn that the Oliver

7   Robinson Foundation had been hired to do community

8   outreach?

9   **A.**  No, ma'am.

10  Q.  Was SEC capable of doing community outreach in Tarrant?

11  **A.**  Yes, ma'am.

12      MS. MARK:  Your Honor, I think that's all I have for

13  Mr. Phillips at this point.

14      THE COURT:  Thank you.  Cross-exam.

15      MR. ESSIG:  Yes, Your Honor.  Just a moment, please.

16      Your Honor, what time is the court planning on taking a

17  break, just so that I can be prepared to --

18      THE COURT:  You still have 20 minutes before I do that.

19      MR. ESSIG:  Okay.  Thank you.

20      THE COURT:  Are you ready to go?  If you need time, I

21  can take a break now if that will help expedite things.

22      MR. ESSIG:  I'll go ahead and get started.

23      THE COURT:  Okay.

24  CROSS-EXAMINATION BY MR. ESSIG:

25  Q.  Good afternoon, Mr. Phillips.  How are you?

PHILLIPS - Cross by Essig

2972

1    **A.**   Good afternoon.

2    *Q.*   We've never met before; is that right?

3    **A.**   That's right.

4    *Q.*   My name is Brandon Essig, and I'm one of the attorneys

5    that represents Joel Gilbert.   You see Mr. Gilbert here in

6    the courtroom?

7    **A.**   I do.

8    *Q.*   Mr. Gilbert was the man, one of the men from Balch &

9    Bingham that hired you to work for him --

10   **A.**   Yes, sir.

11   *Q.*   -- when you were at SE+C; isn't that right?

12   **A.**   Yes, sir.

13   *Q.*   And he hired your company, hired you?   Hired you.   Is

14   that right?

15   **A.**   Yes, sir.

16   *Q.*   Hired you and Mr. Trey Glenn --

17   **A.**   Yes.

18   *Q.*   -- is that right?   Paid y'all good money; is that right?

19   **A.**   Yes, sir.

20   *Q.*   And y'all did good work --

21   **A.**   Yes, sir.

22   *Q.*   -- for them.   You did -- I think you referred to it as

23   primarily what your responsibility was was technical work.

24   **A.**   Yes, sir.

25   *Q.*   Did I understand that correctly?

*PHILLIPS - Cross by Essig*

1   A.  Yes, sir.

2   Q.  And I think, as the jury has come to learn in this case,

3   certainly as I have come to learn in this case, though I'm

4   no scientist, and correct me if I'm wrong, is that

5   typically an environmental issue, when we're using the term

6   "technical," what we mean is science, right?

7   A.  Yes, sir.

8   Q.  It's technical.  There's no wiggle room.  There's no

9   lawyering to it.  It's technical.  It's facts.  Is that

10  right?

11  A.  Yes, sir.

12  Q.  Facts and data are important.  You'd agree with that,

13  wouldn't you, Mr. Phillips?

14  A.  I would, yes, sir.

15  Q.  And accurate facts and data are important.  Would you

16  agree with that?

17  A.  Yes, sir.

18  Q.  And do I understand your testimony here today,

19  Mr. Phillips, to be that as of February 25, 2015, you had

20  no idea that Oliver Robinson was in any way involved in

21  community engagement with Balch & Bingham in the North

22  Birmingham community?

23  A.  No, sir.

24  Q.  You're saying you had no idea?

25  A.  No, sir, not that I --

1   Q.  As of February 25, 2015, is it your testimony here in

2   front of this jury under oath today that you had never even

3   heard of the concept of Oliver Robinson being involved in

4   community engagement in North Birmingham?

5   A.  Only as a legislator.

6   Q.  Only as a legislator?

7   A.  Yes, sir.

8   Q.  Well, let me ask you this, Mr. Phillips:  You

9   testified -- this is not the first time you've testified

10  under oath in this case, is it?

11  A.  No, sir.

12  Q.  All right.  You previously testified in front of the

13  grand jury in this case; is that right?

14  A.  Yes, sir.

15  Q.  And before -- you answered questions in front of the

16  grand jury.  You did that in front of Mr. Martin; is that

17  right?  He was the person asking you the questions?

18  A.  Yes, sir.

19  Q.  And you sat down just like did you here, you raised your

20  right hand, you told everybody where you lived, and you

21  swore under oath that you would tell the truth; is that

22  right?

23  A.  Yes, sir.

24  Q.  Now, as I understand today, you have testified multiple

25  times that anytime there was a discussion with Joel

*PHILLIPS - Cross by Essig*

1   Gilbert, David Roberson, anybody from Drummond or Balch

2   about Oliver Robinson in the context of North Birmingham

3   and the 35th Avenue Superfund Site, that the only

4   discussions you ever had were about his role as a

5   legislator in that area; is that right?

6   **A.**  Yes, sir.

7   Q.  Okay.

8       MR. ESSIG:  Your Honor, may I approach?

9       THE COURT:  You may.

10  Q.  (BY MR. ESSIG:)  Mr. Phillips, I'm handing you a copy of

11  your grand jury testimony.  If you would, take some time to

12  look through it.  It's about 43 pages.  I've read it a

13  couple of times.  And could you please point out for the

14  jury where you told Mr. Martin during your under-oath

15  testimony then that you had had meetings with Balch,

16  Mr. Oliver Robinson regarding the North Birmingham

17  Superfund site and where you told them that those meetings

18  were in his capacity as a state legislator?

19      THE COURT:  You want him to spend time looking at 43

20  pages?

21      MR. ESSIG:  Well, let me do this, Your Honor.

22      THE COURT:  Yeah --

23  Q.  (BY MR. ESSIG:)  Let's do this.  If you will go to

24  page 32, Mr. Phillips.

25  **A.**  Yes, sir.

PHILLIPS - Cross by Essig

Q.  Now, let's start at the top of page 32 at line 4.

Question:  "Do you know a gentleman named Oliver Robinson?"

A.  Yes, sir.

Q.  And your answer is?

A.  "I do."

Q.  Okay.  Your next answer is "How do you know Oliver Robinson?

    "Answer:  Well, I had met him with Edmund in 2013 or '14 just socially at a Partnering for Progress meeting.  I really did not see him again after that."  Is that right?

A.  Correct.

Q.  "And then I met with him when I went to a meeting at Balch & Bingham and they were finished"; is that right?

A.  Yes, sir.

Q.  "They, being Balch & Bingham, was finishing up a meeting with him before our meeting, before the meeting I was to go to"; is that right?

A.  Yes, sir.

Q.  And it says "Do you recall when this was?"

    You said "I really don't.  Late 2015, maybe early 2006." Is that correct?

A.  Yes, sir.

Q.  All right.  Then we'll skip down to line 20.

    "Question:  Did you, as you were doing work under this contract with Balch, did you have interaction with Oliver

PHILLIPS - Cross by Essig

1    Robinson?"  And your answer was?

2    **A.**  "A couple of times, yes."

3    Q.  Okay.  Then line 24:  "In what context did you interact

4    with him?"

5        Your answer was "I was called to a meeting where they

6    were going to talk about community strategy."  Is that

7    right?

8    **A.**  Yes, sir.

9    Q.  "Balch was going to talk about community strategy, and

10   he was in that meeting?"  Is that right?

11   **A.**  "Yes, sir."

12   Q.  That was your answer?

13   **A.**  Yes, sir.

14   Q.  Under oath?

15   **A.**  Yes, sir.

16   Q.  And then you said "And then I introduced him to Lanier

17   Brown, our chairman, because he was going to make public

18   comment at the Environmental Management Commission."  Is

19   that right?

20   **A.**  Yes, sir.

21   Q.  "Did you know that Oliver Robinson was a state

22   legislator?"

23       Your answer was "I did."  Is that right?

24   **A.**  Yes, sir.

25   Q.  Then it says "How did you learn that Oliver Robinson

PHILLIPS - Cross by Essig

1   wanted to appear and make a statement at the commission

2   meeting?"  That was the question.

3       And you stated, "I believe it was in that meeting where

4   they were finishing and I was coming in.  They just asked

5   if I could introduce him to Lanier Brown because he was

6   going to make comment at the hearing."  Is that right?

7   A.  Yes, sir.

8   Q.  So let's back up just a little bit.  And you had said,

9   you had told them just before that that you had met him at

10  a meeting at Balch where they were discussing community

11  engagement strategy; is that right?

12  A.  Yes, sir.

13  Q.  And then the question:  "Well, if I tell you that the

14  meeting, that the commission meeting where he appeared,

15  where Oliver Robinson appeared occurred on February 20 -- I

16  believe that's the date -- of 2015, will that help you

17  remember the date of" --

18      Your answer, "Yeah, it would."

19      -- "of when the meeting you mentioned?"

20      Then you said, "It would have been before that."  Is

21  that right?

22  A.  Yes, sir.

23  Q.  Okay.  So you would have met him at a meeting at Balch

24  where y'all were discussing community strategy; is that

25  right?

*PHILLIPS - Cross by Essig*

1   **A.**  I don't recall meeting him before that date.

2   Q.  Okay.  Before which date?  Before the meeting where you

3   were discussing community strategy, you don't recall --

4   **A.**  I don't remember -- I think I had the two meetings I

5   spent -- I talked about earlier backwards.

6   Q.  Okay.  So you would have -- early, before he appeared at

7   the AEMC, you knew he had a relationship with Balch based

8   on him being present for meetings and that there was some

9   involvement in community outreach; is that right?

10      MS. MARK:  Objection, Your Honor.  He mischaracterizes

11  the witness's testimony.

12      MR. ESSIG:  He can answer.

13      THE COURT:  I will give him a chance to answer, then,

14  please.

15  **A.**  What I said was I believe I got the two meetings

16  backwards when I testified here.

17  Q.  (BY MR. ESSIG:)  Okay.  That's fine.  That happens.  And

18  then if we go -- we're on page 34 now, and let's go to line

19  16.

20      Question:  "And that meeting was breaking up, and

21  Mr. Robinson, Oliver Robinson was leaving."  And this is

22  the end of the question.  "And that's where you saw him?

23  Did y'all exchange" --

24      And then your answer:  "And he said -- and I don't

25  remember if he said -- my recollection is he said" -- and

PHILLIPS - Cross by Essig

1  we're talking about Oliver Robinson there; is that right?

2  A.  Yes, sir.

3  Q.  -- "I'm going to -- I'm going to be making a public

4  comment and, hey, I'd like to meet Lanier Brown.  I hear

5  he's the chairman.  I haven't met him.  I'd like to meet

6  him before I come down there."  Is that right?

7  A.  Yes, sir.

8  Q.  That's the comment that you related in the grand jury,

9  statements that you remember Oliver Robinson making to you

10  at a meeting at Balch & Bingham; is that right?

11  A.  According to this, yes, sir.

12  Q.  And if I read that correctly, that's him asking you to

13  introduce him to Lanier Brown; is that right?

14  A.  Yes, sir.

15  Q.  And it's because he was going to make a commission at

16  the AEMC -- you're a commissioner on the AEMC, and he

17  wanted you to introduce him to Mr. Brown; is that right?

18  A.  According to this, yes, sir.

19      MR. ESSIG:  Just a moment, Your Honor.

20  Q.  All right.  Let me ask you to go forward to page 40,

21  Mr. Phillips, and when you get asked some questions about

22  Mr. Robinson's appearance before the AEMC.

23      Question on line 5:  "Did you have any other conduct

24  with Oliver Robinson prior to his testimony at the

25  commission meeting?"

1    And your answer is, "Not -- not that I recall."

2    Is that right?  Did I read that correctly?

3  A.  Could you tell me which line you're on?  I'm sorry.

4  Q.  That's line 7, where your answer is, page 40.

5  A.  Yes, sir.

6  Q.  And then next question:  "Was it your understanding that

7  Mr. Robinson was appearing at the commission meeting in his

8  official capacity as a state legislator representing

9  citizens here in Birmingham?"

10    And your answer was, "I don't know that I know it that

11  way.  I just knew that he wanted to make a comment.  I'm

12  trying to think of how it was even presented at the agenda.

13  I just don't recall."

14  A.  Yes, sir.

15  Q.  And I think if you'll review this transcript, you will

16  see that that's the only time you've ever referenced Oliver

17  Robinson as a public official.  You get asked some

18  follow-up questions about the letter that came to the AEMC;

19  is that right?

20  A.  Yes, sir.

21  Q.  And the jury's already seen that.

22  A.  Yes, sir.

23  Q.  And they've already seen that's on letterhead.

24  (Defendant's Exhibit 1161 was referenced.)

25  Q.  Mr. Phillips, I want to show you what's been admitted as

1   Defense Exhibit 1161.

2       MR. ESSIG:  Will you pull that up, please, Sam?  And,

3   Sam, if you'll go to the very last page, please.  Actually,

4   Sam, if you'll begin, go to the second -- actually, the --

5   well, page 2.

6   Q.  In the middle of page, Mr. Phillips, this is the

7   beginning of an email exchange.  Am I right that that's an

8   email exchange between Trey Glenn and yourself?  Is that

9   right?

10  A.  Yes, sir, it appears to be.

11  Q.  That's January 8 of 2014.  That's over a year prior to

12  these meetings at Balch where you saw Oliver Robinson and

13  there were meetings about community engagement; is that

14  right?

15  A.  Yes, sir.

16  Q.  And Trey Glenn -- we already talked about this -- he was

17  sort of your partner, somebody you worked with there at

18  SE+C and Strada; is that right?

19  A.  Yes, sir.

20  Q.  All right.  And the subject of this is "2014" -- it's

21  "2014/01/08."  That's January 8, 2014; is that right?

22  A.  Yes, sir.

23  Q.  The subject is "SEC Action Items," and the email is

24  marked confidential; is that right?

25  A.  Yes, sir.

*PHILLIPS - Cross by Essig*

1    Q.  If we read this email, it's an email you received, and

2    it's an email from your partner, Trey Glenn; is that right?

3    A.  Yes, sir.

4    Q.  And if you'll just kind of very quickly glance -- well,

5    you don't have a copy of it in front of you.  I apologize.

6        So let's go to page 3.  And if you see there, sort of

7    two thirds of the way towards the top, the term "proactive

8    outreach."  Do you see that term?

9    A.  Yes, sir.

10       MR. ESSIG:  Sam, pull out of that, please.

11   Q.  You see the next thing down is "Targets" just below

12   that, the next heading?

13   A.  Yes, sir.

14   Q.  What we're talking about here is community outreach; is

15   that right?

16   A.  Correct.

17   Q.  What we're talking about here is community engagement;

18   is that right?

19   A.  Yes, sir.

20   Q.  If you'll go over to page 3.

21       MR. ESSIG:  Sam, if you will highlight sort of from

22   "NBCC" down to the bottom of those bullet points there.

23   Q.  NBCC, that's the North Birmingham Community Coalition;

24   is that right?

25   A.  Yes, sir.

PHILLIPS - Cross by Essig

Q.  You came to learn in your work on this, did you not,

that the NBCC was a community coalition that was funded by

the EPA?  Is that right?

A.  I ultimately learned that, yes.

Q.  Okay.  And they were a grassroots neighborhood group?

A.  Yes, sir.

Q.  Something that commonly exists in these types of

matters; is that right?

A.  Yes, sir.

Q.  Let's go down and let's look at those bullets there.

First one is "Catrena."  Is that a reference to Catrena

Norris Carter?

A.  Yes, sir, it is.

Q.  And for Catrena, it says she's going to "go to all the

meetings, talk to everyone she can, try to be part of the

effort (maybe redevelopment angle), deliver NBCC message,

and find out what Alice Gordon is door-to-door."  Is that

right?

A.  Correct.

Q.  Would it be fair to say that Ms. Carter's role in

community outreach for SE+C for Balch and Drummond was

basically go to the NBCC meetings, take notes on what she

heard or saw, and report back to you guys?  Is that right?

A.  Yes, sir, and other meetings.

Q.  Right.  But go to meetings, hear what people are saying,

PHILLIPS - Cross by Essig

1  write them down, report back to y'all; is that right?

2  A.  Yes, sir.

3  Q.  Isn't it true that Ms. Carter was not creating reports

4  that were then going to the client?

5  A.  That's -- I don't believe so.

6  Q.  The information going to the client was not some robust

7  document that outlined what they were finding out, was it?

8  A.  Oh.  No, sir.

9  Q.  And she wasn't going out putting out fliers, was she?

10  A.  No, sir.

11  Q.  She wasn't going and knocking on doors and talking to

12  people in the neighborhoods, was she?

13  A.  No, sir.

14  Q.  She was one person going to meetings, taking notes, and

15  then reporting back to you so you can report to the client;

16  is that right?

17  A.  Yes, sir.

18  Q.  Now let's go to the second bullet point.  You see that?

19  It says "Edmund (maybe Oliver Robinson)."

20  A.  Yes.

21  Q.  And Oliver Robinson, that's the same Oliver Robinson

22  we're talking about here today; is that right?

23  A.  Yes, sir.

24  Q.  Okay.  And what is contemplated there is grassroots

25  outreach effort.

1    A.  Yes, sir.

2    Q.  And grassroots outreach effort, that's not what

3    Ms. Carter was doing.  That's more like what I just

4    described, right?

5    A.  Yes, sir.

6    Q.  Go out in the community, go door-to-door, "Hey, let me

7    talk to you about what EPA is doing," right?

8    A.  Yes, sir.

9    Q.  "EPA is going to take samples.  Maybe one of the things

10   you ought to do is let us take a split sample," right?

11   A.  Yes, sir.

12   Q.  That's exactly what you wanted the grassroots effort to

13   be, right?

14   A.  Yes, sir.

15   Q.  Okay.  And then the rest of that says "This will likely

16   come later, but since Alice Gordon is going door-to-door to

17   hand out information, we could create our own info to go

18   door-to-door with."  Is that right?

19   A.  Yes, sir.

20   Q.  So based on these bullet points, the contemplation by

21   SE+C in January of 2014, a year prior to the Oliver

22   Robinson appearance, was Catrena will go to meetings; that

23   will be supplemented by maybe Oliver Robinson doing a

24   grassroots community outreach effort; is that right?

25   A.  Yes, sir.  But it was in the context of a brainstorming

1    session on the beginning of the project, yes, sir.

2    Q.  Right.  But, I mean, when you sat here and you figured

3    out grassroots, Edmund, that references Edmund Waters; is

4    that right?

5    A.  Yes, sir.

6    Q.  And who is he?

7    A.  He's the owner of Strada.

8    Q.  Okay.  But you mean Strada, you've got like four or five

9    people primarily is sort of the makeup of Strada; is that

10   right?

11   A.  More about 20 people.

12   Q.  Okay.  I mean, Mr. Glenn testified -- tell me if this is

13   correct or not.  Y'all don't have sort of a section of the

14   company that exists that does community outreach; is that

15   right?

16   A.  No, sir, we don't.

17   Q.  You contract that out; is that right?

18   A.  Yes, sir.

19   Q.  And so in January of 2014, it was contemplated very

20   early on in a brainstorming session that Oliver Robinson

21   could be used as a grassroots outreach effort to supplement

22   what Ms. Carter was doing; is that right?

23   A.  Yes.

24   Q.  And that would have made perfect sense to you; isn't

25   that right, Mr. Phillips?

*PHILLIPS - Cross by Essig*

1    **A.**  Yes.  Grassroots, yes, sir.

2    **Q.**  And one of the reasons that would make perfect sense to

3    you is some of the work that SE+C and Strada did was for

4    the Birmingham-Jefferson County Transit Authority; is that

5    right?

6    **A.**  Yes, sir.

7    **Q.**  And you also did some work for the City of Birmingham;

8    is that right?

9    **A.**  Yes, sir.

10   **Q.**  Am I correct that as a part of the Birmingham-Jefferson

11   County Transit Authority, there was some work that involved

12   with the Birmingham Airport Authority in that as well?  Is

13   that right?

14   **A.**  Yes, sir, the airport authority.

15   **Q.**  And you were aware, as Mr. Glenn was aware, that during

16   the scope of that work, that Oliver Robinson's business

17   actually did community outreach on the Birmingham airport

18   project.  You were aware of that, correct?

19   **A.**  He actually had worked with Birmingham Airport Authority

20   before he worked with us on the airport authority, yes,

21   sir.

22   **Q.**  Right.  Doing community outreach?

23   **A.**  Yes, sir.

24   **Q.**  Did y'all actually hire Oliver Robinson to do community

25   outreach on the Birmingham airport project?

*PHILLIPS - Cross by Essig*

1   **A.**  We were on the same team with AECOM for the master plan.

2   **Q.**  Okay.  So, again, I understand some of these things, you

3   may forget things, you may not remember things, but the

4   truth is in January of 2014, you were having discussions

5   and emails with Scott Phillips about Oliver Robinson doing

6   community engagement, grassroots effort to supplement

7   Catrena Norris Carter on this project; is that right?

8   **A.**  We were having conversations about grassroots outreach

9   and Oliver Robinson's firm being a possible provider of

10  that, yes.

11  **Q.**  As a matter of fact, in this email, he's the only

12  possible provider that you mention.

13  **A.**  And Edmund.

14  **Q.**  Right.  But again, Edmund, the firm itself does not have

15  the resources to do community outreach.  You had to hire

16  somebody to do it door-to-door work, correct?

17  **A.**  Correct.

18  **Q.**  And the person contemplated being hired here is Oliver

19  Robinson; is that right?

20  **A.**  Possibly.

21  **Q.**  I mean, is there any other possibility listed?

22  **A.**  Not listed, but it does say maybe.

23  **Q.**  Okay.  Now, let's back up and let's go back to --

24       THE COURT:  Let's stop here, please, since you're at a

25  good transition point.

*PHILLIPS - Cross by Essig*

1       Members of the jury, let me give you a 15-minute break.

2   Please do not talk about the case during the break.   And if

3   you leave the jury room, let me know if anyone approaches

4   you about this case.   Thanks, everyone.

5   (The following proceedings were had in open court

6   outside of the presence and hearing of the jury.)

