FILED
2018 Sep-24 AM 11:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

1
2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

3    THE UNITED STATES OF AMERICA,    | CASE NO. 2:17-cr-00419-AKK

4              Plaintiff,             | Abdul K. Kallon
                                      | United States District Judge
5    v.                               |

6    JOEL IVERSON GILBERT,            |
     STEVEN GEORGE McKINNEY, and      |
7    DAVID LYNN ROBERSON,             |
                                      | July 12, 2018
8              Defendants.            | Birmingham, Alabama

9

10                 **JURY TRIAL - VOL. 13 of 19**

11

12        Proceedings recorded by mechanical stenography, transcript
                      produced by computer.

13

14

15

16

17

18

19

20

21

22

23              **SABRINA LEWIS, CCR, RDR, CRR**
                  Federal Official Court Reporter
                    1729 Fifth Avenue North
24                Birmingham, Alabama 35203
                       (205) 278-2065
25              sabrina_lewis@alnd.uscourts.gov

```
1   FOR THE GOVERNMENT:        Robin Beardsley Mark
                               George A. Martin, Jr.
2                              John B. Ward
                               Assistant United States Attorneys
3                              United States Attorney's Office
                               Northern District of Alabama
4                              1801 Fourth Avenue North
                               Birmingham, Alabama 35203
5                              205-244-2001
                               robin.mark@usdoj.gov
6                              george.martin@usdoj.gov
                               john.b.ward@usdoj.gov
7

8   FOR THE DEFENDANT          Jeffrey P. Doss
    JOEL IVERSON GILBERT:      Brandon Keith Essig
9                              Jackson R. Sharman III
                               Lightfoot Franklin & White LLC
10                             400 20th Street North
                               Birmingham, Alabama 35203
11                             205-581-0700
                               jdoss@lightfootlaw.com
12                             bessig@lightfootlaw.com
                               jsharman@lfwlaw.com
13

14  FOR THE DEFENDANT          Craig A. Gillen
    STEVEN GEORGE McKINNEY:    Gillen Withers & Lake LLC
15                             400 Galleria Parkway
                               Suite 1920
16                             Atlanta, Georgia 30339
                               404-842-9700
17                             cgillen@gwllawfirm.com

18                             Lawanda N. Hodges
                               The Law Firm of Lawanda Hodges LLC
19                             1100 Peachtree Street NE
                               Suite 200
20                             Atlanta, Georgia 30309
                               404-474-0772
21                             lhodges@lhodgeslaw.com

22                             Stewart Davidson McKnight III
                               Baxley Dillard McKnight James
23                              & McElroy
                               2700 Highway 280
24                             Suite 110 East
                               Birmingham, Alabama 35223
25                             205-271-1100
                               dmcknight@baxleydillard.com
```

```
 1    FOR THE DEFENDANT           Henry W. Asbill
      DAVID LYNN ROBERSON:        Buckley Sandler LLP
 2                                1250 24th Street NW
                                  Suite 700
 3                                Washington, DC 20037
                                  202-349-8007
 4                                hasbill@buckleysandler.com

 5                                Brett M. Bloomston
                                  The Bloomston Firm
 6                                2151 Highland Avenue
                                  Suite 310
 7                                Birmingham, Alabama 35205
                                  205-212-9700
 8                                brett@thebloomstonfirm.com

 9                                David Bouchard
                                  Jones Day
10                                1420 Peachtree Street NE
                                  Suite 800
11                                Atlanta, Georgia 30309
                                  404-581-8386
12                                dbouchard@jonesday.com

13                                Barbara Mack Harding
                                  Jones Day
14                                51 Louisiana Avenue NW
                                  Washington, DC 20001
15                                202-879-3939
                                  bharding@jonesday.com
16

17

18

19

20

21

22

23

24

25
```

|  |  | PAGE |
|---|---|---|
| **EXAMINATION** | | |
| **AGENT ASHLEY HUNT** | | |
| DIRECT EXAMINATION BY MR. MARTIN | | 3470 |
| CROSS-EXAMINATION BY MR. ESSIG | | 3501 |
| CROSS-EXAMINATION BY MR. GILLEN | | 3510 |
| CROSS-EXAMINATION BY MR. BLOOMSTON | | 3518 |
| REDIRECT EXAMINATION BY MR. MARTIN | | 3543 |
| RECROSS-EXAMINATION BY MR. GILLEN | | 3546 |
| FURTHER REDIRECT EXAMINATION BY MR. MARTIN | | 3549 |
| FURTHER RECROSS-EXAMINATION BY MR. GILLEN | | 3550 |
| **GRAND JURY TESTIMONY OF STEVEN McKINNEY** | | |
| GRAND JURY TESTIMONY OF STEVEN McKINNEY | | 3552 |
| **IRVING W. JONES, JR.** | | |
| DIRECT EXAMINATION BY MR. MARTIN | | 3604 |
| CROSS-EXAMINATION BY MR. DOSS | | 3646 |
| CROSS-EXAMINATION BY MR. BOUCHARD | | 3679 |

**GOVERNMENT'S EXHIBITS**

| NO. | DESCRIPTION | REFERENCED | ADMITTED |
|---|---|---|---|
| 1 | 2/6/15 email from Gilbert to Jones with request to provide comments at AEMC meeting | 3613 | |
| 2 | Agreement between Balch & Bingham LLP and Oliver Robinson Foundation, Inc. | 3645 | |
| 13 | 12/10/14 email from Phillips to Glenn with attached GASP presentation | 3619 | |
| 20 | 12/11/14 email from Phillips to Glenn forwarding White Paper GASP Presentation Analysis | 3620 | |
| 26 | Balch and Bingham's *Environmental Update* concerning AEMC 12/12/14 meeting | 3623 | 3624 |
| 40 | 2/6/15 email from Gilbert to Jones regarding draft of Request to provide comments at AEMC meeting | 3609 | 3610 |
| 41 | 2/6/15 email from Jones to Gilbert with attached Request to provide comments at AEMC meeting | 3611 | 3612 |
| 43 | 2/6/15 email from Gilbert to Rep. Robinson discussing his appearance at the AEMC meeting | 3618 | |
| 44 | 2/6/15 letter from Rep. Robinson to AEMC requesting to provide comments | 3619 | |

1                              GOVERNMENT'S EXHIBITS

2      NO.     DESCRIPTION                        REFERENCED  ADMITTED

       52      2/12/15 email from Gilbert to         3643       3643
3              Jones regarding Confidentiality
               Agreement
4      59      2/13/15 email from Jones to           3644       3644
               Gilbert with attached
5              Confidentiality Agreement
       65      2/19/15 email from Jones to           3637       3638
6              Gilbert and McKinney with
               attached white paper on
7              LeFleur's inconsistent comments
       66      2/19/15 email from Jones to           3642
8              Gilbert with attached
               slimmed-down white paper on
9              LeFleur's comments
       129     Balch time sheets                     3487
10     146     11/22/13 Agreement between            3672
               Balch & Bingham and Southeast
11             Engineering & Consulting LLC
       197     1/6/15 email from Roberson to         3626
12             Gilbert discussing neighborhood
               letters
13     198     1/9/15 email from Jones to            3627       3628
               Gilbert with attached draft
14             neighborhood letters
       199     1/12/15 email from Jones to           3631       3631
15             Gilbert with attached draft
               neighborhood letters
16     200     1/12/15 email from Gilbert to         3632
               Rep. Robinson with attached
17             draft comment letters and
               uploading instructions
18     202     1/20/15 email from Jones to           3635       3635
               Gilbert regarding community
19             comments
       203     1/21/15 email from Jones to John      3636       3637
20             Powe with attached Landlord
               Letter
21     204     1/27/15 email from Jones to           3625       3626
               Gilbert with attached EMC
22             Summary
       208     9/9/15 email from Gilbert to          3665
23             Roberson with attached Get Smart
               narrative
24     255     Summary of entries from Balch         3489       3490
               and Bingham billing records
25             related to ADEM, AEMC, AG, GOV,
               OR/JP

**GOVERNMENT'S EXHIBITS**

| NO. | DESCRIPTION | REFERENCED | ADMITTED |
|-----|------------|------------|----------|
| 256 | Summary of entries from Balch and Bingham billing records related to ADEM | 3494 | 3495 |
| 257 | Summary of entries from Balch and Bingham billing records related to AEMC | 3496 | 3497 |
| 258 | Summary of entries from Balch and Bingham billing records related to the Office of the Governor | 3498 | 3498 |
| 259 | Summary of entries from Balch and Bingham billing records related to the Office of the Attorney General | 3499 | 3499 |
| 260 | Summary of entries from Balch and Bingham billing records related to Rep. Oliver Robinson and John Powe | 3500 | 3500 |
| 262 | 5/24/17 Grand Jury Testimony of Steven McKinney (redacted) | 3551 | |

**DEFENDANT'S EXHIBITS**

| NO. | DESCRIPTION | REFERENCED | ADMITTED |
|-----|------------|------------|----------|
| 551 | Balch billing statements 35th Avenue Superfund | 3503 | |
| 552 | Balch billing statements GASP petition | 3503 | |
| 553 | Balch billing statements government relations | 3503 | |
| 655 | Compilation of community comments | 3664 | |
| 1287 | 1/2/15 email from Gilbert to Jones | 3652 | 3652 |
| 1288 | 1/2/15 email from Gilbert to Jones | 3653 | 3654 |
| 1289 | 1/7/15 calendar entry | 3657 | 3657 |
| 1290 | 1/8/15 email from Gilbert to Jones | 3659 | 3660 |
| 1298 | 2/10/15 email from Jones to Gilbert | 3669 | 3669 |
| 1299 | 2/12/15 email from Jones to DeLawrence | 3671 | 3671 |
| 1300 | 1/21/15 email from Jones to johnpfam@aol.com | 3666 | 3666 |
| 3207 | Compilation of Drummond Invoice and Payment Documents | 3534 | |

```
 1        THE COURT:  Good morning, everyone.  Be seated, please.
 2   We'll get started as soon as Karen Humphrey comes in.
 3        MR. BLOOMSTON:  Your Honor, may we be heard on the
 4   record?
 5        THE COURT:  Sure.
 6        MR. BLOOMSTON:  Judge, yesterday, counsel for
 7   Mr. McKinney filed an oral objection to testimony coming in
 8   based on the completeness doctrine.  The testimony
 9   contemplated was Mr. McKinney's grand jury testimony being
10   read in its redacted form.
11        This morning, we would like to file on behalf of David
12   Roberson a similar objection to redactions and David
13   Roberson's 302 being read into the record with redactions.
14   The case law in the Eleventh Circuit is very specific.  I'm
15   citing to you United States v. Lopez, 898 F.2d 1505:  "When
16   multiple defendants are involved and statements have been
17   redacted to avoid Bruton problems, the rule of completeness
18   is violated only when the statement in its edited form" --
19   it's a two-part test -- "effectively distorts the meaning
20   of the statement or excludes information substantially
21   exculpatory of the nontestifying defendant."
22        In this case, Your Honor, the redactions that are
23   proposed by the government in Mr. Roberson's 302 at page 6
24   of 12 specifically addresses that David Roberson had
25   conversations with Mr. Gilbert about the ethical
```

considerations of hiring the Oliver Robinson Foundation.

Further, Gilbert told Roberson that he had checked with

Greg Butrus and Chad Pilcher at Balch and they had no

problem with what they were doing.

There are other redactions that we object to.

Certainly, that is the most exculpatory to David Roberson.

Some of the other redactions include references to

grassroots work --

THE COURTROOM DEPUTY:  Coming out.

(Interruption and off-the-record discussion.)

THE COURT:  Well, it's not you guys' fault.  I try to

keep things moving like clockwork.

Keep going, please, Mr. Bloomston.

MR. BLOOMSTON:  Yes, sir.

Not only is that one example of exculpatory evidence

that's being redacted, but also there were references where

it's also redacted from the government's proposed reading

that David Roberson said they wanted to meet with Oliver

Robinson to know whether the Oliver Robinson Foundation

could do grassroots work.  And that is redacted also from

the government's proposed reading.

So we join in Mr. McKinney's objection.  We cite the

case law that states that if there is exculpatory evidence

that is redacted, that it is highly prejudicial, and the

relief would be a severance at this point, Your Honor.  And

1    I believe that's all.

2        MR. McKNIGHT:  Judge, if I may, on behalf of

3    Mr. McKinney, I have reviewed the case law that Brett

4    cited, and we join in that case law.  It fits the

5    circumstances I described to the Court yesterday on all

6    fours.  Once Mr. McKinney is advised the very first time he

7    hears the name Oliver Robinson that it's been vetted

8    through the ethics guys, that colors every other action,

9    every other thing taken, as I described to the Court

10   yesterday.  And so we would join in the motion that the

11   portions I cited the Court to yesterday must be read with

12   regard to Mr. McKinney's grand jury testimony, or we ask

13   for a severance.

14       THE COURT:  Thank you both.

15       Mr. Martin, anything?

16       MR. MARTIN:  Nothing other than what was argued

17   yesterday, Your Honor.

18       THE COURT:  All right.  You defendants have preserved

19   the issue.  Your objections are noted.  Overruled.

20       Let's bring the jury in, please, Karen.

21       MR. SHARMAN:  Your Honor, very briefly, and this is

22   probably my ignorance, Your Honor, but I noticed a

23   gentleman exiting the jury room that I just didn't

24   recognize.  May we be told who that is?

25       THE COURT:  He is a courtroom deputy for -- Karen, who

1  is Joe working for these days?

2     THE COURTROOM DEPUTY:  He's Judge Hopkins's.  But he's

3  not the courtroom deputy anymore.  He's just going to cover

4  for me for the two days I'm out.

5     MR. SHARMAN:  Thank you, Your Honor.

6     THE COURT:  Thanks, Karen.  Let's bring them in,

7  please.

8  (The following proceedings were had in open court in the

9  presence and hearing of the jury.)

10    THE COURT:  Good morning, everyone.  Be seated, please.

11    Mr. Martin?

12    MR. MARTIN:  United States calls Ashley Hunt.

13    THE COURT:  Agent Hunt, good morning.

14    AGENT HUNT:  Good morning.

15 (Witness sworn.)

16    THE COURTROOM DEPUTY:  Please state and spell your

17 first and last name for the record.

18    THE WITNESS:  Ashley, A-s-h-l-e-y, Hunt, H-u-n-t.

19    THE COURTROOM DEPUTY:  What city and state do you

20 reside in?

21    THE WITNESS:  Birmingham, Alabama.

22    THE COURT:  You may begin.

23    MR. MARTIN:  Thank you, Your Honor.

24                    AGENT ASHLEY HUNT,

25 duly sworn, was examined and testified as follows:

1    DIRECT EXAMINATION BY MR. MARTIN:

2    Q.   Good morning, Agent Hunt.

3    A.   Good morning.

4    Q.   What is your job?

5    A.   I'm a special agent of the Federal Bureau of

6    Investigation.

7    Q.   And how long have you been an FBI agent?

8    A.   Eighteen years.

9    Q.   Can you give the jury a summary of your experience with

10   the FBI, please?

11   A.   Yes.  I started with the FBI in 1997 as an intelligence

12   research specialist working on national security matters.

13   In 2000, I went to the FBI Academy and became an agent.  I

14   then was assigned to the Washington field office for many

15   years where I worked espionage investigations.  And in

16   2012, I transferred to Birmingham, and I have worked the

17   corruption program since I arrived.

18   Q.   Did you grow up in Alabama?

19   A.   I grew up in Birmingham.

20   Q.   Okay.  So you moved back home after a few years?

21   A.   I did.

22   Q.   Okay.  Were you the FBI agent primarily responsible for

23   the investigation of this case for the FBI?

24   A.   Yes.

25   Q.   During the course of the investigation, did you and

1   others interview David Roberson?

2   A.   Yes.

3   Q.   We've heard yesterday that Joel Gilbert testified in

4   grand jury.  Why did David Roberson -- first, was David

5   Roberson subpoenaed to testify in the grand jury?

6   A.   Yes, he was.

7   Q.   Okay.  Did he go in the grand jury, or was he

8   interviewed?

9   A.   We interviewed him instead.

10  Q.   Okay.  And why was that?

11  A.   I believe it was because his attorney had some personal

12  conflict and asked us to accommodate him otherwise.

13  Q.   Okay.  And we did that?

14  A.   We did.

15  Q.   Okay.  When did this interview take place?

16  A.   It took place on March 23, 2017.

17  Q.   And where was the interview conducted?

18  A.   It was conducted at the U.S. Attorney's Office.

19  Q.   And who was present for the interview?

20  A.   I was present, an IRS agent was present, you were

21  present, and AUSA Robin Mark was present.  Mr. Roberson's

22  attorney, Brett Bloomston, was also there.

23  Q.   And Mr. Roberson?

24  A.   And Mr. Roberson.

25  Q.   Do you recall approximately how long the interview

1    lasted?

2    **A.**   Not exactly, but I would say a few hours.

3    **Q.**   And was this a voluntary interview?  Mr. Roberson was

4    not compelled to be there or forced to be there?

5    **A.**   That is correct.  It was voluntary.

6    **Q.**   Can you please take us through what David Roberson said

7    during the interview?

8    **A.**   Yes.  I have my 302 with me.

9    **Q.**   Well, what is a 302?

10   **A.**   A 302 is the agent's summary of a witness' statement.

11   **Q.**   And this is something that was made back at the time

12   closer to the interview?

13   **A.**   Yes.

14   **Q.**   What did Mr. Roberson say during the interview?  First

15   let me ask you this:  Was he given some warnings up front

16   at the beginning of the interview?

17   **A.**   He was.  He was told that, by federal statute, it's a

18   crime to lie to federal agents.

19   **Q.**   Then what did Mr. Roberson say?

20   **A.**   He discussed his background, his professional and

21   education background in some detail.

22   **Q.**   Tell us about that, please.

23   **A.**   "Roberson graduated from Auburn University in 1974 with

24   a bachelor's degree in biology.  After college, he worked

25   for the Lee, Franklin, and Lauderdale Counties in that

HUNT - Direct by Martin

1    order.

2         "In 1978, Roberson moved to Montgomery, where he worked

3    in the State of Alabama's solid waste department and

4    started the state's hazardous waste program in connection

5    with the Resource Conservation and Recovery Act.

6         "In 1982, the Alabama Department of Environmental

7    Management was created, and his group became part of ADEM.

8    Roberson was chief of compliance for the hazardous waste

9    program.

10        "After a year with ADEM, Roberson moved to Alabama Power

11   to set up their hazardous waste program.  After a few

12   years, he became senior environmental supervisor and

13   managed a few programs.  He remained at Alabama Power from

14   1983 to 1990.

15        "In 1990, Roberson took a job with Waste Management, WMX

16   of Alabama, in chemical waste management and represented

17   their family of companies in the state.  He worked with

18   Waste Management entities in collection of waste, which

19   included the manufacturing of dumpsters.  He started as a

20   regulatory manager but in approximately 1993 became a

21   registered lobbyist.

22        "In 1995, Waste Management was looking to sell the

23   company and/or downsize.  In Alabama, the company gave its

24   contract to Johnny Crawford & Associates.  Crawford wanted

25   to expand and do other types of lobbying which did not

1    interest Roberson.  Roberson took a job with Environmental

2    Guidance Company and did lobbying for various companies

3    from 1996 to 2011."

4    Q.  What else did he say?

5    A.  "In 2011, Roberson got a call from Mr. Drummond.  Bruce

6    Windham, Roberson's predecessor at Drummond, was retiring.

7    In May 2011, Roberson went to work for Drummond.

8        "Roberson handles governmental affairs for Drummond, and

9    all lobbyists at Drummond report to him.

10       "Roberson is not involved in the company's operation in

11   Colombia, South America.  Roberson represents both Drummond

12   and the Alabama Coal Association.  Roberson previously ran

13   ACA, the Alabama Coal Association, under contract.

14   Roberson is both a lobbyist and principal, as Drummond has

15   designated him as its principal."

16   Q.  Please continue.

17   A.  "Roberson has known former Alabama State Representative

18   Oliver Robinson since he went to the legislature in 1998.

19   They are friends, but Roberson qualified it as a

20   professional friendship.  Roberson described Robinson as an

21   impressive guy and noted Robinson's history as a

22   professional basketball player.  They sometimes visit in

23   the hall at the State House.

24       "Roberson also occasionally runs into Robinson at

25   events, but they have no personal relationship.  Roberson

1    estimated that in the last two to three years, he has had

2    lunch with Robinson twice.  Roberson knew that Robinson is

3    associated with Partnering for Progress.  Drummond always

4    sponsored the Partnering for Progress annual business

5    conference at the $3,000 level, and Roberson once helped

6    Robinson get a speaker for a panel.  Roberson has never

7    attended the conference.

8      "Roberson was only aware of PFP sponsoring the event in

9    the fall and knew it was previously held at the Grand Hotel

10   in Point Clear, Alabama but is now held in Biloxi,

11   Mississippi.  The previously mentioned speaker was for one

12   of these events.  Drummond received letters on PFP

13   letterhead soliciting contributions for the event in

14   question.  Mr. Drummond approved the contributions after

15   Roberson approved them.

16     "Roberson did not recognize the name of the person on

17   the last letter they received but knew of PFP.  When asked,

18   Roberson confirmed that he relied on the representations

19   made in the letter with regard to how the money contributed

20   would be spent.  If he had known the money would be used

21   for something else, Drummond would not have sponsored PFP.

22     "Roberson confirmed that all decisions at Drummond

23   regarding charitable contributions are made in-house.

24   Sometimes they check with a Drummond niece outside the

25   company, and sometimes they check with United Way to ensure

1    they are using their money wisely.  In the past, Roberson

2    has seen letters asking Drummond to help certain

3    organizations, but Roberson did not recall seeing many

4    letters from state representatives.  Roberson knows John

5    Powe through the work in North Birmingham but did not know

6    him before that effort.

7        "Walter Coke has been under Environmental Protection

8    Agency consent order since 1989.  Walter Energy gave EPA a

9    list of 79 companies responsible for emissions for similar

10   waste in Jefferson County.  In 2013, Drummond received a

11   letter from EPA saying Drummond may be a potentially

12   responsible party for a Superfund site.  ABC Coke, owned by

13   Drummond, was included.

14       "Roberson heard about GASP, a clean air group, and that

15   GASP was out telling the residents of North Birmingham that

16   they could get paid by the companies that were PRPs.

17   Testing of air emissions revealed the presence of arsenic,

18   lead, and BAP, benzo[a]pyrene.  They knew this was not

19   defined under CERCLA (Comprehensive Environmental Response

20   Compensation and Liability Act) as disposal.  Roberson

21   added that several courts have ruled on this.

22       "Stacie Propst from GASP was out bad-mouthing EPA and

23   Drummond.  GASP filed a petition in 2014 recommending

24   Tarrant and Inglenook be evaluated as a potential Superfund

25   site.  Had that happened, Drummond probably would have lost

1    ABC Coke, which would have cost a lot of money.  ABC Coke

2    makes coke for foundries that work with iron and steel.

3        "They decided at that time that they needed the

4    assistance of outside counsel.  Roberson had worked with

5    Balch & Bingham over the years and knew they had an

6    environmental group.  Drummond retained Balch.  It was the

7    first time Drummond used Balch, and they knew by then that

8    EPA was sampling yards.

9        "Roberson thought AJE, the Alliance for Jobs and the

10   Economy, began in the fall of 2014 and was incorporated in

11   early 2015.  They wanted to put out facts instead of the

12   fiction put out by their opposition.  They knew there were

13   lawyers knocking on people's doors in the area asking if

14   people wanted to sign up to participate in a lawsuit.

15       "Roberson thought the five companies named by EPA as

16   PRPs were Walter Coke, U.S. Pipe, Alagasco, KMAC, and

17   ABC Coke.  With regard to AJE, the core group formed was

18   comprised of Drummond; Thompson Tractor; Alabama Power;

19   ACIPCO, which is Alabama Cast Iron Pipe Company; and Nucor

20   Steel, which joined AJE in 2016.  AJE hired consultants to

21   conduct a grassroots campaign in the areas targeted by EPA

22   and to look at documents related to the matter.

23       "The initial agreement was that Thompson Tractor would

24   pay $15,000 a year in dues for two years, and other AJE

25   members would pay $30,000 a year.  Thompson Tractor was not

1   involved in the EPA matter but was located in Tarrant.   A

2   bank account was set up, and Roberson was the signer.

3   Roberson forwarded invoices for AJE to his assistant, Jamie

4   Ingle.   She printed them, and he initialed them.   She was

5   the only other person at Drummond involved with anything

6   related to AJE.

7      "Roberson prepared the tax form for AJE.   The mission

8   statement attached to AJE tax documents was handwritten by

9   Roberson and is similar to the mission statement for BARD.

10      "Technical consultants working on the environmental

11   issues for Drummond and/or Balch included engineers and

12   scientists from Strada.   The main points of contact at

13   Strada were Scott Phillips and Trey Glenn.

14      "Matrix was also involved and sent letters notifying

15   property owners in the area that they were the only ones

16   who could sign, that is, give permission to EPA to test

17   their property.   Roberson thought Matrix helped identify

18   the addresses of the residents of the area in question.

19   Even the mayor of Tarrant was concerned and sent letters to

20   the residents.   Roberson noted that revenue from ABC Coke

21   may make up the bulk of Tarrant's money.

22      "When asked about invoices reflecting payments from

23   Drummond to Balch for governmental affairs work, Roberson

24   stated that it was really public relations work.   They were

25   talking to politicians and making them aware of what was

1    going on.  But the way in which Balch billed and/or

2    invoiced was confusing.

3        "Roberson advised that they were asking how they could

4    get people to go door to door who would be accepted by the

5    residents in the area.  Roberson noted that he could not go

6    out there, that is, to Tarrant, and get people to talk to

7    him.  Roberson thought of Robinson because he knew about

8    the magazine Robinson put out.  Roberson brought up

9    Robinson and recommended they meet with him.

10       "Roberson added that three months after he began working

11   at Drummond, Mr. Drummond asked him to handle public

12   relations for Drummond in addition to his other work.

13       "With regard to the other members of AJE, Roberson noted

14   that Alabama Power has a large PR group, Thompson Tractor

15   probably does not, and Alagasco probably has one.  He has

16   never heard anything from an ACIPCO PR person.

17       "After the Hubbard trial, Roberson considered what they

18   were doing, that is, contracting with a state

19   representative, in light of the ethics law but determined

20   that the area targeted by the campaign was not in

21   Robinson's district.  Roberson stated that they, Drummond,

22   have always been very careful and he, Roberson, has a

23   reputation to maintain.

24       "When asked if the recommendation to form AJE was made

25   in the context of distancing the member companies of AJE

from the work with Robinson, Roberson said he would have to
say that was correct.  It was explained that AJE was a
better way to hire several entities to perform the work.
AJE would use Balch.  Balch would hire the Oliver Robinson
Foundation.

"Roberson added that he did not have time to work with
ORF on a daily basis because he works in Montgomery three
months a year.  Roberson never saw any references
indicating that ORF had done such work before.  Roberson
thought he had his initial conversation with Robinson about
the work in late fall 2014.  Roberson would have just
called Robinson to ask if he could meet.

"Roberson then had Robinson come to Drummond to meet
Andrews, who felt comfortable with him.  Balch then put
together the contract for ORF.  Roberson did not know which
attorney drafted the contract.

"When they were contemplating the grassroots campaign,
Roberson may have asked Steve Bradley for recommendations.
Bradley was on contract and did PR work for Drummond.  At
some point, Mr. Drummond ended Bradley's contract.
Roberson recalled seeing a letter dated November 25, 2014
and proposal from Robinson prior to the execution of the
contract.

"With regard to the amount of money paid to ORF, ORF
made a proposal.  Roberson discussed it and reduced it from

1    $10,000 to $7,000 a month, which they thought was a fair

2    amount for people doing work on the ground.  Robinson was

3    not going to do the work.  Roberson assumed Robinson did

4    not have time to do it with all he had going on.  Roberson

5    never met the people who did the ground work on behalf of

6    ORF.

7    "The amount of the monthly payment increased to $20,000

8    when more people became involved in the work.  Miles

9    College law students were doing surveys on weekends, and

10    they had to have money for that.  Roberson confirmed that

11    he was asked to approve the increase in pay.  He also

12    confirmed that he received invoices addressed to Drummond

13    and AJE for the work.  They were only paying for work with

14    ORF through AJE, and AJE funds were only being used for

15    work with ORF.

16    "Roberson's understanding was that ORF invoiced Balch

17    and Balch invoiced AJE.  AJE paid Balch, and Balch paid

18    ORF.

19    "Balch was also doing work with consultants at the

20    plants involved.  Roberson thought this work was performed

21    by Strada and that Strada was paid by Drummond.  The

22    contracts for work performed by Strada and Matrix were

23    through Balch.

24    "Robinson said ORF could put together a grassroots

25    campaign including door-to-door distribution of fliers,

1    interaction with preachers and churches in the area, and

2    participation of the NAACP, or National Association For the

3    Advancement of Colored People.  ORF tried to educate people

4    in the area.  They wanted people to be aware of what EPA

5    was doing and that GASP's representations were misleading.

6        "John Powe and Amanda Robinson, Oliver Robinson's

7    daughter, were involved.  Amanda had finished law school

8    and passed the bar.  She was looking for something to do.

9    Roberson stated they had the contacts out there.  We did

10   not have them.  They got the word out, went to community

11   meetings and reported back.  Roberson did not expect

12   Robinson to be out in the community.  Robinson was the

13   brain behind it.  Roberson rarely met with Robinson after

14   the contract was established.  Roberson met with Powe or

15   with Powe and Amanda Robinson.

16       "EPA did not come back with high numbers in Tarrant with

17   regard to the contaminants in comparison to EPA test

18   results in other areas of Birmingham.  Birmingham City

19   Councillor William Parker was deeply involved.  Birmingham

20   City Councillor Marcus Lundy wanted them to look at ACIPCO.

21   Roberson heard that Parker recently said he was not part of

22   the effort in North Birmingham anymore.  Roberson also

23   heard that Parker got rid of the women who had contracts to

24   work on environmental issues in North Birmingham.

25       "When asked about some names appearing on the privilege

log as senders or recipients of emails, Roberson could not
identify Todd Brown but identified Mary Sue Kruse as the
secretary of Van Richey at ACIPCO and Ben Thomas as the
person in charge of engineering at ACIPCO.  Roberson did
not recall a conversation about Get Smart being run by ORF
instead of Robinson & Robinson Communications.

"When asked why the grassroots campaign was continuing
after EPA's concerns about Tarrant subsided in 2016,
Roberson stated that EPA was expanding its work to a new
area near Nucor Steel.  They are now paying $6,000 a month
for the grassroots work.

"Powe and Tina Bennett established a new contract using
PFP instead of ORF.  He printed it, and it is on his desk,
but he has not read it.  Roberson did not know about the
new contract beforehand.  Roberson assumed the last check
he wrote went to the new contract and thought it was in the
amount of $6,000.

"When asked about Robinson's appearance before the
Environmental Management Commission, Roberson stated he
understood that Robinson was going to appear before the EMC
to voice his concerns.  Roberson said he did not have any
discussions with Robinson about going before the EMC.

"When asked, Roberson recalled having lunch with
Robinson in Liberty Park.  When asked about their
discussion over lunch, Roberson said they talked about

1  politics.  Roberson did not recall talking about GASP

2  appearing before EMC.  Roberson said he would not have

3  recommended Robinson's appearance before EMC because

4  speaking in public is a waste of time and does not help.

5  Roberson said one should go to the director of an entity or

6  organization instead.

7      "Roberson confirmed there was an effort to get ADEM to

8  take their position.  Roberson denied asking Robinson to

9  contact the director of ADEM.  When asked if he read a

10  transcript of Robinson's comments before EMC, Roberson said

11  he did not but volunteered that he received something

12  related to a Dropbox with a link to a video of Robinson's

13  appearance before EMC.

14      "Roberson did not recall telling Robinson that he needed

15  to write a letter to EMC requesting the opportunity to

16  appear.  When asked, Roberson said he was not aware of

17  Robinson having contact with anyone on the EMC before

18  Robinson's appearance.  When asked, Roberson said he did

19  not know about a meeting of Robinson, EMC Vice Chair Scott

20  Phillips, and EMC Chair Lanier Brown before Robinson's

21  appearance before the EMC.

22      "When asked whether Balch sent anyone to the EMC

23  meeting, Roberson said not to his knowledge.  Roberson

24  advised that there was very little talk about Robinson's

25  appearance before the EMC.  Roberson only recalled watching

1    the video of it later.  Robinson did not know the purpose

2    of making the video of Robinson's appearance at the EMC but

3    assumed AJE paid for the video.  Roberson thought they made

4    a video of Stacie Propst's appearance before the EMC which

5    occurred at an EMC meeting prior to the one at which

6    Robinson appeared.

7         "When asked if someone on the EMC said Robinson did a

8    good job, Roberson said Phillips could have said so.  When

9    asked if he saw a March 4, 2015 letter from Robinson to

10   ADEM, Roberson confirmed he did.  Roberson stated he

11   assumed he saw it after Robinson sent it, adding that he

12   did not see a draft, if that was what the interviewers were

13   asking.

14        "When asked about Alabama Senate Joint Resolution 97

15   (SJR 97) sponsored by Senator James "Jabo" Waggoner and

16   related to EPA and environmental issues in North Birmingham

17   and Tarrant, Roberson said you see a lot of these every

18   legislative session.  Roberson said he would assume he was

19   involved in the resolution.  Balch drafted the resolution.

20   Roberson would have been aware of the resolution but did

21   not recall giving a draft of the resolution to Waggoner or

22   talking to him about it.  Roberson thought it could have

23   been someone from Alabama Power who gave the resolution to

24   Waggoner.  Roberson would have been aware of it at the time

25   but did not take it to Waggoner himself.  Roberson said he

1   knew about the resolution before it was introduced but did

2   not recall seeing the resolution beforehand.  He recalled

3   seeing the stamped copy of it provided in production and

4   displayed by the interviewers.

5       "Roberson noted that in 2015 when the resolution was

6   passed, he was spending more time in Birmingham than

7   Montgomery due to the issues with the EPA in Tarrant.

8   Roberson met with the Attorney General's office about the

9   issues twice in 2014 and/or 2015.

10      "He also met with David Byrne, Governor Bentley's

11  general counsel, about the matter.  They met with

12  Birmingham Mayor William Bell early on, but Bell did not

13  want to get involved.

14      "Roberson confirmed that ADEM was playing both sides,

15  supporting efforts by the community to obtain Brownfields

16  grants from EPA for the affected area but pushing back on

17  EPA regarding the PRPs.

18      "Roberson and others met with six to eight on staff at

19  ADEM and encouraged them to get more involved.  Roberson

20  did not know the terms of agreement with Strada and did not

21  recall seeing the contract with Strada.  Strada was

22  evaluating EPA's work.  Roberson thought payments to Strada

23  would have been part of the legal invoicing to Andrews.

24  AJE was set up to pay ORF, but the plan was to handle

25  Strada through legal fees and/or billing.

1      "Strada was reviewing ATSDR (Agency For Toxic Substances

2   and Disease Registry) reports.   Trey Glenn worked through

3   Strada with his own firm, Blue Ridge Consulting.   Roberson

4   did not think Phillips, an engineer, was the owner but one

5   of the principals of Strada.   Roberson only knew Phillips

6   to have been at Strada after selling shares for Malcolm

7   Pirnie."

8   Q.   Thank you, Agent Hunt.   I want to move to a different

9   topic now and ask, as part of preparation for trial, did

10  you prepare summaries of the Balch time and billing records

11  that had been introduced into evidence?

12  A.   Yes, I did.

13      MR. MARTIN:   May I approach the witness, Your Honor?

14      THE COURT:   You may.

15  (Government's Exhibit 129 was referenced.)

16  Q.   (BY MR. MARTIN:)   First, Agent Hunt, I have handed you

17  what has been admitted into evidence as Government's

18  Exhibit 129.   Can you hold that up for us and tell us what

19  it is, please?

20      MR. ASBILL:   Excuse me, Judge.   There's some sort of

21  reverb going on.   I'm not sure what it is.

22      THE COURT:   It happens from time to time,

23  unfortunately.

24      You may continue.

25  A.   This is Government's Exhibit 129.   And it contains

1  Balch & Bingham billing records for three different matters

2  that Balch & Bingham worked on for its client, Drummond

3  Company, and the records are for the time period of July

4  2014 through September of 2015.

