FILED
2018 Oct-18  PM 03:57
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 2:17-cr-00419-AKK-TMP** |
| **JOEL IVERSON GILBERT,** | ) | *10/18/2018 3:45 PM* |
| | ) | |
| **Defendant.** | ) | |

## JOEL GILBERT'S SENTENCING MEMORANDUM

Jackson R. Sharman III
*jsharman@lightfootlaw.com*
Brandon K. Essig
*bessig@lightfootlaw.com*
Jeffrey P. Doss
*jdoss@lightfootlaw.com*
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 20th Street North
Birmingham, Alabama  35203
Telephone:  (205) 581-0700

## TABLE OF CONTENTS

I.   **THE APPROPRIATE GUIDELINES RANGE IS 41 TO 51 MONTHS, AND A VARIANCE IS APPROPRIATE.** ……………………….. 6

   A.   Joel's Guidelines as Calculated by the PSR………..…………… 7

   B.   Joel's Loss Amount should be $35,000 ………………………… 7

   C.   Joel Did Not Commit Perjury, So an Obstruction Enhancement is Not Warranted……………………………………………………… 9

      1.   The Obstruction Enhancement Does Not Apply to General Denials of Guilt……………………………………………… 10

      2.   State-of-Mind Testimony Cannot Merit the Enhancement… 12

      3.   There is No Dispute, and the Evidence Proved at Trial, that the Foundation Did Legitimate Work………………… 12

      4.   Testimony About the "Vetting" of the Contract Does Not Constitute Willful Perjury………………………………… 13

      5.   The AEMC Letter is More State-of-Mind Testimony that Cannot Prove Perjury………………………………… 17

      6.   The Additional Bases Stated in the Government's Sentencing Memorandum Do Not Support the Enhancement……………………………………………….. 17

II.  **THE APPROPRIATE SENTENCE IN LIGHT OF THE FACTORS IN 18 U.S.C. § 3553(a).** ……………………………………………….. 20

   A.   Section 3553(a)(1):  The Nature and Circumstances of Joel's Offense, and His History and Characteristics……………………… 22

      1.   The Offense was an Aberrational, One-Off Circumstance That Caused No Financial Loss; Posed No Threat of Violence; and had No Effect – Potential or Otherwise – on Residents of North Birmingham or Tarrant………..…..... 22

      2.   Joel's History and Characteristics are Those of a Law-Abiding Citizen, a Consummate Professional, a Devoted Husband and Father, and an Honorable Man Who Puts Others Before Himself……………………………... 32

         Family…………………………………………………… 33

         Life and Professionalism…………………………… 34

         Mentor…………………………………………………… 36

         Trust and Charity…………………………………… 36

B.      Section 3553(a)(2):  Seriousness and Punishment, Deterrence
        And Protection…………………………………………………….   37

        1.      A Downward Variance Would Reflect Both the Seriousness
                of the Offense and an Appropriate Punishment…………....   37

        2,      Deterrence (of Joel) and Protection (of the Public) Counsel
                in Favor of a Downward Variance…………………………   41

        3.      The Government's Sentencing Request Drops All Pretense
                of Discernment…………………………………………………   42

C.      Section 3553(a)(6):  Comparable Cases Show that a Variance is
        Appropriate………………………………………………………   43

Joel Gilbert submits this Sentencing Memorandum with both acceptance and regret.  He accepts the jury's verdict and recognizes that his fellow citizens have convicted him of multiple, serious crimes.  He accepts responsibility for his conduct that led to his conviction.  Most of all, he deeply regrets the pain this process has caused his family, his friends, his client David Roberson, and his former colleagues.

As a lawyer, and former judicial law clerk, Joel has profound respect for the legal system and understands the Court's obligation to sentence him.  He understands that the Court must consider the circumstances of his offense along with his personal and professional history.   Joel maintains his innocence, and will lodge an appeal promptly after sentencing, but he understands that such an argument is for another day. He realizes that he must pay a price—and, unfortunately, so must his loved ones—and he is asking the Court to impose a sentence that is both balanced and, as the law requires, tailored individually to him.

This is not a Guidelines case.  Joel takes issue with the Guidelines calculation in the Presentence Investigation Report, and his objections to those calculations are detailed below.  Regardless of the Court's ruling on his objections and the resulting range, however, a Guidelines sentence is not appropriate.  As the Court knows, it is to impose a sentence "sufficient, but not greater than necessary to comply with the purposes" listed in 18 U.S.C. § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the defendant's future criminal conduct.  The

circumstances of his offense and Joel's value as a father, husband, and contributor to the community cannot justify either a lengthy term of imprisonment or a hefty fine.

The law requires the Court to do more than simple Guidelines math, to consider more than just the prosecutor's charging instrument and the jury's decision about it.  In fact, the Court must consider all those things the jury is mostly forbidden from knowing—the "circumstances of the offense," "deterrence," "unwarranted sentencing disparities," the "need for just punishment," and the "history and characteristics of the defendant."  It is the section 3553(a) factors that determine the reasonableness of the sentence.  In short, the Court must consider the human being standing before it and impose a sentence that does justice.

To determine a just sentence for Joel, the Court must go beyond the caricature of him drawn by the Government and the media as greedy, manipulative, and indifferent to the poor and vulnerable.  This is a caricature that Joel and his family have been fighting since months before he was indicted—a caricature of Joel that has inflicted nearly as much pain on them as the fact of his criminal conviction.

This caricature is painful because it is untrue.  It is a bastardized narrative of a two-year snapshot of a 46-year life marked by faith, family, love, fatherhood, friendship, charity, hard work, success, sacrifice, selflessness, and professionalism.  The Court is in possession of over 100 letters that testify to Joel's virtues. The underpinnings of those virtues are the focus of this Memorandum and Joel's entire sentencing presentation to the Court, because those virtues are both compelling and legally relevant.

If there was ever a defendant for whom the application of the 3553(a) factors

called for a variance from the Guidelines formulas, it is Joel.  The weight of the evidence overwhelmingly demonstrates that his conduct in this case was *at worst* a dark anomaly in an otherwise extraordinary life that has brought light to others.

Joel respectfully asks that he be sentenced as follows:

(1) **Imprisonment**.  Incarceration for one (1) year and one (1) day.

(2) **Supervised Releas**e.  Imprisonment to be followed by a term of supervised release of 1 to 3 years pursuant to USSG 5D1.2(a)(2).

(3) **Home Confinement**.  As a special condition of supervised release, Joel shall serve the first six (6) months of the supervised release term as home confinement, verified by electronic monitoring paid for by Joel; and

(4) **Community Service**.  As an additional special condition of supervised release, Joel shall perform two hundred (200) hours of community service.

## I.      THE APPROPRIATE GUIDELINES RANGE IS 41 TO 51 MONTHS, AND A VARIANCE IS APPROPRIATE.

Joel's assertion of the appropriate Guidelines range is based on his objections to the PSR, which, if sustained, would lower his total offense level from 28 to 22.  Joel first objects to the loss amount calculated by the PSR: The loss amount should be $35,000 instead of the $123,000 reflected in the PSR.  *See* PSR, ¶ 46.  This recalculated loss amount would lower Joel's offense level by a total of four (4) levels.  Joel also objects to the two-level enhancement of his total offense level pursuant to USSG § 3C1.1 based on the Government's contention that he obstructed justice by committing willful perjury during his testimony at trial.  The cumulative effect of Joel's objections would be to

reduce his total offense level from 28 to 22, and with a Criminal History Category of I, result in a Guidelines range of 41 to 51 months.

### A. Joel's Guidelines As Calculated by the PSR.

In *United States v. Booker,* 543 U.S. 220 (2005), the Supreme Court held that district courts, while not bound to apply the Guidelines, must consult them and take them and all of the other factors listed in 18 U.S.C. § 3553 into account when sentencing. *Booker,* 543 U.S. at 259-60.  Here, the advisory Guidelines range was calculated as follows:

All Counts:

| | |
|---|---|
| Base Offense Level = | 24  (2B1.1(b)(1)(E), loss amount of $123,000) |
| Specific Offense Characteristic = | +2  (2S1.1(b)(2)(B), convicted under 18 USC § 1956) |
| Obstruction of Justice = | +2  (3C1.1, obstruction of justice for willful perjury) |
| Total Offense Level = | 28 |
| Criminal History Category = | I |
| **Guidelines Range =** | **78 – 97 months imprisonment; $25,000 to $250,000 fine** |

### B. Joel's "Loss Amount" Should be $35,000.

In paragraphs 39 and 46, the PSR proposes a loss amount of $123,000, which results in an 8-level increase to Joel's base offense level pursuant to USSG § 2B1.1(b)(1)(E).  The loss amount should instead be $35,000, which would result in a 4-level increase to Joel's base offense level.  *See* USSG § 2B1.1(b)(1)(C).