7       THE COURT:   Mr. Phillips, you may step down, sir.   You

8   are precluded from talking to anyone about your testimony

9   during the break.   Thank you.

10      THE WITNESS:   Yes, sir.   Thank you.

11      THE COURT:   15 minutes everyone.

12  (Recess.)

13  (The following proceedings were had in open court in the

14  presence and hearing of the jury.)

15      THE COURT:   Mr. Essig, your witness.

16      MR. ESSIG:   Thank you, Your Honor.

17  Q.  Mr. Phillips, let's go back to Defendant's Exhibit 1161,

18  and let's go back to the very last page, please.

19      MR. ESSIG:   And if we can zoom in, Sam, on those bullet

20  points again.

21  Q.  Now, Mr. Phillips, we talked about the fact that when

22  SE+C or Strada engages in community engagement, one of the

23  things you frequently do is you hire a third party to do

24  the community engagement; is that right?

25  **A.**  Yes, sir.

*PHILLIPS - Cross by Essig*

1    Q.  Okay.  To do the grassroots efforts; is that right?

2    A.  Yes, sir.  Under our direction, yes, sir.

3    Q.  And you had actually, again, if I understand correctly,

4    had previously hired Oliver Robinson to do that work?

5    A.  No, sir.

6    Q.  Okay.  You had worked with him to do that work?

7    A.  Yes, sir, we worked on a team at the airport.

8    Q.  And the way that works is for somebody like Catrena or

9    anybody else that you partner with is that your

10   relationship as the consultant with the client, you're the

11   prime contractor, right?

12   A.  Correct.

13   Q.  And then if you go out and you then contract with

14   somebody to do community outreach, that community outreach

15   person is the subcontractor; is that right?

16   A.  Yes, sir.

17   Q.  And basically you manage that work; invoices get

18   submitted to you; you then invoice the client.  Is that

19   right?

20   A.  Yes, sir.

21   Q.  You would actually get paid for that community outreach

22   effort; is that right?

23   A.  Yes, sir.

24   Q.  Isn't that exactly what's being contemplated here in

25   Defendant's Exhibit 1161 on Number 2, that Edmund would

*PHILLIPS - Cross by Essig*

1   supervise Oliver Robinson as the subcontractor for

2   community outreach effort?

3   **A.**  Well, what's being contemplated there is seeing if

4   Robinson & Robinson could be the subcontractor.

5   Q.  Right.   Right.   But y'all would get paid for the work

6   they were doing and then y'all would pay them; is that

7   right?

8   **A.**  Yes, sir.

9        MR. ESSIG:   Let's go back to page 2 of the document.

10  And what I want to do is I want to go up and just

11  highlight -- page 3.  I apologize, Sam.  Highlight the

12  general messages there.

13  Q.  And what you're articulating here, even though this is a

14  communication between you and Trey Glenn, what you're

15  articulating is what you understand the client's message to

16  be; is that right?

17  **A.**  Well, this is really notes from a discussion, a broader

18  discussion with David Moore.

19  Q.  Okay.

20  **A.**  But that's what was being discussed, yes.

21  Q.  And David Moore was a partner at the time at Balch &

22  Bingham; is that right?

23  **A.**  Yes, sir.

24  Q.  In the Atlanta office.  Is that right?

25  **A.**  Yes, sir.

PHILLIPS - Cross by Essig

1    Q.  This was a discussion with David Moore that didn't

2    involve Steve McKinney, Joel Gilbert or David Roberson; is

3    that right?

4    A.  That's correct.

5    Q.  And point 1 under "General Message" is "To EPA and ADEM,

6    we are not going to go down without a fight"; is that

7    right?

8    A.  Yes, sir.

9    Q.  And nothing wrong with an industry that's been named a

10   PRP by the EPA, nothing wrong with them fighting, right?

11   A.  Yes, sir.

12   Q.  And it says you aren't going to use the novel air

13   deposition theory; is that right?

14   A.  Yes, sir.

15   Q.  And your position was and Balch's position was, is that

16   air deposition couldn't support their liability in 35th

17   Avenue; is that right?

18   A.  It couldn't support the analyticals that were on

19   35th Avenue.

20   Q.  And you as a scientist agreed with that?

21   A.  Yes, sir.

22   Q.  And then they say "We don't think we are to blame for

23   this"; is that right?

24   A.  Yes, sir.

25   Q.  And their position basically was, "Even if there's

1   pollution in North Birmingham, 35th Avenue, we're not

2   responsible for it," right?

3   A.  Yes, sir.

4   Q.  And then it says, that last line of that first bullet

5   point in the last two sentences, "We are good actors"?

6   A.  Yes, sir.

7   Q.  "Like you, we would love to see this area redeveloped";

8   is that right?

9   A.  Yes, sir.

10  Q.  So general message number 1 was, "We're not responsible

11  for pollution in the community, but maybe we can talk about

12  redevelopment"?

13  A.  Yes, sir.

14  Q.  And I think that's consistent with general message

15  number 2; is that right?  "We support" -- last line.  "We

16  support redeveloping your community.  We just didn't cause

17  the pollution."

18  A.  Yes, sir.

19  Q.  And that was a merited position for Balch & Bingham to

20  take?

21  A.  Yes, sir.

22  Q.  And you agree with me, Mr. Phillips, that if you flip

23  back through this email, we go to the first page of this

24  email, the only person from Balch that's included in this

25  email chain is Mr. David Moore, a partner in the Atlanta

1    office; is that right?

2    A.  Yes, sir.  Yes, sir.

3    Q.  This conversation originated talking about Oliver

4    Robinson with you and Scott Phillips, ends up in David

5    Moore's email account at Balch, didn't involve Steve

6    McKinney, didn't involve Joel Gilbert, and didn't involve

7    David Roberson; is that right?

8    A.  That's correct.

9    Q.  I'm going to show you what's been marked Government's

10   Exhibit 153, Mr. Phillips, which you were shown on direct

11   examination.  Okay.  So if we read this in context of the

12   January 2014 email discussion between you and Scott

13   Phillips, let's start with the bottom email.  It's from

14   Joel to you, "Scott" -- would you read that for us, please?

15   A.  "Scott, one thing that Trey had mentioned in passing and

16   I thought we might discuss yesterday was Catrena's efforts

17   and" -- do you want me to -- oh.

18   Q.  Please continue.

19   A.  -- "and also the report you, Catrena, David, and I

20   discussed a couple months ago."

21   Q.  I think her name is spelled wrong twice in that

22   sentence, but that's Catrena Norris Carter; is that right?

23   That's who you're talking about?

24   A.  Yes, sir.

25   Q.  And it says "Again, Mr. Gilbert" -- we start the next

*PHILLIPS - Cross by Essig*

1    line -- "let's try to revisit this issue soon so we can

2    begin developing an action plan involving her and

3    coordinating with Oliver"; is that right?

4    **A.**  Yes, sir.

5    **Q.**  And that is perfectly consistent with the email

6    discussion you and Trey Glenn had had back in January of

7    2014; is that right?

8    **A.**  That's unrelated to the conversation that we had in

9    January of 2014.

10   **Q.**  It is unrelated?

11   **A.**  Yes, sir.

12   **Q.**  The January 2014 email talks about community engagement,

13   right, talks about a grassroots effort?

14   **A.**  Yes, sir.

15   **Q.**  Okay.  Would you please read to me the subject line of

16   this email?

17   **A.**  "North Birmingham Community Activities."

18   **Q.**  Okay.  And you agree that at some point it was going to

19   be necessary not just to have somebody go sit at meetings

20   and listen, but to actually do a door-to-door grassroots

21   outreach activity?  You thought that would be important in

22   North Birmingham, did you not?

23   **A.**  That was one of the options, yes, sir --

24   **Q.**  Okay.

25   **A.**  -- if there was a cleanup to move forward.

1   Q.   Okay.  And even in terms of getting comments on the NPL,

2   that would require some door-to-door work?

3   **A.**   It could, yes, sir.

4   Q.   All right.  And are you aware that Oliver Robinson

5   actually did door-to-door work in North Birmingham, the

6   35th Avenue area?

7   **A.**   No, sir, I'm not.

8   Q.   You're not aware that he went out in December and

9   January of 2014 and 2015 and got a hundred comment letters

10   from citizens?

11      MS. MARK:  Objection, Your Honor.  That's facts not in

12   evidence.

13      MR. ESSIG:  Facts are in evidence, Your Honor.

14      MS. MARK:  I disagree.

15      THE COURT:  I'll give Mr. Essig some leeway.  It's

16   cross-exam.

17   Q.  (BY MR. ESSIG:)  Are you aware of that fact?

18   **A.**   I knew there were letters.  I didn't know where they all

19   had come from.

20   Q.   Okay.  Were you aware that there were a hundred

21   letters that were submitted --

22      THE COURT:  He's already answered.  He said he knew

23   there were letters.

24   Q.  (BY MR. ESSIG:)  But North Birmingham community

25   activities, based on what we saw in January of 2014, what

PHILLIPS - Cross by Essig

1  had been contemplated for Oliver Robinson and community

2  activities was grassroots outreach; is that right?

3  A.  Was a possibility, yes, sir.

4  Q.  And by this point in time, as we heard from your grand

5  jury testimony, you had been in a meeting at Balch &

6  Bingham to discuss community outreach where Oliver Robinson

7  was present; is that right?

8  A.  Yes, sir.

9  Q.  Is it still your testimony that as of February 25, 2015,

10 that you had no idea of the concept of Oliver Robinson

11 being involved in community outreach in North Birmingham?

12 A.  Not that he was involved outside of being a legislator,

13 no, sir.

14 Q.  So you stand by that testimony on direct examination?

15 A.  Yes, sir.

16 Q.  And you say outside as being a legislator.  Okay.

17 Again, going back to your grand jury testimony -- well, let

18 me back up and ask you this.  You went to multiple meetings

19 at Balch; is that right?

20 A.  Yes.

21 Q.  Multiple meetings where Joel Gilbert, David Roberson and

22 Steve McKinney were present; is that right?

23 A.  Yes, sir.

24 Q.  And went to multiple meetings where Oliver Robinson was

25 present; is that right?

PHILLIPS - Cross by Essig

A.   Two.   Yes, sir.

Q.   Just so we're clear, too, when you went to those

meetings at Balch & Bingham, just like anybody else, you

walked in the bottom of the building, walked through the

lobby, fair, of the building; is that right?

A.   Yes, sir.

Q.   Pressed the elevators, got on the elevator; is that

right?

A.   Yes, sir.

Q.   And to get to Balch & Bingham to go to that public

space, you rode up to the 15th floor.

A.   Yes, sir.

Q.   That's where Balch's receptionist is?

A.   Yes, sir.

Q.   That's where their public meeting space is?

A.   Yes, sir.

Q.   And that's where these meetings were?

A.   Yes, sir.

Q.   And so is it your testimony under oath that in those

meetings, that Mr. Gilbert, Mr. McKinney, or Mr. Roberson

ever said to you, "Hey, here's Oliver Robinson.  He's here

as a legislator from the North Birmingham area"?  Is it

your testimony that they said that?

A.   It's my testimony that he said that he was at those

meetings to support what was going forward for the

PHILLIPS - Cross by Essig

1    community.

2    Q.  Okay.  All right.  So no one ever said, "Hey, this is

3    Oliver Robinson.  He's here as a legislator for the North

4    Birmingham area"?

5    A.  No, sir.

6    Q.  Okay.  Nobody ever actually said that?

7    A.  No, sir.

8    Q.  And he said he was there for the community; is that

9    right?

10   A.  In support of the community.

11   Q.  In support of the community.  Okay.

12   A.  Yes, sir.

13   Q.  Typically, people that are doing community outreach are

14   doing community outreach in support of the community; is

15   that right?

16   A.  Yes, sir.

17   Q.  As a matter of fact, community outreach comes in phases

18   oftentimes?

19   A.  Yes.

20   Q.  First phase might mean you go out, you survey the

21   community, "Hey, guys, what's important to you?"  Right?

22   A.  Yes, sir.

23   Q.  Okay.  And then maybe after you figure out what's

24   important to them, if it's an EPA matter, might find some

25   people that like EPA; is that right?

PHILLIPS - Cross by Essig

1    **A.**   Yes, sir.

2    *Q.*   Might find some people that don't like the EPA?

3    **A.**   That's right.

4    *Q.*   And once you figure that out and you figure out which

5    people do support you and which people do not support you,

6    that's how you know who will sign an affidavit or a comment

7    letter; is that right?

8    **A.**   Yes, sir.

9    *Q.*   You go back to those people that supported you when you

10   surveyed them and you had them do the comment letter; is

11   that right?

12   **A.**   Yes, sir, for support.

13   *Q.*   And that process could take place in a number of phases,

14   and that process can take a long time; is that right?

15   **A.**   Yes, sir.

16   *Q.*   That process can be very expensive; is that right?

17   **A.**   Yes, sir.

18   *Q.*   So again, it's your testimony, Mr. Phillips, that as of

19   the time of Oliver Robinson's appearance before the AEMC,

20   that you had no idea of the concept of Oliver Robinson

21   being involved in community engagement in North Birmingham

22   for Balch & Bingham; is that your testimony?

23   **A.**   Yes, sir.

24   *Q.*   These meetings that we talked about, though, and these

25   emails that we talked about, you've all seen they predate

*PHILLIPS - Cross by Essig*

1    the February 20, 2015 AEMC agreements; is that right?

2    **A.**   I think one did.   I thought the other one was after

3    that.

4    **Q.**   January 14 -- January 2014, that predates, doesn't it?

5    Is that right?

6    **A.**   Yes, sir.

7    **Q.**   Okay.   The February 12, 2015 email we just looked at, it

8    talked about getting Catrena Norris Carter and Oliver

9    together?

10   **A.**   Yes, sir.

11   **Q.**   That's February 12, 2015, right?

12   **A.**   Yes, sir.

13   **Q.**   We already talked about the fact that your meeting

14   regarding community engagement where Oliver Robinson was

15   present was prior to February 20, 2015; is that right?   I

16   think you said you got those confused.

17   **A.**   Yeah, I think the meeting was after that, after the

18   20th.   To introduce him to Lanier Brown was before.

19   **Q.**   Okay.   All right.   So let me ask you this, Mr. Phillips.

20   You had a contract with Balch & Bingham as a consultant at

21   SE+C and Strada; is that right?

22   **A.**   Yes, sir.

23   **Q.**   And as part of that contract -- and do you understand

24   that what Balch & Bingham provided to your firm was their

25   standard consulting agreement?

1   A.  That was my understanding, yes, sir.

2   Q.  And in that standard consulting agreement, Balch &

3   Bingham included a provision that required you to follow

4   the law; is that correct?

5   A.  Yes, sir.

6   Q.  And at the time, that was important because you were

7   actually a public official on the AEMC; is that right?

8   A.  Yes.

9   Q.  And as a public official on the AEMC, the rule for you

10  was you could not vote or take action on a matter that

11  involved something that you were consulting on; is that

12  right?

13  A.  Yes, sir.

14  Q.  You understood that to be your duty?

15  A.  Yes, sir.

16  Q.  But the day Oliver Robinson came and spoke in front of

17  the commission, you certainly knew those comments were

18  related to the 35th Avenue Superfund Site; is that right?

19  A.  Yes.  Yes, sir.

20  Q.  But there was no problem with you sitting in the

21  committee room or the commission room and listening to that

22  speech, was there?

23  A.  No, sir.

24  Q.  And the reason there was no problem with you sitting in

25  there was because there was no rules or regs for the AEMC

1    to consider on the 35th Avenue site, was there?

2    **A.**   That's correct.

3    *Q.*   There was no issue, no rules or regs for the AEMC to

4    consider regarding the Tarrant GASP petition on that day,

5    was there?

6    **A.**   Yes, sir.  Yes, sir.

7    *Q.*   And there had been no appeal by anyone of any ruling or

8    any decision that ADEM or AEMC had made on that issue, was

9    there?

10   **A.**   That's correct.

11   *Q.*   And certainly the day that Oliver Robinson came in

12   there, he didn't ask you to fire Lance LeFleur, did he?

13   **A.**   No, sir.

14   *Q.*   He didn't ask you to take any action against Lance

15   LeFleur at all, did he?

16   **A.**   No, sir.

17   *Q.*   So if I'm correct, those are the three ways the

18   commission acts.  You hire and fire Lance LeFleur; is that

19   right?

20   **A.**   Yes, sir.

21   *Q.*   You implement rules and regulations; is that right?

22   **A.**   Yes, sir.

23   *Q.*   You make decisions on appeals based on something ADEM or

24   AEMC has done; is that right?

25   **A.**   Yes, sir.

PHILLIPS - Cross by Essig

1   Q.  That's the only way that the AEMC takes official action;

2   is that right?

3   A.  That's correct.

4   Q.  And those are the only matters on which the AEMC can

5   take official action per its authority; is that right?

6   A.  Yes, sir.

7   Q.  None of those matters was pending before the AEMC on

8   that particular day when Oliver Robinson showed up; is that

9   right?

10  A.  No, sir, they weren't.

11  Q.  And that is the reason you were able to sit in there and

12  still comply with the Balch & Bingham contract; is that

13  right?

14  A.  Yes, sir.

15  Q.  And you were able to comply with the follow-the-law

16  provision; is that right?

17  A.  Yes, sir.

18  Q.  And Oliver Robinson when he stood in there that day and

19  when he spoke, I think you made the motion to allow him to

20  speak; is that right?

21  A.  I don't recall, but I may have.

22  Q.  If the video reflects that that's been shown to the

23  jury, you wouldn't disagree that, would you?

24  A.  No, sir.

25  Q.  And all that is, though, is making a motion so a man can

*PHILLIPS - Cross by Essig*

1    stand up and give a speech.

2    **A.**   Public comment.

3    **Q.**   Right.   And as a result of the speech that Oliver

4    Robinson gave, the AEMC didn't take any action against

5    Lance LeFleur, did they?

6    **A.**   No, sir.

7    **Q.**   As a matter of fact, there was no action for AEMC to

8    take on the 35th Avenue matter, was there?

9    **A.**   No, sir.

10   **Q.**   And AEMC, as a result of Oliver Robinson's speech,

11   didn't go to Lance LeFleur and tell him to change his

12   position, did they?

13   **A.**   No, sir.

14   **Q.**   The body as a whole never did that, did they?

15   **A.**   No, sir.

16   **Q.**   As a matter of fact, as a result of this appearance, the

17   AEMC as a body didn't do a thing, did they?

18   **A.**   They did not.

19   **Q.**   So at the end of the day, as it relates to being a

20   member of the commission, of the AEMC, Oliver Robinson's

21   speech had no impact whatsoever?

22   **A.**   No, sir.

23        MR. ESSIG:   No further questions.

24        THE COURT:   Who's up next?

25        MR. GILLEN:   I am, Your Honor.

1      THE COURT:  You may come forward, Mr. Gillen.

2      MR. GILLEN:  Thank you, Your Honor.

3   CROSS-EXAMINATION BY MR. GILLEN:

4   Q.  Good afternoon, Mr. Phillips.

5   **A.**  Good afternoon.

6   Q.  My name is Craig Gillen.  I'm one of the attorneys

7   representing Mr. McKinney.  I want to follow up a little

8   bit where counsel left off.

9   (Government's Exhibit 145 was referenced.)

10      MR. GILLEN:  If we can take a look at Government's 145,

11   please.

12   Q.  Now, do you have that in front of you?

13   **A.**  Yes, sir, I do.

14   Q.  Do you recognize this Government's 145 at the top?  This

15   is an email from you to Trey Glenn.  This is way back on

16   October 31, 2013, correct?

17   **A.**  Yes, sir.

18   Q.  And this has to do with the draft agreement between

19   Balch and SEC, correct?

20   **A.**  Yes, sir.

21   Q.  Now, what happens is --

22      MR. GILLEN:  If you can take that out, the header off

23   just a sec.

24   Q.  What I'd like you to do is let's focus in on point

25   number 2.  "We need to be sure that my role on commission

1   meets their requirements and the law, including the ethics

2   law, and that we prevent -- and the appropriate process and

3   procedure is to document this," correct?

4   A.  Yes, sir.

5   Q.  So what you wanted to make sure is that if there was

6   anything that required you as a commissioner to recuse

7   yourself or to disclose your relationship with Balch or

8   with Drummond, that you felt like you'd be able to do that,

9   correct?

10  A.  Yes, sir.

11  Q.  Because as we'll go in and Mr. Essig went into in some

12  detail, at the end of the day, you were present and

13  actually moved to permit Mr. Robinson to speak before the

14  commission for less than 10 minutes on February 20, 2015,

15  correct?

16  A.  Yes, sir.

17  Q.  Okay.  And so that was on your mind when you and

18  Mr. Glenn were dealing with Balch and Drummond concerning

19  representation, correct?

20  A.  Yes, sir.

21  Q.  Now, one of the things that -- you remember that

22  actually Mr. Glenn is the one who sort of pitched trying to

23  get the work to Drummond -- from Drummond and Balch,

24  correct?

25  A.  Yes.

1   Q.  So this isn't a situation where Mr. Gilbert or

2   Mr. McKinney or anybody else from Balch or from Drummond

3   went out and said, "Gee, we want to get Mr. Phillips and

4   Mr. Glenn" for whatever reason.  This is Mr. Glenn saying,

5   "We want that business," right?

6   A.  Yes, sir.

7   Q.  Nothing wrong with that, but that's the way it worked,

8   correct?

9   A.  Yes, sir.

10  Q.  So my point being is it's not a situation where someone

11  was saying, "Hey, let's go hire Strada or SEC because

12  they've got Trey Glenn and they've got Scott Phillips, who

13  happens to be the vice chair of the EMC," correct?

14  A.  Yes, sir.

15  Q.  And so you and Mr. Glenn decided, "Hey, let's try and

16  get this business.  This will be good work."  Right?

17  A.  Yes, sir.

18  Q.  And so what you do is you then go through the process of

19  having a contract which is in --

20      MR. GILLEN:  If we can take a look at Government's 146,

21  please.