5      MR. MARTIN:  Could you bring up Number 129, please?

6  Could you go to the third page, please?

7  Q.  This is one page out of Number 129?

8  A.  Yes.

9  Q.  Okay.  And these are the exhibits, the time sheet

10  entries that both the government and the defendants have

11  shown throughout this trial; is that correct?

12  A.  Yes, that's correct.

13  Q.  So what did you summarize out of Government's Exhibit

14  Number 129?

15  A.  I summarized the billing records, the entries, the time

16  entries related to any mention of the Alabama Department of

17  Environmental Management, the Alabama Environmental

18  Management Commission, the Office of the Attorney General,

19  the Office of the Governor, and Oliver Robinson or John

20  Powe.

21  Q.  Okay.  And how did you go about doing that?

22  A.  Responsive to our subpoena, Balch & Bingham provided

23  these billing records and they provided them in an

24  electronic format.  So I opened the text files for the

25  billing records, and I copied the entries from what was

1  provided by Balch & Bingham into a Microsoft Excel

2  spreadsheet.  I then, with the help of another agent, set

3  up additional columns that allowed me to mark which entries

4  were related to the entities I just named.  I then went

5  back and deleted any entries that were not related to those

6  entities.

7      Those extra columns we set up that allowed me to tag

8  entries related to those entities then allowed me to sort

9  the data so that I was able to create one master summary

10  for the entries related to all of those entities combined.

11  And then the tagging also allowed me to sort the data by

12  entity individually.

13  Q.  So after you went through this process, what did you end

14  up with?

15  **A.**  I ended up with one master summary and then five

16  breakout summaries that are a subset of the data in the

17  master summary.

18  (Government's Exhibit 255 was referenced.)

19  Q.  Okay.  I've handed you what has been marked as

20  Government's Exhibit Number 255.  Do you have that in front

21  of you?

22  **A.**  I do.

23  Q.  And do you recognize that?

24  **A.**  I do.

25  Q.  What is it?

1   **A.**  It's the master summary I just described.

2       MR. MARTIN:  Your Honor, I would offer Government's

3   Exhibit Number 255.

4       THE COURT:  Over the objections that were raised?

5       MR. GILLEN:  Objection as to violating 1006.  We

6   object.

7       MR. ESSIG:  And Defendant Gilbert joins as well.

8       THE COURT:  The objections were already raised

9   yesterday.  They were renewed again today.  Overruled.  For

10  reasons stated yesterday, 255 is received, and it may be

11  published.

12  (Government's Exhibit 255 was admitted into evidence.)

13      MR. ESSIG:  Your Honor, I just want to make clear for

14  the record it was joined by all defendants.

15      THE COURT:  I think that was the case yesterday as

16  well.  But to the extent that was not clear, it's now clear

17  as well.

18      MR. MARTIN:  Could you bring that up, please?

19  **Q.**  First, how many pages is Government's Exhibit

20  Number 255?

21  **A.**  This exhibit is 27 pages long.

22  **Q.**  Okay.  And remind us again what it is.

23  **A.**  It's the master summary I created that shows those

24  entries in the Balch & Bingham billing records from July

25  2014 through September 2015 related to the Alabama

1   Department of Environmental Management, the Alabama

2   Environmental Management Commission, the Office of the

3   Attorney General, the Office of the Governor, and Oliver

4   Robinson and John Powe.

5   Q.  Now, what is this first page of the exhibit that's shown

6   now?

7   A.  In some of the entries, individuals who work at some of

8   these places are mentioned, but it may not be clear that

9   those individuals worked for ADEM or work in the Office of

10  the Attorney General.  So the first page is a key with

11  names of individuals that appear in the billing records and

12  the offices that they work in.

13  Q.  Okay.  And I notice some different colors on this key.

14  Can you tell us about that, please?

15  A.  Yes.  To help the jury when you review the master

16  summary, I put each entity in a different color so that you

17  could more clearly see how they fit in, how they fit into

18  the entire chronology.

19      So, for example, ADEM is color coded red.  AEMC is color

20  coded orange.  The Office of the Attorney General is color

21  coded green.  The Office of the Governor is color coded

22  purple.  And references to Oliver Robinson and John Powe

23  are color coded blue.

24      MR. MARTIN:  Okay.  Could you go to the next page,

25  please?

1    Q.   So what is showing on the screen now?

2    A.   The first page of the master summary.

3         MR. MARTIN:   Okay.   And can you blow up the top,

4    please?

5    Q.   And what is at the heading at the top of this first

6    page?

7    A.   "Summary of Entries from Balch & Bingham Billing Records

8    Related to ADEM, AEMC, AG, GOV, OR/JP."

9    Q.   And then where you just read where it says "related to,"

10   and then it has the entities listed, are those entities

11   written in the colors that relate to them throughout the

12   summary?

13   A.   Yes, they are.

14        MR. MARTIN:   Okay.   Would you back out, please?

15   Q.   Now, you'll notice on the first page it's -- well, let's

16   talk about --

17        MR. MARTIN:   I'm sorry.   Go back to the top, please.

18   Q.   Can you tell us about each of the columns, please?

19   A.   Yes.   The first column is the date column.   That is the

20   date of the billing entry.   Second column is the matter.

21   Q.   What does that mean?

22   A.   So the billing records are organized by the particular

23   Drummond matter that was being worked on.   And so the

24   records are related to the 35th Avenue Superfund site

25   matter, the GASP petition for preliminary assessment

1    matter, and the government relations matter.  So that's

2    what appears in the second column.

3    Q.  What about the next column?

4    A.  The third column is the attorney column where it lists

5    the name of the attorney who made that particular entry in

6    the billing record.

7    Q.  And then what is the last column marked "Description"?

8    A.  The description column actually includes the entry that

9    was entered by that attorney, which I copied and pasted

10   from the billing records.

11   Q.  Now, for instance, on the first entry up here that's

12   dated July 1, 2014, I noticed there are ellipses or periods

13   at the end of the entry there.  What does that mean?

14   A.  That means that there was more to this entry, but it was

15   not related to ADEM.  So I did not include it in the

16   summary.

17       MR. MARTIN:  Okay.  Now, if we could back out now,

18   please.

19   Q.  I noticed that the first page appears to be all red.

20   What does that mean?

21   A.  That means that every entry on that page is related to

22   ADEM.

23   Q.  And in your preparation of this master summary, Number

24   255, did you conclude, from your work on this that most of

25   the entries on the master summary are going to be red

1   because they're related to ADEM?

2   **A.**  Yes, that's correct.

3   (Government's Exhibit 256 was referenced.)

4   Q.  Okay.  Could we go to Government's Exhibit -- well, do

5   you have in front of you what's been marked Government's

6   Exhibit 256?

7   **A.**  Yes, I do.

8   Q.  Okay.  Well, first, before we do that, I've got some

9   other questions.

10      MR. MARTIN:  Could you go to page 16 of this exhibit,

11  please?  If you could, blow up the entry for 2/6/15,

12  please, for, first, Mr. Gilbert.

13  Q.  Now, just to be clear, there are different colors on

14  this one.  Can you tell us what that indicates?

15  **A.**  Yes.  So the first part of the entry is color coded

16  orange because it's related to AEMC, the Alabama

17  Environmental Management Commission.

18      Then you see a blue part of the entry because that's

19  related to Oliver Robinson.

20      Then you see another orange reference to AEMC.

21      And then you see a phrase in red because that

22  information's related to ADEM.

23  Q.  Okay.  Do you have in front of you what has been marked

24  as Government's Exhibit 256?

25  **A.**  I do.

1    Q.   Okay.  Do you recognize that?

2    A.   I do.

3    Q.   How so?

4    A.   So this is one of the breakout summaries from the master

5    summary.  This summary includes only those entries related

6    to the Alabama Department of Environmental Management.

7    Q.   Only the red ones?

8    A.   Correct.

9    Q.   From the master summary?

10   A.   Yes.  Although on this breakout summary, there's no more

11   color coding because it's no longer necessary.

12   Q.   Okay.  And did you compile Government's Exhibit 256

13   relating to the ADEM entries in the same way you described

14   earlier?

15   A.   Yes.

16   Q.   Okay.

17        MR. MARTIN:  I would offer Government's Exhibit 256.

18        THE COURT:  Same objections?

19        MR. BLOOMSTON:  Yes, sir.  Same objections.

20        MR. ESSIG:  Same objections.

21        MR. GILLEN:  Same objections, Your Honor.

22        THE COURT:  The record notes from all three defendants.

23   Overruled for the reasons stated previously.  256 is

24   received and may be published.

25   (Government's Exhibit 256 was admitted into evidence.)

1      MR. MARTIN:  If you could just blow up the top of that,

2  please?

3  Q.  So can you tell us what the heading on this is, please?

4  A.  "Summary of Entries From Balch & Bingham Billing Records

5  Related to the Alabama Department of Environmental

6  Management."

7  Q.  Okay.  And as you mentioned, these are related to ADEM,

8  but they are not colored, they're just -- in red.  They're

9  just in plain black text?

10  A.  That's correct.

11  Q.  Okay.  But if the jury were to compare the entries on

12  this exhibit with the master summary, Government's Exhibit

13  255, this would match the red entries?

14  A.  It would.  The only qualification I would make is that

15  if there is an entry on the master summary that contains

16  red and it contains some other color because it also has

17  something regarding another entity, that would have been

18  removed prior to putting that entry on the ADEM summary.

19  Q.  Okay.  So this summary only relates to ADEM?

20  A.  Yes.

21  Q.  Okay.  And how long is this summary?  How many pages?

22  A.  17 pages.

23  (Government's Exhibit 257 was referenced.)

24  Q.  Okay.  Do you have in front of you what has been marked

25  Government's Exhibit 257?

1    **A.**   I do.

2    *Q.*   Do you recognize that?

3    **A.**   I do.

4    *Q.*   And how do you recognize it?

5    **A.**   I recognize it because it is the breakout summary

6    related to entries regarding the Alabama Environmental

7    Management Commission.

8    *Q.*   Okay.  And did you prepare this summary in the same way

9    that you have previously described?

10   **A.**   Yes.

11       MR. MARTIN:  Your Honor, I'll offer Government's

12   Exhibit 257.

13       THE COURT:  Same objections?

14       MR. BLOOMSTON:  Yes, sir.

15       MR. ESSIG:  Yes.

16       MR. GILLEN:  Yes, Your Honor, same objections.

17       THE COURT:  Duly noted from all three defendants, same

18   reasons stated previously, objection overruled.  257 is

19   received and may be published.

20   (Government's Exhibit 257 was admitted into evidence.)

21       MR. MARTIN:  Okay.  If you could, just blow up the top,

22   please.

23   *Q.*   And just to confirm, 257, Government's Exhibit 257 are

24   the summary of the entries from the Balch & Bingham billing

25   records related to the Environmental Management Commission?

1   **A.**   Yes.

2   (Government's Exhibit 258 was referenced.)

3   **Q.**   Okay.  Do you have in front of you what has been marked

4   as Government's Exhibit Number 258?

5   **A.**   I do.

6   **Q.**   Okay.  Do you recognize that document?

7   **A.**   I do.

8   **Q.**   How do you recognize it?

9   **A.**   It's the breakout summary from the master summary for

10  those entries that are only related to the Office of the

11  Governor.

12  **Q.**   Okay.  And did you compile this summary in the same

13  manner that you did the others?

14  **A.**   I did.

15  **Q.**   Okay.

16      MR. MARTIN:   I would offer Government's Exhibit

17  Number 258.

18      THE COURT:   Same objections?

19      MR. BLOOMSTON:   Yes, sir.

20      MR. ESSIG:   Yes.

21      MR. GILLEN:   Yes, Your Honor.

22      THE COURT:   From all three defendants, for the same

23  reasons stated previously, overruled.  258 is received and

24  may be published.

25  (Government's Exhibit 258 was admitted into evidence.)

1  Q.  (BY MR. MARTIN:)  And as the heading of the first page

2  of 258 indicates, does this summary relate to the Balch &

3  Bingham billing records related to the Office of the

4  Governor?

5  A.  Yes.

6  (Government's Exhibit 259 was referenced.)

7  Q.  Okay.  Do you have in front of you what has been marked

8  as Government's Exhibit 259?

9  A.  I do.

10  Q.  What is that, please?

11  A.  It is the breakout summary from the master summary for

12  the entries from the billing records related to the Office

13  of the Attorney General.

14  Q.  Okay.  And did you compile this summary in the same

15  manner?

16  A.  I did.

17      MR. MARTIN:  The government offers Exhibit 259.

18      THE COURT:  Same objections?

19      MR. BLOOMSTON:  Yes, sir.

20      MR. ESSIG:  Yes, sir.

21      MR. GILLEN:  Yes, Your Honor.

22      THE COURT:  From all three defendants, again, for the

23  reasons stated previously, the objection is overruled.  259

24  is received, and it may be published.

25  (Government's Exhibit 259 was admitted into evidence.)

1    Q.   (BY MR. MARTIN:)  And is this the summary for the

2    entries related to the Attorney General's Office?

3    A.   Yes.

4    Q.   Okay.

5    (Government's Exhibit 260 was referenced.)

6    Q.   And finally, do you have in front of you Government's

7    Exhibit Number 260?

8    A.   I do.

9    Q.   Okay.  What is that?

10   A.   This is the breakout summary from the master summary for

11   the billing entries related to Oliver Robinson and John

12   Powe.

13   Q.   Okay.  And did you compile this summary in the same

14   manner?

15   A.   I did.

16        MR. MARTIN:  The government offers Government's Exhibit

17   Number 260.

18        THE COURT:  Same objections?

19        MR. BLOOMSTON:  Yes, sir.

20        MR. ESSIG:  Yes.

21        MR. GILLEN:  Yes, Your Honor.

22        THE COURT:  The record will reflect again it's from all

23   three defendants.  Objection overruled.  260 is received

24   and may be published.

25   (Government's Exhibit 260 was admitted into evidence.)

1   Q.  (BY MR. MARTIN:)  Just to confirm, Number 260 are the

2   summary of entries related to Oliver Robinson and John

3   Powe?

4   A.  Yes.

5       MR. MARTIN:  Thank you.

6       That's all the questions I have, Your Honor.

7       THE COURT:  Cross-exam.  Who is first?  Mr. Essig?

8       MR. ESSIG:  Yes.

9   CROSS-EXAMINATION BY MR. ESSIG:

10  Q.  Good morning, Agent Hunt.

11  A.  Good morning.

12  Q.  I'm just going to -- you know me.  You've seen me speak

13  in court.  We've never actually, I don't think, formally

14  been introduced before, but I'm Brandon Essig and I

15  represent Mr. Gilbert.  You're aware of that fact?

16  A.  Yes.

17  Q.  Okay.  Now, Agent Hunt, what I wanted to ask you

18  about is -- I'm only going to ask you questions regarding

19  the exhibits, the summary exhibits that you just went

20  through with Mr. Martin.  And if I understand correctly,

21  those charts that were just introduced and admitted into

22  evidence, those are summaries of the billing records

23  introduced by the government; is that right?

24  A.  Yes.

25  Q.  All right.  And the government -- in the course of the

1   government's case here through your witnesses; is that

2   right?

3   A.   Yes.

4   Q.   And as you've testified is that the purpose of these

5   charts is for them to be helpful to the jury as they

6   consider the evidence in this case?

7   A.   Yes.

8   Q.   Is that right?

9   A.   Yes.

10   Q.   And do I understand your testimony to be that

11   Government's Exhibit 129 begins with billing records that

12   start in July of 2014; is that right?

13   A.   Yes.

14   Q.   And it ends in September of 2015 --

15   A.   Yes.

16   Q.   -- is that right?

17        Have you read the indictment in this case?

18   A.   Yes.

19   Q.   And the indictment in this case alleges an alleged

20   conspiracy that begins in July of 2014 and continues until

21   November of 2016; is that correct?

22   A.   I would need the indictment in front of me to be

23   certain.

24   Q.   Would you disagree with that?

25   A.   No.

1    Q.   Okay.

2         MR. ESSIG:   Your Honor, may I approach?

3         THE COURT:   You may.

4    (Defendant's Exhibits 551-553 were referenced.)

5         MR. ESSIG:   Handing the witness what have been admitted

6    as copies of Defense Exhibits 551, 552, and 553.

7    Q.   Now, Agent Hunt, I think you testified on direct

8    examination that your summaries of Government's Exhibit 129

9    involve three Drummond matters; is that right?

10   A.   Yes.

11   Q.   And can you tell me, again, what those were?

12   A.   The 35th Avenue Superfund Site, the GASP petition, and

13   government relations.

14   Q.   Okay.  And if you would, if you would please pick up

15   Defense Exhibit 551.  Can you hold that up and show that to

16   the jury, please?

17        And you recognize 551 as Balch billing documents?

18   A.   Yes.

19   Q.   Okay.  And what's the -- is that the 35th Avenue matter?

20   Is that what's indicated on those billing invoices?

21   A.   Yes.

22   Q.   And what is the date of the first billing record in

23   Defense Exhibit 551?

24   A.   August 22, 2014.

25   Q.   Okay.  And if you would, please, flip to the very last

1    billing record in that exhibit.  And if you could tell the

2    jury what the date of that record is.

3    A.  May 31, 2017.

4    Q.  Okay.  Thank you.  And both of these, when we talk about

5    billing records, whether we're talking about Government's

6    Exhibit 129 or Defense Exhibits 551, 552, and 553, what the

7    jury is going to be looking at are the time entries and the

8    ultimate bill that Balch & Bingham was sending to Drummond

9    Company; is that right?

10   A.  Yes.

11   Q.  Okay.  And in each one of those billing records that

12   you've got there in front of you and each one of the

13   billing records that are in Government's Exhibit 129, those

14   are all addressed to Blake Andrews, who is the general

15   counsel at Drummond Company.  And I'm talking about the

16   legal billing records --

17   A.  Yes.

18   Q.  -- is that right?

19       Okay.  If you would, please, pick up Defense

20   Exhibit 552.  Thank you.  Please show that to the jury.

21       And could you tell us, by looking at maybe the first

22   billing record there, what matter Defense Exhibit 552

23   relates to?

24   A.  "GASP Petition For Preliminary Assessment of Release of

25   Hazardous Substances."

1   Q.  And what's the date of the first billing record in

2   Defense Exhibit 552?

3   A.  August 22, 2014.

4   Q.  And can you flip to the end of that and tell us the date

5   of the last billing entry, or billing record in that

6   exhibit?

7   A.  November 23, 2016.

8   Q.  Okay.  So that record continues through the end of the

9   conspiracy charged in the indictment; is that right?

10  A.  Yes.

11  Q.  Now, the -- again, same question as the other ones.  All

12  of those billing records, again, the legal bills contained

13  in Defense Exhibit 552, are all addressed to Blake Andrews

14  as the general counsel at Drummond Company --

15  A.  Yes.

16  Q.  -- is that right?

17      Okay.  Agent Hunt, if you'll pick up Defense

18  Exhibit 553, please.  And if you'll show that to the jury,

19  please.

20      And, again, can you review that and tell us which matter

21  that relates to?

22  A.  "Government Relations."

23  Q.  And can you tell us, just for that -- like, if you can

24  tell us the first date of the billing record bill that's in

25  that exhibit, please.

**A.**  February 12, 2015.

**Q.**  Okay.  And if you can tell us the last billing entry in that particular exhibit.

**A.**  May 31, 2017.

**Q.**  Okay.  And for this one, again, just like all the others, all of the actual legal bills, the bills for time that the attorneys were billing to the client, the legal bills all went to Blake Andrews at Drummond Company; is that right?

**A.**  Some of the bills in this exhibit went to David Roberson.

**Q.**  Those are -- I think you'll see those are invoices from the Oliver Robinson Foundation.  But the actual legal bills went to Blake Andrews; is that right?

**A.**  Yes.

**Q.**  Okay.  And I think that point's been made in this trial that there were some invoices from the foundation that went to Mr. Roberson individually; is that right?

**A.**  Yes.

**Q.**  But, I mean, as the jury has seen throughout this case, is that the meetings that Joel Gilbert had with Oliver Robinson were reflected in his timekeeping records; is that right?

**A.**  Yes.

**Q.**  Okay.  And again, those timekeeping records, all of the

1   meetings with Oliver Robinson, the meetings to prepare

2   Oliver Robinson for going to the AEMC appearance, those

3   meetings are all reflected in Mr. Gilbert's time entries;

4   is that right?

5   A.  I don't know that all of them are, but yes, some of them

6   are.

7   Q.  Okay.  All right.  Sort of the key ones that the

8   government has referenced.  I mean, you've seen them

9   frequently --

10  A.  Yes.

11  Q.  -- pull up those exhibits, show them to witnesses and

12  have them read from them; is that right?

13  A.  Yes.

14  Q.  Okay.  And again, those are reflected in legal bills

15  that ultimately went to Blake Andrews at Drummond Company;

16  is that right?

17  A.  Yes.

18  Q.  Okay.  Now, I just want to be clear.  If the jury wants

19  to see what these attorneys billed and what these attorneys

20  worked on for the complete time period of the indictment,

21  they can't use your chart, can they?

22  A.  That is correct.

23  Q.  And they can't use Government's Exhibit 129, can they?

24  A.  Correct.

25  Q.  To see billing records that continue throughout the time

1  period charged by the government in this case, they've got

2  to use the defendants' exhibits that we admitted; is that

3  right?

4  **A.**  Correct.

5  **Q.**  Okay.  And just to be clear, these are billing records

6  and these are time entries that Balch & Bingham provided to

7  you in the course of the investigation in this case and

8  after they were issued a grand jury subpoena; is that

9  right?

10  **A.**  Yes.

11  **Q.**  Now, I know you've done an analysis of Government's

12  Exhibit 129, right?

13  **A.**  The summaries?

14  **Q.**  Yes.

15  **A.**  Yes.

16  **Q.**  And what you've extracted from those billing records are

17  billing entries that relate to some governmental entities;

18  is that right?

19  **A.**  Yes.

20  **Q.**  Okay.  And what that does not do for the jury, though,

21  it does not give the jury a picture of how those entries

22  relate to all of the matters that were being worked on for

23  Drummond Company throughout this period, does it?

24  **A.**  Correct.

25  **Q.**  Okay.  And if the jury would look at Defense Exhibits

1   551, 552, and 553, would you disagree with me that they

2   would see a total of over 3,000 billing entries?  Do you

3   have any reason to disagree with that?

4   A.  I don't know how many they would see, but I don't have a

5   reason to dispute that.

6   Q.  And would you disagree with me that of the 3,000, only

7   222 of those billing entries would be related to ADEM?  Do

8   you have any reason to disagree with that?

9   A.  I don't.

10  Q.  And do you have any reason to disagree with me that if

11  the jury looks at all of the billing entries that cover the

12  entire period of time charged by the government in the

13  indictment, that they will see that only 36 billing entries

14  relate to the AEMC in any way, whatsoever?  Do you disagree

15  with that?

16  A.  I have not counted, but I don't dispute that.

17  Q.  Okay.  And the government's summaries of Government's

18  Exhibit 129 only focus or primarily focus on time entries

19  by Mr. Gilbert and Mr. McKinney; is that right?  Is that

20  the primary focus of those?

21  A.  The primary focus was the entities.  And so it turns out

22  that Mr. Gilbert and Mr. McKinney are on most of the

23  entries --

24  Q.  Uh-huh.

25  A.  -- but there are some entries included related to other

1    attorneys.

2    Q.   Okay.  And so what you have not done for the jury to

3    help them out and be helpful to them is summarize the work

4    that the other dozens of attorneys working on this matter

5    and that Joel Gilbert was supervising, you haven't gone

6    through the effort to summarize what those attorneys did,

7    have you?

8    **A.**   Only if it related to the entities that were included in

9    the summaries.

10   Q.   Okay.  But no other analysis beyond that; is that right?

11   **A.**   No.

12        MR. ESSIG:   No further questions.

13        THE COURT:   Thank you.

14        Mr. Gillen?

15        MR. GILLEN:   Thank you, Your Honor.

16   CROSS-EXAMINATION BY MR. GILLEN:

17   Q.   Good morning, Agent Hunt.

18   **A.**   Good morning.

19   Q.   How are you?

20   **A.**   I'm fine, thank you.

21   Q.   Now, as it relates to these summaries, you've been

22   working on them for some time, correct?

23   **A.**   I did.

24   Q.   You obviously had the billables prior to the grand jury

25   indictment in this case, correct?

1   **A.**   Balch produced things in a rolling manner, so I think we

2   had them before then.

3   **Q.**   Okay.  And so what you've been doing is you've been

4   going through, I think we've established here, that --

5   would you agree with me that in terms of the pages, the

6   documents that were produced in discovery, the Balch drafts

7   and the billables were over 900 pages; is that fair?

8   **A.**   That's probably fair.

9   **Q.**   Okay.  And so what you did is you explained to us how

10   you went through and you ran computer runs to find out what

11   precisely came up in terms of the areas that you have

12   discussed, correct?

13   **A.**   Yes.

14   **Q.**   Now, this really isn't a summary of what is there.  It's

15   more like you've selected excerpts of what is from the

16   billables, correct?

17   **A.**   You could say that.

18   **Q.**   Because what you did is that when you went and you had a

19   hit on any of the topics that you thought fit your profile,

20   what you did is you went there and you would then look at

21   that attorney and you would take only the excerpt parts of

22   that billable which had to do with the topic that you were

23   looking for, correct?

24   **A.**   Yes.

25   **Q.**   So, for example, the context, the context of what that

1    lawyer was doing on that billable day is not reflected

2    here, is it?

3    **A.**   Not in the summaries.

4    **Q.**   Because really, again, it's not really a summary of the

5    billable.   What you've done is you've extracted and you've

6    put what you thought were little quotes.   And we can see

7    that with the ellipses, correct?

8    **A.**   Yes.

9    **Q.**   So virtually every time that the jury sees an ellipses

10   either before or after -- you know, sometimes you have

11   ellipses before your entry and then after the entry,

12   correct?

13   **A.**   Yes.

14   **Q.**   So what you're telling us is that there's a whole lot of

15   stuff that the attorney was working on as it related to

16   matters that were billed to Drummond that you chose not to

17   put in this summary, correct?

18   **A.**   That's correct.

19   **Q.**   So we may have a brief excerpt that might have been in a

20   sentence of a large paragraph of work that had been done,

21   right?

22   **A.**   Yes.

23   **Q.**   And so did you feel as though that one might be somewhat

24   misleading in terms of explaining to the jury what that

25   attorney was doing on Drummond matters that specific day?

HUNT - Cross by Gillen

**A.**  No, because Government's Exhibit 129 has already been

entered into evidence.  And if they want to compare the

summaries and see the context, they can do that.

Q.  Well, I guess, let's flip that argument.  If you have

129 out, there's really no need for your selected excerpts,

is there, because this goes out with the jury, correct?

**A.**  It goes out with the jury.  The summaries are a subset

of Government's Exhibit 129.

Q.  But we've agreed that this really isn't a summary.  It's

your selected excerpts, correct?

**A.**  They are excerpts.

Q.  So what you're saying is, "I want" -- in these exhibits,

"I want the jury" -- you know, rather than going through

and actually seeing the context in your summary, you're

telling the jury, "No, you go to 129 and you look up what

was really going on on Mr. Gilbert's plate or

Mr. McKinney's plate or Mary Samuels's plate or Mr. Jones's

plate or Mr. Glaze's plate on that particular day,"

correct?

**A.**  They can do that.

Q.  Yeah.  So what you want is you want the jury in these

excerpts to see what you want them to see rather than to

show them exactly what was going on on a day-to-day basis,

which is in Government's 129, right?

**A.**  I want them to see the excerpts related to those

 1   entities.

 2   Q.   Okay.   And your selection of the excerpts, correct?

 3   A.   Yes.

 4   Q.   Okay.   So you told us how you divided them up into such

 5   areas like contacts with the governor.   So you felt as

 6   though it was necessary to say, "Look, people were actually

 7   contacting political officials."   You felt that was

 8   necessary for your summary in this case?

 9   A.   I thought it was important for them to see those

10   entries, yes.

11   Q.   And contacts with the chief law enforcement officer of

12   the State of Alabama, the Attorney General's office, you

13   thought that was something that was relevant to the charges

14   in this case?

15   A.   Yes.

16   Q.   So that's the reason why you did that.   And that's the

17   reason why you had a special section for that, correct?

18   A.   Yes.

19   Q.   Okay.   Now, what I'd like to do is I'd like to --

20        MR. GILLEN:   If I may, Your Honor?

21        THE COURT:   You may.

22   Q.   (BY MR. GILLEN:)   You've gone through these things for

23   hundreds of hours, haven't you?

24   A.   I don't know how many hours it took.

25   Q.   Go ahead and tell me, in the billables, where Steve

1    McKinney ever had a meeting with Oliver Robinson.  Take

2    your time.

3    A.   I'm not aware of an entry.

4    Q.   Look through the billables that you spent so much time

5    putting together for the jury and tell me when Steve

6    McKinney ever had a conversation with Oliver Robinson.

7    A.   I haven't found that in the entries.

8    Q.   Did you find anything in your billables where

9    Mr. McKinney received a letter or sent a letter or sent an

10   email to Mr. Robinson or got an email from him?

11   A.   No.

12   Q.   Now, so you -- I don't want to get that where you --

13   I'll just put it back over here.

14       So you couldn't find anywhere there was any discussions

15   or talking with Mr. McKinney and Mr. Robinson, correct?

16   A.   Correct.

17   Q.   But you told the grand jury, under oath, that

18   Mr. McKinney did talk with Mr. Robinson about appearing at

19   the commission meeting in February, didn't you?

20   A.   Could you give me a copy of the indictment?

21   Q.   No.  I'm going to give you a copy of your grand jury

22   testimony.

23       MR. GILLEN:  If I may approach, Your Honor?

24       THE COURT:  Of course.

25       MR. MARTIN:  Judge, this is beyond the scope of direct.

*HUNT - Cross by Gillen*

```
1        THE COURT:  Overruled.
2   Q.  (BY MR. GILLEN:)  I want you to read the section
3   there -- now, first of all, let's set the stage.
4        You're the FBI case agent in this case, correct?
5   A.  Yes.
6   Q.  You are making a summary presentation to the federal
7   grand jury about whether to indict the folks in this case,
8   correct?
9   A.  Yes.
10  Q.  Now, Oliver Robinson did not testify before the grand
11  jury, correct?
12  A.  Correct.
13  Q.  You were under oath, correct?
14  A.  Correct.
15  Q.  Look at the question that you were asked that I've
16  checked.  Read that question to the grand jury -- excuse
17  me -- this to the jury.
18  A.  "During the time period that they are discussing this
19  proposal and a potential contract, are they also --
20  Gilbert, McKinney, and Roberson -- talking with Oliver
21  Robinson about appearing at the commission meeting in
22  February?"
23  Q.  Read your answer.
24  A.  "Yes."
25  Q.  And your answer was false, wasn't it?
```

1   A.  My answer was true regarding Mr. Gilbert and

2   Mr. Roberson.

3   Q.  Well, let me clarify my question for you.  As it relates

4   to Steven McKinney, your answer about whether he talked

5   with Robinson was false, wasn't it?

6   A.  That was not my intention.

7   Q.  No.  I don't care what your intention was.  Did you or

8   did you not give false testimony before the grand jury

9   about Steve McKinney when you were trying to get him

10  indicted before the federal grand jury?  Yes or no?

11  A.  Yes.

12  Q.  Yes.

13      MR. GILLEN:  That's all I have.  Thank you.

14      MR. BLOOMSTON:  Your Honor, I was intending to go

15  through the 302 with this agent.  If the Court would like

16  me to get started, I'm glad to.

17      THE COURT:  Let's get started, please.

18      MR. BLOOMSTON:  Yes, sir.

19      THE COURT:  Roughly how long do you anticipate,

20  Mr. Bloomston?

21      MR. BLOOMSTON:  Judge, I'm not certain.  I haven't

22  really practiced it in front of a mirror.

23      THE COURT:  Well, I'm not sure you need a mirror to get

24  a time gauge, but I understand your point.  Let's start,

25  and I'll stop you in 15 minutes for a break.

1      MR. BLOOMSTON:  Yes, sir.

2    CROSS-EXAMINATION BY MR. BLOOMSTON:

3    Q.  Agent Hunt, my name is Brett Bloomston.  You know I

4    represent David Roberson.  We have seen each other before.

5      With regards to the government -- I'm sorry.  Yes.

6    Government's Exhibit 255, the colorful excerpts from the

7    Balch billing records that you were referencing today, can

8    you please pull that up, take a look at it?

9    A.  Yes.

10   Q.  If you will, and I think this should be easy for you

11   because you have color coded this.  From November 13, 2014,

12   which is page 7 of 27, bottom of the page, you color coded

13   everything that dealt with Oliver Robinson and John Powe in

14   blue, correct?

15   A.  Yes.

16   Q.  If you will, between November 13, 2014 and February 16,

17   2015, which would be on page 17, count all of the blue

18   entries that reference Oliver Robinson for us.

19   A.  Did you say through February 16?

20   Q.  Yes.

21   A.  31.

22   Q.  All right.  So from November 13, 2014, the first time

23   that Oliver Robinson appears on the Balch & Bingham radar

24   screen, to February 16, 2015, the date that it's been

25   testified he received a $14,000 check, there are 31 entries

HUNT - Cross by Bloomston

1    into your summary where Oliver Robinson either attended a

2    meeting, correct --

3    **A.**   Correct.

4    *Q.*   -- was on a phone call, correct --

5    **A.**   Correct.

6    *Q.*   -- was strategizing about community outreach, correct?

7    **A.**   Correct.

8    *Q.*   Okay.   31 separate meetings, correct?

9    **A.**   No, 31 entries.

10   *Q.*   31 separate entries in that short period of time,

11   correct?

12   **A.**   Yes.

13   *Q.*   Okay.   All right.   I'm going to reference you to the 302

14   that you read regarding David Roberson, if you'll pull that

15   out, please.

16       Now, you were asked if David Roberson received a grand

17   jury subpoena, and he did, correct?

18   **A.**   Yes.

19   *Q.*   And that is one of those invitations that you receive

20   that you cannot refuse, correct?

21   **A.**   Yes.

22   *Q.*   If you're called to the grand jury, you must appear,

23   correct?

24   **A.**   Yes.

25   *Q.*   And in my conversations, did you learn -- my

1    conversations with Mr. Martin, did you learn that I simply

2    requested that we come in and have an informal meeting

3    called a proffer?

4    A.   Yes.

5    Q.   Okay.  And in that proffer meeting, certainly we were

6    not compelled to be there, correct?

7    A.   Correct.

8    Q.   And that proffer meeting is voluntary, correct?

9    A.   Correct.

10   Q.   And it is something that, if there's any issues that

11   come up, if Mr. Roberson would want to stop his testifying

12   or discussions at any time, he was free to leave, correct?

13   A.   Yes.

14   Q.   And at any time in our meeting on March 23, 2017, did

15   Mr. Roberson ask me if we needed to take it outside and

16   talk to him?

17   A.   I don't recall that.

18   Q.   Okay.  And at any time was he uncooperative with your

19   questions?

20   A.   No.

21   Q.   Okay.  And did he ever get to a point where I called

22   timeout, I had to take him outside and speak with him?

23   A.   I don't recall that.

24   Q.   So we sat through that meeting, and he provided you

25   answers to your questions that you asked, correct?

1    A.   Yes.

2    Q.   And you recall that certainly I was there and I was

3    taking my notes, correct?

4    A.   Yes.

5    Q.   Did you record, audio or video, the conference that we

6    had that day?

7    A.   No.

8    Q.   Did you record any of the interviews that you had with

9    any of the witnesses involved in your investigation in this

10   matter?

11   A.   No.

12   Q.   Are you familiar with the Cole Memo?  2014?

13   A.   I don't -- I'm not sure what you're referring to.

14   Q.   It's a directive by the U.S. Attorney's Office or the

15   Department of Justice that recommends that all interviews

16   are recorded.  You don't know what the Cole Memo is?

17   A.   I do not.

18   Q.   It's not something that your department has discussed

19   with you?

20   A.   No.

21   Q.   It's a memo that was sent to the director of the FBI in

22   2014 with those recommendations of recordings?

23   A.   I have not seen the memo.

24   Q.   And we've learned that Oliver Robinson did not testify

25   before the grand jury, so we do not have a verbatim

1    transcript of the six interviews that he had with you,

2    correct?

3    **A.**   Correct.

4    Q.   And he, of course, was not recorded because no other

5    witnesses were recorded, correct?

6    **A.**   That's correct.

7    Q.   And it's important to be very accurate in your note

8    taking, correct?

9    **A.**   Yes.

10   Q.   Did you take notes and the agent from the IRS take notes

11   as well?