Joel understands that the amount of the bribe in the PSR was calculated by multiplying the amount of money that Oliver Robinson had his Foundation pay to him personally during the course of the contract by the number of months that the Indictment alleges that the conspiracy existed—from July of 2014 to November of 2016.  This

calculation is inconsistent with the Government's evidence at trial, especially with regard to the relevant time period.  For that reason, the loss amount is wrong.

The Government called the FBI case agent to testify as a summary witness at trial. The primary purpose of her testimony was to submit to the jury a summary exhibit that highlighted for the jury the events and timeframe that the Government believed encapsulated the bribery scheme in this case.  That exhibit presented the jury with a relevant timeline of November 2014 to October of 2015.  This time period was critical, because it covered all of the acts committed by Oliver Robinson that the Government argued he "exchanged" for the payments from Balch.  These acts were the meetings with the EPA (December of 2014), the AEMC appearance (February of 2015), and his committee vote on the joint resolution (June of 2015).  The Government's summary exhibit did not go beyond the fall of 2015, presumably because the evidence demonstrated that Joel barely dealt with Oliver Robinson at all after that point, and the Foundation's work was being supervised by his daughter.  The evidence at trial further showed that after the fall of 2015 Oliver Robinson undertook no official acts whatsoever.

Relying on the Government's evidence and theory at trial, the relevant time period of the bribery scheme was from November of 2014 to September of 2015, a period of 11 months.  Payments to the Foundation did not begin until February of 2015, and that first payment covered two months of work.  Thus, the period of payments consistent with the Government's evidence would have been nine months and presumably nine payments (two in February, and one for each of the following seven months until September).  However, no payments were made to the Foundation in two of these months.  Thus, there

were a total of just seven (7) payments made to the Foundation during the period that the Government submitted to the jury as the timeframe of the bribery scheme.

The proper value to Robinson during this period is $5,000 per month rather than the $7,000 set out in the PSR.  The $7,000 per month figure is, of course, the full value of the money paid to the Foundation for this period. Yet the Government has produced no evidence, either at trial or now, that the entire $7,000 went to Oliver Robinson, and there is no reason to believe he drew any more during this time than the $5,000 he received for all other months.  Oliver Robinson never testified that he personally received all of the money paid to the Foundation prior to October of 2015.  It is the Government's burden to prove the amount of loss, and in this instance, to prove why an amount greater than $5,000 per month should represent the loss amount for the February 2015 to September 2015 interval.  Because no such evidence exists, there is no basis to include a greater loss amount in the PSR.

In conclusion, applying the $5,000 loss amount over the seven months supported by the trial evidence results in a loss amount of $35,000 and a 4-level increase in the base offense level pursuant to USSG § 2B1.1(b)(1)(C).  This is the appropriate amount of the bribe for sentencing purposes.

### C. Joel Did Not Commit Perjury, So an Obstruction Enhancement is Not Warranted.

In paragraphs 41 and 50, the PSR proposes a 2-level enhancement to Joel's total offense level for obstruction of justice pursuant to USSG § 3C1.1.  The proposed obstruction enhancement is predicated on four (4) instances of putatively false testimony

by Joel at trial and set out in those paragraphs. The summary of Joel's testimony as set out in the PSR is in most instances inaccurate, and, in others, a gross misrepresentation of what he actually said at trial. In no instance does his actual trial testimony constitute willful perjury, and, thus, cannot support an obstruction enhancement.

In support of this enhancement, the Government filed the *United States' Response to the Presentence Investigation Report.* (Doc. 291) The purpose of that document was to provide the Probation Office and the Court with excerpts of Joel's testimony that the Government contends show false testimony. The excerpts do not contain a single example, however, of Joel denying the facts underlying his conviction. At no time does he deny an event that the Government contends is central to his conviction. The Government's excerpts prove Joel's point: they show nothing more than Joel testifying to (1) his belief that he was innocent and (2) his mental state or deliberation at the time his conduct occurred. By law, such testimony cannot constitute willful perjury, and, therefore, cannot support an enhancement pursuant to USSG § 3C1.1.

To see why this is so, a brief review of the law and the actual evidence at trial is appropriate.

### 1. The Obstruction Enhancement Does Not Apply to General Denials of Guilt

**Legal Analysis.** An obstruction enhancement pursuant to USSG § 3C1.1 is not appropriate in every case where a defendant testifies in his own defense but is still found guilty. *See United States v. Grayson,* 438 U.S. 41, 55 (1978); *United States v. Dunnigan*, 507 U.S. 87, 95 (1993). The Supreme Court and the Eleventh Circuit have categorically rejected that concept, noting that such a result would create "grave constitutional

concerns" and improperly chill a defendant's right to testify in his own defense. *See Dunnigan* at 95-96; *United States v. Lawrence*, 972 F.2d 1580, 1582 (11th Cir. 1992) (internal citations omitted). The Supreme Court has further held that the application of the obstruction-for-perjury enhancement is not appropriate for mere general denials of guilt or in instances where the jury's verdict comes down to a resolution of esoteric concepts such as a defendant's state of mind or intent. *Dunnigan* at 95 ("[T]estimony may be truthful, but the jury may nonetheless find the testimony insufficient to . . . prove lack of intent.") This case law makes clear that the enhancement should only be applied in those instances where the defendant's testimony posits a set of facts to the jury that are so contrary to other evidence that a jury's guilty verdict is necessarily a finding that the defendant willfully lied to them about a material fact. *Id.; Lawrence* at 1582-83.

In *Dunnigan*, the Court defined the test for the application of section 3C1.1 using the federal perjury statute:

> In determining what constitutes perjury, we rely upon the definition that has gained general acceptance and common understanding under the federal criminal perjury statute, 18 U.S.C. § 1621. ***A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.*** See § 1621(1); United States v. Debrow, 346 U.S. 374, 376, 74 S.Ct. 113, 114, 98 L.Ed. 92 (1953); United States v. Norris, 300 U.S. 564, 574, 576, 57 S.Ct. 535, 539, 540, 81 L.Ed. 808 (1937).

*See id.* (emphasis added).

That is not the case here. Each of the four bases cited in the PSR at ¶ 41 in support of the proposed obstruction enhancement is insufficient. The Government's submitted excerpts are also insufficient. The four bases cited in the PSR set out broad

categories of testimony for the Court to consider and parallel the Government's submission.  The four bases are dealt with, in turn, below.

**2.   State-of-Mind Testimony Cannot Merit the Enhancement.**  The first basis for the obstruction enhancement is nothing more than a general denial of guilt by Joel and a statement of his belief that the central piece of evidence in the case—the contract between Balch & Bingham ("Balch") and the Oliver Robinson Foundation—was legal. In making that denial, Joel did not testify to any facts that contradicted other evidence in the case.  He provided no amplifying facts at all—merely his state of mind in regards to the contract.  Other than what Joel and the Government believe about what was in his mind during the creation and performance of the contract, there is little disagreement about the underlying facts.  This is precisely the type of testimony and general denial of guilt that the Supreme Court has said *cannot* serve as the basis for an enhancement pursuant to USSG § 3C1.1.

**3.   There Is No Dispute, and the Evidence Proved at Trial, That the Foundation Did Legitimate Work.**  The second basis for the obstruction enhancement grossly misrepresents Joel's testimony at trial.  Joel never testified that Oliver Robinson personally performed any work.  He did testify that Robinson's foundation performed legitimate work, but that fact has been conceded by the Government both at trial and for purposes of sentencing.

Furthermore, the PSR's summary of Joel's purported testimony on this point— though inaccurate—does not present the Court with a factual inconsistency that constitutes willful perjury.  The PSR attributes to Joel testimony that Robinson personally

12

performed "legitimate work," but contrasts that statement with trial evidence that purportedly shows Robinson performed "very little legitimate work."   This is really no contrast at all; for evidence showing that Robinson did "legitimate work," even if "very little," is evidence that Robinson did the thing Joel supposedly said he did.   Any putative discrepancy would relate only to the degree or extent of Mr. Robinson's legitimate work, not whether it happened at all.