22  Q.  And this is the contract agreement between Balch &

23  Bingham and SEC Engineering; is that correct?

24  A.  Yes, sir.

25  Q.  All right.  And now, I apologize.  If we can go back to

1    145 quickly.  I jumped the gun a little bit on this one.

2    If we can go down to the bottom here, the bottom comment,

3    Mr. Glenn is saying to you "Can I get your quick feedback

4    on this draft agreement?  I'm trying to get ready for ABC

5    to engage us through Balch.  This is a standard agreement

6    between Balch and its consultants."  Do you see that?

7    A.  Yes, sir, I do.

8    Q.  And so what he's saying is, "What we're going to do is

9    we're going to have a situation where ABC Coke, Drummond,

10   will be hiring y'all, but it will be through Balch,"

11   correct?

12   A.  Yes, sir.

13   Q.  And there was nothing wrong in your mind or Mr. Glenn's

14   mind about that process occurring, correct?

15   A.  No, sir.

16   Q.  Nothing wrong, standard business, right?

17   A.  Yes, sir.

18   Q.  For the law firm to be hiring a consultant --

19   A.  Yes, sir.

20   Q.  -- through an engagement letter, correct?

21   A.  Yes, sir.

22   Q.  Which is what happened here, correct?

23   A.  Yes, sir.

24   Q.  So let's look at, if we can, back to Government's 146.

25   And this is the agreement that was signed, correct?

PHILLIPS - Cross by Gillen

1   A.   It appears to be.   I don't see a signature.

2        MR. GILLEN:   Let's move to page 4 of that, please.

3   Now, in page 4, if we can blow up the first paragraph there

4   on "Confidentiality."

5   Q.   Now, this is part of the contract that you and Mr. Glenn

6   had with Balch, correct, or your company did, right?

7   A.   Yes, sir.

8   Q.   It says "Confidentiality.   The consultant shall not

9   without prior written consent of Balch disclose to any

10  person confidential, proprietary, or other information

11  concerning the business, financial, or other affairs of

12  Balch or its clients (Balch confidential information)."

13  Standard language, correct?

14  A.   Yes, sir.

15  Q.   "Moreover, the consultant shall use its best efforts to

16  prevent the publication or disclosure by anyone else of any

17  Balch confidential information."   Standard information,

18  correct?

19  A.   Yes, sir.

20  Q.   "Consultant agrees that all communications between

21  consultant and Balch shall remain confidential and shall

22  not be divulged to third parties except to the extent

23  compelled by legal process or to the extent Balch

24  authorizes disclosure in advance."   Do you see that?

25  A.   Yes, sir.

*PHILLIPS - Cross by Gillen*

Q.  Standard language, isn't it?

A.  Yes, sir.

Q.  Okay.  "The existence of this agreement shall also be kept confidential by consultant."  Standard language, isn't it?

A.  Yes, sir.

Q.  "Consultant shall not disclose the existence of any terms of the agreement without the prior written consent of Balch except to the extent that there's a legal obligation to do so or to the extent necessary to object to a demand by a third party for disclosure of same.  This obligation of confidentiality shall survive the termination of this agreement."  All standard language, correct?

A.  Yes, sir.

Q.  So under this particular confidentiality provision, if you felt like you had to make some sort of disclosure about your company's relationship with Balch or with Drummond, then you could certainly do this because if it would be directed or provided by law, then you would be permitted to do that, right?

A.  Yes, sir.

Q.  In other words, if the law says I've got to disclose, then, you know, this allows you to disclose, correct?

A.  Yes, sir.

Q.  If we can turn to page 5, "Compliance with laws," it

*PHILLIPS - Cross by Gillen*

1  says, "Compliance with laws.  Consultant shall comply with

2  the requirements of all applicable laws, rules, and

3  regulations and orders of any federal, state, or local

4  governmental authority.  In particular but not in

5  limitation of the foregoing sentence, consultant shall

6  comply with any and all filings and requirements of the

7  FCPA and the Alabama Code of Ethics 1973 as amended and all

8  other applicable federal, state, and local laws, rules, and

9  regulations."  Correct?

10  **A.**  Yes, sir.

11  **Q.**  So what it's saying here is that -- and this is standard

12  language, isn't it?

13  **A.**  Yes, sir.

14  **Q.**  And what this language does would then if you felt like,

15  "Gee, you know, I've got a conflict here," then you would

16  then say, "Well, I'm going to comply" -- if I feel that I

17  must with the ethical requirements, I would disclose my

18  relationship with Drummond or with Balch, correct?

19  **A.**  Yes, sir.

20  **Q.**  And that's one of the concerns that you had when you

21  were talking about making sure that you could do that,

22  correct?

23  **A.**  Yes, sir.

24  **Q.**  Now, what happens, and we're going to spend some time

25  going through some of your direct testimony, but we'll kind

PHILLIPS - Cross by Gillen

1  of fast-forward back to the end where counsel left off, and

2  that is that as you went into the hearing on February 20,

3  2015, before the commission, correct?

4  **A.**  Yes, sir.

5  Q.  Now, you were the vice chair, correct?

6  **A.**  Yes, sir.

7  Q.  You had moved for Mr. Robinson to be permitted to speak,

8  correct?

9  **A.**  Yes, sir.

10  Q.  So you actually took an official, you know, step there

11  by making that motion, correct?

12  **A.**  Yes, sir.

13  Q.  Okay.  And it was seconded, and they said, "Sure, go

14  ahead and speak," correct?  Correct?

15  **A.**  Yes, sir.

16  Q.  Now, at that time, as of February 20, 2015, you had

17  already met Mr. Robinson in the hallway of Balch on

18  February 11, 2015, correct?

19  **A.**  Yes, sir.

20  Q.  You had already had discussions with other members of --

21  Mr. Gilbert and Mr. Roberson about the appearance before

22  the commission, correct?

23  **A.**  Yes, sir.

24  Q.  You had actually been asked by Mr. Robinson to have you

25  introduce him to the chair, correct?

1  **A.**  As I recall, I said it was either Joel or David.  I

2  don't remember.

3  **Q.**  You don't remember?

4  **A.**  Yes.

5  **Q.**  So if you don't remember, then we're not going to ask

6  you to -- this isn't the place to be speculating or

7  guessing.  So you don't know?

8  **A.**  No, sir.

9  **Q.**  But what you do know is someone asked you to make that

10  introduction, correct?

11  **A.**  Yes, sir.

12  **Q.**  So you were aware that the meeting up there at Balch was

13  about community outreach, correct?

14  **A.**  I wasn't aware of what the meeting was about.

15  **Q.**  But you agreed to an introduction, correct?

16  **A.**  Yes.

17  **Q.**  That introduction took place on February 18, 2015,

18  correct?

19  **A.**  Yes.

20  **Q.**  At Daniel George's?

21  **A.**  Yes.

22  **Q.**  And you're the one who then -- the vice chair,

23  Mr. Phillips, is introducing Oliver Robinson to the chair,

24  Mr. Brown, correct?

25  **A.**  Yes, sir.

*PHILLIPS - Cross by Gillen*

1  Q.  And there was discussion about Mr. Robinson's appearance

2  that would be coming up before the commission on the 20th,

3  correct?

4  A.  Right.  Public comment.

5  Q.  All right.  Public comment.  So you were aware that

6  there had been that discussion.  You were aware obviously

7  that your company was -- had been engaged since 2013

8  working on behalf of Drummond and on behalf of Balch on

9  this very complicated procedure, correct?

10 A.  Yes, sir.

11 Q.  And so but, again, the reason why you felt as though you

12 need not even disclose your relationship with Balch or with

13 Drummond is that there was nothing going on there at the

14 hearing, correct?

15 A.  That's correct.

16 Q.  As we discussed, there was no vote, correct?

17 A.  That's correct.

18 Q.  There was no pending resolution, correct?

19 A.  That's correct.

20 Q.  There was nothing that caused you as the vice chair of

21 the commission, who had been employed through the company

22 with Balch and Drummond since 2013, to either disclose that

23 relationship or to recuse yourself, correct?

24 A.  That's correct.

25 Q.  And if you did think that was the case, that's what you

*PHILLIPS - Cross by Gillen*

1   would have done, right?

2   A.  Yes, sir.

3   Q.  So if you thought that there was anything pending before

4   that commission that had to do with Mr. Robinson's

5   appearance on the 20th that touched in any way on your

6   necessity to either disclose or to recuse, you would have

7   done that, correct?

8   A.  Yes, sir.

9   Q.  Because you had alerted yourself or to your partner,

10  Mr. Glenn, way back in 2013 that you wanted to make sure

11  that that would be addressed, correct?

12  A.  Yes, sir.

13  Q.  And you didn't because you didn't need to, correct?

14  A.  Yes, sir.

15  Q.  Now, when you were discussing on direct examination, you

16  were talking about a meeting or discussions that you had

17  with a number of different lawyers at Balch concerning this

18  matter, correct?

19  A.  Yes, sir.

20  Q.  Many moving parts here concerning this very, very

21  complicated matter of the 35th Avenue Superfund Site,

22  whether it would be extended to Tarrant and also the whole

23  National Priorities listing, correct?

24  A.  Yes.  Yes, sir.

25  Q.  Not only very technical scientific matters, but also

1   very technical and complicated legal issues, correct?

2   A.  Yes, sir.

3   Q.  And what would happen is that you indicated that you on

4   occasion would speak with Mr. McKinney, correct?

5   A.  Yes, sir.

6   Q.  Now, when you spoke with Mr. McKinney, you spoke with

7   Mr. McKinney but only about issues that had to do with the

8   technical aspects of the process that you were working on,

9   which was the NPL listing, the data, or the extension of

10  the Superfund site to Tarrant, correct?

11  A.  Yes, sir.

12  Q.  And so when you said that you would speak with him,

13  basically you in your role as working the technical detail,

14  highly sophisticated fact, scientific fact pattern is what

15  you'd be communicating with Mr. McKinney about, correct?

16  A.  Yes, sir.

17  (Government's Exhibit 148 was referenced.)

18      MR. GILLEN:  Now, as an example, let's go to

19  Government's 148 if we could, please.

20  Q.  Now, in 148, we have -- this is an email from

21  Mr. McKinney on June 27, 2014 to Mr. Glenn with a cc to

22  you, correct?

23  A.  Yes, sir.

24  Q.  And this has to do -- the attachment, there's an

25  attached letter.  If we can just scoot to the attached

```
 1   letter very quickly, that's a June 11, 2014 letter from
 2   Director LeFleur to the EPA, right?
 3   A.   Right, yes, sir.
 4        MR. GILLEN:   Now, if we can go back to the front of the
 5   email.
 6   Q.   So what we have here, if we can box up here, we can see
 7   that the comment is "See the attached letter obtained
 8   today."  Which actually was two weeks after it was sent,
 9   right?
10   A.   Yes, sir.
11   Q.   "See attached letter obtained today.  When you pursue
12   information about this topic with ADEM personnel, please
13   seek any documentation on the request for concurrence that
14   exists and, in particular, any scoring of the site that has
15   been done."  Do you see that?
16   A.   Yes.
17   Q.   "Any scoring of the site that has been done"?
18   A.   Yes, sir.
19   Q.   So what Mr. McKinney is asking you to do at that time is
20   what you're good at or what you and Mr. Glenn are good at,
21   and that's the scientific study, correct?
22   A.   Yes, sir.
23   Q.   So when we talk about scoring the site, we're talking
24   about the numbers out there that might reflect, good or
25   bad, whether or not the data would support either extending
```

1  the Superfund site from 35th Avenue to Tarrant or whether

2  or not the site, the 35th Avenue site, should be placed on

3  the NPL list, correct?

4  A.  Yes, sir.

5  Q.  So that was sort of -- that's the kind of communications

6  that you had with Mr. McKinney about this matter, correct?

7  A.  Yes, sir.

8  Q.  All right.  Now, and what you also did, let's go to --

9  government showed you 149.

10      MR. GILLEN:  Let's go to 149 if we could, please.

11  Government's 149.

12  Q.  And if we go from the back of that, there is a -- this

13  is the September 16, Director LeFleur's email to EPA where

14  it, you know, just jumps out at you from the page "The

15  state did not concur.  The state does not concur."  Right?

16  A.  That's correct.

17  Q.  And then he states five reasons why:  Number 1, no

18  scientific basis; and then, Number 2, the air and land

19  studies --

20      MS. MARK:  Your Honor, I object to this on relevance.

21      MR. GILLEN:  They went over this document on direct,

22  Your Honor, and I want to go over the whole thing with him,

23  not just the part they want to go over.

24      THE COURT:  That's one way to get around it, but speed

25  this up, please.  You may continue, Mr. Gillen.

PHILLIPS - Cross by Gillen

1          MR. GILLEN:   Thank you, Your Honor.

2     Q.  And so what happens is on Number 2, he's saying that the

3     air and land studies performed by the U.S. Agency for Toxic

4     Substances and Disease Registry within the Centers for

5     Disease Control determined there's no public health hazard

6     at 35th Avenue and, therefore, the studies do not support

7     the listing.  Do you see that?

8     A.  Yes, sir.

9     Q.  So what happens is, is that's forwarded to -- you get

10    that, and then what you do is you then sort of have a draft

11    that you wanted to discuss with Mr. Glenn about what you

12    maybe want to send to Mr. McKinney, correct?

13    A.  Yes, sir.

14    Q.  And so you're saying here on page 1 "I was thinking of

15    sending this email that's below to Steve.  What do you

16    think?  Should I copy the full team?"  And here in your

17    proposed draft, what you're saying is, if we go down here

18    to the draft, "Steve, it would seem that we need to

19    determine mayor's position on this and see if we can get

20    him to respond with comments to the proposed listing.  I

21    believe we have 60 days from the *Federal Register's*

22    publication date, so we have little time, but we likely

23    need to think through the best commenters and content of

24    their comments."

25          You remember being asked on direct examination about

PHILLIPS - Cross by Gillen

1   that by the government, correct?

2   A.  Yes, sir.

3   Q.  "As you know, the comments from the PRPs do not carry

4   the same weight as those from others, comments from others.

5   Like the mayor, the governor, city business leaders,

6   congressional delegation, et cetera, are possible

7   commenters that could make a difference."

8       So you're sort of -- what you're doing is running by

9   Mr. Glenn the possibility that you -- of what you might

10   want to suggest to Balch in terms of a protocol or a

11   procedure to take, correct?

12   A.  Yes, sir.

13   Q.  And then you say "However, in my experience, unless

14   there is significant technical argument, alternative method

15   for a cleanup, state led or PRP led, the commenter to refer

16   to, it would be difficult for any real pressure to have the

17   EPA change the listing now they have announced it,"

18   correct?

19   A.  Yes, sir.

20   Q.  What you're saying there is, "Hey, EPA" -- and you can

21   tell from Director LeFleur's letter he's very upset about

22   it -- had gone ahead and put it down, you know, as a

23   preliminary listing, correct?

24   A.  Yes, sir.

25   Q.  And so what you're saying here is once they've done

1   that, you know, absent some data or something else, it's

2   going to be difficult to get the EPA to change from that

3   position, correct?

4   **A.**   Correct.

5   **Q.**   And so but you're also, you know, just to be candid, you

6   and Mr. Glenn are also looking for maybe a little bit more

7   business from Balch and Drummond on this issue, correct?

8   **A.**   We're proposing that we could look at the technical

9   argument.

10  **Q.**   Little bit more business.

11  **A.**   Yes, sir.

12  **Q.**   Nothing wrong with that.  I'm just saying that's what it

13  was, right?

14  **A.**   Yes, sir.

15  **Q.**   And above you say "Do you want me to send or" -- "Do you

16  want to send or do you want me to?"  You see that?

17  Correct?

18  **A.**   I do now.  Yes, sir.

19  **Q.**   And then he responds back "Why don't you try it?  I've

20  been beating on them lately.  It would probably help to

21  come from you."  Do you see that?

22  **A.**   Yes, sir.

23  **Q.**   What he meant by "I've been beating on them lately" is

24  "I've been out trying to get more business from them.

25  Maybe they ought to hear from you," right?

*PHILLIPS - Cross by Gillen*

**A.**   I don't know that that's specifically what he meant.

**Q.**   That's the way you took it, though, isn't it?

**A.**   I took it that the technical argument needed to come from me.

**Q.**   I see.  Okay.

THE COURT:  Let's get back to Defendant Robinson and the alleged bribes or whatever else.

**Q.**   (BY MR. GILLEN:)  And I'd like to show you what has been marked as Government's 153.  You were asked about this on direct examination.  Now, let's break this down.

You told us that you had some meetings, and I think you described some meetings at the beginning of January of 2015, correct, some meetings with Mr. Gilbert and Mr. Roberson?

**A.**   I'm not sure which time frame, but I mean --

**Q.**   Let me rephrase it a different way.  Let's just take December of 2014.  You never had a meeting with Steve McKinney where you discussed Oliver Robinson or the EMC commission meeting, did you?

**A.**   No, sir, not that I recall.

**Q.**   And let's move into January of 2015.  Now, in January of 2015, you didn't have any meetings with Steve McKinney regarding Oliver Robinson or any presentation before EMC, did you?

**A.**   No, sir, not that I recall.

1   Q.   Okay.   Now let's move into February of 2015, February of

2   2015.   Now, you told us earlier on direct examination and

3   some on cross that you went up to a meeting on February 11,

4   2015 to Balch, correct?

5   A.   Yes, sir.

6   Q.   And that, as you may remember, you testified you saw

7   Mr. Oliver Robinson coming out in the hallway, correct?

8   A.   Yes, sir.

9   Q.   You were going into a meeting with some other folks,

10  correct?

11  A.   Yes, sir.

12  Q.   Mr. Gilbert and Mr. Roberson, correct?

13  A.   Yes, sir.

14  Q.   And you've discussed with us what Mr. Robinson said to

15  you, and then you go into the meeting with the two

16  gentlemen, correct?

17  A.   Yes, sir.

18  Q.   Not in that meeting is Steve McKinney, correct?

19  A.   Yes.   No, sir, he's not there.

20  Q.   He's not there.   So then we have some email traffic

21  which is the next day on 153, and there is some discussion

22  about -- you may remember this.   You were asked about this

23  in the latter part down here where you say "I need to sit

24  down with Oliver soon as well and get feedback from him now

25  that he has been involved for a few months and develop a

*PHILLIPS - Cross by Gillen*

1    plan to go forward."  Do you see that?

2    **A.**  Yes, sir.

3    **Q.**  Now, this is an issue, as cross-examination earlier

4    pointed out, regarding the North Birmingham community

5    activities, correct?

6    **A.**  Yes, sir.

7    **Q.**  Community outreach, correct?

8    **A.**  Community activities were the subject.

9    **Q.**  Community activities, correct?

10   **A.**  Yes, sir.

11   **Q.**  And so what happens is on this email, Mr. Gilbert is

12   sending it to you, correct?

13   **A.**  Yes, sir.

14   **Q.**  And sending it also to Mr. Roberson, correct?

15   **A.**  Correct.

16   **Q.**  But, no, Mr. McKinney is not on this email, not either

17   directly or cc'd, correct?

18   **A.**  No, sir.

19   **Q.**  Then there is the February 18, 2015 meeting at Daniel

20   George's, correct?

21   **A.**  Yes, sir.

22   **Q.**  And again for the record, there is no Steve McKinney at

23   that meeting, correct?

24   **A.**  No, sir.

25   **Q.**  There is no discussion that you had with Steve McKinney

PHILLIPS - Cross by Gillen

1   about the meeting, correct?

2   **A.**  No, sir, not that I recall.

3   Q.  And then you have the day after the meeting that --

4   between Mr. Robinson, yourself, Chairman Brown, and Trey

5   Glenn.  Then you send out a February 19 draft PowerPoint

6   regarding community stakeholder strategy, correct?

7   **A.**  I don't remember the date, but yes, I did.

8   Q.  We'll tie it down.  Government's 161.

9   **A.**  Yes, sir.

10  Q.  So you see that on the top of 161 --

11  **A.**  Yes, sir.

12  Q.  -- where you are sending -- now, as it relates to this

13  email where you're sending out your PowerPoint that the

14  government walked through in some detail on February 19,

15  you did not send any cc or either direct or cc to

16  Mr. McKinney regarding your PowerPoint presentation,

17  correct?

18  **A.**  Correct.

19  Q.  And then what occurred on the next day, actually the day

20  of the commission meeting, February 20, there is another

21  email or emails regarding a potential meeting, correct?

22  Let's look at 154.

23  **A.**  Yes.  The meeting that came later.

24  Q.  Yeah.  Well, these emails are going out on February 20,

25  correct?

PHILLIPS - Cross by Gillen

1   **A.**   Correct.

2   **Q.**   And it has to do with a meeting that's going to be held

3   later on concerning your PowerPoint presentation, correct?

4   **A.**   Correct.

5   **Q.**   On all of the emails back and forth, Mr. McKinney is

6   not -- he doesn't send the email, he doesn't get the email,

7   and he's not cc'd on any of these emails, is he?

8   **A.**   No, sir, he's not.

9   **Q.**   As a matter of fact, then you testified that there was a

10   meeting that took place on February 25, 2015 regarding your

11   PowerPoint presentation.   Do you remember that?

12   **A.**   Yes, sir.

13   **Q.**   And without going back into all of what was said and

14   what was done there at that meeting, the one thing that we

15   can be very sure of is Steve McKinney was not at the

16   meeting, was he?

17   **A.**   He was not.

18   **Q.**   Okay.   And if you could take a look at 156, you were

19   asked about this on direct examination.   And here there's

20   some email traffic in 156 on March 6, 2015 regarding

21   community stakeholder engagement and this sort of thing,

22   correct?

23   **A.**   Yes, sir.

24   **Q.**   And this is from Mr. Glenn to Blake Andrews, correct?

25   **A.**   Yes, sir.

PHILLIPS - Cross by Gillen

1    Q.  Blake Andrews is the general counsel for Drummond,

2    correct?