12   **A.**   Yes.

13   Q.   Did you put your notes together to form this 302?

14   **A.**   Yes.

15   Q.   Did you maintain your rough notes, in other words, you

16   didn't type this 302 contemporaneous with us talking, did

17   you?

18   **A.**   No.

19   Q.   In fact, the 302 was not reduced to writing, typed up

20   for some three or four months later, correct?

21   **A.**   No, that's not correct.

22   Q.   You can look at the date on the --

23   **A.**   The June 28 date?

24   Q.   Yes.

25   **A.**   Yes, that's when it was finalized in our system, but it

 1  was drafted much earlier than that.

 2  Q.  Okay.  Did you maintain your rough notes, your

 3  handwritten notes of that meeting?

 4  A.  Yes.

 5  Q.  And did you provide those to Mr. Martin, as we

 6  requested, as part of our discovery request?

 7  A.  I don't know.

 8  Q.  You don't know if you provided your rough notes to

 9  Mr. Martin?

10  A.  I did provide some rough notes to Mr. Martin.  I'm not

11  sure exactly which ones.

12  Q.  Would those rough notes reflect this meeting, this 302,

13  this very important meeting that we have?

14  A.  I have rough notes that reflect the meeting.

15  Q.  But you don't know if you've turned them over?

16  A.  I don't.

17  Q.  And it's important to get all the facts, correct, in

18  this 302, is it not?

19  A.  Yes.

20  Q.  And as part of this investigation, this was done

21  certainly early in your investigation in March of 2017?

22  A.  Yes.

23  Q.  Did you use the information that was provided to you by

24  David Roberson to corroborate things, to do research and

25  investigate?

1    A.  Yes.

2    Q.  Okay.  If you'll look to page 4 of the 302.  Do you

3    recall talking to David Roberson about the formation of

4    AJE?

5    A.  Yes.

6    Q.  And, in fact, David Roberson told you that it was

7    Balch's idea to form that organization, correct?

8    A.  Yes.

9    Q.  Okay.  And it was Balch that set up AJE, which was that

10   coalition of big business -- we've heard Alabama Power,

11   ACIPCO, Thompson Tractor, Nucor Steel.  It was Balch's idea

12   to set up that entity to get support for its community

13   outreach, correct?

14   A.  Yes.

15   Q.  And it was Balch that put on a presentation at the

16   Harbert Center to actually recruit members for that

17   community outreach effort, correct?

18   A.  Yes.

19   Q.  Okay.  And did you ever -- when David Roberson spoke to

20   you about the formation of AJE and what they wanted to do

21   was to put out their side of the facts because they had

22   learned that there were plaintiff's attorneys knocking on

23   doors trying to get people to sign up for lawsuits, do you

24   remember hearing him tell you that?

25   A.  I don't have a specific recollection today.

1   Q.  Well, let me reference you to your notes, to your 302 in

2   the middle of the page.  "They wanted to put out facts

3   instead of the fiction put out by their opposition."

4   **A.**  Yes.

5   Q.  "They knew there were lawyers knocking on people's doors

6   in the area and asking people if they wanted to participate

7   in a lawsuit."

8   **A.**  Yes.

9   Q.  Did you learn that?

10  **A.**  Yes.

11  Q.  And in your investigation, Agent Hunt, did you, in fact,

12  investigate to see whether there were plaintiff's firms in

13  the community knocking on doors looking for a toxic tort

14  lawsuit?

15  **A.**  No.

16  Q.  So you did not corroborate David Roberson's motive for

17  putting community outreach out there, did you?

18  **A.**  I did not corroborate that fact.

19  Q.  Okay.  And you didn't interview any law firms, you

20  didn't interview any citizens to determine whether they

21  were contacted by any lawyers or the like?

22  **A.**  No.

23  Q.  Did you not think that was important?

24  **A.**  I thought other things were important.

25  Q.  Okay.  Back to AJE.  You did accept that Balch is the

HUNT - Cross by Bloomston

1    one that set up that organization, correct?

2    A.  Yes.

3    Q.  And your notes don't reflect, but mine do, that there

4    was a budget set up for AJE.  Do you remember them talking

5    about a $300,000 budget?

6    A.  Yes.

7    Q.  But that's not reflected in your notes?

8    A.  If it's not reflected in my notes, we did not discuss it

9    in the interview.

10   Q.  We didn't discuss that in the interview?

11   A.  If things are in the 302, we discussed them.  If they're

12   not in the 302, we did not.

13   Q.  So if they're in my notes, they're not -- it wouldn't be

14   reflected?

15       MR. MARTIN:  Objection, Your Honor.  Unless he wants to

16   testify.

17       THE COURT:  Sustained.

18   Q.  (BY MR. BLOOMSTON:)  When discussing the issue of AJE

19   and how it was handled as far as any billing or invoices or

20   the like, Mr. Roberson told you that there was only one

21   person involved at Drummond, according to your 302, your

22   notes, that were involved with anything related to AJE, and

23   that's his assistant, Ms. Ingle.  Is that what you wrote?

24   A.  Yes.

25   Q.  Now, you've heard testimony from this court -- from the

```
 1   CEO of Drummond Coal, that he approved the invoices and the
 2   expenses from AJE, correct?
 3       MR. MARTIN:  Objection, Your Honor.
 4       THE COURT:  Overruled.
 5   Q.  (BY MR. BLOOMSTON:)  Did you hear Mike Tracy testify
 6   from the stand that he, in fact, approved the AJE invoices?
 7   A.  I believe so.
 8   Q.  You saw him address his initials?
 9   A.  Yes.
10   Q.  And that would be him ratifying that there was a $14,000
11   check made payable to the Oliver Robinson Foundation for
12   this purpose, correct?
13   A.  You'd have to pull up that particular document for me to
14   be sure of that.
15   Q.  Okay.  You did hear Mr. Tracy testify, correct?
16   A.  I can't recall everything every witness has said.
17   Q.  Okay.  I'll ask Sam to pull it up at his leisure, and
18   I'll revisit it with you.
19       You're also aware that all of the AJE activities are
20   reflected in the Balch billing records, correct?
21   A.  I don't know that it lists all of them.
22   Q.  Okay.  There's a substantial amount of AJE records or
23   action that the Balch firm is taking that are reflected in
24   Government's Exhibit 129, correct?
25   A.  Yes.
```

HUNT - Cross by Bloomston

1  Q.  And you're aware that all of that activity of community

2  outreach through the AJE -- and we talked about starting in

3  November of 2014 -- was sent to Blake Andrews and to

4  Drummond in those billing records, correct?

5  A.  Yes.

6  Q.  Okay.  You talked to Mr. Roberson, and you read some

7  information from page 6 of your 302 about his concerns

8  about Oliver Robinson Foundation being retained, correct?

9  A.  Could you repeat the question?

10 Q.  Well, I'll rephrase it.

11    You read to the ladies and gentlemen of the jury remarks

12 about ethics considerations that were brought forward by

13 David Roberson, correct?

14 A.  Yes.

15 Q.  And you're aware that Mr. Roberson had a conversation

16 with the attorneys at Balch to where he was assured that it

17 had been vetted by Greg Butrus and Chad Pilcher and that

18 there were no ethical issues to deal with, correct?

19 A.  I don't know that I can answer that question.

20 Q.  You can refer to your notes and answer that question.

21    The lawyers at Balch told David Roberson, and David

22 Roberson told you --

23 A.  There's information in this 302 that's been redacted.

24    MR. MARTIN:  Judge, I would object.

25    MR. BLOOMSTON:  Judge, I'm making --

 1          MR. MARTIN:  Based on the Court's previous order.

 2          MR. BLOOMSTON:  If we can approach the bench, I'll be

 3     glad to --

 4          THE COURT:  Okay.  Come on forward.  Let me get the

 5     other lawyers up.  One from each defendant, please.  Thank

 6     you.

 7          Actually, why don't you guys have a seat.  The time...

 8          Karen?

 9          THE COURTROOM DEPUTY:  Yes, sir?

10          THE COURT:  Can you take the noise off?

11          THE COURTROOM DEPUTY:  Yes, sir.

12          THE COURT:  Members of the jury, I lost track of the

13     time.  I told Mr. Bloomston I was going to interrupt him in

14     15 minutes.  Let me do that now and give you your morning

15     break, and I'll tend to this issue while you guys are

16     breaking.

17          Let's stop here.  Please do not talk about the case

18     during the break.  And, again, you're not to do so until

19     after all of the evidence is in and I've charged you on the

20     law.  If you do leave the jury room, let me know if anyone

21     approaches you at all about this case.

22          We are in recess for the next 15 minutes.  I will bring

23     you out shortly before 10:55.  Thanks, everyone.

24     (The following proceedings were had in open court

25     outside of the presence and hearing of the jury.)

 1      THE COURT:  Agent Hunt, you may step down and stretch

 2  your legs.  You know the drill by now.  You cannot talk to

 3  anyone about your testimony during the break.

 4      THE WITNESS:  Yes, sir.

 5      THE COURT:  Let me see the lawyers back up here.  Well,

 6  let's wait for Karen to come back in and give us --

 7      All right.  Come on up.

 8      Ms. Sabrina, are you ready?

 9      THE COURT REPORTER:  Yes, sir.

10  (At sidebar:)

11      THE COURT:  Mr. Roberson's position all along has been

12  he relied on the advice of counsel.  And I guess you want

13  to get out that he conveyed that to the FBI?

14      MR. BLOOMSTON:  Judge, I am, and I have been very

15  deliberate by saying "Balch" and not saying --

16      THE COURT:  "Defendants."

17      MR. BLOOMSTON:  -- the defendants by name.  I think

18  that is the cure.  If the Court made its decision on

19  letting the redacted testimony in, then the cure is for us

20  to at least be able to refer to it as "Balch."

21      THE COURT:  Any objections from --

22      MR. ESSIG:  Your Honor, I have some concerns.  I mean,

23  I think we are dancing all over a potential *Bruton*

24  violation with this line of questioning.  I haven't

25  objected because it's just for concern out of how it

```
 1    looks --
 2        THE COURT:  Optics.
 3        MR. ESSIG:  -- how it looks to the jury when I'm
 4    objecting to my co-counsel's questioning.
 5        So, I mean, again, the line of Bruton case law that
 6    talks about the implication of the codefendants.  And I
 7    think talking about Balch certainly creates that
 8    implication.
 9        THE COURT:  Okay.
10        MR. ESSIG:  So I have that concern.  And then -- one
11    more thing.
12        THE COURT:  What if he specifically said "Butrus," I
13    think is who you mentioned --
14        MR. ESSIG:  Butrus, yes.
15        THE COURT:  -- and Pilcher.
16        MR. BLOOMSTON:  Yes.
17        THE COURT:  And not these defendants?
18        MR. ESSIG:  Right.
19        THE COURT:  Same concern?
20        MR. ESSIG:  Well, because the question was, "You were
21    told it was vetted with Pilcher and Butrus."  I mean, and I
22    think from the evidence in the case, I mean, that points a
23    finger specifically at Mr. Gilbert.
24        THE COURT:  I missed that part of it.  That's a good
25    point.
```

1    MR. ESSIG:  And the other concern I have, Your Honor --

2    and I just spoke with Mr. Bloomston about this.  What I

3    understood the last line of questioning to implicate was

4    that Mr. Roberson specifically -- or that Mr. Roberson told

5    Agent Hunt and the government that the AEMC appearance

6    itself was specifically vetted.  And that's not accurate.

7    I mean, I don't even think the government's contending

8    that.  I don't even think the defendants would contend that

9    that's the case.

10    MR. BLOOMSTON:  And I don't think I said that.  If I

11    did, it was supposed to -- that's not reflected in the

12    section of the 302 that I was referring to.

13    THE COURT:  Mr. Gillen, what concerns --

14    MR. GILLEN:  I would join in the concerns for this

15    reason.  To sort of modify it and to say "Balch," my

16    client, Mr. McKinney, was not in the interview.  To state

17    it at all, the jury might think that maybe it was

18    Mr. McKinney and/or Mr. Gilbert.  But certainly, I would --

19    I don't want to have that implication or that conclusion.

20    So I would object to putting in "Balch," or, you know, to

21    kind of, quote, sanitize it, unquote, but that might have a

22    negative impact on us, and so I would object.

23    THE COURT:  Okay.

24    MR. BLOOMSTON:  And, Judge, Mr. Roberson is effectively

25    being denied a defense of advice of counsel.  We'd move for

1    a severance again at this point.

2         THE COURT:  Mr. Martin, since you started the

3    objection, anything else you want to add?

4         MR. MARTIN:  No, Judge.  Just that, you know, we

5    presented it consistent with the Court's order.

6         THE COURT:  Yeah.  All right.  Mr. Bloomston, your

7    concerns are well received.  For the objections that your

8    codefendants have raised, which are legitimate, and for the

9    government's responses as well to the same issue,

10   consistent with earlier rulings, I will be consistent and

11   will preclude you from going there.

12        And then your renewed motion for severance, I've

13   struggled with that in the course of the pretrial motions.

14   I believe we can do this jointly for the reasons that I

15   have stated before.  So I will at this point as well

16   overrule your renewed motion.  I think you have preserved

17   the issue repeatedly on that issue, so you can take it up

18   if it becomes necessary at the next level.

19        MR. BLOOMSTON:  Yes, sir.

20        THE COURT:  Okay.  Thank you.  You guys have roughly 10

21   minutes.

22   (Recess.)

23   (The following proceedings were had in open court in the

24   presence and hearing of the jury.)

25        THE COURT:  Thanks, everyone.  Be seated, please.

1   Mr. Bloomston, you may continue with your examination.

2        MR. BLOOMSTON:  Yes, sir.  Thank you.  May it please

3   the Court.

4   Q.  Agent Hunt, when we were last speaking, we were talking

5   about AJE and its ultimate use of the Oliver Robinson

6   Foundation to do its community outreach.  If you'll look on

7   the bottom of page 6 of your 302, David Roberson told you

8   that they had to basically meet with Oliver Robinson to see

9   if Oliver Robinson's foundation could do community outreach

10  work, correct?

11  **A.**  What part of page 6 are you referring to?

12  Q.  The very bottom, second-to-last line.

13  **A.**  Yes.

14  Q.  So David Roberson told you at the grand jury that he

15  never knew the Oliver Robinson Foundation had done

16  community outreach work before but that they wanted to meet

17  with him and talk to him about that purpose, correct?

18  **A.**  Yes.

19  Q.  Okay.  And ultimately, there was a decision made to

20  retain Oliver Robinson Foundation, correct?

21  **A.**  Yes.

22  Q.  And that was made with folks at Drummond, David

23  Roberson's employer, correct?

24  **A.**  Yes.

25  (Defendant's Exhibit 3207 was referenced.)

1      MR. BLOOMSTON:  Sam, if you'll pull up DX 3207, please,

2   at page 4.

3   Q.  You see that document in front of you that is in

4   evidence --

5   A.  Yes.

6   Q.  -- Agent Hunt?  And do you recall now after seeing that

7   document that Mike Tracy, the president of Drummond Coal,

8   initialed and authorized a payment of $14,000 to the Oliver

9   Robinson Foundation -- actually, to Balch on behalf of the

10  Oliver Robinson Foundation, correct?

11  A.  Yes.

12  Q.  Okay.

13     MR. BLOOMSTON:  You can take it down, Sam.

14  Q.  In the middle of page 7 of your 302, there's a reference

15  that is made about how Oliver Robinson Foundation was going

16  to be paid.  And David Roberson told you that it was

17  discussed that Oliver's proposal was $10,000, but

18  ultimately, it was a $7,000 payment that was agreed upon,

19  correct?

20  A.  Yes.

21  Q.  And that was Mike Tracy's decision.  You heard him

22  testify that he is the one that negotiated it down from ten

23  to seven or approved from ten to seven?

24  A.  I don't recall Mike Tracy's exact testimony.

25  Q.  Well, let me ask you this:  I mean, you heard Mike Tracy

*HUNT - Cross by Bloomston*

1    testify, correct?

2    **A.**  Yes.

3    **Q.**  And you looked at a string of emails that Joel Gilbert

4    had sent to David Roberson saying "We need to get this

5    signed.  We need to get the contract signed.  Do we agree

6    to $7,000?"  And you recall that David Roberson reached out

7    to Mike Tracy, correct, via mail?

8    **A.**  Could you pull up the email?

9    **Q.**  I could.  You don't recall the email?

10   **A.**  We've looked at a lot of emails.

11   **Q.**  Okay.  If you don't recall it --

12   **A.**  I would like to be accurate.

13   **Q.**  I'll ask Sam to pull that up again when he's able to.

14   But as you sit here today, you don't recall the

15   back-and-forth of those important emails telling -- Joel

16   telling David to get approval for a $7,000 contract?  You

17   don't recall that?

18   **A.**  I recall emails --

19   **Q.**  Okay.

20   **A.**  -- about $7,000.

21   **Q.**  Okay.

22   **A.**  But I don't recall every detail.

23   **Q.**  All right.  In your investigation, did you subpoena

24   phone records?

25   **A.**  Yes.

1   Q.  Did you determine that Mike Tracy and David Roberson

2   actually had a two-minute phone conversation that morning

3   before David Roberson emailed Joel Gilbert back approving

4   the $7,000?

5   A.  I would have to be shown those records.

6   Q.  You have no independent recollection of that?

7   A.  I don't.

8   Q.  With regard to your 302, lower middle of the page on

9   page 7 talked about that -- or your recollection of the

10  meeting was that they were only paying for work with Oliver

11  Robinson Foundation through AJE and the AJE funds were only

12  being used for work with the ORF.  Is that your

13  recollection of the meeting?

14  A.  That's what's written there.

15  Q.  Do you not recall David Roberson telling you that

16  Drummond paid some of those invoices and AJE paid some of

17  those invoices?

18  A.  I don't recall that.

19  Q.  Have you heard in the testimony that has come from this

20  witness stand that, in fact, Drummond paid some of the

21  invoices for community outreach --

22  A.  Yes.

23  Q.  -- and AJE paid some of them?  Regarding this community

24  outreach project, you were told by David Roberson that they

25  were trying to get out in the community, correct?

1    A.  Yes.

2    Q.  They were engaging the NAACP to speak with churches in

3    the neighborhoods, correct?

4    A.  Yes.

5    Q.  And that they wanted the EPA -- they wanted folks to be

6    aware of what the EPA was doing that was misleading,

7    correct?

8    A.  Yes.

9    Q.  And he gave you the names of John Powe and Amanda and

10   Oliver Robinson as the folks that were doing the bulk of

11   that community outreach work; is that correct?

12   A.  Not exactly.

13   Q.  Okay.  Let me rephrase it.  He gave you the names of

14   John Powe, Amanda Robinson, that they were involved in the

15   community outreach, correct?

16   A.  He said that John Powe and Amanda Robinson were

17   involved.

18   Q.  Okay.  And that they, to his knowledge, had Miles

19   College students going door to door with surveys,

20   et cetera; is that correct?

21   A.  Yes.

22   Q.  And the reason why they engaged the Oliver Robinson

23   Foundation and had John Powe and Amanda Robinson out in the

24   community is because they had contacts in that community

25   that David Roberson, that Drummond, that Balch did not

1   have, correct?

2   **A.**   Yes.

3   **Q.**   And, in fact, Mr. Roberson told you, David told you that

4   he did not believe that Oliver Robinson would be in the

5   community doing this outreach, correct?

6   **A.**   Yes.

7   **Q.**   And that there was rarely a time that he thought that

8   Oliver with his busy schedule would be going door to door

9   to meet with people; is that correct?

10   **A.**   Yes.

11   **Q.**   Agent Hunt, with regard to this AEMC meeting, you have

12   no independent knowledge of what motivated Oliver Robinson

13   to speak to that meeting, do you?

14   **A.**   Can you say that again?

15       MR. MARTIN:   Objection.   That's beyond the scope of

16   direct.

17       THE COURT:   I recall that being part of the 302, so why

18   don't you rephrase the question since the witness did not

19   understand it.

20   **Q.**   (BY MR. BLOOMSTON:)   You have heard witness testimony

21   regarding the AEMC meeting, correct?

22   **A.**   Yes.

23   **Q.**   And that Oliver Robinson went to that AEMC meeting to

24   speak to that commission, correct?

25   **A.**   Yes.

1  Q.  And David Roberson told you that he thought it was a

2  foolish idea, a fool's errand, correct?

3  **A.**  He said he thought public speaking was a waste of time.

4  Q.  Well, specifically he thought that approaching the AEMC

5  would have been a waste of time, correct?

6  **A.**  Yes.

7  Q.  Not public speaking on the debate team but --

8  **A.**  Yes.

9  Q.  -- public speaking in front of this agency, correct?

10  **A.**  Yes.

11  Q.  And you heard testimony that Balch and Drummond and

12  their consultants all had relationships with Lance LeFleur,

13  correct?

14  **A.**  Yes.

15  Q.  And they had relationships with Chairman Brown, correct?

16  **A.**  Yes.

17  Q.  And they had relationships with Vernon Barnett, the

18  attorney for Lance LeFleur, correct?

19  **A.**  Yes.

20  Q.  And they had relationships with the governor's office,

21  correct?

22  **A.**  Yes.

23  Q.  And the Attorney General's office, correct?

24  **A.**  Yes.

25  Q.  So David Roberson's view that it would be foolish to go

1   speak before the AEMC, which we have learned is an

2   oversight committee that has no voting power, that

3   substantiates his position, does it not?

4   A.   Could you rephrase the question?

5   Q.   If David Roberson told you that he thought it was

6   foolish to speak to the AEMC, with all of the relationships

7   that they have, that all the businesses have, that

8   substantiates the fact that it's a foolish errand and they

9   don't have to do that?

10       MR. MARTIN:   Objection.

11       THE COURT:   Sustained.

12   Q.   (BY MR. BLOOMSTON:)   Other than Oliver Robinson's

13   testimony, do you have anything that tells you that David

14   Roberson told Oliver Robinson to testify before the AEMC?

15   A.   The Balch & Bingham billing entries indicate that he was

16   at a meeting on February 11, 2015 with Joel Gilbert, Oliver

17   Robinson, Trey Glenn, and Scott Phillips regarding the AEMC

18   meeting.

19   Q.   Does that billing record reflect what David Roberson

20   said at that meeting?

21   A.   It does not.

22   Q.   Does that billing record reflect if David Roberson

23   opened his mouth at that meeting?

24   A.   No.

25   Q.   And David Roberson is sitting in his attorney's office

1    during those meetings, correct?

2    A.  Yes.

3    Q.  And you've heard evidence and testimony during this

4    trial that David Roberson's attorneys were advising him,

5    correct?

6    A.  Yes.

7    Q.  So the only evidence that you have and are aware of

8    comes from a perjurer, someone who has testified under

9    oath, who has lied about his tax filings --

10         MR. MARTIN:  Objection, Your Honor.  Argumentive.

11         THE COURT:  You can ask the question.

12   Q.  (BY MR. BLOOMSTON:)  So the only evidence against David

13   Roberson for suggesting to Oliver Robinson to speak to the

14   AEMC comes from Oliver Robinson, correct?

15   A.  Yes.

16   Q.  And Oliver Robinson has pled guilty to perjury, correct?

17   A.  Yes.

18   Q.  And tax violations, correct?

19   A.  Yes.

20   Q.  And fraud?

21   A.  Yes.

22   Q.  And theft?

23   A.  Yes.

24         MR. BLOOMSTON:  Tender the witness, Your Honor.

25         THE COURT:  Mr. Martin, redirect?

1   REDIRECT EXAMINATION BY MR. MARTIN:

2   Q.  Agent Hunt, you were asked some questions about the time

3   period covered by your summaries that you testified about

4   earlier.  Do you recall that?

5   A.  I do.

6   Q.  The time period included in the government's summaries

7   includes the time period when Oliver Robinson was meeting

8   with EPA; is that right?

9   A.  Yes.

10  Q.  And it includes the time periods when Oliver Robinson

11  was meeting with the Alabama Environmental Management

12  Commission, doesn't it?

13  A.  Yes.

14  Q.  And it involves the time period when Oliver Robinson and

15  Balch & Bingham were negotiating a contract?

16  A.  Yes.

17  Q.  And does it include the time period when Oliver Robinson

18  entered into that contract and was given a $14,000 check?

19  A.  Yes.

20  Q.  You were asked some questions about how many entries

21  were related between certain dates -- between -- were

22  related to Oliver Robinson.  Do you recall those questions?

23  A.  I do.

24  Q.  I want to ask you a related question.  How many --

25  first, what is the first date of contact with Oliver

1   Robinson reflected in the Balch & Bingham records or the

2   first mention?  And that's Government's Exhibit Number 260.

3   **A.**   November 13, 2014.

4   *Q.*   Do you recall from the indictment that there are three

5   checks specifically mentioned in the indictment?

6   **A.**   Yes.

7   *Q.*   Is the date of the third check June 22, 2015?

8   **A.**   Yes.

9   *Q.*   Have you gone through and determined how many entries

10  between those two dates, November 13, 2014 and June 22,

11  2015, relate specifically to community outreach?

12  **A.**   Yes.

13  *Q.*   And what did you determine?

14  **A.**   Do you want me to go over the entries?

15  *Q.*   No.  Did you determine how many entries involving Oliver

16  Robinson specifically related to community outreach between

17  those dates?

18  **A.**   Yes.  I believe there are two entries related to

19  meetings.

20  *Q.*   And what are the dates of those?

21  **A.**   April 20, 2015 and May 18, 2015.

22  *Q.*   Were there emails between Oliver Robinson and Balch

23  lawyers related to community outreach?

24  **A.**   Yes.

25  *Q.*   How many?

1   A.   Three.

2   Q.   And were there phone calls reflected in those records

3   specifically related to community outreach?

4   A.   Yes.   Three.

5   Q.   Three.   So three calls, three emails, and two meetings?

6   A.   Yes.

7   Q.   And those meetings were in April and May of 2015?

8   A.   Yes.

9   Q.   Were you aware at the time that you testified at the

10  grand jury regarding this matter that there were -- that

11  Joel Gilbert and David Roberson were having communications

12  with Oliver Robinson about the proposal that he submitted,

13  a contract, and appearing at the Environmental Management

14  Commission?

15  A.   Yes.

16  Q.   Were you also aware of evidence including Balch &

17  Bingham time records showing that Steve McKinney was

18  discussing Oliver Robinson's appearance and contract with

19  Joel Gilbert?

20  A.   Yes.

21  Q.   Okay.   When Mr. Gillen asked you questions about your

22  grand jury testimony, you began your answer with, "It

23  wasn't my intention."   Do you remember that?

24  A.   I do.

25  Q.   Okay.   What did you mean by that?

1  **A.**  I meant that I would never intentionally lie to a grand

2  jury.

3  **Q.**  And at the time that you testified at the grand jury,

4  you knew about the -- you were testifying about a

5  conspiracy between these three defendants, correct?

6  **A.**  Yes.

7  **Q.**  Okay.  And you were generally aware about the laws

8  regarding conspiracy, right?

9  **A.**  Yes.

10      MR. GILLEN:  Objection, Your Honor.  It's concerning

11  legal issues about laws.

12      MR. MARTIN:  It's about her knowledge of those.

13      THE COURT:  I'll allow you to ask the question.

14  **Q.**  (BY MR. MARTIN:)  Were you aware of the law that during

15  a conspiracy, when one conspirator can speak on behalf of

16  other conspirators?

17  **A.**  Yes.

18      MR. MARTIN:  That's all I have.  Thank you.

19      THE COURT:  Mr. Essig?

20      MR. ESSIG:  No further questions.

21      THE COURT:  Thank you.

22      Mr. Gillen?

23      MR. GILLEN:  Briefly, Your Honor.

24      THE COURT:  You may.

25  RECROSS-EXAMINATION BY MR. GILLEN:

1   Q.  Following up on your recross, Mr. Martin was the

2   gentleman in the grand jury asking you the questions,

3   correct?

4   A.  He was.

5   Q.  You had prepared to go in to the grand jury and to give

6   as complete and truthful answers as you possibly could,

7   correct?

8   A.  Yes.

9   Q.  You knew when you went in the grand jury, the grand jury

10  had not heard Oliver Robinson testify, correct?

11  A.  Yes.

12  Q.  You knew the grand jury was depending on you for

13  complete and truthful answers regarding activities of the

14  individuals that you were seeking to indict.  You knew

15  that, didn't you?

16  A.  Yes.

17  Q.  And the grand jury was depending on you, an FBI agent,

18  when you swore an oath to tell the truth, the whole truth,

19  and nothing but the truth to do exactly that, weren't they?

20  A.  Yes.

21  Q.  And Mr. Martin asked you the question, "During the time

22  period that they're discussing this proposal and potential

23  contract, are they also -- Gilbert, McKinney, and

24  Roberson -- talking with Oliver Robinson about appearing at

25  the commission meeting in February?"  And you answered,

1    "Yes," didn't you?

2    A.  I did.

3    Q.  That didn't have to do with any legal theory about

4    conspiracy.  You're telling that grand jury that Steve

5    McKinney was talking with Oliver Robinson about appearing

6    before the commission in February, weren't you?

7    A.  I was telling them that Mr. Gilbert and Mr. Roberson

8    were talking to Oliver Robinson, and there was a

9    conspiracy, and Mr. McKinney was involved in the

10   conspiracy.

11   Q.  Tell me where in that question where you were telling

12   them about some conspiracy when you told the grand jury,

13   questioned by Mr. Martin -- again, let's just focus in on

14   what you said.  And these people in the grand jury aren't

15   lawyers.  They're depending on the government lawyers and

16   the government agents to get it right, aren't they?  Aren't

17   they?

18   A.  Yes.

19   Q.  And when they say that they are discussing this proposal

20   and potential contract, they -- "Gilbert, McKinney, and

21   Roberson -- are talking with Oliver Robinson about

22   appearing at the commission meeting in February," and you

23   answer "Yes," don't you?

24   A.  I did.

25   Q.  And you were telling the grand jury that Mr. McKinney

 1   was speaking with Mr. Robinson, correct?  And that was

 2   false, wasn't it?  It was false, wasn't it?

 3   **A.**  I was telling them that Mr. Gilbert and Mr. Roberson

 4   spoke with Oliver Robinson.

 5   Q.  But Mr. McKinney never did, did he?

 6   **A.**  I don't know that he did.

 7   Q.  Okay.  And you didn't know that he did when you gave

 8   that false testimony that got him indicted before the grand

 9   jury that they were depending on you for truthful answers;

10   isn't that right?

11   **A.**  Yes.

12       MR. GILLEN:  That's all I have.

13       THE COURT:  Mr. Bloomston?

14       MR. BLOOMSTON:  No, sir, Your Honor.

15       THE COURT:  Okay.

16       MR. MARTIN:  Judge, may I?

17       THE COURT:  Mr. Martin, you may.

18   FURTHER REDIRECT EXAMINATION BY MR. MARTIN:

19   Q.  Did the grand jury have in front of it the same plea

20   agreement by Oliver Robinson that has been introduced into

21   this trial?

22   **A.**  Yes.

23   Q.  And that includes a factual statement by Oliver Robinson

24   about what he did and who he conspired with?

25   **A.**  Yes.

1          MR. MARTIN:  Okay.  That's all.

2          MR. GILLEN:  I've got to follow up.

3    FURTHER RECROSS-EXAMINATION BY MR. GILLEN:

4    Q.  In Mr. Robinson's plea agreement, he never once

5    mentioned Steve McKinney, did he?  Not once?  Yes or no?

6    **A.**  Could you provide me a copy of the plea agreement?

7          MR. GILLEN:  Well, can we do that?

8          THE COURT:  Do you have any reason to doubt

9    Mr. Gillen's representation?

10          THE WITNESS:  No.

11    Q.  (BY MR. GILLEN:)  And you knew then --

12          THE COURT:  Is the plea agreement already in evidence?

13          MR. BLOOMSTON:  Yes.

14          MR. GILLEN:  The plea agreement is in evidence.

15    Q.  And you knew then when you appeared before that grand

16    jury and asked the good people from the community on the

17    grand jury to indict Steve McKinney, you knew that Oliver

18    Robinson's plea agreement did not have any reference

19    whatsoever to Steve McKinney?  You knew that, didn't you?

20    **A.**  Yes.

21    Q.  And the prosecutor who was asking you questions about

22    that in the grand jury, he knew it, too, didn't he?

23    **A.**  Yes.

24          MR. GILLEN:  That's all I have.

25          THE COURT:  Agent Hunt, you may step down.  Thank you

1  for your testimony.

2  (Witness excused.)

3      THE COURT:  Who is the government's next witness?

4      MR. MARTIN:  Judge, we request permission of the Court

5  to read Steve McKinney's grand jury testimony into the

6  record.

7      THE COURT:  You may.  Objections have been made, I

8  believe, Mr. Gillen.  But to the extent that I'm

9  overlooking anything, just let me know if you want to get

10  anything on the record.

11      MR. GILLEN:  Your Honor, I'm sorry.  Mr. McKnight --

12      THE COURT:  Mr. McKnight.  Objections have been made.

13      MR. GILLEN:  Yes, Your Honor.

14      THE COURT:  Okay.  It's already in the record.

15      Ladies and gentlemen, this is the same as yesterday.

16  This is grand jury testimony that Mr. McKinney gave, I

17  believe.  It is only to be considered solely as to him and

18  not to be considered with respect to any of the other

19  defendants in this case.

20      Same drill.  Mr. Martin, I guess, will read his

21  questions, and then Mr. McKinney's answers will be read

22  here in court by this witness.

23      You may begin.  Thank you.

24  (Government's Exhibit 262 was referenced.)

25      MR. MARTIN:  Thank you, Your Honor.  And for the

1    record, this is Government's Exhibit Number 262 for

2    identification.

3    **GRAND JURY TESTIMONY OF STEVEN McKINNEY**

4    *May 24, 2017, 1:04 p.m.   Whereupon, Steven McKinney, a*

5    *witness of lawful age, having sworn to tell the truth, the*

6    *whole truth, and nothing but the truth, was examined and*

7    *testified as follows:*

8    Q.  *Good afternoon.*

9    **A.**  *Hi.*

10   Q.  *Would you state and spell your last name for the grand*

11   *jury, please.*

12   **A.**  *My last name is McKinney, M-c-K-i-n-n-e-y.*

13   Q.  *And your first name?*

14   **A.**  *Steve or Steven, S-t-e-v-e-n.*

15   Q.  *Mr. McKinney, before we get started, I want to give you*

16   *some warnings and some rights that witnesses in the grand*

17   *jury have.   First, you have been placed under oath now.*

18   *And should you give materially false testimony to the grand*

19   *jury, you would be prosecuted for federal offenses such as*

20   *perjury or obstruction of justice.   Do you understand?*

21   **A.**  *I do.*

22   Q.  *You also have the right to refuse to answer any question*

23   *that you think might incriminate yourself.   If you do*

24   *answer questions, anything you say could be used in a*

25   *subsequent legal proceeding.   And I believe you're*

1    *represented by counsel today.  If at any time during the*

2    *questioning you need to consult with counsel, let us know,*

3    *because you have the right to do that, and we'll give you a*

4    *fair opportunity.  Do you understand those?*

5    **A.**   *I do.*

6    *Q.   Could you give us your address, please, your home*

7    *address?*

8    **A.**   *I live at 333 *** in Birmingham.*

9    *Q.   That's good.  Thank you.*

10   **A.**   *That's kind of south of town.*

11   *Q.   Can you give us your work and home number and cell phone*

12   *number, too, please?*

13   **A.**   *Okay.  My work phone number is area code (205) ********.*

14   *My home phone number is area code (205) ********.  And my*

15   *cell phone number is area code (205) ********.*

16   *Q.   Do you have a separate cell phone for work and personal,*

17   *or do you use the same one?*

18   **A.**   *I use the same one.*

19   *Q.   How about email addresses, what email addresses do you*

20   *use?*

21   **A.**   *It's ***@balch.com.*

22   *Q.   Do you have a personal email?*

23   **A.**   *I do not.*

24   *Q.   What's your job, Mr. McKinney?*

25   **A.**   *I'm an attorney.*

1   Q.  *And where do you work?*

2   **A.**  *Balch & Bingham.  It's a law firm here in town.*

3   Q.  *How long have you worked there?*

4   **A.**  *It will be thirty -- started in '79, so it will be*

5   *thirty-eight years next week.*

6   Q.  *Have you had other legal jobs, or have you worked at*

7   *Balch your entire career?*

8   **A.**  *I've worked at Balch & Bingham the whole time.*

9   Q.  *Where did you go to law school?*

10  **A.**  *The University of Illinois, which is in*

11  *Champaign-Urbana, Illinois.*

12  Q.  *How about undergrad?*

13  **A.**  *I went to the University of Mississippi.*

14  Q.  *And what was your undergraduate degree in?*

15  **A.**  *Ah.*

16  Q.  *Has it been that long?*

17  **A.**  *Yeah.  My major -- my degree was a bachelor of arts in*

18  *liberal arts, and my major was in political science and*

19  *economics as a double major, and I have a minor in English.*

20  Q.  *What is the focus of your practice at Balch & Bingham?*

21  **A.**  *I'm an environmental lawyer.*

22  Q.  *And do you have some sort of supervisory role?*

23  **A.**  *Yes, in the sense that I am the head of the*

24  *environmental section.  I assist the partners and all the*

25  *lawyers in my group.  They may come to me for advice or*

*assistance, something of a mentor, you might say, to them.*
*I may help them really with anything that they are doing to*
*serve a client or to improve themselves as a lawyer.  They*
*would ask me to be involved and help them in some way.*

*    For example, if a lawyer in my group believes that going*
*to a particular seminar, you know, will be good for them to*
*help them be a better lawyer, they would come to me and we*
*would talk about that, and I would have input into, you*
*know, whether they should go to that seminar or not.  But*
*it's that kind of thing.*

Q.  *How big is the environmental group at Balch?*

A.  *We have more than 20 lawyers in the environmental group,*
*and I'm trying to remember the exact number.  I can't*
*remember exactly, but we've got 22, 23, maybe 24 lawyers in*
*that group.  They are in Atlanta; Washington, D.C.;*
*Birmingham; Gulfport, Mississippi.  And I should know the*
*exact number, but I don't have it on the tip of my tongue.*

Q.  *Are you familiar with the Environmental Protection*
*Agency's -- EPA's -- actions in North Birmingham in the*
*last few years?*

A.  *I am.*

Q.  *Can you sort of generally describe the history of EPA's*
*actions in North Birmingham for the grand jury, please?*

A.  *Sure.  Let me think of it because it might be a long*
*story.  Generally, several years ago, perhaps five, maybe*

six years ago, maybe even a little longer, USEPA had a
project going on in North Birmingham that was being handled
with the USEPA.