Therefore, these facts, even if true, could not support an obstruction enhancement pursuant to section 3C1.1.  Joel's testimony on this issue is in no way inconsistent with other evidence at trial, much less the type of willful perjury the Court must find in order to impose an obstruction enhancement.

**4. Testimony About the "Vetting" of the Contract Does not Constitute Willful Perjury.**   The third basis for the obstruction enhancement attributes testimony to Joel that he never gave.  This basis seems to assert that Joel provided perjured testimony by claiming he had vetted the Balch relationship with the Oliver Robinson Foundation *before* meeting with Drummond executives about that relationship.  The PSR further asserts that the falsity of Joel's testimony is demonstrated by evidence showing there were "payments . . . to Robinson *prior to* any vetting."  *See* PSR ¶ 41 (emphasis added).

The purported testimony of Joel on this issue cannot support an obstruction enhancement for three reasons.  First, the "facts" recited by the PSR are false.  Second, any inconsistency (if there is one) between Joel's testimony on this issue and other evidence in the case is attributable to slight variations in the memories of various trial witnesses, rather than willful perjury.  Third, this issue was not essential to the jury's

resolution of the charges such that the verdict was a finding that anyone's testimony on this issue constituted willful perjury.

Joel's trial testimony relating to the "vetting" of the Oliver Robinson Foundation and his discussion with Drummond officials sets forth the following sequence of events:

- **November 2014 Meeting with Drummond**.  Joel met with Drummond executives in November of 2014.  During that meeting he discussed the possibility of engaging one of Oliver Robinson's businesses in community outreach efforts in North Birmingham.

- **December 11, 2014 "$7,000" E-mail.**  E-mail correspondence dated December 11, 2014 between Joel and Oliver Robinson reflected that Joel communicated to Oliver Robinson that Drummond had agreed to pay the Foundation $7,000 per month for community engagement work.

- **December 15, 2014 Ethics Discussion with Pilcher.**  On December 15, 2014, Joel discussed his ethical obligations in relation to the firm's engagement of Oliver Robinson with Chad Pilcher, a lawyer at Balch & Bingham who provides ethics advice to attorneys at the firm.  On this point, Joel's testimony was corroborated by contemporaneous email correspondence, Joel's billing records, and the trial testimony of Government witness Chad Pilcher.  The Government offered no evidence at trial to controvert that this meeting occurred. [1]

---

[1] Mr. Pilcher testified that he does not remember the discussion with Joel in December of 2014, but testified at trial that he had no doubt the discussion occurred.  In fact, he testified that he had confirmed

- **December 2014 or January 2015 Drummond Follow-up.** Joel testified that it was his recollection that he had a follow-up discussion with Drummond officials in late December of 2014 or early January of 2015 where he informed them that he had discussed the contract with the firm's ethics lawyers.

- **February 2015 – First Payment.** Trial evidence showed that the first payments to the Foundation were not made until mid-February 2015. This date was a fact agreed to by all parties at trial. Thus, by *any* view of the evidence, the first payments to the Foundation came *well after* Joel ever spoke with anyone at Balch or Drummond about the ethical implications of the contract.

**Drummond CEO Mike Tracy's Testimony Revealed Inconsistent Recollections About Timing and Does Not Establish Perjury by Joel Gilbert**. Mr. Tracy did testify it was his recollection that Joel told him that the contract had been vetted within Balch at the time of the November 2014 meeting between Joel and the Drummond executives. Mr. Tracy, however, equivocated on when this meeting occurred and at times conflated into this one meeting events that indisputably occurred almost a year later. As an example, Mr. Tracy testified that in his first meeting with Joel regarding the contract with the Foundation he was told by Joel that Oliver Robinson's daughter, Amanda, would be participating in the Foundation's community outreach efforts. However, Joel Gilbert did not even know who Amanda Robinson was in November of 2014, and the uncontroverted evidence at trial was that she was not involved in

---

through his cell phone records that he was in the office on December 15, 2014 during the timeframe that the discussion with Joel would have taken place.

community outreach until the fall of 2015. Clearly, Mr. Tracy's recollection of the series of events relevant to this enhancement was less than precise.

At worst, any discrepancy between Mr. Tracy's testimony and Joel's can be attributed to a difference in memory about the precise sequence of events regarding the timing of the vetting and when that fact was communicated to Mr. Tracy.  Under any view of the evidence, both the vetting and the communication of that fact to Mr. Tracy occurred at least one month before any payments to the Oliver Robinson Foundation—payments that Mr. Tracy testified that he approved.  What this scenario creates then is not willful perjury, but the type of inconsistent testimony (if it is that) by Joel that is appropriately attributed to a "mistake" or "faulty memory" that cannot as a matter of law support an obstruction enhancement. *See Dunnigan* at 94 (defining perjury for purposes of this enhancement as "false testimony on a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory").

**Testimony of "Vetting" Was Not Material.**  Finally, this aspect of testimony was not material to the jury's determination of guilt or innocence, because the jury could have believed none or all of Joel's testimony on this point and still convicted him.  It is true that Joel posited the initial vetting of the contract with Mr. Pilcher as *a* piece of evidence—one of many—regarding his lack of criminal intent.  But this evidence was never offered by Joel as a full-spectrum defense of his conduct.  Joel never contended at trial that he obtained ethics advice from Mr. Pilcher or anyone else on every aspect of his engagement with the Robinson Foundation.  He admitted, for example, that he never vetted Mr. Robinson's appearance before the Alabama Environmental Management

16

Commission (AEMC) or the letter drafted for Mr. Robinson to enable that appearance. These events of February 2015 were, of course, the core of the Government's theory of bribery in this case. On the other hand, the timing of the vetting-and-advice-to-Drummond scenario was a collateral matter that, though of evidentiary importance, could not have been dispositive.

5.     **The AEMC Letter Is More State-of-Mind Testimony That Cannot Prove Perjury.** The final basis for the obstruction enhancement, much like the first, is nothing more than a general denial of guilt by Joel. Here the testimony was in relation to Mr. Robinson's appearance before the AEMC and the letter drafted by Joel and a Balch associate to make that appearance happen. Again, Joel never denied any of the facts surrounding the AEMC appearance or the letter. He admitted to editing the draft letter, to include adding a specific reference to Oliver Robinson's status as a state legislator. In fact, Joel testified consistently with all of the facts recited in the PSR as the basis for this enhancement. The only thing Joel denied was that his state of mind was "corrupt" when he engaged in that conduct. As stated above, the case law on this issue establishes that such a general denial of guilt that rests solely on the *mens rea* or intent element of the crime *cannot* serve as the basis for an enhancement pursuant to USSG § 3C1.1.

6.     **The Additional Bases Stated in the Government's Sentencing Memorandum Do Not Support the Enhancement.** The Government's Sentencing Memorandum poses additional specific categories of testimony in support of an obstruction enhancement. None of these is sufficient to carry their burden on this issue.

**Representations to AJE about how money from the AJE was spent.**  The Government contends for the first time that Joel lied to AJE members about how the money of the organization would be spent, because he did not tell them it was a bribe to Oliver Robinson. This purported basis is yet another example of a putative discrepancy in evidence that hinges on Joel's mental operations.  It is true that Joel did not tell the AJE members that he and David Roberson were paying a bribe to Oliver Robinson, but that is only because he did not *believe* he was.  Like the state-of-mind issues above, there are no objective facts about which Joel Gilbert lied on this issue.  The Government continues to take issue with whether or not attaching an Oliver Robinson Foundation invoice to an email to AJE members is an adequate disclosure, but it does not change the fact that the disclosure was made by Joel.  The fact that the AJE members testified to having no recollection of seeing it does not mean much either, for a number of them also testified when shown the email that they did, in fact, receive it. Thus, any derived inconsistency from the testimony can only be attributed to mistake or faulty memory.

**Statements about when community outreach work began.**  The Government also claims that Joel obstructed justice because he gave testimony at trial about the start date of community engagement work (early 2015) that was inconsistent with his grand jury testimony (fall of 2015).  This testimony may in some respects be inconsistent, but it hardly constitutes willful perjury.  The evidence at trial also demonstrated both statements to be true.  The Government did not controvert the defendants' evidence that the Foundation secured more than 90 letters from residents of North Birmingham through

18

community engagement in January of 2015.  The Government certainly does not contest that community engagement occurred in Tarrant from the fall of 2015 onward.