3    A.  Yes, sir.

4    Q.  And also Curt Jones is also cc'd here?

5    A.  Yes, sir.

6    Q.  Is he a lawyer, in-house counsel at Drummond?

7    A.  At Drummond, yes, sir.

8    Q.  And then Mr. Gilbert and then you?

9    A.  Yes, sir.

10   Q.  And those are the people that were looking at the

11   strategy that was outlined in this March 6, 2015, correct?

12   A.  Yes, sir.

13   Q.  Okay.  And, again, down here when it talks about ADEM,

14   community stakeholder engagement under -- that Mr. Glenn is

15   suggesting, that under ADEM "active conversations with ADEM

16   and EMC including NPL and PA," correct?

17   A.  Yes, sir.

18   Q.  And the suggestion by Mr. Glenn regarding reaching out

19   to ADEM or EMC, you did not feel compelled to either recuse

20   or disclose the relationship with Balch and Drummond,

21   correct?

22   A.  No, sir.

23   Q.  And then you testified that there was a meeting, yet

24   another meeting -- we've gone through a lot of them, but

25   they all have the same theme, don't they?  These meetings

```
 1   that we have talked about on direct and on cross here, no
 2   Steve McKinney, right?
 3   A.  Yes, sir.  In the ones you showed me, yes, sir.
 4   Q.  Then you talked about a meeting on April 20, 2015.  Do
 5   you remember that?
 6   A.  Yes, sir.
 7   Q.  And you indicated that a number of people were present
 8   for that, and the one thing that we can be sure of is that
 9   there was no Steve McKinney at that meeting, correct?
10   A.  Right.
11       MR. GILLEN:  That's all I have.  Thank you.
12       THE COURT:  Thank you.  Mr. Bloomston?
13       MR. BLOOMSTON:  Yes, may it please the Court.
14   CROSS-EXAMINATION BY MR. BLOOMSTON:
15   Q.  Mr. Phillips, my name is Brett Bloomston.  I represent
16   David Roberson.  I just wanted to try to clear up something
17   that I heard on your direct and your cross-examination.
18   Regarding this meeting with Lanier Brown, you showed that
19   you had some confusion as to whether Mr. Gilbert or
20   Mr. Roberson may have suggested that to you.  Do you
21   remember that discourse with my --
22   A.  Yes.  Yes, sir.
23   Q.  And you do recall giving testimony before the grand jury
24   in March of 2017, correct?
25   A.  Yes.
```

1    Q.  And do you remember telling the grand jurors and

2    Mr. Martin to his questioning that it was your recollection

3    that he said "I'm going to be making a public comment.

4    And, hey, I'd like to meet Lanier Brown.  I hear he's the

5    chairman.  I haven't met him.  I'd like to meet him before

6    I come down there"?  The "I" in that is referenced right

7    after you stated that you met Oliver Robinson in the hall.

8    Does that refresh your recollection that it was, in fact,

9    Oliver Robinson who asked to meet Lanier Brown?

10   **A.**  It was so long ago.  I just remember being asked to

11   introduce Oliver Robinson to --

12   Q.  You don't have any reason to dispute the fact that a

13   court reporter got down your words verbatim --

14   **A.**  No, sir.

15   Q.  -- that you spoke to the grand jury in March of 2017?

16   **A.**  No, sir.

17   Q.  Okay.  Let me ask you this:  Mr. Phillips, were you the

18   president of Strada in 2014?

19   **A.**  I don't believe I was in 2014.

20   Q.  What was your position at Strada in 2014?

21   **A.**  I was a consultant.

22   Q.  Just a consultant?

23   **A.**  Yes, sir.

24   Q.  Have you become president at some point?

25   **A.**  Yes, sir.

PHILLIPS - Cross by Bloomston

Q.   Okay.  Were you one of the principals involved in the
Birmingham Airport Authority contract that you referred to
earlier today?

A.   I was one of the consultants on the team, yes, sir.

Q.   And your role was as consultant.  Did you have any role
oversight of the community outreach part of that contract?

A.   No, sir.

Q.   Okay.  And this contract that you -- I believe you said
it was a joint venture between AECOM and Strada or SEC.

A.   Yes, sir.

Q.   And it was to deal with community issues dealing with
the expansion of the Birmingham airport, correct?

A.   The master plan, yes, sir.

Q.   And community outreach in that aspect would be dealing
with talking to citizens.  Obviously there's noise
pollution.  There's physical eminent domain where the
houses may get bought up for expansion.  And it would be
important to talk to those stakeholders about their input
in that process, correct?

A.   Yes, sir.

Q.   And that's where community outreach would be involved in
that particular project, correct?

A.   Yes, sir.

Q.   And in 2014, September of 2014 specifically, were you
aware that AECOM and Strada had a $95,000 community

*PHILLIPS - Cross by Bloomston*

outreach contract with Oliver Robinson and his business?

**A.**   Yeah, Robinson & Robinson Communications.

**Q.**   Okay.  So you're aware and worked with Oliver Robinson in some capacity as a consultant in that AECOM joint venture that Oliver Robinson was out in the community doing community outreach programs, correct?

**A.**   Yes, sir.

**Q.**   Okay.  And you did not have any issue with that, he being a legislator?  You didn't see any problem with him in using his business for that purpose, did you?

**A.**   No, sir.

**Q.**   Okay.  September 2014 is when that contract was signed with AECOM and Oliver Robinson through R&R Communications. And you testified earlier that you met Oliver a few times at Balch & Bingham perhaps in passing, correct?

**A.**   Once in passing and once in a meeting.

**Q.**   Did you happen to talk to him about the ongoing work that he was doing for the Birmingham Airport Authority expansion?

**A.**   No, sir.

**Q.**   Just wasn't a topic of conversation?

**A.**   No, sir.

**Q.**   Okay.  You did assist Balch and the lawyers that Drummond had hired in preparing formal comments to the NPL opposition, correct?

1   A.   Yes, sir.

2   Q.   And you helped them get together a package of

3   information that is sent on to the EPA for those purposes,

4   correct?

5   A.   Yes, sir.

6   Q.   And in that preparation, you did become aware of 93

7   community letters, letters from citizens or stakeholders in

8   the Tarrant and Inglenook area, correct?

9   A.   Correct.

10  Q.   And it's not Strada's work product, is it?

11  A.   No, sir.

12  Q.   In other words, Strada did not send Ms. Carter out to

13  the community to get those letters, to get signatures on

14  them, or anything like that?

15  A.   No, sir.

16  Q.   And you're not aware if those letters -- how they got

17  into Balch's possession, are you?

18  A.   No, sir.

19  Q.   And certainly as a technical consultant, your expertise

20  or your specialty or -- you did not know everything that

21  the lawyers at Balch were doing, did you?

22  A.   No, sir.

23  Q.   And you're aware that this was a huge project in

24  fighting the EPA or resisting this listing, correct?

25  A.   Yes, sir.

1    Q.   Okay.  So it's not -- it's not something that you

2    consider unusual that you didn't know the entire scope of

3    what the lawyers were doing with regard to hiring someone

4    other than Catrena Carter to do their community outreach?

5    A.   No, sir.  Not unusual.

6    Q.   Back to that meeting with Mr. Brown at the Daniel George

7    Restaurant.  Try to refresh your recollection about how it

8    was initiated.  But we've heard some testimony that

9    Mr. Glenn was not present at that meeting.  To your

10   information and to your knowledge, he was present, was he

11   not?

12   A.   Yeah, I don't think he was there the whole time, but I

13   thought he came in and left, yes.

14   Q.   Okay.  Mr. Phillips, you were asked about your position

15   as a chair and how you had to insulate yourself from

16   certain matters that were brought before the commission,

17   for example, things that would have a conflict of interest

18   for you, correct?

19   A.   As -- I was vice chair.  Yes.

20   Q.   Okay.  Vice chair.

21   A.   Yes.

22   Q.   My apologies.  But you do remember telling us that if

23   there were matters that you had a professional conflict in

24   either voting policy on or giving input or even hearing the

25   matter, you were -- you would remove yourself from that

*PHILLIPS - Cross by Bloomston*

1   position, correct?

2   **A.**  Yes, sir.

3   Q.  On that particular matter, correct?

4   **A.**  Yes, sir.

5   Q.  And that came from your consulting with your personal

6   attorney, correct?

7   **A.**  Yes, sir.

8   Q.  And you told your personal attorney that you had this

9   position as the vice chair of the AEMC and that from time

10  to time your consulting business may produce some type of a

11  conflict.  And he gave you advice that you were to remove

12  yourself from that, correct?

13       MS. MARK:  Objection, Your Honor.  Relevance.

14       THE COURT:  Sustained.

15  Q.  (BY MR. BLOOMSTON:)  Did you always remove yourself from

16  any conflicts if they were to arise in your position as

17  vice chair?

18  **A.**  Yes, sir.

19  Q.  So you relied on your counsel to give you good advice

20  and to keep you out of trouble, correct?

21       MS. MARK:  Objection, Your Honor.  Relevance.

22       THE COURT:  Sustained.

23  Q.  (BY MR. BLOOMSTON:)  Now, you know David Roberson,

24  correct?

25  **A.**  Yes, sir.

*PHILLIPS - Cross by Bloomston*

1   Q.  And you knew him as an employee of Drummond; is that

2   correct?

3   **A.**  Yes, sir.

4   Q.  And it was actually Balch & Bingham who had a contract

5   with SEC/Strada, correct?

6   **A.**  Yes, the contract was with us.

7   Q.  Okay.  And there was nothing -- David Roberson didn't

8   sign that contract, did he?

9   **A.**  No, sir.

10  Q.  And there's nothing unusual, in your professional

11  experience, to have the end client, in this case Drummond,

12  to pay your expenses and pay your fees, correct?

13  **A.**  That's correct.

14  Q.  Okay.  And David Roberson was not your point of contact

15  at Drummond when you had any issues with that contract, was

16  he?

17  **A.**  No, sir.

18  Q.  And was that Blake Andrews, the general counsel?

19  **A.**  Yes, sir.

20  Q.  And that would be the person that you would talk to most

21  frequently, correct?

22  **A.**  Relative to the contract, yes, sir.

23  Q.  Okay.  You haven't been presented any direct emails

24  between you and David Roberson during this contract -- or

25  during this matter, have you?

1    **A.**  No, sir, not that I recall.

2    **Q.**  Do you recall him being -- or any private phone calls

3    with David Roberson?

4    **A.**  No, sir.

5    **Q.**  Would all of your work on this particular project either

6    be directed to Balch law firm or Drummond general counsel

7    if you needed it?

8    **A.**  Yes, sir.

9        MR. BLOOMSTON:  Okay.  We'll tender the witness, Your

10   Honor.

11       THE COURT:  Thank you.

12       Redirect?

13       MS. MARK:  Can we pull up Government's Exhibit 129 at

14   325?

15   REDIRECT EXAMINATION BY MS. MARK:

16   **Q.**  Mr. Phillips, you were asked a number of questions by

17   Mr. Gillen about Mr. McKinney's involvement in working on

18   the 35th Avenue matter.

19   **A.**  Yes, ma'am.

20       MS. WARD:  Can we go to at the bottom there, the two

21   entries on February 10 and February 11 for SGM?

22   **Q.**  Okay.  Mr. Phillips, looking at the entry for

23   February --

24       MR. GILLEN:  Your Honor, I object.  This is outside the

25   scope of cross.  My questions dealt with meetings that the

1   witness had with Mr. McKinney.  This is outside the scope

2   of cross.

3       THE COURT:  What's your recollection, Ms. Mark?

4       MS. MARK:  Your Honor, I believe he asked him about

5   meeting with Mr. McKinney and his involvement in this

6   matter.

7       THE COURT:  I don't recall the specifics.  I'll give

8   you leeway with the caveat that obviously Mr. Gillen can

9   address it on his recross.  You may continue.

10      MS. MARK:  Thank you, Your Honor.

11  Q.  Mr. Phillips, looking at February 11, 2015, this is an

12  entry for Steve McKinney.  You tell me if I read this

13  correctly.  It says "Provide comments to AEMC and work on

14  strategy for those comments."  "Work on strategy for those

15  comments."  Do you see where I'm referring to?

16  A.  Yes, ma'am.

17      MS. MARK:  That's all I have for that.

18  (Government's Exhibit 62 was referenced.)

19      MS. MARK:  Can we pull up Government's Exhibit 62?  You

20  can just highlight the whole email chain.

21  Q.  Mr. Phillips, you were asked a number of questions about

22  who asked you to meet with Lanier Brown -- excuse me,

23  introduce Lanier Brown to Oliver Robinson.  You remember a

24  number of those questions?

25  A.  Yes, ma'am.

1   Q.   Okay.   Looking at this bottom email there, on

2   February 16, 2015, Joel Gilbert writes to you and Trey

3   Glenn, "Have you guys been able to get Oliver and Lanier

4   connected?"  Do you see where I'm referring to?

5   A.   Yes, sir.

6   Q.   Thank you.

7        MS. MARK:  Can we pull up Government's Exhibit 161?

8   Q.   Mr. Phillips, I believe Mr. Bloomston asked you about

9   whether or not you had any correspondence with David

10  Roberson.  Does this appear to be an email dated

11  February 19, 2015 from you to Joel Gilbert and David

12  Roberson?

13  A.   Yes, ma'am.

14  Q.   And did you attach to this email the Community

15  Stakeholder Strategy, which was the PowerPoint presentation

16  that we went through earlier?

17  A.   Yes, ma'am.

18  Q.   Okay.   And was that specifically about the messaging

19  that would be put out into the community?

20  A.   It was a draft to discuss, yes, ma'am.

21  Q.   And when you had that meeting at Balch & Bingham on

22  February 25, was David Roberson present?

23  A.   Yes, ma'am.

24  Q.   Thank you.   Mr. Phillips, as a member of the commission,

25  did you meet with Director LeFleur?

1   **A.**   Yes, ma'am.

2   **Q.**   Would Director LeFleur actually travel around the state

3   and meet with each of the commissioners in advance of each

4   of the commission meetings?

5   **A.**   Yes, sir.

6   **Q.**   And you had meetings with him?

7   **A.**   I did.

8   **Q.**   And on occasion, was North Birmingham one of the items

9   that he would discuss with the commissioners when he would

10  go out to meet with them in person?

11  **A.**   That was one of the items on his sheet, on his outline.

12  **Q.**   Because those were issues that he was addressing as the

13  director of ADEM?

14  **A.**   It was an update, yes.

15  **Q.**   Okay.  On February 20, when Oliver Robinson appeared at

16  the commission, was Director LeFleur present?

17  **A.**   Yes, ma'am.

18  **Q.**   And was he generally always present for the commission

19  meetings?

20  **A.**   Yes, ma'am.

21  **Q.**   Did he give an address at the commission meeting?

22  **A.**   Yes, ma'am.

23  **Q.**   Okay.  Following the commission meeting --

24        MS. MARK:  Can we pull up Government's Exhibit 156?

25  **Q.**   And we looked at this earlier.  This is an email from

1   Trey Glenn.  And it's to Blake Andrews, Joel Gilbert,

2   yourself, and Curt Jones.  Do you see that?

3   **A.**  Yes, ma'am.

4   Q.  And that's dated March 6 of 2015.

5   **A.**  Yes, ma'am.

6   Q.  And you would agree with me that's after the February 20

7   commission meeting?

8   **A.**  Yes, ma'am.

9       MS. MARK:  If we can back out for just one second and

10  pull up the section titled "Community Stakeholder

11  Engagement."

12  Q.  Mr. Phillips, do you see there the third line that

13  starts with "ADEM"?

14  **A.**  Yes, ma'am.

15  Q.  And it reads "Active conversations with ADEM and EMC

16  including NPL and PA."

17  **A.**  Yes, ma'am.

18  Q.  You see where I'm referring to?  So after the commission

19  meeting in February, February 20, in March of 2015 was SEC

20  having active conversations with ADEM?  Based on this

21  report from Trey Glenn, were there active conversations

22  with ADEM?

23  **A.**  I don't recall what discussions were going on.  This

24  email is about billing and what ongoing activities may be

25  going.  So I don't know specifically.  But yes, it talks

*PHILLIPS - Redirect by Mark*

1   about that.

2   Q.   That was an activity that was ongoing?

3   A.   Yes, ma'am.

4   Q.   And looking at -- thank you.   So Trey Glenn is reporting

5   that there was conversations with ADEM in March of 2015,

6   correct?

7   A.   Yes, ma'am.

8   Q.   And with EMC?

9   A.   Yes, ma'am.

10  Q.   And it references the NPL?

11  A.   National Priorities List, yes, ma'am.

12  Q.   And PA.   What is PA?

13  A.   Preliminary assessment.

14  Q.   And those were two issues that ADEM was considering.

15  Those are issues before ADEM, the NPL and the preliminary

16  assessment, that ADEM was handling the preliminary

17  assessment?

18  A.   Yes, ma'am.

19  (Government's Exhibit 75 was referenced.)

20       MS. MARK:   Thank you.   Can we pull up Government's

21  Exhibit 75?

22  Q.   Mr. Phillips, do you recall that, just as we discussed a

23  moment ago, that Trey Glenn would report to Joel Gilbert,

24  David Roberson, Steve McKinney about activity from SEC?

25       MR. ESSIG:   Objection.   Beyond the scope.

*PHILLIPS - Recross by Essig*

1    THE COURT:  This is the second time an allegation like

2   this has come in.  Let me do what I did with respect to

3   Mr. Gillen's objection because I don't recall the

4   specifics.  I'll overrule the objection with the caveat

5   that Mr. Essig can get into as much detail as he wants to

6   address this issue on his recross.  You may continue.

7   Q.  (BY MS. MARK:)  Mr. Phillips, did Trey Glenn continue to

8   meet with ADEM on behalf of SEC for Balch?

9   A.  Yes, ma'am, I believe so.

10  Q.  Okay.  And looking at this email, it says "We need to

11  discuss how we can influence ADEM's position or have

12  someone in the AG's office attend the meeting as well as

13  make sure ADEM doesn't throw in the towel as well as

14  preserve any issues we want for the appeal process."  Do

15  you see where I'm referring to that?

16  A.  Yes, ma'am.

17      MS. MARK:  That's all the questions I have, Your Honor.

18      THE COURT:  Okay.  Mr. Essig, are you ready to begin?

19      MR. ESSIG:  Yes, Your Honor.  Very briefly.

20      THE COURT:  You may.

21  RECROSS-EXAMINATION BY MR. ESSIG:

22  Q.  Mr. Phillips, you were shown two emails by Ms. Mark that

23  were emails -- one, the first one, and I can't remember the

24  number, was a March 2015 email.  It was from SEC, right?

25  A.  Yes, ma'am.  I mean yes, sir.

PHILLIPS - Recross by Essig

1   Q.  That's okay.  That's okay.  From SEC/Strada, right?

2   A.  Yes, sir.

3   Q.  And it was talking about things that SEC and Strada were

4   going to do on an ongoing basis; is that right?

5   A.  Yes, sir.

6   Q.  Had nothing to do with what the AEMC was going to do; is

7   that right?

8   A.  That's correct.

9   Q.  It wasn't talking about, "Hey, AEMC, I'm Scott Phillips"

10  or "I'm Trey Glenn; here's what the AEMC is going to do on

11  this matter," is it?

12  A.  That's correct.

13  Q.  And then the last exhibit that you were just shown,

14  Government's Exhibit 75, and you were read the quote in

15  there from Trey Glenn -- or it might have been from

16  Mr. Gilbert; I can't remember -- about throwing in the

17  towel; is that right?

18  A.  Yes, sir.

19  Q.  And that was an email communication with Trey Glenn; is

20  that right?

21  A.  Yes, sir.

22  Q.  Trey Glenn was an employee or a principal at SEC or

23  Strada; is that right?

24  A.  At SEC, yes, sir.

25  Q.  Trey Glenn was not on the AEMC; is that right?

1  A.  That's correct.

2  Q.  So Government's Exhibit 75 -- and Trey Glenn wasn't

3  aware of what AEMC was doing, was he, other than what might

4  have been happening at public hearings?

5  A.  That's correct.

6  Q.  So he's not talking about what the AEMC is doing.  He's

7  talking about Trey Glenn's thoughts on that; is that right?

8  A.  Best I can tell from the email.

9      MR. ESSIG:  Thank you.

10     THE COURT:  Mr. Gillen.

11  RECROSS-EXAMINATION BY MR. GILLEN:

12  Q.  Just so we can be perfectly clear, you did not have any

13  meetings with Mr. McKinney in December, in January, in

14  February, in March and April.  We're not going to march

15  through them all.  I did it a few minutes ago.  You did not

16  meet with Steve McKinney on the matters that you discussed

17  here today, did you?

18  A.  No, sir, not that I recall.

19     MR. GILLEN:  Thank you.

20     THE COURT:  Mr. Bloomston?

21     MR. BLOOMSTON:  Just one question, sir.

22     THE COURT:  You may.

23  RECROSS EXAMINATION BY MR. BLOOMSTON:

24  Q.  Did you have any individual one-on-one meetings or phone

25  calls with David Roberson?

1    A.  No, sir.

2        MR. BLOOMSTON:  Thank you, sir.

3        THE COURT:  Anything else for your witness, Ms. Mark?

4        MS. MARK:  Just briefly, Your Honor.

5    Q.  With respect to Government's Exhibit 75, just to clarify

6    one thing, looking at the top of that email --

7        THE COURT:  Is this something that Mr. Essig --

8        MS. MARK:  Yes, Your Honor.

9        THE COURT:  Okay.

10   FURTHER REDIRECT EXAMINATION BY MS. MARK:

11   Q.  Just to clarify, Mr. Essig said this email was from Trey

12   Glenn.  Who is this email from?

13   A.  It's from Joel Gilbert.

14   Q.  And who is it to?

15   A.  It's to Steve McKinney and David Roberson.

16       MS. MARK:  Okay.  Thank you.  That's all, Your Honor.

17       THE COURT:  May this witness be excused?

18       MR. BLOOMSTON:  Yes, sir.

19       MR. ESSIG:  Yes, Your Honor.

20       MS. MARK:  Yes, Your Honor.

21       MR. GILLEN:  Yes, Your Honor.

22       THE COURT:  Thank you for being here, Mr. Phillips.

23   (Witness excused.)