   And there was cooperation from a local company under a
federal law called RCRA.  It stands for Resource
Conservation Recovery Act.  And that federal law is a law
that governs and directs parties, whoever they are, how
they should handle hazardous waste that they generate or
somehow come to possess.  And that project was going on
under RCRA in North Birmingham with regard to a particular
company and their property.

Q.  The particular company was Walter Coke.  Is that who
you're referring to?

**A.**  I believe so, Mr. Martin.  That company's name has
changed a couple of times.  They have been combined with
other companies, but I believe what people refer to as the
Walter Coke property, yes.  And USEPA was involved in that
on that basis, and they decided to change the focus of
their involvement with regard to that property to approach
that situation under federal statute.

   It also deals with hazardous waste, but it deals with it
in a different way, and that statute is called CERCLA.
That's C-E-R-C-L-A.  Its nickname is Superfund.  That
statute is much broader than the previous one I mentioned,
RCRA, and it deals with contaminated land in a different

way.  It gives EPA, USEPA, a more power authority, broader

power and authority to do things.

    And when they changed their focus and started using the

Superfund statute, one of the things they are allowed to do

under Superfund is to deal with parties that they believe

are somehow responsible for the contamination being on the

land.  That notion of being responsible is very broadly

stated.  It is a broadly stated statute.  And it gives

USEPA broad powers.

    In this case, when they began handling the matter as a

Superfund matter, they broadened their activity off of the

property in question into, you might say, adjoining

property in the neighborhoods near or around that property.

And they begin treating that whole area as a Superfund

site.

    There is a lot of process that goes in getting to that

point, but they began treating it like a Superfund site.

One of the things that happens at a Superfund site is USEPA

has money they can use to do things to deal with the

contamination they found.  But the statute also authorizes

USEPA to try to hold other people responsible for the costs

of cleaning up that property.

    You know, it can be very expensive proposition to be

involved in one of these sites to do what EPA wants to do

to address the contamination.  So it's a very serious

1    matter for someone to -- some entity, person, business,

2    company, university, city, you know, county, any

3    government, United States can be a party under the

4    Superfund.  It's a very serious matter to be held

5    responsible for doing -- for paying for what USEPA believes

6    ought to be done.

7        So it leads to a lot of serious consideration when

8    someone thinks they might be responsible or is told that

9    someone else thinks they might be responsible.  Because

10   this statute so broad, you can have someone -- let's just

11   say someone is responsible.  Maybe it's their property

12   even.   That person can turn around and say, well, I believe

13   that there is several other parties who are also

14   responsible and I want to bring them into this activity.

15       There may be someone outside of that process, and maybe

16   USEPA would say we believe that other people are

17   responsible and bring them into the situation.  So that's

18   typical of a Superfund situation, and that's what happened

19   in North Birmingham.  USEPA began to ask themselves, "Is

20   anyone else responsible for this?"  Are there were

21   several -- over time there were several parties that USEPA

22   approached and said," We think you might be responsible for

23   this."

24       That led them to engagement with them, conversations

25   with them and various people.  Really all the people they

1    *spoke to that way denied responsibility and said we're not*

2    *responsible for this.  USEPA continued their activity, the*

3    *activity they thought was appropriate for addressing the*

4    *situation and continued spending money, in various*

5    *episodes, approached those parties they thought that they*

6    *could hold responsible for the situation and said, don't*

7    *you think you're responsible?*

8        *And although I wasn't involved in all the parties, the*

9    *parties I represented, we consistently told the USEPA we*

10   *are not responsible for this.  We had nothing to do with*

11   *it.  And if you have a view otherwise, please tell us, you*

12   *know, why and show us the reasons.  Tell us the reasons.*

13   *Show us the evidence that you have that would say we are*

14   *somehow responsible for this.  So we engaged in that kind*

15   *of discussion.*

16       *USEPA continued their work.  They continue it even today*

17   *doing what they think they need to do out there to address*

18   *contaminated land.  And that was the North Birmingham site.*

19   *Q.  We've heard it referred to in a couple of different*

20   *ways.  Were you referring to the 35th Avenue Superfund*

21   *Site, or were you referring to both that site plus the*

22   *Tarrant/Inglenook area?*

23   **A.**  *I have been referring just now to the North Birmingham*

24   *site, the 35th Avenue site.  Another chapter in that story*

25   *is that there were -- it was an environmental group that*

1  was involved in the North Birmingham site.  You know, this

2  is a very public process.  People are allowed to

3  participate and express their views and things.  This

4  environmental group --

5  Q.  What was the name of the group?

6  **A.**  The name of the group is G-A-S-P.  I suppose they call

7  themselves GASP.  It stands for -- GASP stands for

8  something else.  I'm not sure exactly what it is, but GASP

9  would be the name of the letters of what they spell.  The

10  environmental group was very adverse.  You haven't asked

11  me, but I'll say my client in this matter was ABC Coke, a

12  coke manufacturer over in the Tarrant area.

13  Q.  Which is a division of Drummond?

14  **A.**  It is.  It is a subsidiary or division.  I'm not sure

15  which the appropriate nomenclature would be of Drummond

16  Company.  This environmental group was very adverse to

17  ABC Coke, and they kind of made it very obvious by the

18  things they put on their website and the stuff they

19  published.  And they were very adverse to the coke plant.

20  You know, at least in terms of public activity, they filed

21  a petition with USEPA that in summary said we think that

22  you should take this view that you have about North

23  Birmingham and the activity that you are engaging in in

24  North Birmingham.  We think you should take this and just

25  expand it to include the City of Tarrant and some

1    *neighborhoods of Birmingham, a very large area.*

2        *They petitioned EPA to do that, and that's allowed under*

3    *the statute that I told you about, the Superfund statute.*

4    *So there was a petition filed, and USEPA had an obligation*

5    *to respond to the petition.  So they went about their*

6    *business of preparing a response to the petition, which*

7    *involves taking public comments and such.  So my client --*

8    Q.  *Could you slow down a bit for the court reporter?*

9    **A.**  *Sorry.  So my client, ABC Coke, is located in that area.*

10   *And in light of GASP's previous position opposed to*

11   *ABC Coke, it was pretty apparent and you did not have to*

12   *guess, they were saying it pretty plainly that this*

13   *petition was really about trying to involve, to pull in*

14   *ABC Coke into this North Birmingham situation.*

15       *One of the things that, you know, was always something*

16   *that we would say to USEPA is, you know, our plant that*

17   *you're talking about is a long distance from where you are.*

18   *It's almost two miles away from where this is going on.*

19   *How is it that you think we had something to do with the*

20   *contamination that you're focused on?  So this was kind of*

21   *a response to that in the sense, well, we'll just expand*

22   *the site to include the neighborhood that you're in.*

23       *So that petition was being processed, and USEPA was*

24   *responding to it.  There are several steps in that.  The*

25   *first step was to kind of -- a review of the situation just*

1    *based on paper, you know, what's available on the records*

2    *that would tell us anything about the site.  They came back*

3    *after doing that and they said, well, we're going to go to*

4    *the next step, which is a little more involved.  It's*

5    *beyond the paper.*

6        *It actually goes out in this step -- one actually goes*

7    *out onto the property in question and begins to examine it*

8    *and test for things and do a physical examination of the*

9    *area to enhance the review you've just done based on*

10   *records and things.  So USEPA did that.  And at the end of*

11   *that, they reached a decision that they would not go any*

12   *farther with that petition.  It would not expand the*

13   *Superfund site or create a new Superfund site in that City*

14   *of Tarrant area and the related neighborhoods of*

15   *Birmingham.*

16       *That's pretty much where we are today.  It's a very*

17   *summary form, but that's pretty much where we are today.*

18   Q.  *What's the timing of this action?  Did it begin roughly*

19   *in 2014?*

20   **A.**  *I'm a little fuzzy on exactly when things happened.*

21   *This has been going on for a number of years.  The petition*

22   *that I told you about, you know, I can't be sure, you know.*

23   *This is 2017.  It's been going on two or three years, but I*

24   *don't remember a date specifically.*

25   Q.  *Maybe we'll look at some documents in a bit that will*

1   *refresh your recollection of the date.*

2       *First I want to ask you as part of this -- now, I didn't*

3   *hear this in your explanation -- was there some effort by*

4   *EPA to put the North Birmingham site on the National*

5   *Priorities List?*

6   **A.**   *There was.*

7   Q.   *Can you briefly explain that?*

8   **A.**   *Under the Superfund statute, there is a program, I'll*

9   *call it, whereby USEPA is both authorized and somewhat*

10  *expected to identify, evaluate, and list the most serious*

11  *contaminated areas that are Superfund sites.  You know,*

12  *they get involved and they make a decision:  Should we*

13  *declare this to be a Superfund site?  And they had done*

14  *that in North Birmingham.*

15      *Then this process was kind of after that, and it's a*

16  *process that says we're going to have a list in the United*

17  *States.  We're going to have a list of the most serious*

18  *Superfund sites that are out there.  It's called the*

19  *National Priorities List, or the NPL, and it dates back to*

20  *the beginning of Superfund.*

21      *And a little bit of a history.  When Superfund was*

22  *adopted, it was a very bold and broad and very strong*

23  *statute, and it was adopted in an environment where we had*

24  *some really, really big contaminated land problems.  And so*

25  *Congress acted with a broad sweeping statute that*

1    authorized EPA to get out there and deal with these things.
2    And that was in 1980.  So we're 37 years from that.

3        And this NPL process was a part of that because there
4    were many different places that might qualify as a
5    Superfund site, and EPA would be authorized to do things
6    about that site.  Other parties would be authorized to do
7    things about it and to engage with other people to get
8    things done, but it might not be the highest priority that
9    the USEPA would have, and particularly with regard to
10   spending money from the Superfund.

11       The nickname Superfund comes from the reality that this
12   statute also imposed a tax on a barrel of oil to collect
13   money to create a special fund so the EPA would have money
14   to do what they needed to do when they found a site they
15   wanted to do something with.  But there's not enough money.
16   So issues of priorities arose, and the NPL was a way of
17   saying, well, USEPA, you should create a list of the most,
18   the highest priority sites.  That was mid 1980.

19       Come forward through time, and you know we have done a
20   lot of cleanup.  The sites that are being handled today are
21   somewhat different than the sites that were being handled
22   back then, but the process is still there.  The NPL process
23   is still there.  In this case, the USEPA issued a proposal.
24   And EPA being an agency, a lot of times they act through
25   what we call a notice and comment rulemaking process.

1    *So that's them saying we think we should do this, but*

2    *we're going to receive comments from the public about this*

3    *and then we'll decide whether -- to decide after we*

4    *consider those comments.  And so the NPL process is one of*

5    *those processes.  So they issued a proposal to list the*

6    *North Birmingham or the 35th Avenue Superfund Site on the*

7    *National Priorities List.*

8    *The public had the opportunity to file comments, and*

9    *then USEPA considered those comments.  And they have not*

10    *decided.  I don't know.  I'm trying to think.  I believe*

11    *they have simply not decided.  I don't believe they said*

12    *we're not going to do it.  I believe they simply haven't*

13    *decided the issue, which is common, you know.  That*

14    *happens.*

15    *Q.  So what difference does it make if a Superfund site is*

16    *on the National Priorities List?  And primarily focus on in*

17    *terms of money spent by the federal and state governments*

18    *and the potential effect on responsible parties.*

19    **A.**  *Usually USEPA will propose a site for listing because*

20    *doing so gives them access to more of the Superfund, the*

21    *available Superfund money.  That money is in short supply,*

22    *so people have to make decisions on how they're going to*

23    *allocate it.  So usually listing the site will give USEPA*

24    *access to more of the Superfund money from the perspective*

25    *of a private party.*

1    Q.  *Talk about the state.  What is the potential effect on*
2    *the State of Alabama if the 35th Avenue site is listed on*
3    *the NPL?*
4    **A.**  *Well, first of all, the state is a party like anybody*
5    *else, and they're authorized to participate in this notice*
6    *and comment process and file their comments to see what*
7    *they think.  And they make a statement of what they think.*
8    *In terms of the state, Mr. Martin, I'm a little fuzzy on*
9    *this.  So, you know, bear with me.  When a site gets*
10   *listed, there are by practice and habit opportunities for*
11   *the state where the site is located to participate in some*
12   *form of management of the site.*
13        *I'm a little fuzzy on exactly how, you know, that works*
14   *in the sense of relating to money.  I have heard that the*
15   *process of the state being involved in a listed site*
16   *involves the state putting up some matching funds, some*
17   *state funds that the federal government matches, but I*
18   *don't know that myself.*
19   Q.  *I've read in the statute CERCLA that you mentioned where*
20   *the state could be responsible for as much as 10 percent of*
21   *the cleanup.  Is that what you're referring to?*
22   **A.**  *I have heard that, Mr. Martin, but I don't know that*
23   *myself.  I've never represented the state in a Superfund*
24   *matter, and I've not had the opportunity for that issue to*
25   *be something I needed to study.*

Q. *And you were going to tell us about the potential effect*
*on private parties of a listing on the NPL.*
A. *Well, in my judgment, it doesn't affect private parties*
*in terms of, you know, how you decide whether someone is*
*responsible or not.  It doesn't change the way the law*
*applies to the private parties.  It would, however, you*
*know, mean that if USEPA has seen this particular site as*
*one of the nation's top priorities, it would mean that*
*there would be more activity to address the site or manage*
*the site or whatever.*

*If you are a party who is responsible and, remember --*
*sorry, I shouldn't say remember.  I haven't told you this.*
*But oftentimes the question of who is responsible as a*
*private party is known early.  I mean, you know, the issue*
*of, well, who are the responsible parties for the site*
*oftentimes is determined.  I've been involved in sites*
*where at the earliest stage the private parties would agree*
*that they are responsible for the site, so they get*
*together.  The law makes them responsible in a way we call*
*joint and several.  It's like you're all in this together*
*and the whole issue of how you divided up the*
*responsibility is going to be your business.*

*The statute compels these people then to get together*
*and kind of work to kind of work together and try to work*
*with USEPA to get this addressed or handled and then, you*

1  *know, kind of work out amongst them the financial*

2  *responsibility.*

3       *So oftentimes that's the case.  And it's not the case*

4  *here, but oftentimes it is.  So in that NPL process, those*

5  *parties who are invited to participate like anyone else and*

6  *provide written comments, those parties would do so knowing*

7  *that, hey, we're going to be doing this, so let's get*

8  *involved and provide our view of what this site is like and*

9  *what needs to be done, et cetera.  So I don't know if that*

10  *answers your question.*

11  Q.  *Well, just to go back to something you mentioned*

12  *earlier, you said that -- and we'll talk specifically about*

13  *the 35th Avenue site, that is, that's a Superfund site*

14  *that's listed on the NPL.  And if Tarrant and Inglenook had*

15  *also been designated a Superfund site, I think you used the*

16  *phrase, "That could be an expensive proposition for the*

17  *parties who are responsible for the pollution."  Is that*

18  *correct?*

19  **A.**  *Yes.*

20  Q.  *That's what you meant?*

21  **A.**  *It would be an expensive proposition for USEPA and for*

22  *anyone who is responsible for the site.*

23  Q.  *Just to make it about this case, your client was*

24  *ABC Coke.  If ABC Coke was held responsible for the*

25  *pollution in those areas that the EPA was looking at, it*

1   was going to cost them a lot of money potentially, right?

2   A.   If it were held responsible, yeah.   USEPA has already

3   spent a lot of money in North Birmingham, so if any party

4   who was ultimately held responsible, it would be an

5   expensive proposition.

6   Q.   Because EPA could require a potentially responsible

7   party to pay for the cost of the cleanup, correct?

8   A.   If they were determined to be responsible, yeah.   And,

9   you know, it's not uncommon for USEPA to have a view that

10  someone is potentially responsible, address them to that

11  point and say we think -- and for that party to say we

12  think you're wrong and there to be a dispute over that.

13  Q.   And if there is a dispute that EPA or the parties cannot

14  work out, does that end up in court?

15  A.   It does.

16  Q.   Would you agree with that, that at least it's an uphill

17  climb to avoid liability if it ends up in court?

18  A.   But I don't think, you know, if it ends up in court, I

19  don't think the deck is stacked against anybody.   I mean,

20  the court is the court, and you have the opportunity to

21  defend yourself.   What may be the problem, it's an

22  intricate kind of problem in Superfund that makes it

23  challenging if you want to dispute the USEPA.   And many do.

24      I've been told in disputing those things, if you want to

25  dispute USEPA's position that you're potentially

responsible, it can be challenging because, remember, the
statute was written at a day and time.  Some of you, I can
tell, are maybe as old as I am, and the news was filled
with stories of a place called Love Canal.  And it was on
the news every night.  It was a terrible situation.

Those were the motive forces when congress said we've
got to do something.  And they wrote the statute to be
very, very strong in favor of USEPA to give USEPA lots of
authority to get things done.  Because many times, you
know, these sites involve contamination that occurred over
a long period of time.  Maybe the parties have changed.
The parties have gone or some of the business.  USEPA said
that person is responsible, but they're gone.  We're never
going to get them to help pay.

They wrote the statute to be as broad as I described it
because of that situation.  There have been lots of court
cases about how that's supposed to work and whether it's
fair or not and such.  But I think what might -- what he
may be talking about, Mr. Martin, is the fact that the
statute itself, it gives EPA lots of authority.

And if you want to dispute them about anything -- and
it's not just the idea of who is responsible, but it might
be what's the nature of the site, what's the problem at
this site, how should that problem be addressed, when
should it be addressed, all of those things.  If you're a

1    *responsible party for the site, you know, you're interested*

2    *in those things because those things have cost implications*

3    *or they have, you know, implications for public health and*

4    *you're involved.*

5        *If you're involved, you want to make sure it's done*

6    *right.  So if you have views about that -- but the statute*

7    *gives EPA really strong authority that you're going to do*

8    *it their way.  So if you're going to dispute those things,*

9    *any of those things, it's a process that's extensive and*

10   *it's expensive because you're going to be engaged for a*

11   *long time and it's a very detailed process and things like*

12   *that.*

13   Q.  *So as a lawyer for a potential responsible party on the*

14   *35th Avenue site, was it important -- was it your strategy,*

15   *part of your strategy to try and head this off?  The*

16   *designation on the NPL or expanding the Superfund site to*

17   *include Tarrant and surrounding areas, was it an important*

18   *part of your strategy to try and nip this in the bud, so to*

19   *speak, to not get to the point where you are in court*

20   *disputing EPA?*

21   **A.**  *Well, first we had to make it very clear to USEPA on*

22   *behalf of our client, ABC Coke, that they were not*

23   *responsible for the site.  We had engaged with them several*

24   *different ways and several times at their invitation -- and*

25   *these were meetings, you know.  They would invite you to*

1    *have a meeting and kind of like, you know, this is not a*

2    *fun meeting but it's a meeting.  They would state their*

3    *case.  So we think you might be a responsible party here,*

4    *and we would respond.  So we had made it very clear that we*

5    *did not believe ABC Coke was responsible in any way.  And*

6    *that was the first thing.*

7    *The second thing is recognizing, you know, what I was*

8    *just talking about, how EPA has a lot of authority to do*

9    *things the way they want to do them.  It's not uncommon at*

10   *all, and it is what happened here, that if you think that*

11   *somehow, someday you might get held responsible for this,*

12   *then it is in your best interests to make sure that*

13   *whatever is done is done the best it can be done as far as*

14   *you're concerned.*

15   *So participating in what EPA was proposing to do makes a*

16   *lot of sense if you can point out to them that, well, you*

17   *know, you're thinking about doing this particular activity*

18   *here, but we are aware of other places where you did this*

19   *differently and these were less expensive.  Why don't you*

20   *consider this.  So participating to make sure that what*

21   *they end up deciding to do is the best course of action and*

22   *right and based on the facts, that's what we do.  I say*

23   *"we" in the sense of that's what most parties do.  You*

24   *know, done it many times, and that's what was going on with*

25   *ABC Coke.*

1    Q.   *So part of the strategy -- part of your strategy was to*

2    *meet with EPA and try and convince them of your point of*

3    *view, correct?*

4    **A.**   *Correct.*

5    Q.   *Generally speaking, what were the other parts of your*

6    *strategy in addressing these issues that you were facing?*

7    **A.**   *Well, with regard to the 35th Avenue site, which, as I*

8    *mentioned, is some distance from the ABC Coke plant, we*

9    *essentially engaged with EPA to talk about their suggestion*

10   *that we might be a potentially responsible party to say*

11   *that we're not.  Then I think maybe the fair thing to do*

12   *would be to say that just after that, just to monitor the*

13   *site, keep up with what they were doing and be informed*

14   *about how they were going about business and how they were*

15   *making decisions, how they were evaluating the situation.*

16   *We tried to keep up with the current status of the site.*

17        *I think when they proposed to list it on the National*

18   *Priorities List, based on what we understood about the site*

19   *and based on what we understand about the process for*

20   *evaluating sites for NPL purposes, we decided that they*

21   *were exaggerating the condition of the site as it relates*

22   *to the NPL ranking process.  It's a process, that is, I*

23   *mean it's actually a ranking.  It's like you score the*

24   *site.  So many points for this and so many points for that.*

25        *So they were engaged in evaluating the site in this kind*

1    *of a scoring sense, and we believe that they had not looked*

2    *at it in the right sense and that they had made mistakes in*

3    *the way they evaluated and scored the site.  So we*

4    *participated to point out to make that point of view clear.*

5    Q.  *And as part of your strategy, did you have contact with*

6    *state and federal elected officials to try and convince*

7    *them to support your view of the issues?*

8    **A.**  *Yes.*

9    Q.  *And did you have contact with the Alabama Department of*

10   *Environmental Management to discuss the issues?*

11   **A.**  *I'm trying to remember.  Let me say I did not have any*

12   *contact -- that's what I'm hesitating because I'm trying to*

13   *remember, you know, what contact may have been had.  I did*

14   *not have any contact.*

15   Q.  *That's one of the primary focuses of your testimony*

16   *today is your involvement, your personal involvement in the*

17   *carrying out of this strategy in representing ABC Coke.*

18   *How would you describe that to the grand jury, your*

19   *involvement?*

20   **A.**  *My personal involvement?*

21   Q.  *Yes.*

22   **A.**  *Let me think about that.  The best way to describe that.*

23   *Well, first as a mentor, if you will, as the section head,*

24   *I would help any lawyer.  There were some situations, some*

25   *parts of this representation -- and I'm going to try to*

 1    answer in the sense of representing ABC Coke in this

 2    matter.

 3        There were some parts of this representation where I was

 4    directly involved, and I'll give you an example.  In this

 5    process that the USEPA goes through in evaluating possible

 6    responsible parties, they have the right under the statute

 7    to ask people to provide information, and it's a legal

 8    obligation.  So they use that authority in Superfund, and

 9    they may have some ideas.  Maybe they see some

10    contamination.  They say this looks like it might have come

11    from, you know, Joe's Body Shop or whatever.  And they have

12    the authority under the statute to send that party a letter

13    saying we need information from you and please supply the

14    following.  Answer the following questions and supply the

15    following documents.

16        Well, they did that in this case, and they sent such

17    request for information to ABC Coke, and I was directly

18    involved in helping that client answer those questions.

19    The questions from USEPA to ABC Coke.  I say directly

20    involved.  Like, I helped advise the client, helped gather

21    information, prepare the responses, send the material in.

22    So I was directly involved in that.

23        There were times -- I remember times when, you know, the

24    client wanted to talk about how things are going, what are

25    we doing, what are we going to do next.  I would

1  participate in those conversations with -- like on a

2  conference call or maybe even in person.  So there were

3  some times like that.

4  Q.  Who were your primary client contacts?

5  A.  A man named Blake Andrews is a lawyer who works directly

6  for Drummond, referred to often as an in-house lawyer.

7  Blake -- I don't know his proper title, but he was the

8  Drummond lawyer responsible for environmental matters, so

9  he was the principal contact.

10     There were times, particularly when information was

11  needed to respond maybe to one of these letters I told you

12  about, that I would deal with the plant manager at the

13  plant or other personnel at the plant.

14  Q.  Would it be part of the smart thing to do to communicate

15  to ADEM officials what your position of the matter was?

16  A.  Sure.

17  Q.  Let me show you what has been marked as Grand Jury 2

18  McKinney and ask you again to review that and let me know

19  when you're finished.

20  A.  Okay.

21  Q.  Start at the bottom and sort of go up and describe for

22  the grand jury what that first email in that string is.

23  A.  Okay.  This paper is a paper copy of an email string,

24  and the first email in the string is an email from Lance

25  LeFleur.  And Lance is the director of the Alabama

1    Department of Environmental Management.  He's the top

2    person there.  It is dated September 16, 2014.  It is

3    addressed to one, two, three people at USEPA, and the three

4    people that are addressed is Gina McCarthy, Heather McTeer,

5    and Gwen Fleming.  Those three people are officials at

6    USEPA.  Gina McCarthy was the administrator, the top

7    official at USEPA for the whole nation.  Heather McTeer

8    Toney was the -- I believe at this time -- I'm not sure,

9    but I believe at this time, Heather McTeer Toney was the

10   administrator for Region 4 of the country which involves

11   Alabama, Georgia, and a number of other -- I think it's

12   eight states.  She was the regional administrator of EPA

13   over that area.  Then Gwen Keyes Fleming had been the

14   regional administrator of Region 4, and she had gone to

15   Washington, D.C. to be the chief of staff for Gina

16   McCarthy, the USEPA administrator.  Those are the three

17   addresses.  The subject is the 35th Avenue Birmingham NPL

18   listing.

19   Q.  Just generally, and you don't have to read it, is it

20   true that that email is notifying ADEM -- Mr. LeFleur is

21   notifying EPA that the State of Alabama objects to the 35th

22   Avenue site being listed on the NPL?

23   **A.**  It does.

24   Q.  What is the date and time of that email?

25   **A.**  It's September 16, 2014 at 12:43 p.m.

1    Q.  *Move up to the next email in that string, and tell us*
2    *what that is.*
3    **A.**  *The next email in that string is from Lance LeFleur.  It*
4    *is to the same people -- well, both of them have a carbon*
5    *copy to Governor Bentley.  I'm not sure -- it doesn't*
6    *make -- it's like the same header.  It's to Gina McCarthy,*
7    *Heather McTeer, Gwen Keyes Fleming.  It's the same subject.*
8    *It's 12:46.  I'm not sure what that is.  It looks like the*
9    *same header on the same email.*
10   Q.  *But it says cc Governor Bentley?*
11   **A.**  *Correct.  As does the first one.*
12   Q.  *And what is the date and time of the second email?*
13   **A.**  *It is September 16, 2014 at 12:46 p.m.*
14   Q.  *And how does that time compare to the time of the first*
15   *one?*
16   **A.**  *Three minutes later.  So it looks like -- well, I'm*
17   *sorry.*
18   Q.  *Okay.  Then the top email in that string, tell me about*
19   *that.*
20   **A.**  *Well, it's not the top one.  The next one up.*
21   Q.  *Describe the next one up.*
22   **A.**  *So the next one up is from Lance LeFleur.  It looks like*
23   *this is forwarding this email string.*
24   Q.  *What is the time on that particular email?*
25   **A.**  *The time is 12:49 p.m.*

1    Q.   *How does that compare to the previous two?*

2    **A.**   *It's six minutes after the very first one and three*

3    *minutes after the second one.*

4    Q.   *So my question is why do you think that Mr. LeFleur*

5    *would forward an email to you and others three minutes*

6    *after he forwarded it to the governor, and three minutes*

7    *before that, he had forwarded it to ADEM?  So it went to*

8    *EPA, three minutes later it went to the governor, and three*

9    *minutes later it went to you.  Can you explain that to us?*

10   **A.**   *Sure.  Lance -- of course, first of all, Lance and I*

11   *have worked together for a very long time.  I actually was*

12   *his lawyer in the BP oil spill problem, so we have a*

13   *personal relationship.  Because of that, Lance would have*

14   *been aware and is aware that our firm represents Drummond*

15   *and ABC Coke.  So I can't read his mind or anything, but it*

16   *makes sense to me that when he did something like this that*

17   *affected a client that he knows our firm represents and he*

18   *sees me as the leader of the environmental section at our*

19   *firm, it would make sense to him that he would say well,*

20   *okay, I'm doing -- saying something about a Balch & Bingham*

21   *client in the environmental world.  I'm going to go ahead*

22   *and let Steve know that -- what I've done.  This is a*

23   *public email.  I mean, you know, sending something to USEPA*

24   *is not confidential.  So it makes sense to me that he would*

25   *have notified me of that.*

1   Q.   *And had Balch & Bingham, through you or someone else,*

2   *communicated to Mr. LeFleur that this was an important*

3   *issue to Balch and its clients?*

4   **A.**   *I'm trying to remember whether I had any conversations*

5   *with Lance about it, and I can't actually remember -- or I*

6   *don't remember having any conversations with him about it*

7   *personally, me and him.*

8   Q.   *You mentioned that you were friends with Mr. LeFleur*

9   *because you've done business in the past and you've known*

10   *him a long time, correct?*

11   **A.**   *That's right.*

12   Q.   *So it makes sense to me, and I'm not putting words in*

13   *your mouth, but it just seems to make sense that if you*

14   *have a client that you're representing on a very important*

15   *issue that could cost them lots of money, that you might*

16   *call on your friend to discuss that because he's head of*

17   *ADEM and has some input into these issues.  So it makes*

18   *sense that you would have talked to him even though you*

19   *don't remember maybe specific conversations.*

20   **A.**   *Oh, absolutely.*

21   Q.   *Do you agree that you would have most likely talked with*

22   *him about the issues in North Birmingham?*

23   **A.**   *Yes.  I mean -- and, of course, seeing a document that*

24   *would refresh my recollection certainly, but I would have*

25   *done that with any director of ADEM.  I mean, you know,*

1   *it's kind of what we do is work with government officials.*

2   *You know, I met with EPA.  I met with the regional*

3   *Superfund director trying to address these issues.  We do*

4   *that trying to work out problems, trying to learn*

5   *information.  Trying to, you know, build consensus about*

6   *how to deal with something.  We do that all the time.*

7   Q.  *Because if, in this particular situation, if ADEM took*

8   *the same position that Balch and Drummond were taking in*

9   *regards to North Birmingham, that would help your cause in*

10  *some way?*

11  **A.**  *Well, Mr. Martin, it's deeper than that.  I mean, these*

12  *are complicated matters, and so we're always talking to*

13  *other people trying to, you know -- if they've got a point*

14  *of view, I want to know what it is.  I want to understand*

15  *it.  They may know something that will help me make a*

16  *better decision.  You know, when you're dealing with*

17  *government agencies and there are people involved, many*

18  *times they have a very deep knowledge of a situation.  So*

19  *talking with people about a problem is a key way to serve*

20  *your client by getting information, communicating*

21  *information, trying to work through problems.  So, you*

22  *know, we do that as a part of what we do representing*

23  *clients.*

24  Q.  *The last part of your answer touches on my next*

25  *question, and that is in all of these conversations you had*

1    *with Mr. LeFleur or USEPA, you're representing your client?*

2    **A.**  *Not always.  I mean there are situations where, you*

3    *know, we're having conversations about a problem that*

4    *really doesn't have a client involved.*

5    *Q.  Let's keep it to the North Birmingham issue just to save*

6    *some time here.  In your conversations with ADEM and EPA*

7    *regarding North Birmingham, you were representing ABC Coke,*

8    *and I imagine you billed them for the time you spent*

9    *engaged in those conversations, correct?*

10   **A.**  *Yes.*

11   *Q.  In conversations you may have had with ADEM, are you*

12   *aware of whether or not discussions were had about Balch's*

13   *strategy in addressing the issues in North Birmingham?*

14   **A.**  *I don't know what you mean by strategy.*

15   *Q.  Balch had a strategy for how to best represent ABC Coke*

16   *in relation to these issues created by the EPA in North*

17   *Birmingham, correct?*

18   **A.**  *Yes.*

19   *Q.  In discussions that Balch may have had with ADEM, do you*

20   *know whether or not that strategy was discussed with ADEM*

21   *officials?*

22   **A.**  *I do not.  I do not know whether it was discussed with*

23   *them, but when you speak of strategy, it sounds to me like*

24   *something that we would have -- wouldn't have discussed*

25   *with someone else because strategy is a very detailed --*

1    you know, it's a very involved kind of -- you know, it's

2    not necessarily something that you would have discussed.

3    People wouldn't have the time for you to discuss your

4    strategy with them.  If you're engaged in a conversation

5    with somebody about a matter, you would talk to them about

6    the concerns that you have that they might know something

7    about.  They wouldn't be necessarily interested in you

8    describing to them all the things that you're going to do

9    to represent your client in a particular matter.

10   Q.  Did Balch engage in a joint strategy or talk about a

11   joint strategy with ADEM to address these issues?

12   **A.**  Well, I don't know in the sense that I don't remember

13   having any conversations like that on my own.  I do know

14   that when we were preparing our comments on the proposal to

15   list the site on the NPL, those comments were very

16   extensive.  I don't know how many pages they were, but they

17   might be 40 or 50 pages long, and they would have sections

18   of the comments that are focused on legal issues.  There

19   may be sections of the comments focused on technical issues

20   and sections of the comments based on, you know, what we

21   call record issues.  The facts, so to speak.  And there is

22   a lot of work that goes into that.  You know, really

23   digging into those issues.

24       And so -- and it's not uncommon at all when you're

25   involved in one of these things that you would share drafts

1  of those comments with other people because you want them

2  to see what you're saying.  If you're saying something

3  that's not right, you want them to say, "Hey.  Wait a

4  minute.  You're forgetting so and so," or whatever.  "And

5  why do you say that?  And that's not right."

6      But you're also sharing information with them.  They may

7  be very interested in seeing what your legal analysis is of

8  a particular issue or a technical analysis.  I mean, an

9  example here is in the NPL listing proposal in order to

10 score the site.  In order to evaluate the site and give it

11 a score or a ranking, you have to evaluate it against

12 something.  You know, all property has different chemical

13 constituencies.  You know, most of us don't -- certainly we

14 hear the word arsenic, and we think that's not a good

15 thing.  Arsenic is a poison, isn't it?

16     Well, you could go out in the middle of Nowhere,

17 Alabama, and you could sample the soil and find some

18 arsenic.  We call that background.  In other words, it

19 naturally occurs, and it's harmless.  It's there.  If you

20 measure it, it's there.  So then in this NPL listing, there

21 was a questionable, "What are you comparing this site

22 against?"