It's also important to place Joel's testimony in the proper context.  Joel testified at grand jury with little preparation and without the benefit of a thorough review of the documents in this case.  At that time, he was a year and a half removed from the initial community engagement work in North Birmingham in January of 2015.  He also believed, based on the Government's representations, that he was not a target of their investigation.  On the other hand, by the time of trial he had lived this case and the documents every day for a year straight, and his liberty was on the line.  It makes sense then that his testimony at trial would be more precise.  It strains credulity to contend that any inconsistency was due to anything more than a mistake or faulty memory.

**Testimony as to knowledge about Oliver Robinson's personal receipt of money.**  There can be no question that the defendants' knowledge of Oliver Robinson's personal receipt of money was a key issue in the case.  It is also true that the Government has been able to glean from the voluminous evidence specific examples to indicate that perhaps Joel *should have known* that Oliver Robinson was personally making money from the Foundation's contract with Balch.  However, the Government's recitation omits entirely key facts and evidence that prove the very opposite—that Joel had every right to believe that Robinson was not getting any money at all.

First, Oliver Robinson testified at trial that he never told Joel Gilbert he was getting money.  Second, Oliver Robinson sent Joel Gilbert an e-mail telling him that the Foundation was not a "thing of value" to Robinson under the state ethics law.  This was a

clear indication that he was not taking money personally from the Foundation.  Third, the defense admitted tax records from the Foundation where Robinson had reported to the federal government, under penalty of perjury, that he was not taking any money from the Foundation.  It was far more reasonable for Joel to rely on Robinson's representations to the federal government than to assume from invoices referencing "program leads" that Oliver Robinson was lying on tax forms and personally getting money.

The Government is correct that it was able to admit at trial notes that Joel made in the late fall of 2016 that stated "$5,000 to OR."  However, Joel testified at trial that these notes were not about the existing contract with the Foundation, but were related to an additional proposal for an entirely different scope of work.  There was no testimony at trial to refute this.  Tellingly, the Government had years to prepare Oliver Robinson on this very point—Joel's knowledge of his receipt of money—but he never claimed that Joel had such knowledge. Stated simply, the evidence on this point is conflicting.  The Government cannot carry its burden of proving by a preponderance of the evidence that Joel Gilbert committed willful perjury regarding whether he had actual knowledge of Oliver Robinson's personal receipt of money from the Foundation.

## II.     THE APPROPRIATE SENTENCE IN LIGHT OF THE FACTORS IN 18 U.S.C. § 3553(a).

Once the Court has determined the applicable Guidelines range to be applied at sentencing, it must ultimately fashion a sentence that is appropriate in light of the factors set out in 18 U.S.C. § 3553(a).  The Sentencing Guidelines are "truly advisory," *United*

*States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010), and this Court "may not presume that

a Guidelines sentence is reasonable," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir.

2008).  The Guidelines "serve as one factor among several courts must consider in

determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90

(2007).  The sentence must be individualized as to each defendant, as Justice Sotomayor

wrote for the Court in *Pepper*:

> It has been uniform and constant in the federal judicial tradition for the sentencing
> judge to consider every convicted person as an individual and every case as a
> unique study in the human failings that sometimes mitigate, sometimes magnify,
> the crime and the punishment to ensue.
>
> *Pepper v. United States*, 131 S. Ct. 1229, 1239-1240 (2011) (citations omitted).

As to each defendant, this Court must "make an individualized assessment of the

appropriate sentence based on the facts presented and the factors detailed in [Section]

3553(a)." *United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) (internal quotation

marks omitted).

Joel asks the Court to vary downward.  "Variances" are not subject to the same

Guidelines analysis as "departures."  *See, e.g.*, *United States v. Fumo*, 655 F. 3d 288, 312

(3d Cir.2011), as amended (Sept. 15, 2011).  Indeed, "a prohibited ground for departure

may be a valid basis for a variance."  Office of General Counsel, United States

Sentencing Commission, Primer on Departures and Variances (April 2018) at 41 (citing

*United States v. Chase*, 560 F.3d 828 (8th Cir.2009)).  The section 3553(a) factors most

relevant include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct; [and]
>> (C) to protect the public from further crimes of the defendant[.]
>
>> [ . . . ]
>
> [and]
>
>> [ . . . ]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

*See* 18 U.S.C. § 3553(a).

Joel addresses each of these most relevant  factors.  Collectively, they justify a

downward variance from the Guidelines.

**A.  Section 3553(a)(1):  The Nature and Circumstances of Joel's  Offense, and His History and Characteristics.**

**1.      The Offense was an Aberrational, One-Off Circumstance that Caused No Financial Loss; Posed No Threat of Violence; and had No Effect – Potential or Otherwise -- on Residents of North Birmingham or Tarrant.**

As demonstrated at trial, Joel's offense was limited in duration (either February

2015 to September 2015 [as Joel maintains] or February 2015 to December 2016 [as the

Government maintains]); dollars (either $35,000 [as Joel maintains] or $123,000 [as the

Government maintains]; and divisibility (payment for three "official acts" – Oliver

Robinson's meeting with EPA employees, his AEMC

appearance, and the joint resolution in the Alabama

legislature).  This offense was not a multiyear, ongoing

embezzlement scheme and tax fraud (like that carried

out, for example, by Joel's co-conspirator, Oliver

Robinson, which Robinson did without Joel's

knowledge).

> "In the 28 years that I have known Joel, he has been one of the most honest and trustworthy friends/individuals I have ever known. . . . I have always admired Joel for his honesty, loyalty, and being someone who always does the right thing. . . . The charges and outcome of his trial are not consistent whatsoever with the person I have known for almost 3 decades."  (P. Lowe)

As demonstrated in the many letters that the Court has received, and also in the

Joel's sentencing video, the offenses of which Joel was convicted involved one-off

behavior that represents an aberration in his life.  The Court can see this fact highlighted

again and again by the people in Joel Gilbert's life – childhood friends, work colleagues,

family members, clients, associates and partners from multiple walks of life.

> "I am an attorney and recently became employed in a corporate compliance setting. . . . I have known Joel since I was eighteen years old and a freshman at Samford University. . . . For the last twenty seven years, I have known Joel to be a man of honor and integrity." (M. Beam); "I have known Joel since 1976. . . . When I heard of the charges against Joel of course I was shocked because this did not line up to Joel at all. . . . What I do know is Joel and the charges were inconsistent with this man of good character.  (L. Brown); "The verdict in this case is inconsistent with the neighbor and friend who I have known for several years." (M. King); "The verdict is inconsistent with the Joel I know."  (P. Kolen); "Joel was found guilty of things that are completely counter intuitive of the character and strong moral fiber that I have known and witnessed from him for almost 30 years. . . (S. McFadden); "The charges and the jury's verdict were not consistent with the colleague with whom I practiced for so many years." (J. Noles); "The verdict is inconsistent with the Joel I know."  (L. Shaper); "The conduct which Joel was convicted of was not his normal modus operandi; instead his approach, in my experience, was always a straightforward attempt to efficiently and effectively achieve compliance.  It was anomalous conduct." (R. Glaze)

In addition, although appropriately compensated for his role as an equity partner at Balch, Joel enjoyed no monetary, pocket gain from his actions (and the Government did not prove otherwise at trial).  Indeed, not only did he not realize any profit from the conduct at issue at trial, his actions caused no financial loss to anyone – not to the United States, not to the State of Alabama, and not to any private entities such as Drummond or Balch.  There is no financially-defrauded victim. For that reason, the restitution provisions of 18 U.S.C. § 3663A should not apply because determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

**Non-Violent and Law-Abiding.**  Further, his offenses are not crimes of violence, and he has never been accused of violence.  He has no past criminal history other than minor traffic violations.

**No Harm to Health or the Environment, Despite Fear-Mongering and Falsehoods By the Government and the Media.**  Finally, despite misinformation in the media; in the Government's press conferences announcing the indictment and commenting on the verdict; and in the Government's sentencing submission, Joel's actions had zero effect on the health and well-being of citizens living in North Birmingham. An EPA-directed cleanup was underway in North Birmingham well before the events described in the indictment; the same EPA-directed cleanup was in operation during trial; and the same EPA-directed cleanup continues today. The EPA itself

24

concluded, consistent with its own earlier investigation, that there was no need to conduct further testing in Tarrant.  The Government did not offer at trial a theory of harm to human health and the environment, and it offered no evidence supporting such a theory – a wise choice, considering that there is none       Despite the lack of such evidence, in the Addendum to the Presentence Investigation Report (the "PSR Addendum"), the Probation Office maintains that "the conduct of Robinson, Roberson and [Joel] had the *potential* to affect the health and safety of the citizens of north Birmingham."  (PSR Addendum at 2) (emphasis in original).   The Government takes the same position:  Joel, it claims, "victimized the residents of North Birmingham by potentially adversely affecting their health."  Doc. [296] (Government Sentencing Memorandum) at 12.  *See also* Oliver Robinson Sentencing Hearing Transcript  (September 27, 2018) at 26): according to the Government, Oliver Robinson took "bribes from a lawyer and a corporate executive in a way that really could have had a detrimental effect on the health and well-being of citizens of North Birmingham and Tarrant . . . ."