24       THE COURT:  Who is the government's next witness?

25       MR. WARD:  Government calls Jeff Pitts.

1          THE COURT:  Jeff Pitts?

2          MR. WARD:  Yes, Your Honor.

3          THE COURT:  Thanks.

4          We'll take a break at 4:30 and go until 6:00 today.

5     Tomorrow, because one of the jurors has to be somewhere

6     around 6:15, from what I have been told, we will break

7     around 5:30 tomorrow.

8          Mr. Pitts, good afternoon.

9     (Witness sworn.)

10          THE COURTROOM DEPUTY:  Please state and spell your

11    first and last name for the record.

12          THE WITNESS:  Jeff Pitts.  J-e-f-f P-i-t-t-s.

13          THE COURTROOM DEPUTY:  What city and state do you

14    reside in?

15          THE WITNESS:  Birmingham, Alabama.

16                         JEFF PITTS,

17    duly sworn, was examined and testified as follows:

18    DIRECT EXAMINATION BY MR. WARD:

19    Q.  Good afternoon, Mr. Pitts.  If I could ask you just to

20    step closer to the microphone.  Thank you.

21          Where do you work?

22    **A.**  Matrix.

23    Q.  How long have you been at Matrix?

24    **A.**  Twenty-two years.

25    Q.  What's your role at Matrix?

1    A.   I am the CEO.

2    Q.   Do you have any educational degrees?

3    A.   I do.  I have a bachelor's in economics, a master's in

4    public administration.

5    Q.   Can you tell us what kind of firm Matrix is?

6    A.   We are crisis and issue management, political firm,

7    consulting.

8    Q.   You say crisis and issue management?

9    A.   Correct.

10   Q.   What kind of entities do you do work for?

11   A.   Corporate, political candidates.  We don't do any

12   government work.

13   Q.   Okay.  Do you do work for political campaigns?

14   A.   Correct.

15   Q.   And you said you do work for corporations?

16   A.   Correct.

17   Q.   And you mentioned issue management.  Could you describe

18   what that is?

19   A.   Yeah.  I mean -- I'm sorry.  I'm trying to get this

20   straight.  When a corporation or a person has an issue

21   like -- I'm trying to think of a good example.  I'll use a

22   real example.  Like BP had the oil crisis.  We worked for

23   them to help them manage the issue around the oil crisis,

24   things like that.  Usually, you know, something detrimental

25   to their business.

PITTS - Direct by Ward

1   Q.   Okay.   So an environmental issue potentially?

2   A.   Correct.

3   Q.   Does Matrix have experience doing messaging work?

4   A.   Yes.

5   Q.   Okay.   Can you tell us what that is?   What's messaging?

6   A.   Messaging is, you know, collecting data, deciding what

7   the best message is around data, for example, if you wanted

8   to communicate to the group here, you know, try to find

9   what are the key issues that, you know, they need to

10  understand and then write it and communicate it as simply

11  and concisely as possible.

12  Q.   Okay.   And communicate it to whom?

13  A.   It depends.   It could -- anybody could be in the

14  audience.

15  Q.   Whatever the relevant audience is for that issue?

16  A.   Correct.   Voters.

17  Q.   Does Matrix have experience doing community outreach

18  work?

19  A.   Yes.

20  Q.   Can you tell us what kind of community outreach

21  experience you have?

22  A.   Doing hearings.   Doing door-to-door, survey door-to-door

23  information.   Anything in the community where the community

24  interfaces with the issue.

25  Q.   Do you have and does Matrix have experience spreading a

1   message to a particular community?

2   A.   Yeah.  Delivering messages to audiences, correct.

3   Q.   Mr. Pitts, I want to ask you about the 35th Avenue

4   Superfund Site.  Are you familiar with that site?

5   A.   The name.  I'm not familiar with the geographic site

6   very well.

7   Q.   Okay.  Are you familiar with environmental issues

8   surrounding the 35th Avenue Superfund Site?

9   A.   Yes.

10  Q.   Okay.  At some point, did somebody at Balch reach out to

11  you regarding the 35th Avenue Superfund Site?

12  A.   Yes.

13  Q.   Okay.  Who reached out?

14  A.   The first recollection of any conversation I remember

15  having around the Superfund site would have been a

16  conversation with Steve McKinney on the general idea of the

17  regulation, I think either the regulation changing or

18  expanding.

19  Q.   Okay.  Did you know Mr. McKinney at that point?

20  A.   He worked at Balch.  I knew him socially, I guess you

21  could say.  I knew who he was.

22  Q.   And why did you understand him to be reaching out to

23  you?

24  A.   Just floating around the idea of the regulation and the

25  effects.  And, quite frankly, it was kind of at the

1  beginning, I believe, and they weren't real sure what the

2  effects in the community would be.

3  Q.  Were you talking general advice or strategy?

4  A.  It was really -- that conversation was really more about

5  the regulation, very general.

6  Q.  Okay.  Do you know Joel Gilbert?

7  A.  Yes.

8  Q.  Okay.  How do you know him?

9  A.  I've worked and known Joel for a decade, personally and

10 professionally.

11 Q.  What about David Roberson, do you know him?

12 A.  Yes, same.

13 Q.  Same?  Do you recall, Mr. Pitts, having interactions

14 over a period of time with Joel Gilbert and David Roberson

15 about the 35th Superfund site?

16 A.  Yes.

17 Q.  Okay.  Can you tell us about those?

18 A.  I think, best I can recall, we had two or three, maybe

19 four meetings, a couple of calls to discuss the site, the

20 regulations that were changing.  I'm sorry, I don't

21 remember exactly what the circumstances were.  And then the

22 possible impact to the community and to the companies.

23 Q.  Okay.

24     MR. WARD:  Could we have, Ms. Borden, Government's

25 Exhibit 129 at page 285?  And could we look at the

1    November 11, 2014 entry for Mr. Gilbert?

2    Q.  Mr. Pitts, this is a time entry for Mr. Gilbert, but I

3    want to draw your attention to the first few lines.  Do you

4    see where it says "conference call with Mr. Jeff Pitts

5    regarding recent communications between GASP and city

6    regarding NPL listing"?

7    A.  Yes, I see that.

8    Q.  Okay.  Would that have been one of the conversations you

9    have been describing?

10   A.  Yeah.  I mean, it could have been a conference call or

11   basically a telephone call, yes.

12   Q.  What were the communications you had with Mr. Gilbert

13   and Mr. Roberson about?  What was the sort of the purpose

14   of the calls?

15   A.  Most of the conversations were about where the issue was

16   at, you know, things if there were information or

17   misinformation in the community and also just generally

18   however they thought it was moving forward and then kind of

19   a strategy to address the evolving issue.

20   Q.  Okay.  So were you involved in at least a few

21   conversations with them about what the strategy would be

22   going forward?

23   A.  Yes.

24   Q.  Do you recall discussions about community outreach as

25   part of the strategy?

1    A.   Yes.

2    Q.   Do you know Oliver Robinson?

3    A.   I know who he is.  I do not know him personally.

4    Q.   Okay.  Back in this time frame, late 2014, early 2015,

5    did you ever come to learn that Oliver Robinson or an

6    entity he controlled was working with Balch and Drummond on

7    these issues?

8    A.   No.

9    Q.   Did Mr. Gilbert or Mr. Roberson mention that in any of

10   your meetings about community outreach?

11   A.   Not Mr. Roberson, no.

12   Q.   Okay.  Did Mr. Gilbert or Mr. Roberson ever ask for your

13   input about whether Oliver Robinson had experience doing

14   community outreach work?

15   A.   Not that I recall.

16   Q.   Were you interested in doing more work with Balch and

17   Drummond on these issues?

18   A.   Yes.

19   Q.   Were you interested in taking a more active paid role?

20   A.   Yeah, sure.

21   Q.   Okay.  Did you pitch Matrix, or was that just sort of

22   understood, that you were interested in getting more

23   involved?

24   A.   After 22 years, I'm always pitching Matrix.

25   Q.   Okay.  Did Mr. Gilbert or Mr. Roberson ever suggest to

1    you that they needed Matrix or you to do community outreach

2    on these issues?

3    **A.**  I think it was kind of understood they were looking for

4    something.  And whether it came together or not, that's

5    just how it was.

6    Q.  Okay.  Was Matrix ultimately hired to do the work?

7    **A.**  No.

8    Q.  Could Matrix have done community outreach on these

9    issues?

10   **A.**  Yes.

11   Q.  Could you have put together a grassroots campaign in

12   North Birmingham?

13   **A.**  Yes.

14   Q.  Okay.  Did you have experience doing things like that?

15   **A.**  Yes.

16   Q.  Do you know Catrena Carter?

17   **A.**  Yes.

18   Q.  How do you know her?

19   **A.**  Oh, I've known Catrena ten years.  She's a local

20   Birmingham activist that, you know, you know her in the

21   community.

22   Q.  Say that again.

23   **A.**  I've just known her socially and professionally for a

24   decade.

25   Q.  Does she have experience doing community outreach work

1    in Birmingham?

2    **A.**  Oh, yes.  Yes.

3    **Q.**  From what you've observed of her work, what do you think

4    of it?  What do you think of the quality of it?

5    **A.**  I think it's good, I mean, very good.

6    **Q.**  Is she good at what she does?

7    **A.**  Yes.

8    **Q.**  In fact, at some point did you recommend her to do

9    community outreach work for the firm SEC, Trey Glenn and

10   Scott Phillips' firm?

11   **A.**  Yeah.  Strada.

12   **Q.**  Strada.  Okay.

13   **A.**  Yes.

14   **Q.**  Did you recommend her to one of those two individuals?

15   **A.**  I recommended her to Scott.

16   **Q.**  Do you know whether she actually came to be hired by

17   Scott to do work?

18   **A.**  My understanding was that she did, but I don't know.

19   **Q.**  I want to fast-forward close to a year to the fall of

20   2015.

21       MR. WARD:  Could we look at page 657 of the same

22   exhibit?  Can we look at the entry for August 26, 2015?

23   **Q.**  Mr. Pitts, I want to draw your attention to the middle

24   of this entry, which reads "Emails to Mr. Pitts and

25   Mr. John Powe regarding meeting regarding community

 1   outreach."  Do you see that?

 2   A.  Yes.

 3   Q.  Okay.  Do you recall at some point in late August 2015

 4   reviewing a community outreach proposal for John Powe and

 5   Mr. Gilbert?

 6   A.  I remember reviewing it.  I'm not sure when it was, but,

 7   yes, I remember reviewing the proposal.

 8   Q.  Okay.  Tell us how that came about.

 9   A.  Best I remember is John was putting together a proposal,

10   and Joel and/or David -- I can't remember which -- we

11   discussed having me look at it and see what I thought about

12   it, basically.

13   Q.  Did you know John Powe at the time?

14   A.  Yes.

15   Q.  Okay.  And so what did you understand him to be

16   proposing doing?

17   A.  If I remember, he was proposing a narrow grassroots

18   community outreach proposal, is what I remember.

19   Q.  Okay.  Did you review the proposal?

20   A.  Yes, I did.

21   Q.  Did you make edits to it?

22   A.  Yes.

23   Q.  What did you think of the proposal?

24   A.  I thought it was okay.  I mean, it just needed some

25   editing and some cleaning up.

1    Q.  Okay.

2    (Government's Exhibit 208 was referenced.)

3        MR. WARD:  Can we have Government's Exhibit 208,

4    Ms. Borden?

5    Q.  Mr. Pitts, you're not on the email at the top, but

6    there's an attachment.  At the email at the top, you can

7    see that it's dated September 9, 2015 from Mr. Gilbert to

8    Mr. Roberson.  And you see in the body of the email, it

9    reads "FYI from Oliver and John.  Follow-up to discussion

10   with Jeff and I."

11       Okay.  Do you have any reason to doubt that that's a

12   reference to you, Jeff Pitts?

13   A.  I don't know what's attached.

14   Q.  Okay.  Let's look at the attachment.  And let's not

15   highlight anything yet.  Do you recognize it?  Is this the

16   proposal that you reviewed from Mr. Powe?

17   A.  It looks similar.  Yes, it looks very similar to a

18   proposal I reviewed from him.

19   Q.  Okay.  And if we go to the third page of the document.

20       MR. WARD:  Stop right there.

21   Q.  Do you see on page 2 a reference to website and

22   maintenance?

23   A.  Yes.

24   Q.  Okay.  And then back to the first page of the proposal,

25   reference to workshop activities and then a reference to

1   the Oliver Robinson Foundation?

2   **A.**  I do.

3   **Q.**  Did you know what the Oliver Robinson Foundation was

4   when you reviewed this proposal?

5   **A.**  I don't recall.  No, I don't recall seeing Oliver

6   Robinson Foundation in there.

7   **Q.**  Okay.  Do you recall knowing at the point that you

8   reviewed this proposal that Oliver Robinson's foundation

9   had been on a retainer contract with Balch for seven

10  months?

11  **A.**  No, I did not know that.

12  **Q.**  Do you recall that coming up in any meeting you had with

13  Mr. Gilbert or Mr. Roberson?

14  **A.**  I do not recall that.

15  **Q.**  Do you know what ultimately happened with Mr. Powe's

16  proposal?  Did he get hired to do community outreach?

17  **A.**  I don't know.  There was a lot of drafts.  I don't know

18  where it ended.

19  **Q.**  Okay.  You see a reference here at the top to "Getting

20  Smart," the top of his proposal.  Do you see that,

21  Mr. Pitts?

22  **A.**  Yes, I do.

23  **Q.**  Did you come to be familiar with an organization called

24  Get Smart or Get Smart Tarrant?

25  **A.**  Yes, Get Smart.

1   Q.  What did you understand Get Smart to mean?

2   A.  Get Smart Tarrant, what I understood to be was a

3   community coalition that was being built to educate

4   Tarrant.

5   Q.  Who did you understand to be involved?

6   A.  John Powe, Joel, and -- gosh.  Who else was there?

7   There was one other individual.  I can't remember the other

8   person.

9   Q.  Okay.  At some point in the fall of 2015, did your firm

10   actually do a mail-out for Get Smart Tarrant to the

11   residents of Tarrant?

12   A.  Yes.

13   Q.  How did that come about?

14   A.  They needed a certified letter sent to the residents,

15   and we've got a lot of manpower.  We have done that before.

16   We were contacted.  One of the guys in my office was

17   contacted, asked if we could do a mail-out that was

18   certified mailed.  We got the list and the letter, certify

19   mailed it, sent it, and sent them a bill for the postage

20   and printing.

21   Q.  Who contacted somebody in your firm?

22   A.  Joel and David or Joel or David.  I can't remember.

23   Q.  Mr. Gilbert or Mr. Roberson?

24   A.  Yes.

25   Q.  Okay.  And what they wanted Matrix to do was to put

 1   together a mail-out of a letter to residents in Tarrant?

 2   **A.**   Correct.

 3   **Q.**   Okay.  And did Matrix charge for it, or did you just

 4   pass on your costs?

 5   **A.**   I believe we just passed our costs on.

 6       MR. WARD:  Your Honor, may I approach the witness?

 7       THE COURT:  You may.

 8   **Q.**   (BY MR. WARD:)  Mr. Pitts, do you recall reviewing the

 9   letter that was enclosed in the mail-out that you sent out

10   to Tarrant residents?

11   **A.**   Yes.

12   **Q.**   Okay.  I have handed you a document that has been marked

13   for identification as Government's Exhibit 208.  Tell me if

14   you recognize that as the letter.

15   (Government's Exhibit 212 was referenced.)

16       THE COURT:  This is 212.

17       MR. WARD:  Oh, I'm sorry.  Is it?

18   **Q.**   212.

19   **A.**   It looks very familiar, yes.

20       MR. WARD:  Your Honor, the government would offer

21   Government's Exhibit 212.

22       THE COURT:  Let me know if there's any objections after

23   you have had a chance to review it.

24       MR. SHARMAN:  One moment, Your Honor.

25       THE COURT:  Take your time.

1          MR. McKNIGHT:  No objection, Judge.

2          MR. SHARMAN:  No objection, Judge.

3          MR. BOUCHARD:  No objection, Your Honor.

4          THE COURT:  Thanks, everyone.  212 is in and may be

5    published.

6          MR. WARD:  Thank you, Your Honor.

7    (Government's Exhibit 212 was admitted into evidence.)

8    Q.  Mr. Pitts, just to confirm, does this appear to be the

9    letter that you mailed out on behalf of Mr. Gilbert and

10   Mr. Roberson to residents in Tarrant?

11   A.  I believe it is, yes.

12   Q.  Okay.  Do you see the signature block at the bottom?

13   Amanda Robinson is listed as the executive director of Get

14   Smart Tarrant?

15   A.  Yes.

16   Q.  Do you know who Amanda Robinson is?

17   A.  I now know her to be Oliver's daughter.

18   Q.  Oliver Robinson?

19   A.  Oliver Robinson.

20   Q.  Did you know at the time that you did this mail-out that

21   she was Oliver Robinson's daughter?

22   A.  Quite frankly, I didn't know whose signature was on it.

23   I don't remember the signature on it.  But no, I did not.

24   Q.  Did you do the mail-out in October 2015?  Does that

25   sound about right?

*PITTS - Direct by Ward*

1    **A.**   2015, somewhere in there.

2    **Q.**   And to be clear, did Get Smart do the mail-out, or did

3    Matrix do the mail-out?

4    **A.**   We mailed it, yeah.   They sent us a letter with a list,

5    and we stuck it in an envelope and mailed it.

6    **Q.**   Who sent you the letter?

7    **A.**   It was in an email.

8    **Q.**   Was it Mr. Gilbert or Mr. Roberson?

9    **A.**   Most likely, yes, it was.   It went to a guy in my firm.

10        MR. WARD:   Nothing further, Your Honor.

11        THE COURT:   Thank you.

12        Well, let's take a break here, and then when we come

13   back, we can begin with the cross-exams.

14        Members of the jury, please do not talk about this case

15   during the break.   And if you leave the jury room and in

16   the unlikely event you're approached about this case,

17   please let me know.

18        We are in recess until 4:40.   Thanks, everyone.

19   (The following proceedings were had in open court

20   outside of the presence and hearing of the jury.)

21        THE COURT:   Mr. Pitts, you may step down, stretch your

22   legs.   You cannot talk about your testimony during the

23   break, though.   Thank you.

24        15 minutes, everyone.   Thanks.

25   (Break.)

```
 1    (The following proceedings were had in open court in the
 2    presence and hearing of the jury.)
 3         THE COURT:  Be seated, everyone.
 4         Cross-exam, Mr. Sharman.
 5         MR. SHARMAN:  Thank you, Your Honor.
 6    CROSS-EXAMINATION BY MR. SHARMAN:
 7    Q.  Mr. Pitts, my name is Jack Sharman.  I represent Joel
 8    Gilbert.  Do you see Mr. Gilbert in the courtroom?
 9    A.  Yes, sir, I do.
10    Q.  On direct you were asked a couple of questions about
11    community outreach, and you said with regard to this
12    matter, Matrix could have done it.  Do you remember saying
13    that?
14    A.  Yes, sir.
15    Q.  Now, you don't live in Tarrant, right?
16    A.  No, I do not.
17    Q.  You don't live in North Birmingham, right?
18    A.  Correct.
19    Q.  So you or Matrix, if you did outreach work, you would in
20    all likelihood have to go get folks to actually do that
21    boots-on-the-ground work, right?
22    A.  Correct.
23    Q.  You said on direct in response to Mr. Ward's questions
24    that y'all wanted to do the work and do more work, right?
25    A.  Correct.
```

*PITTS - Cross by Sharman*

```
 1   Q.  And you always want to do more work, right?
 2   A.  Yes.
 3   Q.  And y'all do good work, right?
 4   A.  I hope so.
 5   Q.  But at the end of the day, the client can make a choice
 6   about which firm or individual it wants to go forward with,
 7   right?
 8   A.  Correct.
 9   Q.  And that's their right to do so, right?
10   A.  Correct.
11   Q.  And you don't bring any legal or ethical or moral
12   judgments about a client favoring one firm or one approach
13   over the other, right?
14   A.  No.
15   Q.  And you don't read anything into that?
16   A.  No.
17   Q.  And with regard to a gentleman named John Powe, whom you
18   discussed with Mr. Ward, remind us who Mr. Powe is.
19   A.  John -- and I don't know his title -- works at the
20   county, but he's also an activist, a local activist.
21   Q.  You've worked with him from time to time in the past?
22   A.  Correct.
23   Q.  And you said that he came to you with a draft campaign
24   plan or proposal that he wanted you to review, right?
25   A.  That's -- yeah.  PowerPoint of some sort, yes.
```

3066

1   Q.  And you said that he does that from time to time, come

2   to you for reviewing documents?

3   **A.**  I've met with Powe several times in the last ten years.

4   Q.  All right.  And you were shown what's in evidence as

5   Government's Exhibit 208.

6       MR. SHARMAN:  Sam, could you bring that up, please?

7   Q.  Do you remember discussing first this email with

8   Mr. Ward?

9   **A.**  Yes.

10  Q.  This is where Mr. Gilbert says to Mr. David Roberson in

11  September of 2015 "FYI from Oliver and John.  Follow-up to

12  discussion with Jeff and I."  You aren't on this email, but

13  you reasonably conclude that the Jeff referred there is

14  you?

15  **A.**  Yes.

16  Q.  And then if we go to the next page, you discussed with

17  Mr. Ward the attached document, right?

18  **A.**  Yes.

19  Q.  And was I correct that you said that this looked like

20  the document that Mr. Powe asked you to take a look at,

21  right?

22  **A.**  It looked similar to a version, yes.  Looks like the

23  document, yes.