23 Q.  Mr. McKinney, I don't mean to cut you off, but in the

24 interest of time, I want to sort of focus here.  So if you

25 could sort of get to your point a little more succinctly,

1    *okay?*

2    **A.**   *Okay.  Well, what I was trying to say is that there are*

3    *technical issues.  Background was one of them, you know,*

4    *and EPA had a view of what the background against what you*

5    *would compare the site to say whether it's badly*

6    *contaminated or not.*

7        *We thought their view was completely erroneous, and we*

8    *had a basis for that.  We had studied that subject.  So our*

9    *comments had a lot in there about what the appropriate*

10   *background would be, and that's the kind of information*

11   *you'd share with anybody willing to listen.*

12   **Q.**   *We've heard testimony that, as part of its strategy to*

13   *address these issues, that Balch & Bingham had a consulting*

14   *contract with the Oliver Robinson Foundation.  Are you*

15   *aware of that?*

16   **A.**   *I am.*

17   **Q.**   *Do you know whether that part of the strategy, the*

18   *relationship with the Oliver Robinson Foundation, was*

19   *discussed with ADEM?*

20   **A.**   *I did not discuss it.  I do not know whether anyone else*

21   *discussed it.*

22   **Q.**   *Do you know Oliver Robinson?*

23   **A.**   *I know he was a great basketball player.  I watched him*

24   *when he played basketball, but I do not know him.  I've*

25   *never -- to my knowledge, I've never met him, and I have*

1   *not talked to him about this situation.  If I met him, it*

2   *would have been courtside at a UAB basketball game 30 years*

3   *ago.*

4   Q.  *This grand jury has heard testimony about that contract,*

5   *and what we want to know today is your role or knowledge of*

6   *that contract.  So can you first just generally describe*

7   *what you know about the contract and when you obtained*

8   *knowledge of it?*

9   **A.**  *Sure.  I learned about the decision to hire Oliver*

10   *Robinson Foundation after that decision had been reached,*

11   *and I'm trying to think about the contract, whether there*

12   *is any difference.  I don't know if a contract existed at*

13   *the time when I first learned about it, about the decision*

14   *to hire him, or whether the contract came later.*

15   Q.  *So after the fact, fair to say?*

16   **A.**  *After the decision to hire them?  Yes.*

17   Q.  *Can you give us a time frame?*

18   **A.**  *Well, I can't in the sense that I don't remember, but I*

19   *would say go to the date of the contract and probably back*

20   *up some from that, but I don't remember when the time frame*

21   *was.*

22   Q.  *So I take it from your answer that you did not*

23   *participate in any meetings or negotiations leading up to*

24   *the contract?*

25   **A.**  *That's correct.  To the best of my recollection, I*

1    *agreed with the idea that we needed a contractor to help*

2    *with grassroots education and communication.  I agreed with*

3    *that idea that we needed a contractor, but I wasn't*

4    *involved in considering various contractors and who we'd*

5    *pick, and I was not involved in the choice of Oliver*

6    *Robinson Foundation.*

7    Q.  *Did you review the contract prior to its execution?*

8    **A.**  *You know, Mr. Martin, I may have.  I may have.*

9    Q.  *Did you provide any edits to the contract that you*

10   *recall?*

11   **A.**  *If I looked it over, there is a good chance I suggested*

12   *some change somewhere.  It's just kind of my nature.  But I*

13   *do not remember having suggested any changes, but it's*

14   *quite possible.*

15   Q.  *If I show you the final version of the contract, do you*

16   *think you'd be able to look at that and remember what edits*

17   *you may have suggested or what questions you may have had*

18   *about it?*

19   **A.**  *If I read the contract that something might come off the*

20   *page to me that I said oh, yeah, I remember suggesting*

21   *that.  So I'll be happy to look at it, but I don't*

22   *remember.*

23   Q.  *I'm going to hand you what has been previously marked as*

24   *Grand Jury Exhibit 3 and just ask you to look over that.*

25   **A.**  *Okay.*

1  Q.  *So was that the contract that you mentioned that you*
2  *reviewed prior to its execution?*
3  **A.**  *I think I remember reviewing it.  Reading it over now,*
4  *it doesn't help me remember that I did or not.*
5  Q.  *And having read the contract, do any edits that you may*
6  *have suggested jump out to you?*
7  **A.**  *No.  It has a lot of material in it about ethics and*
8  *about, you know, that none of this is intended to be a*
9  *contribution to anybody, and nobody is allowed to pass*
10  *anything along.  That's information that I had reviewed --*
11  *that had I reviewed this, I would have looked for, you*
12  *know, if I knew, you know.  But I don't have the expertise*
13  *to supply that.*
14  Q.  *Why would you have looked for that sort of language in*
15  *that contract?*
16  **A.**  *Well, because Oliver Robinson was a member of the*
17  *legislature.*
18  Q.  *When a member of the legislature is hired as a*
19  *consultant by a law firm, it raises some ethical issues,*
20  *doesn't it?*
21  **A.**  *We want to be sure that it's done right because the law*
22  *allows you to do it, but you have to do it right.*
23      MR. McKNIGHT:  Your Honor, at this time we renew our
24  completeness objection on the grounds previously stated.
25      THE COURT:  Duly noted.

1      You may continue, Mr. Martin.

2      MR. MARTIN:  Thank you, Your Honor.

3  Q.  *What sort of due diligence did you do or are you aware*

4  *of what was done before Oliver Robinson Foundation was*

5  *hired to do this work?  You know, by due diligence, I mean*

6  *on Oliver Robinson's ability to do the work.*

7  **A.**  *I'm not aware of any evaluation of that before.  I'm*

8  *sorry.  I see what you mean.  I'm not aware of anything,*

9  *you mean like when somebody -- when someone first thought,*

10  *well, why don't we hire, you know, this contractor?  Are*

11  *you saying between then and the time you hire them or*

12  *something?*

13  Q.  *Well, you were about to spend your client's money on*

14  *Oliver Robinson Foundation to do this work, communications*

15  *work, and, you know, I would think that the law firm would*

16  *be interested in knowing whether Oliver Robinson could*

17  *actually do the work he was being hired to do.*

18  **A.**  *Oh, that.  I do not know of any kind of evaluation.  I*

19  *don't know how they got to the decision.  I do not know how*

20  *they got to the decision of Oliver Robinson is the right*

21  *guy for the job.  I don't know that.*

22  Q.  *Okay.  Fair enough.  Are you aware that shortly before*

23  *that contract was signed or shortly after the contract was*

24  *signed -- I'm sorry -- that Oliver Robinson appeared and*

25  *made comments before the Alabama Environmental Management*

1    *Commission?*

2    **A.**   *I know that he did that.  I don't know when it was*

3    *exactly, just looking at the date here, but I know that he*

4    *did that.*

5    *Q.   Were you aware of it at the time it was happening?*

6    **A.**   *No.*

7    *Q.   Were you aware of letters that were put on Oliver*

8    *Robinson's letterhead signed by Oliver Robinson and sent to*

9    *Lanier Brown and Lance LeFleur?*

10   **A.**   *I'm aware of them now, but at the time I was not aware*

11   *of them.*

12   *Q.   When did you become aware of them?*

13   **A.**   *To be honest, I think it was when you started asking*

14   *about them.*

15   *Q.   Okay.  Fair enough.  Were you aware that Oliver*

16   *Robinson, prior to appearing before the commission, met*

17   *with two members of the commission?*

18   **A.**   *At the time I was not.  I have learned that since.*

19   *Q.   And when did you learn that?*

20   **A.**   *Same answer.  When you started asking about it.*

21   *Q.   After we issued subpoenas and started asking questions?*

22   **A.**   *Yeah.  And in the course of reviewing, you know,*

23   *documents and stuff to be responsive to the subpoena.*

24   *Q.   Let me show them to you so there's no misunderstanding*

25   *of what we're talking about.*

**A.**   *Okay.*

**Q.**   *I'm showing you what has been previously marked as Grand Jury Exhibit 4 and Grand Jury Exhibit 5.*

**A.**   *Okay.*

**Q.**   *Just so we're clear, the record is clear and everybody understands, are those the two letters that you and I have been talking about Oliver Robinson signed?  Is that your understanding?*

**A.**   *Well, let me explain because when I say recently, what I mean is that I didn't handle these letters when they were prepared or mailed or anything like that.  I learned of them in the process of gathering information in response to your request, and so that's what I mean by recently.*

**Q.**   *To change gears a little bit, we've talked about your knowledge of the contract that Balch had with the Oliver Robinson Foundation.  What was your personal involvement with Oliver Robinson's execution of that contract on behalf of Balch?*

**A.**   *I had no direct personal involvement.*

**Q.**   *Earlier you talked about the benefits to the client of heading off this action by the EPA early in the process. Just a couple more questions.  What is the benefit to Balch & Bingham in successfully representing its client in relation to this matter with the EPA?*

**A.**   *Well, we earn legal fees working on a client's legal*

1    *matter and providing them with legal advice.*

2    Q.  *Let me ask you some questions.  I said I had two, but I*

3    *have more.  Do you have any idea of the amount of legal*

4    *fees that Balch has earned from Drummond/ABC Coke on this*

5    *matter over the years?*

6    **A.**  *I do not.  I don't.  I mean it would be a significant*

7    *amount.  I don't know the amount.*

8    Q.  *What do you typically charge per hour?*

9    **A.**  *My billing rate is $490 an hour, and that's only because*

10   *I refuse to let the firm raise it higher.  Clients would*

11   *pay more.*

12   Q.  *Any idea of how many hours have been expended by Balch*

13   *attorneys and other personnel on the matter over the years?*

14   **A.**  *I don't.  It would be quite a number of hours.*

15   Q.  *You mentioned the legal fees that the firm earns.  How*

16   *else does Balch benefit from successful litigation against*

17   *EPA in this matter?*

18   **A.**  *Well, you know, we represent many different clients.*

19   *Many different clients in Alabama and really around the*

20   *country.  We were invited to represent Drummond/ABC Coke*

21   *because of our environmental expertise.  They have good*

22   *lawyers that do all kinds of things for them.  They did not*

23   *have anyone who was capable of helping them with*

24   *complicated environment stuff.  So, you know, when you do a*

25   *good job for a client and you help them deal with a*

1   *complicated problem in a way that they're satisfied, you*

2   *know, you hope that that leads to other clients recognizing*

3   *your skill and hiring you to do that for them.*

4   Q.  *So a reputational effect of being successful?*

5   **A.**  *Sure.*

6   Q.  *Plus not only might you earn business from other*

7   *clients, you might get more from Drummond?*

8   **A.**  *Sure.  Yeah.  We always -- we want to be their lawyer*

9   *whenever they need a lawyer.*

10  Q.  *Any other ways the firm benefits?*

11  **A.**  *Well --*

12  Q.  *Are those the main ones?*

13  **A.**  *Yeah.  The only thing I would mention is -- and this is*

14  *relevant in this case -- EPA's theory that they were*

15  *employing to say that ABC Coke was potentially responsible*

16  *was a theory that was new.  It had not been used.  It was*

17  *used in one other situation in the country, and that theory*

18  *had the potential to affect a lot of different parties and*

19  *many other sites.  So I mention it because there would be*

20  *other lawyers from around the country who would be kind of*

21  *touching base with me to say what's going on with that case*

22  *and how is that theory going because it was a matter of*

23  *concern among lawyers around the country.*

24  Q.  *So defeating that issue would have benefitted the firm.*

25  *Again, I guess that's sort of related to its reputation and*

1   *business generating?*

2   **A.**  *I don't know -- I don't mean this to sound hokey, but I*

3   *thought the theory was rubbish, and I thought it had the*

4   *potential to actually turn the Superfund law kind of on its*

5   *head.  So I actually was concerned about the theory from a*

6   *practitioner's perspective and from the perspective of*

7   *somebody who thinks Superfund has its place today and will*

8   *have its place in the future if it's not abused.  And I*

9   *felt like it was being abused.*

10      *So I had kind of a concern from, you know -- I mean, I*

11  *have been doing this a long time.  I'm going to be retired*

12  *in a while.  I sometimes think of from a legal perspective*

13  *of overarching legal good, and I thought this was a bad*

14  *plan.*

15      *MR. MARTIN:  Do the grand jurors have any questions?*

16      *A JUROR:  I have one question.  And I may have*

17  *misunderstood.  Did you say earlier that you did not know*

18  *that your firm had hired Oliver Robinson until after the*

19  *fact?*

20      *THE WITNESS:  That's a good question, but if I said*

21  *that, I didn't mean it.  What I meant was that I didn't*

22  *know that the decision to hire him had been made.  I wasn't*

23  *involved in that decision, and I learned of it after it had*

24  *been made.  I don't know in relationship to the contract,*

25  *the date of the contract, which I would say is the date --*

1   is the date that the foundation got hired.  I'm certain

2   that I learned of it before the contract was signed because

3   I believe I remember looking at the contract as it was

4   being prepared.

5        A JUROR:  That's why I was asking because I was

6   thinking if you looked at the contract then, you would have

7   known.

8        THE WITNESS:  Right.  Yeah.  But I didn't.  I guess

9   what I was trying to say is I didn't.  He had been hired

10  when I learned of it.  I first learned of it after he

11  had -- I'm sorry.  Let me say it again.  The decision to

12  hire him had been made is what I meant.

13  Q.  (BY MR. MARTIN:)  You mentioned in response to her

14  question that you considered the date of the contract --

15  the time, the date, that Oliver Robinson Foundation was

16  hired?

17  **A.**  Uh-huh.

18  Q.  I've got to follow up because there is two dates in this

19  contract, if you noticed.

20  **A.**  Okay.

21  Q.  There is the date that it was signed which was

22  February 16, 2015.

23  **A.**  Right.

24  Q.  But it says it has an effective date of December 1,

25  2014.

1   **A.**   *That's a good point.*

2   Q.   *So which date are you referring to?*

3   **A.**   *Well, a contract for services often, you know, refers to*

4   *you started work on this previous day, and that's what*

5   *it -- that's what that is.  So what date was I referring*

6   *to?  I don't know.  If we're trying to place the*

7   *conversation where I learned about the decision to hire*

8   *Oliver Robinson in between those two dates, I'm not sure.*

9   *December 1, I don't remember if that's, like, when they*

10  *started work on December 1 or is that what -- or is that*

11  *was -- I don't remember why that date is there.  But since*

12  *I've muddled the water so well, let me say it again.  When*

13  *I learned that Oliver Robinson had been chosen, I had not*

14  *previously known that he, you know, was involved or being*

15  *considered.  So learned that he had been chosen and then*

16  *later they showed me the draft contract and asked me to*

17  *look it over, I'm pretty sure, and then the draft contract*

18  *got finalized and was executed.*

19  Q.   *So that would have been sometime between roughly*

20  *December 1, 2014 and February 16, 2015 when you learned*

21  *that he had been hired or chosen?*

22  **A.**   *You know, that makes sense, but, you know, I don't know*

23  *what the December 1 date is.  A lot of times in contracts,*

24  *you know, you will recite the day when someone was perhaps*

25  *even chosen as the beginning date of the contract, and then*

1    *there is the day they started working, and then there's the*

2    *date of the contract.  I don't know what December 1 is.  I*

3    *don't know why that is recited, so I can't say.*

4    Q.  *So I guess it's fair to conclude -- and you tell me --*

5    *Oliver Robinson apparently was already doing work at the*

6    *time that you learned that he had been chosen?*

7    **A.**  *I don't know that that's true.*

8    Q.  *Well, I'm just going by the language of your contract*

9    *where it says the effective date of December 1.*

10   **A.**  *Yeah, it could be, but I don't know that is true.  I*

11   *just don't remember whether he had actually begun working*

12   *when I first learned about him being chosen.  Just don't*

13   *know that.*

14   Q.  *Well, if Balch paid Oliver Robinson back to include*

15   *December 1, you would think he had been working?*

16   **A.**  *I would expect that.  I would expect that, yes.*

17   *MR. MARTIN:  Any other questions?*

18   *A JUROR:  I do.*

19   *The two letters that you reviewed that were from Oliver*

20   *Robinson, they were to the AEC; is that correct?  Those two*

21   *letters that you said -- you questioned him about, and then*

22   *Mr. Martin showed you those two letters.*

23   *THE WITNESS:  Well, I'm looking at them.*

24   *A JUROR:  Oh, you still have them there?*

25   *THE WITNESS:  Yes.*

1     A JUROR:  Do one or both or neither say in the first

2 sentence or references himself as a representative, a state

3 representative?

4     THE WITNESS:  Okay.  Well, the letters are on his

5 letterhead.

6     A JUROR:  Right.

7     THE WITNESS:  The February 6 letter addressed to Lanier

8 Brown.  The second paragraph begins with "As a state

9 legislator and representative of a district adjacent to

10 North Birmingham," and there is a reference there.

11     A JUROR:  Both letters?

12     THE WITNESS:  That's the first letter.  And then the

13 March 4 letter addressed to Lance LeFleur, again, it's on

14 his letterhead.  I see no reference to him being a

15 legislator in the text of the letter.

16     A JUROR:  One other question.  The letterhead, is it

17 the letterhead for him as a state legislator or his Partner

18 for Progress or as Robinson & Robinson?  What's the

19 letterhead say?

20     THE WITNESS:  It is the letterhead of his state

21 legislature job.  It's Representative Oliver Robinson, Jr.

22 letterhead.

23     A JUROR:  Say that he was a state legislator in the

24 letter.  That would come from Mr. Robinson himself?

25     THE WITNESS:  Could have, yeah.

1        MR. GILLEN:  Judge, at this time we would renew our

2   completeness objection on the grounds previously stated.

3        THE COURT:  Again, I understand.  I think the record

4   has been preserved.  You don't need to do it each and every

5   time, but to the extent that you feel as if you need to do

6   so, let us state now Mr. McKinney objects to the reading of

7   this testimony.  I've overruled the objection.  His

8   specific reasons were stated outside of the jury's

9   presence, but those reasons have not been waived at all.

10        Mr. Martin, you may continue.

11        MR. MARTIN:  Thank you, Your Honor.

12   Q.  *What significance does it have to you that it's on*

13   *letterhead, on the House of Representatives letterhead?*

14   **A.**  *Well, I mean to me it doesn't have any significance in*

15   *the sense of, you know, there being anything wrong with it,*

16   *you know.  So I don't see any red flags from that.*

17        *The significance into the addresses, the people that*

18   *receive it, you know, they know Oliver Robinson and they*

19   *know him to be a state representative.  So I don't know if*

20   *it would have been any different if he had written it on*

21   *his personal letterhead.  You know, they would have still*

22   *known they're talking to Oliver Robinson.  So as it relates*

23   *to how those people perceive or concern, I can't say that*

24   *they would have said that they would have a different*

25   *perception if he had put it on some other letterhead.*

1   Q.   *That wasn't the question I was really asking was what*

2   *they thought about it or anything, and I'm sure they knew*

3   *he was a state legislator because it was written in the*

4   *letter if nothing else.*

5   **A.**   *Oh, they know.*

6   Q.   *You know, I guess my question was just when you see a*

7   *person writing a letter on Alabama House of Representatives*

8   *letterhead, does that indicate to you that they're a member*

9   *of the House of Representatives and speaking as such?*

10  **A.**   *Well, sure.  And the point I guess I'm making is that*

11  *they do that.  They carry that with them 24/7 wherever they*

12  *are.  That's why the ethics laws kind of say what they're*

13  *allowed to do and not allowed to do because they can't*

14  *avoid being -- once they're elected, they are, and it*

15  *doesn't matter whether they use letterhead or not.  It*

16  *doesn't matter whether they wear a suit or not.  They're*

17  *still a representative.  So they have to abide by the*

18  *ethics law.*

19  Q.   *I wholeheartedly agree with that.*

20      *MR. MARTIN:  Any other questions?*

21      *A JUROR:  For Lance, how long have you known him?*

22      *THE WITNESS:  I first met Lance LeFleur when he became*

23  *director.  I had met his wife who worked in the state*

24  *government also before I met Lance, so I knew of him.  He*

25  *became director in the Bob Riley administration, probably*

1  *pretty early in the Bob Riley administration.  So he's been*

2  *director for maybe ten years.  No, I don't know.  Eight*

3  *years.  Quite a while.*

4      *MR. MARTIN:  Any other questions?*

5      *A JUROR:  I had a question.  Mr. Robinson was hired as*

6  *a consultant.  Oliver Robinson, was he the contract as a*

7  *consultant through you all?*

8      *THE WITNESS:  Well, the work that we hired Oliver*

9  *Robinson Foundation to do was work in the nature of*

10  *consulting.  That's what consultants do.  It was to provide*

11  *us with help communicating and educating, providing*

12  *information to, collecting information from folks in the*

13  *Tarrant area.  The work that was to be done is work that*

14  *you need to have some local knowledge.  You need to know*

15  *who to talk to, who to find out things from.  So when you*

16  *need help of this type, you go looking for someone in that*

17  *area, you know, and there usually are people who are in the*

18  *business of helping people communicate well.  So you're*

19  *looking for that kind of person.*

20      *I don't know how we got to the Oliver Robinson*

21  *Foundation, but the people who did the work were people who*

22  *had experience in that kind of stuff in that area.*

23      *A JUROR:  In leading up to that, if he had the*

24  *experience in that -- I know you said as a stated practice*

25  *that sometimes they ask the lawyers to draft the letter for*

1  *him?*

2  *THE WITNESS:  Uh-huh.*

3  *A JUROR:  But in this instance, with him not being the*

4  *consultant, would they not have their other outside people*

5  *draft the letter?*

6  *THE WITNESS:  No.  There is a blend between kind of*

7  *like how things get done -- and now I'm speaking kind of*

8  *generically.  We hire a lot of different consultants to*

9  *help us provide legal advice.  We may hire technical*

10  *consultants.  We may hire people, you know, who have*

11  *experience and we want advice from them.  So in all those*

12  *situations, some of those people are really good at writing*

13  *stuff, and I immediately tell them, well, you're writing*

14  *this.  I'll review it to see if I got any issues or*

15  *questions about it.  But you're right.*

16  *In other situations, somebody may be really good at,*

17  *you know, let's just say, chemistry, dealing with chemical*

18  *problems, but they can't write a letter to their mom.  I*

19  *mean they're not any good at writing.  So in that*

20  *situation, I'll say, all right, Dr. Jones, you're the*

21  *greatest chemist in the world, but we'll write things, and*

22  *you read it and see if we have captured the truth.  So it's*

23  *a blend.  So it would kind of go both ways.*

24  *MR. MARTIN:  Any other questions?*

25  *Thank you.  You're excused.*

1   *(Whereupon the witness exited the grand jury room at*
2   *approximately 3:25 p.m.)*

3       THE COURT:  You may step down, ma'am.  Thank you.

4       Mr. Martin, before we break for lunch, who is the
5   government's next witness?

6       MS. MARK:  Irving Jones.

7       THE COURT:  Okay.  Members of the jury, let me give you
8   a lunch break now.  It is 12:27.  Let's plan to come back
9   in time for us to begin at 1:45.  Please do not talk about
10  the case during the break.  And, again, please do not
11  discuss this case with anyone else.  If anyone approaches
12  you about it, please let me know.

13      We are in recess until 1:45.

14  (The following proceedings were had in open court
15  outside of the presence and hearing of the jury.)

16      THE COURT:  May I see the lawyers up here, please.
17  Just one per team.

18  (Sidebar had off the record.)

19      THE COURT:  Thanks, everyone.  Please enjoy your lunch
20  break.  We'll see you at 1:45.

21  (Lunch recess.)

22      THE COURT:  Mr. Martin, how long is the next witness,
23  do you anticipate your direct will be?

24      MR. MARTIN:  Perhaps 30 minutes.

25      THE COURT:  And is this your last one that you have?

1      MR. MARTIN:  Yes, sir.

2      THE COURT:  Okay.  Let's bring the jurors in, then,

3  please.  Thank you.

4  (The following proceedings were had in open court in the

5  presence and hearing of the jury.)

6      THE COURT:  Be seated, everyone.

7      If my notes are correct, the next witness is Irving

8  Jones; is that correct?

9      MR. MARTIN:  Yes, Your Honor.

10      THE COURT:  Mr. Jones, good morning -- sorry.  Good

11  afternoon.  Please come forward.

12  (Witness sworn.)

13      THE COURTROOM DEPUTY:  State your name for the record.

14      THE WITNESS:  Irving William Jones, Jr.

15      THE COURTROOM DEPUTY:  Spell your last name.

16      THE WITNESS:  J-o-n-e-s.

17      THE COURTROOM DEPUTY:  Where do you reside?

18      THE WITNESS:  In Birmingham, Alabama.

19      THE COURTROOM DEPUTY:  Please be seated.

20      THE COURT:  Mr. Martin, when you're ready.

21      MR. MARTIN:  Thank you, Your Honor.

22                  IRVING W. JONES, JR.,

23  duly sworn, was examined and testified as follows:

24  DIRECT EXAMINATION BY MR. MARTIN:

25  Q.  Good afternoon, Mr. Jones.

*JONES - Direct by Martin*

1   **A.**  Good afternoon, sir.

2   *Q.*  What do you do for a living, sir?

3   **A.**  I am a lawyer.

4   *Q.*  Okay.  How long have you been a lawyer?

5   **A.**  For four years.

6   *Q.*  Tell us about your educational background, please.

7   **A.**  Where would you like me to begin?

8   *Q.*  Your undergraduate.

9   **A.**  Sure.  I have an undergraduate degree in sociology,

10  focused in criminal justice.  A master's degree in

11  criminology, focused on law enforcement administration, and

12  a law degree.

13  *Q.*  Okay.  Where did you go to law school?

14  **A.**  University of Mississippi.

15  *Q.*  All right.  Where did you go to work after law school?

16  **A.**  After law school, I worked for Balch & Bingham.

17  *Q.*  Okay.  And are you from Birmingham?

18  **A.**  I am not.

19  *Q.*  Okay.  So when you came to work for Balch, was that your

20  first time living in Birmingham?

21  **A.**  It was.

22  *Q.*  Okay.  Where are you from?

23  **A.**  I'm from the Washington, D.C. area.

24  *Q.*  When did you come to Balch?

25  **A.**  If my memory serves me, it was September of 2014.

1    Q.   Okay.  And how long did you work at Balch?

2    A.   For one year.

3    Q.   And where do you practice now?

4    A.   I practice at Christian & Small, LLP.

5    Q.   Is that a different law firm here in Birmingham?

6    A.   It is.

7    Q.   When you were at Balch, were you in any particular

8    section of the law firm?

9    A.   I was.

10   Q.   Which section was that?

11   A.   The environmental section.

12   Q.   Okay.  And what title -- we've heard testimony about

13   different levels of attorneys at Balch.  Which level did

14   you fall in?

15   A.   Staff attorney, which I would -- I guess if you are

16   stacking them, that would be at the bottom.

17   Q.   Okay.  That was my -- at least in my next question,

18   which was:  When you went to Balch in or about September of

19   2014, in the environmental section, were you like the low

20   man on the totem pole?

21   A.   So to speak, yes, sir.

22   Q.   Okay.  Who did you report to in the environmental

23   section?

24   A.   I did not have an attorney that I reported to directly.

25   I worked for various attorneys.  Steve McKinney was the

*JONES - Direct by Martin*

```
 1   chair, and the rest of the partners were just partners.
 2   Q.  Okay.  What sort of work did you do generally?
 3   A.  Research, writing, essentially whatever I was asked.
 4   Q.  Who assigned work to you?
 5   A.  Again, I worked for various attorneys while I was there,
 6   so would you like me to list them all?
 7   Q.  No.  We're just trying to get a sense of how you got
 8   work.
 9   A.  Sure.  I got work mostly from the partners that worked
10   in the section and occasionally from senior level or upper
11   level associates.
12   Q.  Did you represent clients of Balch by yourself?
13   A.  Absolutely not.
14   Q.  Was your -- all of your work reviewed by partners or
15   attorneys that had been there longer than you?
16   A.  Yes.
17   Q.  How did you -- did you bill for your time?  We've heard
18   testimony about how the billing works.  Did you bill for
19   your time that you worked for clients?
20   A.  I did.
21   Q.  Did you work on the 35th Avenue Superfund Site matter?
22   A.  I did.
23   Q.  All right.  Who assigned you work regarding that matter?
24   A.  That would have either come from Steve McKinney or Joel
25   Gilbert.
```

1  Q.  What sort of work did you do particularly on that

2  matter?

3  A.  Would you like me to list all of it to the extent that I

4  recall?

5  Q.  I would like you to give us a sense of what sort of work

6  you did.

7  A.  Sure.  I did research writing.  I did document review.

8  I attended events, took notes, organized documents,

9  maintained extranet files, which is a service of files

10  located on a site that was only accessible to the firm and

11  the firm's clients, as far as I know.

12  Q.  Was your work on the 35th Avenue Superfund Site matter

13  reviewed by other lawyers?

14  A.  It was.

15  Q.  Okay.  Who would review your work?

16  A.  Well, it depends on the task, but the majority of the

17  work was reviewed by Joel Gilbert.

18  Q.  Okay.  Who was the client on this particular matter?

19  A.  Drummond Company.

20  Q.  Did lawyers in the environmental section who were

21  working on these matters for Drummond at some point begin

22  to hold staff meetings where the issues about Drummond were

23  discussed?

24  A.  They did.

25  Q.  Okay.  Did you attend any of those meetings?

*JONES - Direct by Martin*

1    **A.**  I did.

2    **Q.**  Okay.  And how many meetings or how often would those

3    meetings occur?

4    **A.**  I don't recall how often.  Perhaps monthly.  Maybe less.

5    **Q.**  Okay.  And would other lawyers in the section who were

6    working on these matters also attend those meetings?

7    **A.**  Yes.

8    **Q.**  In any of those meetings, did you ever hear any mention

9    of Oliver Robinson or his foundation?

10   **A.**  I did not.  You're referring to the staff meetings?

11   **Q.**  Yes.

12   **A.**  No, I did not.

13   **Q.**  Okay.

14       MR. MARTIN:  May I approach the witness, Your Honor?

15       THE COURT:  You may.

16   (Government's Exhibit 40 was referenced.)

17   **Q.**  (BY MR. MARTIN:)  Mr. Jones, I've handed you what has

18   been marked as Government's Exhibit Number 40.  Do you see

19   that in front of you?

20   **A.**  I do.

21   **Q.**  Okay.  I would ask that you take a look at that and let

22   me know when you're ready to answer some questions about

23   it.

24   **A.**  I'm ready.

25   **Q.**  Okay.  Can you just tell us generally what this is?

1    **A.**  Well, there is an email on Exhibit Number 40 that is

2    from me to Joel essentially stating that I --

3    **Q.**  Let me ask you first:  What's the date on there?

4    **A.**  The date is February 6, 2015.

5    **Q.**  Okay.

6         MR. MARTIN:  Your Honor, I would offer Government's

7    Exhibit Number 40.

8         THE COURT:  Any objections?

9         MR. DOSS:  No objection, Your Honor.

10        MS. HODGES:  No objection, Your Honor.

11        MR. BOUCHARD:  No objection, Your Honor.

12        THE COURT:  Thanks, everyone.  40 is in and may be

13   published.

14   (Government's Exhibit 40 was admitted into evidence.)

15   **Q.**  (BY MR. MARTIN:)  So, Mr. Jones, you can either look at

16   the paper copy or the copy that's on the screen.

17        Can you tell us who this email is from and who it's to?

18   **A.**  This email is from me to Joel Gilbert.

19   **Q.**  Okay.  And it mentions "I have attached a copy of the

20   letter you requested for your review."  Do you recall what

21   this is about?

22   **A.**  I do.

23   **Q.**  Okay.  Tell us what this is about.

24   **A.**  This looks to me to be the email that corresponds with a

25   letter that I drafted for someone to speak at the AEMC

JONES - Direct by Martin

```
 1   meeting, which would be held on February 20, 2015.  And the
 2   procedures for submitting said letter for someone to speak
 3   at that meeting.
 4   Q.  Okay.  Did someone ask you to do the first draft of that
 5   letter?
 6   A.  Yes.
 7   Q.  Okay.  Who asked you?
 8   A.  Joel Gilbert.
 9   Q.  And what was the discussion, if you recall?
10   A.  I don't recall.
11   Q.  Okay.  Okay.  What was your -- so you -- was this the
12   first draft of the letter that you were sending to
13   Mr. Gilbert?
14   A.  It appears to be the first draft, yes, sir.
15   Q.  Okay.  And he says "Okay, thanks," at the top of the
16   email?
17   A.  Yes.
18   Q.  Okay.
19   (Government's Exhibit 41 was referenced.)
20       MR. MARTIN:  Could you bring up Number 41, please?
21   Q.  Okay.  Do you have Number 41 in front of you?
22   A.  I do.
23   Q.  Okay.  Do you recognize that?
24   A.  I do.
25   Q.  Can you tell us what that is?
```

1  **A.**  It looks like a copy -- I'm sorry.  41 is an email from

2  me to Joel attaching a revised version of the letter that,

3  it looks like, was also attached in Exhibit 40.

4  Q.  Okay.

5      MR. MARTIN:  I would offer Number 41, Your Honor.

6      THE COURT:  Any objections?

7      MR. DOSS:  No objection, Your Honor.

8      MS. HODGES:  No objection, Your Honor.

9      MR. BOUCHARD:  No objection, Your Honor.

10      THE COURT:  Thanks, everyone.  41 is in and may be

11  published as well.

12  (Government's Exhibit 41 was admitted into evidence.)

13  Q.  (BY MR. MARTIN:)  Mr. Jones, if you could just walk us

14  through this.  This is from you to Joel Gilbert?

15  **A.**  It is.

16  Q.  Okay.  And the date and time?

17  **A.**  February 6, 2015 at 1:56 p.m.

18  Q.  Okay.  And what is the subject of the email?

19  **A.**  "Request to Provide Comments at AEMC Meeting."

20  Q.  All right.  And what did your email say?

21  **A.**  "Joel, I have attached a revised version of the letter

22  for your review.  Irving."

23      MR. MARTIN:  Okay.  And if we could, let's go to the

24  next page.

25  Q.  And what is attached to this email?

1  **A.**  It appears to be the attachment that is the draft of the

2  letter.

3  **Q.**  Okay.  And did you make a -- is this the revised version

4  of the letter?

5  **A.**  I would assume so based on the email.

6  **Q.**  Okay.  And does this particular version of the letter

7  include in the second paragraph the words "as a state

8  legislator"?

9  **A.**  It does not.

10  **Q.**  Okay.

11  (Government's Exhibit 1 was referenced.)

12      MR. MARTIN:  Can we go to Government's Exhibit

13  Number 1, please?

14  **Q.**  This one is up on your screen, Mr. Jones, because it's

15  already in evidence.  Can you tell us what this is, please?

16  **A.**  This looks like an email from me to Joel Gilbert.

17  **Q.**  Or is it from Joel Gilbert to you?

18  **A.**  Oh, sorry.  Yes.  It is from Joel Gilbert to me.

19  **Q.**  Okay.  And the date and time?

20  **A.**  February 2, 2015, 1:59 p.m.

21  **Q.**  Okay.  And what did Mr. Gilbert say to you?

22  **A.**  It says "See attached.  Please revise and bring up to

23  15.  Ask receptionist where we are meeting.  Thanks."

24  **Q.**  Okay.  And when he says "bring up to 15," what did you

25  take that to mean?

1   **A.**   Floor 15, a meeting room at that location.

2   **Q.**   Okay.  And is that the public area of the Balch &

3   Bingham office that has conference rooms and a lobby?

4   **A.**   I can't recall the exact number of the floor.  It's been

5   a while since I've worked there.  But there is a floor that

6   resembles what you just described.

7   **Q.**   Okay.

8   **A.**   This may have been that floor.

9   **Q.**   Okay.  And does it -- does this email indicate that

10  there's an attachment?

11  **A.**   It does.

12  **Q.**   Okay.  And "Request to Provide Comments At AEMC Meeting"

13  is the attachment?

14  **A.**   Yes, that looks like the title of the document.

15  **Q.**   Okay.  If we could, let's go to the attachment, please.

16  And do you recognize this document?

17  **A.**   I do.

18  **Q.**   Okay.  And is this a draft of the letter that you first

19  wrote requesting permission to speak at the AEMC meeting?

20  **A.**   It looks like this is a revised version of the draft

21  that I prepared, yes, sir.

22  **Q.**   Okay.  And the -- in the second paragraph, there's some

23  red indicated there.  Can you explain to us what that is?