The Government's claim of a "potential harm" is untrue and falsely suggests to the Court that Joel acted in this case with disregard for the possibility that his actions could have left some human health risk unaddressed.  However, the facts of the science that Joel sought to admit at trial show that not to be the case.  Moreover, Joel, David Roberson, and the entire Balch and Drummond team knew that not to be the case when the Foundation was hired to do community engagement in the first place.  At that time, Joel led lawyers and others who collected documents for Balch's response to the proposed NPL listing of the 35th Avenue Superfund site.  That response was based almost

25

entirely on objective scientific studies by federal and state agencies.  Those studies demonstrated that there was no human health risk posed by the conditions in North Birmingham.  These were studies known to Joel; he relied upon them in every decision he made in this case.  In the face of the Government's false allusions to his corrupt mind and its urging that the Court punish Joel harshly because of it, some of this evidence must be brought to the Court for its consideration.  We will be brief.

- **2013 EPA Air Study.**  In June 2013, the EPA published the "North Birmingham Air Toxics Risk Assessment," which stated findings on the potential risks to human health posed by air monitoring at four locations in North Birmingham for a period of 15 months.  The findings were:

   - "cancer risks calculated at each of the four monitoring sites fell within EPA's range of acceptability:"

   - "it is unlikely that adverse non-cancer affects will occur;"

   - one sample site had the potential for acute exposures for one chemical (benzene) on just 3 days out of the 75 days samples were taken.

*See* Exhibit 1, pp. 5-6.

- **August 2013 ATSDR Soil Study.**  In August of 2013, the Agency for Toxic Substances and Disease Registry (ATSDR), a division of the U.S. Department of Health and Human Services conducted an assessment of the soil samples in North Birmingham as a result of Walter Coke's agreement to its responsibility for contamination there and to pay for the cleanup.  The findings were:

   - "soil exposures to arsenic in sampled properties around the Walter Coke, Inc. site do not present a public health hazard with the possible exception of a child with pica behavior eating a large amount of soil from the property with the highest arsenic concentration;"

26

- ▪ "[s]oil exposures to BaP-TE in sampled properties around the Walter Coke, Inc. site do not present a public health hazard."

*See* Exhibit 2, p. 3.

- • **2014 JCDPH Death Rates Comparison Report.**  On August 6, 2014, JCDH released a report that compared various rates of death and birth outcomes for residents in the North Birmingham communities of Collegeville, Fairmont and Harriman Park to residents of the remainder of Jefferson County for the ten year period of 2000-2009.  The findings were:

  - ▪ no excess cancer due to pollution in the North Birmingham communities;

  - ▪ death rates for all causes of death combined, deaths from all cancers combined and for certain types of cancers were statistically the same between residents of the North Birmingham neighborhoods and the rest of Jefferson County;

  - ▪ death rates from asthma and COPD (Chronic Obstructive Pulmonary Disease) were statistically the same between residents in Collegeville, Fairmont and Harriman Park compared to the rest of the county;

  - ▪ rates of infant mortality, still births and birth defects were statistically the same between the neighborhoods and the county.

*See*  Exhibit 3.

  **There was no risk at Tarrant Elementary School.**  In the Government's Sentencing Memorandum, it now argues that Joel Gilbert's bad character is evidenced in the decision of the Tarrant City Schools Superintendent Dr. Shelley Mize to rescind authorization for the EPA to test school property.  (Doc. 296, p. 32)   The Government seems to contend this decision was due solely to Joel's machinations, which duped Dr.

27

Mize into rescinding her agreement to allow EPA to access the property. The result was schoolchildren unwittingly exposed to toxic pollution. To support that contention, the Government has provided the court with a sampling of e-mail correspondence between Joel, Tarrant City Attorney Ben Goldman, and Dr. Mize.

The Government's position misrepresents the facts surrounding Dr. Mize's decision, and the Government's exhibit is grossly misleading. In sum, the Government's claim that the EPA was not able to test at Tarrant Elementary School because of Joel Gilbert's conduct is refuted by the full record on Dr. Mize's decision to rescind authorization.

That decision was based on her knowledge of extensive testing—both historical and contemporaneous—that had taken place at Tarrant schools for decades. On January 12, 2016, just days after rescinding EPA's access to the school, Dr. Mize wrote in an email to a former colleague:

> We've had an air quality monitoring station at TES [Tarrant Elementary School] for as long as I can remember and I've been here 24 years. I am aware of the results and keep in close contact with the health dept on the matter. I, too, am concerned for all of our stakeholders: families, kids, staff members, my personal child and myself. I would also not put them in jeopardy if I felt that it negatively impacted their health any more than any other urban industrial setting. I have also had the soil tested at all our sites to ensure that it is within safe limits. The results were no different than what naturally occurs in this area of the state.

*See* Exhibit 4, p. 3. Indeed, the Tarrant City Schools website now includes links to scientific documents demonstrating no health risk has ever been found at the school.[2]

---

[2] See http://www.tarrant.k12.al.us/News/1078#sthash.BzrLUMpg.U0xsU5MD.dpbs.

The full record also shows that Dr. Mize's decision was informed by what she perceived as overly aggressive and political tactics employed by GASP.  In an earlier email Dr. Mize sent on January 12, 2016, she stated:

> Kelley just informed me of the impromptu GASP mtg.  I understand that you were caught off guard too.  It is really important for GASP to respect the boundary that I have already expressed.  Our school system cannot and will not participate/encourage/advocate for the agenda being pursued by GASP.

*See* Exhibit 4, p. 4

Furthermore, Dr. Mize's letter did not end the EPA's efforts to test the property at Tarrant Elementary School.  In response, counsel for the EPA threatened to seek a court order to gain access to test the property.  Dr. Mize handled this issue with the assistance of the school board's counsel, Sid Trant, who was at the time a partner at the law firm of Bradley Arant and one of the most competent environmental attorneys in the country.  The Government, tellingly, has not provided this email correspondence to the Court.  In one email, Dr. Mize asks for Mr. Trant's assistance in providing assurances to school parents after dealing with yet another inquiry from GASP.

---

**From:** Mize Dr. Shelly [mailto:mizes@tarrant.k12.al.us]
**Sent:** Tuesday, February 09, 2016 2:46 PM
**To:** Trant, Sid; Yuengert, Anne; Ben Goldman
**Cc:** Mize Dr. Shelly
**Subject:** Fwd: Tarrant Elementary School

FYI.  I asked Beth to not respond and to stay out of it.  Just wanted to make you aware of what is going on. (see email chain below)

Sid: Kelley J and I are talking about getting information out to parents. We are thinking of sending home a letter to parents with explaining that we have been proactive in ensuring the safety and well-being of our children. What if you edit our letter?

Shelly

---

*See* Exhibit 5, p. 1.

In fact, the EPA's ultimate decision to accept Dr. Mize's decision to refuse testing was based on email communications with Mr. Trant wherein he provided past soil sampling results from 2013 that demonstrated there to be no human health risk at the school.  *See* Exhibit 6.  One of the attachments to Mr. Trant's correspondence was another email to Dr. Mize from the company that oversaw the 2013 testing.  That email attached the scientific testing report.  The email advised Dr. Mize that the soil testing showed, "Your numbers are low even for Jefferson County soils where arsenic is a naturally recurring element.  We didn't find any PAH's at your sites so they are very safe." [3]  *See* Exhibit 6, p 3.

---

[3] Lest the Government take the cynical view that the 2013 testing was somehow compromised because it supported Dr. Mize's decision to rescind the EPA's access to the school for further testing, the Court is advised that the 2013 testing was overseen by Jymalyn Redmond, an environmental manager at the engineering firm Goodwyn, Mills & Cawood.  Her involvement is significant, as she was also the person the plaintiff's firm Hare, Wynn, Newell & Newton hired to assist them with testing yards in North Birmingham to bolster their environmental injury cases against the potentially responsible parties.  Mr. Gilbert was provided email correspondence from

Many of these email strings eventually made it into the hands of Joel, after they were forwarded to him by Tarrant City attorney Ben Goldman, but none of the emails were directed by Joel.   Rather, they were the impressions and directions of Dr. Mize, who was smart, concerned, independent, and proactive in her attention to the school's environmental health.