24  Q.  And what you reviewed, except for maybe some phrasing

25  and some typos and so forth, it looked reasonable to you,

1    right?

2    **A.**  Yeah.

3    **Q.**  And nothing struck you in there as being unlawful or

4    inappropriate, right?

5    **A.**  Correct.

6    **Q.**  And in general, when you worked with Mr. Powe, you found

7    him to be forthright and decent to work with, right?

8    **A.**  Right.

9    **Q.**  And then Mr. Ward also visited with you about

10   Government's Exhibit 212.

11       MR. SHARMAN:  Sam, could you call that up, please?

12   **Q.**  Now, if I understood you correctly, 212 was a letter

13   that your firm mailed out, right?

14   **A.**  Yes.

15   **Q.**  And that you received this -- you weren't certain from

16   whom you received it, but you said you may have received it

17   from Mr. Gilbert; is that right?

18   **A.**  Correct.

19   **Q.**  And you don't have any reason to believe that the letter

20   that your firm mailed out contains any untrue statements in

21   it, do you?

22   **A.**  I do not.

23   **Q.**  That's not your practice to be mailing out things that

24   you believe to be untrue, right?

25   **A.**  Yes.

```
 1    Q.  I'm sorry?
 2    A.  Correct.
 3        MR. SHARMAN:  And you can take that down, Sam.
 4    Q.  And you've known Mr. Gilbert for about ten years; is
 5    that right?
 6    A.  Give or take a couple, yes.
 7    Q.  And in that time, Mr. Gilbert, in your experience, has
 8    always been honest with you, right?
 9    A.  Yes.
10    Q.  He's been truthful with you?
11    A.  Always.
12    Q.  Very professional?
13    A.  Correct.
14        MR. SHARMAN:  No further questions.  Thank you, sir.
15        THE COURT:  Thank you, Mr. Sharman.
16        Mr. McKnight?
17        MR. McKNIGHT:  Yes, sir.
18    CROSS-EXAMINATION BY MR. McKNIGHT:
19    Q.  Mr. Pitts, I'm David McKnight.  I represent Steve
20    McKinney in this matter.
21        During your testimony, you mentioned his name one time,
22    and it was for a phone conversation you had very early on;
23    is that correct?
24    A.  Correct.
25    Q.  And it was regarding regulations, correct?
```

*PITTS - Cross by McKnight*

1   A.   Correct.

2   Q.   And thereafter, you mentioned meetings and you saw

3   emails, but Mr. McKinney's name wasn't involved with any of

4   that, correct?

5   A.   Correct.

6   Q.   Okay.  And during that one phone conversation that you

7   mentioned with Mr. McKinney, nothing improper or illegal

8   was discussed, correct?

9   A.   Correct.

10   Q.   Just a general conversation about regulations?

11   A.   Yes.

12        MR. McKNIGHT:  Thank you.  That's all I have.

13        THE COURT:  Thank you, Mr. McKnight.

14        Mr. Bouchard?

15        MR. BOUCHARD:  No cross-examination, Your Honor.

16        THE COURT:  Thank you.

17        Any redirect for this witness?

18        MR. WARD:  No, Your Honor.

19        THE COURT:  Mr. Pitts, looks like you may be free to

20   go.

21        Any objections?

22        MR. SHARMAN:  No, sir.

23        THE COURT:  Thank you for being here, sir.  Take care.

24   (Witness excused.)

25        THE COURT:  Who's your next witness, Mr. Ward?

1      MR. WARD:  The government calls Catrena Carter.

2      THE COURT:  Ms. Carter, good afternoon.

3  (Witness sworn.)

4      THE COURTROOM DEPUTY:  Please state and spell your

5  first and last name for the record.

6      THE WITNESS:  Catrena Norris Carter.  Catrena,

7  C-a-t-r-e-n-a.  Last name Carter, C-a-r-t-e-r.

8      THE COURTROOM DEPUTY:  What city and state do you

9  reside in?

10      THE WITNESS:  Birmingham, Alabama.

11                    CATRENA NORRIS CARTER,

12  duly sworn, was examined and testified as follows:

13  DIRECT EXAMINATION MR. WARD:

14  Q.  Good afternoon, Ms. Carter.

15  A.  Good afternoon.

16  Q.  What do you do for a living?

17  A.  I am a political activist -- well, a community activist.

18  I do political consulting.  I do events.  I'm the national

19  coordinator for the Selma to Montgomery March every year

20  and have a nonprofit where I train women to run for office.

21  Q.  Okay.  Busy schedule.  Can you tell us about your work

22  as a sort of community activist?  What do you mean by that?

23  What kind of work do you do?

24  A.  As far as community activism?

25  Q.  Yes.

CARTER - Direct by Ward

1    **A.**  Or community relations?

2    **Q.**  Well, let's take them in turn.  Community activism first

3    and then community relations after.

4    **A.**  Well, activism, for example, I've taken several buses

5    and vans from the state of Alabama to D.C. to lobby on

6    behalf of women, on behalf of voting rights.  I do campaign

7    work.

8    **Q.**  Okay.  What about community relations?  What kind of

9    experience do you have doing that work?

10   **A.**  Community relations is more issue-driven with things

11   that's going on on the ground in the community just doing

12   outreach and not necessarily activism.

13   **Q.**  Okay.  And then you mentioned events, putting on events.

14   And you mentioned the national coordinator for the Selma

15   March?

16   **A.**  Yes.

17   **Q.**  Tell us about that.  What is that?

18   **A.**  I've been doing that every year since I probably was 18

19   years old.  But more recently, the 50th anniversary of the

20   commemoration of the celebration of the right to vote and

21   Bloody Sunday, I was the national coordinator for that

22   where we brought in like three sitting -- three different

23   presidents and folks from all over the country came on

24   behalf the Edmund Pettus Bridge.

25   **Q.**  Okay.  When was that held?

1   A.   That was 2015.

2   Q.   Okay.  And what was your role in --

3   A.   I was the national coordinator and the executive

4   director for the foundation, for Selma to Montgomery.

5   Q.   Can you tell us about the kinds of coordination and work

6   that you had to do to get ready for that event?

7   A.   Well, you got to hold --

8        MS. HODGES:  Objection, Your Honor.  Relevance.

9        THE COURT:  Sustained.

10       MR. WARD:  Fair enough.

11  Q.   (BY MR. WARD:)  Ms. Carter, can you tell us if you know

12  Jeff Pitts?

13  A.   I do, yes.

14  Q.   Have you done work for him?

15  A.   Yes.

16  Q.   What type of work have you done?

17  A.   Mostly campaign work.

18  Q.   Okay.  Do you know Trey Glenn and Scott Phillips?

19  A.   Yes.

20  Q.   How do you know them?

21  A.   Community relations.

22  Q.   At some point, did you begin working with Trey Glenn and

23  Scott Phillips on community relations related to

24  environmental issues in North Birmingham?

25  A.   Yes.

CARTER - Direct by Ward

1    Q.  Okay.

2    (Government's Exhibit 147 was referenced.)

3        MR. WARD:  Could we have Government's Exhibit 147,

4    Ms. Borden?

5    Q.  And we'll just look at the top half of the page.

6    Ms. Carter, I don't want to take you through this email

7    chain in detail, but do you see the top two emails there,

8    the email exchange between you and Trey Glenn?

9    A.  I do.

10   Q.  From January 7, 2014?

11   A.  I do.

12   Q.  Okay.  Do you see Mr. Glenn saying at the bottom that "I

13   would like to get you started tomorrow.  I got the okay for

14   2500 per month to start.  We'll just need to stay in

15   touch -- in close coordination to see how much effort this

16   is taking.  Send your invoice to Southeast Engineering &

17   Consulting"?  Do you see that?

18   A.  Yes.

19   Q.  Okay.  At about that time, early January 2014, did you

20   begin doing work for SEC in the community outreach phase?

21   A.  Yes.

22   Q.  Tell us what kind of work you did.

23   A.  I would just go to meetings and take detailed reports on

24   who was there and what was the conversation as far as the

25   community, the people within the community and what they

 1   wanted, what was the conversation on, what people were

 2   talking about.

 3   Q.  Okay.  And that was specifically with respect to the

 4   North Birmingham environmental issues?

 5   A.  Right.

 6       MR. WARD:  Could we take a look at Government's Exhibit

 7   127?  And let's look at page 2.

 8   Q.  Ms. Carter, this is a collection of SEC invoices to its

 9   client, ABC Coke, and Balch & Bingham for the work it did

10   on the North Birmingham issues.  I want to direct your

11   attention to the bottom entry on this page, January 2014,

12   Specialist III.  Do you see there a description that reads

13   "Prepare for, participate in, and report on community and

14   grassroots meetings"?

15   A.  Yes.

16   Q.  Okay.  Is that a fair description of what you were doing

17   for SEC during this time frame?

18   A.  Yes.

19   Q.  Okay.  And did that work continue for some period of

20   time?

21   A.  It did.

22   Q.  Okay.

23       MR. WARD:  If we go, for example, to page 67 of this

24   exhibit and just magnify that part.  Perfect, Ms. Borden.

25   Q.  Do you see in this invoice, Ms. Carter, a reference to

*CARTER - Direct by Ward*

1    September 2015 to a CC?  Is that you?

2    **A.**  Yes.

3    Q.  Okay.  And do you see a description there that reads

4    "Review materials, meet with several community members, and

5    report to WSP"?

6    **A.**  Yes.

7    Q.  Is that Scott Phillips?

8    **A.**  WS -- well, I just know him as Scott Phillips, but I'm

9    assuming, yes.

10   Q.  Okay.  So that's nearly two years later.  Did you do

11   work for SEC, community outreach work for SEC on these

12   issues for two years?

13   **A.**  Yeah, about that.  Yes.

14   Q.  And did you attend the community meetings throughout

15   this time frame?

16   **A.**  Yes.

17   Q.  Okay.  Did you have a point of contact at SEC that you

18   talked to and reported back to on these issues?

19   **A.**  Yes.  It was either Scott or Trey --

20   Q.  Okay.

21   **A.**  -- Glenn.

22   Q.  And did you know who they were working for, who their

23   client was?

24   **A.**  No.

25   Q.  Okay.

1    **A.**  I -- initially, no, when all this happened.

2    **Q.**  Sure.  At some point did you come to find out that they

3    were working for Drummond and Balch & Bingham?

4    **A.**  I think Balch.  I thought Balch.

5    **Q.**  Okay.

6         MR. WARD:  Could we go to Government's Exhibit 129 at

7    page 340?

8    **Q.**  And look at the April 27 entry for Mr. Gilbert.

9    Ms. Carter, this is a time entry --

10        MR. ESSIG:  Object to relevance with this witness.

11        THE COURT:  Is this witness mentioned here?

12        MR. WARD:  Yes, Your Honor, in the second line.

13        THE COURT:  All right.  Well, I'll overrule for now.

14        MR. WARD:  Thank you, Your Honor.

15   **Q.**  Ms. Carter, this is a time entry that Mr. Gilbert wrote,

16   but it refers to you in the second line.  So could you read

17   for us just the first two lines of this entry?

18   **A.**  "Attend meeting with David Roberson and Trey Glenn,

19   Ms. Catrena Norris Carter regarding community outreach."

20   **Q.**  Thank you.  That's good.  Do you recall attending

21   meetings with Mr. Gilbert and Mr. Roberson regarding

22   community outreach?

23   **A.**  Just one meeting.

24   **Q.**  Okay.  Do you know Joel Gilbert?

25   **A.**  Yes.

CARTER - Direct by Ward

```
 1    Q.  Okay.  How do you know him?
 2    A.  We met out -- I might have been having cocktails or at a
 3    restaurant, and he came when Scott and I were having a
 4    meeting.  And that was the first time that I met him.
 5    Q.  Okay.  And --
 6    A.  It was social, though.
 7    Q.  Do you recall what time frame that was?
 8    A.  Probably 2014ish.
 9    Q.  And was that a meeting regarding North Birmingham issues
10    or something else?
11    A.  No, it was social.  Scott and I had been meeting, but
12    then Trey came, and it was social from there.
13    Q.  Okay.  What about David Roberson, did you know him?
14    A.  No.
15    Q.  Did you know where he worked?
16    A.  Not until the one meeting that we had and he was there.
17    I met him that one time.
18    Q.  Okay.  Do you recall this meeting regarding community
19    outreach?
20    A.  I do.
21    Q.  Okay.  What was the purpose of this meeting in April of
22    2015?
23    A.  To my recollection, we talked about Tarrant.  It wasn't
24    anything about North Birmingham.  It was about what was
25    going on in Tarrant.
```

CARTER - Direct by Ward

1   Q.  Was it about a community outreach strategy for Tarrant?
2   A.  Uh-huh.  Well, possibly.
3   Q.  Okay.  But one had not been begun at that point?
4   A.  No.
5   Q.  Do you recall communicating with Mr. Gilbert or
6   Mr. Roberson in the months after this meeting took place?
7   A.  I did continue to have some conversations with
8   Mr. Gilbert.
9   Q.  Okay.  Can you tell us about those?
10  A.  They were about what was going on in Mobile and in
11  Africatown, but never really conversations about North
12  Birmingham.
13  Q.  Okay.  So did you have conversations with Mr. Gilbert at
14  some point about a different project?  Is that what you
15  were referring to?
16  A.  Yes.
17  Q.  Okay.  And that was in Mobile?
18  A.  Yes.
19  Q.  Do you recall conversations with Mr. Roberson after this
20  point?
21  A.  No.
22     MR. WARD:  Can we look at page 376 of this exhibit,
23  Ms. Borden?
24  Q.  I want to direct you to the May 12 entry for Mr. Gilbert
25  and in particular the third line from the bottom.  Do you

1  see, Ms. Carter, the reference to meeting with Ms. Catrena

2  Carter -- Ms. Catrena Norris (North Birmingham outreach)

3  regarding EPA FOIA materials?  Do you see that?

4  **A.**  I see that, yes.

5  Q.  Okay.  Do you recall having a meeting with Mr. Gilbert

6  in May of 2015 on North Birmingham outreach?

7  **A.**  No.  I don't recall.

8  Q.  How much contact did you have with Mr. Glenn or

9  Mr. Phillips about your community outreach efforts in North

10  Birmingham?  How regular was your interaction with them?

11  **A.**  Weekly.

12  Q.  Weekly?

13  **A.**  Uh-huh.

14  Q.  Would you give them updates during those weekly

15  conversations?

16  **A.**  Yes.

17  Q.  Did they ever express to you that Mr. Gilbert or

18  Mr. Roberson wanted to do more community outreach work on

19  these issues in North Birmingham?

20  **A.**  No.  They would just say they wanted me to do something,

21  but never mentioning other parties.  It would just be us as

22  a team.

23  Q.  Ms. Carter, do you know Oliver Robinson?

24  **A.**  I do.

25  Q.  How do you know him?

*CARTER - Direct by Ward*

1    **A.**  He's a state representative.

2    *Q.*  Okay.  Did you know him personally in the 2015 time

3    frame?

4    **A.**  I knew him -- did I know him or did I have a

5    relationship with him?  I mean, I knew him.

6    *Q.*  You knew him casually?

7    **A.**  Yeah, but I didn't -- I never had a personal

8    relationship with him.

9    *Q.*  Did Trey Glenn or Scott Phillips ever tell you anything

10   during your two years working on these issues, did they

11   ever tell you anything about Oliver Robinson or Oliver

12   Robinson's foundation having been hired to do community

13   outreach work in North Birmingham?

14   **A.**  No, never.

15   *Q.*  And then the two meetings that are referred to in

16   Mr. Gilbert's time entries that you had with Mr. Gilbert,

17   do you recall Mr. Gilbert ever mentioning Oliver Robinson

18   or Oliver Robinson's foundation as a potential way of doing

19   community outreach in North Birmingham?

20   **A.**  No.

21   *Q.*  Did Mr. Gilbert or Mr. Roberson ever ask you to

22   coordinate with Oliver Robinson's foundation to do this

23   work?

24   **A.**  No.

25   *Q.*  And did Mr. Glenn or Mr. Phillips ever ask you that?

1   **A.**   No.

2   **Q.**   You said you attended community meetings over time.  Was

3   that over the course of the two years, you attended a

4   number of community meetings?

5   **A.**   Uh-huh.

6   **Q.**   Okay.  Did you see various community activists or other

7   players at those meetings over time?

8   **A.**   Yes.

9   **Q.**   Did you ever see Oliver Robinson at any of those

10   meetings?

11   **A.**   Not that I recall.  No.

12        MR. WARD:  Nothing further, Your Honor.

13        THE COURT:  Thank you.

14        Cross-exam, Mr. Essig?

15        MR. ESSIG:  Yes, Your Honor.

16   CROSS-EXAMINATION BY MR. ESSIG:

17   **Q.**   Good afternoon, Ms. Carter, how are you?

18   **A.**   I'm good.  How are you?

19   **Q.**   I'm good.  My name is Brandon Essig, and I represent

20   Joel Gilbert.  You know Mr. Gilbert; is that right?

21   **A.**   I do.

22   **Q.**   And, Ms. Carter, do you see Mr. Gilbert in the courtroom

23   here today?

24   **A.**   I do.

25   **Q.**   And you interacted with Mr. Gilbert quite a bit during

1    the time you were doing community outreach in North

2    Birmingham; is that right?

3    A.   Toward the end, yes.

4    Q.   Okay.  Had a lot of conversations with Mr. Gilbert;

5    would that be fair to say?

6    A.   Yes.

7    Q.   And y'all had a decent number of discussions about the

8    work that you were doing for Strada, SEC, and Balch &

9    Bingham; is that right?

10   A.   Well, Strada and SEC, yes.

11   Q.   And y'all talked about the potential of you doing some

12   additional work for Balch & Bingham; is that right?

13   A.   Yes.

14   Q.   And you like Mr. Gilbert?

15   A.   I do.

16   Q.   All right.  And always found Mr. Gilbert to be a

17   transparent and honest person with you; is that right?

18   A.   I did, yes.

19   Q.   And always found him to be truthful; is that right?

20   A.   Yes.  To me, yes.

21   Q.   Now, Ms. Carter, what I want to do is talk a little bit

22   about -- you said that you've been involved in either sort

23   of community activist work or community relations work

24   since the age of 18; is that right?

25   A.   Yes.

CARTER - Cross by Essig

1   Q.  And when you were 18 years old -- do I understand

2   correctly you grew up in Selma, Alabama?  Is that right?

3   A.  That's right.

4   Q.  And I think you testified on direct examination that

5   from age 18, you had done some work on the annual Selma to

6   Montgomery March celebration.

7   A.  Yes.

8   Q.  Is that right?

9   A.  Yes.

10  Q.  And am I understanding correctly, too, is that you got

11  into that work based on a relationship that you had with

12  Senator Hank Sanders from Selma?  Is that right?

13  A.  That's correct.

14  Q.  And the way you got involved with that work for the

15  Selma to Montgomery March with Senator Sanders is he was

16  one of the individuals that helped organize that event; is

17  that right?

18  A.  Founder, yes.

19  Q.  As a matter of fact, he's the founder of the foundation

20  that puts that event on?

21  A.  Correct.

22  Q.  And the same was true, Senator Sanders was involved in

23  that when the 50th anniversary event occurred as well; is

24  that right?

25  A.  That's right.

CARTER - Cross by Essig

1   Q.  And you're aware, are you not, through your work on the

2   50th anniversary march that Senator Quinton Ross had a

3   contract where he did some work on that particular event as

4   well?  Are you aware of that?

5   A.  I wasn't.

6   Q.  Okay.  Now, when you got hired by SE+C and Strada, you

7   got hired by them and you had a sort of a specific very

8   limited purpose; is that right?

9   A.  Yes.

10  Q.  And that specific purpose was you'd go to community

11  public meetings; is that right?

12  A.  Uh-huh.  Yes.

13  Q.  You take down notes of what you see there?

14  A.  Yes.

15  Q.  And then you report back to either Mr. Glenn or

16  Mr. Phillips; is that right?

17  A.  That's right.

18  Q.  Now, Ms. Carter, how are you making those reports?  Were

19  you doing that orally?  Were you giving them something

20  written?  How was that happening?

21  A.  Well, I would usually record them and then make notes on

22  anything that I thought was extra, extra relative to

23  revitalizing the community, which was what my conversation

24  was and what my contract was about in talking about what

25  the community wanted --

1    Q.  Okay.

2    A.  -- to rebuild and revitalize.

3    Q.  Okay.  And can you tell us, what were the meetings that

4    you were going to?  Where were they happening?  Who was

5    running those?  Who was present?

6    A.  Most of them would be at different churches.  The EPA

7    would call meetings and bring information just on updates

8    on what was going on with the cleanup efforts.  And then

9    there would also be community leader meetings where it

10   would be the citizens within the areas again telling their

11   personal stories about their properties and about what they

12   wanted and what their expectation was and their

13   frustrations.

14   Q.  Okay.  And so it would be fair to say -- and nothing

15   wrong with this, Ms. Carter -- you didn't have a lot of

16   knowledge on environmental issues?

17   A.  No.

18   Q.  Is that right?

19   A.  No.

20   Q.  Had never dealt with the politics that surrounded

21   environmental issues before; is that right?

22   A.  No.

23   Q.  That doesn't sound like that's actually what you were

24   asked to go to those meetings for --

25   A.  No.

CARTER - Cross by Essig

Q.   -- would that be fair to say?

A.   No, sir.

Q.   I mean, your focus was let me go hear about the sort of the community revitalization aspect of these meetings and report that back to Mr. Phillips and Mr. Gillen?

A.   Yes.

Q.   Did your role ever get to be anything larger than that out there?

A.   No.

Q.   And we saw, Mr. Ward showed you your bills or the bills that Strada sent to the client, to their client based on the work you did.

A.   Yes, sir.

Q.   And sometimes you worked on an hourly rate; would that be fair to say?

A.   No, it was just a straight retainer.

Q.   Okay.  We saw some hours reported.

A.   Yeah, I think they reported hourly, but I just had a monthly retainer that never changed.

Q.   And your retainer never changed.  And one of the reasons you do that in a community outreach situation is sometimes your work might be more and you might be really busy one month and the next month you may not have a lot going on; is that right?