24  **A.**   That is tracked changes in Microsoft Word.  In other

25  words, if an editor of a document goes in and clicks to

*JONES - Direct by Martin*

1  revise and track changes, when you make revisions to a

2  document, it appears in red.

3  Q.  Okay.  And the words "as a state legislator and" are in

4  red and underlined.  What does that indicate?

5  A.  That indicates that whoever edited this document revised

6  it to include that language.

7  Q.  Okay.

8      And if we could, let's go back to the first page of

9  this email.

10     And this is Joel Gilbert sending it to you asking you

11 to "please revise"; is that right?

12 A.  That is correct.

13 Q.  Okay.  Did you know -- at this point, did you know

14 Oliver Robinson at all?

15 A.  I did not.  Do you mean personally?

16 Q.  Yes.

17 A.  No, I did not.

18 Q.  Did you know, before you saw these revisions, that he

19 was a state legislator?

20 A.  Not that I recall.

21 Q.  Okay.  What did you do when you received -- after you

22 received this email from Joel Gilbert?

23 A.  I followed these instructions.  I accepted his tracked

24 changes and brought --

25 Q.  What does that mean?

JONES - Direct by Martin

1    A.   There is a button in track changes, Microsoft Word,

2    where if you click "accept," it's a check mark, I think, in

3    what looks like a blank document.  You click that button.

4    It turns this red language that are revisions from the

5    editor into black language so that it looks like the rest

6    of the text.

7    Q.   Okay.  Did you make any changes to -- like Joel Gilbert

8    had asked you, to revise?

9    A.   I did not.

10   Q.   Okay.  You just clicked the button and accepted all his

11   changes?

12   A.   Yes, sir.

13   Q.   Okay.

14   A.   That's what I would have done.

15   Q.   Okay.  And what did you do after you did that?

16   A.   I followed the rest of the instructions, which was to

17   bring the document up to the 15th floor.

18   Q.   Okay.  And what happened when you got to the 15th floor?

19   A.   There -- I believe there was a meeting that was in

20   session, and I sat down with the document, and that is --

21   that's it.

22   Q.   Who was -- was this meeting already in progress as

23   you -- when you arrived?

24   A.   I believe so.

25   Q.   Okay.  And who was there?

JONES - Direct by Martin

A.   Joel Gilbert and Oliver Robinson.

Q.   All right.  What happened when you got there?

A.   I sat down, and there may have been some small talk going on.  I'm not really sure exactly what was said.  I just recall sitting down.

Q.   Okay.  And how long were you there?

A.   Not very long.  I -- maybe a few minutes.

Q.   Okay.  Were you essentially just doing what you were told and delivering the revised letter to the 15th floor?

A.   Yes, sir.

Q.   Okay.  Other than small talk, did you hear any conversation between Mr. Gilbert and Oliver Robinson?

A.   Not that I recall.

Q.   Did you have any conversation with Joel Gilbert about Oliver Robinson appearing at the Environmental Management Commission?

A.   I believe we did have a conversation about it, yes.

Q.   Tell us about that.  When was that in relation to this letter?

A.   It would have been shortly before, I guess, this meeting took place.  The only thing I recall from the conversation was that Oliver Robinson appeared to be experiencing some reluctance in participating in this meeting and we were just -- they were just going to talk it out.

Q.   Okay.  What did Joel Gilbert say?

*JONES - Direct by Martin*

1   **A.**  That they were just going to talk it out.  I believe,

2   I -- I mean, I don't know the exact language, but something

3   to that effect.

4   (Government's Exhibit 43 was referenced.)

5        MR. MARTIN:  Can you bring up Number 43, please?  If

6   you could, bring up the bottom part.

7   **Q.**  Can you tell us what this is, Mr. Jones?

8   **A.**  It looks like an email from me to Oliver Robinson.  I'm

9   assuming ORobinson@aol.com is Oliver.

10  **Q.**  Okay.  And the date and time?

11  **A.**  February 6, 2015 at 2:21 p.m.

12  **Q.**  Okay.  And that's about 20 or so minutes after you took

13  the revised letter up to the 15th floor?

14  **A.**  It appears so, yes, sir.

15  **Q.**  Okay.  And read the body of the email, please.

16  **A.**  "Mr. Robinson:  I have attached a copy of the letter we

17  discussed at the meeting for your review.  If you would

18  like me to make any edits, please let me know.  Thanks,

19  Irving Jones."

20  **Q.**  Okay.

21       Now, can we look at the top part of this email, please?

22       And does this appear to be an email from Joel Gilbert to

23  Oliver Robinson on February 6, a little bit later in the

24  day?

25  **A.**  That appears correct.

1    Q.   Okay.   Does he appear to be discussing the letter in the

2    meeting that you just testified about?

3    **A.**   That's right.   Yes, sir.

4    Q.   Okay.

5    (Government's Exhibit 44 was referenced.)

6        MR. MARTIN:   If you could, go to Number 44, please.

7    Q.   Mr. Jones, does this appear to be the final and signed

8    copy of the letter that we have been talking about?

9    **A.**   It appears to be.

10       MR. MARTIN:   Thank you.

11   Q.   As part of your -- thank you.

12       As part of your work on the 35th Avenue Superfund Site

13   matters and then for Drummond, did you have some

14   responsibility regarding the environmental group GASP?

15   **A.**   I did.

16   Q.   What was that?

17   **A.**   There were various tasks that I was asked to complete,

18   one of which was to monitor, in some capacity, shared with

19   another lawyer, their online site or any information that

20   they posted on social media.

21       I was also instructed, I think, maybe on one or two

22   occasions, to attend a meeting where they would either be

23   speaking or they would have some involvement.

24   Q.   Okay.

25   (Government's Exhibit 13 was referenced.)

1         MR. MARTIN:  Would you, Ms. Borden, please bring up

2    Government's Exhibit Number 13, please?  If you could, go

3    to the second page.

4    Q.  Mr. Jones, we're looking at an email that contains an

5    attachment that is a -- we've heard testimony that is a

6    PowerPoint that Stacie Propst of the group GASP submitted

7    to the Environmental Management Commission.  Do you

8    recognize this?  Have you seen it before?

9    A.  I do.  I have.

10   Q.  Okay.  Did you do something in the course of your work

11   at Balch with this?

12   A.  I did.

13   Q.  What did you do?

14   A.  I reviewed it and, as instructed, I prepared a

15   document -- I believe it's referred to as a white paper --

16   which contained counter-research and counter-arguments to

17   the positions and propositions that they asserted in the

18   spreadsheet.

19   Q.  Who asked you to do that?

20   A.  Mr. Gilbert.

21   (Government's Exhibit 20 was referenced.)

22        MR. MARTIN:  Could you bring up Number 20, please?  If

23   you could, just blow up the email, please.

24   Q.  Mr. Jones, starting at the bottom, does this appear to

25   be an email from Joel Gilbert to Scott Phillips and

1   T. Glenn with copies to Mr. McKinney and David Roberson,

2   "Subject, White Paper, 12/12/14 EMC Meeting, Propst-GASP

3   Presentation"?

4   **A.**  It does.

5   **Q.**  Okay.  And it says "See attached.  Please provide to

6   interested parties."

7   **A.**  It does.

8       MR. MARTIN:  Okay.  Could you go to the attachment,

9   please?

10  **Q.**  Do you recognize this document?

11  **A.**  I do.

12  **Q.**  Okay.  How do you recognize it?

13  **A.**  Because that is a document that I prepared that I

14  referred to earlier as the white paper.

15  **Q.**  Okay.  So this is the white paper you wrote after

16  reviewing and studying the GASP PowerPoint?

17  **A.**  That is correct.

18  **Q.**  Did you attend -- you mentioned you attended meetings at

19  which GASP may have made a presentation.  Do you recall

20  attending an Alabama Environmental Management Commission

21  where Dr. Propst of GASP spoke?

22  **A.**  I remember attending that meeting.  I believe it was her

23  who spoke.  I'm not really sure.  But someone from GASP did

24  speak at that meeting.

25  **Q.**  Okay.  And who asked you to attend that meeting?

1    **A.**   Joel Gilbert.

2    **Q.**   Okay.  Was there another -- tell us first, where did the

3    meeting happen?

4    **A.**   It happened at some facility in Montgomery, Alabama, I

5    believe.  I don't recall what facility, but it was

6    somewhere, a building down there.

7    **Q.**   Okay.  And was there another Balch attorney also in

8    attendance at the meeting?

9    **A.**   There was.

10   **Q.**   Do you recall who that was?

11   **A.**   I do not recall her name, but it was a lady.

12   **Q.**   Well, do you believe she was from the Birmingham office

13   or the Montgomery office or some other?

14   **A.**   I don't believe she was from the Birmingham office.  I

15   had never seen her there.

16   **Q.**   Were you present when the representative from GASP

17   spoke?

18   **A.**   I was.

19   **Q.**   Were there responses from the commissioners to her

20   presentation?

21   **A.**   There were.

22   **Q.**   And did you hear those comments?

23   **A.**   I did.

24   **Q.**   Did you recognize anything that was familiar to you as

25   you listened to those comments?

1   **A.**   I did.

2   Q.   How were you able to recognize the comments?

3   **A.**   Well, I believe that one of the counter-arguments

4   paralleled the white paper that I prepared, an argument in

5   the white paper that I prepared.

6   Q.   Okay.

7   **A.**   At least one.   There may have been more.   I didn't keep

8   count.

9   Q.   Okay.

10      MR. MARTIN:   May I approach the witness, Your Honor?

11      THE COURT:   You may.

12   (Government's Exhibit 26 was referenced.)

13   Q.   (BY MR. MARTIN:)   I have handed you what has been marked

14   Government's Exhibit Number 26.   I want to ask if you

15   recognize that.

16   **A.**   I do.

17   Q.   Okay.   What is it, please?

18   **A.**   It is an *Environmental Update*.

19   Q.   What is an *Environmental Update*?

20   **A.**   Well, it appears to be a summary of the contents and

21   discussions had at the AEMC meeting.

22   Q.   And what is the date of that meeting?

23   **A.**   The meeting was held, it looks like, on December 12 of

24   2014.

25   Q.   Okay.

1          MR. MARTIN:   I would offer Government's Exhibit

2     Number 26.

3          THE COURT:   Any objections?

4          MR. DOSS:   No objection, Your Honor.

5          MS. HODGES:   No objection, Your Honor.

6          MR. BOUCHARD:   No objection, Your Honor.

7          THE COURT:   Thanks, everyone.   26 is received and may

8     be published.

9     (Government's Exhibit 26 was admitted into evidence.)

10    Q.   (BY MR. MARTIN:)   And just to confirm what you said,

11    this is an *Environmental Update* of the Alabama

12    Environmental Management Commission meeting of December 12

13    of 2014?

14    A.   Yes, sir.

15         MR. MARTIN:   Okay.   If we could, let's go to the second

16    page.

17    Q.   And there where it says "Public Presentation," did you

18    have some role in writing that part of this *Environmental*

19    *Update*?

20    A.   Yes, I would have prepared this section.

21    Q.   Okay.   And when would you have done that?

22    A.   Not long after I got back from the meeting, while it was

23    still fresh in my mind.

24    Q.   Okay.   If we could, let's --

25         MR. MARTIN:   May I approach again, Your Honor?

1          THE COURT:  You may.

2     Q.  (BY MR. MARTIN:)  I'm going to hand you the whole stack

3     this time so I don't have to keep walking back up here.

4     **A.**  Okay.

5     (Government's Exhibit 204 was referenced.)

6     Q.  I've handed you what's been marked as Government's

7     Exhibit Number 204.  Can you look at that and tell me, when

8     you're ready, if you recognize that?

9     **A.**  I recognize the first page as an email from me to Joel

10    containing a subject line that says "EMC Summary" and an

11    attachment of the EMC meeting summary.

12    Q.  Okay.

13         MR. MARTIN:  I would offer Government's Exhibit

14    Number 204.

15         THE COURT:  Any objections?

16         MR. DOSS:  No objection, Your Honor.

17         MS. HODGES:  Objection, Your Honor.  Hearsay.

18         THE COURT:  May I see it, please?  I'll reach over

19    Mr. Jones's shoulder, if you don't mind, sir.

20         THE WITNESS:  Absolutely.

21         THE COURT:  Thank you.

22         THE WITNESS:  You're welcome.

23         THE COURT:  Overruled.  204 is received and may be

24    published.

25         Thank you, sir.

1         THE WITNESS:  Thank you, sir.

2    (Government's Exhibit 204 was admitted into evidence.)

3    Q.  (BY MR. MARTIN:)  Mr. Jones, is this an email from you

4    to Joel Gilbert dated January 27, 2015?

5    A.  It is.

6    Q.  Okay.  And this is some approximately a month and a half

7    after -- month and -- yeah, month and a half after you

8    attended the meeting where GASP spoke?

9    A.  It appears so, yes.

10   Q.  If we could, let's go to the attachment, please.

11   A.  Sure.

12   Q.  Do you recognize the attachment?

13   A.  I do.

14   Q.  How are you able to recognize that?

15   A.  Because this is a document that I believe I prepared.

16   Q.  Okay.  And tell us what this is.

17   A.  This appears to be a summary of the EMC meeting.

18   Q.  Okay.  We saw that you had written a paragraph summary

19   that was in the *Environmental Update*.  Is this a fuller

20   explanation of what happened at the meeting?

21   A.  Yes.  This looks like a recording of GASP's comments and

22   the responses thereto.

23   Q.  Okay.  Thank you.

24   (Government's Exhibit 197 was referenced.)

25        MR. MARTIN:  Could you bring up Number 197, please?

1    Q.  And I want to show you this, the top of this email that

2    has already been admitted into evidence.

3    A.  Okay.

4    Q.  And it's from David Roberson, January 6, 2015, to Joel

5    Gilbert.  "Subject:  Deadline Nearing for EPA National

6    Priorities List Proposal, GASP."

7        And Mr. Roberson said, "Oliver needs to get some of the

8    neighborhood officers to send letters opposing the

9    listing."  Did you have some role in drafting letters for

10   neighborhood residents to sign?

11   A.  I did.

12   Q.  Okay.  Tell me how it came about that you were involved

13   with that.

14   A.  I was asked to prepare multiple versions of letters for

15   community members, and I drafted those documents.

16   Q.  Who asked you to draft those documents?

17   A.  Mr. Gilbert.

18   Q.  Okay.  Do you recall how many versions of the letter

19   that you drafted?

20   A.  I believe at least three.

21   Q.  Okay.

22   (Government's Exhibit 198 was referenced.)

23   Q.  Do you have in front of you what has been marked

24   Government's Exhibit Number 198?

25   A.  I do.

1  Q.  Okay.  Do you recognize that document?

2  **A.**  The first document is an email from me to Joel, cc Tom

3  DeLawrence on January 9, 2015.  I do recognize this.

4  Q.  And what is the subject of the email?

5  **A.**  "Draft Letters."

6      MR. MARTIN:  Your Honor, I offer Government's Exhibit

7  Number 198.

8      THE COURT:  Any objections?

9      MR. DOSS:  No objection, Your Honor.

10     MS. HODGES:  No objection, Your Honor.

11     MR. BOUCHARD:  No objection, Your Honor.

12     THE COURT:  Thanks, everyone.  198 is received and may

13  be published.

14  (Government's Exhibit 198 was admitted into evidence.)

15  Q.  (BY MR. MARTIN:)  Just to confirm what you just said,

16  this is from you to Joel Gilbert on January 9 of 2015; is

17  that right?

18  **A.**  That is correct.

19  Q.  Okay.  And the subject and the attachment are both

20  "Draft Letters"?

21  **A.**  That is correct.

22  Q.  Okay.  Can you read what you wrote to Mr. Gilbert?

23  **A.**  Sure.

24      "Joel:  Good morning.  I received a text this morning

25  from the consultant regarding the letters, and I told them

JONES - Direct by Martin

1    that the letters had been sent to you for review.  Attached

2    are finalized versions of the letters.  The consultant may

3    be expecting to receive them today.  Thanks, Irving."

4    Q.  Okay.  Do you recall who the consultant was that you

5    communicated with?

6    A.  That would have been Oliver Robinson.

7        MR. MARTIN:  And if we could, can we look at the first

8    page of the attachment, please.

9    Q.  And you have in front of you the paper copy.  Can you

10   tell us what is attached to the email?

11   A.  Attached to the email, it looks like three versions of

12   the community letters.

13   Q.  Okay.  And can you just generally describe those letters

14   for us?  What are they?

15   A.  Sure.  They are letters that were drafted on behalf of

16   community members who, upon review and agreement, would

17   sign these letters opposing the Superfund site listing.

18   Q.  And you mentioned there are three versions of the

19   letter?

20   A.  Yes, sir.

21   Q.  And are each of the letters similar, but not exactly the

22   same?

23   A.  Yes, sir.

24   Q.  And who asked you to do three different versions of the

25   same letter?

1    A.   Mr. Gilbert.

2         Just a slight correction.   I'm not sure that he

3    specifically asked for three.   He may have asked for

4    multiple, and I provided three and then eventually we

5    reached three.

6    Q.   Okay.   Well, when you drafted them and sent him however

7    many, did he review them and approve what you had done?

8    A.   He did.

9    Q.   Okay.   Did you send your drafts of these letters to

10   Mr. Gilbert for review?

11   A.   I did.

12   Q.   Okay.   Did you have some conversation with him regarding

13   your efforts at drafting these letters?

14   A.   I did.   There were revisions that he thought needed to

15   be made.

16   Q.   Okay.   And what did he say to you?

17   A.   Well, about the revisions?

18   Q.   Did you have some conversation with him about the

19   letters that you had drafted?

20   A.   I did.   He wanted to make revisions because they were

21   initially too well drafted.

22   Q.   What do you mean?

23   A.   Well, I believe the exact conversation was something to

24   the effect of, "Irving Jones, how many degrees do you

25   have?"   I answered, "Three."   He responded something to the

*JONES - Direct by Martin*

```
 1  effect of, "Well, the people that we're writing these
 2  letters on behalf of may not have three degrees."  So in
 3  other words, dumb them down a bit.
 4  (Government's Exhibit 199 was referenced.)
 5  Q.  Do you have in front of you what is marked as
 6  Government's Exhibit Number 199?
 7  A.  I do.
 8  Q.  Okay.  Can you tell us what that is, please?
 9  A.  It is an email from me to Joel cc'ing Tom DeLawrence,
10  where I attached the three letters with his edits, also
11  attached a document that provides instructions for
12  uploading the comments for these letters online.
13      MR. MARTIN:  Your Honor, I offer Government's
14  Exhibit 199.
15      THE COURT:  Any objections?
16      MR. DOSS:  No objection, Your Honor.
17      MS. HODGES:  No objection, Your Honor.
18      MR. BOUCHARD:  No objection, Your Honor.
19      THE COURT:  Thanks, everyone.  199 is received and may
20  be published.
21  (Government's Exhibit 199 was admitted into evidence.)
22      MR. MARTIN:  Blow up the top part of that, please.
23  Q.  Mr. Jones, could you take us through this again now that
24  it's up on the screen?
25  A.  Sure.
```

1     It is an email from me to Joel Gilbert, cc Tom

2   DeLawrence, on January 12, 2015 at 10:39 a.m.  It says

3   "Joel:  Attached are three separate letters with your

4   edits.  I also attached a document which provides

5   instructions for uploading comments online for your review.

6   Irving."

7   Q.  Who is Tom DeLawrence, by the way?

8   A.  He is a partner at the firm.

9   Q.  Does he work in the environmental section?

10   A.  He does.

11   Q.  And what was attached to the -- this email?

12   A.  It appears to be drafts of the letters that we were just

13   discussing that were intended for the community and -- yes.

14   That's it.

15   Q.  And were these the drafts after your conversation with

16   Mr. Gilbert?

17   A.  Yes, sir.  They appear to be.

18   Q.  Okay.

19   (Government's Exhibit 200 was referenced.)

20     MR. MARTIN:  Could you bring up 200, please?

21   Q.  Do you see this on the screen, Mr. Jones, from Joel

22   Gilbert to Oliver Robinson, January 12 of 2015, with a copy

23   to David Roberson and yourself?

24   A.  Yes, sir.

25   Q.  Okay.  It says "Oliver, see attached.  Please review and

1    call me.  Joel."  Correct?

2    A.  Yes, sir.

3    Q.  And what is attached to this email?

4    A.  It looks like the three letters that were revised and a

5    copy of the instructions.  I believe, if you go back, the

6    instructions for uploading them onto the site.

7        MR. MARTIN:  Okay.  If you could just scroll down

8    through the entire thing.

9    Q.  Those are the instructions.  It says "Uploading

10   instructions for comments related to 35th Avenue NPL

11   listing."  What does that mean?

12   A.  From an administrative procedural aspect, essentially

13   what happens is before the EPA lists a site or designates a

14   site as a Superfund, there is a period in time in which

15   individuals, corporations, whomever, may submit comments in

16   either opposition to or in support of the listing.

17       The EPA then reviews those documents, comes back with

18   what they call a rule, essentially either listing it or not

19   listing it.

20   Q.  And the uploading instructions, does the EPA maintain a

21   website where interested parties can electronically send

22   their comments to the EPA for review?

23   A.  Yes, sir.

24   Q.  Okay.  And are these uploading instructions you were --

25   Joel Gilbert was sending to Oliver Robinson explaining how

1    to do that?

2    **A.**  Yes, sir.

3    **Q.**  Okay.  Did you have any role in uploading any of these

4    letters that you wrote and Joel Gilbert reviewed -- go

5    ahead.

6    **A.**  I did.

7    **Q.**  Okay.  Tell us about that, please.

8    **A.**  When the letters were returned to the office, I and

9    maybe one other lawyer -- I can't really recall -- were

10   instructed to upload them onto the EPA site as comments.

11   **Q.**  Okay.  Do you remember the day or night that you were

12   doing that?

13   **A.**  I don't, but it was a late night.  I do remember that.

14   **Q.**  Okay.  Do you recall who delivered letters to you?

15   **A.**  I don't recall if it was Oliver Robinson or someone else

16   maybe in his camp.  I don't know.  I can't remember.

17   **Q.**  How did those -- how did those letters get to you?  Were

18   you waiting at your office for them to be delivered one

19   night?

20   **A.**  I was.

21   **Q.**  Okay.  And then, eventually, either Oliver Robinson or

22   somebody associated with him delivered those to you?

23   **A.**  Yes, sir.

24   **Q.**  Okay.  Was there some -- we're talking about sort of the

25   middle of January, these dates we've been looking at.  Was

1   there some urgency to getting those submitted?

2   **A.**   I believe there was.

3   Q.   And why was that?

4   **A.**   I believe the time period for submitting comments for

5   this particular site was quickly approaching.  Or the

6   deadline was, anyway.

7   (Government's Exhibit 202 was referenced.)

8   Q.   Okay.  Do you have in front of you what is marked as

9   Government's Exhibit 202?

10   **A.**   I do.

11   Q.   And is that an email from you to Mr. Gilbert?

12   **A.**   It is.

13      MR. MARTIN:  Okay.  I would offer Government's Exhibit

14   202.

15      THE COURT:  Any objections?

16      MR. DOSS:  No objection, Your Honor.

17      MS. HODGES:  No objections.

18      MR. BOUCHARD:  No objection, Your Honor.

19      THE COURT:  Thanks, everyone.  202 is received and may

20   be published.

21   (Government's Exhibit 202 was admitted into evidence.)

22   Q.   (BY MR. MARTIN:)  Can you take us through this email,

23   Mr. Jones?

24   **A.**   Sure.  It's an email from me to Joel Gilbert on

25   January 20, 2015 at 2:30 p.m.  It states in the subject

 1   line "Community Comments."  The body of the email states

 2   "Joel, I have uploaded and submitted the first batch of

 3   community comments.  I am ready whenever the second batch

 4   arrives.  Irving."

 5   Q.  Okay.  And this relates to uploading the letters that we

 6   were just talking about?

 7   A.  Yes, sir.

 8   (Government's Exhibit 203 was referenced.)

 9   Q.  Okay.  If you could, do you have Government's Exhibit

10   203 in front of you?

11   A.  I do.

12   Q.  Okay.  Do you recognize that document?

13   A.  I do.

14   Q.  How are you able to recognize it?

15   A.  Well, the first page is an email that it looks like I

16   sent to a -- someone named John.

17   Q.  Okay.  And is Mr. Gilbert copied on it?

18   A.  He is.

19   Q.  All right.

20       MR. MARTIN:  I would offer Government's Exhibit 203.

21       THE COURT:  Any objections?

22       MR. DOSS:  No objection, Your Honor.

23       MS. HODGES:  No objections.

24       MR. BOUCHARD:  No objection, Your Honor.

25       THE COURT:  Thanks, everyone.  203 is received and may

 1   be published.

 2   (Government's Exhibit 203 was admitted into evidence.)

 3   Q.  (BY MR. MARTIN:)  Do you remember who John is?

 4   A.  I do not.

 5   Q.  Okay.  What did you write to John?

 6   A.  "John:  Attached is the landlord letter that you

 7   requested.  Please me know if you have any questions" -- I

 8   think "let" is supposed to be in there -- "Irving."

 9   Q.  Okay.  And what is attached to this?

10   A.  It looks like the heading is "Draft Letter 4."  And it

11   is a letter much like the community comments letter but is

12   intended to come from a landlord.

13   Q.  Do you recall who asked you to write this letter?

14   A.  Well, I think that it was requested that -- it was

15   requested either by Oliver Robinson -- I can't recall, but

16   the idea came up, and Joel asked me to draft this letter.

17   Q.  Okay.

18       MR. MARTIN:  Thank you.

19   (Government's Exhibit 65 was referenced.)

20   Q.  Do you have in front of you what has been marked as

21   Government's Exhibit Number 65?

22   A.  I do.

23   Q.  Do you recognize that document?

24   A.  I do.

25   Q.  Is it an email from you to Joel Gilbert and Steve

1   McKinney?

2   **A.**  It is.

3   Q.  All right.

4       MR. MARTIN:  I would offer Government's Exhibit

5   Number 65.

6       THE COURT:  Any objections?

7       MS. HODGES:  One moment, Your Honor.

8       MR. DOSS:  No objection, Your Honor.

9       MS. HODGES:  No objections, Your Honor.

10      MR. BOUCHARD:  No objection, Your Honor.

11      THE COURT:  Thanks, everyone.  65 is received and may

12  be published.

13  (Government's Exhibit 65 was admitted into evidence.)

14  Q.  (BY MR. MARTIN:)  Please take us through this,

15  Mr. Jones.

16  **A.**  Sure.  There is an email on the first page from me to

17  Joel Gilbert and Steve McKinney.  That subject line reads

18  "Chronology."  The heading of the document or the document

19  attached is entitled "Chronology."  The email states "All:

20  I have attached a revised copy of the white paper on Lance

21  LeFleur's inconsistent comments related to the NPL listing.

22  Please advise if you would like additional editing.

23  Irving."

24  Q.  And what is the date of this email?

25  **A.**  February 19, 2015 at 11:22 a.m.

1  Q.  Okay.  And if you recall from the letter you drafted for

2  Oliver Robinson to sign, was he appearing -- is this the

3  day before he was scheduled to speak at the commission

4  meeting?

5  A.  I'm not sure.  I believe the commission meeting --

6  sorry.  Go ahead.

7     MR. MARTIN:  Could you bring up Number 44, please?

8  Q.  This is the letter we looked at earlier, the final

9  submitted copy of the letter that we had talked about

10  earlier.  You see the date there on this when Oliver

11  Robinson was requesting permission to speak?

12  A.  I do.

13  Q.  Okay.  So that's February 20?

14  A.  Yes, sir.

15     MR. MARTIN:  Okay.  Could we go back to the other one,

16  please?

17  Q.  So now we're the day before that, right?

18  A.  Yes, sir.

19  Q.  Okay.  How did it come about that -- it says you have

20  attached a revised copy of the white paper on Lance

21  LeFleur's inconsistent comments.  How did it come about

22  that you were assigned the task of writing this white

23  paper?

24  A.  This was something that Joel Gilbert requested that I

25  draft.

1    Q.   Okay.   And what was your assignment?

2    A.   My assignment was to review communications and documents

3    that we had obtained, put them in chronological order in

4    effort to show Lance LeFleur's inconsistent comments with

5    respect to what I think was a group opposition, or at least

6    a movement to oppose the NPL listing, that he was not

7    necessarily on board with.

8    Q.   That "he" who was not necessarily on board with?

9    A.   Lance LeFleur.

10   Q.   Okay.   Did you know him to be the director of ADEM?

11   A.   I did.

12   Q.   Okay.   If we could, let's go to the attachment, please.

13   A.   Sure.

14   Q.   And can you tell us what this is, please?

15   A.   This is the chronology.

16   Q.   That you prepared for Mr. Gilbert?

17   A.   Yes, sir.

18   Q.   Okay.   And the title there, "ADEM Director Lance LeFleur

19   Correspondence Related to the 35th Avenue Site."   Did I

20   read that correctly?

21   A.   You did.

22   Q.   Okay.   And does the introductory paragraph there, the

23   first paragraph sort of summarize what your assignment was

24   and what you did?

25   A.   It is.

JONES - Direct by Martin

1   Q.   Could you read that first paragraph for us?

2   A.   Sure.   "This memo outlines the various comments made by

3   the Director of Alabama Department of Environmental

4   Management ("ADEM") Lance LeFleur, as they relate to the

5   Environmental Protection Agency's proposal to place the

6   35th Avenue Superfund Site located in North Birmingham on

7   the National Priorities List.

8        "Of particular concern is the number of occasions where

9   LeFleur makes inconsistent statements regarding ADEM's

10  position on the NPL listing.   Because ADEM represents the

11  State of Alabama in this matter, the importance of

12  maintaining a unified and consistent front cannot be

13  overstated, and LeFleur's inconsistent statements do

14  nothing to advance that interest."

15  Q.   Okay.   Did you have some conversation with Joel Gilbert

16  about that last sentence?

17  A.   I did.

18  Q.   Tell us about that, please.

19  A.   Well, that is the impetus for this white paper, to

20  demonstrate that he, as in Lance LeFleur, is not in line

21  with the unified front that I believe was being advanced.

22  Q.   And is that what Joel Gilbert told you?

23  A.   Yes.   That's not information I would have known.

24  Q.   If you could, do you have --

25       MR. MARTIN:   I believe Number 66 is already in.   Could

1    you bring that up, please?

2    (Government's Exhibit 66 was referenced.)

3    Q.  Can you tell us what this is, please?

4    A.  This is an email from me to Joel Gilbert on February 19,

5    2015, the day before that meeting.  And the subject line

6    is -- I don't know what that stands for other than

7    "Birmingham" something.  "Lanier Brown White Paper."

8    Q.  Did you know Lanier Brown was the chairman of the

9    Alabama Environmental Management Commission?

10   A.  I don't believe I knew who Lanier Brown was.

11   Q.  Okay.  And what did you write to Mr. Gilbert?

12   A.  "Joel, attached is a copy of the slimmed-down white

13   paper you requested.  You have been added to the document

14   in the system.  Irving."

15   Q.  Okay.  And what is attached to this email?

16   A.  It looks like the slimmed-down white paper referenced in

17   the email.

18   Q.  Is this the white paper that you wrote that we just

19   looked at, but a slimmed-down version of it?

20   A.  It does appear to be that, yes, sir.

21   Q.  Okay.

22       Thank you.

23       Mr. Jones, at some point were you asked to draft a

24   confidentiality agreement involving the Oliver Robinson

25   Foundation?

1    **A.**   I was.

2    *Q.*   Who asked you to do that?

3    **A.**   Joel Gilbert.

4    (Government's Exhibit 52 was referenced.)

5        MR. MARTIN:   Would you bring up Government's Exhibit

6    Number 59, please -- I mean, 52, please.

7    *Q.*   Do you have in front of you what has been marked as

8    Government's Exhibit 52?

9    **A.**   I do.

10   *Q.*   Okay.   And is this an email from Joel Gilbert to you?

11   **A.**   It is.

12       MR. MARTIN:   I offer Government's Exhibit 52, please.

13       THE COURT:   Any objections?

14       MR. DOSS:   No objection, Your Honor.

15       MS. HODGES:   No objection.

16       MR. BOUCHARD:   No objection, Your Honor.

17       THE COURT:   Thanks, everyone.   52 is in and may be

18   published.

19   (Government's Exhibit 52 was admitted into evidence.)

20   *Q.*   (BY MR. MARTIN:)   Let's look at the top part of this

21   email, Mr. Jones.   Can you tell us what this is?

22   **A.**   It's an email from Joel sent on February 12, 2015 at

23   1:10 p.m., to me, cc Tom DeLawrence.   Subject line says,

24   "Forward, Oliver Robinson Proposal (Attorney Work

25   Product/Privileged and Confidential).   Attachment:

1   Robinson Letter PDF."

2   Q.  And what did Mr. Gilbert write to you?

3   **A.**  "Irving:  Please incorporate this original agreement

4   into the confidentiality/engagement agreement we discussed

5   for Oliver.  Also, please date the agreement you are

6   drafting to be effective December 1, 2014.  Thanks, Joel."

7   Q.  Okay.  And what did you do once you received this email?

8   **A.**  I assume that I complied with this request.

9   (Government's Exhibit 59 was referenced.)

10  Q.  Okay.  Do you have in front of you what has been marked

11  as Government's Exhibit 59?

12  **A.**  I do.

13  Q.  Tell us what that is, please.

14  **A.**  That is an email from me to Joel on February 13, 2015 at

15  9:38 a.m.

16      MR. MARTIN:  I offer Number 59, Your Honor.

17      THE COURT:  Any objections?

18      MR. DOSS:  No objection, Your Honor.

19      MS. HODGES:  No objection.

20      MR. BOUCHARD:  No objection, Your Honor.

21      THE COURT:  Thanks, everyone.  59 is received and may

22  be published.

23  (Government's Exhibit 59 was admitted into evidence.)

24  Q.  (BY MR. MARTIN:)  Please take us through this email,

25  Mr. Jones.

*JONES - Direct by Martin*

1   **A.**   Sure.   I read the top half.   It is an email from me to

2   Joel.   It says "Joel:   I have attached a copy of the

3   confidentiality agreement you requested.   I assumed this

4   document would be executed this month, so I used

5   February for the execution date.

6      "With the exception of making the changes you requested

7   and correcting a few typographical errors, no other changes

8   were made.   Irving."

9   **Q.**   And the date of this email was February 13?

10  **A.**   Yes, sir.

11  **Q.**   Okay.   And what is attached to this email?

12  **A.**   It appears to be the confidentiality agreement.

13     MR. MARTIN:   Can you show the top half of that, please?

14  **Q.**   Is this an unsigned draft of the agreement that you

15  wrote for Mr. Gilbert?

16  **A.**   That's what it appears to be.

17  **Q.**   Okay.

18  **A.**   One that I drafted.

19  **Q.**   Okay.   And looking at the last page, it's not signed

20  yet, right?

21  **A.**   No, it does not appear to be signed.

22  **Q.**   Okay.

23  (Government's Exhibit 2 was referenced.)

24     MR. MARTIN:   If you could, bring up Government's

25  Exhibit Number 2, please.

*JONES - Cross by Doss*

1    Q.  Does this appear to be another copy of the agreement you

2    drafted?

3    **A.**  It appears to be.

4    Q.  Okay.  And what is the "executed as of" date?

5    **A.**  February 16, 2015.

6    Q.  If we could, let's go to the last page, please.  And

7    does this appear to be the executed copy of the

8    confidentiality agreement you wrote at Joel Gilbert's

9    request?

10   **A.**  It appears to be signed, yes, sir.

11   Q.  And it was executed, as we saw, on February 16 of 2015?

12   **A.**  Yes, sir.

13   Q.  And that was four days before Oliver Robinson was

14   scheduled to speak at the commission meeting?

15   **A.**  Yes, sir.

16       MR. MARTIN:  That's all the questions I have.  Thank

17   you.

18       THE COURT:  Mr. Doss?

19       MR. DOSS:  Yes, Your Honor.

20   CROSS-EXAMINATION BY MR. DOSS:

21   Q.  Good afternoon, Mr. Jones.

22   **A.**  Good afternoon, sir.

23   Q.  My name is Jeff Doss.  I'm one of the attorneys

24   representing Mr. Gilbert in this case.

25   **A.**  Okay.

1    Q.  I know it's been a while since you and he worked

2    together, but do you see him today in the courtroom?

3    A.  I do.

4    Q.  So if I heard you correctly, Mr. Jones, on direct, you

5    started working at Balch & Bingham in 2014; is that right?