Joel Gilbert and the rest of the Balch and Drummond team that worked on this project did not approach it with a disregard for the health and well-being of the Tarrant Elementary School community.  Like Dr. Mize, they had reviewed previous EPA testing at Tarrant Elementary, done by both the EPA and the Jefferson County Department of Public Health.  In fact, in 2009 the EPA conducted testing at elementary schools nationwide, including Tarrant.  The results of the Tarrant testing showed that levels of lead were "below the level of the national standard for protection of public health," and "pollutants associated with coke plant emissions . . . were . . . below the levels of significant concern for long-term exposure."  *See* Defendant's Exhibit 7, p1.  Based on these results, the EPA ceased any further monitoring at Tarrant Elementary School.  Joel was aware of these test results; Balch's submissions to the EPA in opposition to the agency's decision to conduct testing in Tarrant specifically relied on this study.  Thus, it is less than full candor for the Government to claim that Joel did anything in this case in disregard of health risks to schoolchildren.  It is shamefully dishonest to even suggest it.

---

the EPA, in response to his Rule 17 subpoena, which demonstrates this fact.  That correspondence is not included here, but can be provided to the Court upon request.

**The Court Precluded Joel From Putting On Health and Environmental Evidence at Trial.**  The absence of supporting evidence is all the more remarkable in the PSR because *this is the very argument and evidence that the Court refused to allow Joel to present to the jury*.  *See* Doc. [194] (Order Granting Government Motion to Exclude Experts) at 4-10; Doc. [185] (Order Denying Motion In Limine Regarding Environmental Issues Charged in the Indictment) at 2 (refusing to allow defendants to present "scientific studies and data related to the Birmingham Superfund Site."). The Government's sentencing memorandum spends pages talking about health, the environment and the EPA --- the same topic that the Government claimed that the trial was *not* about.  *See* Doc. [139] (Government Motion to Exclude Experts) at 8-14.  Joel should not be whipsawed into prison by an incendiary claim he was not allowed to address at trial; as to which there is no supporting trial evidence; and one involving a subject the Government flees except when it suits the prosecution otherwise.

**2. Joel's History and Characteristics are Those of a Law-Abiding Citizen, a Consummate Professional, a Devoted Husband and Father, and an Honorable Man Who Puts Others Before Himself.**

The second portion of section 3553 (a)(1) – the history and characteristics of the defendant – are particularly important among the statutory factors.  As the Court noted during the sentencing hearing of Oliver Robinson, "you learn a lot about people based on who they are before their public shortcomings." (Oliver Robinson Sentencing Hearing Transcript  (September 27, 2018) at 12).  Indeed, now is the very moment for such a focus:

32

> Surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513 – 14 (S.D.N.Y. 2006).  Here, the good from Joel's life dramatically outweighs the bad and justifies the sentence requested.  As the Court can see in the more than 100 letters that it has received, Joel has been an extraordinary husband, father, son, brother, community servant, and work colleague.

## FAMILY

"I have seen a loving father who cares that his children know and do what is right.  I've also seen a devoted husband with the heart of a servant, putting his wife and family ahead of other things that can seem more important." (C. Anderson); "Joel is a loving father, husband, son and brother."  (M. Beam); "Joel loves his family greatly.  He beams with pride and joy when he tells stories of their antics.  I truly miss those stories and seeing the love of this father for his daughters." (A. Benschoter); "He is a doting, loving, caring, affectionate and very, very hands on father.  It breaks my heart to think of him being away from his girls." (C. Burton); "Joel has two little girls and is an incredibly involved father. . . . Girls need their father, especially when theirs is a father that builds self-esteem, guides, and nurtures." (D. Carter); "Not only is Joel fiercely involved with his immediate family but has become the patriarch to his extended family.  Joel's mom and dad rely on him heavily for family guidance, emotional, and financial support.  He's also very close to brother, Gerry, his wife and three small children (all nephews).  Joel's mom suffers from MS and he has been instrumental in supporting her through this disease." (A. Carter).

33

## LIFE AND PROFESSIONALISM

Joel Gilbert worked long and hard to achieve a dream: to be an environmental lawyer at one of the premier environmental practices in the Southeast.  He began with little, but worked steadily since his teens, including the years he was in college and graduate school.

> "Joel and I were in similar positions in that we both worked several jobs through college to help make ends meet.  We were runners at local firms in downtown Birmingham and worked at local restaurants at night. . . . Following his career trajectory and his rise to partner at Balch was meaningful to me, as we had both logged time, literally at the ground level, delivering correspondence to prestigious firms, such as Balch, and we wondered what it would be like to be an associate or a partner in such a place. . . . The depiction in the media of Joel as a "privileged" attorney is totally inconsistent with Joel, as I have known him for over 25 years."  (M. Rohdy); "Joel . . . had a very modest upbringing. . . . Joel was a man that was not handed things. . . ." (N. Gilbert); "This is a self-made man that worked incredibly hard to put himself through college. . . . no country club kid, he was raised in a very humble home . . . and drove a 20+ year old car daily until he could save and buy another.  He worked throughout high-school to help his father, mother and younger sister when they found themselves in financial trouble. . . ." (L. Cole)

For almost two decades, he has been held in the highest regard by the bar, including the environmental bar, and even by adversaries.

> "I have known Joel for about 15 years from our common practice in environmental law, usually on opposite sides, and membership in the Alabama Bar Association Environmental Law Section where we both served as officers.  In my extensive dealings with Joel he was professional, candid, ethical, and followed every applicable rule to the letter.   He was courteous and respectful even when we did battle in hotly contested court cases.  He handled large amounts of money for the bar and other people and always did so honestly and professionally.  I have never heard or seen a hint of dishonesty or malfeasance in that period of time.   I have always known him to be a responsible, professional and outstanding lawyer."  (B. Slawson); "Even though our clients as well as Joel and I personally have not always been on the same side of the issues that we have faced I have always known him to be forthright, fair and honest in his dealing with me and other attorneys.  The insights and points that he brought to our discussions and negotiations were such that they always contributed to moving the issue forward for the betterment of our community.  I might add that I have personally heard other attorneys representing environmental interests express the same sentiments about Joel." (L. Montgomery)

He has abided by the ethical rules of the profession and has a wide reputation for doing so.

> "I have seen how he interacts with colleagues and clients.  I've always known him to display the utmost integrity, and to truly earn the trust and respect of those around him." (C. Anderson); "Even in the overly competitive law school environment, Joel was uniformly well-respected by our classmates.  While he strove to do well in law school, he did so through hard work and discipline, not by cutting corners or compromising his ethical or moral standards. . . . I know Joel Gilbert to be a man of integrity and good character. . . . a hard-working and principled lawyer and man, who strives to do what is right. " (S. Blanton); "Joel . . . [paid] close attention to detail regarding the law and regulation, including government guidelines, always in the utmost of integrity and professionalism" (J. Cowden); "He and I were assisting in a matter during which a subtle reference to falsified recordkeeping was made by a third-party. . . . He . . . addressed it head on because legally and ethically it was the right thing to do—even though it was uncomfortable and would forever alter the firm's relationship with that client. He did the right thing."  (T. DeLawrence)

## MENTOR

He has been a mentor to younger lawyers and to young men and women generally.

> "Often, I was the only younger attorney working with Joel, and Joel would have a direct relationship with the owners of the entities we were representing, so I felt much more of a connection to the clients and the work we were doing for them.  Joel gave me a lot of responsibility and was a good mentor. . ." (T. Simpson); "Joel and I worked together extensively in my first few years at Balch.  He was the first person to include me in his work and went out of his way to take me "under his wing" to provide me every opportunity to succeed at the firm.  It would be impossible to count the number of hours Joel dedicated to explaining the basics of environmental law to me or to field my elementary questions during these early years in my career.  No matter how busy he was, Joel was always willing to stop what he was doing and hash out what was troubling me." (T. DeLawrence); "I joined a hunting club of which Joel was the organizer. . . . Joel's interaction with my son and other young men and women in the club highlighted his nature.  Joel was always there to help these young people grow.  He did it with clear direct feedback in an honest and meaningful way.  He took the time to teach our kids respect for one another, respect for the club, and respect for nature."  (B. Jessup)

## TRUST AND CHARITY

Of extraordinary note is how Joel has for years served as the unpaid trustee of a trust set up by his grandfather for the benefit of his uncle's three daughters. The uncle died an alcoholic, and the three girls made significantly bad choices in their lives, often fighting Joel when he was working to help them.