A.   Correct.

CARTER - Cross by Essig

1   Q.  But you just keep a flat fee because that makes sense

2   for you and it makes sense for the client; is that right?

3   **A.**  Correct.

4   Q.  And you would have understood in this situation in these

5   circumstances that Strada and SEC, they had a client

6   ultimately that they had to satisfy; is that right?

7   **A.**  Right.  I found out later that -- yeah.

8   Q.  Right.  Right.  And so you understand, then, that it

9   would be the -- whatever client has hired SEC and Strada,

10  it's ultimately their decision what type of community

11  engagement work they want done and who is involved in that

12  community engagement work; is that right?

13  **A.**  Sure.

14  Q.  And you certainly wouldn't have been privy to any

15  discussions that maybe Balch & Bingham, Strada, SEC, or the

16  Drummond Company had had about the type of community

17  engagement work they were wanting?

18  **A.**  No.  Other than me.

19  Q.  Yes, ma'am.

20  **A.**  Other than myself.

21  Q.  Other than yourself, right.  And you wouldn't know

22  whether or not Drummond as the client wanted more of a

23  community engagement effort than what Strada and SE+C was

24  providing them?

25  **A.**  No.

1    Q.  And you don't know what information Strada or SE+C was

2    giving to Balch & Bingham, do you?

3    **A.**  No.

4    Q.  And you don't know if they ultimately may have

5    determined that it -- they just weren't getting enough

6    information from their client.  You don't know if that may

7    not be the case?

8    **A.**  No.

9    Q.  Now, in the time that you were out in the community

10   doing community engagement, you came into contact with some

11   other public officials; is that right?

12   **A.**  Yeah, there would be a few there.  Sure.

13   Q.  And one of them was Councilman William Parker; is that

14   right?

15   **A.**  Yes.

16   Q.  And he had some young ladies that he had out there doing

17   community engagement for him; is that right?

18   **A.**  That's right.

19   Q.  Okay.  And those were ladies that were doing community

20   engagement with the North Birmingham Community Coalition;

21   is that right?

22   **A.**  Yes.

23   Q.  And did you understand that the North Birmingham

24   Community Coalition was an effort that was being funded by

25   the EPA?  Did you understand that?

**A.** Which part of it?

**Q.** Well, I don't know.  I'm just asking.  I'm asking --

**A.** The consultants or the dirt work?

**Q.** Yeah, I'm just asking if you knew at all whether the consultants, the dirt work, or anything was being done by the EPA?

**A.** Yes.

**Q.** Is it both?  Were you aware that both were being done or maybe just the dirt work, or do you know?

**A.** Well, I knew that EPA was responsible for the actual cleanup, and I knew that the city had hired and William Parker had hired consultants that were also going out to engage the community and see, you know, what the temperature was within his district.

**Q.** All right.  And you described the work you've done in your career as either community activism or community outreach; is that right?

**A.** Right.

**Q.** And I think you mentioned that includes some politics from time to time; is that right?

**A.** Sure.

**Q.** Nothing unusual in your career doing community activism and community outreach about interacting with public officials on issues; is that correct?

**A.** No.  Not at all.

1  Q.  Issues like this facing the community, nothing unusual

2  about having public officials involved?

3  A.  No.

4  Q.  And let me ask you this, Ms. Carter.  You grew up in

5  Selma; is that right?

6  A.  That's right.

7  Q.  And currently you live in Hoover, Alabama?

8  A.  That's right.

9  Q.  Is that right?

10  A.  Uh-huh.

11  Q.  Pretty good distance away from the 35th Avenue Superfund

12  Site?

13  A.  Sure.

14  Q.  And how long have you been in Hoover?

15  A.  In Hoover, probably eight to ten years.

16  Q.  Okay.  And so did you come straight there when you moved

17  from the Selma, Montgomery --

18  A.  No, I lived in Center Point.

19  Q.  Okay.  But for the last eight to ten years, you've been

20  in Hoover?

21  A.  That's correct.

22     MR. ESSIG:  No further questions.

23     THE COURT:  Thanks.

24     Who's up next?

25     MS. HODGES:  Your Honor, I have no questions for this

CARTER - Cross by Bloomston

1    witness.  Thank you, Ms. Carter.

2        THE COURT:  Thank you, Ms. Hodges.

3        Mr. Bloomston, your witness.

4    CROSS-EXAMINATION BY MR. BLOOMSTON:

5    Q.  Good afternoon.

6    A.  Good afternoon.

7    Q.  My name is Brett Bloomston, and I am an attorney for

8    David Roberson.  I believe you testified that you had met

9    Mr. Roberson once at a meeting.

10   A.  Yes.

11   Q.  And that meeting was in April of 2015; does that sound

12   right?

13   A.  Round about.

14   Q.  Okay.  And you were asked a question by Mr. Ward about

15   the outreach.  And I believe Mr. Ward's question was when

16   you met with them, you weren't aware that any community

17   outreach had begun yet.  Do you remember --

18   A.  Mr. Ward?

19   Q.  Yes, from the government.

20   A.  Oh, okay.  I'm sorry.  I'm sorry.

21   Q.  Do you remember being asked that question?

22   A.  Yes.

23   Q.  Now, when you signed a contract or you began your work

24   with Strada, that was in January of 2014, correct?

25   A.  Round about, yes.

CARTER - Cross by Bloomston

1  Q.  Okay.  So you would have gotten out into the community

2  and started your -- it's been described to us as reactive

3  outreach.  In other words, you're listening, you're

4  absorbing things, and you're taking that back to the folks

5  at Strada.

6  A.  That's right.

7  Q.  All right.  So if that started in 2014 and you're

8  attending these meetings, you're not aware of what the

9  Balch law firm or Drummond is doing parallel to what you're

10 doing, are you?

11 A.  No.

12 Q.  Are you aware that they may have been in the communities

13 knocking on doors, getting things signed --

14 A.  No.

15 Q.  -- distributing information, fliers, things like that?

16 A.  No.

17 Q.  And that would be a more proactive community engagement,

18 correct?

19 A.  That's correct.

20 Q.  Okay.  And that's something that you're used to seeing,

21 correct?

22 A.  Sure.

23 Q.  Okay.  And you have been asked this question before

24 today.  The work that you did in the communities in Tarrant

25 and Inglenook, do you believe that it was beneficial to

1    those communities?

2    **A.**   I thought so, yes.

3    **Q.**   Okay.  And do you think it was beneficial because you

4    were helping get more information to those citizens?

5    **A.**   Well, I was hoping -- because, again, I never gave -- I

6    never engaged, but I was hoping that it would start a

7    partnership between the communities at the grassroots level

8    and the corporate community that would assist in rebuilding

9    those communities.

10   **Q.**   I'm going to give you credit for one of my favorite

11   quotes I've heard in a long time.  You said that if you're

12   not at the table, you're on the menu.

13   **A.**   On the menu.

14   **Q.**   And what you meant by that is that you would have liked

15   to see these communities and these corporations get

16   together; is that correct?

17   **A.**   That's correct.

18       MR. BLOOMSTON:  Okay.  Thanks for your testimony.

19       THE COURT:  Any redirect?

20       MR. WARD:  No, Your Honor.

21       THE COURT:  Ms. Carter is free to go, I'm assuming?

22       MR. MARTIN:  Yes, sir.

23       MR. BLOOMSTON:  Yes.

24       THE COURT:  Ms. Carter, have a good evening.

25   (Witness excused.)

 1      THE COURT:  Who is your next witness?

 2      MR. WARD:  The government calls Patrick Runge.

 3      THE COURT:  Mr. Runge, good evening.

 4  (Witness sworn.)

 5      THE COURTROOM DEPUTY:  Please state and spell your

 6  first and last name for the record.

 7      THE WITNESS:  It's John Runge, J-o-h-n R-u-n-g-e.

 8      THE COURTROOM DEPUTY:  What city and state do you

 9  reside in?

10      THE WITNESS:  Homewood, Alabama.

11                          PATRICK RUNGE,

12  duly sworn, was examined and testified as follows:

13  DIRECT EXAMINATION BY MR. WARD:

14  Q.  Good evening, Mr. Runge.  Where do you work?

15  **A.**  At Balch & Bingham.

16  Q.  How long have you worked there?

17  **A.**  This is my ninth year.

18  Q.  What's your position?

19  **A.**  I'm an associate attorney.

20  Q.  Before you got to Balch, what did you do?

21  **A.**  I taught high school one year in Atlanta as a religion

22  teacher.  Then I did youth ministry for three years in

23  Washington, D.C.  And then I was a paralegal at a law firm

24  in Washington, D.C. as well.

25  Q.  Could you give us your educational background?

*RUNGE - Direct by Ward*

1   **A.**  I went to college at Emory in Atlanta, and I went to law

2   school at Notre Dame in Indiana.

3   **Q.**  Do you have a law degree?

4   **A.**  Yes, sir.

5   **Q.**  During your time at Balch, have you been assigned to a

6   particular section?

7   **A.**  I started off in the litigation section for the first

8   three years I was at Balch, and then I switched to the

9   environmental section, and I've been there since then.

10  **Q.**  So were you in the environmental section during 2014,

11  '15, and '16?

12  **A.**  Yes.

13  **Q.**  And during that period, did you focus your time at work

14  on environmental matters?

15  **A.**  Yes.

16  **Q.**  Did you work with a number of partners in the section?

17  **A.**  Yes, I worked with all the partners in the section.

18  **Q.**  Okay.  Was Joel Gilbert a partner in the section?

19  **A.**  Yes, he was.

20  **Q.**  Did you work with Joel Gilbert?

21  **A.**  I did.

22  **Q.**  What about Steve McKinney?

23  **A.**  Yes.  He was the head of the section.

24  **Q.**  Okay.  Did you do work with him during this period?

25  **A.**  I did.

1   Q.  During the 2014 and '15 period, how much of your work

2   would you say you got from Mr. Gilbert?

3   A.  Probably about -- it's hard to estimate because it would

4   change daily or weekly, but sometimes the majority of my

5   work and sometimes not as much but probably about 10 or 20

6   percent or so.  It's hard to estimate.  I'm sorry.

7   Q.  Did you get a fair amount of work from Mr. Gilbert sort

8   of throughout the 2014 and '15 year?

9   A.  Yes.

10  Q.  Was he a partner you worked -- was he one of the

11  partners you worked with most?

12  A.  He -- yes, probably.

13  Q.  At some point, Mr. Runge, did you begin working on

14  matters involving Drummond Coal Company?

15  A.  Yes.

16  Q.  When was that?

17  A.  I think it was in the fall of 2014 or late summer of

18  2014.

19  Q.  Did you know whether at that time Drummond was already a

20  client of Balch?

21  A.  I think Drummond had become a client of Balch shortly

22  before I started working for them.

23  Q.  Shortly before you started at Balch or shortly before

24  you started working for Drummond?

25  A.  For Drummond.  I'm sorry.

*RUNGE - Direct by Ward*

1   Q.   Okay.   Do you know who at Balch was involved in getting

2   the work from Drummond?

3   **A.**   I know that Joel was heavily involved, and I think Steve

4   was somewhat too.

5   Q.   So Mr. Gilbert and Mr. McKinney both?

6   **A.**   Yeah.

7   Q.   Did you work on matters for Drummond involving the 35th

8   Avenue Superfund Site?

9   **A.**   Yes, I did.

10   Q.   Okay.   Did you work on a matter involving the proposed

11   listing of that site on the National Priorities List?

12   **A.**   Yes.

13   Q.   Did you work on a matter involving the proposed

14   expansion of that site into Tarrant?

15   **A.**   I did some work on that too.

16   Q.   Did you do more work for one of the two matters?

17   **A.**   I did.   I did a lot more work at the beginning in the

18   initial listing process and less work with the Tarrant

19   stuff.

20   Q.   Okay.   What type of work did you do on these matters?

21   **A.**   My role is mainly in legal research.   So different

22   issues would arise, and I would be asked to look into --

23   just research different aspects of them.

24   Q.   Who did you typically get your work from with respect to

25   these matters?

1   **A.**   The majority of the work I think was probably from Joel,

2   but some of it may have come from Steve too.

3   Q.   Okay.   And was the typical process that you would get an

4   assignment or project, you would complete the project, and

5   then you would report back or provide that work product to

6   the partner?

7   **A.**   Yes.

8   Q.   Did your work include drafting white papers?

9   **A.**   Yes, it did.

10   Q.   Okay.   Did it include drafting comments?

11   **A.**   Yes.

12   Q.   Comments that were submitted to the EPA?

13   **A.**   Yes.

14   Q.   And did it include comments that were submitted to the

15   EPA on behalf of Drummond or ABC Coke?

16   **A.**   I think I did work on some aspects of their comments.

17   Q.   Okay.   Did it also include work on comments on behalf of

18   the attorney general?

19   **A.**   Yes.

20   Q.   And did your work include drafting memos on various

21   legal issues?

22   **A.**   Yes.

23   Q.   Over the course of your work on these matters, did you

24   have periodic interaction with Mr. Gilbert and Mr. McKinney

25   on them?

*RUNGE - Direct by Ward*

1    **A.** I did.

2    **Q.** Okay.  Did you have meetings with them?

3    **A.** Yes, we'd have office meetings and things like that.

4    **Q.** How else did you communicate?

5    **A.** Over the phone or over email.

6    **Q.** Would you say you had pretty regular communication with

7    them?

8    **A.** Yes.

9    **Q.** On these issues?

10   **A.** Uh-huh.

11   **Q.** Okay.  Did Balch hold internal staff meetings at some

12   point to discuss the Drummond matters?

13   **A.** We did.  So I think when we first got -- when Balch

14   first got Drummond as a client, Mr. McKinney and

15   Mr. Gilbert would hold meetings where they would -- we

16   would just -- they would just discuss the different issues

17   that were going on and make sure that everyone was covering

18   all their bases and the client was getting served.

19   **Q.** Did you attend some of those meetings?

20   **A.** I did.

21   **Q.** Did other attorneys attend some of those meetings?

22   **A.** Yes.

23   **Q.** Okay.  In a typical meeting, how many attorneys would be

24   in the room?

25   **A.** Probably about eight.

*RUNGE - Direct by Ward*

1   Q.   Who typically led the meetings?

2   **A.**   I think it would depend on -- they weren't always

3   necessarily formally led, but whoever had an issue to talk

4   about.   And Steve, Mr. McKinney, he was our section head,

5   so he kind of naturally led a lot of things.   And then Joel

6   would lead sometimes too.

7   Q.   We've been talking in general terms about the 2014-2015

8   time frame.   In particular at the end of 2014 and the

9   beginning of 2015, did you devote a good portion of your

10   time during those months to the 35th Avenue Superfund

11   issues?

12   **A.**   Yes.

13   Q.   Okay.   And were you working on the NPL issue or the

14   Tarrant issue during that period?

15   **A.**   The NPL issue.

16   Q.   And why do you recall that period in particular as being

17   an active period?

18   **A.**   EPA had proposed listing the site on -- the 35th Avenue

19   site on the National Priorities List, on the NPL.   And so

20   we were responding and drafting comments.

21   Q.   You were responding and drafting comments to be

22   submitted to the EPA --

23   **A.**   Yes.

24   Q.   -- in January 2015?

25   **A.**   Yes.

*RUNGE - Direct by Ward*

1    Q.  Did you interact with Mr. Gilbert and Mr. McKinney

2    during this time period?

3    A.  Yes.

4        MR. WARD:  Could we pull up Government's Exhibit 129 at

5    page 327?

6    Q.  And look at the bottom entry on the --

7        MR. WARD:  I'm sorry.  Maybe the page just before.

8    326.  Okay.

9    Q.  Mr. Runge, during this period, did you ever learn from

10   Mr. Gilbert or Mr. McKinney that there were discussions

11   ongoing about engaging Oliver Robinson or Oliver Robinson's

12   foundation to work for Balch and Drummond?

13   A.  I don't remember anything like that.  I wasn't really

14   involved in that aspect of the project.

15   Q.  Okay.  When you say "that aspect of the project," what

16   aspect do you mean?

17   A.  Well, there was just different things going on.  And so

18   I guess this was more the Tarrant stuff, and I just

19   wasn't as -- at this point, I wasn't very involved in the

20   Tarrant -- in what was going on in Tarrant and what we were

21   doing up in Tarrant.  So because I don't -- because I

22   wasn't involved, I can't describe it very well.

23   Q.  But you were very involved in NPL issues?

24   A.  Yes, that's what I was at this point --

25   Q.  Was that the focus of your energy in January of --

1    December of 2014 and January of 2015?

2    A.   This was a lot of it and just doing research on various

3    legal issues that arose.

4    Q.   Okay.  Did you ever learn from Mr. Gilbert or

5    Mr. McKinney during this period that there were discussions

6    ongoing to engage Oliver Robinson's foundation to do work

7    regarding the NPL issues?

8    A.   I don't remember anything about that.

9    Q.   In the 2014 and 2015 time frame, do you recall any

10   discussion at Balch of Oliver Robinson or his foundation

11   doing work for Drummond?

12   A.   No.

13   Q.   Okay.  During that time frame, 2014 and 2015, do you

14   recall ever hearing the name "Oliver Robinson Foundation"?

15   A.   I don't remember it specifically, no.

16   Q.   Do you recall it during any of the staff meetings that

17   you described?

18   A.   No.

19   Q.   Mr. Runge, at some point in mid 2015, did you draft a

20   resolution on the Superfund issues?

21   A.   Yes.

22   Q.   Okay.  Did someone ask you to do that?

23   A.   Yes, Joel did.

24   Q.   Do you recall how he asked you?

25   A.   I had -- I recall him calling me on the phone and

1    discussing it.  That's my memory.

2    Q.  Okay.  Did he give you instruction or direction on what

3    he wanted the resolution to say?

4    **A.**  I can't really remember the specifics, but I just

5    remember him asking for a resolution, and then what's in

6    the resolution that I drafted would have been what he

7    requested.

8    Q.  Do you know how Mr. Gilbert intended to use the

9    resolution?

10   **A.**  Well, my understanding was that we would -- and I

11   didn't -- I can't remember at the time if there was already

12   somebody lined up or not, but a state legislator would --

13   if they agreed with the positions would enter it into or

14   would propose it or whatever the legal -- the legislative

15   process is.  And then the state legislator -- legislature

16   would vote on it as either a show of support for the

17   resolution or against it.

18   Q.  Okay.  And assuming that the draft resolution was

19   ultimately passed by the legislature, how would Mr. Gilbert

20   have planned to use it, if you know?

21   **A.**  I don't know the specifics, but -- and just in general,

22   he would have used that as a -- just to show that --

23   general support for that position in various contexts.

24   Q.  Do you know whether the resolution was ultimately

25   passed?

1    **A.**   I think it was.

2         MR. WARD:   Let's look at Government's Exhibit 129 at

3    377, Ms. Borden, and look at the two -- the entries on

4    May 18 for Mr. Gilbert and Mr. Runge.

5    **Q.**   Mr. Runge, do you see an entry by your -- are your

6    initials JPR?

7    **A.**   Yes, they are.

8    **Q.**   Do you see an entry dated May 18, 2015 that says "Draft

9    Alabama legislative joint resolution"?

10   **A.**   Yes.

11   **Q.**   That was regarding oversight of EPA environmental

12   justice activities throughout Alabama?

13   **A.**   Yes.

14   **Q.**   Was May 18, 2015 the day that you were asked to start

15   working on this resolution?

16   **A.**   If it's the first day that I have a time entry for it,

17   which it appears to be, then I would say yes.

18   **Q.**   Did you send Mr. Gilbert the draft after you finished

19   it?

20   **A.**   Yes.

21   **Q.**   Did he edit it?

22   **A.**   Yes, I think he did.

23   **Q.**   And are you aware whether he ultimately passed that on

24   to be sponsored by someone in the legislature?

25   **A.**   That's what I recall.

*RUNGE - Direct by Ward*

1    Q.  And looking at the top entry on the -- it's magnified

2    here.  Do you see an entry for Mr. Gilbert, same day, that

3    says "Prepare for and attend meeting with Messrs. David

4    Roberson and Oliver Robinson regarding community outreach;

5    office conference with S. McKinney regarding status of

6    various issues"?  Do you see that?

7    A.  Yes.

8    Q.  When Mr. Gilbert called you to ask you to draft the

9    resolution, did he say anything about having been in a

10   meeting with Mr. Roberson and Oliver Robinson that same

11   day?

12   A.  I don't remember him mentioning anything like that.

13   (Government's Exhibit 91 was referenced.)

14       MR. WARD:  Go to Government's Exhibit 91, Ms. Borden.

15   Q.  And you see, Mr. Runge, here on the first page SJR 97 by

16   Senator Waggoner?

17   A.  Yes.

18   Q.  And the date stamp of June 4, 2015?

19   A.  Yes.

20   Q.  Which was, I suppose, a couple of weeks after the time

21   entries we just looked at?  Okay.

22       MR. WARD:  Can you go to the second page of that

23   resolution?  Just magnify the entire second page.

24   Q.  Does this page, Mr. Runge, seem familiar to you as the

25   first page of the resolution that you drafted?

RUNGE - Cross by Doss

1    **A.**   It looks like it, yes.

2        MR. WARD:  Nothing further, Your Honor.

3        THE COURT:  Thank you, Mr. Ward.

4        Cross-exam?

5        MR. DOSS:  Yes, Your Honor.

6    CROSS-EXAMINATION BY MR. DOSS:

7    *Q.*  Good afternoon, Mr. Runge.  My name is Jeff Doss, and

8    I'm one of the attorneys representing Mr. Joel Gilbert.  I

9    just have some follow-up questions for you.  But I'm going

10   to start with generally the kind of work you were doing

11   with respect to the Drummond matters.

12       Is it fair to say that you probably billed hundreds of

13   hours to Drummond-related work concerning at least the

14   35th Avenue NPL issue?