6    A.  I believe it was September of 2014, yes, sir.

7    Q.  And you had gone to school at the University of

8    Mississippi; is that correct, for law school?

9    A.  I did.

10   Q.  And you started at Balch & Bingham in September of 2014,

11   and you were excited about that opportunity, weren't you?

12   A.  Sure.  It was a job out of law school.

13   Q.  Absolutely.  It was a good firm, right?

14   A.  It was a great firm.

15   Q.  But before law school, though, if I heard you correctly,

16   you got a master's degree in criminology or criminal

17   justice; is that right?

18   A.  I did.

19   Q.  And that would have been in 2006?

20   A.  I believe so.

21   Q.  And you're a lawyer now, but this is in some ways a

22   second career for you, right?

23   A.  In some ways, yes, sir.

24   Q.  Because between getting your master's degree and going

25   to law school, you actually worked for the NSA; is that

1  right?

2  **A.**  I did.

3  Q.  And what was your position generally there?

4  **A.**  I was an agent in counterintelligence.

5  Q.  And you did that for four years; is that right?

6  **A.**  I did.

7  Q.  And while you were in law school, you interned with the

8  Department of Justice; is that right?

9  **A.**  I did.

10  Q.  And that was both summers while you were in law school?

11  **A.**  Yes, but different divisions for each.

12  Q.  And is it fair to say that by September of 2014, you

13  were a newly minted lawyer but you weren't -- you weren't a

14  doe-eyed novice; is that fair?

15  **A.**  I think it depends on how you define that term.

16  Q.  You had some real-world experience?

17  **A.**  Indeed.

18  Q.  And as best I can tell, and correct me if I'm wrong, but

19  about one week or so after you started at Balch, you met

20  with Mr. Gilbert, didn't you?

21  **A.**  Oh, I couldn't tell you when I met with him.

22  Q.  Sure.  Do you recall it being pretty early on?

23  **A.**  I honestly don't recall when, but I would assume it was

24  early on.

25  Q.  And at some point shortly after you started at Balch,

1   you started working on Drummond-related matters?

2   **A.**   I don't recall the date, but it wasn't long after

3   working there.

4   **Q.**   Within the first month or so; is that fair to say?

5   **A.**   Again, I don't recall the date.

6   **Q.**   And I think we heard on direct you did some research for

7   Drummond?

8   **A.**   I did.

9   **Q.**   You did some legal drafting for Drummond?

10  **A.**   I did.

11  **Q.**   You did document review for Drummond?

12  **A.**   I did.

13  **Q.**   We can walk through some of the billing records, but it

14  looks like a lot of your time in that fall time period of

15  2014 was devoted to document review?

16  **A.**   I'll take your word for it.

17  **Q.**   And if I represent to you that the billing invoices

18  indicate you billed at least 400 hours to Drummond-related

19  projects, any reason to doubt that?

20  **A.**   No.

21  **Q.**   You were busy?

22  **A.**   Very.

23  **Q.**   And you weren't just working on Drummond-related

24  projects.  You had other client matters that you were

25  working on as well?

1  **A.**  I did, and I was studying for the Bar at that time.

2  **Q.**  And did I understand correctly that you were licensed by

3  the state bar of Mississippi first?

4  **A.**  I was.

5  **Q.**  And then you became licensed by the state bar of

6  Alabama?

7  **A.**  I did.

8  **Q.**  Okay.  And by December of 2014, I think I heard you say

9  you attended an AEMC meeting in Montgomery?

10  **A.**  Yes, sir.

11  **Q.**  And Dr. Propst with GASP was at that meeting?

12  **A.**  It appears so.

13  **Q.**  And a couple of days before you attended that meeting,

14  you reviewed GASP's PowerPoint presentation, right?

15  **A.**  Yes, sir.

16  **Q.**  And you prepared a white paper for Mr. Gilbert analyzing

17  that presentation?

18  **A.**  I did.

19  **Q.**  And you provided that to him, correct?

20  **A.**  I did.

21  **Q.**  And then you attended the meeting and you listened to

22  Dr. Propst's presentation and you reported back to

23  Mr. Gilbert about that presentation, right?

24  **A.**  I did.

25  **Q.**  And I think we saw Government's Exhibit 26.  If we look

1   on page 2 of that exhibit --

2       MR. DOSS:   I think that's DX 26.

3   Q.   And this is a newsletter that goes out by Balch,

4   correct?

5   A.   I believe so, yes.

6   Q.   If we look at the second page of that, it indicates the

7   public presentation, Dr. Stacie Propst on behalf of GASP,

8   correct?

9   A.   Yes, sir.

10  Q.   You also reported that following AEMC's questioning,

11  Director LeFleur was given an opportunity to respond.  Do

12  you see that?

13  A.   I do.

14  Q.   And it says, in his opinion "No justification existed to

15  warrant any expenditure of cleanup funds from the state

16  budget at the site and that other methods of cleanup

17  funding, i.e., full federal funding, may prove more

18  advantageous for all parties involved."  Did I read that

19  correctly?

20  A.   You did.

21  Q.   And when you prepared this, as best you recall, that was

22  your recollection of what happened at that meeting?

23  A.   It would have been, yes, sir.

24  Q.   And then in reviewing the billing records for this

25  matter, it looks like you might have taken the last week of

1    December off for vacation.  Does that seem likely,

2    possible?

3    **A.**  It does.

4    **Q.**  But lawyers being lawyers, you returned to billing in

5    early January, right?

6    **A.**  I'll take your word for it.

7    **Q.**  Okay.  I want to talk about January 2 of 2015.  And I

8    know this has been a few years ago, so we're going to try

9    to walk through maybe some documents to help jog your

10   memory.

11   **A.**  Sure.

12       MR. DOSS:  May I approach, Your Honor?

13       THE COURT:  You may.

14   (Defendant's Exhibit 1287 was referenced.)

15   **Q.**  (BY MR. DOSS:)  I'll show you, Mr. Jones, what we've

16   marked as Defense Exhibit 1287.  Does this appear to be an

17   email from Mr. Joel Gilbert to you on January 2, 2015?

18   **A.**  It does.

19       MR. DOSS:  Your Honor, we offer Defendant's Exhibit

20   1287.

21       MR. MARTIN:  No objection.

22       THE COURT:  1287 is received and may be published.

23   (Defendant's Exhibit 1287 was admitted into evidence.)

24       THE COURT:  Thank you, Mr. Martin.

25   **Q.**  (BY MR. DOSS:)  Do you see on the bottom half of this

```
1   email, it looks like an email from a Shea Jones-Johnson
2   with an EPA.gov email address to an ORobinson@aol.com email
3   address.  Do you see that?
4   A.  I do.
5   Q.  Do you see where in the next email in the chain, it
6   appears that Oliver Robinson forwards that email to Joel
7   Gilbert?
8   A.  I do see that.
9   Q.  Okay.  And then turning to you, Mr. Jones, on January 2,
10  2015, Mr. Gilbert forwards that to you?
11  A.  It appears so, yes, sir.
12  Q.  And his email says "Materials from EPA meeting.  Will
13  forward EPA recording and cards."  Do you see that?
14  A.  I do see that.
15      MR. DOSS:  May I approach, Your Honor?
16      THE COURT:  You may.
17  (Defendant's Exhibit 1288 was referenced.)
18  Q.  (BY MR. DOSS:)  Mr. Jones, I will show you what we've
19  marked as Defendant's Exhibit 1288.  And, Mr. Jones, does
20  this appear to be another email dated January 2, 2015
21  between you and Mr. Gilbert?
22  A.  It does.
23      MR. DOSS:  Your Honor, we offer Defendant's Exhibit
24  1288.
25      MR. MARTIN:  No objection.
```

1      THE COURT:   Thank you.   1288 is received and may be

2  published.

3  (Defendant's Exhibit 1288 was admitted into evidence.)

4  Q.  (BY MR. DOSS:)   And does this appear to be Mr. Gilbert

5  forwarding to you a fax message?

6  A.   That's what it appears to be, yes, sir.

7  Q.   And Mr. Gilbert's message to you is "EPA reps in meeting

8  in addition to Heather Toney," right?

9  A.   That's what it reads, yes, sir.

10  Q.   So if we look at the second page, this is the actual fax

11  that was being forwarded, right?

12  A.   I assume so.

13  Q.   And it appears to be from a Robinson & Robinson

14  Communications to Joel Gilbert from Oliver L.

15  Robinson, Jr., correct?

16  A.   Yes, sir.

17  Q.   And then if we go to the third page, do these appear to

18  be business cards for various EPA officials?

19  A.   They do.

20  Q.   Do you also recall that about this same day, Mr. Gilbert

21  forwarded to you a recording between Oliver Robinson and

22  those same EPA officials?

23  A.   If you're asking if I recall the day, I don't.   But that

24  very well could have happened.

25  Q.   Do you recall that event occurring, that Mr. Gilbert

*JONES - Cross by Doss*

1  provided you with a recording of Oliver Robinson and some

2  EPA folks?

3  **A.**  Not from memory, but that's not to say it didn't happen.

4  **Q.**  Okay.

5      Let's look at Defense Exhibit 551 at 93.

6      And, Mr. Jones, are your initials IWJ?

7  **A.**  They are.

8  **Q.**  If we could look at January 5, 2015.  Does this appear

9  to be a billing entry for you?  It says "Review and

10  summarize taped interviews related to GASP operations."

11  **A.**  It does.

12  **Q.**  Does that help you recall whether you might have

13  listened to some recordings between GASP and Oliver

14  Robinson and summarized them?

15  **A.**  It does.

16  **Q.**  And it indicates you spent about eight hours that day

17  working on that project?

18  **A.**  It does.

19      MR. DOSS:  Then if we could look at January 6 for

20  Mr. Jones.

21  **Q.**  And, Mr. Jones, you see where it says "Review and

22  summarize taped interviews related to GASP and EPA

23  operations pertaining to the 35th Avenue site"?

24  **A.**  I do see that.

25  **Q.**  You were also reviewing documents that day, too,

1    correct?

2    **A.**   It appears so.

3    **Q.**   And you billed 2.75 hours?

4    **A.**   That's correct.

5    **Q.**   So of that 2.75 hours, some portion of it was spent

6    reviewing and summarizing interviews related to GASP and

7    EPA operations?

8    **A.**   Yes, sir, that is what this document indicates.

9    **Q.**   And does this help you remember that you were listening

10   to some EPA recordings between EPA folks and Oliver

11   Robinson?

12   **A.**   I would assume so.   I mean, it doesn't -- that's not

13   what it says, but I assume so.

14   **Q.**   You were asked on direct about Government's Exhibit 197.

15   Let's take a look at that date.   Mr. Martin asked you about

16   this top email between Mr. Roberson and Mr. Gilbert on

17   January 6, 2015, correct?

18   **A.**   That's correct.

19   **Q.**   And it says "Oliver needs to get some of the

20   neighborhood officers to send letters opposing the

21   listing," right?

22   **A.**   Yes, sir.

23   **Q.**   Okay.   Hold on to the date of January 6 for me, all

24   right?

25   **A.**   Got it.

*JONES - Cross by Doss*

1    Q.  Okay.

2       MR. DOSS:  Your Honor, may I approach?

3       THE COURT:  You may.

4    (Defendant's Exhibit 1289 was referenced.)

5    Q.  (BY MR. DOSS:)  I'll show you, Mr. Jones, what we marked

6    as Defendant's Exhibit 1289.  Mr. Jones, does this appear

7    to be a calendar entry from January 7, 2015?

8    **A.**  I've never seen one that looks like this, but I guess it

9    could be.

10      MR. DOSS:  Your Honor, we offer Defense 1289.

11      THE COURT:  Any objections?

12      MR. MARTIN:  Judge, apparently the witness does not

13    recognize it.

14      THE COURT:  Mr. Jones, is it your calendar entry?  Does

15    it have anything in it --

16      THE WITNESS:  It says required attendees, which would

17    indicate that this was at least sent to me, but I don't

18    know if --

19      THE COURT:  May I review it, again?

20      THE WITNESS:  You may.

21      THE COURT:  Take a look at it, please?  Thanks.

22      Thank you.  All right.  He does not recognize it, but

23    because it has his name on it, over the government's

24    objections, I will admit 1289.

25    (Defendant's Exhibit 1289 was admitted into evidence.)

1   Q.   (BY MR. DOSS:)   Okay.   Let me orient you before we look

2   at this.   Let's look at Defendant's Exhibit 551 at 94.

3        On January 7, 2015, Mr. Jones, does that appear to be a

4   billing entry related to you?

5   A.   It does.

6   Q.   Okay.   Do you see where it says "Teleconference with

7   consultant on EPA and GASP interviews"?

8   A.   I do.

9   Q.   Does that help refresh your recollection?

10  A.   Yes, it's consistent with this date here on this what

11  you've called a calendar invite.

12  Q.   Okay.   And to be clear, when you said consultant, the

13  only consultant that you were aware of in January 2015

14  related to Drummond work would have been Oliver Robinson,

15  right?

16  A.   Yes, sir.

17  Q.   So now let's go back to Defendant's 1289.   So this looks

18  like maybe a calendar invitation or a calendar entry, call

19  with Oliver Robinson, telephone number, January 7, 30

20  minutes, required attendees, Irving Jones?

21  A.   Yes, sir.

22  Q.   As best you can recall, it wouldn't have just been you

23  and Mr. Robinson participating in that conference call,

24  right?

25  A.   It would not have been.

*JONES - Cross by Doss*

Q.  It likely would have been you and Mr. Gilbert as well?

A.  Yes, sir.

Q.  And this was one day after the email we just looked at
where Mr. David Roberson was sending an email to Mr. Joel
Gilbert saying we need to talk to Oliver to get some people
out in the community, right?

A.  I'll take your word for it.  I don't remember, honestly.

Q.  That's GX 197.

A.  Yes, sir.

    MR. DOSS:  May I approach, Your Honor?

    THE COURT:  You may.

(Defendant's Exhibit 1290 was referenced.)

Q.  (BY MR. DOSS:)  I show you, Mr. Jones, what we have
marked as Defendant's Exhibit 1290.  All right.  So we have
a conference call between you, Mr. Gilbert, Mr. Robinson on
January 7, correct?

A.  Yes, sir.

Q.  Okay.  And then does this appear to be an email between
Mr. Gilbert and you on January 8, 2015?

A.  It does.

    MR. DOSS:  Your Honor, we offer Defendant's
Exhibit 1290.

    MR. MARTIN:  No objection.

    THE COURT:  Thank you.  1290 is received and may be
published.

1    (Defendant's Exhibit 1290 was admitted into evidence.)

2    Q.  (BY MR. DOSS:)  Now, this is a very short email, just an

3    FYI; is that right?

4    A.  Yes, sir.

5    Q.  There's an attachment to it, "OliverLRobinson.msg"?

6    A.  Yes, sir.

7    Q.  If we look on the second page, the attachment, Mr.

8    Gilbert was sending you contact information for Mr. Oliver

9    Robinson, correct?

10   A.  It appears so, yes, sir.

11   Q.  And it indicates Mr. Robinson at the top is president of

12   Robinson & Robinson Communications, correct?

13   A.  It does.

14   Q.  It also indicates Alabama State House of Representatives

15   District 58, correct?

16   A.  That is what this says, yes, sir.

17   Q.  And as best you can recall, Mr. Gilbert was providing

18   you this information because you were going to be in touch

19   with Mr. Robinson about some work in January; is that

20   right?

21   A.  I don't know where you see that.

22   Q.  Well, let's look at Government's Exhibit 198.  So this

23   would have been the day after you received Mr. Robinson's

24   contact information, correct?

25   A.  Yes.

*JONES - Cross by Doss*

```
1    Q.  And it says "I received a text this morning from a
2    consultant regarding the letters, and I told him that the
3    letters had been sent to you for review," correct?
4    A.  Yes, sir.
5    Q.  Presumably Mr. Robinson was able to text you because he
6    had your phone number, right?
7    A.  Yes, sir.
8    Q.  And you had Mr. Robinson's phone number at that point in
9    time?
10   A.  I would assume so, yes, sir.
11   Q.  And I believe you said the consultant reference here
12   would be Oliver Robinson, right?
13   A.  It would be.
14   Q.  Is it fair to say that as of January 9, two days after
15   this conference call on January 7, Mr. Robinson is
16   following up asking about the comment letters?
17   A.  It would appear that way, yes, sir.
18   Q.  And you've copied on this email a Mr. Tom DeLawrence who
19   I believe you said was a partner at Balch at the time; is
20   that right?
21   A.  I believe he was a partner.  Either he was a senior
22   associate or a partner.  I think he was a partner, though.
23   I can't remember.
24   Q.  Okay.  And do you generally remember that January 20,
25   2015 was the deadline for NPL comments?
```

1    **A.**  I don't remember that.  But if you say it was, I'll take
2    your word for it.
3    **Q.**  No reason to doubt that?
4    **A.**  No reason to doubt that, no, sir.
5    **Q.**  And if I -- is it correct that you had some involvement
6    as well with helping draft portions of Drummond's comment
7    letter to the EPA?
8    **A.**  I'm not sure.  I can't remember.  It's possible.
9    **Q.**  And then let's look at Government's Exhibit 199.  And
10   the date on this is January 12, 2015, correct?
11   **A.**  It is.
12   **Q.**  And so you had provided some drafts of these letters to
13   Mr. Gilbert on the Friday before, on January 9, right?
14   **A.**  Yes, sir.
15   **Q.**  He'd provided some edits, and then you sent him updated
16   versions on the following Monday, right?
17   **A.**  That's what appears to have happened, yes, sir.
18   **Q.**  And you're copying Mr. Tom DeLawrence again here?
19   **A.**  Yes, sir.
20   **Q.**  And then if we look at Government's Exhibit 200, that
21   same day that you turned the letters around, Mr. Gilbert
22   sends it to Mr. Robinson, right?
23   **A.**  Yes, sir.
24   **Q.**  And he copies you on this email?
25   **A.**  He does.

*JONES - Cross by Doss*

1   Q.  And that would make sense to keep you in the loop

2   because you were involved with this process, right?

3   **A.**  Involved in the sense that I drafted the letters?  Yes,

4   sir.

5   Q.  Yes.  And then if we look at Government's Exhibit 202, I

6   believe you said you stayed late that day, correct?

7   **A.**  No, that's not what I said.  I said I stayed late the

8   day that I received the letters back.

9   Q.  Do you know if January 20 would have been the day you

10  received them back?

11  **A.**  I don't know.

12  Q.  Okay.  Let's look at Defendant's Exhibit 551 at page 87.

13      January 20, 2015, IWJ.  It appears that you billed 11

14  hours that day?

15  **A.**  Yes, sir.

16  Q.  And you reviewed and submitted the community comments

17  online?

18  **A.**  Yes, sir.

19  Q.  Okay.  So is it fair to say that at least on January 20,

20  you received some of the community comments and submitted

21  some of them?

22  **A.**  Yes, sir.

23  Q.  And as of 2:30 in the afternoon on January 20, according

24  to Government's Exhibit 202, you had submitted the first

25  batch, right?

1   **A.**  Yes, sir.

2   **Q.**  And you were waiting for the second batch to arrive on

3   January 20?

4   **A.**  Yes, sir.

5   **Q.**  And given that you billed 11 hours that day, which would

6   be a long day --

7   **A.**  That's fairly typical.

8   **Q.**  And it's a long day, right?

9   **A.**  It is.

10  **Q.**  All right.  Does that help refresh your recollection

11  that it was January 20 you stayed late to receive the

12  second batch of letters?

13  **A.**  Again, I don't -- I can't recall.

14  **Q.**  Fair enough.  But January 20, somewhere around that time

15  frame, you waited at the office really late to get another

16  batch of letters that you then submitted online?

17  **A.**  I would -- I don't know what date it was that I waited

18  late, if that's your question.

19  **Q.**  And that's okay.

20  (Defendant's Exhibit 655 was referenced.)

21      MR. DOSS:  If we could look at Defendant's 655.   655.

22  **Q.**  Okay.  This is the first page.  There are 70-plus pages

23  to this exhibit.  Do these appear to be the comment letters

24  that you received and submitted to the EPA?

25  **A.**  Yes, sir.

1    Q.  And I believe you said you couldn't recall if it was

2    Oliver Robinson or someone else who brought the comment

3    letters to Balch's office; is that right?

4    A.  That's right.  They didn't come to the office.  I don't

5    think I said that.  I met them outside somewhere, but it

6    wasn't in the office.

7    Q.  Okay.  If we could look at Government's Exhibit 203.

8    And this is an email to a johnpfam@aol.com, right?

9    A.  It is.

10    (Government's Exhibit 208 was referenced.)

11        MR. DOSS:  If we could look at Government's Exhibit

12    208, please.  This is in evidence.

13    Q.  If you look at the bottom here, Mr. Jones, do you see

14    where it indicates johnpfam@aol.com is associated with John

15    Powe?

16    A.  I do.

17    Q.  Does that refresh your recollection that

18    johnpfam@aol.com was John Powe?

19    A.  I don't know who John Powe is, but I would assume that

20    that is his email address, yes, sir.

21    Q.  So if we go back to Government's Exhibit 203, you're

22    sending this landlord letter to someone named John at

23    johnpfam@aol.com?

24    A.  Yes, sir.

25    Q.  Was it your understanding that this person John was

*JONES - Cross by Doss*

 1    somehow associated with Oliver Robinson's group?

 2    **A.**   I think so.

 3         MR. DOSS:   May I approach, Your Honor?

 4         THE COURT:   You may.

 5    (Defendant's Exhibit 1300 was referenced.)

 6    Q.   (BY MR. DOSS:)   I'll show you, Mr. Jones, what I marked

 7    as Defendant's Exhibit 1300.   Does this appear to be

 8    another email between you and that johnpfam@aol.com on

 9    January 21, 2015?

10    **A.**   Yes, sir.

11         MR. DOSS:   Your Honor, we offer Defendant's

12    Exhibit 1300.

13         MR. MARTIN:   No objection.

14         THE COURT:   Thank you, Mr. Martin.   1300 is received

15    and may be published.

16    (Defendant's Exhibit 1300 was admitted into evidence.)

17    Q.   (BY MR. DOSS:)   Does this email appear to be earlier

18    that day on Wednesday, January 21, 2015?

19    **A.**   Yes, sir.

20    Q.   And you're providing some instructions on how to upload

21    comment letters to the EPA to johnpfam@aol.com?

22    **A.**   I am.

23    Q.   And then if we look at the second page -- we won't walk

24    through it -- but that gives a step-by-step way to actually

25    upload those comments, right?

*JONES - Cross by Doss*

1   **A.**   It does.

2   **Q.**   Okay.  So flash forward to February 6 of 2015.

3        MR. DOSS:  If we can look at Government's Exhibit 40.

4   **Q.**   And Mr. Martin asked you some questions about this.  And

5   on direct, you said you prepared this letter for someone to

6   speak before the AEMC.  Do you remember that?

7   **A.**   That's right.

8   **Q.**   And do you see there in parentheses, it says "Oliver or

9   otherwise"?

10  **A.**   It does.

11  **Q.**   Was it your understanding as of February 6, 2015 that it

12  wasn't necessarily going to be Oliver Robinson speaking at

13  the AEMC?

14  **A.**   That is what that would appear to indicate.

15  **Q.**   And this information included in this email, "The next

16  AEMC meeting will be held on February 20, 2015," was that

17  information that you would have obtained by contacting the

18  AEMC yourself?

19  **A.**   Oh, I don't know.

20  **Q.**   Okay.  Or the fact that Debbie Thomas is the AEMC

21  executive assistant, was that information you learned on

22  your own, or was that information someone had provided to

23  you?

24  **A.**   Someone would have had to provide that to me.

25       MR. DOSS:  Okay.  Now let's look at Government's

*JONES - Cross by Doss*

1    Exhibit 1.

2    Q.  Mr. Jones, do you recall what floor your office was on

3    in February of 2015?

4    A.  I do not.

5    Q.  Okay.  And if we look at the second page, I think these

6    are the redline edits that you and Mr. Martin discussed.

7    In the original draft of your letter, in that second

8    paragraph, is it correct it would have originally read "as

9    a representative of a neighboring district in North

10   Birmingham" comma?  Is that what you originally wrote?

11   A.  It looks like that was the original draft, yes, sir.

12   Q.  In fact, as of February 6, 2015, Mr. Oliver Robinson

13   was, in fact, a representative of a neighboring district in

14   North Birmingham, right?

15   A.  That's not something that I recall, but sure, he could

16   have been.  It appears that he was.

17   Q.  In other words, is there really any difference between

18   saying state legislator or representative?

19       MR. MARTIN:  Objection.  Speculation.

20       THE COURT:  Yeah, since he was not the drafter of the

21   redline language, sustained.

22       MR. DOSS:  Let's look at Government's Exhibit 43.

23   Q.  On the bottom half, Mr. Jones, is the email where you

24   provided a copy of the letter to Mr. Robinson, correct?

25   A.  Yes, sir.

Q.  And in the second sentence, you said "If you would like

me to make any edits, please let me know."

A.  Yes, sir.

Q.  No one was demanding Oliver Robinson put anything in

this letter, were they?

A.  Not that I recall.

     MR. DOSS:  Your Honor, may I approach?

     THE COURT:  You may.

(Defendant's Exhibit 1298 was referenced.)

Q.  (BY MR. DOSS:)  Mr. Jones, I'll show you Defendant's

Exhibit 1298.  Does this appear to be an email between you

and Mr. Gilbert dated February 10, 2015?

A.  It does.

     MR. DOSS:  Your Honor, we offer Defendant's Exhibit

1298.

     MR. MARTIN:  No objection.

     THE COURT:  Thank you.  1298 is in and may be

published.

(Defendant's Exhibit 1298 was admitted into evidence.)

Q.  (BY MR. MARTIN:)  All right, Mr. Jones.  On February 10,

2015, Mr. Gilbert provided a copy to you of Oliver's letter

to the AEMC, correct?

A.  Yes.  Well, it says subject.  I don't see where there's

an attachment.  I assume there was an attachment, but this

email does not indicate that.

1        MR. DOSS:  Your Honor, may I approach?

2        THE COURT:  You may.

3    Q.  (BY MR. DOSS:)  Can you take a look at this email for

4    me, please?

5    A.  Sure.  Yes, this does show an attachment.

6    Q.  All right, Mr. Jones.  So on February 10, 2015,

7    Mr. Gilbert provided you a copy of Mr. Robinson's letter to

8    the AEMC, correct?

9    A.  Yes.  Did you say 2014?

10   Q.  '15.

11   A.  '15.  Yes, sir.

12   Q.  And then your response to Mr. Gilbert was "Well, he did

13   not change anything in the letter," right?

14   A.  Yes, sir.

15   Q.  And is it fair to say that your response was that

16   because if Oliver had wanted to change anything in the

17   letter, he could have?

18   A.  Well, I did ask him if he wanted to make any revisions,

19   and it appears, based on this email, he did not.

20   Q.  And he never asked to make any revisions, right?

21   A.  Not that I recall.

22   Q.  All right.  So then two days later, I believe Mr. Martin

23   discussed with you the drafting of the contract.  Do you

24   remember that?

25   A.  The confidentiality agreement?

*JONES - Cross by Doss*

1    Q.  Yes, sir.

2    A.  I do remember.

3        MR. DOSS:  Your Honor, may I approach?

4        THE COURT:  You may.

5    (Defendant's Exhibit 1299 was referenced.)

6    Q.  (BY MR. DOSS:)  I'll show you what we marked as

7    Defendant's Exhibit Number 1299.

8    A.  Sure.

9    Q.  And does this appear to be an email between you and Tom

10   DeLawrence dated February 12, 2015?

11   A.  It does.

12       MR. DOSS:  Your Honor, we offer Defendant's

13   Exhibit 1299.

14       MR. MARTIN:  No objection.

15       THE COURT:  Thank you.  1299 is in and may be

16   published.

17   (Defendant's Exhibit 1299 was admitted into evidence.)

18   Q.  (BY MR. DOSS:)  All right.  Now, here is Mr. DeLawrence

19   again, correct?

20   A.  It is.

21   Q.  And the subject line is "Confidentiality Agreement,"

22   right?

23   A.  It is.

24   Q.  And you say "Tom, do you have a copy of the SE+C

25   confidentiality agreement you drafted?  I would like to use

1    it as a template for the agreement I am drafting for

2    Oliver."  Is that right?

3    **A.**   That's what it says, yes, sir.

4    **Q.**   And that's not uncommon in a law firm to look for a

5    template for a contract, right?

6    **A.**   Yes, sir.

7    (Government's Exhibit 146 was referenced.)

8    **Q.**   If we look at Government's Exhibit 146, do you see here,

9    Mr. Jones, a document titled "Agreement Between Balch &

10   Bingham, LLP and Southeast Engineering & Consulting, LLC"?

11   **A.**   I do.

12   **Q.**   Does that refresh your recollection about what SE+C

13   stands for?

14   **A.**   I assume so.  Although I don't see another C.  But I'll

15   take your word for it.

16   **Q.**   Okay.  And then we go to Government's Exhibit 59, dated

17   February 13, 2015.  And you say "I have attached a copy of

18   the confidentiality agreement you requested.  I assumed

19   this document would be executed this month, so I used

20   February for the execution date.  With the exception of

21   making the changes you requested and correcting a few

22   typos, no other changes were made," right?

23   **A.**   Yes, sir.

24   **Q.**   And then you attach to it a draft of the Oliver Robinson

25   confidentiality agreement, right?

*JONES - Cross by Doss*

**A.**  It appears that was attached, yes.

THE COURT:  Mr. Doss, let me give the jury an afternoon break, please.

MR. DOSS:  Yes, Your Honor.

THE COURT:  Mr. Jones, I know you are anxious to get back to work.  They've been going at it for about an hour and a half now, so let me give the jury a 15-minute break.

Members of the jury, please do not talk about this case during the break.  We are in recess until 3:40.

(The following proceedings were had in open court outside of the presence and hearing of the jury.)

THE COURT:  Mr. Jones, you may step down to stretch your legs.  You cannot talk to anyone about your testimony during the break.

THE WITNESS:  Yes, sir.

THE COURT:  We're in recess for the next 15 minutes. Thanks, everyone.

(Recess.)

(The following proceedings were had in open court in the presence and hearing of the jury.)

THE COURT:  Mr. Doss, you may continue.

MR. DOSS:  Thank you, Your Honor.  May I approach?

THE COURT:  You may.

**Q.**  (BY MR. DOSS:)  Mr. Jones, I'm going to show you what's in evidence as Government's Exhibit 2, which is the Oliver

*JONES - Cross by Doss*

1    Robinson Foundation contract, and Government's Exhibit 146,

2    which is the Southeast Engineering & Consulting contract,

3    okay?  And I'll ask you, Mr. Jones, if you'll take a quick

4    look at these and tell me if it appears that, though the

5    parties may be different, the signature blocks may be

6    different, if these are basically the same contracts?

7    **A.**  Do you mind if I ask if there are any privilege issues

8    with discussing this Southeast Engineering & Consulting,

9    LLC group document?

10   Q.  There are not --

11       MR. DOSS:  Your Honor?

12   Q.  There are not.

13   **A.**  Okay.  Did you want me to go line by line?

14   Q.  If you can just tell me if the basic provisions of the

15   contracts are the same.

16   **A.**  Sure.  They appear to be on the first page.  They appear

17   to be on the second page.  They appear to be on the third

18   page.  They appear to be on the fourth page.  They appear

19   to be on the fifth page.  And absent the signatures, they

20   appear to be on the sixth page.

21   Q.  Thank you, sir.  So to close the loop, does it appear

22   that the Southeast Engineering & Consulting contract may

23   have been the template you used for the Oliver Robinson

24   Foundation contract?

25   **A.**  It does.

*JONES - Cross by Doss*

1  Q.  So let's look at Government's Exhibit 2, please.  Now,

2  earlier you mentioned that this was a confidentiality

3  agreement; do you remember that?

4  **A.**  I do.

5  Q.  Do you see in the first paragraph that it says services

6  to be performed?

7  **A.**  I do.

8  Q.  Would it be fair to say that this is a services contract

9  with a confidentiality clause?

10  **A.**  Sure, I suppose you could call it that.

11  Q.  And confidentiality clauses, those are fairly standard

12  for consultant contracts between law firms and consultants,

13  right?

14  **A.**  That I don't know.  This is the first and only one I've

15  ever drafted.

16  Q.  Fair enough.  Do you see on page 5 of this exhibit a

17  compliance with laws provision?

18      MR. MARTIN:  Judge, objection.

19      THE COURT:  It's already in evidence.  I'll let the

20  question go forward.

21  **A.**  I'm sorry.  Can you repeat the question, sir?

22  Q.  (BY MR. DOSS:)  Yes, sir.  Do you see that there's a

23  compliance with laws provision in this agreement?

24  **A.**  I do.

25  Q.  So is it fair to say that this was not a contract

1  specifically drafted for the Oliver Robinson Foundation but

2  was based on a template from another contract?

3  **A.**  It was based on a template from another contract, yes,

4  sir.

5  Q.  Okay.  If we could look at Defendant's 551 at 103 and

6  just want to close the loop here.  If we look at

7  February 6, 2015, it says "Draft letter to AEMC to request

8  time for comments at February 20, 2015 meeting."  Do you

9  see that, sir?

10  **A.**  I do.

11  Q.  And then again, just to be clear, that doesn't mean you

12  spent four and a half hours drafting that letter.  You

13  spent some portion of four and a half hours drafting that

14  letter, correct?

15  **A.**  Yes, sir.

16      MR. DOSS:  And if we could look at Government's Exhibit

17  260, page 2.

18  Q.  Do you see the title of this exhibit says "Summary of

19  Billing Entries From Balch & Bingham Billing Records

20  Related to Oliver Robinson and John Powe"?

21  **A.**  I do.

22  Q.  Do you see anywhere on this page where there are any

23  billing entries for you?

24  **A.**  I do not.

25  Q.  Is it fair to say that we have covered today some

1   billing entries from you related to Oliver Robinson?

2   **A.**  We have.

3   Q.  And Mr. Jones, to be clear, while you were working at

4   Balch & Bingham, Mr. Gilbert, he wasn't your client, right?

5   **A.**  He was not.

6   Q.  Your client was Drummond, among others?

7   **A.**  Yes, the firm's client was Drummond.

8   Q.  And as an attorney, you owed duties of loyalty to your

9   client, right?

10   **A.**  Yes, sir.

11   Q.  And, you know, during this time frame that we're talking

12   about, January -- let's back up -- December 2014,

13   January 2015, February 2015, at no point in time you

14   thought that you weren't being loyal to your client, right?

15   **A.**  Not that I can recall.

16   Q.  And at no point in time was anybody asking you, from

17   your perspective, to do anything unethical, right?

18      MR. MARTIN:  Objection.  Relevance.

19      THE COURT:  Sustained.

20   Q.  (BY MR. DOSS:)  From your point of view, Mr. Jones,

21   December 2014, January 2015, February '15, from your point

22   of view, no one was asking you while you were doing work at

23   Balch & Bingham to do anything that you considered to be

24   unlawful, fair?

25      MR. MARTIN:  Objection.  Relevance.

1          THE COURT:   Mr. Doss, I'm going to sustain again.

2     Q.   (BY MR. DOSS:)   Is it fair to say, Mr. Jones, that this

3     time frame we're talking about, you don't have -- it was

4     several years ago, right?

5     **A.**   It was.

6     Q.   And aside from the documents we've looked at, is it fair

7     to say that you don't remember much of this really?

8     **A.**   I wouldn't say that's fair to say.

9     Q.   Okay.   Was there anything at this time period -- well,

10    let me back up.

11         You had a couple of meetings where Mr. Oliver Robinson

12    was present?

13    **A.**   I had one meeting.

14    Q.   Okay.   And you had the telephone conference call

15    apparently, right?

16    **A.**   It appears so, yes, sir.

17         MR. DOSS:   One moment, Your Honor.

18         Thank you for your time this afternoon, Mr. Jones.

19         No further questions, Your Honor.

20         THE COURT:   Thank you, Mr. Doss.

21         Ms. Hodges?

22         MS. HODGES:   Your Honor, I have no questions for this

23    witness.

24         Thank you, Mr. Jones.

25         But at the Court's convenience, I would like to perfect

*JONES - Cross by Bouchard*

 1   the record regarding my objection.

 2        THE COURT:  Thank you.

 3        Mr. Bouchard, is this your witness?

 4        MR. BOUCHARD:  Just briefly, Your Honor.

 5        THE COURT:  Thank you.  You may proceed.

 6   CROSS-EXAMINATION BY MR. BOUCHARD:

 7   Q.  Good afternoon, Mr. Jones.  My name is David Bouchard,

 8   and I'm an attorney for David Roberson.