> "Joel took on the responsibility of trustee on his late Grandfather's Trust, which he managed very carefully to ensure his Grandfather's wishes were carried out regarding 3 minor children named in the Trust, Joel's nieces.  Through the years, the nieces endured drug addiction and unplanned pregnancies, which Joel promptly handled by calling various centers to find help for the girls; he also guided them in working towards a career, and one is on track to become a counselor."  (L. Shaper); "Joel is the trustee of his deceased grandfather's estate located outside of Heflin, AL.  As trustee, Joel's responsibilities include the active management of several thousand acres of timber and farm lands, as well as administering financial oversight and providing for his grandfather's three granddaughters.  In this duties, Joel has had to act as a surrogate father to his cousins and apply tough love several times to ensure that his cousins received their education, spent their money responsibly, stayed out of trouble, received the help and support they needed when they struggled with substance abuse, and faced other life challenges.  Joel's impact on their lives has been immeasurable."  (M. Davis)

In addition, Joel has been involved with and actively supported the Multiple Sclerosis Society, the Exceptional Foundation of Homewood, Forever Wild and the Alabama Urban Forestry Association.  He also served for years on the board of the Birmingham chapter of the Alabama Wildlife Federation and has provided free legal services to King's Ranch.[4]

## B.  Section 3553(a)(2):  Seriousness and Punishment, Deterrence and Protection.

### 1.  A Downward Variance Would Reflect Both the Seriousness of the Offense and an Appropriate Punishment.

---

[4] The Government tries to smear Joel's character by claiming that he harmed Balch by "selfishly [putting] his partners and firm at risk"; that he lied to Mike Tracy; and that he poisoned Tarrant schoolchildren. (Government Sentencing Memorandum at 29-31).  The Court's review of the letters and video statements from current and former Balch lawyers will allay the first concern.  We address Mr. Tracy's testimony *supra* at 15-16.  We address the Tarrant schoolchildren – yet another Government mispresentation to the Court – *supra* at 28-32.

The crimes for which Joel stands convicted are, without a doubt, serious crimes. He understands that fact; he will never forget it.  The reality, though, is that the loss and public shame that Joel has already suffered will provide ample specific deterrence (to him) and general deterrence (to the community at large) and have already inflicted permanent, life-changing punishment on him.

First, consider Joel's indictment, heralded by the United States Attorney himself at a televised news conference and followed by a lengthy, high-profile trial publicized – sometimes viciously -- by opinion writers, bloggers and social media commenters.

> "See Joel as the husband, father, son, brother, attorney, colleague, and friend that he truly is and not the caricature that has been portrayed in the press." (M. Davis); "He cares not just about family, but about people.  People in his community, his clients, his neighbors. . . . The 'Joel Gilbert' the media chose to portray is not the Joel Gilbert I know." (A. Davenport); "The person described in several opinion columns is not the Joel Gilbert I have come to know." (C. Waldrep); "The depiction in the media of Joel as a "privileged" attorney is totally inconsistent with Joel, as I have known him for over 25 years."  (M. Rohdy).

Second, his conviction, disbarment, public shame and private upheaval --- these are in themselves devastating punishments.

> "Joel will no longer be able to practice law, meaning his ability to earn a living has been forever altered.  Moreover, the stigma associated with his conviction will forever be his albatross.." (T. DeLawrence); "Joel will most likely never be able to practice law again, something that he truly enjoyed. . . . It is going to be extremely difficult to find work and provide for his family after all of this." (M. Kessler); "It is important to recognize the significant career-crushing blow that Joel and his family have already suffered at this point. . . . his chosen career is over and further work in his profession is impossible."  (J. Noles); "Joel's life from this point forward will be full of penalties and penance.  He will not be able to work in his chosen profession . . . . (R. Carter).

<u>Third</u>, a Guidelines sentence would punish not only Joel but those closest to him who also depend upon him.

> "Not only is Joel fiercely involved with his immediate family but has become the patriarch to his extended family.  Joel's mom and dad rely on his heavily for family guidance, emotional, and financial support.  Joel's mom suffers from MS and he has been instrumental in supporting her through this disease."  (A. Carter); "Joel provides for his family financially, emotionally, and spiritually.  Joel puts his family needs above everything else.  He is the rock of his family."  (B. Jones)

But perhaps the most far-reaching damage would not be to Joel or any adult but rather to Joel's two daughters, one age 5 and one aged 1.

> "The biggest impact would be to Joel's daughters." (C. Denson).

Despite the demands of his career, and in addition to the years of service to his cousins as the trustee, Joel has been an extraordinary presence in his young daughters' lives, as shown in just a sampling from the letters that the Court has received.

> "His two little girls adore him, and anyone can see the love and adoration he has for them. . . . I honestly do not see how his family will survive without him in the picture. He is their stabilizing force. (K. Grace)  "No matter how many family members and friends step in to assist Ally with the girls, it will not replace the absence of their father."  (B. Jones)

The health of Joel's youngest daughter remains an issue.

"Both [of his] girls were born premature, and Olivia has struggled and continues to struggle with serious medical problems that have required multiple surgeries. These issues require considerable attention and dedication from both Ally and Joel—above and beyond the sizeable effort required to be a loving parent. It pains me to think of the damage that would result to their family if Joel is absent from their lives for any substantial length of time, especially during Joel's girls' formative years." (T. DeLawrence);  "Both of Joel's young daughters . . . were born premature and spent the first two months of their lives in the NICU. [The 1 year-old daughter], especially, has undergone numerous surgeries and continues to struggle with health issues. I can honestly say that I have never met a more devoted, loving, kind and patient husband and father than Joel. A father is critically important in the growth, education and development of his children, especially with daughters. . . . Those little girls literally cling to their father. He is at the center of their world, and they, his." (M. Davis)

As the Court saw in the sentencing video, Joel's cousin was the beneficiary of a trust set up by his grandfather and also the recipient of much of Joel's time, effort and love. She can speak to the loss of a father.

"I personally understand the impact losing a father has on one's life. I needed my father more than ever when I lost him. . . . [I] t is imperative for him to be home with his girls. Joel is an amazing father and he is raising his daughters in a supporting, loving, caring, stable environment." (S. Thrower)

The Court will recall the testimony of one of the Government's witnesses, Joel's legal assistant. She is perhaps as qualified as anyone to predict the effect of Joel's absence on his girls.

"Joel is a very involved father of two girls. His oldest is 5 years old. He often brought his eldest daughter to work, and anyone could see the strong bond between them. She is the quintessential "daddy's girl" believing she is a princess and Joel is, of course, a prince. Joel recently told me that he has been trying to explain to her that he may have to leave her for a while, in which she responded, "Oh, daddy, that only happens in Disney movies." I can't imagine what a long absence from her father would do to her." (L. Shaper)

### 2. Deterrence (of Joel) and Protection (of the Public) Counsel in Favor of a Downward Variance.

A Guidelines sentence in this case is necessary neither to deter Joel from similar crimes nor to protect the public.

He has lost his law license, something he worked much of his adult life first to obtain and then to burnish as part of a career at one of the leading law firms in the southeastern United States. His reputation has been destroyed in as high-profile a manner as one could imagine in this community. Indeed, the felony conviction alone will adequately deter him from committing any crimes in the future. See, e.g., *Adelson*, 441 F. Supp. 2d at 514 (pointing out that, "[w]ith his reputation ruined by his conviction, it was extremely unlikely that [the defendant] would ever involve himself in future misconduct."). Because the crimes of Joel's conviction relate specifically to his practice as a lawyer and have resulted in the loss of his law license, it is essentially impossible that he could reoffend in the same manner.

For that reason, "in white collar cases," including this one, "general [rather than specific] deterrence is usually the primary focus."[5]  Whether or not there was a need to "send a message" to the community of Alabama lawyers and their business clients with regard to the pitfalls of bribery and the honest-services statute, the Court may take judicial notice of the fact that such a message has been sent.  After this trial, few lawyers in Alabama do not recognize the name "Joel Gilbert"; fewer still will ignore the implications of the case for themselves, their law firms and their clients.