15   **A.**  That's definitely possible.

16   *Q.*  You mentioned that you did some legal research.  That

17   was a big part of the work that you were doing for

18   Drummond?

19   **A.**  Yes.

20   *Q.*  I understand what you mean by legal research, but help

21   us understand what you mean by legal research, please.

22   **A.**  So, in this context, basically EPA had proposed that

23   certain area of town should be listed on the National

24   Priorities List.  And if you get on the National Priorities

25   List, EPA -- it makes you a priority for EPA to investigate

1   and then they can -- oh, I'm sorry.  I apologize.

2   Q.  Let me clarify.  Even more fundamental than that, when

3   we talk about legal research generally, it's typically not

4   going to a library and pulling a book off a shelf.

5   A.  Oh, no.  I'm sorry.  Right.

6   Q.  Right.  You have something maybe called Westlaw, right?

7   A.  Yes.

8   Q.  And you have access to cases and opinions and statutes

9   and regulations and administrative law and a whole host of

10  legal research tools, correct?

11  A.  Yes.

12  Q.  And so as part of your legal research that you were

13  doing on these Drummond matters, you were consulting this

14  wide array of legal authority in helping you come up with

15  legal strategies and legal opinions on the issues related

16  to these Drummond matters, correct?

17  A.  Yes.  I wasn't involved as much in the strategy, but

18  yes.

19  Q.  And fair point.  So you might have been tasked by

20  Mr. Gilbert, for example, to go and research a particular

21  issue related to CERCLA, which is the Superfund law.  And

22  then you would go consult that legal authority and you

23  would look at how courts have interpreted the law, how

24  agencies had interpreted the law.  Then you would report

25  your findings back to Mr. Gilbert, correct?

*RUNGE - Cross by Doss*

1    **A.**   Yes.

2    *Q.*   Okay.   And you mentioned that you drafted memos,

3    correct?

4    **A.**   Yes.

5    *Q.*   When you're talking about a memo in the legal context,

6    is it fair to say that's sort of like an interoffice

7    research paper?

8    **A.**   Yeah.   So a memo can be more or less formal.   And I'd

9    say it's usually -- in this context, it's usually an answer

10   to a question in a kind of a more or less formalized form.

11   It could be an email or it could be a piece of paper with

12   the word "memo" on top of it.

13   *Q.*   Certainly.   And that would reflect your legal analysis

14   of an issue that you had been asked by another attorney at

15   Balch to research, correct?

16   **A.**   Yes.

17   *Q.*   So Mr. Gilbert might ask you a particular question about

18   CERCLA.   You consult the research, you write up your

19   analysis, and you provide that answer to Mr. Gilbert, for

20   example, correct?

21   **A.**   Yes.

22   *Q.*   And you drafted white papers, correct?

23   **A.**   Yes.

24   *Q.*   And white papers are typically the same idea.   It's a

25   legal analysis, but it would be generally something that

RUNGE - Cross by Doss

1    you would share outside of the firm, correct?

2    **A.**  Yes.

3    Q.  You might share it with a client, right?

4    **A.**  Yes.

5    Q.  You might share it with public officials, correct?

6    **A.**  Yes.

7    Q.  Okay.  And you also mentioned that you assisted in

8    preparing Drummond's comments to the EPA.  Do you remember

9    that?

10   **A.**  Yes.

11   Q.  Okay.  And there were lots of lawyers who were involved

12   in that process, right?

13   **A.**  With the drafting of the comments?

14   Q.  Yes, sir.

15   **A.**  On different levels.  I drafted -- I did a lot of the --

16   yes, but I did a lot of Drummond work.

17   Q.  And those comments reflected again a legal analysis of

18   the issue that the EPA was considering, correct?

19   **A.**  Yes.

20   Q.  And in general, Mr. Runge, you would agree with me that

21   throughout your involvement with the Drummond matters, you

22   were convinced or at least you had convinced yourself of

23   the rightness of the legal conclusions that you were

24   reaching in providing the advice to Drummond, correct?

25        MR. WARD:  Objection.  Relevance.

1      THE COURT:  As to this question only, overruled.

2  **A.**  I was convinced that the positions that we were taking

3  were defensible legally.

4  **Q.**  (BY MR. DOSS:)  Now, you mentioned that you assisted in

5  the preparation of comments for the Attorney General.  Do

6  you remember that?

7  **A.**  Yes.

8  (Government's Exhibit 189 was referenced.)

9      MR. DOSS:  If we could look at Government's

10  Exhibit 189, please?

11  **Q.**  Let's look at the second page.  Do you recognize these,

12  Mr. Runge, as those comments you were involved with helping

13  draft?

14  **A.**  Yes.

15  **Q.**  And there were other lawyers at Balch who were also

16  involved in that process, correct?

17  **A.**  Yes.

18  **Q.**  Adam Israel was also involved, right?

19  **A.**  Yes.

20  **Q.**  And Mr. Gilbert was overseeing your work on this

21  project, right?

22  **A.**  Yes.

23  **Q.**  And he was overseeing other attorneys in the office,

24  their work on the Drummond-related matter, correct?

25  **A.**  Yes.

1    *Q.  All right.  You had some questions about the Oliver*

2    *Robinson Foundation, and you said, "I wasn't familiar with*

3    *that aspect of the project," correct?*

4    **A.**  *Yes.*

5    *Q.  And that aspect of the project, as you understand it,*

6    *would be the community outreach aspect of the project,*

7    *right?*

8    **A.**  *Yes.*

9    *Q.  And is it fair to say that in these large, complicated*

10   *legal projects, when you have lots of lawyers involved, an*

11   *associate, for example, like yourself, you may not be aware*

12   *of every detail of that project that every other attorney*

13   *is working on?*

14   **A.**  *Yeah -- yes, that's correct.*

15   *Q.  Now, I want to shift gears and talk about the*

16   *resolution, Mr. Runge.*

17       MR. DOSS:  If we could look at Government's Exhibit

18   Number 91, please.

19   (Defendant's Exhibit 551 was referenced.)

20       Actually, before we go there, let's look at

21   Defendant's Exhibit 551 at page 137.

22   *Q.  Mr. Runge, these are the invoices from Balch to Drummond*

23   *on the 35th Avenue Superfund Site.  Am I correct that your*

24   *initials are JPR?*

25   **A.**  *Yes.*

*RUNGE - Cross by Doss*

1    Q.  Okay.  So let's look at May 18, 2015.  And that's the

2    entry that Mr. Ward covered with you on direct examination,

3    correct?

4    A.  Yes.

5    Q.  And that would be 3.3 hours?

6    A.  Yes.

7    Q.  And just so we're all clear, lawyers, they typically

8    bill in tenth-of-an-hour increments, right?

9    A.  Right.

10   Q.  So that would be approximately how many minutes?

11   A.  18 minutes.

12   Q.  So it's 3 hours and 18 minutes on May 18.  And then if

13   we look down a little further, we have a May 20, 2015 entry

14   for you.  And it looks like you're continuing to draft and

15   edit that joint resolution, right?

16   A.  Part of the entry is about that, yes.

17   Q.  And that's a good point.  The total amount of time

18   reflected here is 6 hours -- 6.7 hours, correct?

19   A.  Yes.

20   Q.  And that day you spent or billed to Drummond about 6.7

21   hours.  Of that 6.7 hours, some fraction of it was devoted

22   to the drafting and editing of the joint resolution?

23   A.  Yes.

24   Q.  And there were other things you were doing that day too?

25   A.  Yes.

1   Q.  Okay.  And as a general rule, when you did work on --

2   when you did work for a client, you wrote it down, you kept

3   track of your time?

4   **A.**  Yes.

5   Q.  So let's look now at Government's Exhibit 91, the

6   resolution.  Now, Mr. Runge, you understand generally that

7   a resolution is an expression of the legislature's opinion.

8   Is that a fair characterization of it?

9   **A.**  It's a -- yeah, I guess so.  It's an expression of the

10  majority of the legislators' opinions.

11  Q.  Good point.  It has to have a majority of both houses of

12  the legislature to be passed, right?

13  **A.**  Right.

14  Q.  And a resolution like this one, SJR 97, it doesn't

15  require anyone to do anything, right?

16  **A.**  Yes.

17  Q.  And it doesn't prohibit anyone from doing anything,

18  right?

19  **A.**  Right.

20  Q.  And it doesn't appropriate public funds, does it?

21  **A.**  No.

22  Q.  And that's in contrast to what's called a bill?

23  **A.**  Yes.

24  Q.  And that's not what this is, right?

25  **A.**  No.

RUNGE - Cross by Doss

1   Q.  Now, do you recall a Mr. Trey Glenn providing some input

2   on the drafting of this resolution?

3   A.  I don't recall that, but I did see an email that --

4   where his name was on it.

5   Q.  Okay.  Any reason to doubt that Mr. Glenn did provide

6   some input on the drafting of this resolution?

7   A.  No.

8   Q.  And did you understand that Mr. Trey Glenn was a

9   consultant hired by Balch to assist in its representation

10  of Drummond?

11  A.  I'm not -- I don't know if I was aware of that at the

12  time, but that would have been consistent with our

13  practice.

14  Q.  And during your conversations with Mr. Gilbert about the

15  drafting of SJR 97, Mr. Oliver Robinson's name never came

16  up; isn't that true?

17  A.  I don't remember it ever coming up.

18  Q.  And, in fact, if you look here on the first page, it

19  indicates a Senator Waggoner.  Do you see that?

20  A.  Yes.

21  Q.  In your experience, does that indicate to you that

22  Senator Waggoner introduced SJR 97?

23  A.  It does.

24  Q.  Now, in 2015 was it your understanding that the Alabama

25  House of Representatives had a Republican majority?

1    **A.**  Yes.

2    Q.  And in 2015 was it your understanding that the Senate

3    also had a Republican majority?

4        MR. WARD:  Objection to relevance.

5        THE COURT:  Sustain your objection.

6        MR. DOSS:  If we look on page -- let's see.

7    Second-to-last page, please.  One more.  Keep going.  Okay.

8    Q.  Does this signature page indicate to you, Mr. Runge,

9    that SJR 97, in fact, passed both houses of the legislature

10   and was signed by Governor Bentley?

11   **A.**  Yes.

12   Q.  And just to be clear, as far as you can tell from this

13   page, Mr. Oliver Robinson's name doesn't appear anywhere

14   there, does it?

15   **A.**  No.

16       MR. DOSS:  If we could look at page 2 of this exhibit.

17   Q.  So just to help us understand, I notice in this it has

18   several sentences that begin with "whereas."  And then it

19   has several sentences that begin with "be it resolved."

20   What is a "whereas" clause of a resolution?

21   **A.**  It's kind of like the -- it's kind of the background

22   information that's kind of building up to the resolution.

23   So you're saying because of this and because of this and

24   because of this, therefore, we declare this.

25   Q.  And when you were assisting in drafting SJR 97, did

RUNGE - Cross by Doss

1   these "whereas" clauses reflect the results of your legal

2   research?

3   A.  They look -- yes, they look consistent with it.

4       MR. DOSS:  And then let's look at page -- fourth page of

5   this exhibit, please.

6   Q.  All right.  And Mr. Runge, we see here what I was just

7   mentioning, the "be it resolved" and "be it further

8   resolved" paragraphs.  Do you see that?

9   A.  Yes.

10  Q.  And it says "Be it resolved by the Legislature of

11  Alabama, both Houses thereof concurring, that we urge the

12  EPA to reconsider its proposal to include the 35th Avenue

13  site on the NPL without the support of the state," correct?

14  A.  Yes.

15  Q.  And there the legislature is urging the EPA to do

16  something, right?

17  A.  Yes.

18  Q.  It's not requiring the EPA to do anything?

19  A.  It can't.

20  Q.  Fair point.  And there are several more "be it further

21  resolved" paragraphs there, right?

22  A.  Yes.

23  Q.  Now, on direct, you testified that from time to time you

24  received work assignments from Mr. Gilbert and others at

25  Balch, correct?

*RUNGE - Cross by McKnight*

1  **A.**  Yes.

2  *Q.*  But to be clear, Mr. Gilbert was not your client, right?

3  **A.**  No.

4  *Q.*  Drummond was your client?

5  **A.**  Yes.

6  *Q.*  And as a licensed attorney in the state of Alabama, you

7  owe duties of loyalty to your client, right?

8  **A.**  Yes.

9  *Q.*  And that duty of loyalty guided you throughout the

10  hundreds of hours that you worked on this matter, correct?

11  **A.**  Yes.

12     MR. DOSS:  One moment, Your Honor.  Thank you for your

13  time, Mr. Runge.  No further questions, Your Honor.

14     THE COURT:  Thank you, Mr. Doss.

15     Mr. McKnight?

16  CROSS-EXAMINATION BY McKNIGHT:

17  *Q.*  Mr. Runge, I'm David McKnight.  I represent Steve

18  McKinney in this matter.  You know Steve.  You work with

19  Steve, correct?

20  **A.**  Yes.

21  *Q.*  And you testified that the vast majority of your

22  projects came from people other than Steve with regard to

23  the 35th Avenue site, correct?

24  **A.**  Yes.

25  *Q.*  Okay.  And I want to focus on the projects that involved

1  Steve.  That was all legal research, correct?

2  **A.**  Yes.

3  Q.  Okay.  And so basically, any sort of communications or

4  meetings that you would have with Steve involved legal

5  research with regard to this project?

6  **A.**  Yes.

7  Q.  Okay.  And so what that would be is Mr. McKinney would

8  say, "Patrick, you know, here's an issue.  Please go find

9  the law on this area and tell me what it is," or, "We need

10  to inform other people of what it is," or something along

11  those lines, correct?

12  **A.**  Yes.

13  Q.  Okay.  And the environmental law area is to ordinary

14  people a very complicated, technical area; wouldn't you

15  agree?

16  **A.**  It is.

17  Q.  Okay.  And you have laws and you have statutes and you

18  have regulations.

19  **A.**  Yes.

20  Q.  Okay.  And you have deadlines that if you don't meet

21  those deadlines, you're foreclosed from presenting comments

22  or things along those lines, correct?

23  **A.**  Yes.

24  Q.  Okay.  And there's procedures that have to be followed

25  in this very technical area?

*RUNGE - Cross by McKnight*

1    **A.**   Yes.

2    **Q.**   And so what you would be doing, you would go research

3    and look up the law, the statutes, and the regulations.

4    You'd put it down on paper, and you'd bring that back to

5    Mr. McKinney, correct?

6    **A.**   Yes.

7    **Q.**   And then that would either be to educate Mr. McKinney or

8    it would be to educate other people, whether it be the EPA

9    or ADEM or the client or whoever it may be, but it was

10   educating people with regard to the applicable law,

11   correct?

12   **A.**   Yes.

13   **Q.**   Okay.  And you've worked with Mr. McKinney for nine

14   years?  Well, the three years in litigation and then six

15   years you have been in the environmental section, correct?

16   **A.**   Yes.

17   **Q.**   And all the time you have been working with

18   Mr. McKinney, has he ever asked you to do anything improper

19   or illegal?

20   **A.**   No.

21       MR. McKNIGHT:  Thank you.  That's all I have.

22       THE COURT:  Thank you, Mr. McKnight.

23       MR. BOUCHARD:  No cross, Your Honor.

24       THE COURT:  Thank you, Mr. Bouchard.

25       Redirect for your witness?

 1          MR. WARD:  No, Your Honor.

 2          THE COURT:  Thank you.

 3          Mr. Runge, you're free to go, sir.

 4          THE WITNESS:  Thank you.

 5          THE COURT:  I'm assuming he's released from his

 6     subpoena?

 7          MR. WARD:  Yes, Your Honor.

 8          THE COURT:  Have a good night.

 9     (Witness excused.)

10          THE COURT:  Ladies and gentlemen of the jury, it's 9

11     minutes before 6:00.  Rather than start a witness and

12     stopping very early into his or her testimony, let's stop

13     here for the day.

14          Let me remind you again, please do not discuss this

15     case as a group or with anyone else.  And again, if anyone

16     approaches you about it, please let me know.

17          We will start at 9:00 a.m. in the morning and will end

18     roughly around 5:30 tomorrow.  Have a good night, everyone.

19     And, obviously, please do not read or watch anything about

20     this case at all.  Thanks, everyone.

21     (The following proceedings were had in open court

22     outside of the presence and hearing of the jury.)

23          MR. SHARMAN:  Your Honor, may I be briefly heard on a

24     scheduling question?

25          THE COURT:  You may.

1      MR. SHARMAN:  Your Honor, I believe the Court had

2  expressed a hope earlier that the case would be ready so

3  that the jury would have it by or even before the end of

4  the month.  My inquiry was that if --

5      THE COURT:  It's contingent on when they finish.  And I

6  don't know anything about the defendants' cases obviously.

7      MR. SHARMAN:  Yes, sir.  And I'm not trying to put any

8  burdens on anybody's presentation of the case.  But if it

9  is the case, Your Honor, that, for example, the government

10  were to rest this week, let's say Thursday or Friday

11  morning, then I wanted to ask the Court how it might

12  consider handling any potential Rule 29 motions and the

13  Court's entertainment of those.

14      I believe, Your Honor -- obviously, the Court can

15  schedule as it wishes.  But I believe, Your Honor, that

16  given where we are, that it would be possible to accomplish

17  the Court's goal schedule-wise something like the

18  following:  that if, in fact, the government were to rest

19  Thursday or Friday morning, the Court could tell the jurors

20  that they have been working hard and that they have that

21  day off, which would be a short day by the Court's schedule

22  anyway.

23      The Court could consider on Thursday afternoon or

24  Friday morning any Rule 29 motions and potentially address

25  any jury instruction issues.

1      THE COURT:  That's the easy part.  I agree with you

2  wholeheartedly.  The hard part is if they end at noon on

3  Friday, for example, I've got a full afternoon of other

4  things.  So we may need to carry over motions to Monday

5  morning.  But that will be the plan, will be to release the

6  jury for either the afternoon or morning, take up the

7  motions, and then resume, assuming motions are denied, the

8  next business day.

9      MR. SHARMAN:  And, Your Honor, would it be -- just

10  again planning ahead, assuming the motions are denied in

11  part or in whole and assuming defense case or cases

12  proceed, would the Court, for purposes of efficiency, would

13  the Court object to essentially a joint defense?  And by

14  that, I mean that witnesses could be called by any party.

15  The jury doesn't usually seem to mind or know the

16  difference, and that seems to work well.

17      THE COURT:  I will definitely entertain that.  I think

18  one of the charges that the defendants are proposing deals

19  with the defendants' willingness for efficiency reasons to

20  confer and consult.  I'm definitely in favor of that.  I

21  will defer to you guys on how to proceed.

22      My goal obviously for now is to give you a draft charge

23  to have to look at over the weekend.

24      Is the government still on track, you believe, to be

25  finished by Thursday?  I know you lost an hour yesterday

1    afternoon when we were dealing with the issue that came up

2    during the lunch hour.

3         MR. MARTIN:  Judge, I fully expect to rest on Thursday.

4         THE COURT:  Okay.  Then we may -- if that's the case,

5    let's keep Friday morning, depending on what time Thursday

6    the government ends, at a minimum Friday morning for

7    motions.  We may, depending on what time Thursday, begin

8    arguments on Thursday afternoon as well.

9         Okay.  I think I have addressed your question,

10   Mr. Sharman.  Anyone else?

11        MR. GILLEN:  Your Honor, just to be clear.

12        THE COURT:  Uh-huh.

13        MR. GILLEN:  Under that scenario, then, if the --

14   obviously we're hoping or we're hopeful that our motion is

15   going to be granted.  If the defense motions are not

16   granted, then the defense cases would start Monday morning;

17   is that correct?

18        THE COURT:  Yeah.  There's no way -- we're supposed to

19   end at 1:00 on Friday anyway.  Mr. Martin, I know this is

20   all contingent on cross-exams before I definitively tell

21   Mr. Gillen yes.  Based on how we're going right now, what

22   time Thursday -- morning or afternoon -- will you

23   anticipate the government will rest?

24        MR. MARTIN:  Could very well be morning, Your Honor.

25        THE COURT:  Okay.  Assuming motions are denied, why

1   don't the defendants have at least a witness or two ready

2   for Friday, please.  We may not -- depending on how long it

3   takes to address motions on Thursday, we may not even call

4   anyone, but just to be on the safe side, I want to use

5   Friday morning if possible.  Okay.  Check all witnesses --

6   yes, sir.

7        MR. ASBILL:  I'm sorry, sir.  It would be very helpful

8   to us in terms of what we do in the defense case to know

9   what the Court's instructions are going to be, assuming

10  that nothing new happens that would alter those

11  instructions either in the defense case or in a rebuttal

12  case.

13       THE COURT:  My plan, as always, is not working neatly

14  here, obviously.  It's to work within the constraints of

15  the pattern charges and when there is no pattern charge

16  directly on point, is to still craft one that is as

17  narrowly tailored to track the closest pattern charge as

18  possible, is the best I can tell you right now.

19       I will definitely be in a position to circulate the

20  substantive charges by close of day tomorrow.  So that will

21  give you at least overnight to think about them.

22       Again, I don't know how long we will have arguments on

23  Thursday afternoon.  But to the extent that we're able to

24  resolve the motions on Thursday afternoon and to the extent

25  that the motion or motions are denied, I will want to use

1   Friday morning for the presentation of witnesses for the

2   defense's case.  But I will give you guys a draft charge

3   tomorrow so you can at least be thinking about it.

4        All right.  Thank you, all.  It's 6:00.  You know the

5   drill.  Please exit as quickly as possible.  Have a good

6   night, everyone.

7   (The proceedings were continued to July 11, 2018.)

C E R T I F I C A T E

     I, Sabrina Lewis, RDR, CRR, Official Court Reporter for the United States District Court for the Northern District of Alabama, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

     I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

               Dated:  September 10, 2018

*Sabrina Lewis*

SABRINA LEWIS, FEDERAL OFFICIAL COURT REPORTER