 9        You said that you worked for about 400 hours,

10   approximately, for Drummond; is that right?

11   A.  I believe the lawyer said 400.  I took his word for it.

12   Q.  You don't have any reason to dispute that; is that fair?

13   A.  I do not.

14   Q.  You worked on drafting the agreement between the Oliver

15   Robinson Foundation and Balch & Bingham?

16   A.  I did.

17   Q.  You drafted letters for Joel Gilbert to review?

18   A.  I did.

19   Q.  Do you recall, Mr. Jones, in your very first interview

20   with the FBI, telling them that you did not know who David

21   Roberson was?

22   A.  I do.

23   Q.  So over the course of your 400 hours of work for the

24   Drummond client, over the course of all the important

25   documents that you drafted, you never once met

*JONES - Cross by Bouchard*

1    Mr. Roberson?

2    **A.**   I did not.

3          MR. BOUCHARD:   Thank you.

4          Nothing further.

5          THE COURT:   Thank you.

6          Any redirect for this witness?

7          MR. MARTIN:   No further questions, Your Honor.

8          THE COURT:   Is Mr. Jones released from his subpoenas?

9          MR. MARTIN:   He is, Your Honor.

10         MR. BOUCHARD:   Yes, Your Honor.

11         MR. DOSS:   Yes, Your Honor.

12         MS. HODGES:   Yes, Your Honor.

13         THE COURT:   Thank you.

14         Mr. Jones, have a good afternoon, sir.

15         THE WITNESS:   Thank you, Judge.   You, too.

16         Would you like these documents up here?

17         THE COURT:   Just leave them up there, please -- thank

18   you -- I think.

19   (Witness excused.)

20         THE COURT:   Who is the government's next witness?

21         MR. MARTIN:   Your Honor, the United States rests.

22         THE COURT:   Thank you, Mr. Martin.

23         Ladies and gentlemen of the jury, the government has

24   rested.   I'm going to break for the day and probably -- let

25   me just break for the week and bring you guys back Monday

1    morning at 9:00.  There are matters that I need to attend

2    to with the lawyers.  Given the lateness of the day,

3    they'll probably carry over until the morning.  Instead of

4    having you wait and wait for what may be 10 minutes or it

5    could be an hour or two, let me just give you Friday off

6    since we were only going to go until 1:00 anyway.

7         Long breaks, again, always give me pause for concern.

8    Please do not talk about this case with anyone and

9    certainly not amongst yourselves, and please do not read

10   anything about this case or watch any news or listen to any

11   news stories about this case at all.

12        Again, you are to decide this case solely based on all

13   of the evidence that's presented in this courtroom and my

14   jury instructions that I will give you at the end of the

15   case.

16        Thanks, everyone.  Have a good weekend.  I will see you

17   Monday morning at 9 a.m.

18   (The following proceedings were had in open court

19   outside of the presence and hearing of the jury.)

20        THE COURT:  Be seated, everyone.  I have not overlooked

21   the jury issue.  Ms. Humphrey, who's been here from day

22   one, needs to be a part of the issue since I will need her

23   help in perhaps dealing with differing assessments of the

24   issue from the lawyers.  So I will take that up on Monday

25   or Tuesday when she is here.

 1        The government has rested.  Let me just go in the order

 2   that you guys have been going.  I'll start first with

 3   Mr. Gilbert.  Is there a motion from Mr. Gilbert?

 4        MR. DOSS:  Yes, Your Honor, pursuant to Rule 29, I make

 5   a motion for judgment of acquittal --

 6        THE COURT:  Mr. Doss, is it an oral motion only, or is

 7   it a paper motion as well?

 8        MR. DOSS:  Oral motion at this time as to all counts in

 9   the indictment.  At the Court's indulgence, we can submit a

10   written motion later today outlining in more detail the

11   issues, or we can take it up orally, whatever the Court

12   would prefer.

13        THE COURT:  Okay.  I'll come back to you in a minute.

14   Thank you.

15        Mr. McKinney?

16        MR. GILLEN:  Thank you, Your Honor.  On behalf of

17   Mr. McKinney, we move for a Rule 29 judgment of acquittal

18   on all counts.  We have probably about 60 seconds ago filed

19   a written motion.

20        THE COURT:  How long is your motion?

21        MR. GILLEN:  It's 30 pages.

22        THE COURT:  Okay.  You just filed it recently?

23        MR. GILLEN:  Well, they just rested, so we filed it

24   about a minute and a half ago.

25        THE COURT:  Okay.  I just wanted to make sure that the

1    government has not had a chance to look at it yet as well

2    on the record.  All right.  Let me come back to you as

3    well.

4        MR. GILLEN:  Your Honor, may I pass up a hard copy to

5    the Court?

6        THE COURT:  Please.  Thank you.

7        And then for Mr. Roberson, oral or paper motion at this

8    point?

9        MR. ASBILL:  Oral motion for Mr. Roberson, Your Honor.

10       THE COURT:  All right.  You are the last one up, so let

11   me start with you.  Are you going to file a paper motion as

12   well?

13       MR. ASBILL:  No, sir.

14       THE COURT:  No, sir?  Good.  Okay.  Let's take yours up

15   then, please.

16       MR. ASBILL:  Briefly, Your Honor, we'd submit that

17   there is no evidence of an explicit agreement here to

18   exchange for official acts as required by *McCormick* from

19   the Supreme Court and *Siegelman* from the Eleventh Circuit.

20   When the quid in the quid pro quo involves the First

21   Amendment -- First Amendment conduct, here payments for

22   issue advocacy by the Oliver Robinson Foundation, we submit

23   that there's no evidence of advice or pressure as to the

24   EPA or AEMC and no evidence of any agreement to trade

25   anything for the committee vote on the joint resolution.

1    I want to make the same points with respect to the 666

2    count and also argue there's no evidence of any corrupt

3    intent by Mr. Roberson and that there's no evidence of any

4    retainer agreement to take official acts as opportunities

5    arise.

6        And with respect to the illegal agreement itself, the

7    conspiratorial agreement, we don't think that there is any

8    evidence of sufficient meeting of the minds to sustain that

9    count.  As the Court is well aware at the end of this case,

10   Oliver Robinson says that at the time of the supposed

11   conspiratorial agreement being entered on the 26th of

12   November, he had his own secret agenda with John Powe that

13   is contrary to what Drummond wanted to achieve.  And I

14   don't believe any reasonable juror could find guilt beyond

15   a reasonable doubt based on the evidence in this record.

16       I think that there are a number of cases that I would

17   commend to the Court's attention in analyzing the

18   conspiratorial agreement issue.  One is *United States v.*

19   *Brown*, 954 F.2d 1563 at 1571, Eleventh Circuit, 1992.

20       Another is *United States v. Parker*, 839 F.2d 1473 at

21   1478, which is a 1988 Eleventh Circuit case.

22       And *United States v. Parker*, 839 F.2d 1473 at 1478,

23   which is an Eleventh Circuit 1988 case.  Obviously, the

24   Court, I'm sure, is aware of --

25       THE COURT:  Let me stop you for a minute.  What is the

1    first case?  I think you said *United States v. Parker*

2    twice.

3        MR. ASBILL:  I'm sorry.  I wanted you to look at

4    Parker -- Brown, excuse me.  I didn't mean to cite it

5    twice.  Same case.  But *Parker* and *Brown* are the two cases,

6    I think, merit some attention, in addition to *Glasser* in

7    the Supreme Court, which is 315 U.S. 60 at 80.  And that's

8    a 1942 case.

9        And I'd also suggest that the Court look at *United*

10   *States v. Peoni*, P-E-O-N-I, 100 F.2d. 401 at 403, which is

11   a Second Circuit 1938 case.  Those are the principal cases

12   upon which we would rely for the propositions that we've

13   articulated.

14       THE COURT:  Thank you.

15       MR. ASBILL:  Thank you, Your Honor.

16       THE COURT:  Mr. Doss, I want to make sure I understand

17   the point that you made earlier.  Is it your plan to file a

18   motion, or do you just want to go forward solely based on

19   the oral arguments that you will make here in court?

20       MR. DOSS:  We're happy to move forward orally this

21   afternoon, Your Honor.  Right now.  We're happy to do so.

22       THE COURT:  Okay.  Let me get your motion as well then,

23   please, and the basis for yours.

24       MR. DOSS:  Yes, Your Honor.  And to be clear, we move

25   for -- we move for a judgment of acquittal pursuant to

1  Rule 29 as to all counts in the indictment because the

2  government has failed to produce or present sufficient

3  evidence to meet each element of each offense, and to the

4  extent it has produced evidence, the evidence is legally

5  insufficient.

6      And to drill down on that.  As to Count 1, conspiracy.

7  The heart of a conspiracy is an agreement between two or

8  more people to commit an unlawful act.  The objects of this

9  particular conspiracy are bribery in violation of Section

10 666 and the two subparts, as well as the commission of

11 honest services fraud in violation of Sections 1343 and

12 1346.  So for purposes of this analysis, we turn, in

13 particular, to those substantive offenses.  And for the

14 record, we do also adopt the arguments raised by

15 Mr. Roberson through Mr. Asbill.

16     So with respect to the 666 count in Count 2, the

17 problem with the government's case, Your Honor, is that

18 there's been repeated evidence from witnesses who have

19 testified as to separation of powers issues that exist in

20 the State of Alabama.  That makes it extremely difficult

21 for Oliver Robinson to be an agent of the State of Alabama

22 writ large as charged in the indictment.  There's no

23 differentiation.

24     For example, had the government charged that Oliver

25 Robinson was an agent of, for example, the legislature,

1   that may present a different issue in this case.  But

2   instead, the government charged it as being an agent for

3   the State of Alabama without differentiating between the

4   various branches of government.  That matters because the

5   way 666 is structured is it's not that it could be within

6   the scope of any agency can be corrupted, but rather within

7   the scope of your particular agency.

8       So even if we assume he's an agent for the State of

9   Alabama, his agency is limited to that agency relevant to

10  the legislative responsibilities and powers he occupies.

11  So even if we assume that the government's theory is

12  correct that the defendants here paid Oliver Robinson to

13  influence him as to writing a letter or as to appearing

14  before the AEMC or as to meeting with the EPA, that's

15  outside the scope of his agency as a representative, state

16  representative of the State of Alabama.

17      I table for the moment the issue of the vote.  And we

18  fully adopt Mr. Roberson's position there.

19      But the problem fundamentally with the 666 charge is

20  that the government is trying to essentially say you can

21  bribe any employee of the State of Alabama in connection

22  with any other activity of the State of Alabama even though

23  that particular person has no power, control, influence,

24  legally speaking, over that process.

25      THE COURT:  So far it sounds like -- and I may be

 1    wrong -- that the argument that you are making is similar
 2    to one that I have already rejected in the joint motion to
 3    dismiss.  I recall some federalism-type arguments that were
 4    made there as well.  The alleged problem with the
 5    government's theory.  So to the extent that I am correct
 6    that these arguments are repeating ones that were made in a
 7    joint motion to dismiss, you may not be able to sway me.
 8        What I'm more interested in, and this goes for all of
 9    you, but in particular for Mr. McKinney, who has filed a
10    paper motion, and I'm going to give the government the
11    benefit of reading it before they respond.  So
12    Mr. McKinney's I'll deal with in the morning.
13        I'm singling out Mr. McKinney because the evidence is
14    replete -- or the trial, I should say, is replete with
15    testimony from various individuals that they never
16    interacted with Mr. McKinney.  And so the government needs
17    to be ready with respect to him as well as everyone else to
18    tell me how they believe the evidence before me has proven
19    a case against these defendants.
20        But coming back to you, Mr. Doss, what is it about the
21    evidence in this case or lack thereof that you believe
22    supports your motion?  I don't want to hear valid arguments
23    from your perspective, but --
24        MR. DOSS:  Yes, Your Honor.  Looking at Count 2 where
25    they have identified the three actions that Oliver Robinson

```
1   supposedly took for using his official position -- and this
2   also bleeds into the honest services fraud issue, the
3   official act requirement under McDonnell -- to making
4   public statements, pressuring, advising AEMC and the ADEM
5   director; two, meeting and advising EPA officials; and,
6   three, voting as a member of the State of Alabama House of
7   Representatives Rules Committee.
8       As to the first one, the evidence has been substantial
9   in this case that no one felt pressured or advised by
10  Oliver Robinson's statements to the AEMC, even with ADEM
11  Director LeFleur present.
12      THE COURT:  How do you reconcile that, I guess, with
13  how I read the McDonnell case that said pressure is one
14  aspect of it.  But let me find the quote, just to make sure
15  we're all on the same page.  That's an argument, again,
16  that was made in the joint motion to dismiss.
17      The Supreme Court said, first part of it obviously,
18  they include using one's position to exert pressure.  And
19  then it goes on to say "or to advise another official
20  knowing or intending that such advice will form the basis
21  for an official act by that official."  Their theory -- and
22  to the extent they have not proved it, I want to hear that.
23  But their theory, obviously, is that he appeared -- and
24  I'll give Mr. Martin and his team an opportunity to
25  articulate it better than perhaps I will do in just a
```

 1   minute.  But their theory is that through his appearance,

 2   his appearance being Oliver Robinson's appearance, he

 3   intended to advise the various agencies of his position and

 4   that the hope was that his advice, in this case his

 5   opposition to the EPA's proposed actions, would form the

 6   basis for those agencies to oppose the EPA.

 7        Tell me why you believe that assuming -- and, again,

 8   I'll let the government expand or correct me in a minute.

 9   But assuming my reading of the government's case is

10   correct, why you believe that the evidence that's been

11   presented here does not support that position.

12        MR. DOSS:  Yes, Your Honor.  I think a couple points.

13   One, the mere hope by Oliver Robinson that some action or

14   some message he would deliver would eventually form an

15   official act, I'm not sure that hope alone would be enough

16   under these circumstances.

17        But, second, as to the word "advise" as charged in the

18   indictment -- and I don't have the citation.  But there's a

19   reference in the *McDonnell* opinion to a *Byrdsong* case.  And

20   that's where the Supreme Court was drawing from in pulling

21   the pressure and advice language.

22        In *Byrdsong*, it was more than just giving advice in the

23   colloquial sense.  It was advice that was sort of expected

24   to be given through custom.  So there were these customary

25   relationships that developed whereby it was expected that

1  someone without legal influence or legal control over

2  another official would be expected by custom to advise that

3  official.  And then that type of advice was the sort of

4  advice that could then form the basis for an official act.

5      THE COURT:  Yeah, you guys briefed that issue

6  collectively.  I think I said this on the phone, but I do

7  need to state it here again in open court.  The briefing in

8  this case has definitely been among the best that I've seen

9  in criminal matters and, frankly, even beyond that.  There

10  are some good lawyers on both sides of the V.  The cases

11  were cited very, very well.  The briefs made some very good

12  points on both camps.

13      You know, in response to your *Byrdwell* argument which

14  was made in the joint motion to dismiss, I stated that I

15  refused to have such a narrow -- I acknowledge, obviously,

16  that the *McDonnell* case gave very little advice or guidance

17  on what qualifies as advice.  But then I rejected the

18  defendants' reading of advice which I described as being a

19  very narrow reading.

20      MR. DOSS:  Well, in addition to that, Your Honor, if we

21  take the expansive definition of advice, I think even what

22  we hear from the witnesses in this case doesn't meet that

23  definition.  We heard from Chairman Brown, who testified

24  that what Oliver said did not move the needle one way or

25  the other.  I mean he took it to be just generalized

1    question and generalized speaking.  But really at the end

2    of the day, what Chairman Brown was saying was I rely on

3    ADEM Director LeFleur.

4         THE COURT:  But is it the impact on the listener or --

5    at least when I read *McDonnell*, it says "or to advise

6    another official knowing or intending."  So what did Oliver

7    Robinson say, if anything, about what he hoped to do when

8    he appeared before the commission?

9         MR. DOSS:  I don't recall off the top of my head Oliver

10   Robinson testifying about what his intent was necessarily

11   there.

12        THE COURT:  Okay.

13        MR. DOSS:  I do know based on the actual things that he

14   did say at that meeting, as one witness said, I believe it

15   was Chairman Brown, he was surprised by how balanced it

16   was.  He did not really take a very clear position either

17   way, and I think that's what struck everyone about what he

18   spoke about.  He ultimately said if there are polluters

19   here, hold them responsible.  If they're not, don't.  In

20   other words, he was saying, AEMC, I think we should follow

21   the law.

22        So it's very difficult for me to see how asking a

23   public body that's in a different governmental branch to

24   follow the law on a matter that the AEMC doesn't even have

25   control over in the first place when there was no pending

1    action to be taken by the AEMC, as both Chairman Brown and

2    Vice Chairman Phillips said, how it's even possible to hope

3    from Oliver's perspective, Oliver Robinson's perspective

4    that the AEMC would, in fact, be moved in some way because

5    there was no pending matter.  And that is language that we

6    see from *McDonnell*, that there must be -- in the definition

7    of the official act, there must be some pending matter

8    before the body.  And that's what we don't have here.

9         Witness after witness testified that at the end of the

10   day, the Superfund issue was exclusively within federal

11   jurisdiction.  It had no -- the AEMC had no jurisdiction

12   over this matter.  So what we're left with is a state

13   legislator giving a speech at a public meeting taking a

14   balanced approach and urging the AEMC to take the position

15   that people -- that the law should be followed.

16        And that seems to be outside the scope of what

17   *McDonnell* contemplates.  In particular, when we consider

18   that the purpose of *McDonnell* is to narrow the scope of the

19   honest services fraud statute rather than to broaden it.

20        So with that, we think that the evidence is legally

21   insufficient to support any offense predicated on Oliver

22   Robinson's appearance before the AEMC given the

23   government's evidence in this case.

24        The same could be said for his meeting with EPA

25   officials.  We heard from one, Ms. Heard, who actually

1    attended such a meeting.  Though she was surprised with the

2    tone of his questions, the key there, Your Honor, is that

3    they were questions.  That was it.  There was no demands

4    being made.  There was nothing -- again, regardless of what

5    Oliver Robinson imagined that meeting to be for, what is

6    the truth is that the only thing discussed during that

7    meeting were answers to Oliver Robinson's questions.

8         These are federal officials over which he has no

9    control.  This falls, we think, squarely outside of the

10   scope of an official act and the scope of 666.

11        As to the third point --

12        THE COURT:  Yeah, let's talk about -- I think I did not

13   accept the argument that he had no control over federal

14   officials.

15        The third official act, I think, is the one that you

16   were going to next.

17        MR. DOSS:  Yes, Your Honor.

18        THE COURT:  I don't want you to take my comment now

19   that I've rejected your EPA argument.  And I will let the

20   government answer as to the point that you've made that, at

21   least based on the testimony, that Mr. Robinson was

22   perceived to be asking questions only and was not there to

23   exert pressure on anyone.

24        But assuming you're right about the EPA meeting and

25   assuming you are right about the commission meeting, what

1      about the third official act?

2          MR. DOSS:  Yes, Your Honor.  Voting as a member of the

3      Alabama's House of Representatives Rules Committee.  I

4      think by the end of Mr. Robinson's testimony, it was even

5      unclear, at least from our perspective, what he was saying

6      he did.  We heard that he thought he voted.  We heard that

7      he may have technically voted.  We heard that there's no

8      evidence that he didn't not vote.  We heard that he told

9      the FBI he didn't vote.  So the evidence there is extremely

10     murky, at the baseline, as to what even happened in that

11     Rules Committee.  That's point one.

12         Point two would be there's no agreement.  Even

13     Mr. Robinson testified, with every incentive to curry

14     favor, he testified that there was no discussion whatsoever

15     between Mr. Gilbert and him concerning that resolution.  So

16     the problem there is if there's no expectation, if there's

17     no intent to influence or reward, it's very difficult to

18     see how that could be sufficient to establish some form of

19     bribery or some form of honest services fraud or the basis

20     for a conspiracy count.

21         So what we're left with is the speculation that there

22     may have been some unsubstantiated retainer theory in

23     place, which we submit the government has offered no

24     evidence of to suggest that this arrangement wasn't somehow

25     designed to just put Oliver Robinson in the defendants'

1    back pocket and to be used whenever the opportunity arose.

2        We think it's a stretch to connect the quo of the vote

3    to the supposed quid of the consulting arrangement between

4    Balch and the Oliver Robinson Foundation.  And to ask the

5    jury to decide that would amount to pure speculation at

6    this point.

7        THE COURT:  Okay.  Thank you.

8        MR. DOSS:  And just to close out the record, Your

9    Honor, to the extent the money laundering conspiracy

10   charge, it would be a derivative charge that depends on the

11   viability of the underlying specified unlawful conduct.  We

12   think the government has failed to present sufficient

13   evidence as to the underlying specified unlawful conduct

14   and, with that failure, it also pulls with it the money

15   laundering conspiracy.  And in addition, we think the

16   evidence is insufficient to show some effort to hide the --

17   to unlawfully hide these proceeds as alleged and necessary

18   for the indictment.

19       THE COURT:  Thank you, Mr. Doss.

20       MR. DOSS:  Thank you, Your Honor.

21       THE COURT:  Who is arguing for the government?

22       MR. MARTIN:  I am, Your Honor.

23       THE COURT:  Mr. Martin, looks like your official acts

24   are all being challenged.  I'm assuming the government is

25   still taking the position that all three you cited

1    previously are official acts still in this case?

2         MR. MARTIN:  Yes, Your Honor.

3         THE COURT:  All right.  Walk me through.  Let's

4    start -- I think, if I recall correctly, in chronological

5    order, EPA was first, followed by the commission and/or the

6    vote.  But let's start with the EPA.

7         Is Mr. Doss correct that the EPA folks did not perceive

8    Mr. Robinson as being there to exert any pressure on them

9    and, if he is correct and related to that, does that matter

10   with respect to the analysis?

11        MR. MARTIN:  It does not matter because the focus of

12   this trial is what the defendants intended.  It's not what

13   Oliver Robinson intended, and it's not what the EPA

14   officials or any other official perceived or felt.  It's

15   solely what the defendants intended.  And the evidence --

16   the pending matter was before both ADEM and EPA.  The

17   record is replete with evidence of ADEM's involvement in

18   these issues, and, of course, EPA was involved also.

19        THE COURT:  What is the evidence with respect to the

20   intent as to the meeting with the EPA?

21        MR. MARTIN:  The theme --

22        THE COURT:  And I know there's been a lot, and so we

23   probably will continue this in the morning to give all

24   parties an opportunity to give me cites to evidence and/or

25   testimony.  But go ahead, Mr. Martin.

1         MR. MARTIN:  Well, the evidence is that the timing of

2    the agreement to pay Oliver Robinson $7,000 per month the

3    day before he goes to meet with EPA and within a short time

4    frame after he informed them or reminded them that he was

5    going to meet with EPA, that same day they gave him -- you

6    know, they agreed to pay him $7,000, and they gave him

7    talking points.  And, you know, their plan, their strategy

8    was not to have Oliver Robinson go in with a heavy hand

9    with EPA because they knew that would not work.  It was a

10   more subtle form of pressure and advice.  It was -- and we

11   showed this to the jury, and it's consistent between what

12   he told EPA and what he told the Environmental Management

13   Commission, and that is focus on Walter Coke.  You know,

14   "Why are you bringing other people in?  Focus on Walter

15   Coke.  They've admitted it.  And, you know, why -- it was a

16   question, but it was, "Why are you bringing these other

17   people in?  You know, this is just going to drag things out

18   and result in lots of litigation," et cetera.

19        So the defendants intended to have Oliver Robinson,

20   using his office and the weight that it carries and the

21   extra attention that it gets from these officials he's

22   talking to because of his position, to subtly advise and

23   pressure EPA to take a different course.

24        And the same with the commission meeting.  Our

25   theory --

```
 1        THE COURT:  You have -- yeah.  With respect to the
 2   commission -- well, starting with ADEM first.  I think
 3   Director LeFleur testified and then Commissioner Brown
 4   testified.  I believe both of them essentially said that
 5   Mr. Robinson's advocacy or appearance had no impact on
 6   anything that they were doing.  In fact, if I recall
 7   correctly -- don't quote me on this.  If I'm wrong, please,
 8   I'll defer to you guys since you're more familiar.  You
 9   guys collectively being the parties before me, not
10   necessarily the government.  You're more familiar with the
11   evidence since you have been paying closer attention to it
12   since you are presenting it or crossing the witness.
13        But if I recall correctly, those two gentlemen
14   testified that they had already, I guess, reached a
15   decision which is to not go along with the EPA's proposal
16   and that Oliver Robinson's meetings or letters to them did
17   not in any way influence them.  Why do you disagree with
18   Mr. Doss that that is irrelevant?
19        MR. MARTIN:  Because that is not the law.  *McDonnell's*
20   focus is on the defendants' intent.  It does not matter
21   even if the public official they were bribing intended to
22   go through with the plan or agreed with the plan or even
23   carried out the plan.  It's what the defendants intended.
24        And the evidence is substantial that the defendants
25   were concerned with the position that ADEM and
```

1    Director LeFleur were taking on this.  They wanted him more

2    involved.  They wanted him fully engaged.  They were

3    concerned about him throwing in the towel on this NPL

4    appeal process.

5         So there was -- although he had written the email that

6    said he did not concur, there was still plenty going on

7    between ADEM and EPA regarding these environmental issues

8    in North Birmingham that had the defendants' attention, and

9    it was their intent to continue to influence

10   Director LeFleur.

11        And they went about it in several different ways.  And

12   we heard that through the trial.  That's the reason that

13   these -- there was so much evidence about the governor's

14   office and testimony from their lawyers because they were

15   using the governor to advise Director LeFleur.  They were

16   using the commission.  And Chairman Brown testified that,

17   given their supervision and oversight of ADEM and

18   Director LeFleur, that if they had disagreed with him or

19   thought he was taking a position they disagreed with, they

20   could have done something.

21        THE COURT:  And the last official act is the

22   resolution.  At least on paper, there is no proof that any

23   of the people on the rollcall voted in favor -- was a voice

24   vote, is what I'm trying to say.  But you would argue, I

25   guess, that -- maybe you will not.  But you would argue

1   that it is irrelevant that Oliver Robinson did not vote or

2   does not remember voting on this resolution.

3         MR. MARTIN:  I think he did testify that he voted.

4         THE COURT:  Okay.

5         MR. MARTIN:  He certainly stated that in his plea

6   agreement that is in evidence.  But I do think he testified

7   that he did vote in the Rules Committee.  And, yes, I do

8   agree that it doesn't matter whether he voted or not.

9   Defendants Gilbert and Roberson caused this Senate Joint

10  Resolution to be put into the process knowing that Oliver

11  Robinson would have a vote and knowing that he was on their

12  payroll.  And through -- you know, it's their intent, and

13  it doesn't matter whether they talked to him about it or

14  whether Oliver Robinson knew of Joel Gilbert and David

15  Roberson's involvement with the drafting of the resolution.

16  It was their intent, and they put this in the process

17  knowing he had a vote and knowing they were paying him at

18  the time and that it would be wrong for him to vote on it.

19        THE COURT:  Do you recall the arguments that were made

20  by Mr. Asbill as to why his client is due a judgment of

21  acquittal?

22        MR. MARTIN:  I wrote down what I could, Your Honor,

23  while he was talking.  He argued the same official acts

24  that I believe Mr. Doss did.  And I have addressed those, I

25  think.

1    And in all of my arguments, you know, it is -- the

2  standard at this point is whether viewing the evidence in

3  the light most favorable to the government, whether a

4  reasonable jury could find the defendants guilty.  So

5  that's our standard we're dealing with.

6    THE COURT:  Now, that may come back to bite you, but

7  maybe not from your perspective.  But be ready with respect

8  to defendant McKinney to tell me how viewing the evidence

9  in the light of most favorable to you that you believe that

10  you've made a case.

11    MR. MARTIN:  We are ready.

12    THE COURT:  Well, he's filed a motion.

13    MR. MARTIN:  I haven't read his motion, but I can

14  discuss the evidence.

15    THE COURT:  All right.  You can start now, and I will

16  come back to this tomorrow because whenever there's a

17  motion filed, I want to make sure I read it to fully

18  understand the parties' argument.

19    MR. MARTIN:  Well, I would prefer to read the motion

20  first, Your Honor, if that's --

21    THE COURT:  Yeah.  But go ahead and tell me while

22  you're up here why you believe that as to McKinney --

23  there's been a lot of testimony.  I guess the defendants

24  have been effective in their theme on their cross because

25  it's resonated with me, perhaps, just based on the

1    repetitive nature, that in these conversations or emails,

2    defendant McKinney was either not present or was not

3    copied.  Why do you believe that, notwithstanding that

4    testimony, both oral and the evidence, that you still have

5    made a case against defendant McKinney?

6        MR. MARTIN:  Judge, you know, as I told the jury in

7    opening statements, these defendants had different roles.

8    Mr. McKinney's role was not having the direct contact with

9    Oliver Robinson.  That was Mr. Gilbert and Mr. Roberson.

10       But Mr. McKinney did several things that furthered the

11   conspiracy, and it shows that he was part of it.  Number

12   one, he received the day that -- the same day that Oliver

13   Robinson submitted it to Joel Gilbert, he received a copy

14   of the proposal back in November of 2014.  In February of

15   2015, he saw the letter that Joel Gilbert had drafted for

16   Oliver Robinson to sign showing that he was going to the

17   commission as a state legislator.  He strategized about

18   those comments.  He --

19       THE COURT:  What's the evidence as to the latter point

20   you just made?  He saw the letter, but how do I infer from

21   that that he was part of the conversations to send

22   Mr. Robinson down to the meeting?

23       MR. MARTIN:  It's in the time records, Your Honor.

24       THE COURT:  Okay.

25       MR. MARTIN:  It's -- on the -- and I don't have them in

1   front of me, but from memory, the days -- the day of or the

2   day before Mr. McKinney is meeting with Mr. Gilbert to

3   discuss strategy, he gets the letter, and his time entry

4   shows that he read the letter and strategized about the

5   AEMC comments.  And he -- his grand jury testimony

6   indicates that he misled the grand jury by telling them

7   that he had not seen the letter until the government had

8   subpoenaed documents from Balch much later.

9        He also helped Joel Gilbert -- knowing that Oliver

10  Robinson was going to the commission to speak, he helped

11  Joel Gilbert set up the payment scheme involving Drummond

12  and Balch, and he helped Joel Gilbert get the check -- the

13  $14,000 check to pay to Oliver Robinson on a rushed basis

14  the days before Oliver Robinson goes to the foundation.

15       THE COURT:  Okay.  We'll start at 9 a.m. in the morning

16  with argument from Mr. Gillen with respect to your motion.

17  I'll be in a better position to engage you after I've read

18  it.  And then Mr. Martin will be in a position to respond

19  as well.

20       And then after I deal with Mr. McKinney, I will circle

21  back to Mr. Asbill so I can give you a chance to argue your

22  motion that you have outlined briefly here today.

23       MR. ASBILL:  Thank you, Your Honor.

24       THE COURT:  Thank you all.  9 a.m. in the morning back

25  here, please.

1        MR. DOSS:  Your Honor.

2        THE COURT:  Yes, Mr. Doss.

3        MR. DOSS:  This issue that's come up about official

4    acts, what's in the head of the person versus what is

5    actually happening --

6        THE COURT:  If you want to file something, you're free

7    to do that.  Again, I will leave here today -- no pressure

8    on you, but I will leave here probably at 7:00.  If you can

9    get it in before then, that will be great.  It not, I will

10   read it before I take the bench in the morning.

11       MR. DOSS:  Thank you, Your Honor.

12       MS. HODGES:  And Your Honor?

13       THE COURT:  Ms. Hodges?

14       MS. HODGES:  At some point I would like to perfect the

15   record regarding Exhibit 204, please.

16       THE COURT:  Was that the one where you objected on

17   hearsay?

18       MS. HODGES:  Yes, Your Honor.  And I would just like

19   to --

20       THE COURT:  It was the young man's own notes.  He was

21   just relaying what he perceived or was doing at the time.

22   But go ahead and perfect the record to the extent that you

23   believe it needs to be perfected.

24       MS. HODGES:  I'm sorry, Your Honor.  You want me to do

25   that at this moment?

1        THE COURT:  You can, yeah.

2        MS. HODGES:  Okay.

3        THE COURT:  While we're thinking about it.

4        MS. HODGES:  Thank you, Your Honor.

5        THE COURT:  Mr. Martin, I think this -- I'm sorry,

6   Ms. Hodges -- was your witness, so be ready to chime in.

7        Go ahead, Ms. Hodges.

8        MS. HODGES:  Thank you, Your Honor.  As you recall, the

9   government entered Exhibit 204 over Mr. McKinney's team's

10  objection.  My basis was hearsay.  And I know that at first

11  glance in looking at 204, it appears to be like all the

12  other documents that were admitted under 803(6) business

13  exception.  But in contrast, the other documents that had

14  been admitted were communications between attorneys,

15  consultants, you know, clients, whereas 204, the first

16  paragraph appears to be similar to those, but if you read

17  deeper into the exhibit, there are actually very specific

18  comments, quotes that were made by Dr. Propst, the GASP

19  petitioner.  And they're not contemplated as protected

20  communication under 803(6) because she does not fall within

21  the scope of communications that would ordinarily be kept

22  in the ordinary course of business.

23       Essentially they are just like Dr. Propst coming in

24  here testifying and, importantly, the defense would not be

25  able to refute the comments that she makes by showing

```
 1   studies.  Because as you understand, Your Honor, up until
 2   now, what we've heard from the evidence is that GASP filed
 3   a petition, and Your Honor has graciously allowed us to
 4   refute that by saying that the EPA denied that petition,
 5   and they stopped there.  But these -- in Exhibit 204, these
 6   are specific comments made by Dr. Propst about the
 7   pollution.
 8       THE COURT:  This is the presentation that she made in
 9   front of the commission, the presentation that she made was
10   circulated by email.  It's in the record over, I think, the
11   defendants' objections.  I'm not sure if it was all
12   defendants, but someone definitely objected to it.  The
13   counterproposal, or the white paper, is also in evidence.
14   So I think -- Mr. Martin, come in in a minute, but from
15   what I understand, the testimony here was that Mr. Jones
16   attended the meeting where someone from GASP was making a
17   presentation.  He took notes.  And then he transcribed
18   those notes after the meeting, and that was 204.  Is that
19   correct, or am I overlooking?
20       MS. HODGES:  I'm sorry, Your Honor.  I'm sorry.  Go
21   ahead.
22       MR. MARTIN:  He testified -- Irving Jones testified
23   that he was asked to create a white paper and summarize the
24   GASP meeting that he attended, and that is what he said
25   that this attachment to this email is.
```

1        THE COURT:  Ms. Hodges, you were not finished.  Keep

2    going.  I'm looking for 204.

3        MS. HODGES:  Yes, Your Honor.  I don't have 204 in

4    front of me, but from my recollection, it was actually

5    different from the white paper, which is why we do not

6    object to the white paper.

7        THE COURT:  Yeah, it's not the -- thank you.  It's not

8    the actual white paper itself.  It's his records where he

9    summarized the meeting that he attended.

10       Anything else you need to say with respect to the

11   objection?

12       MS. HODGES:  Only that if it were merely his summary,

13   then we would not have an objection because that would be

14   contemplated by 803(6).  But the direct quotes that he

15   recited in the communication, I submit, are not protected.

16   But thank you for the opportunity to allow me to perfect

17   the record.

18       THE COURT:  You're welcome.  The objection is

19   overruled.

20       MS. HODGES:  Thank you, Your Honor.

21       THE COURT:  No, thank you.

22       Have a good evening, everyone.  I will not be in my

23   robe tomorrow.  I don't want you to think that I'm not

24   taking this seriously.  My general practice when I meet

25   with lawyers is to be in my normal attire.  So just don't

1    think it's any slight on anyone at all.  It's just the way

2    I do things as a matter of course.

3        See you folks in the morning.

(The proceedings were continued to July 13, 2018.)

C E R T I F I C A T E

I, Sabrina Lewis, RDR, CRR, Official Court Reporter

for the United States District Court for the Northern

District of Alabama, appointed pursuant to the provisions

of Title 28, United States Code, Section 753, do hereby

certify that the foregoing is a correct transcript of the

proceedings reported by me using the stenotype reporting

method in conjunction with computer-aided transcription,

and that same is a true and correct transcript to the best

of my ability and understanding.

I further certify that the transcript fees and

format comply with those prescribed by the Court and the

Judicial Conference of the United States.

Dated:  September 1, 2018

*Sabrina Lewis*

SABRINA LEWIS, FEDERAL OFFICIAL COURT REPORTER