---

[5] Todd Haugh, *Sentencing the Why of White Collar Crime*, 82 Fordham L. Rev. 3143, 3182 (footnote omitted) (2014).  Haugh concludes generally that it is appropriate for judges, in sentencing, to inquire into the individualized "why" of an offender's conduct.

### 3.   The Government's Sentencing Request Drops All Pretense of Discernment

"Short of an act of violence, the defendants could not have asked Oliver Robinson to commit a more egregious crime than selling his elected office."  (Government Sentencing Memorandum at 26).

The Government thus  invites comparisons to other crimes in the federal code. Child pornography?  Human trafficking?  Selling nuclear secrets to an enemy of the United States?  Financial transactions with terrorist organizations?  Embezzlement from a charity (as Oliver Robinson did)?  Multiyear tax fraud (as Oliver Robinson committed)? The Government asks the Court to conclude that what it heard and saw of Joel Gilbert in almost three weeks of trial was more egregious than these offenses.

The Government then offers three claims as a basis for the reasonableness of an 8-year prison sentence: the recycled North Birmingham "health" argument, the notion that Joel has damaged "our government as an institution," and the charge that he has "breach[ed] several ethical rules of the Alabama Bar Association."  (Government Sentencing Memorandum at 27).  None of these claims are supported by evidence from trial.

The "health" argument has already been addressed.  *See supra* at 25-32.

As to "government as an institution," the Court oversaw a criminal trial, not a political trial (though the Government tried to turn it into a political trial, with days of testimony about letter-writing, and closing arguments about "shining a light").  No insitution of government was "damaged."  As the Court heard at trial, no branch of state

government, no agency of the federal government, no politician (except Oliver Robinson), and no government official or employee did (or did not do) anything except what would have happened anyway.

As to the state bar and its rules, those matters were not offered for the jury to consider in this criminal trial.  Joel will lose his law license because he has been convicted of a felony, not because he broke a bar rule.  He has not committed perjury, embezzled money in trust, violated client confidences or taken any of the other dozens of steps that could potentially end up as a violation of the bar rules.  Similarly, there was little or no evidence at trial that correlated his income at Balch with the acts that formed the basis of his conviction.  Joel was a rising star at Balch before Drummond and Oliver Robinson, and would have continued to be a star, with or without them.

## C.  Section 3553(a)(6):  Comparable Cases Show that a Variance is Appropriate.

Public corruption and similar fraud cases are unique in that they often present the court with "outlier" defendants.  Such defendants not only present to the Court with no criminal history at all, but with personal histories that demonstrate their criminal conduct to be a marked deviation from an otherwise successful, law-abiding servant life that is often an overflowing of blessings on family, friends, and co-workers.  That history is certainly what the Court encounters here with Joel Gilbert. For this reason, it appears to be somewhat unusual for defendants similar to Joel to be sentenced within their applicable Guidelines range.

Indeed, our survey of recent prominent national public corruption cases; historical cases within the state of Alabama; and the most recent case involving a lawyer convicted

of conspiring with a client demonstrates that it is typical for defendants similar to Joel to receive sentences *substantially* below their applicable Guidelines range.  The data is reflected in a Sentencing Chart attached to this Memorandum (Exhibit 8).  All ten cases reflected in the Chart relate to defendants who were sentenced after guilty verdicts at trial.  Thus, none of these cases reflect an adjustment for cooperation or acceptance of responsibility due to a guilty plea.  For the ten cases in the Chart, the survey indicates a variance or departure in every case with a percentage of reduction ranging from 36% to 83%.[6]  The ultimate sentences imposed range from 18 months (83% reduction) to 120 months (x2 (1 was 36% reduction, 1 was 43% reduction)).  The defendants reflected in the Chart cross racial, ethnic, and religious boundaries and include both bribers and bribees.  The defendants also present varied professional backgrounds and include a lawyer, the CEO of a publicly traded company, governors, a congressman, and local officials.

Many of the defendants in these cases engaged in far more egregious conduct than Joel.  To cite a prominent and geographically relevant example, a number of the bribers in the *United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010) cases received sentences that represented a 76% reduction from their applicable Guidelines, despite delivering several hundred thousand dollars in cash and other payments directly to members of the Jefferson County Commission in exchange for exorbitant sewer repair contracts valued as high as $178 million.  *See McNair* at 1216-34.  In 2016, Pennsylvania Congressman

---

[6] The reduction percentages are calculated by comparing the sentence imposed to the very bottom of the applicable Guidelines range.  Thus, the reduction percentages represent the most conservative calculation possible.

Chakka Fattah was sentenced to 120 months in the Eastern District of Pennsylvania, a 43% reduction from the bottom of his Guidelines range of 210 – 262 months.  *See* https://thehill.com/homenews/house/309958-former-rep-chaka-fattah-sentenced-to-10-years-in-prison.   Congressman Fattah received this reduction despite egregious facts demonstrating that he stole money from an educational nonprofit to pay off an illegal campaign contribution.  *Id.*  Similarly, just this year New York State Assembly Speaker Sheldon Silver received a 68% reduction in his sentence after a second trial and conviction on corruption charges that spanned 15 years and involved millions of dollars in direct kickbacks to Mr. Silver.  *See Generally United States v. Silver*, 864 F.3d 102, 119-124 (2nd Cir. 2017)

On the other hand, in the two cases where courts imposed reductions in excess of 80%, press reports indicate that the sentencing courts went out of their way to note the extraordinarily good qualities of the human beings they were sentencing.  The most recent example, and perhaps most relevant, is the sentencing of attorney Evan Greebel in the Eastern District of New York.  Mr. Greebel was convicted of assisting the most infamous CEO in recent memory of defrauding his company, a company that was actually Mr. Greebel's client.   Despite his conviction, and a Guidelines range of 108 – 135 months in prison, Judge Kiyo Matsumoto sentenced Mr. Greebel to just 18 months in prison.  In imposing the sentence, Judge Matsumoto noted that his conduct was egregious, but also commented on his profound personal history, calling him "truly generous and kind."  *See* https://www.wsj.com/articles/martin-shkrelis-former-lawyer-sentenced-to-18-months-in-prison-1534541458.

The other case where the court's imposed sentence was a reduction in excess of 80% was the seminal prosecution of Virginia Governor Bob McDonnell.  There, the initial Guidelines range was 120 – 151 months, which the court reduced at sentencing *sua sponte*.  Ultimately, Judge James Spencer imposed a sentence of just 24 months and noted that Governor McDonnell's personal history demonstrated him to be "a generous decent man who has done a lot of good."  In light of who Governor McDonnell was as a human being, Judge Spencer dismissed a Guidelines range sentence as "unfair" and "ridiculous."  *See*  https://www.richmond.com/news/virginia/government-politics/mcdonnell-trial-judge-a-price-must-be-paid/article_025024c5-5bbb-5ca3-8772-323a12f37e4b.html.

All of these things, and more, can and have been said about Joel Gilbert.

## CONCLUSION

The Guidelines range contained in the PSR overstates Joel's level of culpability. As a first-time, non-violent offender, the Section 3553(a) factors weigh in his favor and warrant a variance from whatever Guideline range the Court ultimately determines to be appropriate.  Joel respectfully requests that the Court sentence him accordingly, and as follows:

(1) **Imprisonment**.  Incarceration for one (1) year and one (1) day.

(2) **Supervised Releas**e.  Imprisonment to be followed by a term of supervised release of 1 to 3 years pursuant to USSG 5D1.2(a)(2).

(3) **Home Confinement**.  As a special condition of supervised release, Joel shall serve the first six (6) months of the supervised release term  as home confinement,

verified by electronic monitoring paid for by Joel; and

(4) **Community Service**.  As an additional special condition of supervised release,

Joel shall perform two hundred (200) hours of community service.

Respectfully submitted this 18th day of October, 2018.


*/s/ Jackson R. Sharman  III*
One of the Attorneys for Joel Gilbert


OF COUNSEL:
Jackson R. Sharman III
*jsharman@lightfootlaw.com*
Brandon K. Essig
*bessig@lightfootlaw.com*
Jeffrey P. Doss
*jdoss@lightfootlaw.com*
LIGHTFOOT, FRANKLIN & WHITE, LLC
400 20th Street North
Birmingham, Alabama 35203
(205) 581-0700


## CERTIFICATE OF SERVICE

I certify that on this 18th day of October, 2018, I electronically filed the foregoing with the Clerk of Court via ECF, which will send electronic notification of such filing to all counsel of record.


*/s/ Jackson R. Sharman, III*
Of Counsel